UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
BAKKEN RESOURCES, INC.,

|  |  |  |
|---|---|---|
|  | *Plaintiff*, | **FIRST AMENDED COMPLAINT** |
| v. |  |  |
|  |  | **JURY TRIAL REQUESTED** |
| JOSEPH R. EDINGTON, JEROD EDINGTON, RYAN EDINGTON, IWJ CONSULTING GROUP, INC, TRIAX CAPITAL MANAGEMENT, INC., MARYCLIFF INVESTMENT CORP., AMERICAN CORDILLERA MINING  CORP. |  | Case No:15-CV-8686 |
|  | *Defendants* |  |

-------------------------------------------------------------------X

I.     **Parties in This Complaint**

        *Plaintiff*        Bakken Resources, Inc.
                                    1425 Birch Ave, Suite A
                                    Lewis and Clark County, City of Helena
                                    Montana 59601

| | |
|---|---|
| *Defendant No. 1* | Joseph R. Edington<br>702 Edenderry Ct.<br>Spokane County, City of Spokane<br>Washington 99223 |
| *Defendant No. 2* | Jerod Edington<br>c/o Hydrodynex, Inc.<br>2009 E. 30th Ave.<br>Spokane County, City of Spokane<br>Washington 99203 |
| *Defendant No. 3* | Ryan Edington<br>5227 North Walnut St.<br>Spokane, WA 99205 |
| *Defendant No. 4* | IWJ Consulting Group, LLC<br>451 West 21St Ave.<br>Spokane, WA 99203 |
| *Defendant No.5* | Triax Capital Management, Inc.<br>c/o Joseph Edington<br>1314 S. Grand Blvd. # 2-176<br>Spokane County, City of Spokane<br>Washington 99202 |
| *Defendant No.6* | Marycliff Investment Corp.<br>c/o Joseph Edington<br>2910 East 57th Ave., Suite 5<br>Spokane County, City of Spokane<br>Washington 99223 |
| *Defendant No.7* | American Cordillera Mining Corporation<br>c/o Nevada Agency and Transfer Company<br>50 W. Liberty St., Suite 880<br>Washoe County, City of Reno<br>Nevada 89501<br>(509) 671-9401 |

2

**Contents**

I.   Parties in This Complaint ................................................................................ 1

II.  Basis for Jurisdiction ................................................................................... 5

   Subject Matter Jurisdiction ......................................................................... 5

   Personal Jurisdiction ................................................................................... 6

   Venue ........................................................................................................... 6

III.  Statement of Claim .................................................................................... 7

   General Factual Background Common to all Claims for Relief ................... 7

      Parties and Their Relation to One Another ............................................. 8

         Plaintiff .............................................................................................. 8

         Defendants ......................................................................................... 9

      Certain Relevant Non-Parties affiliated with the Parties ........................ 11

      Overview and Background ...................................................................... 14

      Particular Background Relating to Defendants' Securities Laws Violations and Other Laws to Plaintiff's Detriment ....................................................... 24

         Edington's First Deal Attempt Involving Val Holms' Minerals Failed Using APD ........................................................................................... 24

         Edington Was Manipulative in Backing Out of the First Deal Attempt to Save Face .......................................................................................... 40

         Edington's Second Deal Attempt for Val Holms' Minerals Succeeded Using MLS ........................................................................................... 42

         Grandiose Representations Were Essential to the Promoter's Fund Raising Plan 46

         The Promoter Structured the Merger to Have Excessive Complexity and Ambiguity ......................................................................................... 49

         Promoter's Advice to Misuse a Form S-8 Registration for His Own Benefit ...... 53

         Promoter's Advice to Selectively Provide Material Information ........................ 54

         Promoter Requesting to Borrow Money from Val Holms While Exaggerating Deal ......................................................................................... 57

         Promoter's Patent Lack of Respect for Authority ................................. 59

         Promoter's Tendency to Falsify Documents ......................................... 62

         Promoter Maintaining Control over Both Sides of the Deal .................. 64

         Investment and Public Relations Efforts Centered in New York City ................. 66

         Promoter's Facilitation Network Comprised a Range of Questionable Professionals ...................................................................................... 66

         Promoter's Conversion of a Bakken Subsidiary's Assets ...................... 69

Manipulating Facts by Forging Documents to Conceal Information From Auditors ................................................................................................... 72

Court Held That Promoter Acquired Eight Million "Shares of Bakken by Fraud" ................................................................................................... 74

Promoter's Intentional Evasion of Securities Laws Through the Use of Strawmen ................................................................................................... 78

Promoter's Spiteful Attacks Against Bakken and its Leadership ......................... 80

Promoter's Orchestration of Threats and Harassment Against Bakken's Principals ................................................................................................... 83

Deceitful use by Promoter of False Shell Companies in Order to Defraud .......... 86

Promoter's Material Omissions and Misrepresentations During Capital Formation ................................................................................................... 91

Promoter's Contempt by Violating the Injunction ................................................. 94

Collusion with Others Meant to Prevent Proper Business Activities ................... 94

Malicious Prosecution and the related Conspiracy ............................................... 94

Detailed Facts Relating to Defendants' Violation of the Racketeering Influenced and Corrupt Organizations Act ................................................................................ 104

Triax Capital Management ................................................................................. 108

American Cordillera Mining Corporation (formerly APD Antiquities, Inc.) ..... 109

Arbios Systems Inc. (formerly Historical Autographs USA, Inc.) ..................... 111

Cordex Pharma (formerly Duska Therapeutics, formerly Shiprock, Inc.) ......... 113

Global MobileTech (formerly Trevenex Resources, Inc.) ................................... 115

Greenplex Services, Inc. .................................................................................... 120

Hyrdodynex, Inc. ............................................................................................... 123

Bayhorse Silver Mine ........................................................................................ 123

IV. Relief ................................................................................................................. 126

First Claim for Relief ............................................................................................. 126

Second Claim for Relief ........................................................................................ 130

Third Claim for Relief ........................................................................................... 132

Fourth Claim for Relief ......................................................................................... 133

Fifth Claim for Relief ............................................................................................ 134

Sixth Claim for Relief ........................................................................................... 136

Seventh Claim for Relief ....................................................................................... 137

Eighth Claim for Relief ......................................................................................... 138

Ninth Claim for Relief ........................................................................................... 140

Tenth Claim for Relief ........................................................................................... 140

Eleventh Claim for Relief ............................................................................. 142

Twelfth Claim for Relief .............................................................................. 144

V.  Demand for Jury Trial .................................................................................. 146

## II.  Basis for Jurisdiction

1.     Jurisdiction and venue are appropriate in the Southern District of New York due to federal question jurisdiction and diversity of citizenship because defendants have availed themselves of the benefits and protections of the jurisdiction, and because significant events giving rise to the causes of action occurred in the Southern District.

### Subject Matter Jurisdiction

2.     Jurisdiction in this case may be based upon either federal question or diversity of citizenship jurisdiction under 28 U.S.C. § 1331 or § 1332.  The case arises under the following statutory provisions: the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §1962; Section 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j; Section 17 of the Securities Exchange Act of 1934, 15 U.S.C. § 78q; and various contempt provisions of the Criminal Code such as 18 U.S.C. § 402.  Diversity of citizenship jurisdiction is also proper under 28 U.S.C. § 1332 because no defendant or plaintiff shares a state of domicile, and the amount in controversy exceeds $75,000.  Plaintiff Bakken Resources, Inc. is a domiciliary of both Montana and Nevada, since it is a Nevada corporation with its principal place of business in Montana.  Defendants are domiciled in other states.  Defendants all have considerable contacts with the State of New York in their respective business activities, as described below.

3.     Plaintiff's supplemental state law claims find proper jurisdiction in this court under 28 U.S.C. § 1367.  They are so related to claims in this action that they form

part of the same case or controversy.  None of the state claims are expected to raise novel or complex issues of state law.  Whether considered collectively or individually, the state law claims do not predominate over claims for which this court has original jurisdiction because the bulk of this case arises under federal law.  There is also no other compelling reason, to the best of Plaintiff's understanding, for declining supplemental jurisdiction over Plaintiff's supplemental claims.

**Personal Jurisdiction**

4.     This Court has personal jurisdiction over the foreign Defendants.  They have transacted business within the State of New York by hiring a New York promoter for their stocks and promoting their investment opportunities within New York.  Foreign Defendants committed tortious acts of fraud within the State of New York, which they should reasonably have expected to have consequences in New York.  Such activity derived substantial revenue for the foreign Defendants from interstate commerce.

5.     Specifically, Defendants have conducted substantial business activities for several years, including activities directly relating to the claims stated herein.  These Defendants have conducted fundraising activities in New York for Plaintiff Bakken Resources, Inc. and other entities, and they also solicited legal advice from counsel in New York.

**Venue**

6.     Venue is proper in this District pursuant to §27(a) of the Securities Exchange Act of 1934 because defendants materially promoted their securities in the District, causing venue to be proper also under 28 U.S.C. § 1391 in this judicial district as a district in which a substantial part of the events giving rise to the claims occurred.

III.     **Statement of Claim**

"As the twig is bent so grows the tree."

– Alexander Pope, 1734, *Epistle to Cobham*, 149-50.

**General Factual Background Common to all Claims for Relief**

7.      The relevant time period for this case's RICO claims spans from January of 2010 through the present.

8.      For all other claims, the relevant time period for this case spans generally from November of 2010 through the present.

9.      This case revolves around the story of how a company came into existence, the small group of people who pulled the strings during that process, and the man who led his enterprise.  He implemented and orchestrated various acts that harmed the company in such a way that, at the time, those things did not individually appear to be deceitful.  Over time, however, that person's purported help and advice became suspect and was questioned.  He would discredit everyone opposing him, going so far as to call an attorney for U.S. Securities and Exchange Commission a "Rotten little Asian bitch."  This combative approach led to as a series of disagreements, conflicts, and litigations.  As time progressed, it became clear that the company's very existence was the product of deeply engrained deceit such that nearly every one of the company's outside facilitator's were under a common influence adverse to the company's interest.   It also became apparent that the company's misfortune is not unique to it.  The same group of people involved in its creation, including the group's mastermind Joseph R. Edington, is experienced at formulaically implementing the same type of scheme, whose devious tactics and cast of

7

characters unfortunately comprise the story underpinning several other companies.   This lawsuit seeks to free one such company from its crippling foundation, to expose the people who laid that foundation, and to recover for the harm that foundation has caused.  The story begins in 2009.

## PARTIES AND THEIR RELATION TO ONE ANOTHER

### Plaintiff

10.     Bakken Resources, Inc. (the "Company," "BRI," or "Bakken") is a Nevada Corporation with securities registered under Section 12(g) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78l(g), and with a principal place of Business at 1425 Birch Ave., Suite A, Helena, Montana 59601.

11.     From Bakken's inception in late 2010 through March 24, 2015, Val M. Holms ("Val Holms") was Bakken's President and CEO.

12.     During Bakken's capital formation, Val Holms personally contributed Bakken's principal asset, consisting of roughly 2,500 net mineral acres spread across approximately 6,000 acres of land in the Northwest United States in and around the state of North Dakota.

**Defendants**

13.     Joseph R. Edington ("Edington") is domiciled in of Washington State.

14.     Edington is a promoter under securities Rule 405, 17 C.F.R. § 230.405 and has more than 30 years of experience promoting transactions involving public companies.

15.     At all relevant times, and currently, Edington was subject to a permanent injunction against committing further securities fraud in violation of anti-fraud provisions of the Securities Act of 1933 ("Securities Act"), as well as against transacting securities either as or through a broker-dealer without proper registration or a valid exemption.  *See* Civil Action No. C-88-511-RJM (E.D. WA, January 17, 1990) (granting the permanent injunction sought in an enforcement action by the U.S. Securities and Exchange Commission) [hereinafter the "Injunction" or "Edington's Injunction"].

16.     During Bakken's capital formation, which occurred in the second half of 2010, Edington was the promoter, acting as a principal or agent for Bakken, Val Holms, and various other natural persons and entities.

17.     Jerod Edington ("Edington II") is domiciled in the State of Washington. He maintains a LinkedIn account indicating that he has 10 years of mergers and acquisitions experience related to private equity investments.  Edington II's LinkedIn profile puts him out as the "owner" of a public company named HydroDynex, Inc., a Nevada company whose principal executive office is listed in multiple public filings as a residential address in Spokane, Washington.  HyrdoDynex filed an initial Form S-1 registration statement on June 30, 2008, and reports in its most recent Annual Report for 2013 on Form 10-K, filed September 15, 2014, that it had cash assets of just $162, other assets of only $1,000, and a stockholders' deficit of $41,228.  Of the two available

HydroDynex phone numbers, one (702.884.2150) connects to the personal cell phone of a woman named Liz, who claims to have no knowledge of HydroDynex, and the other (702.722.9496) goes immediately to a generic voice-mail with a computerized male voice that has nothing to do with the company. Edington II's LinkeIn profile also states that he earned a B.S. from the University of Washington in Zoology, Biology, Medicine, and Radiation Oncology as a result of attending that school for four years from 1996 to 2000.

18.     Upon information and belief, Ryan Edington ("Edington III") is domiciled in the State of Washington.

19.     Edington II and Edington III are Edington's sons and each other's siblings.

20.     Edington II is the oldest sibling, followed by Edington III.

21.     IWJ Consulting Group, LLC was a Nevada limited liability company whose managing member was Edington II and whose registered agent was Edington II's younger sister, Janelle Edington. IWJ Consulting Group regularly appears in consulting agreements mentioned in or attached as exhibits to public disclosures filed by the various public reporting companies that the Edingtons have directly or indirectly controlled.

22.     Triax Capital Management, Inc. was a Nevada corporation that served as one location where the Edingtons placed assets for, among other things, hiding ill-gotten gains or obscuring their beneficial ownership in various issuers.

23.     Marycliff Investment Corp. was a Washington corporation registered to Edington and served as another location where the Edintons placed assets for, among other things, hiding and investing ill-gotten gains.

24.     American Cordillera Mining Corporation is the company to whom Edington transferred silver mining assets that belong to Plaintiff Bakken.

### CERTAIN RELEVANT NON-PARTIES AFFILIATED WITH THE PARTIES

25.     Janelle Edington ("Janelle") is a mother domiciled in the State of Nevada. She maintains a LinkedIn profile listing her as having been a cocktail waitress at the Venetian Hotel, Resort, & Casino since March of 2004.  Janelle's LinkedIn profile indicates that she has also been a private consultant for Splango Media Holdings since May of 2015.  It also states that she earned a B.B.A. from Washington State University in Business Administration and Law as a result of attending that school for four years from 1999 to 2003.

26.     Janelle has been compensated for being listed in public filings as holding one or more principal officer roles for the various public reporting companies that the Edingtons have directly or indirectly controlled, regardless of such companies' operational status.

27.     Janelle is Edington's daughter, and the youngest sibling of Edington II and Edington III.

28.     Jennifer Edington is Edington II's wife.

29.     Sherry Edington is Edington's wife and is domiciled in the state of Washington.

30.     Manuel Franco Graiwer ("Graiwer") is a Mexican national domiciled in the state of California.  Graiwer is one of two partners at the small law firm of Graiwer & Kaplan, LLP, located in the Korea Town district of Los Angeles, practicing in personal injury, workers compensation, and related matters.

31.     Graiwer has worked closely with Edington and his associates over the years on various business dealings, and he has been put out during such dealings as an investor.

32.     Graiwer facilitated Edington's promotion activities related to Plaintiff Bakken Resources through a close relationship with Edington.

33.     Marisa Graiwer is Graiwer's daughter.

34.     Kenneth Graiwer is Graiwer's son.

35.     Allan Holms is Val Holms' half-brother who introduced Edington to Val Holms, and who underwent during the first half of 2010 the preliminary stages of forming a public company with Edington and Val Holms using Val Holms' mineral assets, but the deal fell through.

36.     Allan Holms is domiciled in the state of Washington.

37.     BR Metals Corporation is a wholly owned private subsidiary of Plaintiff Bakken.  Bakken formed BR Metals in 2011 for the purpose of exploring silver mining.

38.     Li & Company, PC was the auditor the Edingtons selected to issue audit opinions for some of the various shell companies they controlled, including Multisys Language Solutions, Inc.

39.     APD Antiquities, Inc. was the shell company Edington unsuccessfully sought to use for a reverse merger to form Bakken in the first half of 2010.

40.     Multisys Language Solutions, Inc was the shell company Edington successfully used for a reverse merger to form Bakken in the second half of 2010.

41.     Multisys Acquisitions, Inc. was the subsidiary that MLS formed for the purpose of effecting the merger that formed Bakken.

42.      Roil Energy, LLC was the Nevada company Edington structured for the purpose of transferring Val Holms' assets to Bakken as part of a failed merger attempt during the first half of 2010.

43.      Holms Energy, LLC is the Nevada company Edington structured as the investment vehicle that transferred Val Holms' assets to Bakken as part of a successful merger attempt during the second half of 2010.

44.      Karen Midtlyng is a director and the corporate secretary of Bakken.

45.      Michael Espey was the corporate and securities attorney for MLS, and he was also Bakken's corporate and securities attorney post-merger until the Company retained its current outside counsel.

46.      Empire Stock Transfer, Inc. was the transfer agency Edington initially chose for MLS and Bakken to use for their securities.

47.      Matthew Blevins is an affiliate of Edington's who, during the relevant period, was vice president of operations for Empire Stock Transfer, Inc.

48.      Nevada Agency and Transfer Company ("NATCO") is Bakken's current transfer agency.

49.      Osbourn Cox is believed to be an online alias the Edingtons use to disparage Bakken and people related to the Company.

## OVERVIEW AND BACKGROUND

50.     Edington typically promotes public companies that have no or limited operations and also have limited or no assets.

51.     Many of the public companies that Edington has promoted by are known as a "shell" companies, some are known as a "penny stock" companies, and some are known as a "blank check" companies.

52.     Edington has been involved in several transactions known as "reverse mergers," whereby a penny stock, shell, or blank check company merges with a non-public company that has either assets or business operations.

53.     Edington's role as a promoter in such reverse mergers has varied from advising the overall transaction to representing the interests of the acquirer or acquired entities.

54.     Edington has involved both Edington II and Edington III into aspects of Edington's business.

55.     Despite having no formal legal or securities training, Edington II has been consulting companies in order to help prepare for transactions such as a reverse merger.

56.     Edington III has offered additional support and consulting for companies that are seeking to become public.  Upon information and belief, Edington III has no formal legal or securities training either.

57.     Edington was introduced to Val Holms by Val Holms' half-brother, Allan Holms, which led to a series of meetings between Val Holms and Edington.  These meetings first took place in Spokane, Washington around December 2009.

14

58.     Edington learned that Val was the holder of certain valuable oil and gas assets located in North Dakota.  This area is commonly known as either the Bakken formation or the Williston Basin.

59.     The Bakken formation comprises an oil and gas producing geological formation lying approximately 8,000 to 10,000 feet below the surface.  Many oil operators currently drill for oil and gas in the Bakken formation using so-called horizontal drilling techniques, which during the relevant period was relatively new.

60.     During initial discussions between Edington and Val Holms, Edington proposed that Val Holms put his mineral assets into a public shell company as part of a reverse merger transaction with the intention of forming a new public company based on those assets.  The company that eventually resulted, after one failed attempt, was Plaintiff Bakken Resources, Inc.

61.     Edington outlined his plans extensively with Val Holms in many detailed e-mails, discussions, and meetings.

62.     Edington told Val Holms that Val Holms would earn a significant return on his assets by pursuing a reverse merger plan, which initially involved Allan Holms' efforts and investments.

63.     Allan Holms began participating in such reverse merger plan, but Val Holms decided that he did not want Allan Holms to be involved because of personality conflicts that developed in part due to Allan Holms not contributing meaningfully to the proposed venture.

15

64.     Val Holms told Edington that Val Holms did not want Allan Holms involved in the proposed transaction and that there would be no transaction if Allan Holms was involved.

65.     Edington told Val Holms that Edington would "take care of everything" and asked that Val Holms follow all of Edington's directions in order to do so, which Val Holms agreed to do.

66.     Edington represented falsely to Val Holms that Edington had a good sense of what Allan Holms wanted and that Val Holms should trust Edington because he had such information.

67.     Edington proceeded to orchestrate a fraudulent plan, at Plaintiff's expense, telling unnecessary fabrications to Allan Holms in order to dissuade Allan Holms from taking any personal interest in a proposed transaction involving Val Holms' mineral assets.

68.     Edington's overly complicated and convoluted plan involved drafting numerous "ghost-written" e-mails to Allan Holms purportedly written by Val Holms in order to convince Allan Holms that Val Holms did not wish to engage in any reverse merger transaction whatsoever.

69.     Edington also prepared several legal documents that Edington indicated had the definitive legal effect of dissolving an entity named Roil Energy, LLC that was formed for the possible exploration of an initial venture involving Allan Holms.

70.     Under the guise of advising Val Holms, Edington directed Val Holms to tell Allan Holms information that turned out to be inaccurate.  The purpose of doing this was to remove Allan Holms from the deal under consideration, an effort that proved to be

successful.  Edington similarly took control over virtually every facet of the merger plans in order to affect a reverse merger using Val Holms' mineral assets and a shell company that Edington also controlled indirectly through family and friends.

71.     All these actions by Edington took place between February 2010 and May 2010, and they were unnecessary because Allan Holms was not a party to any legal agreement or undertaking.  Val Holms could have, and would have, simply told Allan Holms that he did not want to do a deal with Allan Holms.

72.     Edington was apparently motivated to orchestrate this scheme because he wanted to preserve Allan Holms as a possible business client and contact.  In fact, Edington and Allan Holms were already at the time discussing other business ventures, and Edington did not want Allan Holms to walk away from such other deals due to any conflicts between Allan and Val Holms.

73.     Edington's inappropriate handling of these matters involving Allan Holms led Allan Holms to file suit against Edington, Val Holms, and the Company in February of 2012.  The Company was harmed and suffered millions of dollars of lost revenue due to delays inflicted by the lawsuit and incurred hundreds of thousands of dollars in attorney's fees in defending against this lawsuit, which the Company won at trial and Allan Holms is currently appealing.

74.     Starting in May 2010, Edington began anew with a second active campaign to lead the organization of a reverse merger transaction to form Bakken.

75.     Edington proposed using a shell company called Multisys Language Systems, Inc. ("MLS") in order to effect the reverse merger transaction involving Val Holms' mineral assets.

76.     Edington installed his daughter, Janelle, to serve as MLS's Founder, President, CEO, and Director.

77.     MLS had no or nominal operations in May 2010 and did not appear to have any significant assets at any time during its operational lifetime.

78.     Edington had an undisclosed control position with MLS that he was using to his and the other Defendants' advantage in connection with the transaction involving Val's mineral assets.

79.     Edington continued to represent to Val Holms and other persons who would become officers or directors of the Company that he was unbiased and well-qualified to conduct all facets of the reverser merger transaction involving MLS and Val Holms' mineral assets.

80.     The Company and its principals relied upon Edington's representations.

81.     As a result of Edington's improper and false representations, Edington was able to fashion a transaction and other related transactions that greatly benefited himself and others at the expense of those who relied on him.

82.     Edington made himself responsible for drafting a June 28, 2010 Private Placement Memorandum ("PPM") during the summer of 2010.  The PPM was used to assist in the raising of certain investor funds for the new entity, Bakken, created by the MLS reverse merger transaction.  Edington solicited primarily his investor contacts for the PPM.

83.     Edington was not and continues to not be authorized to practice law, but that did not deter him from preparing all manner of legal documentation necessary for the reverse merger transaction involving MLS.

18

84.     The documents Edington prepared, directly or indirectly, include the Asset Purchase Agreement ("APA") attending the PPM, various option agreements, a Unit Agreement, and filings with the U.S. Securities Exchange Commission ("SEC" or the "Commission") that would normally be prepared by qualified corporate and securities counsel.

85.     Because Edington and his family were in a position to control MLS, Edington and the defendants also manipulated transactions in MLS in order to increase their overall compensation in connection with the MLS reverse merger transaction.

86.     For instance, in June 2010 MLS declared a 3 for 1 forward share split that had the effect of tripling the number of shares held by MLS's shareholders.

87.     Edington's family and other affiliates were significant or controlling shareholders, directors, and officers of MLS.  These persons, as well as MLS itself, were inactive.  This structure was put in place to, and in fact did, afford Edington unilateral control over MLS.

88.     Holms Energy, LLC ("Holms Energy") contributed Val Holms' previously held oil and gas mineral interests to MLS.  As it would later be evident, Edington's direction that Holms Energy be the entity to contribute Val Holms' mineral assets was an unnecessary step to the overall transaction and was designed to hide the fact that Edington and certain of the other defendants intended to use Holms Energy as a vehicle for hiding the distribution of certain securities to themselves.

89.     Edington orchestrated the mid-2010 fund raising contemplated under the PPM for the benefit of select investors, who were Edington's friends or family members, by hiding certain material information from public disclosure.

19

90.     This failure to disclose material information was incident to Edington's and the other Defendants' formation, control, and maintenance of MLS, particularly Edington formulating and dictating all material details of the MLS reverse merger transaction involving Val Holms' mineral assets.

91.     Throughout the reverse merger process, Edington substantially controlled MLS, either directly or indirectly, not only by installing his daughter to all key control positions and installing other friendly persons as significant holders, but he also directed his son, Edington II, to draft the MLS documents required under the Exchange Act.

92.     Edington II was not at the time an attorney or someone who has received any formal training in the preparation of SEC disclosure documents, nor is he now.  The kinds of abuses leading to overall financial collapse which are rooted in improper observation of standards designed to ensure integrity in the system are very clearly evident in this scenario.  Edington sought personal gain for him and his relatives in the absence of adherence to the rules.  This kind of damage must be curbed and the best place to start is by not allowing this sort of behavior to be rewarded and incentivized.  In the immediate, though, Bakken is the victim.

93.     The MLS reverse merger transaction closed in November 2010.  Following that transaction, the Company came into its current existence, and Val Holms was installed as its CEO and chairman, along with other board members of Edington's choosing.

94.     As a result of the reverse merger, MLS issued 40 million shares to Holms Energy.

95.     Edington and the Defendants improperly granted themselves 8 million of the 40 million shares allocated to Holms Energy.

96.     Edington improperly advised Holms Energy to structure a transaction so that Edington's and the Defendants' shares would not be immediately disclosable under SEC rules.

97.     Following the MLS reverse merger transaction, Edington remained a consultant to the Company, and Edington II became, upon Edington's direction, principally responsible for preparing the Company's SEC filings, despite the fact that Edington II was not and is currently not a lawyer.

98.     In December 2010, Edington and Edington II prepared a registration statement that sought to register shares that were held by only the existing shareholders of MLS.  The registration statement did not cover any shares that were issued to Holms Energy.  Thus, the statement sought only to benefit Edington and his nominee shareholders, but the SEC did not accept or declare effective the registration statement.

99.     Had this registration statement been declared effective, only select shareholders of MLS, specifically Edington and the other Defendants, would have been able to sell their shares on the open market without the same restrictions that bound other shareholders.

100.     The SEC issued extensive comments to such registration statement.  Roughly a year after Edington directed the registration statement to be filed, the Company withdrew it on December 19, 2011.

101.     In or around January 2011, Edington convinced Val Holms that Edington should engage in efforts to promote the Company's stock.

21

102.    In January 2011, Edington travelled with Val Holms to New York City for that purpose.  They spoke with potential investors and met persons who may assist with the promotion of the Company's stock.

103.    Following this business trip, the Company decided, based on Edington's recommendations, to devote resources to pursue stock promotional and fundraising efforts in New York City.

104.    In this regard, the Company hired Joel Brownstein, an affiliate of Edington's, to be the Company's stock promoter and shareholder liaison in late February 2011.  Upon Edington's advice, the Company had Mr. Brownstein acquire and setup an office in New York City at 41 Maddison Avenue.

105.    Near the same time in early 2011, the Company began to discover previously undisclosed and false information that Edington had stated about his background.

106.    Such omitted information included Edington's non-disclosure of Edington's Injunction, censure, and fines issued in connection with an SEC enforcement action by the U.S. District Court for the Eastern District of Washington.

107.    Edington also failed to disclose the fact that he had a material share interest in MLS, and *de facto* control through nominees, despite the Company's prior inquiries in this regard.

108.    During this time in early 2011, Edington and the Defendants began to increase their demands for additional compensation but resisted entering any formal agreement.

109.     The Company elected to retain outside corporate and securities counsel in New York City.

110.     Edington was highly critical of the appointment of any counsel that he did not have a role in choosing.

111.     Edington and the other Defendants opposed any review of the Annual Report filing by outside counsel.  Edington II wrote several disparaging and unsubstantiated e-mails that were critical of outside counsel.

112.     Edington took steps, including contacting the Company's board members, as well as actual and former clients of outside counsel, in an effort to convince the Company to disengage outside counsel.

113.     In May of 2011, the Company determined that Edington's questionable regulatory past, misstatements, and overall behavior warranted his termination.  The Company notified Edington and the Defendants through Val Holms to cease any further work relating to the Company.

114.     Following the termination of the Edingtons, the Defendants began a systematic campaign to discredit, defame, malign, and interfere with the Company and its officers and directors through various means, including litigation, as described in further detail below.

## PARTICULAR BACKGROUND RELATING TO DEFENDANTS' SECURITIES LAWS VIOLATIONS AND OTHER LAWS TO PLAINTIFF'S DETRIMENT

115. Edington promotes stock. He engages and has engaged the other Defendants in his various schemes.

116. At all relevant times, and currently, Edington's Injunction forbade him against committing further securities fraud in violation of anti-fraud provisions of the Securities Act, as well as against transacting securities either as or through a broker-dealer without proper registration or a valid exemption under of Exchange Act. *See* the Injunction, *supra* ¶ 16.

### Edington's First Deal Attempt Involving Val Holms' Minerals Failed Using APD

117. Edington, Allan Holms, and Val Holms' 2009 discussions about building a public company through a reverse merger revealed neither Val Holms nor Allan Holms understood mergers, acquisitions, securities, or public companies in general. They also lacked experience with any of those things. Edington represented himself as an expert capable of profitably guiding them through the process, explaining that he had connections to various companies for use in a reverse merger transaction. One of those companies was APD Antiquities, Inc. ("APD").

118. ADP was a public shell company with nominal operations and only $6,671 total assets, comprised of $1,962 cash, according to its 2009 annual report on Form 10-K, filed April 13, 2010.

119. During the entire course of APD's supposed operating history, it generated only nominal amounts of revenue.

120.    Edington advised Allan Holms in late 2009 to invest substantial sums of money into APD in order to provide the start-up costs for building a public operating company around Val Holms' oil and gas mineral interest.

121.    Edington's basis for advising Allan Holms to invest in APD was procuring inexpensive pre-merger shares that could be sold for substantially more after increasing the shares' value by promoting them.

122.    Edington provided Allan Holms with a scheme to purchase low valued shares (at $0.02 per share), with the anticipation that once APD became public through the infusion of Val Holms' mineral assets, such shares would be valued at many times more.

123.    Early Monday morning, February 1, 2010, Edington e-mailed Allan Holms with legal and other advice about how to proceed with a contemplated transaction under the securities rules.  After claiming that a well was drilled near one of Val Holms' properties, Edington began to base his advice to Allan Holms on a discussion that Edington had with individuals Edington refers to as "the President and Secretary of APD." Edington indicated that Edington had acquired an agreement in principle from APD's leadership to proceed with a significant transaction.  He failed to mention, however, that these people were Edington's affiliates.

>Saturday afternoon, I met with the President and Secretary of APD Antiquities, Inc. to outline the transition from the exiting [sic] company to the new company. I explained that it was necessary for APD to sell approximately 50% of the shares in the company for $50,000, for two critical reasons. First, it would take this amount to complete their audit, do the legal work on an S-l registration statement after the acquisition of the mineral rights, new stock certificates, transfer agent fees, legal fees, accounting fees, prepare a PPM to raise up to $1,000,000, pay Edgar filings and other costs related to converting the company into an energy company.

> The last stock they sold was at $.05 in November of last
> year. The transaction I proposed to them was to sell
> 2,500,00[0] shares of common stock to 6 investors at $.02
> per share. This is approximately 60% less than the last sale,
> but I convinced them that this was for $50,000 not some
> $5,000 investment. They are ok with this transaction, so
> long as we get the next step implemented and get into the
> oil business.

124.    Referring to ADP with official titles and terms such as "President,"

"Secretary," and "they" misleadingly depicted APD and its principals as arms-length

negotiation counterparties.  They were not.

125.    Proposing $50,000 for 50% of APD to Allan Holms was highly

misleading.  Edington's valuation of APD at $100,000 (viz. $50,000 for 50%) referenced

only paperwork to be done, nothing specific about APD, its assets, or its operations.  In

fact, the balance sheet on APD's Form 10-K, filed April 13, 2010, reflected that its total

assets were only $6,671, which was $28,647 less than the sum of its long-term and current

liabilities (together $35,318).  That is, APD's actual value could have been stated as a

negative number.  The same filing also states that the so-called "President and Secretary,"

to whom Edington refers in his February 1 e-mail, made $0 in 2009 for their affiliation

with APD, which produced no sales that year: "The officers/directors [are paid] based

solely on bringing business to the Company [on a] nine percent (9%) commission . . . No

commissions were paid during the year ended December 31, 2009."

126.    Quoting a stock price of $0.02 was deceptive.  Edington framed things as

though APD and its leadership were willing to take a short term loss, but they in fact had

nothing to lose.  The $0.02 investment was simply a pretense meant to pay the Edingtons

for paperwork.

127.    The mentioned paperwork was that which Edington and his family members or affiliates would charge to complete themselves.  The Edingtons lacked qualifications, as described below, and were charging significantly less than such work usually costs.  With the benefit of hindsight, this becomes clearly an effort aimed at artificial revenue generation by the Edingtons.

128.    Edington went on in his February 1 message to advise Allan Holms that they must limit each investor's holdings to 10%.  That limit comes from the Williams Act's disclosure requirements under Section 16 of the Exchange Act, which Edington did not mention in his e-mail to Allan Holms.

> In this case, we want to make certain that none of the investors own more than 10% of the outstanding shares, because they become deemed to be affiliates. After this private offering, the company will have approximately 5,000,000 shares issued and outstanding. So, none of the new investor [*sic*] should own more than 500,000 shares.

129.    The e-mail to Allan Holms continues with descriptions that make apparent Edington's intention to include only the early investors of Edington's choosing (not Val), giving tax advice, and requesting to meet personally with Val Holms' accountants.

> Val cannot be an investor in this round, because it could be deemed to be a sweetheart deal, selling shares in advance of an acquisition and part of a plan that should be disclosed to the shareholders. The investors can be investment companies, individuals that you trust who do not have the last name Holmes (we can discuss this in person). In order for Val to transfer the mineral right to APD on a tax free basis, he and his associates need to end up with 80% of the stock to comply with a 351 tax free exchange. He can do this personally or use a corporation, just so long as he can show a legal paper trail of ownership, I suspect I will have to meet with his CPA to work out the final details. The right currently rest inside a NV corporation, so we could potentially just adjust the share ownership of the NV

corporation and keep it simple. Basically, 5,000,000 shares
would have to be less than 20% at the time of acquisition.

130.     Edington then reiterates his hard and fast 10% rule, something Edington

did throughout Bakken's capital formation stages.  Such advice underscores the

Edingtons' purposeful evasion of the securities laws, as well as avoidance of any paper

trail leading to Edington – undoubtedly because of Edington's Injunction.  Edington's

stated reasoning for this, however, was that his approach "keeps it simple."

> I would recommend the following: Have 6 individuals or
> companies invest $7,500 into the company and a 7th entity
> invest $5,000 for a total of $50,000. This way no single
> investor is over 10% and no investor will have to file with
> the SEC as it relates to being an affiliate. This just keeps it
> simple.

131.     The message goes on to discuss various details about how Edington plans

to proceed, indicating that Edington will complete the necessary corporate governance

documents and SEC filings, which is typically the work of a securities lawyer.  It also

repeats Edington's concern about paper trials, which are generally required under the

securities laws.  Paying sham "consultants" to hide improper transfers is a common tactic,

and Edington openly embraces it.

> If you are ready to go, the first step is to get the 7 investors
> line [*sic*] up ASAP. I can have the necessary corporate
> resolutions, stock subscription agreements and 8-K
> prepared by the end of today, if you are ready. . . .
>
> Even if we put 2-3 weeks between the time the $.02
> offering is completed and the mgt comes in and the name is
> changes [*sic*] that is not all that bad.  There can be not [*sic*]
> paper trail between APD and Val until after the $50,000
> investment is made.
>
> I many [*sic*] even generate a consulting agreement so it
> looks like the public company makes a deal with a
> consultant to raise funds and help find a new business
> opportunity.

132.    This February 1, 2011 e-mail excluded Val Holms.

133.    Two days later, on Wednesday morning at roughly 10:00 am, February 3, 2010, Edington e-mailed Allan Holms under the subject "Holms," this time copying Val Holms.  The e-mail directed Val and Allan Holms to fly to Spokane, Washington to discuss various matters about the transaction, including which "nominee shareholders" to use as investors.

134.    About 11 minutes later, Wednesday morning at 10:11 am, February 3, 2010, Edington separately e-mailed Val Holms an extensive message consisting of more than 1,700 words – this time excluding Allan Holms.  No one can write a 1,700 word e-mail in just 11 minutes.  Given the timing, Edington obviously drafted the individual message to Val Holms before sending a message to both Val and Allan Holms, in hopes of capitalizing on a rift Edington would create between Allan and Val Holms.  The message went on at length to dramatically vilify Allan Holms to Val Holms before their trip to Washington.  It also mentioned that Edington was working under the notion that the contemplated deal would be a "sweetheart" deal, which is a common way of referring to insider trading based on material non-public information.

> [Allan and I] got into the discussion about how the pie was going to be divided up and areas of responsibility. I have no problem with a discussion of this type, but I am thinking Allan has it in his mind that if he puts up $50,000 to do the sweetheart deal that I have arranged with APD, this equity will be his and his alone.

135.    Edington's mention of Allan Holms putting "up $50,000 to do the sweetheart deal" strongly suggests that Edington planned for Allan Holms to fund the seven investors expected to invest $50,000, doing so as a means of hiding beneficial ownership – a common tactic by Edington.

29

136.     Four days later, Sunday morning at about 7:00 am, February 7, 2010, Edington individually e-mailed Allan Holms.  The e-mail touted Edington's experience through condescending self-aggrandizement.  Problematically, however, Edington's insolent boastfulness had the effect of misrepresenting himself as a corporate attorney.

> When an acquisition of assets is undertaken, there has to be a comprehensive exchange agreement entered into, then a Super 8 has to be filed. Do any of you four even know what a Super 8 is? The reality is that I have as [*sic*] complete legal library of document templates for almost every facet of a public company. I have developed this over years and it allows me to generate documents very quickly and professionally.
>
> Let me give you an example of my capacity to generate accurate documents timely and efficiently. A long time friend introduced me to a young guy that has a great business getting started, but he is out of cash and kind of on the ropes. He went to one of the local law firms to get a quote for doing a comprehensive private placement; they wanted $30,000 and 6 weeks. I spent two days with this individual last week, learning as much as I could about his business, where he had been and where he wanted to do [*sic*]. He has an S corporation, but wanted to raise money and [I] did the conversion for him, drafted all the amendments and filed them with the state of Washington. In addition to the time I spent regarding BRI, plus many other meeting [*sic*] and other work, I generated the attached Private Placement Memo for M2d CAMO. This draft is 98% done and I went through 8 revisions. I described those aspects of the business that I grasp and then the CEO filled in as much as he could. Between us both, me working part time, this memo will be ready for him to take to his investors by 9 am tomorrow, assuming Kinko[s] can print this between 6 am and 8:30. I don't want to pat myself on the back, but what I did in my part time last week, will save this individuals [*sic*] company. He is literally begging me to become more involved with his company and told me I could write my own ticket as to how much of the company I wanted. I don't give money to the church, but I give directly to people and this is an example, [*sic*] The reality is that I made time to save his company, but I am going to decline to get involved and this one was pro bono.

> However, you can bet your last dollar that if the company grown [*sic*] to $50,000,000+ in sales, as he says it can and if he wants to go public, I guess we both know who will get the call. I did not use this example to toot my own horn or pat myself on the back, it was simply a demonstration of my capacity to get things accomplished and the fact that I have always been a "go to guy".

137.    Significantly, Edington's e-mail went on to reiterate that Allan Holms' participation in the transaction was a sweetheart deal.  Also, Edington's vaunt about completing intricate legal or business work so quickly, sometimes in just "a few minutes," concedes that his work is ill-considered if his claims are true.

> As it relates to BRI, who else in a matter of a few minutes would come up with a strategy to insure that you get your initial $280,000 investment back (first money out). Who else could come to the table with a full reporting clean shell and then engineer a sweetheart deal for almost 50% of the stock at an incredible low level of $.02. Naturally, this was done base on my reputation with the directors of APD and the fact that they trust my business judgment. I guess it goes without saying that if for some reason Bakken did not work out, I would have to go back to these people and make some financial amends, which I would stand tall for. So, how do you put a value on all of these intangible assets? Just the concept of putting stock in the hands of a trusted person or company, so some liquidity can be generated by Val, but not traumatize the market when the CEO is perceived to be a seller. These are the kinds of things I understand and issues that are really to the advantage of people I work with on projects. The two of you have valuable mineral rights (we all hope). If they are as valuable as we all hope, then they are more valuable inside a public company than they are if they are owned on a personal basis (for all the reasons I have outlined in our various meetings). So, under the assumption they are valuable, I have the resources and ability to make the worth many times what they might be worth if retained by the two of you on a personal basis. . . . The innovative strategy of leveraging these mineral rights in a public company is a great business decision in my mind and frankly stated, I am pretty certain that until you met me, you did not even understand die [*sic*] Reverse Merger concept.

31

138.    The e-mail also evinces some of the deceitful tactics Edington would

employ but that were not identified until a later time.  For instance, Edington framed the

following as a testament to his good reputability: I did this based "on my reputation with

the directors of APD and the fact that they trust my business judgment. [If Bakken] did not

work out, I would have to go back to these people and make some financial amends,

which I would stand tall for."  As explained above, APD lacked operations of any kind.

Virtually any investment in it would have benefitted APD, which would have been in no

worse a position if the Bakken deal did not go through.  That circumstance completely

undermines Edington's claims above.  Edington was in no way answerable to APD or its

leadership, who were Edington's friends, and who had no active role in APD.  Edington

would not need to "make financial amends" to them if the Bakken deal fell through in the

same way that a legitimate promoter normally would when dealing with a director.

Statements to the contrary were intentionally misleading.

139.    The e-mail went on to indicate that, following the merger, the newly

formed company, Bakken, would have a fabricated stock price.

> At the end of the day, in the first couple of years, BRI is
> more or less going to be a stock play and the stock price
> will not be tied to fundamentals. Hopefully, if we can raise
> the money, pick the right projects to participate in and have
> some degree of luck, 3-4 years down the road BRI can
> become a real operating company.

140.    Edington went on to justify Val and Allan Holms paying him by

comparing himself to a professional athlete's manager.

> So at the end of the day [paying me] 4.0 million shares out
> of 40.0 million (35.0 issued for rights and 5.0 million in the
> shell), represents 10% of the outstanding [shares costs]
> 50% less than value than pro athletes and entertainers pay
> their managers/agents. I see this as bargain for you and Val

32

> based on the way things operate in this segment of fee
> business.
>
> Allan, I would like nothing more than to go forward on this
> project and you and I develop a long term relationship that
> generate substantial income, but the parties in the various
> projects can have some fun along the way. Please discuss
> this proposal with Val and let me know you believe it
> makes sense for the two of you.

141. This e-mail to Allan Holms came shortly after Edington's individual e-mail to Val Holms. Edington's tactic of individually e-mailing in this way continued throughout his dealings with Allan and Val Holms. The practice makes clear that Edington sought to establish secret alliances individually with Allan and Val Holms, so as to create tension between them while positioning Edington as a confidant.

142. The next afternoon, Monday at 4:39 pm, February 8, 2010, Edington e-mailed Allan Holms advising Allan Holms to secure investors as soon as possible in order to drag out the timing between two key events during the merger's PPM process: (1) securing investors, and (2) transferring Val Holms' assets. Edington did not disclose, however, that timing things for the sole purpose of appearances in this way has no purpose other than manipulation meant to mislead regulators.

> As a practical matter, the more time that goes by between
> the time the investor buy[ing] 2,500,000 of APD and the
> time the options are exercised, as compared to the time the
> assets come into the shell, the better is looks. Technically,
> the investors should not be privy to the pending asset
> acquisition to avoid any inside info. Cheers, [Edington]

143. The next morning, Tuesday at 9:45 am, February 9, 2010, Edington e-mailed Allan Holms following a meeting the previous day. Edington generates reasons to use a certain advisor (a geologist named Boyd Henneman, referred to as "Boyd") even though that person apparently has a conflict. It is common for Edington to discredit the

use of anyone he does not personally choose or endorse as incompetent or wasteful of money.

> Thinking about the meeting yesterday, it seems to me that there are two primary near term objectives. First and foremost to get Boyd started developing a valuation report (geologic analysis and possible/probable reserve report), which he can then find someone to sign off on, so we do not have a conflict issue. If we go to an outside engineer, this task could take 6 or more weeks. If Boyd develops the content then works with another registered geologist, they can collectively review the report and agree upon conservative numbers that the signing geologist will feel comfortable with.

144.    The e-mail goes on to discuss placing the deals' shares in the names of select trusted individuals who are close to Edington, but not "too close."  He goes so far as to advise Allan Holms that the investors will use funds provided by Edington or his affiliates to purchase their stock.

> Secondly, it would be wise to get the five unrelated nominee investors lined up to purchase the 2,500,000 shares of APD at $.02. The more time that passes between selling of such a large position of the shell and the actual acquisition of the assets, the better it looks. The ideal investor should be someone that will not be involved down the road, someone that has a history of making speculative investments and most importantly, someone that can be trusted, in all cases[. T]he procedure will be to provide the investors the funds to invest ($10,000 each), so there is a record of them writing the check from their personal account to APD. Down the road, the company will file the S-l registration statement and these shares will be include [sic] and become free trading when the registration statement become [sic] effective. This will be a great advantage to us to have access to these registered shares. When they are registered, then they can be transferred back to us and put in company or partnership names, available for selling or to be used for other purposes to help the company. I would not recommend that any of these five investors be family members, that is too close. When the shares are paid for and the new stock certificates returned

34

> to APD to be delivered, they can all be delivered to you to
> hold. Perhaps the best solution is for you to find three
> investors and I will find two. As we agreed, first money out
> will be going to you to return the amount invested. So, one
> of the 500,000 share blocks out of the 2,500,000 could be
> used to liquidate for this purpose, or at the minimum put a
> big dent in the return of the initial funds.

145.    The next Monday morning at about 7:30 am, February 15, 2010, Edington

e-mailed Allan Holms, reiterating that Edington wants to provide Allan Holms' funds to

trusted persons so as to create the semblance of having real investors while obscuring the

fact that Edington and his nominees are the beneficial holders.

> As explained, since you, I and Val will be deemed to be
> controlling shareholders pursuant to the assignment of the
> assets from the newly formed [Roil Energy,] LLC to APD,
> we should not appear to be working both sides of the street.
> In this case, it will require that we provide funds to trusted
> parties to make the investments. However, when the new
> stock certificates are issued, I have no problem with you
> keeping possession of the physical stock certificates until
> your money is returned. The other key is that we never
> want more than 9.9 % stock ownership in any of the APD
> shares to be in the hands of a single party, this makes them
> an affiliate and they have different selling restrictions. If
> you like, I can pull out the first transactions from the list of
> the shareholders previously provided and get these to you
> within the next hour. Cheers, [Edington]

146.    Two days later, on Wednesday at about 4:00 pm, February 17, 2010, Allan

Holms e-mailed Edington under the subject "Re: travel plans" about the status of certain

logistical and legal matters.

147.    Edington replied shortly after to say that the logistical and legal steps have

been completed toward forming new Nevada LLCs.  Edington reiterated the importance of

timing for appearances and pressed Allan Holms for funding.

> As explained, for the best Interest [*sic*] of all concern[ed], I
> would like to have as much time as possible between

> acquiring such a large Interest [*sic*] in the shell and the
> acquisition. I guess everything Is [*sic*] pretty much on hold
> until you provide the necessary funding, Cheers, Jay

148.    Later that evening, Wednesday at about 8:00 pm, February 17, 2010,

Allan Holms e-mailed Edington under the subject "?'s."  In response to Allan Holms

asking about whether the LLC should have a defined ownership at that time, Edington

stressed to Allan Holms, among other things, the importance of obscuring stock

ownership.

> That is easy to address, but here again, I think you do not
> want to put all the LLC interest in your own name. At this
> early stage, this is the time when you have the most
> flexibility. After going public options for estate planning
> and liquidity strategies are not feasible.

149.    Six days later, on Tuesday roughly between 8:00 am and 9:30 am,

February 23, 2010, Edington and Allan Holms had an e-mail exchange about the deal's

various aspects.  It began with Edington e-mailing Allan Holms at about 8:00 am to

inform Allan Holms that Edington had lined up several investors and other necessary

facilitators of his choosing.  Allan Holms responded, requesting to meet with Edington

that Thursday in preparation for a Saturday meeting with Boyd, the geologist Allan Holms

chose previously to provide certain reports.  Edington responded at roughly 9:30 am to

confirm and reiterate a few points about timing, appearances, and securing nominees to

hold stock as strawmen.

> I hate to sound like a broken record, but things are really
> getting down to crunch time regarding acquiring the APD
> shares.  The more time that transpires between the time we
> purchase those shares from the company and the various
> parties and the acquisition, the better is [*sic*] appears. As of
> now, there have been on [*sic*] direct communications
> between any Bakken people and APD officers and
> directors. Were you able to get three nominees lined up in

> Montana, stock purchase contracts signed and mechanism
> in place to transfer funds?

150.    Edington then e-mailed Allan Holms the following week on Monday at about 6:00 pm, March 2, 2010, about whether Allan Holms had secured nominee investors, to invest either directly in APD or through a Roil Energy, LLC, as Edington instructed.  This was part of Edington's plan to temporally space out early APD investments as far as possible from the contemplated reverse merger, where Edington would fund each strawman holder for up to 10% of APD.

> I still need to file an 8-K for the one investors [*sic*] for $10,000 (500,000 shares) in APD. Can I get a name or better yet, how about an executed stock purchase agreement. [*sic*] I just need a warm body to be the investor and don't want to put APD in a position to not file timely regarding a sale of securities. If I can help let me know. Jay

151.    The more time that passed without pre-merger investors, the closer in time early APD investments would be to the merger.  Spacing these things out, however, was critical to Edington's scheme.  Temporal spacing serves as a manipulative means of building the impression that the two events were unrelated, even though they were related. The 10% reporting threshold, as mentioned above, comes from the Williams Act, codified under Section 16 of the Exchange Act at 15 U.S.C. § 78p, which serves an important purpose of protecting investors from covert accumulations of stock.  But that was Edington's goal.  Despite Edington never articulating why temporal spacing "appears" better, the tactic is an obvious way to muddy the waters surrounding the fact that initial investments resulted from insider trading and were meant to disguise Edington's beneficial ownership as early-stage investments.

152.    When Edington mentioned in a February 9 e-mail that the early "investors should not be privy to the pending asset acquisition," he intended to add an additional level of obscurity.  If questioned, those investors could say they were unaware of the future transaction when they invested.  But that is irrelevant.  In addition to the fact that anticipated changes in control should be disclosed to investors, the investors in question were not the beneficial holders; Edington was.  He stated clearly in a February 9 e-mail that his plan was to "provide the investors the funds" for their APD investment with the intention of reclaiming his shares post-merger, either directly or indirectly through nominees.

153.    This amounted to a plan for Edington to acquire beneficial ownership in APD's stock based on material non-public information that he acquired as a promoter and planned to hide from investors.

154.    Two days after Edington pressed Allan Holms for any "warm body to be the investor," Edington again e-mailed Allan Holms on Thursday at about 4:00 pm, March 04, 2010, about getting investors.  His advice was essentially to fabricate documents in order to create the semblance of additional investors.

> `I still have to come up with a name and address for the investor for the APD filing with the SEC. I guess until all things are sorted out, one possible solution would be to say I or a company I am affiliated with, borrowed the money from you and made the investment[.  T]hat way I can do the paper work, even develop a promissory note in your favor. As it now stands, it seems like we are in "no man's land" or a sail boat with out [sic] a rudder.

155.    Edington went on to disparage Allan Holms' selected geologist, Boyd, because Boyd's report turned out to be inconsistent with Edington's expectations; Edington accusing Boyd of operating under ulterior motives.

38

Seems like Boyd triggered a land slide with his attitude and report. What I do not understand are his numbers. He stated that the average Bakken well would flush and then drop down to 350 b/d [barrels per day]. He gave a total production value of 350,000 barrels. However, if you assume 350 b/d, that is about 10,000 b/month. So, he is then suggesting that with 350,000 total barrels a Bakken well has a life of only 35 months or less than 3 years. This is just nonsense of the first order. These companies are not spending $7.0 million to get a well that has a 35 month life. Nobody can convince me that he did not have a private agenda for that Monday meeting. He sure did not help with the auditor and I think he feels like he is some Jesus Christ incarnate and is saving Val's life by creating a scenario that more or less put the kibosh on a public company. He sure turned out to be the fly in the ointment.

156.    Val Holms was not included on most of the e-mails above, though he was generally aware that Edington and Allan Holms were in communication.

157.    Edington's criticisms of Boyd to Allan Holms were a misleading attempt to convince Allan Holms that Allan Holms should not trust Boyd. The criticisms Edington advanced appear to have stemmed primarily from the fact that Boyd's report did not strictly align with Edington's vision, which was presumably to have a Geologist's report overstate production potential so that Edington would have a basis upon which to exaggerate investment potential to investors.

158.    Assuming Edington's characterization of Boyd's numbers was correct, which it may not have been, Edington failed to mention to Allan Holms that a barrel of oil was selling for roughly $80 at the time in late February of 2010, nor did Edington mention that such price was rapidly increasing. If the relevant wells had a lifespan of 350,000 barrels and cost $7 million to install, each one would still have been expected to produced approximately $28 million worth of oil. That would amount to an expected 400% net return on investment in just a few short years. This signals that Edington's criticisms of

39

Boyd were based on reasons other than those Edington stated, a recurring theme in Edington's communications.  Against this background, it becomes apparent that Edington, by framing Boyd's report as inadequate, desired a report that would permit him to pump the stock up so that he could sell it for large short-term profit.

159.    Val Holms was unaware of this, particularly that Edington's promotion plan involved the use of inside, misleading, or inaccurate information prior to dumping the shares.  The tactics are a common component of a known scheme commonly referred to as a "pump-and-dump."

160.    The upshot of a pump-and-dump scheme is enabling insiders to sell overpriced stock in large quantities, at the expense of remaining shareholders, who continue to hold stock after the market corrects its value to a much lower price.  Edington was not, however, ultimately successful in doing this with APD.  Allan Holms never provided the necessary startup capital, and Edington's attempted pump-and-dump using APD ultimately fell short.

**Edington Was Manipulative in Backing Out of the First Deal Attempt to Save Face**

161.    Edington had second thoughts about dealing with Allan Holms and APD after realizing that he could make much more money on Val Holms' minerals without Allan Holms in the picture.  So he formulated a new plan that involved only Val Holms, excluding Allan Holms.

162.    The plan began by Edington convincing Val Holms that Allan Holms wanted to seize control of Val Holms' assets and that Allan Holms was trying to steal Val Holms' assets.

163.    Edington's plan worked.  The original scheme of using APD never materialized because Edington dissuaded Val Holms form doing business with Allan Holms, and Allan Holms did not invest the start-up capital for the APD deal.  Edington did this using ghost-written e-mails, or writing e-mails from another person's account in order to give the appearance that the account owner (Val Holms) authored the e-mail. Ghost-writing was a common tactic for Edington, and he used it to dissuade Allan Holms from participating in the deal.  Edington even made specific mention of the tactic in a March 15, 2010 e-mail to Val Holms at about 10:30 am, telling Val Holms that "we need to work on ghost writing . . ."

164.    For instance, on Friday morning at about 9:30 am, March 5, 2010, Edington sent an e-mail from his personal Gmail account to Val Holms' MSN account. The message that Edington wrote, however, was written to Allan Holms as Val Holms.  It pretends to convey Val Holms' decision and thought process after counseling Val Holms' wife, Mary.

> Allan,
>
> Mary and I have done lots of soul searching about this project. As you know, this is our primary asset for retirement and putting this into a public company without knowing if there is going to be any money raised is just to [sic] risky for us. Even if there was money, I have never been part of a public company. I am also thinking that with my health, I probably do not want to get into anything stressful and a public company seems to have a stress element. I am sorry that you and Jay invested so much time, but at this point in time, I want to step back from Bakken Resources, Inc. 1 [sic] will be happy to pay the invoice to Boyd.
>
> Val

165.     By writing to Allan Holms as Val Holms, Edington was able to maintain his relationship with Allan Holms, and based on information and belief, Allan Holms and Edington continue working together on other business ventures until Allan Holms discovered the truth in 2011.

166.     The aftermath of Edington's pump-and-dump attempt using APD resulted in costly litigation currently on appeal from a final judgment.  *See Roil Energy, LLC v. Edington*, Cause No. 12-2-01039-5 (Superior Co., WA) [hereinafter "Allan Holms Litigation"].

167.     Allan Holms testified under oath on November 5, 2013 in the Allan Holms Litigation, tr. 244 – 438, that at the time he "had no knowledge" of the underlying circumstances, and that Allan Holms took "at face value" the last quoted e-mail as Val Holms' honest position.  That is, Allan Holms did not realize in March of 2010 that Edington wrote the previous e-mail, and Allan Holms was willing to let his half-brother, Val Holms, walk away from the deal because of Edington's deceitful tactic.

168.     Edington's representations to Allan Holms that he could provide Allan Holms with low-cost securities played a significant part in Allan Holms' decision to pursue a lawsuit against Val Holms and the Company in 2012.

**Edington's Second Deal Attempt for Val Holms' Minerals Succeeded Using MLS**

169.     Having convinced Val Holms to proceed with another deal that did not involve Allan Holms, Edington then moved on in the second half of 2010 to a different shell company called Multisys Language Solutions, Inc. ("MLS").  His overall aim was to affect a similar plan, this time without Allan Holms, and using MLS instead of APD.  But the MLS reverse merger, unlike the APD deal, successfully closed in November of 2010.

170.    MLS filed its initial Form S-1 registration statement on February 26, 2009 as a Nevada corporation with a proposed maximum aggregate offering price of $185,250.

171.    MLS was a public shell corporation, as defined in 17 CFR § 230.405 of the Securities Rules ("Rule 405"), because it lacked substantial operations and non-cash assets.  Edington identified MLS as a suitable vessel for the transaction, and Val Holms agreed to rely on Edington's advice throughout the process.

172.    Edington's proposed deal structure was, again, aimed at creating a publicly traded oil and gas company using Val Holms' mineral assets.  The plan was to place Val Holms' minerals into a private company that Edington formed under Val Holms' name for this purpose, Homs Energy, LLC ("Holms Energy"), in order to effect a reverse merger into a shell company, thereby creating a public company with substantial mineral assets.

173.    Edington misadvised Val Holms around this time to dissolve Val Holms' existing company known as Roil Energy, LLC ("Roil").  A series of e-mails from that time shows Edington telling Val Holms that Val Holms must sign certain documents in order to dissolve Roil, and that doing so without unanimous consent from the members was proper because there was a lack of what Edington referred to as "equity issues." Advice about the legal adequacy of dissolving an LLC typically must come from lawyers, and despite the fact that Edington is not a lawyer, he provided such advice.

174.    With Roil dissolved, Edington controlled the foundational documents used to form companies utilized during the formation of Bakken.  On Sunday at 9:00 am, May 30, 2010, Edington e-mailed Val Holms, copying Kent Beers, then Senior Vice President of Land for the large oil and gas company Oasis Petroleum, Inc. ("Oasis"), and attached a

43

"boilerplate Organizational Agreement" for Val Holms' review.   This was part of forming

Holms Energy as a Nevada limited liability company for use in the reverse merger.

> Formation documents for Holms Energy, LLC will be
> faxed in the SEC of state of Nevada during business hours
> on Tuesday.  It will be effective on Wednesday (accelerated
> filling), so technically, if you [and your wife] Mari can
> make it over this coming weekend, we could finalize this as
> well.  We will have to work out the logistics related to
> transferring the mineral rights from the existing [Roil
> Energy] LLC to Holms Energy LLC and then at closing
> from Holms to Bakken Resources, Inc.  Cheers, J

175.    Edington also ensured that he retained control over both sides of the

reverse merger deal.  About 90 minutes after Edington's previous e-mail, Edington sent

another e-mail on Sunday at about 10:30 am, May 20, 2010, to Val Holms, copying

Edington's son Edington II, to inform Val Holms that Edington would use his son "Jerod

as the advisor for [MLS] and keep me more or less on the Bakken side."  Edington

attached a "draft of a memo that we can send out to [solicit] a variety of potential

auditors."  Edington mentioned that this "is the only challenge I see in the entire deal."

The purported "challenge" was presumably because Edington did not have a replacement

auditor in his pocket already, which required him to find one.

176.    The attachment had a subject reading "Requirement for Auditor with Oil

and Gas Experience."  It described MLS as a company "actively engaged in the business

of distributing . . . language education software developed by Stroked International AG.,

an Austria based software company in the China . . . pursuant to an exclusive Software

Reseller Agreement . . . via an independent third party distribution company in the

territory."   This convoluted explanation is at odds with balance sheet on MLS's Form 10-

K, filed on April 7, 2010, which shows total assets of only $14,308 for fiscal year 2009 –

far from an "actively engaged" company.  From this point until securing a new auditor,

Edington controlled through his immediate family all aspects of the process by which

MLS selected a replacement auditor.

177.    Roughly a month later, on Tuesday at about 5:45 pm, June 8, 2010,

Edington II e-mailed MLS's then-auditor, Tony Li of Li & Company, PC, representing to

Tony that MLS will replace Tony with a new auditor.

> Hi Tony,
>
> It appears that Multisys will engage your
> recommendation, George Qin, as its new auditor in
> preparation of becoming an oil exploration
> company.  We'd like this to happen quickly so we can get
> him up to speed, and we hope to file the Super 8-K before
> the end of the month, and then the 10-K and POS AM to
> the S-1 as soon as possible.
>
> Thank you so much for coming this far with us, wish you
> could stay on through the fun part.  Janelle sent you a $6K
> check, we still currently owe you $2K which will come
> from the offering when it closes before the end of the
> month.
>
> Attached is a draft dismissal letter.  If it is in order, I will
> have Janelle sign and send to you.  Also attached is the
> draft 8-K for the switch to be filed tomorrow, June 9th, if
> that gives us enough time.  I sent a note to George
> requesting him to send the engagement papers dated for
> tomorrow.
>
> Thank You!
>
> Jerod

178.    This e-mail strongly suggests that the auditor switch stemmed more from

older brother (Edington II) telling his little sister (Janelle) what to do than it did from a

legitimate corporate decision making process.

179.    Later that evening, on Tuesday at about 9:00 pm, June 8, 2010, Tony Li responded by e-mail to Edington II, copying Edington and Janelle, under the subject "RE: George Qin." Tony Li attached a resignation letter to file with MLS's Form 8-K announcing its auditor replacement, stating that Tony agreed with the statements in the Form 8-K, filed June 9, 2010, which stated that there were no auditor disagreements. The new auditor was a firm MaloneBailey, LLP ("MaloneBailey").

180.    The next morning, on Wednesday at about 11:30 am, June 9, 2010, Edington e-mailed Val Holms separately under the subject "Fw: George Qin" to inform Val Holms that "MLS now has a new oil auditor:"

> Glad this one is behind us.  Meeting your sis on Friday.
> Headed to L.A. on Tuesday, all systems are go.

181.    That same day, June 9, 2010, MLS issued a definitive proxy statement, soliciting votes to re-elect the board members, including Edington's daughter Janelle, and to approve MaloneBailey as auditor.

182.    Just two days after announcing and approving MaloneBailey as MLS's new auditor, on June 11, 2010, MLS announced the three-for-one stock split that tripled its holders' shares.  This effectively prepared MLS as a vehicle by which to funnel Val Holms' mineral assets to Edington and his immediate family members post-merger.

**Grandiose Representations Were Essential to the Promoter's Fund Raising Plan**

183.    With a contrived stock split in place, Edington sent out private solicitations containing grandiose claims of returns to investors using sources other than Boyd's report.  For instance, on Monday at about 7:00 pm, June 28, 2010 Edington e-mailed one Mark Shellman.  Edington played up the fact that Oasis was related to the deal. Oasis is a major oil drill operating company with roughly $1.6 billion in market

46

capitalization.  Edington pointed out that a joint venture partner of Oasis', Continental Resources, Inc. ("Continental"), was doing "$500 m funding with UBS to raise money for drilling the Bakken [formation]."  Continental is much larger than Oasis, with a market capitalization of roughly $12.75 billion.  Edington attached a letter from Continental regarding its plans to operate in an area near Val Holms' mineral interest, using a well referred to in Edington's e-mail to Mark Shellman as the "Angel" well.  Edington attached maps that were very difficult to interpret but were purported to show the Angel well's proximity to Val Holms' minerals.  Edington pointed out that the "small green dot just south of the yellow shaded area is the Angel well," where the yellow area was said to denote Val Holms' minerals.  Looking at the maps, however, the yellow and green markings were on different documents that together provided more obscurity than clarity.

184.    Nonetheless, Edington claimed that the Angel well "tested at more than 3,200 to 4,000 barrels [of oil] per day."  He indicated to Mark Shellman that would yield up to $4.8 million per month "for the benefit of the company."  Attached were some figures about approved expenditures from Continental, but those did not support Edington's assertions.  Edington also attached a copy of the PPM and a subscription agreement, which would permit Mark Shellman to invest.

185.    Bakken does not and never has generated revenue anywhere near $4.8 million per month by any measure.

186.    Edington's excessive puffery was not limited to investors.  It also applied to Val Holms.

187.    The Saturday evening following Edington's e-mail to Mark Shellman, at about 10:30 on July 3, 2010, Edington e-mailed Val Holms.  It was aimed at causing Val

Holms to believe that the same mineral assets MLS would pay $100 thousand for would earn Val Holms $170,000,000.

> Val, there were some things I could not say in the last memo, because I blind copied a few key people like Mark, Manny, and others.
>
> First, you [*sic*] 30,000,000 shares of stock is substantially better than the $3,900,000 controlled by CEO of [Northern Oil and Gas, Inc. ("NOG")], but you did put in valuable mineral rights.  You have 7.5 times more stock than he does.
>
> Next, with the mineral [*sic*] and the leases in BRI, the stock to trade to land companies for leases will be a lot more attractive (much less risk).
>
> I think we need to get Oasis to go for as many wells as we can in 2010, then I want to get the price of the stock up to $2.00 or higher, get some investments made to show we have the relationships, acquire some leasese [*sic*] and then go for $10,000,000 or more.  It will take some work to get the stock to this level, but I have a pool of shares available in the public company to help get this accomplished.  The more I think about it, I think we need to keep the trailer park program private and not put it in the company.  We can get the money another way, which I can explain in person.
>
> NOG has a total market cap of $673,000,000, if we only do have [*sic*] of this amount in 24-36 months $325,000,000 and by then you own 55% of the company, I think a net worth of $170,000,000 will insure that you don't skip any meals and have lots of money for guns and toys.

188.    Edington went on to tout his ability to ensure such a grandiose outcome as turning Val Holms' mineral assets into assets equivalent to those of NOG, whose stated total assets exceeds $2 billion on its most recent Form 10-K, filed February 27, 2015.

> Most important, I know how to make this happen and we both need to do business and have some damn fun.  Thanks for letting me have this opportunity, you know that I am a go-to guy and I will do whatever it takes to get the company flying.  Cheers, Jay

48

**The Promoter Structured the Merger to Have Excessive Complexity and Ambiguity**

189.    That same day, on June 3, 2010, MLS formed a wholly owned subsidiary called Multisys Acquisitions, Inc. ("MA"), according to the Form 10-K filed April 15, 2011, for the purpose of executing the PPM's reverse merger.

190.    Edington directed Val Holms to transfer his mineral assets to Holms Energy.  Holms Energy would convey an option to transfer its mineral assets to MA in exchange for $100,000 cash and 40 million shares of MLS.  Upon execution of that option, which was executed, MLS would change its name to Bakken Resources, Inc. Completion of this reverse merger process would create Bakken as it exists today.

191.    Two days after forming MA, Edington e-mailed Val Holms on Monday, July 5, 2010 at about 3:30 pm with a convoluted plan about structuring Holms Energy's part of the reverse merger.  The plan structured investment units in a way meant to prevent any investor from exceeding the 10% reporting threshold under Section 16 of the Exchange Act.  Remarkably, the e-mail and attached Membership Interest Unit Purchase Agreement ("Unit Agreement"), buried the fact that Edington's entire model was based on a grossly and unrealistically high valuation of Holms Energy, which had only recently been formed for the purpose of holding Val Holms' mineral assets.  At various places in Edington's e-mail and in the Unit Agreement, the unit price was inconsistently stated as either $10,000 or $100,000, each unit representing 0.1% interest in Holms Energy.  There were 100 units total.  When the MLS reverse merger closed, the Unit Agreement would convert each unit to 40,000 shares of MLS, valuing MLS's shares at either 25¢ or 2.5¢, depending on which price per unit in the agreement was to be believed – either $10,000 or $100,000.  There was no statement about the total number of authorized MLS shares, nor

the total number of units authorized in Holms Energy; only that the 100 units potentially represented 40 million shares in MLS.

192.    Edington's deal structure under the Unit Agreement he drafted, then, solicited investors under the assumption that the newly formed Holms Energy had a value of up to $100 million.  However, based on the body of Edington's June 5, 2010 e-mail to Val Holms, the attached Unit Agreement was clearly little more than Edington's ploy to generate roughly $80,000 from investors and siphon off about $40,000 for himself.

193.    Edington wrote confusing emails to Val Holms, in an effort to hide his schemes:

> Val,
>
>  The strategy to get smaller investors into the deal via Holms Energy is a great idea for many reasons.
>
>  1.   This will not cause problems with the primary offering, whereby we have to go under $25,000.
>
>  2.   The people that buy into Holmes [sic] get the same deal as the other offering.
>
>  3.   The cash in Holms can really come in handy due to all the costs that have been paid and need to be paid for the organizational phase.  Holms does not have to account for any disbursement of funds regarding any audit.

194.    Two of Edington's first three reasons for obtaining small investors get at the notion of Holms Energy funding administrative costs before Edington's e-mail quickly jumps into disjointed details about a proposed deal structure.

>  4.   Here is the formula you need to follow while explaining this deal.  When we have the closing, Holms Energy will have 100 Membership Units and these 100 Membership units will receive 40,000,000 shares of common stock.  So, one membership unit equals 400,000 shares (40,000,000 divided by 100).   So an investment of $10,000 buys 1/10th of one membership unit 0.1%.  If 1% is equal to 400,000 shares then .1% is equal to 40,000

shares, so $10,000 invested into Holms energy gets 40,000
shares $.25 per share, same as the primary offering.  We will also
issue warrants to Holms and they can do a preferred distribution to
the cash investors.

5.   The $100,000 cash paid to Holms Energy will not be disbursed
to the members.

195.     These fourth and fifth reasons imply that each unit is worth $100,000,

which is consistent with the Section 2.1(d)(i) of the Unit Agreement.  But the Unit

Agreement's Section 1.1, and the accompanying Subscription Agreement, state $10,000 as

the unit price.  Either way, the only valuation existing at the time was that Val Holms

agreed to sell his mineral assets for only $100,000 and 40,000,000 shares of MLS, after

putting those minerals in Holms Energy.  Neither Holms Energy nor MLS had any other

notable assets, and Val Holms' minerals were represented by these 100 units.  The

minerals later became valuable at substantially more than $10 million, but they were

clearly not worth $100 million, and the only two valuations supported by Edington's

ambiguous numbers were either $10 million or $100 million – depending on which

version of Edington's numbers were accepted.  In any case, Edington's e-mail continued

to confuse things even further.

6.   Now here is the tricky part, we have valued the initial Capital
contribution of Holms Energy at $4,000 to make the math
simple.  Each member purchases a percentage that will equate to
$.001 for each share after the asset purchase is triggered (cash
basis for tax purposes).  So, we have to finalize that list and get
checks from everyone and they MUST be dated last week.  We
cannot take a check for $.001 then a check for an amount equal to
$.25 from a small investor and then go back to $.001.  This has to
be done in the proper sequence, otherwise the IRS will say there
was some constructed gain.  We can discuss the list today if you
like.

196.     It is difficult to understand what this "tricky part" might mean, though it does suggest that Edington had plans to overstate stock transfer prices by 250-times. What is clear, however, is that it bears no relation to the underlying assets, contemplates falsification of checks by backdating, and alludes to a scheme aimed at tax evasion.

197.     After putting forth these confusing items, Edington proceeds to ask Val Holms for money, in a similarly convoluted way.  Edington's ask is entirely disconnected from the relatively enormous valuation contemplated in Edington's e-mail and attachments, which strongly suggests that Edington knew what he was doing in overvaluing Holms Energy.  It also makes clear Edington's collusion with Val Holms' brother Allan Holms, and candidly admits that Edington was involved in obtaining the stock that Edington claim Allan Holms "stole" from APD.

> 7.   If possible, I would like to get $75,000 to $80,000 of small investors in to Holms.  The reason is simple, I have used most of my available cash to fund things to this date, I have not generated any new revenue, because I have been 150% occupied with BRI for the last two months and I need to get some gas back in my tank and I suspect you could use some as well.  So, the idea of the small investors is perfect and I can easily work out the schedule.
>
> a.   When Allan purchased all the APD stock from four big shareholders and put $10,000 directly into the company, I had to go back and give him the money, which totaled $36,250.  I got the stock back, but cannot turn this back to cash until I get the certificates he stole reissued.  I had to put $15,000 into MLS so they could pay off the old auditor and retain a new oil auditor and I gave Rocky $7,500 on behalf of Holms Energy for the option money. There have been lots of other out of pockets costs but these big ones total $58,700.  If we can get $80,000 from some small investors and I could get $40,000 back, this would make life easier.  I may still have to come up with $10,000 retainer to CIM Securities, if I have to use them as a NASD broker in the deal.  But that will be determined in about a week.

198.     Edington then represents to Val Holms that the documents he prepared were adequate legal documents, something that Edington did regularly.

> b.    Attached are the necessary legal documents required to get money from a handful of small investors.  Since the account [*sic*] bank account is already open for Holms, I would think we might even be able to get some funds this week.

199.     The attached Unit Agreement and Subscription Agreement contained representations that all information was accurate and complete, also speaking in past tense about future events in Section 2.2(o), suggesting dates on the documents were manipulated.

200.     On various occasions, Val Holms would ask Edington about his experience and confidence in the transaction that Edington was proposing.  Edington would non-responsively reply each time that he had almost 40 years of experience in the securities markets and that he has made a lot of money for a lot of people.

201.     On June 28, 2010, MLS issued the PPM seeking to raise between $1.5 and $2.5 million, and describing the transactions and occurrences that would result in Bakken.

**<u>Promoter's Advice to Misuse a Form S-8 Registration for His Own Benefit</u>**

202.     On Wednesday at about noon, August 4, 2010, Edington e-mailed Val Holms, Karen, and Kent Jensen about paying for mineral rights with free-trading shares by issuing an S-8 registration statement.

203.     Form S-8 registration statements are short form registration statements not automatically reviewed by the SEC in the same way that a substantially longer Form S-1 registration statement is reviewed automatically.  This has to do with the fact that Form S-8 is designed to compensate those already familiar with the issuer's business, typically employees with stock options or other benefits.  Unlike Form S-1, Form S-8 does not offer

securities to public investors, which is why the disclosure requirements are significantly less stringent.

204.    The SEC notes a history of fraudulent abuse associated with issuing freely tradable securities using Form S-8, particularly by promoters like Edington, as part of a "pump-and-dump" scheme that avoids necessary registration attending disclosures. *See* SEC Rel. No. 33-8909, p. 9, April 10, 2008.

205.    Edington's August 4, 2010 e-mail advocating the use of Form S-8 advised an application of the form clearly outside of its intended scope, and within the realm of known fraudulent activity.

> [Form S-8] can be a very useful tool to Bakken down the road.  We could issue shares for mineral rights and the shares would be free trading.  This means the party receiving the shares could hold the shares and sell via long term capital gains, versus selling mineral rights or leases for cash and having immediate ordinary income.

206.    MLS was a shell company whose stock was not free trading, meaning that Edington would need to devise a way to sell his shares in order profit from his scheme. While deceptive, Form S-8 would have achieved this goal under less scrutiny than other options.

**<u>Promoter's Advice to Selectively Provide Material Information</u>**

207.    The next day, Thursday at about 9:30 pm, August 5, 2010, Val Holms e-mailed himself a link, apparently blind carbon copying Edington.

208.    One day later, on Friday at about 5:30 am, August 6, 2010, Edington individually replied to Val Holms' e-mail message.  Edington essentially instructed Val Holms to allow Edington to withhold information from shareholders about the value of Val Holms' assets, which was material to investing in the MLS reverse merger.

> Val,
>
> I want to be very careful about bring to the attention of anyone the agreement and statements in the PPM related to the Three Forks.  In reality, it appears you only assign 50% of your mineral rights, if you look at this over 10 years.  I don't what to have to answer questions about why the company did not acquire all the rights.  I don't even think Mark [a potential investor] has picked up on this point yet!!!!  Jay

209.    The "Three Forks" formation Edington mentions in his e-mail refers to an oil and gas formation located immediately below the Bakken formation.  Val Holms' original mineral ownership included both the Bakken and Three Forks formations.  But his assignment of that ownership to Holms Energy, which would ultimately go to Bakken via the PPM deal's reverse merger, only went as deep below the surface as the Bakken formation.  Accordingly, neither Holms Energy nor Bakken would have rights to the Three Forks formation.  Because the Three Forks formation is also a valuable mineral-producing formation located in the same geographic region, the value of assets subject to the PPM deal would be significantly impacted by whether the Three Forks rights were included. That is, if oil or gas were discovered too deep below the surface, the Company would have no right to any income from it.  Such income would instead all belong to Val Holms.  This is the material piece of information that Edington attempted to hide.

210.    About two weeks after Edington's cover up e-mail, on Thursday at about 3:50 pm, August 19, 2010, Edington forwarded an e-mail to an investor named Jeff.  The message he forwarded was one he sent to Manuel Graiwer that morning, at about 6:00 am, which played up the prospect of investing early in the MLS reverse merger based on a web link sent in that e-mail.  Information in that link simply mentioned that a formation

known as the "Spearfish" formation might be related to an influx of drilling applications

for minerals that Edington claimed were accessible through Val Holms' mineral interests,

thereby indicating that Spearfish was part of the contemplated deal.  Based on the link,

Edington assures that performance will keep the stock price above the $0.25 per share

investment Edington solicited.

> Manny,
>
> I think you will find this article
> interesting.  http://nextbigfuture.com/2010/08/spearfish-oil-
> formation-could-be.html    Predicated on the drilling of a
> few Mission Canyon wells years ago on and near the
> Holms property, the Spearfish formation is on the Holms
> property as well as the Bakkan [sic].  This new horizontal
> multi-fracking drilling has changed everything in this
> geographic area.  It would be hard for me to guess how
> much more valuable this makes Bakkan Respources, [sic]
> but it is all good for those people smart enough to make an
> investment at this early stage.  Drilling a well in 4 days
> with new equipment really makes this formation
> economically viable.  When the offering is completed at the
> end of the month and the story gets out, the stock will never
> again see $.25 a share, just based on real assets in the
> ground and great fundamentals.  Cheers, Jay

211.   This e-mail to Edington's friend, Manuel Graiwer (referred to as Manny in

the message), was what Edington forwarded the same day to an investor named Jeff.

Manuel Graiwer is personal injury lawyer in Los Angeles, where he and one other lawyer

own a law office in the Korea Town district.  Forwarding the message served as evidence

showing why Edington was able to "assure [Jeff] that [he] will not be disappointed" about

investing.

> Jeff,
>
> I [sic] was great to speak with you this morning and being
> able to get acquainted.  Both Val and I are extremely happy

that you decided to make an investment in Bakken
Resources, I can assure you that you will not be
disappointed.  Even more important, we look forward to
meeting you in the near future.  We believe that we have
several area [*sic*] of interest in common and could be in our
collective and mutual interest.  Below is a short
communication to Manuel Graiwer, Esq.  Manny is the
senior partner of Graiwer & Kapplan a mid sized law firm
here in L.A.  Manny is investing $250,000 into Bakken
Resources and got pretty motivated by this info concerning
the Spearfish Formation.  In the event your wife has any
questions concerning the offering documents, please tell
her to feel free to call me any time at 509-868-
1710.  Perhaps when you get back to Phoenix in early
September, Val and I will come down and introduce
ourselves over dinner.  Not sure if Mark got you all the
germane documents, so I have attached the PPM
and another summary pertaining to the working interest
owned by Northern Oil and Gas.  We would like to
immolate [*sic*] the business strategy being used by NOG, it
seems the financial community likes this diversification
approach. Cheers, Jay Edington

212.     This August 19 e-mail attached a copy of the PPM and a list of wells held

by Northern Oil and Gas, referred to in the e-mail immediately above as NOG.

**Promoter Requesting to Borrow Money from Val Holms While Exaggerating Deal**

213.     Edington at various times during the capital formation stages leading up to

the reverse merger would reveal to Val Holms that Edington was personally in need of

money, blaming his circumstance on someone else, and then ask Val Holms for a loan.

214.     On Monday at about 2:20 pm, August 23, 2010, Edington asked Val

Holms to lend him some money, which Edington buried in a story about work, family

drama, legal costs, and losing money on another deal.

Val,

I have all nine of the packages I brought home going out to
new investors.  Manny had decided to get his law partner in
the deal for 50-100, so I am continuing to update the work

sheet.  Sherry just called, they are taking Janelle to the hospital, [t]he contractions are down to 7 minutes, so I am the asshole, home working when I probably should be in L.V. when the baby is born.  I could go down this afternoon, but opt to go in the morning.  I just got the damn retainer agreement from Baker and Hostetler, the[y] want $30,000 before they file the new lawsuit, which should be the last one.  I am headed down to the bank to get a cashier's check.  Well that wipes out my capital, but I have now [*sic*] choice in the matter and it should result in me having 2.3 million bucks in the next 90 days.  I just dumped $4,000 of TNS stock (at a loss) but [had] no choice.  Headed down to get the stock signature guaranteed and sent to transfer.  I will get paid next Monday.

Any chance that Holms could wire $4,000 to Sherry's account and then I will have her send a check back over to be deposited a week from today.  Sorry to have to ask for a bridge, but the damn attorneys just go for my balls every time.  Cheers, Jay

215.    Edington also sent communications that revealed his intention to tout Bakken's stock in a way that is common to pump-and-dump schemes.  On Tuesday at about 10:00 pm, October 5, 2010, Edington e-mailed Val Holms, Manuel Graiwer, and Edington II a link to www.thestreetalert.com, which highlights certain developing companies from time to time.  The message indicated that Edington was in the process of attempting to have Bakken featured.

Can you imagine Bakken Resources on this web site, then have them list the reasons WHY WE LIKE BAKKEN RESOURCES.  OMG the list of reasons would be fantastic.  I will let you know the results of the conference call, but when he hears our story, I know at the right time I can make a deal with this company.  Probably right after the first well is drilled.  J

216.    There was no logical reason at this point for Edington to tout the stock in this way.  Bakken had not drilled or been involved in the drilling of even a single well.  Premature touting of this kind falls in line with pump-and-dump activity.

58

**Promoter's Patent Lack of Respect for Authority**

217.    At various times throughout the capital formation stages leading up to the MLS reverse merger, Edington would expose his outright lack of respect for authority when advisors would give advice he did not like.  This was especially true of lawyers and regulators, such as the SEC.

218.    On Monday at about 11:00 am, September 20, 2010, Edington individually e-mailed Val Holms to inform Val Holms about various expenses that Edington claimed to be covering for MLS.  Edington seemed to be playing up a narrative to make Val Holms comfortable with loaning Edington money.  The dramatic message makes apparent Edington's improper motives of simply funneling himself funds without a paper trail leading back to him, particularly because Edington subtly prompts Val Holms to loan additional money.

> Val,
>
> Just been sitting here trying to figure out where the hell I am financially speaking.  I still have to send $10,000 back to Holms.  Thx to Manny this financing had drug out much longer than it should.  Thanks to the continued litigation that I have to support, I feel like I have a chunk of garden hose in my carotid artery and I just sort of drip to death.  The good news is that when this last step is completed, I will get back at least $2,000,000.
>
> I also know that it is quite likely that I am going to have to put up some additional money into MSL [*sic*].  Even though I have done most of the preparation of the legal documents, along with Jerod's help, the Attorney Michael Espey will still bill us for this time.  It is also the end of the quarter, so we will have to fill a 10-Q, but it will be a lengthy one, due to the acquisition.  The auditor will have to bless the 10-K as well.
>
> I, like most people seem to work better when I am not under pressure, financial or other wise [*sic*].  The reason I

asked about how many investors there were in Holms, was because I was considering going to a friend and having him buy $50,000 of my interest in Holms, and structure it in such a way that he would get a good deal upon conversion to BRI stock.  I prepared a memo and spoke with him over the weekend and he is very interested, he just has to see what his cash position is.  This would put the $10,000 back into Holmes and give me $40,000 to take care of some obligations and have funds for some current problems.  Janelle had to take two months off to have the baby and she needs some help.  I had to pay the damn attorney in L.A. a retainer, so that used up the funds I got back from Holms that I had advanced and used to get asshole Alan out of our hair.

Long story short, I just wanted to advise you what I was working on.  As far as how this is done, it is simple, I just move X percentage from me to the investor.

A few days before we go to closing we have to freeze the work sheet that I developed and get all the percentages Locked [*sic*] in.  I think we need to get together face to face to go over that work sheet and make darn sure we have it correct.

My plan is to be in L.A. on the Thursday the 23rd, meet with Manny and then call or visit all the people that have not remitted their checks, then come back to Spokane and pick up any check [*sic*] that have not been sent it from people around here.  The actual closing is not all that complicated, but it might be a good idea if you came to Spokane, because we will need your signature on several document [*sic*], the exercise of the options, corporate name change, setting up new bank account, and a dozen other little items.  Might even have to have the attorney fly over for a day from Seattle. . .

I am around all day.  Cheers, Jay

219.    At the end of that week, Edington derided MLS's then-securities attorney,

Mike Espey, because Mr. Espey advised Edington to comply with disclosure requirements

under the securities laws.  On Sunday at about 11:30 pm, September 26, 2010, Edington

forwarded to Val Holms Mike Espey's detailed comments on a draft preliminary proxy

statement.  Mr. Espey's comments pointed out that the statement was deficient in several

respects, particularly due to the fact that the way Edington structured the deal amounted to

an acquisition or change of control without disclosing it as such.  In fact, in the forwarded

message sent on the afternoon of September 26, at roughly 4:00 pm, Mike Espey

summarized his comments for Edington in all capital letters.

> I AM SORRY ABOUT THE LEVEL OF DISCLOSURE
> REQUIRED, BUT IF WE DO NOT FOLLOW THE
> REGS, THE SEC WILL COME BACK ASKING FOR
> MORE BECAUSE THEY WILL REVIEW THE PRE-14A
> CLOSELY FOR SURE.  THE FACT THAT NO WELLS
> HAVE BEEN CONSTRUCTED ON THE PROPERTY
> INVOLVED IN THE MINERAL RIGHTS AND THOSE
> SUBJECT TO THE OPTION SHOULD BE MADE
> CLEAR.  WHAT SHOULD ALSO BE MADE CLEAR IS
> HOW BAKKEN RESOURCES WOULD MAKE MONEY
> FROM THE MINERAL RIGHTS.

220.    In the body of the message in which Edington forwarded Mike Espey's

comments and summary to Val Holms, Edington portrayed himself as more

knowledgeable than Mr. Espey, who is an experienced securities lawyer.  Edington simply

does not like to follow legal advice and clearly does not respect the law.

> Val, in this case, I really do not agree with the attorney and
> I think he is over the top being ultra conservative.  Holms
> Energy is not acquiring Multisys. Holms Energy is selling
> assets and taking over voting control of the company.  The
> reality is the MLS is acquiring certain assets from holms
> energy for stock and cash, but the surviving entity is not
> holms, it is Multysis, so his notion of who is acquiring who
> is not correct.  MLS is the acquiring company, the
> surviving company, but ownership does transfer to the
> equity owners of Holm Energy.  We will comply with his
> level of disclosure, but I personally think it is over
> kill.  When have you ever heard of anyone
> CONSTRUCTING a well "see his language below"

221.     Despite Edington's position on Mr. Espey's advice, the SEC issued comments on Friday, October 8, 2010, to MLS's Preliminary Proxy Statements on Schedule 14A.  The comment letter, which was issued by an SEC Enforcement attorney member named Jan Woo, presented 10 material deficiencies in the filing Edington and Edington II prepared.

222.     The next day, Saturday at about 10:00 pm, October 9, 2010, Edington attached the SEC's October 8th letter in an e-mail to Val Holms and Manuel Graiwer under the subject "Fw: SEC Fax," calling Jan Woo a racially charged and inappropriate name aimed at undermining her authority.  He also attempts to use the insult as a reason to discredit the President of the United States, ending the e-mail with legal advice.

> Rotten little Asian bitch is really making us jump through hoops that are totally unnecessary.  The good news is that none of these questions present any challenges and the answers will be filed on Tuesday.  This is so typical of the SEC, the[y] hire people out of law school, [and] give them all the small companies to learn on, so they try to find everything wrong they can to impress their bosses.  Welcome to Big Government and a round of thanks to Mr. Obama.  This is about as simple of transaction as it gets and they are still knit picking.  The other reality is that we should never had to even due a 14-A pursuant to Nevada law that provides written consent.

### Promoter's Tendency to Falsify Documents

223.     At various times during the capital formation stages leading up to the MLS reverse merger, Edington advised Val Holms about the necessity (according to Edington) of falsifying various invoices in order to hide, among other things, promoter payments to Edington.  This continued until the eve of the deal's closing.

224.     The night before closing the MLS reverse merger, on Thursday at about 10:00 pm, November 25, 2010, Edington e-mailed Val Holms under the subject "Late

Accounting Issues." The message appears to have come after some correspondences regarding a spreadsheet between Edington and Kent Jensen, who the PPM would make a director and CFO of Bakken the following day. Kent's work apparently did not align with Edington's expectation, setting Edington off on a rant aimed at discrediting Kent to Val Holms.

> Val,
>
> This is exactly where I DID NOT want to be the night before the closings!!!!!!!!!!!!!! Pisses me off to wait until the very last minute and I can tell you that Kent is a nice religious man, but he does not know jack shit about how a public company needs to operate. When a public company puts out a PPM, this is more or less a contract with the investor, all the terms and conditions are laid out. There is no way in hell MLS can pay Holms back $15,000 legal fees for Manny, if Holms did not disburse this amount. The same thing goes for the $25,000 mineral rights. What mineral right paid by whom? Holms put out $7,500 to acquire the option from Greenfield. This was their cost to get the contract. MLS had a cost of $392,500 to exercise the option, but instead paid $385,000 directly to Greenfield, so MLS owes $7,500 to Holms, which is the difference between $385,000 and $392,500. The historical cost basis in the option was $7,500, this is the Holms basis in the asset and they got $100,000 and 40,000,000 shares to pay for the assets. Accounting wise, MLS/BRI will book the option with a historical cost basis of Holmes [*sic*] at $7,500 and the exercise price will be booked by BRI at $392,750, the amount actually paid to move from the option to the purchase agreement. I just set it up in such a way that the $7,500 applied to the purchase price, but $7,500 was the Holms cost basis. I will try to work this out with Kent in the morning before the closing, which is scheduled for 9 am, when the bank opens. MLS has to clean up its liabilities, pay out expense for the offering and then whatever is left goes to BRI. The MLS accountant will do a month end statement, Holms will get the 40,000,000 share certificate dated tomorrow, but due to Friday being an off day for the transfer agent, the certificate will be cut on Monday and delivered on Tuesday.

63

225.     Edington's message went on to describe that Edington was essentially fabricating books and records in efforts to direct funds to himself without leaving evidence of doing so.  But he worded the message in a way so as to obfuscate that fact, and Val Holms did not understand the implications of Edington's activity at the time.  Edington did this by recording legal work as being done by Manuel Graiwer, who stated during a December 9, 2014 deposition that "I have never done any legal work for Multisys, I have never done any legal work for Bakken."  Deposition of Manuel Graiwer, Esq., p 108. Edington's message to Val Holms, however, represented that falsification of records was "a legal way" to book payments.

> I have a commission schedule all worked out and I have things worked out with Manny to get part of his fees via a legal invoice to MLS.  The reality is that Jerod and I did all the work he is going to invoice for, so this is a real number, but just a legal way of getting funds to him in the form of services rendered and not so much for finder's fee.  The consultant for a portion of finders [sic] fee is an investment company in HK that will document the clients they introduced to MLS.  Most of these will be Manny's clients, but I have piggy backed a few into this invoice.  All distributions will be done legally correct and pursuant to the terms of the PPM, so we will not have any audit problems or SEC problems.

### Promoter Maintaining Control over Both Sides of the Deal

226.     Edington's November 25, 2010 message went on to discuss transfer details, but in doing so, it illustrates the level of control that Edington exerted over MLS through his daughter, Janelle.

> On Friday, Janelle will [file] a form from the bank to add you to the MLS bank account and she will send you the checks.  When FINRA allows the name change, which will be filed on Monday, you can simply take the Amendment to the Wells Fargo Bank, show it to them, show them a

copy of the request for a name change with the IRS, which will also be file [*sic*] this coming Monday.  Then you can write a single check out of MLS to Bakken Resources and we can then close down the two MLS checking accounts.  There will be some stragglers, so these two accounts will be shut down about the 15th.  We cannot accept any checks after the 8th, if we want to do a shut down on or about the 15th.  After the 8th, it is all wires or nothing.

We still have to determine how to pay other third parties finder's fees and get that accomplished that objective, not later than this coming Monday.  I will be up early in the morning, lots to get straightened around.   Jay

227.    This November 25th e-mail from Edington sheds light on Edington's status as the *de facto* control person of MLS.  On the night before closing the Bakken deal, he coordinated with significant investors in MLS, its named principals, and designated how to book activity.  Such level of control is the kind typically delegated among top executives and a board of directors, but Edington unilaterally wielded such control through his affiliates.  The deal closed the next morning as Edington directed it.

228.    Immediately after the Company completed its reverse merger transaction on November 26, 2010, Edington then prepared a post-effective amendment to MLS's prior S-1 ("POS-AM") registration statement and filed such POS-AM with the SEC on December 30, 2010.  The original and the new registration statements' lists of selling security holders was comprised largely of Edington's friends and immediate family members.  This effectively excluded all investors involved in the PPM deal with Bakken, benefitting only Edington and his affiliates.

229.    Janelle Edington was the largest holder of MLS on the list, and she was also designated in the S-1 as MLS's Founder, President, CEO, and Director.  At the time, Janelle was in her mid- to late-twenties, which was not disclosed.   MLS's SEC filings

65

also omitted other biographical descriptions of Janelle's qualifications, but based on publicly available information on Janelle's LinkedIn profile, she appears to have been a cocktail waitress at a Las Vegas casino roughly since graduating from college in 2003. MLS's filings disclose that MLS paid $1,000 monthly for her leading MLS as a publicly traded corporation.  Putting this together with MLS's lack of operations prior to the PPM and reverse merger makes clear that Edington structured MLS in a way so as to funnel money to his daughter for doing nothing more than having her name on MLS's documents until MLS could be used in one of Edington's schemes.

**Investment and Public Relations Efforts Centered in New York City**

230.    Edington organized significant stock promotion efforts for Bakken to occur in New York City by centering investor and public relations ("IR/PR") activity there.  At about noon on December 7, 2010, Edington mentioned in an e-mail to Val Holms and Karen under the subject heading "follow up" that for the IR/PR efforts to be effective, the "reality is that we will have more than one meeting back in NYC . . . ." in addition to New York City trips previously taken before that date.

**Promoter's Facilitation Network Comprised a Range of Questionable Professionals**

231.    Edington also involved friends of his in the securities transaction who should not have been involved; particularly one Matthew Blevins, who subsequently developed a negative disciplinary record with the SEC's Division of Enforcement ("Enforcement") for his conduct that occurred before the PPM and reverse merger.  *See In re Blevins*, Ex. Rel. No. 71905, April 8, 2014 (enjoining, censuring, and fining Mr. Blevins for illicit activity resulting in securities law violations); *In re Empire Stock*

*Transfer, Inc.*, Ex. Rel. No. 71904, April 8, 2014 (enjoining, censuring, and fining other persons involved in the scheme).

232.    Empire Stock Transfer, Inc. ("Empire") was the registered Nevada transfer agent Edington selected to handle the securities processing surrounding the reverse merger, and Mr. Blevins was vice president in charge of operations of Empire, as well as Edington's main point of contact.

233.    As Bakken's transfer agent, Empire handled various shareholder administrative functions, including recording changes in stock ownership, maintaining the security holder records, canceling and issuing stock certificates, distributing dividends, resolving problems arising from lost, destroyed, or stolen certificates, and mailing proxy ballots and tabulating proxy votes.

234.    The enforcement action against Mr. Blevins found that he "willfully aided and abetted and caused Empire's violations" related to filing false or misleading statement in documents publicly filed with the SEC.  That is, Mr. Blevins was charged in 2014 with knowing what he was doing when he caused Empire to violate the federal securities laws through his conduct, going back as far as 2006.

235.    Mr. Blevins' conduct entailed covering up the fact that Empire was controlled by an individual found to have violated the securities laws by orchestrating a scheme that generated approximately $6.88 million in ill-gotten gains from November 2006 to December 2007.  *See* Lit. Rel. No. 23035, June 30, 2014; Lit. Rel. No. 21779 (Dec. 15, 2010) (prohibiting the individual, an attorney, from providing legal advice on securities transactions and ordering him to disgorge $4.98 million plus interest and a civil

penalty of $2.03 million); *SEC v. Luna*, Case No. 2:10-CV-02166 (D. Nev., Dec. 14, 2010).

236.    Empire remained Bakken's transfer agent until its resignation in 2012, after which it inexplicably refused to return Bakken's materials until the Company's counsel wrote multiple demand letters to Empire.  Bakken replaced Empire as its transfer agent in 2012 with the Nevada Agency and Transfer Company ("NATCO").

237.    With the transfer agent of Edington's choosing still in place, however, Edington manipulated the issuance of the Company's securities.  Following the reverse merger in November 2010, Val Holms, as managing member of Holms Energy, had discretion over the 40 million shares that Holms Energy received from the transaction as a result of contributing Val Holms' mineral interests into MLS.

238.    The Edingtons also tend to utilize an auditor named Tony Li, the managing partner for the auditing and accounting firm of Li & Company, PC.  The firm has been the subject of four inspections in four years by the Public Company Accounting Oversight Board ("PCAOB"), which consistently reported material and ongoing deficiencies.  PCAOB includes Li & Company, PC multiple times on its official public list of "Firms that Failed to Address Quality Control Criticisms Satisfactorily."   The first report was published on January 21, 2010, and the second was published on September 23, 2011.  PCAOB's second report found material deficiencies in nearly every respect.  The report characterized Li & Company, PC as having "deficiencies of such significance that it appeared to the inspection team that the Firm" simply did not review the required audit evidence enough to "support its opinion on . . . financial statements."  PCAOB then conducted additional inspections that reported increasing seriousness on October 1, 2013

and December 8, 2014.  The most recent report noted that Li & Company, PC's issuance of audit opinions without reasonable assurance "is a serious matter," finding that an "audit opinion should not have been issued."  Even after PCAOB gave Li & Company, PC an opportunity, the "Firm did not provide a written response" to the second, third, or most recent inspection reports.

239.    Tony Li was MLS's auditor from its initial registration and during its life as a shell company, through June 9, 2010.  Li's resignation came shortly before the PPM went into effect, suggesting that the Edingtons use Li primarily to rubber stamp SEC filings for their shell companies but not for other companies.  This permits the Edingtons to keep shells on the shelf until they can be used to perpetuate a scheme.

240.    Edington also had contacts with various brokerage firms including, upon information and belief, brokers associated with Spartan Securities, a brokerage firm with an office in Spokane, Washington.

241.    With this degree of control over the stock, Edington II, and various other Defendants, Edington appears to have manipulated Bakken's stock through his broker contacts and Mr. Blevins, particularly because the initial trading price ranged somewhere between $0.75 and $1.25.  That price range bore no relation to Bakken's assets at the time.

**Promoter's Conversion of a Bakken Subsidiary's Assets**

242.    Edington's bad advice was pervasive and persisted after the reverse merger.  Edington advised Bakken to form a subsidiary in 2011 called BR Metals to explore certain opportunities.  Bakken formed the subsidiary on January 13, 2011, as noted in its Form 10-K, filed April 16, 2012.

243.    Nevada's secretary of state lists BR Metals as an active private corporation with the same address as, and overlapping leadership with, Bakken.

244.    Bakken's SEC filings include its subsidiaries' finances on a consolidated basis such that financial information need not be separately listed for the private subsidiaries.

245.    Based on information and belief, Edington had no plans to assist in the BR Metals initiative, and it is clear that the way in which he orchestrated the BR Metals transaction resulted in corporate waste.

246.    The deal's structure entailed forming a separate company, selling shares to Val Holms, and then having Val Holms sell those shares to Bakken.  Had BR Metals been formed as a typical subsidiary, an entire transaction (and associated costs) would have been completely avoided.  However the subsidiary should have been formed, though, Bakken sought to put it to the good use of increasing shareholder value.

247.    Upon the advice and recommendation of Edington, BR Metals retained Edington in 2011 as a consultant for at least $10,000 to seek out and stake mining claims in an area known as the Bay Horse mine, an old silver mine in the state of Oregon.

248.    Edington staked the claims, and the Company paid Edington for ownership of those claims and related information about them.

249.    Unbeknown to the Company, Edington had previously used the same or substantially similar Bay Horse assets in the formation of another shell company.

250.    The Company hired consultants and expended considerable time and resources to investigate the viability of such claims, even after Edington became disengaged with the Company in May of 2011.

251.     Edington delivered the staked claims to the Company but failed to do so, however, until April of 2011.  By then the February 2011 deadline for BR Metals to perfect the claims had already past, and the opportunity to profit from the Bay Horse venture was gone.

252.     Roughly two years later, the Company discovered that Edington provided assets to another company called American Cordillera ("AmCor"), and those assets were substantially similar to the Company's claims and related information.

253.     AmCor is the surviving company of a 2012 reverse merger Edington orchestrated using APD, the same shell Edington sought to use in his 2009 pump-and-dump attempt with Val and Allan Holms during the first half of 2010.

254.     AmCor's President, CEO, and Director, one Frank H. Blair, is also a former Bakken director who Edington secured as part of the reverse merger.

255.     Another AmCor director, Manuel F. Graiwer, is the same known affiliate of Edington's discussed above.  Edington brought in Mr. Graiwer as an early investor in the 2010 reverse merger that formed Bakken.  Manuel Graiwer and Edington have an established history of working together in highly questionable shell company transactions.

256.     Mr. Graiwer remains a holder of Bakken and is currently litigating an action against the Company, its officers, directors, and outside counsel.

257.     Due to significant and continuing interactions between Mr. Graiwer and Edington, the Company believes Edington to have a hand in Mr. Graiwer's litigation pursuits in the state of Washington.

**Manipulating Facts by Forging Documents to Conceal Information From Auditors**

258.    Edington forged documents to hide information and provide misleading information from Bakken's auditors.

259.    On February 28, 2011, after Bakken came into existence, its then CEO, Val Holms, incorrectly issued a $30,000 Bakken check to pay for a transaction in the name of Holms Energy, Val Holms' private company.  He then sought to undo the transaction so that it would not be paid for using Bakken funds.

260.    On March 9, 2011, Edington wrote an e-mail to Karen, Bakken's director and corporate secretary, saying that he did not "want anyone outside of the three of us to know about this."  By the "three of us," the e-mail referred to Edington, Lisa Hjalatin, and Karen.

261.    The same day, Edington e-mailed Val Holms with instructions on how he should reverse the transaction, which reads in relevant part as follows:

> To reverse this, you need a paper trail and this is what has to happen.
>
> Attached is a draft option and deposit agreement . . . . It is not necessary to get the guy granting the option to actually sign this, just need his name and have someone sign it to keep it simple, because this agreement terminated everything as far a [Bakken] is concerned.  The key is getting the $30,000 back into [Bakken].
>
> I recommend that unless you really trust this guy in Texas, I would not send down another $30,000 to have him wire it back.  If required, send $30,000 out of Holms Energy to Mike Trahan's bank account or someone you trust, and then have them send it back to BRI's bank account.  The wire could be from Michael Trahan, the agent for the seller.  This will unwind the deal and all you have to do is put a hand written memo into the file that there was a problem with the title report and BRI got its deposit back.  End of

72

story, went to the alter [*sic*] and came away unmarried.
This will clean up the transaction . . . .

. . . This one was easy to clean up and rectify . . . . I will try
to sneak in a board resolution after the fact. . . .  Jay"

262.     On March 12, 2011, Edington sent Bakken's CEO an e-mail attaching a
request from Bakken's auditor to explain the original $30,000 check.

263.     It explains that Edington thinks "this is now cleaned up, but they may ask
for the resolutions.  Getting the money back on Mon or Tuesday would really put this to
bed."

264.     Edington responded to the auditor's request for support by sending the
fabricated option and deposit agreement described in the March 9, 2011 e-mail quoted at
length above.

265.     Following Edington's advice, the Company's CEO sent a letter dated
March 15, 2011 to the recipient of Bakken's $30,000 check in order to create "a paper
trail," as Edington put it in his May 9, 2011 e-mail.

266.     The letter references the questionable deposit and option agreement that
Edington previously e-mailed.

> Pursuant to the terms and conditions of our Deposit and
> Option Agreement, please be advised that as a consequence
> of not being able to secure a lease on the 320 acre parcel
> adjoining your land, the economics do not appear to be as
> favorable as I once believed.
>
> Therefore, per our agreement, I kindly request that you
> return the $30,000 deposit via wire transfer to the account
> below.

267.    Edington followed up via e-mail with Karen and Lisa Hjalatin, noting that Bakken's $30,000 "better be back this week, or [Bakken] is getting hosed," asking them to look out for the funds and notify him when it came in.

268.    After receiving confirmation on this point, Edington responded on March 31, 2011 to indicate that the auditor accepted the fabricated agreement, going on to describe how to account for the fiction he created.

> Information to the auditor has been supplied regarding the $30,000 . . . .  Per the agreement, [Bakken] had the right to get the deposit back and Val has exercised this right and requested to get the funds returned.  So, from an accounting perspective, the $30,000 out was a deposit or basically earnest money and it is being returned. So this should be easy to book and describe. Thanks, Jay.

269.    On March 18th, Karen sent "the Baber letter" as an e-mail attachment to Edington, and Edington responded with instructions directing Karen to "just stick [it in] the file, correct [the] date, [and] correspond [it] to the incoming wire [transfer], end of story."  A Wells Fargo bank statement shows that the wire transfer deposited $30,000 back into Bakken's account on March 16, 2011.

**Court Held That Promoter Acquired Eight Million "Shares of Bakken by Fraud"**

270.    Edington prepared a spreadsheet in February of 2011 showing where 40 million shares in Holms Energy would go.  The spreadsheet listed 39 recipients.  Edington represented that the spreadsheet was accurate and received approval to use as an attachment to a forthcoming letter that would authorize distribution of the shares once signed.

271.    Edington delivered the letter with the attached spreadsheet and had it signed.

272.     Not until several months later did the Company realize that Edington swapped the approved spreadsheet for another one that included additional recipients not authorized.  Edington was one of those added recipients.

273.     In total, Edington inappropriately procured eight (8) million shares of the Company's stock and possibly more.

274.     Forming Holms Energy permitted Edington to use it as a means to participate in the PPM deal through nominee shareholders.  Edington advised obtaining certain small investors for the Company through a Unit Agreement in Holms Energy, which converted each unit into a number of MLS shares.  But Edington stated in e-mails that he and Mr. Graiwer selected those investors and paid themselves for doing so, albeit under the heading of "legal" and "consulting" work.  *See* ¶ 226, *supra*.  Transferring the mineral assets to Holms Energy, after advising that it must be created for that purpose, simply ensured that Edington would have a heightened level of control over the disposition assets as they progressed through the Bakken deal.

275.     Edington advised that the eight (8) million shares under Edington's control would be used to secure additional investors, and that Edington could sell the shares to those people.  Under the securities and other applicable rules and regulations, however, this would likely make Edington both an underwriter and a broker-dealer. Edington's injunction forbade that exact kind of activity.  The Company did not at the time know this, which permitted Edington to proceed.  But Edington did not do what he said he would do.

276.     In December of 2011, Edington II (through his company IWJ) and two of Edington's affiliates requested that Bakken remove restrictive legends from 4,750,000 shares of the Company.   The Company sent the request to its outside counsel, for review.

277.     Corporate counsel conducted a customary investigation to confirm the valid issuance of such shares and discovered that such shares did not appear to be validly issued.  Bakken's corporate counsel denied the request to remove restrictive legends for insufficient proof of ownership.

278.     Edington and the other purported holders then requested a legal opinion from their counsel indicating that the restrictive legends could be removed, but neither Edington nor his affiliates informed their counsel about the title defects.

279.     Their counsel issued the opinion.

280.     Company counsel engaged in several communications with Mr. Blevins, vice president of operations at Empire Trust (the Company's stock transfer agent at the time).  Mr. Blevins indicated that it was Empire's intention to honor the third party opinion.

281.     The Company disagreed with Mr. Blevins and Empire, and took steps to seek out another transfer agent.  The Company then elected to change its transfer agent from Empire to NATCO.

282.     On June 1, 2012 Edington and his affiliates delivered a facially valid legal opinion to NATCO as part of their request to remove the restrictive legends.

283.     Receiving the request with a facially valid legal opinion obliged NATCO to remove the legends unless a court of law restrained NATCO from doing so.

284.     Bakken filed for a restraining order in the state of Nevada on June 6, 2012. Edington and his affiliates opposed the motion, alleging that the shares were compensation for facilitating the reverse merger that formed Bakken.  But fraudulent authorization of those particular shares was obtained by secretly swapping out a document, as described above.

285.     On August 14, 2012, the Nevada state court entered an injunction order restraining NATCO from removing the restrictive legends from the shares under Rule 144, 17 C.F.R. § 230.144, because Edington and his affiliates did not pay for those shares as required by that rule.  *See* Case No. CV12-01509, Dept. No. 8, transaction # 3147914.

286.     The Nevada District Court issued a final judgment on June 12, 2014, accepting the facts laid out above with respect to Edington's fraudulent procurement of Bakken's stock.  Specifically, the court accepted that "[Edington] falsely represented that the Defendants were entitled to shares of Bakken, he knew or should have known the representation was false, he intended Val Holms to rely on his representation in distributing shares to the Defendants, and Holms relied on that representation to sign the letter authorizing the distribution of shares to the Defendants."  Case No. CV12-01509, Dept. No. 8, transaction # 4475033.

287.     The final judgment declared that the Defendants "obtained their shares of Bakken by fraud," and it ordered that "Defendants are permanently enjoined from attempting to transfer their shares from Bakken."

**Promoter's Intentional Evasion of Securities Laws Through the Use of Strawmen**

288.    Much of the obscured ownership that managed to keep Edington's name off of documents that tie him to the various things mentioned in this complaint resulted from the use of so-called "straw men."

289.    Section 16 of the Securities Exchange Act of 1934 requires every "beneficial owner" holding more than a 10% of any class of non-exempt securities in a company registered under that Act to file certain statements disclosing information about that ownership.  *See* 15 U.S.C. § 78p.  The securities laws are sophisticated enough to preclude attempts to evade this requirement by means of simply putting securities in the names of multiple persons, or so-called "strawmen."  Beneficial ownership reaches beyond direct ownership of the person whose name is on a stock certificate.  Because of 17 C.F.R. § 240.16a-1 and 17 C.F.R. § 240.13d-3, the concept of beneficial ownership under Section 16 also contemplates indirect ownership of securities through any "understanding, relationship, or otherwise" that results in either voting or investment control over the securities in question.  Strawmen are clearly covered, and anyone using strawmen as a "plan or scheme to evade the reporting requirements" is deemed to be "the beneficial owner" for purposes of the rules.

290.    Not only did Edington use strawmen during the formation of Bakken, but he also instructed others relying on him for advice as a promoter to do the same as if it were proper – all the while aware of Section 16's 10% threshold.

291.    Edington has discussed under oath the fact that he obfuscates his ownership in companies through the use of straw men.

292.     Using strawmen involves placing stock in trusted persons' names to obscure the indefinability of the true beneficial holder's ownership.

293.     Limiting ownership avoids regulation because many of the federal securities laws impose disclosure obligations upon persons who beneficially own more than threshold amounts of stock in a registered company.

294.     Beneficially holding more than 10% of any equity class of a company's securities amounts to being a "principal shareholder" under the rules.  Beneficial ownership under Rule 16a-1, 17 CFR § 240.16a-1(a), broadly includes any arrangement that directly or indirectly creates a pecuniary interest in the security.

295.     Because Rule 13d-3 deems as a beneficial holder any person who attempts to "evade the reporting requirements" by affecting or preventing any arrangement for that purpose, Edington and his affiliates constituted a beneficial holder group.

296.     Exceeding the 10% threshold of beneficial ownership for the first time requires an initial statement on Form 3.  Subsequent changes in beneficial ownership must be reported on Form 4, and all other unreported but reportable events must be disclosed annually on Form 5.

297.     No relevant Form 3, 4, or 5 discloses the required information for Edington or his affiliates because Edington arraigned for certain people he identified to hold stock in their names even after (in some cases) Edington provided the funds for such holders to purchase securities.  Edington discussed the reason for doing this was to ensure that no single investor holds more than 10%.  Doing this amounts to an arrangement meant to evade the reporting requirements under the Exchange Act.  Edington is thus deemed to be the beneficial holder of all securities related to such scheme.  Those

securities total more than 10% of Bakken's common stock, which obliged Edington to report himself as a principal holder of Bakken.

298.    In his January 7, 2013 deposition in Allan Holms' lawsuit against the Company, Edington discussed that he intentionally placed shares in multiple peoples' names, stating that he did not want to create reporting requirements by putting more than 10% in any single person's name.

299.    Edington used strawmen in connection with the formation of Bakken.  He assigned roughly 7,000,000 shares belonging to Bakken's CEO to other persons, which Edington discusses openly in e-mails quoted above.

300.    Edington filed no Form 3, 4, or 5 as a principal shareholder of Bakken's stock even though he was the beneficial owner of more than 10% of the Company's stock. The same reasoning applies to Edington's failure to report his holdings, as well as the group consisting of his affiliates, as they related to other companies, particular APD through 2009.

301.    During the process of preparing the materials for the Company's 2011 Annual Report, the Company, in its review of the Company's equity capital, discovered that several shareholders were not actually the true beneficial holders of stock.  The Company then began the process of associating the shares with the true beneficial holders. This process resulted in multiple Form 3 filings by Bakken spanning 2011 through 2013.

**Promoter's Spiteful Attacks Against Bakken and its Leadership**

302.    Once it became clear to Edington that he could lose control of certain things, he and his affiliates undertook an aggressive campaign to undermine the company, its leadership, and its business decisions.

80

303.     In a series of e-mails during the second half of 2011, Edington attempted to engage in selective correspondences with the Company's outside counsel.  In those e-mails, Edington went on at length instructing outside counsel on the securities laws.  Voluminous messages from Edington were accusatory and based on Edington's mischaracterizations of and limited access to Bakken's inner-workings.  Edington repeatedly portrayed himself as a gatekeeper between the Company and largely unnamed shareholders.

304.     He did, however, name shareholder Mr. Graiwer, threatening that Mr. Graiwer would pursue legal action as a matter of spite.  The basis for these threats, which ultimately materialized into an ongoing litigation that Mr. Graiwer brought against Bakken and its leadership, was that the Company had not filed a new Form S-1 registration statement allowing investors to freely trade Bakken's stock.

305.     Edington understood the PPM to require filing of a new registration statement following the reverse merger.

306.     The PPM's requirement with respect to filling a subsequent registration statement read under the heading "Registration Rights" in relevant part as follows:

> Within 150 days following the [Closing] we will cause [MLS] to file with the [SEC] a registration statement [covering] the resale of the Shares of common stock purchased in this offering.  We will further [use] best efforts to have the Registration Statement declared effective [within the] earlier of (1) 210 days following the Acquisition Date, or . . . Closing Date, or (2) five trading days following the date on which we are notified by the Commission that the Registration Statement will not be reviewed or is no longer subject to further review (the "Prescribed Periods").  [If not], we will pay to each investor, as liquidated damages and not as a penalty, a cash amount equal to 1.5% (with a Cap of 6% in any 12 month period) of the total Offering Price for the Units purchased

81

> by such investor for each monthly period, or portion
> thereof, in which we are not in compliance with our
> obligation to file or make effective the Registration
> Statement.

307.     On December 30, 2010, well within the PPM's proscribed periods, Edington directed the Company to file a post-effective amendment no. 1 to the Form S-1 previously filed on February 26, 2009 as MLS.

308.     The amendment included all shares subject to the November 2010 PPM and attendant reverse merger.  This satisfied the PPM's subsequent registration statement filing requirement even though the statement did not become effective.

309.     The SEC issued comments to the registration statement expressing concerns that Bakken's status as a shell company correctly precluded it from freely trading stock on the over-the-counter bulletin boards ("OTCBB") markets.

310.     Comments from the SEC indicated, in part, that the SEC had concerns about the Company's operating company status.

311.     Resolution of comments from the SEC would have likely taken several months and cost the Company tens of thousands of dollars in legal, accounting, and other fees.

312.     When Edington and the other Defendants were removed and disengaged from the Company in the late spring 2011, Edington tried to cover his tracks by claiming that the Company failed to file a registration statement as required under the PPM.

313.     Bakken decided that filing a new registration statement at that point would have been a costly act.  Language from the PPM quoted above is qualified by a "best efforts" clause, and the Company used its best efforts to effect a registration statement.

314.     Bakken filed a notice on December 19, 2011 notifying the SEC that it had withdrawn the post-effect registration statement.  The reason for this was the vast majority of securities of the Company held by *bona fide* investors were eligible for restrictive legend removal under Rule 144 of the Securities Act, as amended, which would have permitted sale on the OTCBB markets.  Accordingly, a registration statement for such investors' securities was unnecessary and would have constituted a waste of Bakken's time and resources.

315.     Rule 144 under the Securities Act, as amended, provides substantially identical rights that otherwise would have been provided had a registration statement been declared effective.

316.     Edington's extensive series of e-mails and memoranda to Bakken's corporate and securities counsel appears to have been an attempt to create a paper trail shifting attention away from Edington's poor advice to prematurely file a post-effective registration statement.

317.     This issue was the subject of litigation that settled, but the Company maintains that it complied in good faith with its obligations under the PPM.

**Promoter's Orchestration of Threats and Harassment Against Bakken's Principals**

318.     In addition to his other vindictive tactics, Edington or his affiliates also caused Members of Bakken's management to receive threats from Edington's family members starting in mid-2011.

319.     Karen Midtlyng, Bakken's corporate secretary and director, reported receiving a threatening phone call from Edington's son, Edington III, in the latter half of 2011.  She included a note in Bakken's records that reported Edington III telling her that a

"day of reckoning" was upon her because Mr. Graiwer was willing to pursue legal action against anyone who stood in his way simply because he felt angry.

320.    Karen also reported the incident to outside counsel, who informed local police, but she chose to not press charges.  Such instances exemplify a limited sample of untoward interaction that Edington and his affiliates have instigated against Bakken and its leadership.

321.    Around the same time in 2011, the Company and its leadership began receiving disturbing letters in the mail penned in the name of a Bakken director, Edward Nichols, who lives in Colorado.  The letters came from an address in Spokane, Washington, where Edington lives.  Mr. Nichols denies writing them.

322.    The letters were written in a manner bearing a striking resemblance to Edington's, and they pertained to matters about which Edington was among those most familiar.

323.    The Company believes, based upon the information available, that Edington either wrote the letters or caused them to be written and sent.

324.    Content of the letters described a parade of horribles that would follow from keeping the same leadership, in what appears to be Edington's calculated attempt at inducing board members to resign.

325.    Edington, Edington II, Edington III, or some combination of the three also appear to have been maintaining an aggressive and persistent internet trolling campaign.

326.    One of the most active internet boards for OCTBB investors is InvestorsHub.com.  The user "Osbourn Cox" has been consistently writing disparaging public messages from August 20, 2012 to the present.

327.    As of October 1, 2015, all or substantially all of Osbourn Cox's posts are under Bakken's investor page.

328.    Obourne Cox's posts correspond in timing and with events that Edington openly criticized in various communications to the Company and its leadership, particularly Bakken's CEO.  *See* Bakken's page on InvestorsHub.advfn.com, posts 241, 262, 391, 392, 424, 498, 536, 643, and 724 (spanning from late-2013 to mid-2015).

329.    It appears from the posts that Edington and his constituents, after filing a complaint against Bakken, had been posting about the allegations in the complaint as if they were established matters of fact.

330.    The posts also seem to focus on relatively routine SEC filings, such as a confidential treatment request, discussing such filings as serious matters for concern without any other information.

331.    Doing this illustrates one means by which Edington and his affiliates can intentionally mislead investors to draw unfounded conclusions.

332.    Edington would also "ghost write" under other people's names to harass the Company, taking on other identities for the purpose of spreading misinformation.

333.    A recent internal investigation by the Company revealed that Edington forged a Bakken director's signature in connection with a $30,000 transaction in February of 2011.

334.    A series of e-mails between Bakken management and Edington show Edington providing directions to cover up a mistake made by Bakken's then-CEO.

335.    Instead of simply reversing the transaction, Edington provided detailed instructions for how to create a false paper trail and hide the mistake from the auditors.

One executed instruction was to include a letter in the Company's files written by Edington under the name of a Bakken director.

336.    As the Company began to understand the true nature of Edington's conduct and network of supporters, Bakken learned that Edington and his constituency had deceived it from the beginning.

### Deceitful use by Promoter of False Shell Companies in Order to Defraud

337.    The very act of going public through a "shell company" as defined under Rule 405, 17 C.F.R. § 230.405, and then immediately registering stock after a transaction raise red flags signaling fraudulent conduct because the tactic has an established history of abusive and illicit activity.  *See* SEC Rel. No. 33-8591, July 19, 2005; SEC  Rel. No. 33-8587, June 15, 2005.

338.    A shell company under Rule 405 denotes any registrant whose balance sheet reflects "no or nominal" operations and assets (other than cash and cash equivalents).

339.    Shell companies are often "blank check" companies under Rule 419, 17 C.F.R. § 230.419, when they are a development stage company lacking any real business plan and issue "penny stock" under Rule 2a51-1, 17 C.F.R. 240.3a51-1 (describing certain stock of issuers who meet minimum value, earning, shareholder-count, and other requirements).

340.    MLS was in 2010 a shell company whose metrics fell far below even the "blank check" and "penny stock" thresholds.

341.    Balance sheets for its first annual report on Form 10-K, filed April 7, 2010, showed that it had only $14,308, of which $3,855 was cash.  It also lacked any

significant operations, stating that it had "no available line of credit . . . [and needed] to raise additional capital [and] revenues;" otherwise it would need to "curtail [its] operations."

342.    This clearly falls under Rule 405's definition of a "shell company" as a registrant with no or nominal assets and operations.

343.    In fact, total asset value stated on MLS's Form 10-K is less than the professional fees often associated with drafting a Form 10-K.

344.    As discussed above, Edington or his nominees also had total control over the MLS shell.  Edington used it to facilitate the PPM's reverse merger that formed Bakken.

345.    The SEC has consistently announced its deeply-seeded mistrust of most shell company transactions of a certain type, particularly when it comes to publicly registering a shell's stock:  "Certain of these issuers have been viewed historically as unsuited for short-form registration [and] we have repeatedly stated our belief that . . . shell companies . . . may give rise to disclosure abuses."  SEC Rel. No. 33-8591, p. 97, July 19, 2005.

346.    Edington's orchestration of the 2010 PPM and merger forming Bakken falls in line with a particular type of circumspect shell transaction, which places assets in a shell primarily to lift shell status and enable free trade of its stock.

347.    The Commission, in promulgating Rule 405's current definition of a shell company, intentionally chose to not define the term "nominal."  This was because doing so would permit unscrupulous market participant to incrementally surpass that threshold to avoid shell status, and leaving the term to its plain language anticipated such activity.

348.    Registrants seeking to escape their shell status and then file a registration statement in order to enable free public trading of its stock engage in what has informally become known to the Commission as filing a "sham registration statement."

349.    Doing this first requires successful efforts to make the registrant appear to maintain more than "nominal" assets and operations.

350.    The practice is outlined in footnote 32 of Rule 405's final 2005 release, SEC  Rel. No. 33-8587, p. 10, June 15, 2005.

> We have become aware of a practice in which a promoter of a company and/or affiliates of the promoter appear to place assets or operations within an entity with the intent of causing that entity to fall outside of the definition of "blank check company" in Securities Act Rule 419. The promoter will then seek a business combination transaction for the company, with the assets or operations being returned to the promoter or affiliate upon the completion of that business combination transaction. It is likely that similar schemes will be undertaken with the intention of evading the definition of shell company that we are adopting today. In our view, where promoters (or their affiliates) of a company that would otherwise be a shell company place assets or operations in that company and those assets or operations are returned to the promoter or its affiliates (or an agreement is made to return those assets or operations to the promoter or its affiliates) before, upon completion of, or shortly after a business combination transaction by that company, those assets or operations would be considered "nominal" for purposes of the definition of shell company.

351.    Edington putting Val Holms' minerals into a sketchy shell (MLS) in 2010, and his prior attempt to put them in a similar shell (APD) in 2009, aligns with the very type of scheme described in footnote 32.

352.    First, Edington acted with his affiliates as promoter of Bakken.  Use of the term "promoter," defined in Rule 405, describes persons who take "initiative in founding and organizing the business or enterprise of an issuer" or who receive payment of at least

10% "of any class of securities of the issuer" for such activity." Edington and his affiliates took initiative to organize Bakken and received millions of its shares for doing so.

353.    As promoter for Bakken, Edington and his affiliates stood at the helm. None of Bakken's directors or managers had experience navigating the securities rules or running public companies, and they did not appreciate the fact that taking such a company public could be suspect as highly atypical.

354.    Edington both selected and retained influence over the Company's initial advisors, including its transfer agent.

355.    When Edington directed the Company to file its December 30, 2010 post-effective amendment to MLS's registration statement, the Company's leadership was unable to appreciate the implications of it being a sham registration statement.

356.    That December 30, 2010 filing, however, came little more than a month after the PPM closed in November of 2010.  Considering the length and breadth of the filing, it likely could not have been filed sooner.

357.    Once mineral assets were in the Company, Edington appeared to have expected that those assets would give Bakken the appearance of having more than nominal assets on its balance sheet in the hopes of lifting shell status and opening up trade in Bakken's stock.

358.    There was a strong but illicit financial incentive to do this.

359.    Bakken's stock price has never been higher than it was immediately after the Company's formation.

360.    The price bore no logical relationship to the Company's assets, strongly suggesting that the price was artificially inflated.

361.    Edington's relationship with Matt Blevins put him and his affiliates in a position to manipulate the stock.

362.    Mr. Blevins held a key operational position for Bakken's initial transfer agent, Empire, who the Commission charged in 2014 with willfully covering up the fact that Empire was controlled by the mastermind behind a deceptive scheme that defrauded investors out of nearly $10 million.

363.    Selling artificially inflated stock would have benefited Edington and his affiliates, and Edington's persistent efforts to obtain and sell Bakken's stock during this time indicate that this was a secret purpose behind the promotion efforts.

364.    At the same time, investors who put in money into the transaction would not be afforded the same opportunity to liquidate their respective shares, nor would any company insiders.

365.    After the SEC stopped short the registration statement, Edington's numerous correspondences with Bakken's new corporate counsel revolved around Edington's efforts to make Bakken's stock freely tradable.

366.    Edington sought to create rifts among management, directors, and counsel around the idea that Bakken's stock must immediately become registered for trading.

367.    For instance, Edington e-mailed Bakken's outside counsel, but not its CEO, several times with disparaging and threatening language aimed at scaring Bakken's outside counsel to release Bakken's stocks shortly after the SEC issued comments to Edington's December registration attempt.

368.    Bakken's outside counsel, however, responded to Edington's e-mail with explanation, copying on the e-mail everyone Edington intentionally excluded from the message.

369.    The Company determined, as it should have, that it would not be in the best interest of the shareholders to take actions that would disproportionately help Edington and his affiliates sell out a stock position that may have been unlawfully procured.

370.    There simply was a misalignment of goals, but Edington could not disclose his goal to the Company because Edington's goal involved profiting from Bakken's loss rather than its success.

371.    Had the Commission accepted Edington's sham registration statement, Edington would have likely sold his shares at the then-inflated price and left the Company with the mess.  Unable to do this, Edington focused his efforts towards encouraging a series of litigations designed to oust the Company's management and outside legal counsel.

**Promoter's Material Omissions and Misrepresentations During Capital Formation**

372.    Edington portrayed his promotion plan as having the goal of creating a successful oil and gas company capable of raising adequate capital through publicly tradable stock.  Those involved proceeded with that as the underlying motivation based on Edington's description of the benefits associated with doing so.

373.    Reverse merging into a shell can be, and often is, a legitimate means of going public, but that was not what happened.

374.    Edington covered up material information and presented other such information in a misleading way.

375.    During the 2010 reverse merger that formed Bakken, Edington made at least three material misrepresentations or omissions.

376.    The first was Edington made absolutely no mention of his poor disciplinary record with the SEC.  He hid the fact that a U.S. District Court had issued a permanent injunction restraining him from engaging in substantially the type of activity attending Bakken's formation.  Even after inquiries, Edington put himself out as and maintained that he is a competent and reliable securities professional.

377.    This representation was false and misleading because Edington failed to disclose that the injunction that SEC Enforcement had secured was still in effect, and the enforcement action related to conduct similar conduct to that complained of here.

378.    Subsequent securities law violations by Edington, such as those alleged here, could accordingly establish contempt of the standing injunction.

379.    This fact was material information that should have been disclosed and considered before moving forward using Edington and his network to facilitate the reverse merger that resulted in Bakken.

380.    Edington did not disclose any of his past securities law violations and sanctions by the SEC despite being asked by Bakken on prior occasions about his professional background while the MLS reverse merger process was being contemplated.

381.    Second, Edington was not forthcoming about the level of control he exerted over MLS.

382.    His young daughter, Janelle, was one of the co-founders of the company, and Edington's admitted use of "straw-men" stockholders suggests that he directly or indirectly controlled a substantial portion of MLS's stock through Janelle and others.

383.    Edington exerted this control to obtain material non-public information and use it to his benefit.

384.    Edington's significant involvement in MLS was never disclosed in any MLS document publicly filed with the SEC.

385.    For instance, during the Company's pre-merger money raise in connection with the PPM, MLS filed with the SEC a June 11, 2010 Form 8-K, and a June 29 amendment, announcing a three-to-one forward stock split.

386.    This split took place approaching the eve of the MLS merger that formed Bakken, and it had the effect of artificially tripling the number of MLS's stock in anticipation of the deal.

387.    The split benefitted MLS's few shareholders, who were largely friends and immediately family members of Edington over whom he had considerable influence.

388.    Third, Edington acted not only as a promoter and business consultant, but also as an attorney while making grandiose promises in communications leading up to and during the reverse merger.

389.    Edington repeatedly touted that he had the knowledge to adequately complete legal filings necessary for public companies in connection with the MLS reverse merger transaction.

390.     He made several comments and gave detailed explanations about crafting SEC disclosures so as to circumvent the securities laws, as if he were a securities lawyer who had researched the matter carefully.

391.     Edington would essentially dictate information under the guise of advising the Company on how to properly navigate the reverse merger.

392.     He did this without regularly involving the company's nominal securities attorney at the time, who apparently took direction directly from Edington rather than anyone officially connected with the Company.

### Promoter's Contempt by Violating the Injunction

393.     The deceptive tactics discussed throughout this complaint violate antifraud provisions of the Exchange Act in contempt of Edington's Injunction.

394.     By designating to whom the 40 million post-merger shares would be assigned, Edington transacted securities for the account of others as a broker, and he also transacted securities for his own account.  These acts also serve as contempt of Edington's Injunction.

### Collusion with Others Meant to Prevent Proper Business Activities

395.     As discussed above, the Edingtons coordinated the activity of both APD and MLS with the aid of a facilitating network of individuals and institutions.  The purpose of doing this was to enrich themselves and their affiliates, not to conduct legitimate business activity, and they did this at the expense of investors.

### Malicious Prosecution and the related Conspiracy

396.     Bakken removed Edington in May of 2011 once it began to uncover his conduct discussed above.   Roughly a year after Allan Holms discovered that Edington

and Val Holms formed Bakken without him, Allan Holms filed the Allan Holms

Litigation against Edington, Bakken, its CEO, and others on March 6, 2012.  Edington

then began making significant efforts to conspire with Graiwer and Allan Holms, who

Edington introduced to one another, and such efforts began long before Edington settled

out of the Allan Holms litigation on August 8, 2013.  With Edington taking the lead, the

three devised a slew of malevolent litigation tactics aimed at Bakken and its CEO as

common targets.  Edington, Allan Holms, and Graiwer proceeded to bring a series of

lawsuits in a synchronized and calculated manner primarily for the vindictive purpose of

harming Bakken and its management.  Claims in this collective effort have been filed in

multiple jurisdictions throughout the United States, and Bakken continues its defense.

Based on e-mails currently available prior to discovery in this case, facilitating discussions

between Edington, Allan Holms, and Graiwer were occurring in early 2013, though their

discussions may have begun sooner.

     397.     On Thursday morning at about 10:15 am, January 17, 2013, Allan Holms

e-mailed Edington under the subject "Fresh Start."  After "reading [Edington's] e-mail and

learning of [Graiwer's] position," Allan Holms mentioned to Edington the concept of

"global litigation" against the Company as a motivation for settling Edington out of the

Allan Holms Litigation.  Allan Holms' message signals a clear awareness that such a

global litigation campaign would compromise Bakken: "As you know the public entity

will become worthless with all of this litigation."  Allan Holms forwarded this message to

Graiwer that same day at about 2:40 pm.

     398.     Two days later, on Saturday morning at about 11:00 am, January 19, 2013,

Allan Holms e-mailed Edington under the subject "Bakken."  At the time of this e-mail,

Edington was still a defendant in the Allan Holms litigation in which Allan Holms was a plaintiff.   Allan Holms' message begins by thanking Edington "for informing [Allan Holms] of [Edington's] various contemplated legal actions and sending the filed class action."  The "class action" refers to a suit filed against Bakken in Nevada State court on January 17, 2013, just two days before the date of this e-mail: *Gillis v. Bakken Resources, Inc*,. case no. A-13-675280-B, (Dist. Ct., Nev., filed Jan. 17, 2013) [*hereinafter* the "Gillis Litigation"].  Allan Holms then goes on to articulate his impression of the class action complaint that Edington provided.

399.    The message was sent before Bakken was served in the Gillis Litigation. Given the timing of this message, Edington likely had access to the complaint before it was even filed, suggesting that Edington was directly involved in advancing the Gillis Litigation even though he was not named as a plaintiff.

400.    Roughly two months later, Edington e-mailed Allan Holms at 1:40 pm on Thursday afternoon, March 14, 2013, under the subject "2013 production 3a well.jpg; 2013 production 3a well.jpg."  Edington was at the time of this e-mail still a defendant in the Allan Holms Litigation in which Allan Holms was a plaintiff.   Not only did Edington, Allan Holms, and Graiwer individually have litigation plans against Bakken, but the message shows that their efforts were beginning to merge.  It also strongly suggests that Graiwer had informed Edington about Graiwer's litigation plans against Bakken. Edington mentioned to Allan Holms that the Allan Holms Litigation brought by Allan Holms and "Roil Energy is paramount to a .22 riffle, but Manny is bringing a cannon to the party and he has a take no prisoners mentality."  Edington went on in his message to inform Allan Holms that Allan Holms should not worry about whether defendants in the

96

Allan Holms Litigation had enough money to defend because "Lots of very wealthy people or people with access to cash have been taken down by the SEC and criminal prosecutors." Edington ends his e-mail to Allan Holms by coordinating a meeting to settle Edington out of the Allan Holms Litigation and to move forward together against Bakken. Edington's proposed meeting involved Allan Holms and his attorney at the time, Roger Reed, and Edington and his attorney at the time, Carl Oreskovich.

> [I]f you think it would be productive for me to meet with you and Roger to discuss a possible strategy, I am more than willing and Carl is invited as well. I can lay out the blueprint and you can take it under advisement and let us know how you would like to proceed, if at all. Cheers, [Edington].

401. Shortly after Edington's previous March 14 e-mail, Edington arranged for Allan Holms and his wife, Robyn, to have dinner with Graiwer. Approximately two weeks later, on Thursday morning at about 10:20 am, April 4, 2013, Allan Holms e-mailed Graiwer to follow up on their dinner.

> It was truly a pleasure to meet with you and discuss our various experiences within the business community. The dinner was great, the company even greater and I hope we can continue on the track we discussed.
> Best regards,
> Allan

402. Just two minutes later, Allan Holms e-mailed a similar follow up to Edington, indicating that he seeks to move forward with Graiwer and Edington in a coordinated manner. All the while the emails clearly indicate that Edington was the facilitator and motivating party in encouraging all parties to bring their respective lawsuits.

> [Graiwer] treated Robyn and I to a fabulous evening
> of business conversation, background and dinner.  I
> find [Graiwer] to be charismatic, excellent trial
> lawyer, and look forward to a business relationship
> if possible.  What is a good time for us to talk
> today?
> Allan

403.    About seven weeks later, Edington e-mailed Allan Holms at about 4:30

pm on Tuesday, May 23, 2013.  After discussing certain settlement options related to the

Allan Holms Litigation, Edington reiterated his view that he and Allan Holms are aligned

with respect to harming Bakken and its principals through litigation.

> [My goal is] to cause whatever misery I can to the
> two thugs.  I am tired of paying legal fees for this
> situation, I am not willing to continue to pay fees to
> battle you unless absolutely required and then go
> sell stock and assets to support HH [Holland &
> Hart] which will inure to your benefit indirectly.

404.    Given that Edington's stock and asset sales activity follows an illicit

pattern, this final portion of Edington's e-mail reveals his conditional plans to invest illicit

gains toward funding improper litigation efforts.

405.    About one week later, Edington e-mailed Allan Holms at about 7:30 am

on Wednesday, May 29, 2013, reinforcing Edington's resolve about working with Allan

Holms to coordinate litigation against Bakken and its CEO:  "I am as they say in the poker

world 'Going all in', I am ready to implement my plan to go to investors to fund this, it

takes 5% from each and they are pissed and want to help."  This is language of conspiracy.

The message suggests that Edington planned to improperly obtain and use investor funds

for the inappropriate purpose of malicious prosecution: "Not sure what more I can bring to

the table, except my desire to take the two of them down as quickly and efficiently as

possible."  Edington mentions to Allan Holms that coordinating litigation efforts will

require Edington "moving from Val's side of the table to your side" in the Allan Holms

Litigation by settling Edington out as a defendant and helping Allan Holms as a Plaintiff.

Edington goes on to discuss how he, Allan Holms, and Graiwer could take over Bakken

through litigation, mentioning that if Allan Holms "ended up controlling Roil with 60%,

we would demand that ail [*sic*] the revenue taken in to date by BKKN [would go] back to

Roil . . ."

406.     Discussing these things repeatedly in terms of "we" signals cooperation.

Edington goes so far as to propose two fallback litigations for if the Allan Holms

Litigation does not serve the purpose of either taking over Bakken or else starving it of

funds to the point of financial ruin.

> The [first] fall back [*sic*] position is then the class
> action related to the registration rights [contained on
> page 8 of the June 28, 2010 PPM], which is a slam
> dunk and easy to ascertain because it is a simple
> breach, but the amount of money is not
> insurmountable and could be paid by BKKN from
> current cash position or switched out for stock.
> This is not a hammer, it was a way to get into
> discovery to gather other more damaging
> information.

407.     This language reveals the motivation behind the Gillis Litigation, which

was the "class action" Edington referred to in the previous quote.  Mentioning that the suit

was not a "hammer" but just an excuse to gather "more damaging information" through

abusing the discovery process shows that multiple layers of improper litigations were

being coordinated for the primary purpose of harming Bakken, as well as usurping its

Bakken's assets.  Edington then went on to discuss a second fallback litigation.

> Then there is the new proposed litigation and this
> too is a slam dunk for securities fraud and
> misrepresentation at the very minimum, just based

> on the Marine misrepresentation, which was
> confirmed by the [Holland & Hart] attorney [in
> Colorado.]  I guess this is the safety net for all
> concerned and this is why 1 [*sic*] have no real
> choice but to proceed with reckless abandon.

408.     This second fallback litigation of Edington's shows that he and Graiwer are pulling at straws for any reason to harm the Company through litigation.  The purported basis stems from a potential misstatement of dates related to the duration of Val Holms' military service as presented in the biographical information that Bakken reports in its periodic SEC filings.  Prior military service does not relate to the Company's financial statements.  The final paragraph of Edington's e-mail recognizes that these fallback positions are just that – fallbacks and not lawsuits based on meritorious claims. Edington redirects attention to coordinating efforts in the Allan Holms Litigation, which was then ongoing, and from which Edington had not yet been dismissed as a defendant.

> [Graiwer] and I both agree that for you to prevail is
> the most efficient way to proceed, so lets [*sic*]
> please get some defined understanding as to what
> happens in the event that takes place.

409.     Between Tuesday afternoon at 4:15 pm, June 25, 2013, and Thursday afternoon at about 5:00 pm, June 27, 2013, an e-mail chain started by Edington's attorney, Carl Oreskovich, coordinated a meeting under the subject "Shareholders list for Exhibit A Carl.xls."  Edington was a recipient along with Allan Holms' attorneys, Roger Reed and Timothy Giesa.  The attachment appears to have been Bakken's shareholder list "prepared to discuss the derivative claim" later filed by Graiwer:  *Graiwer v. Holms*, Case No. CV14-00544, Dept. No.B7 (Dist. Ct. Nev., 2d Dist., filed March 13, 2014) [hereinafter the "Graiwer Litigation"].

100

410.     Pulling a company's shareholder list for discussion with corporate counsel is typically a preliminary step toward taking over a corporation, and it appears that was their goal – whether directly indirectly through derivative litigation.  Roger, Carl, Allan Holms, and Edington each responded to establish a meeting time for early that afternoon.

411.     After the meeting, that same day at about 5:00 pm, June 27, 2013, Edington e-mailed Allan Holms under the subject "Fw: another change in profile" to give Allan Holms "A big congratulations on the filing in ND."  The referenced North Dakota "filing" was a *lis pendens* case aimed at starving Bakken's revenue stream in anticipation of filing other lawsuits, presumably to limit Bakken's resources available to defend itself in those suits: *Roil Energy, LLC v. Toll Reserve Cons., Inc.*, Civ. No. 27-2013-CV-00124 (Dist. Ct. Nev., NW Dist., filed June 12, 2013) [hereinafter "*lis pendens* Case"].

412.     About two weeks later, on Monday morning at about 8:45 am, July 8, 2013, Allan Holms e-mailed Edington under the subject "update" to confirm that Allan Holms had "authorized the necessary paperwork to accomplish our settlement" in the Allan Holms Litigation.  Allan Holms then mentioned to Edington that he met with the law firm who filed the North Dakota *lis pendens* case, Crowley Fleck, PLLP, about coordinating other litigation efforts between Allan Holms, Edington, and Graiwer.

> I meet [*sic*] with the Crowley firm on Monday the 15th and they understand what we are trying to accomplish and want to assist in that regard.

413.     This language signals conspiracy.  Settling Edington out of the Allan Holms Litigation and then coordinating litigation efforts against Bakken as goals that "we are trying to accomplish" shows a clear understanding to cooperate, especially because steps were already being taken to advance things along.

414.     Roughly three weeks later, Edington e-mailed Allan Holms at about 5:00 pm on Wednesday afternoon, July 31, 2013, to inform Allan Holms that Graiwer "has identified a top notch securities litigator in L.A." for them to use in an anticipated case against the Company.  Edington then asked Allan Holms two specific points about whether Allan Holms caused the *lis pendens* Case to be filed in North Dakota as discussed.

> [W]hen you filed the litigation via the Crowley firm in ND, did you include Bakken Resources as a defendant like you did in the initial filing? . . . [D]id you find out for certain if the operators of the BKKN wells are escrowing the royalties?

415.     The mentioned "royalties" comprised one of Bakken's most significant revenue streams.  Edington was checking to make sure that the Company would be starved for resources while being forced to defend litigation on multiple fronts, as coordinated by Edington, Allan Holms, and Graiwer.  Allan Holms replied to Edington's queries within 30 minutes, writing back to indicate an affirmative answer to both questions based on Allan Holms understanding:  "Bakken is a defendant . . . [And the Crowley] lawyer is on vacation, but it appears that [escrowing the royalties] was going to happen."

416.     The next Tuesday afternoon, August 6, 2013, Bakken's defense attorney in the North Dakota *lis pendens* action, Michael Schoepf of Fredrikson & Byron, P.A., e-mailed with Allan Holms' attorney in the same matter, David Charles of Crowley Fleck, PLLP, under the subject "Roil Energy, et al. v. Toll Reserve Consortium, et al."  They confirm their previously oral stipulation to a two-week time extension for Bakken's defense attorneys to file a response to Allan Holms' complaint by August 23, 2013.

417.    Allan Holms forwarded this chain to Edington at about 3:30 pm that same Tuesday afternoon, August 6, 2013, adding this note to Edington: "It is more important than ever to try and file your complaint during this two week period of time."

418.    Edington replied five minutes later: "I have [Graiwer] working on two fronts to see which develops first.  They still have not filed an 8-K."

419.    This level of coordination demonstrates a strategy meant to wear down Bakken's financial resources through litigation, all the while maintaining Bakken's perception that Allan Holms and Edington were not aligned in interest against the Company.

420.    All of the e-mails quoted about these litigation efforts occurred while Edington was still a defendant in the Allan Holms Litigation in which Allan Holms was the plaintiff suing Bakkan and its CEO.  Allan Holms and Edington did not file a stipulation to settle Edington out of the Allan Holms Litigation until August 8, 2013, which was granted the same day.

421.    Allan Holms had to withdraw the North Dakota *lis pendens* Case because the December 2, 2013 findings of fact and conclusions of law in the Allan Holms Litigation held that neither Allan Holms nor Roil had a valid claim to the royalties that the *lis pendens* Case caused to be placed into escrow.  The result, however, was that the *lis pendens* Case effectively cut off one of the Company's primary revenue streams long enough for Edington, Allan Holms, and Graiwer to begin filing a series of synchronized litigations against Bakken that were meant to harm the Company during a time of manufactured financial vulnerability.  Concurrently dealing with these multiple cases also occupied the Company's management to the extent that Bakken could not replace the

escrowed revenue stream by securing deals.  Such tactics are an improper abuse of the courts.

422.     Based on information and belief, these inappropriate and malicious litigation efforts continue to this day, led by Edington and the other Defendants.

423.     Moreover, Bakken's internal investigation in 2015 discovered that Edington, Graiwer, Allan Holms, and perhaps others were actively seeking to establish similar coordination with the Company's former audit committee chairman as a means of obtaining confidential Company information, and such efforts were successful.  This was, *inter alia*, a primary reason that Bakken asked its former audit committee chairman to resign.

## DETAILED FACTS RELATING TO DEFENDANTS' VIOLATION OF THE RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT

424.     Edington, Edington II, IWJ Consulting, Marycliff Investment, Triax Capital Management, and the other parties not yet named (the "RICO Defendants") have engaged in a pattern of activity designed to defraud and harm numerous people and companies in a similar manner to which they harmed Bakken.

425.     The RICO Defendants and their affiliates have invested and schemed together in numerous companies including but not limited to, American Cordillera Mining Corporation (formerly APD Antiquities), Arbios Systems Inc. (formerly Historical Autographs USA Inc.), Cordex Pharma (formerly Duska Therapeutics and Shiprock, Inc.), Global Mobiletech, Inc. (formerly Trevenex Resources, Inc.), and Greenplex Services, Inc.

426.    Most of the Defendant entities and many other related companies list the same address on their incorporation documents, with various Edington family members serving as directors, officers, and registered agents.

427.    Such companies have engaged and continue to engage in what the SEC refers to as "sham registrations;" that is, they register the stock of a public shell company for the purpose of defrauding investors.

428.    The practice, also referred to as a "footnote 32 shell," *see* ¶ 351, *supra*, generally involves a promoter of a securities placing, either directly or through affiliates, assets or operations into a shell company for the intended purpose of taking it outside the definition of a "shell company" under Rule 405, 17 C.F.R § 230.405.  The promoter then seeks a merger transaction for the company, with the assets or operations being returned to the promoter or other affiliate upon completion of that business transaction.

429.    Edington and the other RICO Defendants have used nominal assets and business plans that have no reasonable expectation of generating shareholder value to create public companies.

430.    The RICO Defendants have also tried to use the same asset, the Bayhorse Mine leaseholds, on multiple occasions to trap unwary targets into merging or investing into a public vehicle.

431.    The SEC has a longstanding history of monitoring shell companies like those mentioned in this complaint to reduce the very kind of abusive tactics that the RICO Defendants employed here.

432.    RICO Defendants have close ties as part of a larger network of immediate family members, close friends, and other affiliates and associates acting in concert to

perpetuate their fraudulent investment-related schemes, which are aimed at promoting their own self-interests without regard for damages inflicted upon a diverse array of entities and individuals.

433.     Edington was at the center of these transactions, manipulating public companies and their share prices to defraud investors for his own self-interest.  To advance his schemes, Edington assists in forming or locating corporations with little to no assets or legitimate business purpose.

434.     Based on Plaintiff's information and belief, Edington overstated his companies' operations to avoid disclosure obligations that the SEC requires of shell companies.  Once a shell company is identified or formed, the RICO Defendants' scheme typically involves promoting the new company in order to solicit new investors using the internet in order to secure additional funding.

435.     In order to create the semblance of market activity in these companies while also assuming power and control of the newly formed entities, the RICO Defendants utilized their individual funds, the funds and names of their affiliates, and those of various entities.  Such entities are, thus far and prior to discovery, believed to include without limitation Defendants IWJ Consulting, Triax Capital Management, Inc., and Marycliff Investment Corp.

436.     These companies were formed to serve primarily as nominal shareholders used to hide the RICO Defendants' beneficial interest in various public companies.

437.     Such activity is prohibited, not only by the securities laws, but also by Edington's Injunction.

106

438.    The RICO Defendants used newly formed companies to perpetuate illegal pump-and-dump schemes in an effort to create profits for those involved with no regard for the investing public or other shareholders.

439.    Edington maintains close relationships with broker-dealers and transfer agents who he can utilize in his schemes.  One such broker-dealer, Spartan Securities, is known by the Plaintiff as having a close relationship with Edington.

440.    The RICO Defendants have also maintained a close relationship with Li & Company, P.C., auditors who have been subject to numerous inspections by the PCAOB.

441.    Li & Company, P.C. are also listed on a PCAOB list of firms that failed to address quality control criticisms satisfactorily.

442.    Li & Company, P.C. served as auditors for many of the entities that the RICO Defendants have been involved with, including Global MobileTech, Hydrodynex, AmCor, and MLS.

443.    The RICO Defendants and their affiliates are part of an ongoing enterprise in which they have taken deliberate and calculated steps to defraud the public.  While there have been multiple parties involved and entity names change throughout the course of the arrangements, the key actors have remained the same.

444.    The RICO Defendants committed multiple counts of wire fraud by ghost-writing emails purporting to be from the Company's CEO or others in order to deceive investors by grossly and fraudulently misrepresenting the price and value of securities. They did this using wires in order to induce further investment, and by misrepresenting and omitting material disclosures to the Plaintiff, such as their affiliation with MLS and previous history of SEC violations in order to effectuate their scheme.

107

445.    The RICO Defendants participated in the scheme against Plaintiff to manipulate and control a public company through a reverse merger for their own personal gain.

446.    The RICO Defendants' enterprise is a vertically integrated operation with a top-down structure and extends far beyond the named Defendants.  Many individuals and entities have been targeted and harmed by the RICO Defendants in a similar manner to which Plaintiff was targeted and harmed in this case. Several of the many instances of the RICO Defendants' harmful investment-related activities involve the following entities.

**Triax Capital Management**

447.    Triax Capital Management ("Triax") was formed as a Nevada domestic corporation on July 18, 1997.

448.    Sherry Edington ("Sherry"), Edington's wife, served as President of Triax, and Edington served as Director, Treasurer, and Secretary.

449.    The RICO Defendants utilized Triax to invest in various business entities in furtherance of their various fraudulent schemes. Triax was at one time or another listed as a shareholder of AmCor, Arbios Systems, Inc., Cordex Pharma, and Global MobileTech, Inc.

450.    Public SEC filings, such as the S-1 filed by Global Mobiletech, Inc. on December 6, 2012 and the S-1 filed by Arbios Systems, Inc. on March 18, 2008 state that Edington controlled all voting interest Triax had in any public companies.

451.    The address filed with the Secretary of State of the State of Nevada for the officers of Triax is the same address filed for IWJ Consulting, Inc., a corporation run by Jerod Edington as managing member.

452.     Based upon Plaintiff's information and belief, RICO Defendants used Triax as an investment vehicle for putting Edington's ill-gotten funds into public companies without disclosing Edington's name personally.

**American Cordillera Mining Corporation (formerly APD Antiquities, Inc.)**

453.     APD was incorporated under the laws of the State of Nevada on July 23, 1996, as an Asian art and antiquities business.

454.     On December 27, 2004, APD and GCJ, Inc. ("GCJ") entered into an Acquisition Agreement and Plan of Merger, whereby APD acquired all the outstanding shares of common stock of GCJ from its sole stockholder, Jeffrey Chad Guidry, in an exchange for only $3,600.  GCJ had no assets or liabilities at the time of the merger. This transaction was categorized as a reverse merger with GCJ serving as a public shell company.

455.     APD's Current Report on Form 8-K, filed February 8, 2005, described GCJ as a blank check corporation prior to the APD merger.

456.     Based upon Plaintiff's information and belief, the RICO Defendants began promoting APD immediately following its formation as a shell company, soliciting offers to merge with an operational entity.

457.     APD's Form 10-KSB/A-1, filed December 31, 2006, incorrectly states that APD is not a shell company as defined by Rule 12b-2 of the Exchange Act.   However, APD's annual report for the fiscal year ending December 31, 2006 on Form 10-KSB/A-2, filed June 19, 2007, states that the company was in fact a shell company.

458.     The change in status from non-shell to a shell company is the only change from the Form 10-KSB/A-1 filing to the Form 10-KSB/A-2.

459.    APD's Annual Report on Form 10-KSB, filed March 30, 2007, stated that the company had minimal operations and assets. From inception through the fiscal year ending December 31, 2006, APD accumulated an operating deficit of $71,792. APD listed assets of $51 in cash and $9,110 in resale inventories as of December 31, 2006 whereas of December 31, 2005 they had $7,343 in cash and $12,464 in inventory.

460.    According to the American Cordillera Mining Corporation's Annual Report on Form 10-K, filed on April 16, 2013, APD completed an Asset Purchase Agreement with Martin Clements of Northern Adventures, LLC and Northern Adventures, Inc. ("Northern Adventures") in order to acquire mineral interests. Northern Adventures, Inc. was a private Nevada Corporation.

461.    Pursuant to that Asset Purchase Agreement, APD changed its name to American Cordillera Mining Corporation ("AmCor") and changed the focus of its business to acquiring mineral properties, mineral leases, and mining claims from Northern Adventures.

462.    AmCor then designated Manuel Graiwer, an Edington associate and friend, as a director of AmCor.

463.    David Boleneus and Frank H. Blair, two Edington associates and former Bakken Directors who Edington had introduced to Bakken, were also named Directors of AmCor.

464.    AmCor also possesses a leasehold interest in the Bayhorse Mine pursuant to a lease with a company called Bayhorse Silver Mine, LLC.

465.    Bayhorse Silver Mine, LLC was registered in Nevada on January 26, 2011 with Edington's daughter, Janelle, as its Registered Agent – much like Multisys.

466.     The Bayhorse Mine leasehold had been previously purchased by Bakken to serve as the primary asset of Bakken's mining subsidiary, BR Metals.

467.     The RICO Defendants misappropriated Bakken's previously purchased asset (the Bayhorse Mine leasehold) to serve as the foundation for a new public venture.

468.     According to AmCor's most recent Form 10-K, filed on March 17, 2015, Edington, Edington II, Sherry Edington, Manuel Graiwer, IWJ, Myriad Financial Group, and Triax are all disclosed as related parties with whom AmCor has transacted business, among others.

469.     The RICO Defendants have controlled and continue to control AmCor for their own benefit to the detriment of the investing public through close relationships with the company's directors, shareholders, and many others involved in these transactions.

### Arbios Systems Inc. (formerly Historical Autographs USA, Inc.)

470.     Historical Autographs USA, Inc. ("HAU") was organized by filing its Articles of Incorporation in the State of Nevada on February 1, 1999.  It was formed as an e-Commerce company engaged in the business of acquiring and marketing historical documents.

471.     Based on Plaintiff's information and belief, it is highly uncommon for a company specializing in this sort of business to register as a publicly traded company without serving as a shell company.

472.     HAU's Preliminary Schedule 14C, filed October 29, 2003, states that on October 20, 2003, the Company entered into an Agreement and Plan of Reorganization with Arbios Technologies, Inc.  Prior to the Plan of Reorganization, HAU generated only

"limited revenues" from February 1999 through 2003.  The company still had not reported any revenue even by the time it filed its Form 10-KSB on March 31, 2006

473.    As part of the merger, HAU changed its name to Arbios Systems, Inc. ("Arbios") and changed its business to developing, manufacturing, and marketing liver assistance devices.

474.    Arbios's Form SB-2/A, filed September 10, 2004, lists Edington as the selling stockholder of 68,750 shares.  It also states that he has voting and investment control over the securities owned by Triax, whose 244,000 shares of Arbios amounted to 1.85%.

475.    Based upon Plaintiff's information and belief, HAU was never intended to serve as a legitimate business and was instead a shell used in a reverse merger without disclosing its shell status.

476.    Edington received stock in Arbios because of his connections both with the shell company, HAU, and the operating company, Arbios Technologies.

477.    The Arbios Form 424b3 Prospectus, filed May 14, 2008, shows Edington as the selling stockholder of 68,750 shares, or .28% and Triax as the selling stockholder of 644,000 shares or 2.6%.  The closing price of Arbios common stock as of that filing was $0.29.

478.    Arbios's most recent Form 10-Q, filed November 18, 2009, listed none of the Edingtons, their associates, or their known entities that had previously been disclosed on Arbios public filings.

479.    RICO Defendants liquated their shares in the time between the May 14, 2008 Prospectus and November 18, 2009 10-Q for an amount not less than $206,697.50

based on the market price of $.29 per share and the 712,750 shares listed as being controlled by Edington and Triax.  Based on Plaintiff's information and belief, the RICO Defendants also owned more shares that were hidden from SEC disclosure by the use of strawmen or other misrepresentations.

480.    RICO Defendants sold their Arbios shares for a large profit, abandoning Arbios and the remaining shareholders.

481.    Arbios stock last traded in 2011 at a price of $.0046 per share, and it withdrew its registration as a reporting company on June 23, 2011.

### Cordex Pharma (formerly Duska Therapeutics, formerly Shiprock, Inc.)

482.    Shiprock, Inc. ("Shiprock") was organized by the filing of Articles of Incorporation with the Secretary of State of Nevada on November 2, 1999.  Shiprock's Preliminary Schedule 14C, filed March 18, 2004, sought to amend its Articles of Incorporation to change the company name to Duska Therapeutics ("Duska") and to increase the authorized number of shares of common stock from 20,000,000 to 50,000,000.  The proposals were part of a merger agreement to acquire Duska Scientific Co., a biopharmaceutical company.

483.    Prior to the merger, Shiprock's Form 10-QSB, filed May 10, 2004, reported total assets of only $4,549 with revenue of only $10,834 from the company's inception in November 1999 through March 31, 2004.

484.    According to the March 18, 2004 Pre-14C, Shoprock was not formed for the purposes of engaging in a merger or acquisition with an unidentified company and was not, nor had it ever been, a "blank-check company."

485.    According to the Shiprock's Form 10QSB, filed on August 13, 2004, as of June 30, 2004 Shiprock held $5 in assets and $478 in inventory and operated at a net loss of $25,653, as of June 30, 2004.

486.    Duska's Form SB2, filed November 19, 2004, stated that on August 23, 2004 Duska issued Triax two options in exchange for Triax introducing Duska to Shiprock.  The first gave Triax a three-year stock option to purchase 25,000 shares of Duska's common stock at $1.00 per share, and the second gave Triax a three-year stock option to purchase 25,000 shares of common stock at $2.00 per share.

487.    According to that same Form SB2, Edington had voting and investment control over the securities owned by Triax.

488.    The closing price of Duska common stock on November 18, 2004 was $2.84 per share. As of December 17, 2007, the last bid price of Duska common stock was $.47 per share.

489.    Edington already had the plans in place to merge Duska and Shiprock and did no legitimate work to earn the stock options that were granted to him through his company, Triax.

490.    The RICO Defendants therefore made an immediate gain that would result in profits upon sale.  They then moved on from Duska, leaving close friend and associate Manuel Graiwer in a position of power. According to Duska's Preliminary Schedule 14C filed November 5, 2008, Manuel P. Graiwer beneficially owned 24% of the company.

491.    Edington "introduced" Shiprock to Duska Scientific acting under the cloak of his personal company, Triax, in order to perform a reverse merger and place his friend and associate Manuel Graiwer in a strong position of power over the resulting company.

114

492.     Based on Plaintiff's information and belief, the RICO Defendants utilized Shiprock's undisclosed shell status in order to perpetuate a pump-and-dump scheme.  This made available the benefit of Shiprock's public status while avoiding special disclosures required for such transactions.

493.     Duska's Preliminary Schedule14C, filed on November 5, 2008, proposed an amendment to its Articles of Incorporation to change its name to Cordex Pharma, Inc. ("Cordex") as part of a rebranding.

494.     Duska's last Form 10-Q, filed on November 16, 2009, failed to disclose any of the Edingtons, their associates, or their known entities at all in the document despite having been disclosed on previous filings.

495.     Based on Plaintiff's information and belief, RICO Defendants sold their shares for a profit and immediately abandoned Cordex. The amount of the profit is unknown at this time but based on share prices, profits could have been several hundred thousand dollars.

496.     The SEC issued an October 27, 2014 order that revoked Cordex's registration.  Before that date, Cordex traded at $0.02 per share, and the highest trade ever recorded was for $3.00 per share on March 1, 2005.

### Global MobileTech (formerly Trevenex Resources, Inc.)

497.     Trevenex Resources, Inc. ("Trevenex") originally filed for a proposed sale to the public by filing a Form S-1on July 16, 2008.

498.     Trevenex's business purpose was to engage in exploration of mineral properties in North America, specifically the Bayhorse Silver Mine.  Based upon

Plaintiff's information and belief, this is the same Bayhorse Silver Mine project that Edington listed as an asset for Bakken and AmCor.

499.    Trevenex's Form S-1 Filed on July 16, 2008 states that the company was not founded as a "blank check company" and that they did not intend to participate in a reverse merger or similar transaction.

500.    As of September 1, 2008, all of Trevenex's mining claims had been closed.  The Bayhorse mining claims listed on Trevenex's July 16, 2008 Form S-1 may have been worthless and not possible to develop.  The RICO Defendants named those assets in order to misrepresent the company as anything more than a standard shell.

501.    Trevenex's first annual report on Form 10-K, filed September 30, 2008, stated that the company was not a shell company even though it had no revenue.

502.    Edington and his immediate family members were listed as Selling Shareholders on Tevenex's Post-Effective Amendment No.1 to its Form S-1 Registration Statement, filed October 27, 2008.  Edington was listed as the Selling Security Holder of 100,000 shares (6.66%).  Sherry Edington was a Selling Security Holder of 40,000 shares (2.66%); Jennifer Edington (Edington's daughter-in-law, and Edington II's wife) was a Selling Security Holder of 10,000 shares (0.67%); and Janelle Edington was the Selling Security Holder of 10,000 shares (0.67%).

503.    In contrast to previous SEC filings, Trevenex's Form 10-K, filed on August 7, 2009, disclosed that it was a shell company. The total assets as of June 30, 2009 were $40,060, with $60 in cash and $40,000 in mining claims. A year previously, as of June 30, 2008 Trevenex had $14,462 in cash and $40,000 in mining claims.

116

504.   On July 1, 2009, 50,000 unregistered shares of common stock in Trevenex were issued to Triax in exchange for $5,000 cash and "consulting services."  As stated previously, Triax was an entity wholly owned and controlled by Defendant Edington.

505.   Based on Plaintiff's information and belief, these "consulting services" were actually promoter fees paid to Edington for promoting Trevenex as part of a reverse merger connected to a pump-and-dump scheme.

506.   On November 20, 2009, Trevenex filed a Preliminary Schedule 14C announcing a Share Exchange and Reorganization Agreement with Sunway Technology Development, Ltd.

507.   According to that November 20, 2009 Preliminary Schedule14C, Trevenex changed its name to VyseTech Global, Inc. ("VyseTech"). However, future filings show that Trevenex never did change its name.

508.   According to that November 20, 2009 Pre-14C, Trevenex became a shell company under Rule 12b-2 of the Exchange Act immediately before issuing 50,000 shares to Edington's company, Triax.

509.   On Trevenex's final filing before changing its business and name to VyseTech, Form 10-Q, filed December 31, 2009, it reported only $367 in total assets and $40,000 in mining claims.

510.   Rather than change entirely into VyseTech, the Trevenex Schedule 14-C filed on April 8, 2010 disclosed that Trevenex entered into a formal contract with VyseTech Asia Sdn Bhd on March 15, 2010 whereby Vysetech granted exclusive marketing, distribution, development, and licensing rights to sell and market mobile Voice

over Internet Protocol ("VoIP") products, services, and software in the United States, Canada, and Mexico.

511.    According to that same 14-C, on March 31, 2010 Trevenex changed its name to Global MobileTech and changed its principal business activity from mining exploration to the marketing and distribution of mobile VoIP products, services, and software for a wide variety of applications.

512.    Based on Plaintiff's information and belief, Edington never intended for Trevenex to succeed as a mining company.  After a year of operations, the RICO Defendants used Trevenex's public status as a shell corporation to perpetuate a pump-and-dump scheme with Global MobileTech. The limited operations and existence of Trevenex along with the multiple changes to the company name and business purpose suggest various acts of "shell games" conducted by the RICO Defendants to shield their true intentions from regulators and the investing public.

513.    Based on Plaintiff's information and belief, the RICO Defendants intentionally misrepresented Trevenex as a mining company in order to avoid shell company disclosures at the company's early stages.

514.    Edington obtained his shares at zero cost and subsequently placed shares in the names of several family members

515.    Global Mobiletech's prospectus on Form 424B3, filed June 21, 2010, lists as Selling Security Holders Edington for 100,000 shares (5.28%), Sherry Edington for 40,000 (2.11%), Jennifer Edington for 10,000 shares (.53%), Janelle Edington for 10,000 (.53%), and Shaney Edington for 5,000 (.26%), totaling 8.71% of the company.

516.     According to Global Mobiltech's June 21, 2010 Prospectus, the offering price at the time was $0.10 per share.  Based on Plaintiff's information and belief, the RICO Defendants controlled more than the 165,000 shares listed under the Edingtons' names on the June 21, 2010 Prospectus.

517.     In addition to the 165,000 shares listed under the Edingtons' names, based on Plaintiff's information and belief, the RICO Defendants were in control of many more shares, including but not limited to 140,000 (7.39%) owned by Manuel Graiwer, 100,000 owned by Marisa Graiwer (5.28%), and 100,000 owned by Kenneth Graiwer (5.28%).

518.     The Graiwer shares total about 17.95% of the company. Together, the Graiwer and Edington shares total roughly 26.66% of Global Mobiletech at the time.

519.     Upon information and belief, the RICO Defendants sold all of their shares on or around June 21, 2010 for an amount not less than $50,000 plus those fees and equity associated with Triax.

520.     Global Mobiletech stock rose from around $0.51 per share to $1.50 per share in May of 2011.  By September 2011 the stock dropped to $.50 per share, bottoming out at $0.03 per share around October 2013.

521.     Global Mobiletech's final quarterly report on Form 10-Q, filed May 14, 2013, mentioned none of the Edingtons, their affiliates, or their known entities anywhere in the document despite previously being disclosed on several filings.

522.     Based on Plaintiff's information and belief, the RICO Defendants sold their shares for a large profit and immediately abandoned Global MobileTech to the detriment of the company and the investing public because such sales involved securities that were fraudulently procured.

523.     Global MobileTech terminated its filing obligations by filing Form 15-12G on October 9, 2013.

## **Greenplex Services, Inc.**

524.     Greenplex Services, Inc. ("Greeplex") was organized as a Nevada corporation on September 2, 2009 for the purpose of providing landscape and exterior property management services to residential, industrial, and commercial customers throughout the areas of Western Washington State and Northern Idaho. Greenplex went public via a Form S-1 Registration Statement filed on April 8, 2010.

525.     Based on Plaintiff's information and belief, it is highly uncommon for a local landscaping company to file as a publicly traded company without serving as a shell company.  Greenplex's public filing as an operational company was a "sham registration" as described above.

526.     In addition to affiliates of the RICO Defendants, at least five of Manuel Graiwer's immediate family members were listed as security holders on Greenplex's Form S-1 Registration Statement filed April 8, 2010.

527.     The Form S-1 filed on April 8, 2010 indicated that Greenplex was not a blank check company and that it did not intend to participate in a reverse merger or similar transaction

528.     Greenplex had minimal revenue-producing operations.  Its 2013 annual report on Form 10-KT, filed March 17, 2014, stated that the company generated only $198,489 in revenue over the entire course of roughly four years of business operations, from its inception in September of 2009 through November 30, 2013.

529.     Greenplex incurred a net loss of $173,746 from inception through November 30, 2013.

530.     According to a Greenplex Current Report on Form 8-K, filed March 7, 2014, Greenplex entered into a consulting agreement with Edington II's company, IWJ, a Nevada corporation, on March 3, 2014.  Edington II executed the consulting agreement as IWJ's managing member.

531.      IWJ shares the same Washington address with Edington's company, Triax.  Both companies are located in a small strip mall, where the largest business is a grocery store named Albertson's.  The surrounding area is residential suburbs, which contain Edington's nearby home.

532.     The RICO Defendants retain control over IWJ through Edington II's role as IWJ's managing member.

533.     Greenplex's filings in the State of Washington list Edington II as its Registered Agent.

534.     IWJ agreed pursuant to its consulting agreement with Greenplex to undertake promotion activities in exchange for an option for two years to purchase 500,000 shares of restricted common stock at $0.04 per share. This agreement with IWJ served as another deal for the Edingtons' own gain and shows a pattern of inside deals intended to mislead the investing public.

535.     Upon information and belief, the "promotion activities" IWJ was hired for included locating and coming to terms on a reverse merger agreement with an operating company.

536.     Greenplex's quarterly report on Form 10-Q, filed October 23, 2013, stated that the company had only $21,164 in total assets, $15,460 of which was cash.

537.     GreenPlex disclosed on its Form 10-Q, filed May 31, 2014, that it entered into a joint venture agreement on March 24, 2014 with C.S. Analytics for the purpose of operating a cannabis testing facility in Pullman, Washington with the intention of expanding to other states.

538.     Greenplex's most recent Form 10-K, filed March 24, 2015, indicates that IWJ controls 21.35% as Greenplex's largest beneficial owner.  Triax controls 9.67% of Greenplex's shares, and Manuel Graiwer controls 7.66%.  The RICO Defendants and their affiliates are in substantial control of Greenplex.

539.     Based on Plaintiff's information and belief, Greenplex was never intended to succeed as a landscaping company.  Edington helped to create Greenplex and intentionally misrepresented the company's assets and business purpose in order to avoid shell company disclosures while pursuing a reverse merger transaction.

540.     With the close relationships between Manuel Graiwer, Edington II, Edington and others involved with Greenplex, the RICO Defendants utilized control over Greenplex for their own benefit to the detriment of the investing public.

541.     Greenplex is currently an active corporation and filed its most recent Form 8-K as of September 29, 2015.

542.     Greenplex demonstrates a developed sophistication by the RICO Defendants in their enterprise. The RICO Defendants are avoiding obvious shell companies and creating companies that appear to be operational but that have no business being public companies, despite generating revenue.

**Hyrdodynex, Inc.**

543.    Hydrodynex, Inc. filed its form S-1 Registration Statement on June 30th 2008 with Edington II listed as the principal executive and only employee.

544.    According to Hydrodynex's first 10-K filed on September 30, 2008, the company was not formed as a shell company and did not disclose as a shell company at that time.

545.    Hydrodynex first disclosed its shell company status on a Form10-Q/A filed on March 16, 2009.

546.    The most recent 10-Q filed by Hydrodynex on April 21, 2015 states that the company is a shell company as defined in Rule 12b-2 of the Exchange Act. Hydrodynex's assets as of February 28, 2015 are listed as $142 in cash and $1,000 in prepaid expenses.

547.    According to that 10-Q, Edington II is the current CEO of Hydrodynex.

548.    Based on Plaintiff's information and belief, the RICO Defendants are preparing to use Hydrodynex in a future reverse merger transaction as they have previously done.

**Bayhorse Silver Mine**

549.    The Bayhorse Silver Mining claims are purportedly located in Baker, Oregon.

550.    The RICO Defendants' devious and fraudulent plans involve multiple transactions with the same assets from the Bayhorse Silver Mine.

551.     The RICO Defendants used such assets, which upon Plaintiff's information and belief were then worthless, to start a public company in order to create the impression that such sham public company was involved in a legitimate business.

552.     The RICO Defendants entered transactions using the same Bayhorse Mining claims with at least three separate entities.  Two such transactions involved using this suspect asset to start a public company while one such instance involved a fraudulent sale of such assets to Bakken.

553.     The Bayhorse Silver Mine is first mentioned amidst the RICO Defendants' schemes on Trevenex's Form S-1, filed July 16, 2008. Trevenex's initial business purpose was to explore the mine in 2008.

554.     When Edington became involved with Bakken, he convinced the Company to explore silver mines, specifically the Bayhorse Silver Mine.

555.     Bakken devoted considerable resources and funds towards developing BR Metals, a subsidiary of Bakken formed for the purpose of exploring mining opportunities.

556.     BR Metals was formed on January 13, 2011 and Edington immediately assumed the responsibility to secure the mining claims for BR Metals.

557.     Edington and the RICO Defendants "sold" the same Bayhorse Silver Mine leaseholds obtained through Trevenex to Bakken Resources in early 2011.  Bakken paid Edington at least $10,000 and provided at least 500,000 shares of common stock (valued at least $0.25 per share) for those claims.

558.     The deadline to use the claims was in February 2011. Edington did not deliver the claims to Bakken until April 2011. As a result of Edington's delay, Bakken was unable to utilize the claims it rightfully paid for.

559.     APD's Preliminary Schedule 14C, filed October 5, 2012, states that on September 21, 2011, Bayhorse Silver Mine, LLC (an Edington-controlled entity) granted an option to Northern Adventures to evaluate the Bayhorse interest and enter into a lease agreement relating to the mining claims.

560.     According to that Preliminary Schedule 14C, Frank Blair and David Boleneus, individuals who served as Bakken directors, were hired in late 2010, early 2011 to assist APD in completing a transaction with Northern Adventures, LLC.

561.     Frank Blair resigned from Bakken on July 26, 2011. David Boleneus resigned from Bakken on November 10, 2011.

562.     The RICO Defendants sold the Bayhorse interests to Bakken and then Edington intentionally delayed delivery so that they could utilize those same interests for APD in a separate transaction at the same time.

563.     The RICO Defendants listed these leaseholds as company assets of AmCor on AmCor's Form 10-K, filed April 16, 2013.

564.     Edington misappropriated the Bayhorse Mining interests by using them for AmCor's benefit when those interests rightfully belonged to Bakken.

565.     Edington also fraudulently and intentionally misrepresented AmCor's interest in the Bayhorse Mines to the shareholders and to the investing public.

IV.     **Relief**

WHEREFORE, Plaintiff prays for relief as set forth below.

**FIRST CLAIM FOR RELIEF**

**Civil Racketeering Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C.**

**§1962(c), Violations Due to Conduct and Participation in a RICO Enterprise**

**through a Pattern of Racketeering Activity against All Defendants**

566.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in Paragraphs 1 through 565 into this First Claim for Relief as if fully set forth herein.

567.     RICO Defendants are "persons" within the meaning of the civil Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. 1961 et seq.

568.     At all times relevant to this claim, the above-named RICO Defendants have acted in concert in various combinations, forming a group of persons associated together for the common purpose of carrying out various similar schemes to obtain control of companies, misrepresent the company to investors in order to perpetuate a pump and dump scheme, and defraud the shareholders and owners.

569.     The continued association of the above-named Defendants, acting together in carrying out unlawful schemes to defraud, constitutes an enterprise within the meaning of 18 U.S.C. 1961(4) (the "Enterprise"), which is engaged in unlawful activities including mail and wire fraud affecting interstate commerce.

570.     Each of the RICO Defendants have directed, assisted, and supported the Enterprise and the schemes through which the Enterprise implemented its frauds.  Each of the RICO defendants actively participated in the direction, operation, or management of

126

the Enterprise; the individual defendants actively participated in and implemented the decisions of the Enterprise, and the individual Defendants' active participation played a vital and instrumental role in the achievement of the common goals of the Enterprise.

571.    The Enterprise spanned several states including but not limited to Washington, California, North Dakota, Nevada, and New York. Each of the RICO Defendants utilized wires to communicate and perpetuate their fraudulent schemes as demonstrated by the wide array of emails sent between the RICO Defendants amongst one another, with third parties, and with the Company's officers.

572.    The RICO Defendants committed multiple counts of wire fraud by ghost-writing emails purporting to be from the Company's CEO in order to deceive other investors and by grossly and fraudulently misrepresenting the price and value of securities to potential investors.

573.    The RICO Defendants participated in the scheme against Plaintiff to manipulate and control a public company through a reverse merger for their own personal gain. The RICO Defendants omitted material disclosures to the Plaintiff, such as their affiliation with MLS and previous history of SEC violations in order to effectuate their scheme.

574.    The RICO Defendants also fraudulently distributed eight million shares of MLS stock for themselves before the Nevada District Court nullified that action and accepted that Edington falsely represented that the RICO Defendants were entitled to those shares, and the Company relied on that misrepresentation.

575.    The RICO Defendants also committed mail fraud by sending letters to Bakken directors and officers purported to be from former Bakken director Ed Nichols.

Ed Nichols has denied any involvement in writing those letters, and there is no explanation for why Ed would have written the letters.  The letters came from a Spokane address and were written in a format substantially similar to previous Edington correspondences. Those letters were sent with the intent to defraud and harm Bakken and its principals.

576.     As a direct result of the frauds committed by the RICO Defendants, the Company has sustained injury to their business, including two million dollars stemming from the eight million shares Edington misappropriated to himself; injury to its business and property.  Such property injuries include but are not limited to damage to Bakken's reputation and goodwill; loss of at least $125,000 paid for Bakken's interest in the Bayhorse Mine; losses stemming from the unnecessary and convoluted process of bringing Bakken public through a failed transaction with APD and then through an insider transaction with MLS, which led to, among other things, $30 million in lost business opportunities; and losses from the litigation that resulted from the failed APD transaction, including attorneys' fees and costs.

577.     In furtherance of the schemes of the Enterprise, the RICO Defendants have committed and continue to engage in a practice of racketeering activity consisting of at least two or more predicate acts within the last 10-year period. These predicate acts rest on wire and mail fraud, as prescribed by 18 U.S.C. 1341 and 1343, include a pattern of fraudulent schemes analogous to that which the RICO Defendants used to defraud the Company, and involve at least the following companies who are presently known to the Plaintiff:

a. American Cordillera: fraudulent scheme involving misrepresenting APD Antiquities to the SEC and the investing public through wire fraud so as to avoid shell company disclosures, soliciting the services of associates as auditors to sign off on fraudulent company information through the use of wires, misappropriating an asset previously sold to Bakken as an asset of the company, and placing associates into positions of control within a new entity;

b. Arbios Systems: fraudulent scheme involving misrepresenting Historical Autographs USA to the SEC and the investing public through wire fraud so as to avoid shell company disclosures and utilizing a shell company for a pump and dump scheme;

c. Cordex Pharma: fraudulent scheme involving misrepresenting Shiprock, Inc. to the SEC and the investing public through wire fraud so as to avoid shell company disclosures and utilizing a de facto shell company for a pump and dump scheme;

d. Global MobileTech: fraudulent scheme involving misrepresenting Trevenex, Inc. to the SEC and the investing public through wire fraud so as to avoid shell company disclosures and utilizing a shell company for a pump and dump scheme;

e. GreenPlex Services: fraudulent scheme involving misrepresenting the company's business plan through wire fraud, using related party transactions to gain control of the company and utilizing the company for self interest

578.     These identified instances of fraudulent schemes, including the fraudulent scheme conducted by the RICO Defendants against Bakken, have in common a pattern of investment-based practices: entering into agreements, promoting the sale of securities, misrepresenting the status and purpose of public companies, intentionally failing to disclose previous Enforcement Actions and Violations, and using wires to deceive investors and asset holders for the benefit of the enterprise, all to the financial detriment of shareholders and the investing public.

579.     These identified instances of fraudulent schemes all involve a common purpose with the same participants utilizing similar fraudulent practices to those employed by the RICO Defendants to harm Bakken.

580.     Unless curtailed by this Court, the RICO Defendants' pattern of racketeering conduct using wire and mail fraud remains a continuing threat to target companies, their shareholders and employees, and the investing public. Plaintiff is informed and believes that companies such as Hydrodynex, Inc. are currently set aside by the RICO Defendants in order to continue to perpetuate such schemes.

## SECOND CLAIM FOR RELIEF

**Civil Racketeering Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. §1962(d), Violations Due to Conspiracy to Violate the RICO Act against All Defendants**

581.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in Paragraphs 1 through 580 into this Second Claim for Relief as if fully set forth herein.

582.     In violation of 18 U.S.C. §1962(d), the Defendants conspired to conduct or participate, directly or indirectly, in the conduct, management, or operation of the above mentioned Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §1962(c).

583.     Upon information and belief, the RICO Defendants knew that they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes conspiracy to violate 18 U.S.C. §1962(c).

584.     As a direct and proximate result of violations by the Defendants of 18 U.S.C. §1341 and §1343, the conspiracy, and overt acts taken in furtherance of such conspiracy, Bakken suffered injury to its business and property including but not limited to damage to Bakken's reputation and goodwill; loss of Bakken's interest in the Bayhorse Mine; losses stemming from the unnecessary and convoluted process of bringing Bakken public through a failed transaction with APD, and then through an insider transaction with MLS; and losses from the litigation that resulted from the failed APD transaction, including attorneys' fees and costs.  These damages were caused by the Defendants' unlawful predicate acts of wire or mail fraud and their RICO violations.

585.     Additionally, Plaintiff is entitled to recover treble damages, together with reasonable attorneys' fees and costs incurred by this action pursuant to 18 U.S.C. §1964(c).

## THIRD CLAIM FOR RELIEF

### Fraud against All Defendants

586.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in Paragraphs 1 through 585 into this Third Claim for Relief as if fully set forth herein.

587.     Defendants conducted a fraudulent scheme that setup Bakken for failure from the outset by forming the Company through a reverse merger with MLS, a company in which Edington held an undisclosed substantial control interest.

588.     Defendants misrepresented that their superior knowledge of the securities industry and public filings allowed them to prepare the Company's filings on their own without proper legal counsel.

589.     Bakken's principals and investors reasonably relied upon such misrepresentations by Defendants, and Defendants prepared such filings or caused them to be prepared.

590.     Edington misrepresented that documents he prepared in connection with the MLS merger were adequate to complete the merger despite little or no advice or approval from legal counsel.

591.     Defendants fraudulently granted themselves eight (8) million of Bakken's shares.

592.     Defendant Edington fraudulently and grossly misrepresented Bakken's earning potential to potential investors via e-mails in 2010.

593.     Edington also essentially admitted to fraud in his 2010 e-mail to Bakken's CEO where he described that he had fabricated Bakken books and records in attempt to

direct funds to himself without leaving evidence of doing so.  The Company was unaware of Edington's plan, and its principals were then incapable of detecting the fraudulent actions.

594.    Defendants made these false representations while knowing that their representations and omissions were materially false and misleading.

595.    Plaintiff's investors or principals relied upon the Defendants' representations or omissions, but it was unaware that they were materially false or misleading.

596.    Plaintiff's reliance was reasonable under the circumstances.

597.    If not for Defendants' fraud and misrepresentations surrounding the attempted APD pump-and-dump transaction, Plaintiff would never have been sued as part of the Allan Holms litigation.

598.    As a result of such reliance, Plaintiff sustained damages including costs and fees incurred in defending the Allan Holms litigation, as well as other unnecessary costs incurred pursuing Defendants' convoluted plan.

## FOURTH CLAIM FOR RELIEF

### Breach of Fiduciary Duty against Defendants Jay Edington and certain other Defendants

599.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in Paragraphs 1 through 598 into this Sixth Claim for Relief as if fully set forth herein.

600.    Defendants Edington I and Edington II had a fiduciary duty to honestly and fairly discharge their duties and responsibilities as corporate promoters, consultants, and representatives of Bakken.

601.    Defendants breached that duty by willfully working in their own self-interest with reckless disregard for the Company's well-being.

602.    The acts of the Defendants caused Bakken to enter into an unnecessary and convoluted process, which wasted the Company's time and resulted in the loss of earnings.

603.    The Defendants acts also caused Bakken to incur further costs and corporate waste in disputing the eight million shares that Edington fraudulently assigned himself.

## FIFTH CLAIM FOR RELIEF

**Tortious Interference with Prospective Business Advantage against Defendants Jay Edington and certain other Defendants**

604.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in Paragraphs 1 through 603 into this Seventh Claim for Relief as if fully set forth herein.

605.    Defendants engaged in intentional activity designed to benefit their own self-interests with no regard for the interests of the Company, including setting up a reverse merger transaction with MLS, a company in which Edington and Edington II held a controlling interest.

606.    As a result of Defendants' convoluted and difficult acts, Bakken incurred millions of dollars in damages and was deprived of the opportunity to properly emerge from the merger transaction.

607.    Defendant's convoluted and unnecessary path prohibited Plaintiff Bakken from entering into agreements that would have brought profitability and a higher stock price to the Company, and caused Bakken to incur unnecessary legal costs and fees.

608.    Plaintiff Bakken was able to enter into one transaction for roughly ten million dollars with Athene Annuity & Life Assurance Company, an affiliate of Apollo Global Management, a New York-based LLC.

609.    The Athene transaction involved the sale of mineral assets and garnered roughly eight million dollars for the Company and an override royalty interest valued at approximately two million dollars.

610.    If not for Defendant's actions and guidance, Bakken would have entered into similar transactions each year for the past four years, resulting in approximately forty million dollars' worth of transactions for the Company.

611.    Defendants intentionally perpetrated these deprivations without legal justification.

612.    Defendants are liable for the Plaintiff's damages due to their tortious interference with Bakken's prospective business advantage whereby Bakken could have engaged in mineral asset transactions resulting in a value not less than thirty million dollars for the Company.

613.    Plaintiff should be awarded punitive damages due to the egregious nature of the Defendants' actions, and because sound public policy dictates that deceptive and

illegal practices such as those inflicted by the Defendants upon the Company ought to be discouraged in the most vehement manner.

## SIXTH CLAIM FOR RELIEF

### Civil Conspiracy against All Defendants

614.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in Paragraphs 1 through 613 into this Eighth Claim for Relief as if fully set forth herein.

615.     As set forth above, Defendants have committed torts against Bakken, including acts of racketeering giving rise to violations of RICO, fraud, tortious interference with prospective economic advantage, and breach of fiduciary duties.

616.     Defendants agreed to participate in a common scheme for their own benefit against the Company.  Defendants intentionally participated in the furtherance of a plan or purpose to obtain an interest in Bakken and to profit from a reverse merger with a previously-controlled entity, MLS.  In furtherance of this plan or purpose, Defendants committed overt and unlawful acts, including acts of racketeering as alleged herein.

617.     As a direct and proximate result of Defendants' conspiracy, the overt acts committed in furtherance of that conspiracy, and the torts committed against the Company, Bakken was damaged in its business and property, and imminent threat of further damage to the business and property remains.

618.     Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Plaintiff is entitled to, and should be awarded, punitive damages against each of the Defendants.

## SEVENTH CLAIM FOR RELIEF

### Malicious Prosecution against Jay Edington and certain other Defendants

619.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in Paragraphs 1 through 618 into this Ninth Claim for Relief as if fully set forth herein.

620.     Defendant Edington was in constant contact with Allan Holms and Manuel Graiwer in connection with a series of four litigations brought against Bakken in order to financially cripple the Company: the (1) Allan Holms Litigation, (2) *lis pendens* Case in North Dakota, (3) Gillis Litigation, and (4) Graiwer Litigation.

621.     An email dated June 27, 2013 from Edington to Allan Holms demonstrates Edington's excitement over Allan Holms filing a *lis pendens* claim against Plaintiff in North Dakota.  Edington characterizes this filing as a "harpoon" as the plan was always to bring down Bakken.

622.     This lawsuit was brought in malice without regard for or belief of whether it would succeed.

623.     The *lis pendens* Case against Bakken was used primarily as a calculated attempt to starve the Company of revenue.  Doing so was not only meant to generally cause Bakken harm, but also so that it would be less financially equipped to defend itself against the three separate litigations that Defendants coordinated.

624.     A July 31, 2013 email from Edington to Allan Holms shows Edington specifically checking on whether Bakken's well operators had begun placing Bakken's royalty payments into escrow, which Edington, Allan Holms, and Graiwer caused to occur as a means of preventing such payment from going to the Company during pendency of

the *lis pendens* Case in North Dakota. Defendants then proceeded to advance other litigations during the time Bakken was not permitted to access its royalty revenue, an artificially generated state of hardship that Defendants intentionally put in place.

625.     Despite not being named as a plaintiff in the *lis pendens* Case in North Dakota, it is clear through a series of e-mails that Allan Holms filed that claim as part of Edington's calculated plan of action and that Edington played an active role in its prosecution by giving advice and encouragement for the purpose of damaging the Company to benefit Edington and the other Defendants.

626.     The *lis pendens* Case brought by Allan Holms ultimately failed but resulted in unnecessary costs and fees for Plaintiff, and the defense of the Company's other litigations were immeasurably compromised during the time when the *lis pendens* case involved escrowing one of Bakken's primary revenue streams.

## EIGHTH CLAIM FOR RELIEF

### Conversion against Defendants Jay Edington, American Cordillera Mining Corporation and certain other Defendants

627.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in Paragraphs 1 through 626 into this Tenth Claim for Relief as if fully set forth herein.

628.     Defendants Edington, Edington II, and Edington III have exerted control over the Bayhorse Silver Mine interests and offered them as assets to several of the public companies they were conducting business with, including Bakken.

629.    When Edington became involved with Bakken, he convinced the Company in early 2011 to pursue the exploration of silver mines and to purchase the Bayhorse Silver Mine leaseholds.

630.    Bakken purchased the Bayhorse Mine leaseholds with at least 500,000 shares of common stock (valued at a minimum $.25 per share), or at least $125,000 for those claims.

631.    Defendant Edington intentionally failed to deliver the Bayhorse claims to Bakken until two months after the deadline to use the claims passed.

632.    Later in 2012, when the Edingtons orchestrated the merger between AmCor and APD Antiquities with the help of former Bakken directors, the Edingtons sold the same Bayhorse Silver Mine interests to AmCor and listed them as AmCor assets.

633.    Defendants' conduct in selling assets to the Company and then re-selling those same assets to another public company resulted in damages to Bakken, including the lost value of the Bayhorse Mine leaseholds, the costs incurred by Bakken in forming BR Metals, costs associates with pursuing the Bayhorse transaction, and the lost profits that the Bayhorse leaseholds could have reasonably provided to Bakken through BR Metals.

634.    Plaintiff is entitled to damages from Defendants equal in amount to the value of the Bayhorse Silver Mine leaseholds, which Bakken rightfully should possess, or the maximum value of those leaseholds from the time Defendant Jay Edington sold the leaseholds to Bakken, including any appreciation in value of the asset during the period in which the Defendants deprived the Company of those leasehold interests.

## NINTH CLAIM FOR RELIEF

### Unjust Enrichment against All Defendants

635.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in Paragraphs 1 through 634  into this Eleventh Claim for Relief as if fully set forth herein.

636.     Defendants have benefitted from their misrepresentations and overall deceit by which they obtained shares in both entities to a reverse merger, thereby making a large profit without providing any substantial benefit to the company.

637.     These benefits have come at the expense of Bakken, as they could have otherwise been used to benefit the Company.

638.     Equity and good conscience require that Bakken receive restitution.

639.     Plaintiff should be awarded punitive damages due to the egregious nature of the Defendants' actions, and because sound public policy dictates that deceptive and illegal practices such as those inflicted by the Defendants upon the Company ought to be discouraged in the most vehement manner.

## TENTH CLAIM FOR RELIEF

### Violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b-5, 17 CFR § 240.10b-5, thereunder against Defendants Jay Edington and Jerod Edington

640.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in Paragraphs 1 through 639 into this Twelfth Claim for Relief as if fully set forth herein.

641.     Section 10(b) of the Exchange Act constitutes the basic anti-fraud provisions of the federal securities laws, prohibiting any person from using any manipulative or deceptive device in connection with the purchase or sale of any security, in contravention of such rules or regulations as the SEC may proscribe.

642.     The SEC promulgated Rule 10b-5, which makes it unlawful for any person to make any false statement of material fact, to omit to state a material fact, or to engage in any practice or course of conduct which operates as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

643.     As alleged in detail above and incorporated herein, the Defendants employed a device, scheme, or artifice to defraud through material omissions and misrepresentations of fact, which served as an act, practice, or course of business that operated as fraud and deceit up the Company in connection with the 2010 Bakken reverse merger transaction and thereafter.  Defendant Jay Edington made no mention of his disciplinary record with the SEC and failed to disclose the SEC Enforcement injunction against him.  He was not forthcoming about the level of control he exerted over MLS and he acted as promoter, business consultant, and unlicensed *de facto* attorney.

644.     These misrepresentations and omissions were done with the specific intent of defrauding Bakken and its investors in order to effectuate the reverse merger as quickly as possible, with little to no regard for the overall well-being of the Company.

645.     Defendants' material misrepresentations and omissions led to securities transactions through the purchase and sale of securities.

646.     Plaintiff reasonably relied upon Defendants' representations.

647.     Such reliance and related securities transactions caused losses for which Bakken seeks to recover.

648.     Bakken seeks to recover the eight million shares lost, valued at $.25 per share at that time, for a total of two million dollars.  It also seeks to recover for the lost business opportunities that Bakken could have had but for the Defendants' violation of securities laws. Bakken could have done one major transaction per year since the merger, at approximately ten million dollars each, and so the Company seeks to recover forty million dollars in lost business opportunity.

649.     The Defendants deliberately submitted false representations to the SEC.

## ELEVENTH CLAIM FOR RELIEF

**Violation of Section 16 of the Securities Exchange Act of 1934, 15 U.S.C. §78p, against All Defendants**

650.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in Paragraphs 1 through 649 into this Thirteenth Claim for Relief as if fully set forth herein.

651.     Defendant Jay Edington admitted in a sworn deposition that he had previously placed his own shares in the names of other people in order to avoid Section 16(a) disclosures.

652.     Defendant Jay Edington also attempted via e-mail to convince Allan Holms to do the same with his shares during a potential reverse merger transaction.

653.     Pursuant to 15 U.S.C. § 78p(a)(1), a beneficial owner of more than ten percent of any class of equity securities includes any shareholder holding securities for the

benefit of third parties when such shares are acquired by those shareholders with the purpose or effect of changing or influencing control of the issuer.

654.     Rule 13-3(b), 17 CFR § 240.13d-3(b), states that any person who "directly or indirectly, creates or uses a trust, proxy, power of attorney, pooling arrangement or any other contract, arrangement, or device with the purpose or effect of divesting such person of beneficial ownership of a security or preventing the vesting of such beneficial ownership as part of a plan or scheme to evade the reporting requirements of section 13(d) or (g) of the Act shall be deemed for purposes of such sections to be the beneficial owner of such security."

655.     Edington remained beneficial owner of the shares which he had placed in other persons' names.

656.     Edington along with the other Defendants divested themselves of securities or prevented vesting as part of a plan or scheme to avoid disclosing their beneficial interest.

657.     As such, Rule 13-3(b) deems the Defendants to be the beneficial owner of such securities.

658.     By reason of the foregoing, Edington has directly violated Section 16 of the Exchange Act, 15 U.S.C. §78p, and unless enjoined will continue to violate Section 16 of the Exchange Act.

659.     To the extent the Company suffers harm attributable to the Defendants' failures to provide accurate information for public disclosures, thereby making the public filings inaccurate, the Plaintiff seeks declaratory relief as the Court sees fit.

143

## TWELFTH CLAIM FOR RELIEF

**Violation of Section 17(a) of the Securities Act, 15 U.S.C. §77q, against All Defendants**

660.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in Paragraphs 1 through 659 into this Fourteenth Claim for Relief as if fully set forth herein.

661.    Defendants, by engaging in the conduct set forth above, directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or  communication in interstate commerce, or of the mails: (a) with scienter, employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of securities.

662.    By reason of the foregoing, Defendants have directly violated Section 17(a) of the Securities Act, 15 U.S.C. §77q(a), and unless enjoined will continue to violate Section 17(a) of the Securities Act.

663.    Plaintiff also prays for damages as to be determined following discovery.

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Declaratory Relief;

B.    Injunctive relief;

C.      Award compensatory damages and punitive damages on the First and Second Claims for Relief according to proof, and an award of Plaintiff's attorneys fees and costs, trebled as provided under federal statute 18 U.S.C. §1964(c);

D.      Award compensatory and punitive damages on the Third and Fourth Claims for Relief, including but not limited to hundreds of thousands of dollars in costs associated with the Allan Holms Litigation dollars according to proof, as provided under New York law;

E.      Award compensatory and punitive damages on the Fifth Claim for Relief according to proof, as provided under New York law;

F.      Award compensatory and punitive damages on the Sixth Claim for Relief according to proof, as provided under New York law;

G.      Award compensatory and punitive damages, totaling on the Seventh Claim for Relief according to proof, as provided under New York law;

H.      Award compensatory and punitive damages on the Eighth Claim for Relief according to proof, as provided under New York law;

I.      Award compensatory and punitive damages on the Ninth Claim for Relief according to proof, including but not limited to the fair market value of the eight (8) million shares Defendants fraudulently allocated to themselves, as provided under New York law;

J.      Award compensatory and punitive damages on the Tenth Claim for Relief according to proof, including but not limited to forty million dollars in lost business opportunity, and an award of Plaintiff's attorneys fees and costs, as provided under federal law;

145

K.      Award compensatory and punitive damages on the Eleventh Claim for Relief, and an award of Plaintiff's attorneys fees and costs, as provided under federal law;

L.      Award compensatory and punitive damages on the Twelfth Claim for Relief according to proof, and an award of Plaintiff's attorneys fees and costs, as provided under federal law;

M.      Any such other legal or equitable relief as the Court may deem appropriate or to which the Court finds Plaintiff entitled.


**V.      Demand for Jury Trial**

Plaintiff reiterates its request for trial of this First Amended Complaint by a jury, pursuant to Federal Rule of Civil Procedure 38(b).


PAUL LAW GROUP, LLP
Attorney for Plaintiff
902 Broadway Fl. 6
New York, NY 10010
Tel: (646) 202-2532


Dated:      March 28, 2016      By:

Wesley J. Paul

146

---

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BAKKEN RESOURCES, INC.,

*Plaintiff*,

-against-

JOSEPH R. EDINGTON,
JEROD EDINGTON,
RYAN EDINGTON,
IWJ CONSULTING GROUP, INC,
TRIAX CAPITAL MANAGEMENT, INC.,
MARYCLIFF INVESTMENT CORP.,
AMERICAN CORDILLERA MINING CORPORATION,

*Defendants*

---

COMPLAINT

---

PAUL LAW GROUP, LLP
Wesley J. Paul, Esq.
Attorney for Plaintiff
902 Broadway Fl. 6
New York, NY 10010
(646) 202-2532