# EXHIBIT A

May 17, 2016 Nevada CV 16-01086 - Val Holms v Bakken - Complaint

F I L E D
Electronically
CV16-01086
2016-05-17 04:31:56 PM
Jacqueline Bryant
Clerk of the Court
Transaction # 5519637 : yvilbria

**1425**
Douglas R. Brown, Esq., NSB #7620
Caryn S. Tijsseling, Esq., NSB #6521
Lemons, Grundy & Eisenberg
6005 Plumas Street, Third Floor
Reno, Nevada 89519
(775) 786-6868
Attorneys for Defendant, VAL HOLMS

IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

IN AND FOR THE COUNTY OF WASHOE

| | |
|---|---|
| VAL HOLMS, an individual,<br><br>        Plaintiff,<br><br>    vs.<br><br>BAKKEN RESOURCES, INC., a Nevada corporation, DAN ANDERSON, an individual, KAREN MIDTLYNG, an individual, HERMAN R. LANDEIS, an individual, BILL M. BABER, an individual, SOLANGE CHARAS, an individual, DOUGLAS L. WILLIAMS,<br><br>        Defendants. | Case No.<br><br>Dept. No. |

**VERFIED COMPLAINT**
*Injunctive Relief*

Plaintiff VAL HOLMS hereby alleges against Defendants Bakken Resources, Inc. ("BRI"), a Nevada corporation, Dan Anderson, an individual, Karen Midtlyng, an individual, Herman R. Landeis, an individual, Bill M. Baber, an individual, Solange Charas, an individual, and Douglas L. Williams, an individual, (collectively Defendants") as follows:

PARTIES AND JURISDICTION

1.     Plaintiff Val Holms is an individual and resident of Polson, Montana.  He owns 26,235,000 shares (approximately 47%) of BRI's outstanding stock and is the Chairman of the BRI Board of Directors and former president and chief executive officer of BRI.

2.     Defendant Bakken Resources, Inc. is a current and existing Nevada Corporation.

3.     Defendant Dan Anderson is BRI's Chief Financial Officer and a member of the

LEMONS, GRUNDY
& EISENBERG
6005 PLUMAS ST.
SUITE 300
RENO, NV 89519
(775) 786-6868

1

1   BRI Board of Directors.

2       4.      Karen Midtlyng is BRI's Secretary and a member of the BRI Board of Directors.

3       5.      Herman R. Landeis is a member of the BRI Board of Directors.

4       6.      Bill M. Baber is a member of the BRI Board of Directors.

5       7.      Solange Charas is a member of the BRI Board of Directors.

6       8.      Douglas L. Williams is a member of the BRI Board of Directors.

7       9.      This Court has jurisdiction over Defendants because BRI is incorporated in
8   Nevada and the Defendants' wrongful conduct has resulted in irreparable harm and
9   substantial damages to Mr. Holms and BRI's other shareholders.

10                                  INTRODUCTION

11      10.     This action is about BRI's and its Board of Directors' wrongful attempts to wrest
12  complete control of BRI from its shareholders so that the Directors may act with impunity
13  from shareholder oversight and enjoy their board positions in perpetuity. As a result of BRI's
14  and the Board's wrongful actions, Holms has been deprived of his shareholder right to vote to
15  amend, adopt, or repeal the Board's changes to BRI's Bylaws, deprived of his shareholder
16  voting rights and power, deprived of his ability to sell his BRI stock, and Holms's settlement of
17  companion litigation involving many of the same parties herein has been placed in dire
18  jeopardy.

19                              GENERAL ALLEGATIONS

20      11.     This is an action for breach of fiduciary duty, tortious interference with
21  contract, and injunctive relief that arises out of events and transactions from a companion
22  shareholder derivative lawsuit currently pending before the Second Judicial District Court in
23  and for the County of Washoe, Nevada, Civil Case No. CV14 00544, Dept. No. B7, styled
24  *Manuel Graiwer et al. v. Val Holms, et al.* (the "Derivative Action").

25      12.     The Derivative Action involves claims by named Deriviative Plaintiff Manuel
26  Graiwer against Holms and other current and former BRI directors, some of whom are named
27  as defendants in this action, and BRI's corporate counsel. The Derivative Action alleged two
28  principal causes of action against Holms: (1) that he caused BRI to adopt an interpretation and

LEMONS, GRUNDY
& EISENBERG
6005 PLUMAS ST.
SUITE 300
RENO, NV 89519
(775) 786-6868

2

pay unto Holms Energy LLC ("HELLC") a higher overriding royalty than what was provided for in the November 26, 2010 Asset Purchase Agreement between Multisys Language Systems, Inc. (n/k/a BRI) and HELLC; and (2) that Holms conspired with Derivative Defendant Wesley J. Paul, corporate counsel for BRI, to not tender the defense of certain lawsuits to BRI's insurance carrier to the financial benefit of Mr. Paul. Arising out of these allegations are claims against the then board of directors, Derivative Defendants Midtlyng, Landeis, Baber, and Deffinbaugh for breach of fiduciary duty, negligence, and acts that resulted in corporate waste. Derivative Plaintiffs moved to amend their Complaint and added numerous allegations directed primarily at Holms including allegations concerning a purchase of the so-called Duck Lake minerals.

13.    Holms is the former president and CEO of BRI, current Chairman of the BRI Board, and the single largest BRI shareholder with approximately 47% of the outstanding stock. BRI's main asset, the McKenzie County, North Dakota mineral interests on which HELLC receives its overriding royalty under the Asset Purchase Agreement, was contributed to BRI by Holms himself. The oil and gas royalties that BRI receives on the minerals are the company's main income source and, upon information and belief, is the Company's only current income stream. Without Holms's mineral interest, BRI would not exist.[1]

14.    On November 10-11, 2015, Manuel Graiwer, on behalf of Derivative Plaintiffs, and Holms participated in a two-day mediation in Denver, Colorado before retired federal Judge William F. Downes. That mediation resulted in a preliminary settlement that was subject to BRI Board approval as it contemplated a tender offer to all shareholders other than Holms and the Derivative Defendant directors. BRI rejected the settlement and, on December 10, 2015, filed an action in the First Judicial District Court, Lewis & Clark County, State of Montana, complaining that Holms was without authority to negotiate a settlement that would resolve the lawsuit for all parties involved, that the "proposed settlement would result in

---

[1]    Multisys Language Systems, Inc. was a shell corporation with limited cash assets. In 2010, Multisys became BRI through a reverse merger, which principally included acquisition of the McKenzie County minerals from Holms.

1 Holms controlling the vast majority of the issued and outstanding shares of BRI, thereby
2 providing him with the ability to replace the Board of Directors and terminate the ongoing
3 [Spira] investigation," and sought to enjoin Holms from, *inter alia,* "voting his [BRI] shares in
4 any manner with [Plaintiff] Graiwer or any other BRI shareholder <u>that replaces the majority of</u>
5 <u>the members of the Board</u> who are currently charged with overseeing the [Spira] investigation
6 of Holms." A copy of the Montana Complaint is attached as **Exhibit 1,** ¶¶ 19, 20, 25(d)
7 (emphasis added). BRI further states that the Spira investigation concerns the disputed Duck
8 Lake mineral purchase, alleged breach of Holms's employment agreement, and the adequacy
9 of BRI's financial reporting. *Id.* at ¶ 14. The Montana court never granted the relief sought by
10 BRI.

11     15. On January 28, 2016, all parties in the Derivative Action participated in a
12 second mediation before Judge Downes in Reno, Nevada (the "Reno Mediation"). While the
13 parties did not reach settlement in Reno, all parties continued settlement discussions with the
14 assistance of Judge Downes, as necessary.

15     16. On or about February 9, 2016, in anticipation that Graiwer and Holms may
16 reach a settlement and to prevent a shareholder vote or settlement that would cause the
17 replacement of the majority of the BRI Board, BRI and the BRI Board attempted to amend the
18 BRI Bylaws (1) by adding language to Article III, § 3.2 that approved staggering the BRI Board
19 so that only a limited number of board members could be removed by shareholder vote in a
20 given year and, more importantly, (2) by removing the shareholders right to "adopt, amend,
21 or appeal" any bylaws adopted, amended, or repealed by the BRI Board as provided in Article
22 IX. *See* **Exhibit 2** comparing the original Bylaws with the Amended Bylaws. Significantly, BRI's
23 February 9, 2016 Form 8-K, signed by Dan Anderson and filed with the SEC, disclosed only the
24 Article III Bylaw amendments but conveniently failed to alert the shareholders and the public
25 of the substantial change to Article IX. *See* BRI Form 8-K, dated 2/9/16, and signed by Dan
26 Anderson on 2/16/16, attached as **Exhibit 3**.

27     17. On February 17, 2016, Graiwer, on behalf of the Derivative Plaintiffs, and
28 Holms met in Denver, Colorado to discuss settlement as between Derivative Plaintiffs and

LEMONS, GRUNDY
& EISENBERG
6005 PLUMAS ST.
SUITE 300
RENO, NV 89519
(775) 786-6868

4

1   Holms only in order to avoid any issues with needing BRI approval as encountered in the first

2   settlement attempt.   Graiwer and Holms reached a settlement that resolved all claims

3   between Derivative Plaintiffs and Holms and also resolved the concerns of BRI and the Spira

4   investigation. The general terms of the settlement include: (1) Holms agreed to sell all of his

5   shares in BRI to Derivative Plaintiff Graiwer at a price of $0.16/share; (2) Holms agreed to

6   modify the five percent (5%) overriding royalty in the November 26, 2010 Asset Purchase

7   Agreement to a reduced ten percent (10%) of all monies received by BRI on oil and gas

8   production from the Holms Property; (3) Holms agreed to resign from his position as CEO and

9   Director of the BRI Board and not take any future employment with BRI or acquire any future

10  stock in BRI; (4) Holms granted BRI a one-year option to require Holms to purchase the Duck

11  Lake minerals at the same net price which BRI paid; (5) Holms agreed to pay Graiwer

12  $479,426.35 for attorneys' fees incurred in the Derivative Action on behalf of Plaintiffs; (6)

13  Plaintiffs agreed to dismiss all claims in the present action against Holms with prejudice; and

14  (7) Plaintiffs and Holms each fully release each other of all liability.

15       18.    On February 29, 2016, in his Reply in Support of Defendant Val Holms' Motion

16  for Order Confirming the Current Stay of Litigation, a copy of which is attached as **Exhibit 4**,

17  Holms informed the Court that Graiwer and Holms had reached a settlement and attached as

18  Exhibit 1 thereto a letter from Derivative Plaintiffs' counsel confirming the settlement and

19  summarizing the general terms.  Holms's Reply brief was served on all Derivative Defendants

20  that same day. Also on that day, Derivative Plaintiffs' counsel sent an email to counsel for the

21  Derivative Defendants notifying them of the settlement and the general terms.  On May 9,

22  2016, Holm's filed with the Court the executed settlement agreement between Derivative

23  Plaintiffs and Holms (the "Derivative Settlement Agreement") for approval pursuant to NRCP

24  23.1.

25       19.    After receiving notice of the terms, BRI and the Board engaged in additional

26  intentional acts to thwart the settlement and to protect their interests above the best

27  interests of BRI and the shareholders.

28       20.    On May 9, 2016, BRI issued a press release attached to a Form 8-K/A filed with

LEMONS, GRUNDY
& EISENBERG
6005 PLUMAS ST.
SUITE 300
RENO, NV 89519
(775) 786-6868

5

1   the SEC announcing that BRI had entered into a "term sheet on May 3, 2016" with a New York

2   private equity firm, Eagle Private Equity ("Eagle"), for a one million dollar line of credit that

3   will purportedly "be intended for the acquisition of mineral assets." A copy of the Form 8-K/A

4   and press release filed on 5/9/16 are attached as **Exhibit 5**. The press release further states

5   that the "[l]oans made to the Company based on the initial $1 million credit line may be

6   converted into a newly-created class of the Company's preferred stock." *Id*. The term sheet

7   was not disclosed with the Form 8-K.

8        21.    On May 10, 2016, BRI filed another Form 8-K, signed by Dan Anderson, which

9   provided that BRI had now executed a loan agreement with Eagle and disclosed that the

10   company paid a 5% fee[2] ($50,000) for the right to draw on a $1 million credit facility (the

11   "Facility"), that Eagle has the right to force "the Company [to borrow] up to the balance of the

12   Facility" if the company has not drawn on the Facility, and in the event there is a "change[] in

13   control of the Company, loans under the Facility are convertible into shares of a newly-

14   designated class of the Company's Series A Preferred stock," with each preferred share being

15   convertible into 100 shares of common stock at Eagle's option. Even if Eagle chose not to

16   convert the preferred shares to common stock, each share of preferred stock votes on an as-

17   converted basis, meaning Eagle has 100 votes per preferred share. A copy of the Form 8-K

18   filed on 5/10/16 is attached as **Exhibit 6**. A copy of the loan agreement was not disclosed with

19   the Form 8-K.

20        22.    The Eagle financing arrangement is unconventional, at best, and intended to

21   thwart the Derivative Settlement Agreement by diluting the value and voting power of

22   Holms's 47% of outstanding BRI stock in order to to prevent anyone from acquiring his shares

23   to obtain a controlling interest in BRI that would allow for replacement of the current Board of

24   Directors. In its desperate attempt to prevent Holms's from selling his interest in BRI and

25   extricating himself from the Derivative Action, the Board of Directors effectively sold control

26   of BRI to Eagle for a million dollars.

27

LEMONS, GRUNDY
& EISENBERG
6005 PLUMAS ST.
SUITE 300
RENO, NV 89519
(775) 786-6868

28

---

[2]     A typical fee from a legitimate lender is less than 1%.

6

23.     BRI's corporate counsel admtted the same in the Derivative Action.   In his Opposition to Plaintiffs' Motion for Continuance, BRI's corporate counsel objects to the Derivative Settlement Agreement[3] because

> [u]nder the terms [of the Eagle Facility] agreed to[,] if there is a change of control in the company (BRI), Eagle Private Equity has the right to convert its outstanding loans into shares of Series A preferred stock in BRI.  Each share of Series A preferred stock has the voting rights of 100 shares of BRI common stock.  As a result, Val Holms shares, on a fully diluted basis, would amount to twenty-one percent (21%) ownership in BRI, which is not controlling or a majority.

A copy of Wesley Paul's Opposition to Plaintiffs' Motion for Continuance is attached as **Exhibit 7**.

24.     There is no legitimate business purpose to agree to the stock conversion terms as provided in the BRI/Eagle credit agreement.  The line of credit could have been, as is typically done in a financing agreement, secured by BRI's assets – namely the McKenzie County, North Dakota minerals that Holms himself contributed to the company.  Yet, as BRI's corporate counsel admits, the Facility is secured by a "poison pill" designed solely to dilute the value and voting power of Holms's 47% of BRI stock and thwart the Derivative Settlement Agreement.  Even more, it effectively restricts Holms's ability to sell his stock to anyone who may own 3% or more of BRI stock.  Indeed, a 47% stake in a company provides significant degree of control of the company.

25.     Of significance is that there is little or no market for Holms's BRI stock.  BRI shares are not traded through an electronic system and over the last three months, BRI trading has averaged only 15,000 shares per day.  At that rate, it would take Holms nearly five (5) years to sell all of his stock.

---

[3]     BRI's corporate counsel also objected to the Derivative Settlement Agreement alleging that approval thereof may create SEC liability because the current Board may not have an opportunity to complete the Spira investigation.  BRI's corporate counsel has been spinning this specter of SEC liability for months, yet has never, despite requests, produced any evidence that the SEC has any concerns regarding BRI other than bringing its financial disclosures current – of course, BRI has not even filed its required Form 10-Q since 3rd Quarter 2014, but it has seen fit to file numerous Form 8-K's about Bylaw changes, unconventional financing, etc.

Lemons, Grundy
& Eisenberg
6005 Plumas St.
Suite 300
Reno, NV 89519
(775) 786-6868

26.     BRI and the Board of Directors, by having entered into the Eagle financing arrangement have breached their fiduciary duty to Holms as a shareholder and intentionally interfered with the Derivative Settlement Agreement.

27.     Upon information and belief, BRI and the Board of Directors have not yet drawn on the Facility and therefore the preferred shares poison pill has not yet occurred. Should BRI and the Board draw on the Facility, however, they will have intentionally interfered with the Holms Settlement Agreement, cause Holms irreparable harm by depriving him of his shareholder voting rights and power and creating an unreasonable restriction on the alienation of his BRI shares, and cause money damages to Holms not less than $4,197,600.00. Accordingly, Holms is entitled to injunctive relief restraining BRI and the Board of Directors from drawing on the Facility.

28.     All conditions precedent to bringing this action have been satisfied.

### FIRST CLAIM FOR RELIEF

(Breach of Fiduciary Duty against Defendant Directors)

29.     Holms hereby refers to, alleges, and incorporates each and every allegation contained in the preceding paragraphs as if fully set forth herein.

30.     BRI's Board of Directors owe Holms, as a shareholder of BRI, fiduciary duties to, *inter alia*, act in his best interest as a shareholder.

31.     The Board of Directors have breached their duties.

32.     As a result of the Board of Directors' breaches of their fiduciary duties, they have caused irreparable injury to Holms.

33.     Unless the BRI Board of Directors is enjoined from continued breaches of their fiduciary duties, Holms will suffer additional immediate and irreparable harm.  Therefore, injunctive relief is appropriate.

### SECOND CLAIM FOR RELIEF

(Intentional Interference with Contract against all Defendants)

34.     Holms hereby refers to, alleges, and incorporates each and every allegation contained in the preceding paragraphs as if fully set forth herein.

LEMONS, GRUNDY
& EISENBERG
6005 PLUMAS ST.
SUITE 300
RENO, NV 89519
(775) 786-6868

8

35. The Derivative Settlement Agreement is a valid and enforceable contract.

36. BRI and the Board of Directors owe Holms duties to refrain from interfering with the Derivative Settlement Agreement.

37. BRI and the Board of Directors had knowledge of the Derivative Settlement Agreement when they engaged in the conduct set forth herein to interfere, frustrate, and disrupt the Settlement Agreement.

38. Unless BRI and the BRI Board of Directors are enjoined from breaching their duties to Holms by, among other things, drawing on the Facility, Holms will suffer immediate and irreparable harm. Therefore, injunctive relief is appropriate.

39. Further, unless BRI and the BRI Board of Directors are enjoined from breaching their duties to Holms by, among other things, drawing on the Facility, Holms will suffer money damages in an amount not less than $4,197,600.00, the exact amount to be proved at trial.

THIRD CLAIM FOR RELIEF

(Injunctive Relief against all Defendants)

40. Holms hereby refers to, alleges, and incorporates each and every allegation contained in the preceding paragraphs as if fully set forth herein.

41. BRI and the Board of Directors have a fiduciary duty to Holms as a shareholder to refrain from conduct that places their best interest above his and owe Holms an independent duty to refrain from interfering with the Derivative Settlement Agreement. Unless BRI and the Board of Directors are enjoined from continued breaches of their duties, *inter alia*, drawing on the Facility, Holms will suffer immediate and irreparable injury.

**BASED UPON THE FORGOING**, the Plaintiff prays as follows:

A. That the Court enter orders for injunctive relief in the form of a Temporary Restraining Order, and preliminary and permanent injunctions, prohibiting the Board of Directors from breaching their fiduciary duties to Holms as a shareholder;

B. That the Court enter orders for injunctive relief in the form of a Temporary Restraining Order, and preliminary and permanent injunctions, prohibiting Defendants from any continued or future conduct or activities which would in any manner dilute the value and

LEMONS, GRUNDY
& EISENBERG
6005 PLUMAS ST.
SUITE 300
RENO, NV 89519
(775) 786-6868

9

1  voting power of Holms's BRI stock, restrict or impair the alienability and value of Holms's

2  stock, or otherwise interfere, frustrate, or disrupt the Derivative Settlement Agreement; and

3      C.      That the Court enter orders awarding damages against Defendants in an

4  amount to be determined at trial including costs and attorneys' fees as allowed by law, and

5  for such further relief as the Court deems just and proper.

6      **The undersigned does hereby affirm that the preceding document does not contain**

7  **the social security number of any person.**

8      Dated: May _17_, 2016.

9                                      Lemons, Grundy & Eisenberg
                                       6005 Plumas Street, Suite 300
10                                     Reno, Nevada 89519

11

12      By: _____
                                       Douglas R. Brown, Esq.
13                                     Attorneys for Plaintiff, VAL HOLMS

14

15

16

17

18

19

20

21

22

23

24

25

26

27
LEMONS, GRUNDY
& EISENBERG
6005 PLUMAS ST.
SUITE 300
RENO, NV 89519
(775) 786-6868
28

VERIFICATION

1

2

STATE OF MONTANA        )
3                       ) ss
COUNTY OF Lake          )

4

5      Val Holms, being first duly sworn, deposes and says that he has read and assisted in

6  preparing the foregoing Complaint, knows the contents thereof, and that the same is true as

7
   of his own knowledge, except as to those matters stated upon information and belief, and he
8
   believes those matters to be true.
9

10     I declare under penalty of perjury under the laws of the State of Nevada that the

11 foregoing is true and correct.

12

13                                              _____
                                                Val Holms
14

15 Subscribed and sworn to before me

16 this 17th day of May, 2016

17 _____

18 Notary Public

19 My commission expires:_____

20

21

22

23

24

25

26

27

28

EMONS, GRUNDY
& EISENBERG
005 PLUMAS ST.
SUITE 300
ENO, NV 89519
775) 786-6868

SUSAN R FORTNER
NOTARY PUBLIC for the
State of Montana
Residing at Frenchtown, MT
My Commission Expires
June 21, 2019
SEAL

11

## INDEX OF EXHIBITS
## TO VERIFIED COMPLAINT

| Exhibit No. | Description | Length of Exhibit |
|---|---|---|
| 1 | Montana Complaint | 12 pages |
| 2 | Amended and Restated Bylaws of Bakken Resources, Inc. | 18 pages |
| 3 | Form 8-K from SEC dated 2/9/16 | 3 pages |
| 4 | Reply ISO Holms' Motion for Order Confirming Current Stay of Litigation | 9 pages |
| 5 | Form 8-K/A Amended Current Report from SEC dated 5/9/16 | 5 pages |
| 6 | Form 8-K Current Report from SEC dated 5/10/16 | 26 pages |
| 7 | Wesley Paul's Opposition to Plaintiffs' Motion for Continuance filed 5/13/16 | 13 pages |
| | | |

F I L E D
Electronically
CV16-01086
2016-05-17 04:31:56 PM
Jacqueline Bryant
Clerk of the Court
Transaction # 5519637 : yviloria

# EXHIBIT 1

# EXHIBIT 1

NANCY SWEENEY
CLERK DISTRICT COURT

2015 DEC 10  AM 11: 04

FILED
LISA KALTH

DEPUTY

Oliver H. Goe
BROWNING, KALECZYC, BERRY & HOVEN, P.C.
800 North Last Chance Gulch, Suite 101
PO Box 1697
Helena, MT 59624
Telephone: (406) 443-6820
Facsimile:  (406) 443-6883

Attorneys for Plaintiff

MONTANA FIRST JUDICIAL DISTRICT COURT,
LEWIS & CLARK COUNTY

BAKKEN RESOURCES, INC.,

        Plaintiff,

        v.

VAL M. HOLMS,

        Defendant.

Cause No. CDV 2015-954

COMPLAINT AND APPLICATION
FOR TEMPORARY RESTRAINING
ORDER AND INJUNCTIVE RELIEF

KATHY SEELEY
Presiding Judge

       Plaintiff, Bakken Resources, Inc. (hereinafter "Plaintiff" or "BRI"), by and through its

attorney, Oliver H. Goe of Browning, Kaleczyc, Berry & Hoven, P.C. files this Complaint and

Application For Temporary Restraining Order and Injunctive Relief against the Defendant Val

M. Holms ("Holms") alleging as follows:

## I.  THE PARTIES, JURISDICTION AND VENUE

    1.     BRI is a public corporation incorporated in the state of Nevada, and at all relevant

times has its principal place of business and conducted its business operations from an office

located at 1425 Birch Ave, Suite A, Helena, Lewis and Clark County, MT 59601.  BRI is duly

registered with the Montana Secretary of State to conduct business in the state of Montana.

    2.     BRI's primary business as a royalty company relates to leasing oil and gas

properties to oil and gas production companies.

- 1 -



153404B/5364.001

3.    Defendant Val Holms ("Holms") is a resident of Lake County, Montana.

4.    The performance and breach of contract at issue herein and the injuries alleged herein occurred primarily in Lewis and Clark County, Montana.

5.    This Court has jurisdiction over the subject matter and the parties to this action.

6.    Venue properly resides in the Montana First Judicial District, Lewis and Clark County.

## II. GENERAL ALLEGATIONS

7.    Holms owns 26,350,000 shares of BRI which represents approximately 47% ownership interest in BRI's issued and outstanding common stock.

8.    Holms is the Chairman of the Board, Chief Executive Officer and President of BRI. Holms is currently on a leave of absence from BRI.

9.    In December 2014, the BRI Board of Directors formed an Audit Committee and initiated an investigation into alleged wrongdoing by Holms in his capacity as Chairman of the Board, Chief Executive Officer and President of BRI.

10.    On March 17, 2015, BRI filed a Form 8-K with the United States Securities and Exchange Commission ("SEC") advising of the status of the investigation. As reflected therein, W. Edward Nichols, the Chair and sole member of the Company's audit committee, had submitted his resignation by letter dated March 12, 2015. The resignation had been preceded by a request of the Board seeking removal of Mr. Nichols due to questions relating to the independence of such investigation. In his resignation letter, Mr. Nichols alleged in part:

> The results of my investigation are clear and the evidence indicates that Mr. Holms breached his duties to BRI by causing BRI to overpay for certain oil and gas leases, and then took a kickback/payment from the seller of those leases. There are other very questionable matters that also came to my attention.

1534940/5364.001

11.   In its March 17, 2015 8-K, BRI also advised the SEC that it was continuing the investigation:

> A special independent investigator has been retained by the Company to continue the investigation initiated by the Company's audit committee. The Company intends to make all necessary announcements and take appropriate actions following the results of the special independent investigation.

12.   In an effort to ensure that the integrity of the investigation would not be compromised, BRI requested and Holms agreed to take a voluntary leave of absence during the pendency of the investigation. On March 24, 2015, BRI and Holms entered into a Leave of Absence Agreement ("Agreement") in which Holms agreed to take a leave of absence "with respect to all his positions with BRI, effective immediately, until conclusion of the Investigation and the results of such investigation are presented to the Board." (Exhibit A.)  In the Agreement, "Val agrees not to interfere with BRI's business/operations during the period of his leave of absence." Agreement, ¶ 6.

13.   In its 8-K of March 30, 2015, BRI advised the SEC of the ongoing investigation and the Agreement.

> On March 24, 2015, Val M. Holms, President, Chief Executive Officer, and Chairman of the Board of Bakken Resources, Inc. (the "Company"), began a voluntary paid leave of absence. Mr. Holms will remain on such voluntary paid leave through the completion of an internal investigation by the Company's independent outside investigator. The Company retained its special independent investigator to continue the investigation initiated by the Company's former audit committee chairman. Our independent investigation is expected to relate to matters that the Company's prior audit committee chairman raised by his resignation letter (attached as an exhibit to the Company's Form 8-K, filed with the Securities Exchange Commission on March 17, 2015).
>
> No replacement for Mr. Holms has been appointed during his leave at this time. The Company expects that the Board will determine all matters during Mr. Holms' leave that would otherwise require consideration in his capacity as President and CEO of the Company. Following the results of the special independent investigation, the Company intends to make all necessary announcements and take appropriate actions.

- 3 -

1

2     The Company has issued a press release announcing Mr. Holms' leave
      of absence described above, and a copy of that press release is attached
3     to this Form 8-K as Exhibit 99.1.

4     14.    BRI has continued to advise the SEC of the status of the investigation. See letter

5  dated September 21, 2015 from Wesley J. Paul, counsel for BRI, to H. Roger Schwall, which

6  states in part:

7          Immediately after Mr. Nichols' resignation as a board member, BKKN
           retained a new investigator named Shirley Spira. Ms. Spira is a New York
8          City attorney with experience investigating corporate fraud. Ms. Spira's
           staff includes a fact investigator and a securities attorney.
9          On March 24, 2015, upon the commencement of Ms. Spira's investigation,
           BKKN's Chairman and CEO, Val M. Holms, voluntarily began an
10         indefinite, paid leave of absence, pending the outcome of the
           investigation. Information relating to Mr. Holms' leave of absence was
11         disclosed in BKKN's Current Report on Form 8-K, filed with the SEC on
12         March, 30, 2015.

13         BKKN then announced in a press release attached to its Current Report on
14         Form 8-K, filed with the SEC on April 15, 2015, that BKKN's auditors are
           awaiting the finalized results of and responses to Ms. Spira's internal
15         investigation before issuing an audit opinion. As a result, BKKN's has
           been unable to file an Annual Report for the year ended December 31,
16         2014 or any Quarterly Reports since January 1, 2015.

17         Ms. Spira presented her initial investigation report in person to BKKN's
18         Board of Directors on August 3, 2015. BKKN's auditors were present at
           that presentation. The initial Spira report found evidence of a potential
19         kick back in the amount of $200,000 to Mr. Holms in connection with a
           transaction that took place in 2011, as well as potential breaches of Mr.
20         Holm's employment agreement. Ms. Spira's report also raised questions
           about the adequacy of Bakken's reporting of certain related person
21         transactions.

22
           BKKN provided some comments to Ms. Spira's report and asked Mr.
23         Holms to respond to Ms. Spira's initial findings.

24         Mr. Holms issued a written response to the initial Spira Report, presenting
25         that response in person to BKKN's Board of Directors and auditors on
           September 10, 2015. Mr. Holms' presentation and report identified certain
26         missing information in the Spira Report, maintaining that the purported
           kickback was actually repayment of an existing personal loan.
27

- 4 -

15. Ms. Spira's investigation has not been completed. Certain recommendations contained in Ms. Spira's report, such as undertaking a forensic analysis on BRI financial transactions to determine fraud are still pending. However, the investigation is also being delayed by Holms' part. For instance, on November 12, 2015, BRI formally requested for forensic ink-dating analysis of a journal allegedly containing Holms' evidence of prior loans that are the subject matter of the investigation. Holms claims that such journal contains handwritten entries dating to the 1980's that evidence loans he made. To date, the journal has not been produced.

16. On November 12, 2015, the same day that BRI requested that the Holms journal be produced, Holms called Herman Landeis, a member of the BRI Board of Directors, stating that (1) the investigation is over, (2) Holms is "getting back in the saddle" and would be running the company and, (3) that he and the rest of the Board are required to attend a meeting in Denver relating to the *Graiwer* litigation in the next few days. Affidavit of Herman Landeis, Exhibit B.

17. Currently pending in the Second Judicial District Court of the State of Nevada, in and for the County of Washoe, is a shareholder derivative action brought by plaintiffs Manuel Graiwer and T.J. Jesky. The named defendants are Val Holms, Herman Landeis, Karen Midtlyng, corporate secretary and Board member, David Deffinbaugh, former Board member, Bill Baber, Board member, Edward Nichols, former Board member and Wesley Paul, outside corporate counsel.

18. On or about December 4, 2015, counsel for Holms in the *Graiwer* litigation stated that they were filing a Joint Motion For Order Staying Litigation and Ordering Parties to Participate in Settlement Conference. In that motion, Holms reveals that he participated in a lengthy mediation conference with plaintiffs and negotiated a potential resolution of the case for all parties. Holms also states in his motion:

> Moreover, a majority of the voting shares (over 51%) believe the settlement terms are in the best interests of the company and the shareholders given that Val Holms owns 47% of the outstanding shares and Mr. Jesky and Mr. Graiwer, his family members and close associates own over 4% of the outstanding shares.

- 5 -

1534940/5364.001

On December 8, 2015, the plaintiffs in the *Graiwer* litigation filed a Motion for Order Staying Litigation and Ordering Parties to Participate in Settlement Conference. This motion filed by the plaintiffs was substantively identical to the joint motion provided by Holms' counsel, and demonstrates the coordinated efforts of Holms and the plaintiffs in the *Graiwer* litigation to coerce an action that was not approved by BRI.

19.     BRI nor any of the other Defendants in the *Graiwer* litigation including current Board members were afforded the opportunity to participate in the mediation. BRI is informed that the mediation resulted in a global settlement agreement, despite the fact that Holms is not authorized to represent any other defendant in the *Graiwer* litigation. Likewise, he is not authorized to act on behalf of BRI in any capacity and is specifically precluded from so doing by the Agreement.

20.     BRI is informed and believes that the proposed settlement includes a tender offer to all shareholders in BRI other than Holms and the current Board members who own stock. This proposed settlement would result in Holms controlling the vast majority of the issued and outstanding shares of BRI, thereby providing him with the ability to replace the Board of Directors and terminate the ongoing independent investigation. Such tender offer also has the potential to cost BRI several million dollars depending on the tender offer price.

21.     To date, Holms has refused to share with BRI a copy of the settlement agreement that he entered into with the Plaintiffs in the *Graiwer* litigation, despite BRI's repeated requests to provide this settlement agreement. Instead, Holms insists upon having the entire Board meet in person in order to personally present the settlement terms to the Board, thus forcing BRI to needlessly expend thousands of dollars. This action by Holms is also in violation of the Agreement by not only interfering with BRI's business/operations, but also by failing to cooperate with BRI in connection with the *Graiwer* litigation.

1534940/5364.001

### III.  LEGAL CLAIMS

#### Count I – Breach of Contract

22.     BRI re-alleges and incorporates the allegations contained in paragraphs 1-21 above.

23.     By his actions, Holms has materially breached the terms of the Agreement.

#### Count 2 – Temporary Restraining Order
#### And Injunctive Relief

24.     BRI re-alleges and incorporates the allegations contained in paragraphs 1-23 above.

25.     BRI, pursuant to MCA §§ 27-19-101 through 27-19-319 and based on the fact delay could cause immediate and irreparable harm and injury to BRI, requests a temporary restraining order prohibiting Holms from any of the following actions during the pendency of the investigation:

    a)     continuing to refuse to provide BRI with a copy of the settlement agreement;

    b)     contacting current Board members, Directors and/or Officers to demand any in-person meeting with Holms prior to the completion of the investigation and the Board's actions following such completion;

    c)     contacting current Board members, Directors and/or Officers to discuss the Graiwer settlement without first providing a copy of the settlement agreement to BRI;

    d)     voting his shares in any manner with Graiwer or any other BRI shareholder that replaces a majority of the members of the Board who are currently charged with overseeing the investigation of Holms; and

    e)     any other actions of any kind that could have a materially detrimental impact on BRI's business/operations or the completion of the investigation of Holms.

- 7 -

## PRAYER FOR RELIEF

WHEREFORE, BRI prays for relief as follows:

1.     For an immediate order restraining Holms or his agents from any of the following actions:

     a)    continuing to refuse to provide BRI with a copy of the settlement agreement;

     b)    contacting current Board members, Directors and/or Officers to demand any in-person meeting with Holms prior to the completion of the investigation and the Board's actions following such completion;

     c)    contacting current Board members, Directors and/or Officers to discuss the Graiwer settlement without first providing a copy of the settlement agreement to BRI;

     d)    voting his shares in any manner with Graiwer or any other BRI shareholder that replaces a majority of the members of the Board who are currently charged with overseeing the investigation of Holms; and

     e)    any other actions of any kind that could have a materially detrimental impact on BRI's business/operations or the completion of the investigation of Holms.

2.     An order to show cause why a preliminary injunction should not issue upon expiration of the TRO.

DATED this 10th day of December, 2015.

BROWNING, KALECZYC, BERRY & HOVEN, P.C.

By_____
      Oliver H. Goe

Attorneys for Plaintiff

- 8 -

1534940/5364.001

March 24, 2015

Dear Val:

As we discussed, it is in the best interest of Bakken Resources, Inc. (the "BRI" or the "Company") if you take a voluntarily leave of absence pending the conclusion of the various investigations which are presently taking place and in particular the special investigation being conducted by the independent investigator, Shirley Spira (the "Investigation"). Your willingness to do so is appreciated, will ensure the integrity of the investigations, and will send a strong message to regulatory authorities. As we agreed, during your voluntary leave of absence, the following conditions will be in effect:

1. Val will take a leave of absence from BRI with respect to all his positions with BRI, effective immediately, until the conclusion of the Investigation and the results of such Investigation are presented to the Board.

2. Following the conclusion of the Investigation, Val's status will be reviewed based on the results of such Investigation.

3. Val agrees to cooperate with the Investigation and assist in other matters that may be reasonably requested by BRI during the leave.

4. BRI agrees to cooperate with the Investigation and not cause any undue delay in the conclusion of the Investigation.

5. Val agrees not to interfere with BRI's business/operations during the period of his leave of absence. Val is permitted to work on any project during his leave provided that he does not interfere with BRI's business/operations during this time.

6. BRI agrees to cooperate with Val in connection with his preparation for matters relating to the Grajwer lawsuit (and any other lawsuit, threatened or pending). Val will also cooperate as well as reasonably requested by BRI.

7. The duties of the CEO will be assumed by the Board during the time of Val's leave of absence.

8. Val will continue to be paid his regular salary and all usual benefits during the leave.

9. Val will continue to be paid his override rights (in favor of Holms Energy, LLC) during the leave. Such payment will be done as soon as possible with supporting documentation as may be requested by Val.

10. Val will continue to be paid for any production coming from the Three Forks formation for minerals that were originally conveyed from Toll Reserve Consortium (now HEDC) to BRI. Such payment will be done as soon as possible with supporting documentation as may be requested by Val.

EXHIBIT

A

11. Val will receive a copy of the draft 10K for 2014 at least three (3) days prior to anticipated filing for his review and comment.

12. Any announcement relating to Val's leave should be provided to Val first prior to filing. Val expects that the 8-K announcing his leave will indicate that he is taking a leave for health reasons and to cooperate with the investigation. Val will have a right to include a short quote in connection with such 8-K, subject to review and approval by company counsel. Suggested quote, "At this time, I plan to take a short leave of absence to allow my health to continue to improve and also to cooperate with the current company investigation. I am pleased that the Company continues to make progress in this difficult environment for oil and gas companies, and I look forward to bringing new projects to the Company."

If at any time during your voluntarily leave of absence you fail to meet these agreed upon understandings or conditions as they relate to you, you understand that the Board may reconsider your status.

We at BRI appreciate that you have taken the investigations seriously and understand the position BRI is in. We will advise you when the investigations have been concluded and will provide you with a copy of the investigators' findings and recommendations prior to making any final decisions as to your status.

The Agreements herein shall be confidential to the fullest extent permitted by law.

Should you have any questions, please direct all inquiries to outside counsel for BRI, Oliver Goe at Browning, Kaleczyc, Berry & Hoven, P.C. or Wesley J. Paul at Paul Law Group, LLP.

Very truly yours,

Don Anderson
CFO, Bakken Resources, Inc.

Agreed and Accepted:

Val M. Holms

1  Oliver H. Goe
   BROWNING, KALECZYC, BERRY & HOVEN, P.C.
2  800 North Last Chance Gulch, Suite 101
   PO Box 1697
3  Helena, MT 59624
   Telephone: (406) 443-6820
4  Facsimile:  (406) 443-6883

5  Attorneys for Plaintiff

6                    MONTANA FIRST JUDICIAL DISTRICT COURT,
7                            LEWIS & CLARK COUNTY

8  _____ | _____
   BAKKEN RESOURCES, INC.,             | Cause No. _____
9                                      |
            Plaintiff,                 |
10                                     |
        v.                             |        AFFIDAVIT OF
11                                     |        HERMAN LANDEIS
   VAL M. HOLMS,                       |
12                                     |
            Defendant.                 |
13 _____ |
14
15 _____
16 STATE OF WYOMING        )
                           :ss
17 COUNTY OF PARK          )

18     The undersigned, being duly sworn, deposes and says:

19     1.     I am Herman Landeis, a resident of the State of Wyoming.

20     2.     I am a member of the Board of Directors of Bakken Resources, Inc. ("BRI") and

21 have served in such capacity since January 4, 2011.

22     3.     On the morning of November 12, 2015, I was contacted by phone by Val M.

23 Holms ("Holms").

24     4.     During this call, Holms stated to me that:

25            a.     the independent investigation was over [referring to the investigation that
26                   had been initiated by BRI and being performed by Ms. Shirley Spira];
27            b.     he was getting "back in the saddle" to run BRI;

                                        - 1 -

                                                              54187/5364.001

                           ┌─────────────────────┐
                           │      EXHIBIT         │
                           │        B             │
                           │   _____   │
                           └─────────────────────┘

    c.    I and the rest of the Board were required to go to Denver in the next few days to attend a meeting related to the *Gralver* case [referring to a current shareholder derivative litigation where I am named as a defendant]; and

    d.    he would be contacting other Board members to advise them of these same things.

5.    I advised Holms that I also would be contacting BRI's Corporate Secretary regarding these discussions.

6.    After my call with Holms, I called Karen Midtlyng, also a member of the Board as well as Corporate Secretary and relayed the substance of my conversations with Holms.

7.    I also relayed the substance of my discussions with Holms to Dan Anderson, the Chief Financial Officer for BRI and to Wesley J. Paul, corporate counsel for BRI.

Further your Affiant sayeth naught.

DATED this ___8___ day of December, 2015.

By _____
Herman Landeis

SUBCRIBED AND SWORN TO before me this ___8___ day of __December__, 2015.

(Notary Seal)

_____
NOTARY PUBLIC FOR THE STATE OF WYOMING
Print Notary Name: __Chad  Vincent  Hopkin__
Residing at __1037 River View Drive, Cody WY 82414__
Notary Expires: __April 1, 2019__

CHAD VINCENT HOPKIN - NOTARY PUBLIC
County of Park    State of Wyoming
My Commission Expires April 1, 2019

- 2 -

1534187/5364.001

F I L E D
Electronically
CV16-01086
2016-05-17 04:31:56 PM
Jacqueline Bryant
Clerk of the Court
Transaction # 5519637 : yviloria

# EXHIBIT 2

# EXHIBIT 2

EX-3.1 2 exhibit3-1.htm COMPANY'S AMENDED AND RESTATED BYLAWS AS OF FEBRUARY 9, 2016

## AMENDED AND RESTATED BYLAWS OF
## BAKKEN RESOURCES, INC.
### (a Nevada Corporation)

## Contents

| | | |
|---|---|---|
| ARTICLE I – CORPORATE OFFICES | | 1 |
| 1.1 | REGISTERED OFFICE | 1 |
| 1.2 | OTHER OFFICES | 1 |
| ARTICLE II – MEETINGS OF STOCKHOLDERS | | 1 |
| 2.1 | PLACE OF MEETINGS | 1 |
| 2.3 | SPECIAL MEETING | 1 |
| 2.4 | NOTICE OF STOCKHOLDERS MEETINGS | 2 |
| 2.5 | MANNER OF GIVING NOTICE; AFFIDAVIT OF NOTICE | 2 |
| 2.6 | QUORUM | 3 |
| 2.7 | ADJOURN MEETING: NOTICE | 3 |
| 2.8 | VOTING | 4 |
| 2.9 | WAIVER OF NOTICE | 4 |
| 2.10 | STOCKHOLDER ACTION BY WRITTEN CONSENT WITHOUT A MEETING | 4 |
| 2.11 | RECORD DATE FOR STOCKHOLDER NOTICE; VOTING; GIVING | 5 |
| | CONSENTS | 5 |
| 2.12 | PROXIES | 5 |
| 2.13 | LIST OF STOCKHOLDERS ENTITLED TO VOTE | 6 |
| 2.14 | INSPECTORS OF ELECTION | 6 |
| ARTICLE III – DIRECTORS | | 7 |
| 3.1 | POWERS | 7 |
| 3.2 | NUMBER OF DIRECTORS | 7 |
| 3.3 | ELECTION QUALIFICATION AND TERM OF OFFICE OF DIRECTORS | 7 |
| 3.4 | RESIGNATION AND VACANCIES | 8 |
| 3.5 | PLACE OF MEETINGS; MEETINGS BY TELEPHONE | 9 |
| 3.6 | FIRST MEETINGS | 9 |
| 3.7 | REGULAR MEETINGS | 9 |
| 3.8 | SPECIAL MEETINGS; NOTICE | 10 |
| 3.9 | QUORUM | 10 |
| 3.10 | WAIVER OF NOTICE | 10 |
| 3.11 | ADJOURNED MEETING NOTICE | 10 |
| 3.12 | BOARD ACTION BY WRITTEN CONSENT WITHOUT A MEETING | 10 |
| 3.13 | FEES AND COMPENSATION OF DIRECTORS | 10 |
| 3.14 | APPROVAL OF LOANS TO OFFICERS | 11 |

3.15   REMOVAL OF DIRECTORS ......................................................... 11
ARTICLE IV – COMMITTEES ............................................................... 11
4.1   COMMITTEES OF DIRECTORS ................................................. 12
4.2   COMMITTEE MINUTES ............................................................. 12
4.3   MEETINGS AND ACTION OF COMMITTEES ........................ 12
ARTICLE V – OFFICERS ...................................................................... 12
5.1   OFFICERS ................................................................................. 12
5.2   ELECTION OF OFFICERS ........................................................ 12
5.3   SUBORDINATE OFFICERS ...................................................... 13
5.4   REMOVAL AND RESIGNATION OF OFFICERS ................... 13
5.5   VACANCIES IN OFFICES ........................................................ 13
5.6   CHAIRMAN OF THE BOARD .................................................. 13
5.7   PRESIDENT ............................................................................... 13
5.8   VICE PRESIDENT .................................................................... 13
5.9   SECRETARY ............................................................................. 14
5.10   TREASURER ............................................................................. 14
5.11   ASSISTANT SECRETARY ....................................................... 15
5.12   ASSISTANT TREASURER ........................................................ 15
5.13   AUTHORITY AND DUTIES OF OFFICERS ........................... 15
ARTICLE VI – INDEMNITY ................................................................ 15
6.1   INDEMNIFICATION OF DIRECTORS AND OFFICERS ........ 15
6.2   INDEMNIFICATION OF OTHERS ........................................... 15
6.3   INSURANCE .............................................................................. 16
ARTICLE VII – RECORDS AND REPORTS ......................................... 16
7.1   MAINTENANCE AND INSPECTION OF RECORDS ............. 16
7.2   INSPECTION BY DIRECTORS ................................................ 17
7.3   ANNUAL STATEMENT TO STOCKHOLDERS ..................... 17
7.4   REPRESENTATION OF SHARES OF OTHER CORPORATIONS ........ 17
ARTICLE VIII – GENERAL MATTERS .............................................. 17
8.1   CHECKS ..................................................................................... 17
8.2   EXECUTION OF CORPORATE CONTRACTS AND INSTRUMENTS ........ 18
8.3   STOCK CERTIFICATES; PARTLY PAID SHARES ............... 18
8.4   SPECIAL DESIGNATION ON CERTIFICATES ..................... 18
8.5   LOST CERTIFICATES ............................................................... 18
8.6   CONSTRUCTION; DEFINITIONS ........................................... 19
8.7   DIVIDENDS ............................................................................... 19
8.8   FISCAL YEAR ........................................................................... 19
8.9   SEAL .......................................................................................... 19
8.10   TRANSFER OF STOCK ...........................................................

ii

8.11   STOCK TRANSFER AGREEMENTS                          20
8.12   REGISTERED STOCKHOLDERS                            20
ARTICLE IX -- AMENDMENTS                                  20
ARTICLE X -- DISSOLUTION                                  20
ARTICLE XI -- CUSTODIAN
11.2   DUTIES OF CUSTODIAN                                21
CERTIFICATE OF ADOPTION OF BYLAWS

i

# ARTICLE III – DIRECTORS

## 3.1 POWERS

Subject to the provisions of the General Corporation Law of Nevada and any limitations in the certificate of incorporation or these bylaws relating to action required to be approved by the stockholders or by the outstanding shares, the business and affairs of the corporation shall be managed and all corporate powers shall be exercised by or under the direction of the board of directors.

The board of directors' powers described in these bylaws includes plenary authority to reasonably ensure that the company, its employees, and its affiliates – as the case may be – abide by ethical standards the board of directors may designate or identify as applicable to the company, its employees, or its affiliates. Similarly, the board of directors may respond as appropriate to potential or actual unethical conduct to detect or address such conduct. Measures, procedures, or other action taken to reasonably assure ethical conduct may be ordered by board of directors or, in accordance with Article IV of these bylaws, by a committee, which may in turn delegate matters as reasonably necessary or appropriate. If the board of directors or its delegate orders an internal investigation and corresponding report into purported unethical conduct, the investigation must be independent, shall be overseen by counsel, and is hereby deemed to be conducted, reviewed, and delivered for the primary purpose of obtaining legal advice.

## 3.2 NUMBER OF DIRECTORS

The number of directors of the corporation shall be not less than two (2) and not more than nine (9). This number may be changed by a duly adopted amendment to the certificate of incorporation or by an amendment to these bylaws adopted by the vote or written consent of the holders of a majority of the stock issued and outstanding and entitled to vote or by resolution of a majority of the board of directors. No reduction of the authorized number of directors shall have the effect of removing any director before that director's term of office expires. To the fullest extent allowed by applicable law, directors may be classified into more than one group (with a maximum of four groups) such that in any given fiscal year only one group of directors shall be slated for re-election. The board of directors shall, to the fullest extent allowed by applicable law, have the right to initially classify directors and modify such classifications.

## 3.3 ELECTION QUALIFICATION AND TERM OF OFFICE OF DIRECTORS

Except as provided in Section 3.4 of these bylaws, directors shall be elected at an annual meeting of stockholders. Directors need not be stockholders unless so required by the certificate of incorporation or these bylaws, wherein other qualifications for directors may be prescribed. Each director, including a director elected to fill a vacancy, shall hold office until his successor is elected and qualified or until his earlier resignation or removal.

Elections of directors need not be by written ballot. Pursuant to authority delegated to these bylaws by Article V of the Articles of Incorporation, the number of directors may be increased or decreased between two (2) and nine (9) directors in such a manner as provided by these bylaws.

7

## 3.4 RESIGNATION AND VACANCIES

Any director may resign at any time upon written notice to the corporation. When one or more directors so resigns and the resignation is effective at a future date, a majority of the directors then in office (even if less than a quorum), including those who have so resigned, shall have power to fill such vacancy or vacancies, the vote thereon to take effect when such resignation or resignations shall become effective, and each director so chosen shall hold office as provided in this section in the filling of other vacancies.

Unless otherwise provided in the certificate of incorporation or these bylaws:

    i.    Vacancies and newly created directorships resulting from any increase in the authorized number of directors elected by all of the stockholders having the right to vote as a single class may be filled by a majority of the directors then in office, although less than a quorum, or by a sole remaining director.

    ii.    Whenever the holders of any class or classes of stock or series thereof are entitled to elect one or more directors by the provisions of the certificate of incorporation, vacancies and newly created directorships of such class or classes or series may be filled by a majority of the directors elected by such class or classes or series thereof then in office, or by a sole remaining director so elected.

    iii.    Directors appointed at any time to fill a vacancy or newly created directorship in accordance with either of the two foregoing paragraphs (i) or (ii) of this Section 3.4, where such director's appointment becomes or shall become effective on a date falling within second half of the Company's fiscal year, shall remain in office until removal or replacement at an annual meeting of the shareholders for the year following the year in which such director was appointed pursuant to either of the two foregoing paragraphs (i) or (ii) of this Section 3.4.

If at any time, by reason of death or resignation or other cause, the corporation should have no directors in office, then any officer or any stockholder or an executor, administrator, trustee or guardian of a stockholder, or other fiduciary entrusted with like responsibility for the person or estate of a stockholder, may call a special meeting of stockholders in accordance with the provisions of the certificate of incorporation or these bylaws, or may apply to the Court for a decree summarily ordering an election as provided in the General Corporation Law of Nevada.

If at the time of filling any vacancy or any newly created directorship, the directors then in office constitute less than a majority of the whole board (as constituted immediately prior to any such increase), then the Court may, upon application of any stockholder or stockholders holding at least ten (10) percent of the total number of the shares at the time outstanding having the right to vote for such directors, summarily order an election to be held to fill any such vacancies or newly created directorships, or to replace the directors chosen by the directors then in office as aforesaid, which election shall be governed by the provisions of the General Corporation Laws of Nevada as far as applicable.

8

## 8.11 STOCK TRANSFER AGREEMENTS

The corporation shall have power to enter into and perform any agreement with any number of shareholders of any one or more classes of stock of the corporation to restrict the transfer of shares of stock of the corporation of any one or more classes owned by such stockholders in any manner not prohibited by the General Corporation Law of Nevada.

## 8.12 REGISTERED STOCKHOLDERS

The corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends and to vote as such owner, shall be entitled to hold liable for calls and assessments the person registered on its books as the owner of shares, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of another person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of Nevada.

## ARTICLE IX – AMENDMENTS

The original or other bylaws of the corporation may be adopted, amended, or repealed exclusively by the board of directors. Amendments to these bylaws shall not become effective until, but will become effective upon, adoption by an affirmative vote of the majority of the board of directors holding office at the time such vote takes place.

## ARTICLE X – DISSOLUTION

If it should be deemed advisable in the judgment of the board of directors of the corporation that the corporation should be dissolved, the board, after the adoption of a resolution to that effect by a majority of the whole board at any meeting called for that purpose, shall cause notice to be mailed to each stockholder entitled to vote thereon of the adoption of the resolution and of a meeting of stockholders to take action upon the resolution.

At the meeting a vote shall be taken for and against the proposed dissolution. If a majority of the outstanding stock of the corporation entitled to vote thereon votes for the proposed dissolution, then a certificate stating that the dissolution has been authorized in accordance with the provisions of the General Corporation Laws of Nevada and setting forth the names and residences of the directors and officers shall be executed, acknowledged, and filed and shall become effective in accordance with the General Corporation Laws of Nevada. Upon such certificate's becoming effective in accordance with the General Corporation Laws of Nevada, the corporation shall be dissolved.

Whenever all the stockholders entitled to vote on dissolution consent in writing, either in person or by duly authorized attorney, to dissolution, no meeting of directors or stockholders shall be necessary. The consent shall be filed and shall become effective in accordance with the General Corporation Law of Nevada. Upon such consent's becoming effective in accordance with the General Corporation Laws of Nevada, the corporation shall be dissolved. If an attorney signs the consent, then the original power of attorney or a photocopy thereof shall be attached to and filed with the consent. The consent filed with the Secretary of State shall have attached to it the affidavit of the secretary or some other officer of the corporation stating that the consent has been signed by or on behalf of all the

stockholders entitled to vote on a dissolution; in addition, there shall be attached to the consent a certification by the secretary or some other officer of the corporation setting forth the names and residences of the directors and officers of the corporation.

20

EX-3 5 mlss1022309ex32apg.htm EXHIBIT 3.2
   Exhibit 3.2

**BYLAWS OF**
**MULTISYS LANGUAGE SOLUTIONS, INC.**
(a Nevada Corporation)

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| ARTICLE I - CORPORATE OFFICES | | 1 |
| 1.1 | REGISTERED OFFICE | 1 |
| 1.2 | OTHER OFFICES | 1 |
| ARTICLE II - MEETINGS OF STOCKHOLDERS | | 1 |
| 2.1 | PLACE OF MEETINGS | 1 |
| 2.2 | ANNUAL MEETING | 1 |
| 2.3 | SPECIAL MEETING | 1 |
| 2.4 | NOTICE OF STOCKHOLDERS' MEETINGS | 2 |
| 2.5 | MANNER OF GIVING NOTICE; AFFIDAVIT OF NOTICE | 2 |
| 2.6 | QUORUM | 3 |
| 2.7 | ADJOURNED MEETING; NOTICE | 3 |
| 2.8 | VOTING | 3 |
| 2.9 | WAIVER OF NOTICE | 4 |
| 2.10 | STOCKHOLDER ACTION BY WRITTEN CONSENT WITHOUT A MEETING | 4 |
| 2.11 | RECORD DATE FOR STOCKHOLDER NOTICE; VOTING; GIVING CONSENTS | 5 |
| 2.12 | PROXIES | 5 |
| 2.13 | LIST OF STOCKHOLDERS ENTITLED TO VOTE | 6 |
| 2.14 | INSPECTORS OF ELECTION | 6 |
| ARTICLE III – DIRECTORS | | 7 |
| 3.1 | POWERS | 7 |
| 3.2 | NUMBER OF DIRECTORS | 7 |
| 3.3 | ELECTION, QUALIFICATION AND TERM OF OFFICE OF DIRECTORS | 7 |
| 3.4 | RESIGNATION AND VACANCIES | 7 |
| 3.5 | PLACE OF MEETINGS; MEETINGS BY TELEPHONE | 8 |
| 3.6 | FIRST MEETINGS | 8 |
| 3.7 | REGULAR MEETINGS | 9 |
| 3.8 | SPECIAL MEETINGS; NOTICE | 9 |
| 3.9 | QUORUM | 9 |
| 3.10 | WAIVER OF NOTICE | 9 |
| 3.11 | ADJOURNED MEETING; NOTICE | 10 |
| 3.12 | BOARD ACTION BY WRITTEN CONSENT WITHOUT A MEETING | 10 |
| 3.13 | FEES AND COMPENSATION OF DIRECTORS | 10 |
| 3.14 | APPROVAL OF LOANS TO OFFICERS | 10 |

Exhibt 3.2 BYLAWS

Exhibt 3.2 BYLAWS

| 3.15 | REMOVAL OF DIRECTORS | 10 |
|---|---|---|

ARTICLE IV – COMMITTEES ............ 11

| 4.1 | COMMITTEES OF DIRECTORS | 11 |
| 4.2 | COMMITTEE MINUTES | 12 |
| 4.3 | MEETINGS AND ACTION OF COMMITTEES | 12 |

ARTICLE V – OFFICERS ............ 12

| 5.1 | OFFICERS | 12 |
| 5.2 | ELECTION OF OFFICERS | 12 |
| 5.3 | SUBORDINATE OFFICERS | 12 |
| 5.4 | REMOVAL AND RESIGNATION OF OFFICERS | 13 |
| 5.5 | VACANCIES IN OFFICES | 13 |
| 5.6 | CHAIRMAN OF THE BOARD | 13 |
| 5.7 | PRESIDENT | 13 |
| 5.8 | VICE PRESIDENT | 13 |
| 5.9 | SECRETARY | 14 |
| 5.10 | TREASURER | 14 |
| 5.11 | ASSISTANT SECRETARY | 14 |
| 5.12 | ASSISTANT TREASURER | 15 |
| 5.13 | AUTHORITY AND DUTIES OF OFFICERS | 15 |

ARTICLE VI – INDEMNITY ............ 15

| 6.1 | INDEMNIFICATION OF DIRECTORS AND OFFICERS | 15 |
| 6.2 | INDEMNIFICATION OF OTHERS | 15 |
| 6.3 | INSURANCE | 16 |

ARTICLE VII - RECORDS AND REPORTS ............ 16

| 7.1 | MAINTENANCE AND INSPECTION OF RECORDS | 16 |
| 7.2 | INSPECTION BY DIRECTORS | 17 |
| 7.3 | ANNUAL STATEMENT TO STOCKHOLDERS | 17 |
| 7.4 | REPRESENTATION OF SHARES OF OTHER CORPORATIONS | 17 |

ARTICLE VIII - GENERAL MATTERS ............ 17

| 8.1 | CHECKS | 17 |
| 8.2 | EXECUTION OF CORPORATE CONTRACTS AND INSTRUMENTS | 18 |
| 8.3 | STOCK CERTIFICATES; PARTLY PAID SHARES | 18 |
| 8.4 | SPECIAL DESIGNATION ON CERTIFICATES | 18 |
| 8.5 | LOST CERTIFICATES | 19 |
| 8.6 | CONSTRUCTION; DEFINITIONS | 19 |
| 8.7 | DIVIDENDS | 19 |
| 8.8 | FISCAL YEAR | 20 |
| 8.9 | SEAL | 20 |
| 8.10 | TRANSFER OF STOCK | 20 |

ii

Exhibt 3.2 BYLAWS

Exhibt 3.2 BYLAWS

| | | |
|---|---|---|
| 8.11 | STOCK TRANSFER AGREEMENTS | 20 |
| 8.12 | REGISTERED STOCKHOLDERS | 20 |

ARTICLE IX – AMENDMENTS ................................ 20

ARTICLE X – DISSOLUTION ................................ 21

ARTICLE XI – CUSTODIAN ................................ 21

| | | |
|---|---|---|
| 11.1 | APPOINTMENT OF A CUSTODIAN IN CERTAIN CASES | 21 |
| 11.2 | DUTIES OF CUSTODIAN | 22 |

iii

## ARTICLE III

### DIRECTORS

### 3.1      POWERS

Subject to the provisions of the General Corporation Law of Nevada and any limitations in the certificate of incorporation or these bylaws relating to action required to be approved by the stockholders or by the outstanding shares, the business and affairs of the corporation shall be managed and all corporate powers shall be exercised by or under the direction of the board of directors.

### 3.2      NUMBER OF DIRECTORS

The number of directors of the corporation shall be a minimum of not less than two (2) and not more than nine (9). This number may be changed by a duly adopted amendment to the certificate of incorporation or by an amendment to these bylaws adopted by the vote or written consent of the holders of a majority of the stock issued and outstanding and entitled to vote or by resolution of a majority of the board of directors. No reduction of the authorized number of directors shall have the effect of removing any director before that director's term of office expires.

### 3.3      ELECTION QUALIFICATION AND TERM OF OFFICE OF DIRECTORS

Except as provided in Section 3.4 of these bylaws, directors shall be elected at each annual meeting of stockholders to hold office until the next annual meeting. Directors need not be stockholders unless so required by the certificate of incorporation or these bylaws, wherein other qualifications for directors may be prescribed. Each director, including a director elected to fill a vacancy, shall hold office until his successor is elected and qualified or until his earlier resignation or removal.

Elections of directors need not be by written ballot.

### 3.4      RESIGNATION AND VACANCIES

Any director may resign at any time upon written notice to the corporation. When one or more directors so resigns and the resignation is effective at a future date, a majority of the directors then in office (even if less than a quorum), including those who have so resigned, shall have power to fill such vacancy or vacancies, the vote thereon to take effect when such resignation or resignations shall become effective, and each director so chosen shall hold office as provided in this section in the filling of other vacancies.

Unless otherwise provided in the certificate of incorporation or these bylaws:

(i)      Vacancies and newly created directorships resulting from any increase in the authorized number of directors elected by all of the stockholders having the right to vote as a single class may be filled by a majority of the directors then in office, although less than a

- 7 -

quorum, or by a sole remaining director.

(ii)     Whenever the holders of any class or classes of stock or series thereof are entitled to elect one or more directors by the provisions of the certificate of incorporation, vacancies and newly created directorships of such class or classes or series may be filled by a majority of the directors elected by such class or classes or series thereof then in office, or by a sole remaining director so elected.

If at any time, by reason of death or resignation or other cause, the corporation should have no directors in office, then any officer or any stockholder or an executor, administrator, trustee or guardian of a stockholder, or other fiduciary entrusted with like responsibility for the person or estate of a stockholder, may call a special meeting of stockholders in accordance with the provisions of the certificate of incorporation or these bylaws, or may apply to the Court for a decree summarily ordering an election as provided in the General Corporation Law of Nevada.

If, at the time of filling any vacancy or any newly created directorship, the directors then in office constitute less than a majority of the whole board (as constituted immediately prior to any such increase), then the Court may, upon application of any stockholder or stockholders holding at least ten (10) percent of the total number of the shares at the time outstanding having the right to vote for such directors, summarily order an election to be held to fill any such vacancies or newly created directorships, or to replace the directors chosen by the directors then in office as aforesaid, which election shall be governed by the provisions of the General Corporation Laws of Nevada as far as applicable.

3.5       PLACE OF MEETINGS; MEETINGS BY TELEPHONE

The board of directors of the corporation may hold meetings, both regular and special, either within or outside the State of Nevada. Unless otherwise restricted by the certificate of incorporation or these bylaws, members of the board of directors, or any committee designated by the board of directors, may participate in a meeting of the board of directors, or any committee, by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

3.6       FIRST MEETINGS

The first meeting of each newly elected board of directors shall be held at such time and place as shall be fixed by the vote of the stockholders at the annual meeting and no notice of such meeting shall be necessary to the newly elected directors in order legally to constitute the meeting, provided a quorum shall be present. As an alternative, each director listed in the Articles of Incorporation can execute a Consent of Directors in Lieu of an Organizational Meeting. In the event of the failure of the stockholders to fix the time or place of such first meeting of the newly elected board of directors, or in the event such meeting is not held at the time and place so fixed by the stockholders, the meeting may be held at such time and place as shall be specified in a notice given as hereinafter provided for special meetings of the board of directors, or as shall be specified in a written waiver signed by all of the directors.

- 8 -

Exhibt 3.2 BYLAWS                                    Page 25 of 28

8.8     **FISCAL YEAR**

The fiscal year of the corporation shall be fixed by resolution of the board of directors and may be changed by the board of directors.  The fiscal year for the first year will be December 31, 2004.

8.9     **SEAL**

The Corporation shall have power to have a corporate seal, which shall be adopted and which may be altered by the board of directors, and the corporation may use the same by causing it or a facsimile thereof to be impressed or affixed or in any other manner reproduced.

8.10    **TRANSFER OF STOCK**

Upon surrender to the corporation or the transfer agent of the corporation of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignation or authority to transfer, it shall be the duty of the corporation to issue a new certificate to the person entitled thereto, cancel the old certificate, and record the transaction in its books.

8.11    **STOCK TRANSFER AGREEMENTS**

The corporation shall have power to enter into and perform any agreement with any number of shareholders of any one or more classes of stock of the corporation to restrict the transfer of shares of stock of the corporation of any one or more classes owned by such stockholders in any manner not prohibited by the General Corporation Law of Nevada.

8.12    **REGISTERED STOCKHOLDERS**

The corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends and to vote as such owner, shall be entitled to hold liable for calls and assessments the person registered on its books as the owner of shares, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of another person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of Nevada.

ARTICLE IX

AMENDMENTS

The original or other bylaws of the corporation may be adopted, amended or repealed by the stockholders entitled to vote; provided, however, that the corporation may, in its certificate of incorporation, confer the power to adopt, amend or repeal bylaws upon the directors. The fact that such power has been so conferred upon the

directors shall not divest the stockholders of the power, nor limit their power to adopt, amend or repeal bylaws.

- 20 -

Exhibt 3.2 BYLAWS

## CERTIFICATE OF ADOPTION OF BYLAWS

### OF

## MULTISYS LANGUAGE SOLUTIONS, INC.
### (a Nevada Corporation)

### Adoption by the Board of Directors

The undersigned, appointed pursuant a resolution by the Board of Directors and a written consent by the majority of the shareholders of the company, hereby adopts the foregoing bylaws, comprising twenty-two (22) pages, as the Bylaws of the corporation.

Executed this 7TH day of June, 2008.


/s/ Raymond Kuh
Raymond Kuh, Secretary


### Certificate by Secretary of Adoption by the Board of Directors and Shareholders

The undersigned hereby certifies that he is the duly elected, qualified and acting Secretary of MULTISYS LANGUAGE SOLUTIONS, INC. and that the foregoing Bylaws, comprising twenty-two (22) pages, were adopted as the Bylaws of the corporation on the 7th day of June, 2008, by Raymond Kuh, the Secretary of the corporation, appointed by the Board of Directors pursuant to written resolution on the 6th day of June, 2008.

IN WITNESS WHEREOF, the undersigned has hereunto set his hand and affixed the corporate seal this 7th of June, 2008.


/s/ Raymond Kuh
Raymond Kuh, Secretary

F I L E D
Electronically
CV16-01086
2016-05-17 04:31:56 PM
Jacqueline Bryant
Clerk of the Court
Transaction # 5519637 : yviloria

# EXHIBIT 3

# EXHIBIT 3

8-K 1 bakken_8k.htm CURRENT REPORT

## UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

### FORM 8-K

### CURRENT REPORT

**Pursuant to Section 13 or 15(d) of
the Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported): **February 9, 2016**

## Bakken Resources, Inc.

(Exact name of registrant specified in charter)

| | | |
|---|---|---|
| **Nevada** | **000-53632** | **26-2973652** |
| (State of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**1425 Birch Ave., Suite A, Helena, MT 59601**
(Address of principal executive offices) (Zip Code)

**(406) 442-9444**
Issuer's Telephone Number

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 5.03 Amendments to Articles of Incorporation or Bylaws; Change in Fiscal Year**

The board of directors ("Board") of Bakken Resources, Inc. (the "Company," "we," "us," or "Bakken") approved updates to the Company's bylaws, effective February 9, 2016. A full copy of the Company's current bylaws are attached to this Form 8-K as Exhibit 3.1

The approved amendments primarily related to Article III. Article III's changes amend §§ 3.1, 3.2 and 3.4. The changes are meant to facilitate the board's ability to maximize shareholder value by better ensuring compliance and stability. The first change authorizes the Board to take preventative and remedial steps, as necessary or appropriate, toward ensuring ethical and compliant corporate conduct, and the remaining amendments permit board staggering and afford board carry-over in the case of board appointments made in the latter half of a fiscal year.

**Item 9.01 Financial Statements and Exhibits**

(d)    Exhibits

Exhibit 3.1    Company's Amended and Restated Bylaws as of February 9, 2016

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Bakken Resources, Inc.

By:   /s/ Dan Anderson
Name: Dan Anderson
Title: Chief Financial Officer
Dated: February 16, 2016

F I L E D
Electronically
CV16-01086
2016-05-17 04:31:56 PM
Jacqueline Bryant
Clerk of the Court
Transaction # 5519637 : yviloria

# EXHIBIT 4

# EXHIBIT 4

3795
Douglas R. Brown, Esq., NSB #7620
Richard G. Verlander, Esq., NSB #12887
Lemons, Grundy & Eisenberg
6005 Plumas Street, Third Floor
Reno, Nevada 89519
(775) 786-6868
Attorneys for Defendant, VAL HOLMS

RECEIVED
MAR 03 2016
WSMT

Kendor P. Jones, Esq.
Joseph C. Pierzchala, Esq.
Welborn, Sullivan, Meck & Tooley, P.C.
1125 17th Street, Suite 2200
Denver, Colorado 80202
(303) 376-4485
*SCR 42/Pro Hac Vice*
*Attorneys for Defendant, VAL HOLMS*

IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

IN AND FOR THE COUNTY OF WASHOE

MANUEL GRAIWER AND T.J. JESKY,
derivatively on behalf of BAKKEN RESOURCES,
INC., a Nevada Corporation,

        Plaintiffs,

   vs.

VAL HOLMS, an individual, HERMAN LANDEIS,
an individual, KAREN MIDTLYNG, an
individual, DAVID DEFFINBAUGH, an
individual, BILL BABER, an individual, W.
EDWARD NICHOLS, an individual, WESLEY
PAUL, an individual, and DOES 1-100,

        Defendants.

BAKKEN RESOURCES, INC., a Nevada
Corporation,

Case No. CV14-00544

Dept. No. B7

**REPLY IN SUPPORT OF DEFENDANT VAL HOLMS' MOTION FOR ORDER
CONFIRMING THE CURRENT STAY OF LITIGATION**

    Defendant, Val Holms, by and through his counsel, submits this Reply in Support of

Motion for an Order Confirming the Current Stay of Litigation. This Reply in Support of the

Motion is based upon Nevada case law, the following Memorandum of Points and Authorities,

LEMONS, GRUNDY
& EISENBERG
6005 PLUMAS ST.
SUITE 300
RENO, NV 89519
(775) 786-6868

1

1  the attached exhibits, the papers and pleadings on file, and upon any other matter the court
2  may properly consider.

3  **MEMORANDUM OF POINTS AND AUTHORITIES**

4      On March 13, 2014, Plaintiffs filed their Complaint which asserted claims for breach of
5  fiduciary duty, gross negligence, and corporate waste against Defendants Val Holms, and
6  Bakken Resources, Inc. ("BRI") directors Herman Landeis, Karen Mydtling, David Deffinbaugh,
7  Bill Baber, and Edward Nichols, and claims for breach of fiduciary duty and unjust enrichment
8  against BRI's corporate counsel, Wesley Paul, and a claim for civil conspiracy against Val Holms
9  and Wesley Paul. On September 28, 2015, Plaintiffs filed a Motion to Amend Complaint and in
10  the proposed First Amended Complaint asserted numerous new allegations directed primarily
11  at Defendant Val Holms. The Motion to Amend is fully briefed and was scheduled to be heard
12  for oral argument on March 3, 2016, along with several other pending motions, significant
13  portions of which will be rendered moot as a result of the settlement between Plaintiffs and
14  Val Holms.

15      On December 16, 2015, all parties to this litigation entered into a Stipulation and
16  Order to Mediate and Vacate December Hearing, pursuant to which the parties agreed to
17  participate in mediation before Judge William F. Downes, in Reno, Nevada. The stipulation
18  further provided that the litigation shall be stayed until the mediation is concluded either by
19  settlement or upon a written determination by Judge Downes that settlement was no longer
20  possible.

21      On January 28, 2016, all parties to this litigation participated in mediation. While the
22  mediation did not result in a successful resolution of the lawsuit, all parties continued
23  settlement discussions with the assistance of Judge Downes, as necessary.

24      On February 17, 2016, and in furtherance of the mediation, Graiwer, on Plaintiffs'
25  behalf, and Val Holms, participated in a settlement conference in Denver, Colorado, which
26  resulted in a successful settlement of this litigation as between Plaintiffs and Mr. Holms. As
27  explained in Mr. Holms' Motion for Order Confirming Current Stay of Litigation, Mr. Holms is
28  the owner of approximately 47% of the stock and largest single shareholder of Defendant BRI

LEMONS, GRUNDY
& EISENBERG
6005 PLUMAS ST.
SUITE 300
RENO, NV 89519
(775) 786-6868

2

1  and nearly all of the company's assets consist of Mr. Holms' mineral rights that he contributed

2  to the company by way of the Asset Purchase Agreement, which forms a significant basis of

3  Plaintiffs' Complaint. Moreover, the Complaint and pending Amended Complaint are

4  comprised primarily of allegations against Mr. Holms related to other matters outside the

5  Asset Purchase Agreement. Thus the settlement between Plaintiffs and Mr. Holms

6  substantially resolves this litigation.

7  Upon information and belief, Plaintiffs and the remaining Defendants are still in active

8  settlement discussions to resolve the litigation as it pertains to them. While Defendants

9  Herman Landels, Karen Midtlying, David Deffinbaugh, and Bill Baber contend in their

10  opposition to Defendant Val Holms' Motion to Confirm Stay that the upcoming hearing must

11  proceed as scheduled, this Court's Order and the Stipulation of the parties expressly require

12  that "[t]he litigation shall be stayed until Mediation is concluded, either by settlement or the

13  mediator has determined that settlement is not possible in writing within 10 days after the

14  mediation, except for the potential filing of a dispositive Motion by Defendant Paul." See,

15  Order Vacating December Hearing and Staying Litigation until Mediation is Concluded, pg. 2,

16  paragraph 5. Despite Defendants' contention that the mediation has concluded, Judge

17  Downes has not issued a written communication expressing that the mediation has failed.

18  Plaintiffs and Mr. Holms believe that, in the interest of justice, court economy, and the

19  parties' resources, a stay of the litigation is appropriate including vacating the March 3, 2016

20  hearing on the pending motions. Attached to this Reply as **Exhibit 1** is a letter from Plaintiffs'

21  counsel dated February 29, 2016 confirming the settlement and summarizing the general

22  terms of the agreement between the parties. The parties to the Settlement Agreement

23  require additional time to negotiate additional details and to finalize the specifics of the

24  agreement, including a stock purchase agreement, a promissory note, and a pledge

25  agreement to complete the settlement. Upon information and belief, Plaintiffs have engaged

26  qualified counsel with the law firm of Holland & Hart, experienced in stock transfers to review

27  and approve the remaining documents, but due to the press of prior business, counsel has not

28  been able finish his review. Requiring Plaintiffs and Mr. Holms to proceed with the March 3,

LEMONS, GRUNDY
· & EISENBERG
6005 PLUMAS ST.
SUITE 300
RENO, NV 89519
(775) 786-6868

3

1  2016 hearing will cause them to incur unnecessary and substantial additional attorneys' fees

2  and costs including, but not limited to, fees for four attorneys to prepare for and attend a full

3  day hearing and airfare and hotel travel expenses for Mr. Holms' out-of-state counsel. This is a

4  case with limited insurance proceeds to pay defense counsel and, upon information and

5  belief, the insurance proceeds available to cover defense cost have been largely depleted. Any

6  further litigation activities at this time will further deplete the costs available to defend this

7  matter.

8      Plaintiffs and Defendant Val Holms believe that the parties and the Court's resources

9  are better spent finalizing the settlement documents. Once the final settlement documents

10  are submitted to the Court, the remaining parties will have an opportunity to review,

11  comment, and object to the terms of the settlement, and a hearing may be held to resolve

12  any such objections and final approval by the Court. In the event the settlement is not

13  approved, the parties can then proceed with oral argument on the pending motions.

14      No party will be prejudiced by the relief sought herein. Rather, to the extent the

15  hearing is to proceed as scheduled, the proceeds available to cover defense costs will be

16  eroded even further, potentially prejudicing Defendant Val Holms in this litigation.

17      **WHEREFORE**, Plaintiffs and Defendant Val Holms respectfully request that the Court

18  grant the motion to confirm the current stay of litigation and vacate the March 3, 2016

19  hearing and award such further relief as the Court deems just and proper.

20      **The undersigned does hereby affirm that the preceding document does not contain**

21  **the social security number of any person.**

22      Dated: February 29, 2016.

23                              Lemons, Grundy & Eisenberg
                                6005 Plumas Street, Suite 300
24                              Reno, Nevada 89519

25

26                              By: _____
                                    Douglas R. Brown, Esq.
27                                  Richard G. Verlander, Esq.
                                    Attorneys for Defendant, VAL HOLMS
28

LEMONS, GRUNDY
& EISENBERG
6005 PLUMAS ST.
SUITE 300
RENO, NV 89519
(775) 786-6868

4

**CERTIFICATE OF SERVICE**

Pursuant to NRCP 5(b), I certify that I am an employee of Lemons, Grundy & Eisenberg and that on February 29, 2016, I e-filed a true and correct copy of the foregoing **REPLY IN SUPPORT OF DEFENDANT VAL HOLMS' MOTION FOR ORDER CONFIRMING THE CURRENT STAY OF LITIGATION**, with the Clerk of the Court through the Court's electronic filing system and notice will be sent electronically by the Court to the following:

Jack Angaran, Esq.
Mary-Ann Lebrun, Esq.
Georgeson Angaran, Chtd.
5450 Longley Lane
Reno, Nevada 89511
*Attorney for Landeis, Midtlying, Deffinbaugh, Baber*

Frank C. Gilmore, Esq.
Robison, Belaustegui, Sharp & Low
71 Washington Street
Reno, Nevada 89503
*Attorney for Allan Holms*

Paul J. Anderson, Esq.
Proctor Hug, IV, Esq.
Maupin, Cox & LeGoy
P. O. Box 30000
Reno, Nevada 89520
*Attorney for Wesley J. Paul*

Matthew C. Addison, Esq.
McDonald Carano Wilson
100 West Liberty Street, 10th Floor
Reno, Nevada 89501
*Attorney for Bakken Resources, Inc.*

Robert F. Greer, Esq.
Francis James Gebhardt, Esq.
Feltman, Gebhardt, Greer & Zeimantz, P.S.
421 West Riverside Avenue, Suite 1400
Spokane, Washington 99201
*Attorneys for Landeis, Midtlying, Deffinbaugh, and Baber*

*The following people have not been served electronically and have been served by mail:*

Kendor P. Jones, Esq.
Joseph C. Pierzchala, Esq.
Welborn, Sullivan, Meck & Tooley, P.C.
1125 17th Street, Suite 2200
Denver, CO 80202
*Attorneys for Val Holms*

Andrew D. Kaizer, Esq.
Calhoun & Lawrence, LLP
81 Main Street
White Plains, NY 10601
*Attorney for Wesley J. Paul*

Susan G. Davis

EMONS, GRUNDY
& EISENBERG
005 PLUMAS ST.
SUITE 300
ENO, NV 89519
775) 786-6868

INDEX OF EXHIBITS

| Exhibit No. | Description | Length of Exhibit |
|---|---|---|
| 1 | Letter dated February 29, 2016 from Thomas C. Bradley to Joseph Pierzchala confirming general terms of a settlement | 2 pages |
| | | |
| | | |

# EXHIBIT 1

# EXHIBIT 1

# SINAI, SCHROEDER, MOONEY, BOETSCH,
## BRADLEY & PACE
### An Association of Law Offices

Patrick M. Mooney
Mary E. Boetsch
Thomas C. Bradley
James P. Pace

John S. Sinai (1892 to 1973)
David P. Sinai (1923 to 2006)
Theodore J. Schroeder, Ret.

February 29, 2016

Joseph C. Pierzchala, Esq.
WELLBORN SULLIVAN MECK TOOLEY
1125 17th Street, Ste. 225
Denver, CO 80202

Re:   **Graiwer v. Holms**

Dear Mr. Pierzchala:

This letter will confirm that Plaintiffs and Val Holms have reached an agreement on the general terms of a settlement.   Because the resolution between the parties involves a stock transfer, Plaintiffs have engaged separate counsel outside of this litigation to review the agreement and stock transfer documents.

The Agreement, which is contingent upon Court approval, generally provides that:

1. Graiwer, as an individual, will purchase all of the stock owned by Holms, at a mutually agreed upon price above market price.

2. Holms grants BRI a one-year option to require Holms to purchase the Duck Lake minerals at the same price for which the company acquired the minerals net of monies provided by Holms or Holms' affiliates for the purchase of the Duck Lake minerals. Holms will also re-pay reasonable costs such as recording fees, escrow fees, and similar expenses.

3. Holms will reimburse Graiwer a mutually agreed upon sum for attorney fees and costs;

4. Holms will resign as CEO and Director and will agree not to be employed by BRI in the future, will not serve as a director, manager, or officer. Holms will also agree not to purchase BRI stock in the future.

5. From this point forward, Holms agrees on behalf of Holms Energy, LLC ("HELCC") to submit to the BRI Board of Directors a written proposed amendment to of the Asset Purchase Agreement which reduces the current royalties being paid to HELCC for the remaining period of the royalty term.

448 Hill Street
Reno, Nevada 89501

Telephone: 775.323.5178
Facsimile: 775.323.0709

SINAI, SCHROEDER, MOONEY, BOETSCH,
BRADLEY & PACE
An Association of Law Offices

Joseph C. Pierzchala, Esq.
February 29, 2016
Page 2

6. Plaintiffs shall provide Holms a full release of claims alleged in the derivative suit.

We have also agreed to discuss additional terms and once resolved we include them in a Settlement Agreement and file it with Court together with a request for approval.

Sincerely,

THOMAS C. BRADLEY, ESQ.

TCB/sh

F I L E D
Electronically
CV16-01086
2016-05-17 04:31:56 PM
Jacqueline Bryant
Clerk of the Court
Transaction # 5519637 : yviloria

# EXHIBIT 5

# EXHIBIT 5

5/12/2016                          https://www.sec.gov/Archives/edgar/data/1450390/000120677416005904/bakken_8ka.htm

8-K/A 1 bakken_8ka.htm AMENDMENT TO CURRENT REPORT

### UNITED STATES
### SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

### FORM 8-K/A

### AMENDED CURRENT REPORT

Pursuant to Section 13 or 15(d) of
the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): May 3, 2016

### Bakken Resources, Inc.

(Exact name of registrant specified in charter)

| Nevada | 000-53632 | 26-2973652 |
|---|---|---|
| (State of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

1425 Birch Ave., Suite A, Helena, MT 59601
(Address of principal executive offices) (Zip Code)

(406) 442-9444
Issuer's Telephone Number

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

WP02335

EXPLANATORY NOTE:    This Current Report on Form 8-K/A attaches the press release that was actually filed by the Registrant. The original Current Report contained an incorrect version of the press release.

Item 8.01 Other Events

Bakken Resources, Inc. issued a press release dated May 9, 2016, which is attached hereto as Exhibit 99.1.

Item 9.01 Financial Statements and Exhibits.

(d) Exhibits

Exhibit 99.1    Press release issued by Bakken Resources, Inc. on May 9, 2016

WP02336

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Bakken Resources, Inc.

By: /s/ Dan Anderson
Dan Anderson
Chief Financial Officer
May 10, 2016

WP02337

5/12/2016                          https://www.sec.gov/Archives/edgar/data/1450390/000120677416005904/exhibit99-1.htm

EX-99.1 2 exhibit99-1.htm PRESS RELEASE ISSUED BY BAKKEN RESOURCES, INC. ON MAY 9, 2016

Exhibit 99.1

May 9, 2016

### Bakken Resources, Inc. Announces Entry into Term Sheet Financing

Bakken Resources, Inc. (OTCQX: BKKN) ("Bakken," "BRI," "us," "we," or the "Company") announces its entry into a term sheet on May 3, 2016 with Eagle Private Equity ("Eagle"), a New York-based private equity firm, for debt and equity financing (the "Term Sheet"). The Term Sheet provides for an immediate $1 million credit line to be provided by Eagle, along with a subsequent debt or equity financing of up to $10 million. Proceeds from the loans and other financing will be intended for the acquisition of mineral assets. Loans made to the Company based on the initial $1 million credit line may be converted into a newly-created class of the Company's preferred stock.

Dan Anderson, the Company's Chief Financial Officer, states, "We are extremely pleased to announce this term sheet and believe the financing can be the catalyst for future growth. We look forward to taking the Company in a positive direction that we believe will further benefit our shareholders."

Carl George, principal of Eagle Private Equity, added, "We are very happy to provide BRI with initial financing. We are impressed with the quality of current management and look forward to working with management to secure additional acquisition financing."

ABOUT BAKKEN RESOURCES, INC.

BAKKEN RESOURCES, INC. is an oil and gas exploration and development company with activities currently focused on the acquisition of mineral leases and non-operating oil and gas interests.

ABOUT EAGLE PRIVATE EQUITY, LLC

EAGLE PRIVATE EQUITY is an early-stage investment firm focused primarily on opportunities in technology, energy, sports, entertainment, and healthcare. Eagle's investment model differs from that of traditional private equity and venture capital firms, allowing Eagle to work closely with entrepreneurs to build promising companies. For roughly twenty years, Eagle has positioned its principals as founders of, and itself a significant equity partner to, emerging companies in Eagle's investment portfolio.

WP02338

## Caution Regarding Forward-Looking Information

*All statements contained in this Form 8-K, other than statements of historical facts, that address future activities, events or developments are so-called "forward-looking statements." Forward-looking statements include, but are not limited to, statements containing the words "believe," "expect," "anticipate," "intend," "estimate," "forecast," "project," and similar expressions. All statements other than statements of historical fact are statements that could be deemed forward-looking statements, including any statements of the plans, strategies, or objectives of management for future operations; any statements concerning proposed new acquisitions, products, services, developments, or industry rankings; any statements regarding future economic conditions or performance; any statements of belief; or any statements of assumptions underlying any of the foregoing. These statements are based on certain assumptions and analyses made by us in light of our experience and our assessment of historical trends, current conditions and expected future developments, as well as other factors we believe are appropriate under the circumstances. However, whether actual results will conform to the expectations and predictions of management is subject to a number of risks and uncertainties described under "Risk Factors" of our previously-filed and forthcoming annual reports on Form 10-K and other similar sources, as well as certain matters we have not described due to the fact that certain events, circumstances, and occurrences are not reasonably foreseeable. Any combination of such things may cause actual results to differ materially from those described in our forward-looking statements.*

*Consequently, all of the forward-looking statements made in this Form 8-K are qualified by these cautionary statements, and there can be no assurance that the actual results anticipated by management will be realized or, even if substantially realized, that they will have the expected consequences to or effects on our business operations. Readers are cautioned not to place undue reliance on such forward-looking statements as they speak only of the Company's views as of the date the statement was made. The Company undertakes no obligation beyond what may be legally required to publicly update or revise any forward-looking statements, whether as a result of new information, future events, or otherwise.*

For further information please contact Karen Midtlyng, Corporate Secretary, (406) 442-9444.

WP02339

F I L E D
Electronically
CV16-01086
2016-05-17 04:31:56 PM
Jacqueline Bryant
Clerk of the Court
Transaction # 5519637 : yviloria

# EXHIBIT 6

# EXHIBIT 6

8-K 1 bakken_8k.htm CURRENT REPORT

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 8-K

### CURRENT REPORT

Pursuant to Section 13 or 15(d) of
the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): May 6, 2016

## Bakken Resources, Inc.

(Exact name of registrant specified in charter)

| Nevada | 000-53632 | 26-2973652 |
|---|---|---|
| (State of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

1425 Birch Ave., Suite A, Helena, MT 59601
(Address of principal executive offices) (Zip Code)

(406) 442-9444
Issuer's Telephone Number

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

WP02340

### Item 1.01 Entry into a Material Definitive Agreement

Bakken Resources, Inc. ("Bakken," "our," or the "Company") entered into a loan agreement with Eagle Private Equity ("Eagle") on May 6, 2016. The loan agreement permits the Company to draw up to One Million dollars ($1,000,000) from a non-revolving credit facility provided by Eagle (the "Facility"). The Facility is initially open for 270 days but may be extended at the Company's option. Loans drawn on the Facility accrue interest at 4% above LIBOR, and the Facility includes a 5% fee. Any loans on the Facility are due on May 5, 2018. In certain events, the loan agreement permits Eagle to put loans to the Company up to the balance of the Facility.

The Facility is unsecured, but upon certain triggering events generally described as changes in control of the Company, loans under the Facility are convertible into shares of a newly-designated class of the Company's Series A Preferred stock, described below under Item 5.03 of this Report.

The loan agreement contains representation and warranties of the Company that are customary for transactions of this type.

### Item 5.03 Amendments to Articles of Incorporation or Bylaws; Change in Fiscal Year.

On May 6, 2016, the Company filed a Certificate of Designation with the Nevada Secretary of State. The Certificate of Designation creates a series of preferred stock comprised of one million (1,000,000) shares designated "Series A Preferred" pursuant to Article IV of our Articles of Incorporation, which authorizes up to ten million (10,000,000) shares of preferred stock by resolution of the Board of Directors ("Board").

Series A Preferred rights, designations, preferences and terms include (but are not limited to):

1. Dividends: The Series A Preferred participates with Common Stock ("Common") and gives the Board discretion to issue separate Series A Preferred dividends not available to Common.

2. Liquidation: Priority over Common upon a Liquidation Event up to twice the initial price per share for each share of Series A Preferred, participating with Common thereafter.

3. Voting: Each share of Series A Preferred votes with Common and has one vote for each share of Common into which each stock of Series A Preferred is convertible (initially 100 shares of Common).

4. Conversion: Holders of Series A Preferred may elect to convert each such share into one hundred (100) shares of Common, subject to Bakken's authorized limit of Common shares and any applicable adjustment to shares of Series A Preferred contained in the Certificate of Designation.

5. Anti-Dilution Protection: Series A Preferred is protected by "full-ratchet" anti-dilution rights for the first Ten Million dollars ($10,000,000) in equity financing raised by the Company following the closing of the Facility. After such full ratchet period, adjustment to the conversion price will be based on the "weighted average" formula described in the Certificate of Designation.

6. Limitations: The Series A Preferred must vote as a class in order to approve certain events outside the course of normal business.

WP02341

7. <u>Registration Rights</u>: Converting shares of Series A Preferred into Common shares entitles the holders of the converted Common shares to register those shares with the SEC, in accordance with and subject to the terms of Section D of the Certificate of Designation.

The Board reserves all rights concerning the remaining nine million (9,000,000) preferred shares reserved under Article IV of the Company's Articles of Incorporation and any shares that may be redeemed, retired, cancelled or amended relating to Series A Preferred.

A copy of the Certificate of Designation for Series A Preferred is attached hereto as Exhibit 3.1

**Item 9.01 Financial Statements and Exhibits.**

(d)     Exhibits

Exhibit 3.1     Certificate of Designation for Series A Preferred Stock of Bakken Resources, Inc. (filed on May 6, 2016 with the Nevada Secretary of State)

WP02342

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Bakken Resources, Inc.

By: /s/ Dan Anderson
Dan Anderson
Chief Financial Officer
May 10, 2016

WP02343

5/12/2016                          https://www.sec.gov/Archives/edgar/data/1450390/000120677416005905/exhibit3-1.htm

EX-3.1 2 exhibit3-1.htm CERTIFICATE OF DESIGNATION FOR SERIES A PREFERRED STOCK OF
BAKKEN RESOURCES

### STATE OF NEVADA



*BARBARA K. CEGAVSKE*
Secretary of State

*JEFFERY LANDERFELT*
Deputy Secretary
for Commercial Recordings

**OFFICE OF THE
SECRETARY OF STATE**

### Certified Copy

May 6, 2016

**Job Number:**       C20160506-1455
**Reference Number:**  00010295028-77
**Expedite:**
**Through Date:**

The undersigned filing officer hereby certifies that the attached copies are true and exact
copies of all requested statements and related subsequent documentation filed with the
Secretary of State's Office, Commercial Recordings Division listed on the attached
report.

**Document Number(s)**      **Description**                **Number of Pages**
20160208117-58              Certificate of Designation     18 Pages/1 Copies



Respectfully,

*Barbara K. Cegavske*

BARBARA K. CEGAVSKE
Secretary of State

Certified By: Sandy Edwards
Certificate Number: C20160506-1455
You may verify this certificate
online at http://www.nvsos.gov/

**WP02344**

5/12/2016 https://www.sec.gov/Archives/edgar/data/1450390/000120677416005905/exhibit3-1.htm

**Commercial Recording Division**
202 N. Carson Street
Carson City, Nevada 89701-4201
Telephone (775) 684-5708
Fax (775) 684-7138

WP02345

WP02346

https://www.sec.gov/Archives/edgar/data/1450390/000120677416005905/exhibit3-1.htm





**BARBARA K. CEGAVSKE**
Secretary of State
202 North Carson Street
Carson City, Nevada 89701-4201
(775) 684-5708
Website: www.nvsos.gov

| Filed in the office of | Document Number |
|---|---|
| *Barbara K. Cegavske* | **20160208117-58** |
| Barbara K. Cegavske | Filing Date and Time |
| Secretary of State | **05/06/2016 2:10 PM** |
| State of Nevada | Entity Number |
| | **E0365262008-2** |

# Certificate of Designation
### (PURSUANT TO NRS 78.1955)

USE BLACK INK ONLY - DO NOT HIGHLIGHT

ABOVE SPACE IS FOR OFFICE USE ONLY

## Certificate of Designation For
## Nevada Profit Corporations
### (Pursuant to NRS 78.1955)

**1. Name of corporation:**

Bakken Resources, Inc.

**2.** By resolution of the board of directors pursuant to a provision in the articles of incorporation this certificate establishes the following regarding the voting powers, designations, preferences, limitations, restrictions and relative rights of the following class or series of stock:

Series A Preferred

The attached document (Certificate of Designation of Bakken Resources, Inc. of Series A Preferred) is specifically incorporated by reference in its entirety into this Certificate of Designation form. Such document sets forth all information required under the applicable provisions in Chapter 78 of the Nevada Revised Statutes.

**3. Effective date of filing:** (optional) _____

(must not be later than 90 days after the certificate is filed)

**4. Signature:** (required)

X _____

Signature of Officer   DAN ANDERSON, CFO

**Filing Fee: $175.00**

**IMPORTANT:** Failure to include any of the above information and submit with the proper fees may cause this filing to be rejected.

*This form must be accompanied by appropriate fees.*

Nevada Secretary of State Stock Designation
Revised: 1-5-15

https://www.sec.gov/Archives/edgar/data/1450390/000120677416005905/exhibit3-1.htm

4/22

**WP02347**

5/12/2016                                   https://www.sec.gov/Archives/edgar/data/1450390/000120677416005905/exhibit3-1.htm

WP02348

CERTIFICATE OF DESIGNATION

OF

BAKKEN RESOURCES, INC.

To be Designated
Series A Preferred Stock

---

*Pursuant to Section 1955 of*
*Chapter 78 of the Nevada Revised Statutes*

---

A. Under Article IV of the Articles of Incorporation of Bakken Resources, Inc. (the "Corporation"), this Corporation is authorized to issue two classes of stock, designated common stock ("Common Stock") and preferred stock ("Preferred Stock"). The total number of shares of Common Stock that the Corporation is authorized to issue is One Hundred Million (100,000,000). The total number of shares of Preferred Stock this Corporation is authorized issue is Ten Million (10,000,000). Both the Preferred Stock and the Common Stock shall have a par value of $0.001 per share.

B. The Preferred Stock may be divided into series. The first series shall consist of One Million (1,000,000) shares and is hereby designated "Series A Preferred." The price at which the first share of Series A Preferred originally issues is designated the "Series A Price Per Share," which shall be one dollar ($1.00) per share. The remaining Nine Million (9,000,000) shares of authorized Preferred Stock are not hereby designated but may be designated and issued from time to time in one or more series or classes. Except as otherwise set forth in this Certificate of Designation, this Corporation's Board of Directors ("Board") is authorized to determine or alter the rights, preferences, privileges and restrictions granted to or imposed upon any wholly unissued series of Preferred Stock and, within the limits and restrictions stated in any resolution or resolutions of the Board originally fixing the number of shares constituting any series, to increase or decrease (but not below the number of shares of such series then outstanding) the number of shares of any such series subsequent to the issue of shares of that series, unless a vote of the holders of such series is required pursuant to the certificate or certificates establishing the series of Preferred Stock.

WP02349

5/12/2016                              https://www.sec.gov/Archives/edgar/data/1450390/000120677416005905/exhibit3-1.htm

C. Except as set forth in this Sections C, and subject to Section F, the Series A Preferred shall have the identical powers, preferences, rights, and restrictions to the Common Stock, such provisions being set forth for the Series A Preferred as follows:

1. **Dividends.**

(a) Rate and Preference. Each share of Series A Preferred shall entitle the holder thereof to participate on a fully diluted based with the Common Stock in any Common Stock dividend or similar payment that the Board may declare or issue and also to receive any Series A Preferred dividend or similar payment that the Board may declare or issue, in the manner and at the rate that the Board may determine.

(i) No dividends shall be paid on any Common Stock of the Corporation until dividends on the Series A Preferred shall also have been paid or declared and set apart during that fiscal year and any prior year in which dividends accumulated but remain unpaid, and no dividends shall be paid on any share of Common Stock unless a dividend (not including any amount declared or issued to the Series A Preferred pursuant to Section C.1(a)) is paid with respect to all outstanding shares of Series A Preferred in an amount for each such share of Series A Preferred equal to or greater than the aggregate amount of such dividends for all shares of Common Stock into which each such share of Series A Preferred could then be converted.

(ii) Except as otherwise provided herein, no right shall accrue to holders of shares of Series A Preferred by reason of the fact that dividends on said shares are not declared in any prior year, nor shall any undeclared or unpaid dividend bear or accrue any interest.

(b) Participation. In the event the Corporation shall declare a distribution (other than any distribution described in Section C.2) payable in securities of other persons, evidences of indebtedness issued by the Corporation or other persons, assets (excluding cash dividends) or options or rights to purchase any such securities or evidences of indebtedness, then, in each such case the holders of the Series A Preferred shall be entitled to a proportionate share of any such distribution as though the holders of the Series A Preferred were the holders of the number of shares of Common Stock of the Corporation into which their respective shares Series A Preferred are convertible as of the record date fixed for the determination of the holders of Common Stock of the Corporation entitled to receive such distribution.

2. **Liquidation.**

(a) Preference. In the event of any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary (each, a "Liquidation Event"), the holders of the Series A Preferred shall be entitled to receive, prior and in preference to any distribution of any of the assets or surplus funds of the Corporation to the holders of the Common Stock by reason of their ownership thereof, the Series A Price Per Share (as adjusted for any stock dividends, combinations or splits with respect to such shares) with interest accrued to the date of conversion plus all accumulated but unpaid dividends on such shares for each share of

2

WP02350

6/12/2016                    https://www.sec.gov/Archives/edgar/data/1450390/000120677416005905/exhibit3-1.htm

Series A Preferred then held by them (the "Series A Preference"). If, upon any such Liquidation Event, the assets of the Corporation shall be insufficient to make payment in full to all holders of Series A Preferred of the Series A Preference set forth in this Section C.2(a), then such assets shall be distributed among the holders of the Series A Preferred at the time outstanding, ratably in proportion to the full amounts to which they would otherwise be entitled if the assets of the Corporation were sufficient to make such payment in full to holders of the Series A Preferred.

(b) Cap. For any Liquidation Event or Deemed Liquidation Event (defined below), if the amount payable on each share of Series A Preferred upon such distribution (inclusive of the preferential liquidation proceeds) would exceed twice the amount of the Series A Price Per Share (as adjusted for any stock dividends, combinations or splits with respect to such shares and treating the Series A Preferred on an as converted basis), then the Series A Preference mentioned in Section C.2(a) shall be of no force or effect as to any such amount payable on each share of Series A Preferred that exceeds twice the amount of such Series A Price Per Share, and all amounts payable upon such a distribution in excess of such amount shall be allocated amongst all the shareholders of the Corporation as set forth in Section C.2(c).

(c) Participation. After payment to the holders of the Series A Preferred of the amounts set forth in Section C.2(a), as limited by Section C.2(b) above, the entire remaining assets and funds of the Corporation legally available for distribution, if any, shall be distributed among the holders of the Common Stock and the Series A Preferred in proportion to the shares of Common Stock then held by them and the shares of Common Stock which they then have the right to acquire upon conversion of the shares of Series A Preferred then held by them.

(d) Deemed Liquidation Events. For purposes of this Section C.2, (i) any acquisition of the Corporation by means of merger or other form of corporate reorganization in which outstanding shares of the Corporation are exchanged for securities or other consideration issued, or caused to be issued, by the acquiring corporation or its subsidiary (other than a mere reincorporation transaction) (ii) a sale of all or substantially all of the assets of the Corporation, (iii) the sale of all or substantially all of the outstanding shares of capital stock of the Corporation, (iv) any change of control of the Board, the Corporation's voting stock, or that is otherwise not covered herein, and (v) a bankruptcy, shall, unless provided otherwise by the option of a majority the holders of Series A Preferred, voting together as a class, each be treated as Liquidation Event and shall entitle the holders of the Series A Preferred and Common Stock to receive at the closing in cash, securities or other property (valued as provided in Section C.2(e) below) amounts as specified in Sections C.2(a) through C.2(c) above if occurring or discovered at or within a reasonable time after occurrence (a "Deemed Liquidation Event").

(e) Non-Cash Valuation. Whenever the distribution provided for in this Section C.2 shall be payable in securities or property other than cash, the value of such distribution shall be the fair market value of such securities or other property as determined in good faith by the Board.

3

WP02351

3. **Voting Rights; Directors.**

(a) <u>Preferred Voting with Common</u>. Each holder of shares of the Series A Preferred shall be entitled to the number of votes equal to the number of shares of Common Stock into which such shares of Series A Preferred could be converted (such number being initially one hundred (100) shares Common Stock) and shall have voting rights and powers equal to the voting rights and powers of the Common Stock (except as otherwise expressly provided herein or as required by law, voting together with the Common Stock as a single class) and shall be entitled to notice of any stockholders' meeting in accordance with the bylaws of this Corporation. Fractional votes shall not, however, be permitted and any fractional voting rights resulting from the above formula (after aggregating all shares into which shares of Series A Preferred held by each holder could be converted) shall be rounded to the nearest whole number (with one-half being rounded upward). Each holder of Common Stock shall be entitled to one (1) vote for each share of Common Stock held.

(b) <u>Conditional Board Seat</u>. As of the date on this Certificate of Designation, the Board consists of seven (7) members but may consist of no less than two (2) and no more than nine (9) members. The holders of Series A Preferred shares shall be entitled to elect one (1) member of the Board (voting as a class) on the condition that the number of seats on the Board is increased to either eight (8) or nine (9) seats, or to a any greater number of directors that may be later authorized by an amendment to the Corporation's Articles of Incorporation in accordance with that document, the Corporation's bylaws, and any applicable laws. The member elected by the holders of Series A Preferred, if applicable, shall be designated the "Series A Preferred Director." All other board members shall be elected by normal vote as described herein and consistent with this Corporation's bylaws.

(c) <u>Filling Vacancy of Conditional Board Seat</u>. In the case of a vacancy in the office the Series A Preferred Director, such vacancy shall remain vacant to be filled only by the vote of a majority of the shares of the Series A Preferred. Any director who shall have been elected by the holders of the Series A Preferred may be removed during the aforesaid term of office, whether with or without cause, only by the affirmative vote of the holders of a majority of the Series A Preferred.

4. **Conversion.**

The holders of the Series A Preferred shall have conversion rights specified in this Section C.4, <u>except that</u> in all cases conversion of any Series A Preferred stock into Common Stock shall be limited by the amount of available Common Stock authorized under this Corporation's Articles of Incorporation unless such Articles are amended by an affirmative vote in accordance with this Certificate of Designation and the relevant provisions of this Corporation's Articles of Incorporation or bylaws, as the case may be, where such amendment will take place within a reasonable time after this Corporation receives a relevant conversion notice attached hereto as Exhibit 1, and if approved, would increase the authorized number of shares of Common Stock by an amount sufficient to satisfy full conversation of any applicable request to convert shares of Series A Preferred into shares of Common Stock that would require such an amendment, as follows (the "Conversion Rights"):

4

WP02352

(a) <u>Right To Convert</u>. Each share of the Series A Preferred shall be convertible, at the option of the holder thereof, at any time after the date of issuance of such share, at the office of the Corporation or any transfer agent for such stock, into one hundred (100) fully paid and nonassessable shares of Common Stock. The price at which shares of Common Stock shall be deliverable upon conversion of shares of the Series A Preferred (the "Conversion Price") shall initially be the Series A Price Per Share. Such initial Conversion Price shall be adjusted as hereinafter provided.

(b) <u>Automatic Conversion</u>. Each share of Series A Preferred shall automatically be converted into shares of Common Stock at the then-effective Conversion Price immediately upon either (i) the election of the holders of a majority of the shares of the Series A Preferred then-outstanding (voting together as a class), or (ii) the closing of the sale of the Corporation's Common Stock in a firm commitment, underwritten public offering registered under the Securities Act of 1933, as amended (the "Securities Act"), other than a registration relating solely to a transaction under Rule 145 under such Act (or any successor thereto) or to an employee benefit plan of the Corporation, at a public offering with aggregate proceeds to the Corporation (after deduction for underwriters' discounts and expenses relating to the issuance, including without limitation fees of the Corporation's counsel) exceeding Twenty-Five Million dollars ($25,000,000).

(c) <u>Mechanics of Conversion</u>.

(i) Before any holder of the Series A Preferred shall be entitled voluntarily to convert the same into shares of Common Stock, he shall surrender the certificate or certificates therefor, duly endorsed, at the office of the Corporation or of any transfer agent for such stock, and shall give written notice to the Corporation at such office that he elects to convert the same and shall state therein the number of shares to be converted and the name or names in which he wishes the certificate or certificates for shares of Common Stock to be issued. The Corporation shall, as soon as practicable thereafter, issue and deliver at such office to such holder of Series A Preferred, a certificate or certificates for the number of shares of Common Stock to which he shall be entitled. Such conversion shall be deemed to have been made immediately prior to the close of business on the date of surrender of the shares of Series A Preferred to be converted, and the person or persons entitled to receive the shares of Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such shares of Common Stock on such date.

(ii) If the conversion is in connection with an underwritten offering of securities pursuant to the Securities Act, the conversion may, at the option of any holder tendering shares of Series A Preferred for conversion, be conditioned upon the closing with the underwriters of the sale of securities pursuant to such offering, in which event the person(s) entitled to receive the Common Stock upon conversion of the Series A Preferred shall not be deemed to have converted such Series A Preferred until immediately prior to the closing of such sale of securities.

5

WP02353

(d) <u>Adjustments to Conversion Price for Certain Diluting Issues</u>. No adjustment described below in Sections C.4(d)(i)-(vi) shall affect the conversion price of the Series A Preferred if any such adjustment would apply in relation to any of the following: (a) securities issued or issuable to employees or directors of, or consultants to, the Corporation pursuant to any plan approved by the Corporation's Board of Directors, (b) Common Stock issued pursuant to a stock split or similar reorganization, (c) Common Stock issued upon conversion of Preferred Stock, (d) securities issued in connection with a bona fide business acquisition by the Corporation or an initial public offering, (e) securities issued to persons or entities with which the Corporation has business relationships, which issuances are approved by the Corporation's Board of Directors, and for primarily non-equity financing purposes, (f) securities issued or issuable pursuant to equipment lease financings or bank credit arrangements that are approved by the Board and for primarily non-equity financing purposes; or (g) securities that are otherwise excluded by consent of holders of a majority of the Series A Preferred.

(i) *Special Definitions*. For purposes of this Section C.4(d), the following definitions apply:

(1) "Options" shall mean rights, options, or warrants to subscribe for, purchase or otherwise acquire either Common Stock, Convertible Securities (defined below), or Series A Preferred.

(2) "Original Issue Date" shall mean the date on which a share of Series A Preferred stock was first issued.

(3) "Convertible Securities" shall mean any evidences of indebtedness, shares (other than Common Stock) or other securities convertible into or exchangeable for Common Stock.

(4) "Additional Shares of Common Stock" shall mean all shares of Common Stock issued (or deemed to be issued under Section C.4(d)(iii)) by the Corporation after the Original Issue Date, other than shares of Common Stock issued or issuable:

(A) upon conversion of shares of the Series A Preferred;

(B) to employees, directors, consultants or advisors under stock option, stock bonus or stock purchase plans or agreements or similar plans or agreements approved by the Board (including the affirmative vote of the Directors elected by the holders of the Series A Preferred);

(C) as a dividend or distribution on the Series A Preferred; or

(D) for which adjustment of the Conversion Price is made pursuant to Section C.4(e).

6

WP02354

5/12/2016                    https://www.sec.gov/Archives/edgar/data/1450390/000120677416005905/exhibit3-1.htm

(5) "Ratchet Period" shall mean the time between the Original Issue Date and the date which is one day after the date on which at least an additional Ten Million dollars ($10,000,000) in equity or convertible debt financing at a per share price in excess of the Series A Price Per Share is obtained by the Corporation (which does not include proceeds from existing shareholders or the issuance of Series A Preferred) in one or more such financings.

(ii) *Condition for Adjustment of Conversion Price.* Any provision herein to the contrary notwithstanding, no adjustment in the Conversion Price shall be made in respect of the issuance of Additional Shares of Common Stock unless the consideration per share (determined pursuant to Section C.4(d)(vi) hereof) for an Additional Share of Common Stock issued or deemed to be issued by the Corporation is less than the Conversion Price in effect on the date of, and immediately prior to, such issue.

(iii) *Deemed Issuance of Additional Shares of Common Stock.* If the Corporation causes after the Original Issue Date there to be issued any Options or Convertible Securities, or if the Corporation fixes a record date designating which holders are then entitled to any receive such securities, then the maximum number of shares of Common Stock issuable under the terms of any such security (without regard to any relevant anti-dilution provisions) shall be deemed to be Additional Shares of Common Stock issued after the Original Issue Date. Common Stock deemed issued in this way shall be considered issued on the same date that the relevant Options or Convertible Securities were issued, or if Common Stock is deemed issued because the Corporation sets a record date, such Common Stock will be considered issued as of the close of business on such record date. The forgoing provisions of this Paragraph C.4(d)(iii) applicable to Additional Shares of Common Stock that are deemed to be issued are subject to the following:

(1) no further adjustments in the Conversion Price shall be made upon the issuance or exercise of any Option or Convertible Security discussed in this Paragraph C.4(d)(iii) or its subsections;

(2) if any Option or Convertible Security discussed in Paragraph C.4(d) contains terms that, by the passage of time or otherwise, cause any adjustment, upon exercise, conversion or exchange, in price payable to the Corporation or in Common Stock issuable under such security, the Conversion Price and all adjustment computed therefrom shall, upon any such increase or decrease becoming effective, be recomputed to reflect any such increase or decrease to the extent it affects such Option or Convertible Security; provided, however, that no adjustments under this Paragraph C.4(d)(iii) (2) shall apply to Common Stock previously issued upon conversion from Series A Preferred;

(3) upon the expiration of any unexercised right of conversion or exchange contained in any such Option or Convertible Security, the Conversion Price and all adjustment computed therefrom shall, upon such expiration, be recomputed so as to exclude such expiration and to include only the relevant securities actually issued and payments received or receivable by the

7

WP02355

Corporation in relation to such security prior to expiration of any such unexercised right;

(4) no readjustment pursuant to clause (2) or (3) above shall increase a Conversion Price to exceed the lesser of (a) the Conversion Price on the original adjustment date, or (b) the Conversion Price that would have resulted from any issuance of Additional Shares of Common Stock between the original adjustment date and such readjustment date;

(5) in the case of any Options which expire by their terms not more than thirty (30) days after the date of issue thereof, no adjustment of the Conversion Price shall be made until the expiration or exercise of all such Options, whereupon such adjustment shall be made in the same manner provided in clause (3) above.

(iv) *Adjustment of Conversion Price Upon Issuance of Additional Shares of Common Stock During the Ratchet Period.* During the Ratchet Period, in the event this Corporation shall issue Additional Shares of Common Stock (including Additional Shares of Common Stock deemed to be issued pursuant to Section C.4(d)(iii)) for a consideration per share less than the Conversion Price in effect on the date of and immediately prior to such issue, then and in such event, the Conversion Price shall be reduced to the price at which any Additional Shares of Common Stock (including Additional Shares of Common Stock deemed to be issued pursuant to Section C.4(d)(iii)) are issued. The Conversion Price, as adjusted by the Ratchet Period, will not be affected by the conclusion thereof, except for any subsequent readjustments to be made in accordance with the provisions of Section C.4(d)(iii)(2) and (3).

(v) *Adjustment of Conversion Price Upon Issuance of Additional Shares of Common Stock After the Ratchet Period.* In the event this Corporation, at any time after the Ratchet Period shall issue Additional Shares of Common Stock (including Additional Shares of Common Stock deemed to be issued pursuant to Section C.4(d)(iii)) for a consideration per share less than the Conversion Price in effect on the date of and immediately prior to such issue, then and in such event, the Conversion Price shall be reduced, concurrently with such issue, to a price (calculated to the nearest cent) determined by multiplying the Conversion Price by a fraction, the numerator of which shall be the number of shares of Common Stock outstanding immediately prior to such issue plus the number of shares of Common Stock which the aggregate consideration received by the Corporation for the total number of Additional Shares of Common Stock so issued would purchase at the Conversion Price in effect immediately prior to such issuance, and the denominator of which shall be the total number of shares of Common Stock outstanding immediately after issuing such Additional Shares of Common Stock. For the purpose of the above calculation, the number of shares of Common Stock outstanding immediately prior to such issue shall be calculated on a fully diluted basis, as if all shares of Series A Preferred, Options and Convertible Securities had been fully converted into shares of Common Stock to the extent possible immediately prior to such issuance. Calculating the number of shares of Common Stock outstanding immediately prior to such issue shall exclude any Additional Shares

8

WP02356

of Common Stock issuable with respect to shares of Series A Preferred, Convertible Securities, or outstanding options, warrants or other rights for the purchase of shares of stock or convertible securities, solely as a result of the adjustment of the Conversion Price (or other conversion ratios) resulting from the issuance of Additional Shares of Common Stock causing such adjustment.

(vi) *Determination of Consideration.* For purposes of this Section C.4(d), the consideration received by the Corporation for the issue of any Additional Shares of Common Stock shall be computed as follows:

(1) *Cash and Property.* Such consideration shall:

(A) insofar as it consists of cash, be computed at the aggregate amount of cash received by the Corporation excluding amounts paid or payable for accrued interest or accrued dividends;

(B) insofar as it consists of property other than cash, be computed at the fair value thereof at the time of such issue, as determined in good faith by the Board; and

(C) in the event Additional Shares of Common Stock are issued together with other shares or securities or other assets of the Corporation for consideration which covers both, be the proportion of such consideration so received, computed as provided in clauses (A) and (B) above, as determined in good faith by the Board.

(2) *Options and Convertible Securities.* The consideration per share received by the Corporation for Additional Shares of Common Stock deemed to have been issued pursuant to Section C.4(d)(iii), relating to Options and Convertible Securities shall be determined by dividing:

(A) the total amount, if any, received or receivable by the Corporation as consideration for the issue of such Options or Convertible Securities, plus the minimum aggregate amount of additional consideration (as set forth in the instruments relating thereto, without regard to any relevant anti-dilution provisions) payable to the Corporation upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities or for Series A Preferred, the exercise of such Options for Convertible Securities or for Series A Preferred and the conversion or exchange of such Convertible Securities or Series A Preferred by

(B) the maximum number of shares of Common Stock (as set forth in the instruments relating thereto, without regard to any relevant anti-dilution provisions) issuable upon the exercise of such Options or conversion or exchange of such Convertible Securities.

9

WP02357

5/12/2016                                    https://www.sec.gov/Archives/edgar/data/1450390/000120677416005905/exhibit3-1.htm

(e) <u>Adjustments to Conversion Price for Stock Dividends and for Combinations or Subdivisions of Common Stock</u>. If the Corporation causes after the Original Issue Date there to be a declaration or payment, without consideration, any dividend on the Common Stock payable in Common Stock or in any right to acquire Common Stock for no consideration, or shall effect a subdivision of the outstanding shares of Common Stock into a greater number of shares of Common Stock (by stock split, reclassification or otherwise than by payment of a dividend in Common Stock or in any right to acquire Common Stock), or in the event the outstanding shares of Common Stock shall be combined or consolidated, by reclassification or otherwise, into a lesser number of shares of Common Stock, then the Conversion Price in effect immediately prior to such event shall, concurrently with the effectiveness of such event, be proportionately decreased or increased, as appropriate. In the event that this Corporation shall declare or pay, without consideration, any dividend on the Common Stock payable in any right to acquire Common Stock for no consideration, then the Corporation shall be deemed to have made a dividend payable in Common Stock in an amount of shares equal to the maximum number of shares issuable upon exercise of such rights to acquire Common Stock.

(f) <u>Adjustments for Reclassification and Reorganization</u>. If the Common Stock issuable upon conversion of the Series A Preferred shall be changed into the same or a different number of shares of any other class or classes of stock, whether by capital reorganization, reclassification or otherwise (other than a subdivision or combination of shares provided for in Section C.4(e) above or a merger or other reorganization referred to in Section C.2(d) above), the Conversion Price then in effect shall, concurrently with the effectiveness of such reorganization or reclassification, be proportionately adjusted so that the Series A Preferred shall be convertible into, in lieu of the number of shares of Common Stock which the holders would otherwise have been entitled to receive, a number of shares of such other class or classes of stock equivalent to the number of shares of Common Stock that would have been subject to receipt by the holders upon conversion of the Series A Preferred immediately before that change.

(g) <u>No Impairment</u>. The Corporation will not, by amendment of its Certificate of Designation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Corporation, but will at all times in good faith assist in the carrying out of all the provisions of this Section C.4 and in the taking of all such action as may be necessary or appropriate in order to protect the Conversion Rights of the holders of the Series A Preferred against impairment.

(h) <u>Certificates as to Adjustments</u>. Upon the occurrence of each adjustment or readjustment to the Conversion Price pursuant to this Section C.4, the Corporation at its expense shall promptly compute such adjustment or readjustment in accordance with the terms hereof and prepare and furnish to each holder of Series A Preferred a certificate executed by the Corporation's President or Chief Financial Officer setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based. The Corporation shall, upon the written request at any time of any holder of Series A Preferred stock, furnish or cause to be furnished to such holder a like

10

https://www.sec.gov/Archives/edgar/data/1450390/000120677416005905/exhibit3-1.htm

WP02358

certificate setting forth (i) such adjustments and readjustments, (ii) the Conversion Price at the time in effect, and (iii) the number of shares of Common Stock and the amount, if any, of other property which at the time would be received upon the conversion of the Series A Preferred stock.

(i) Notices of Record Date. In the event that the Corporation shall propose at any time: (i) to declare any dividend or distribution upon its Common Stock, whether in cash, property, stock or other securities, whether or not a regular cash dividend and whether or not out of earnings or earned surplus; (ii) to offer for subscription *pro rata* to the holders of any class or series of its stock any additional shares of stock of any class or series or other rights; (iii) to effect any reclassification or recapitalization of its Common Stock outstanding involving a change in the Common Stock; or (iv) to merge or consolidate with or into any other corporation, or sell, lease or convey all or substantially all of its assets, or to liquidate, dissolve or wind up; then, in connection with each such event, the Corporation shall send to the holders of Series A Preferred:

(1) at least twenty (20) days' prior written notice of the date on which a record shall be taken for such dividend, distribution or subscription rights (and specifying the date on which the holders of Common Stock shall be entitled thereto) or for determining rights to vote, if any, in respect of the matters referred to in (iii) and (iv) above; and

(2) in the case of the matters referred to in (iii) and (iv) above, at least twenty (20) days' prior written notice of the date when the same shall take place (and specifying the date on which the holders of Common Stock shall be entitled to exchange their Common Stock for securities or other property deliverable upon the occurrence of such event).

(j) Issue Taxes. The Corporation shall pay any and all issue and other taxes that may be payable in respect of any issue or delivery of shares of Common Stock on conversion of the Series A Preferred pursuant hereto; provided, however, that the Corporation shall not be obligated to pay any transfer taxes resulting from any transfer requested by any holder in connection with any such conversion.

(k) Fractional Shares. No fractional share shall be issued upon the conversion of any share or shares of Series A Preferred. All shares of Common Stock (including fractions thereof) issuable upon conversion of more than one share of Series A Preferred by a holder thereof shall be aggregated for purposes of determining whether the conversion would result in the issuance of any fractional share. If, after such aggregation, the conversion would result in the issuance of a fraction of a share of Common Stock, the Corporation shall, in lieu of issuing any fractional share, pay the holder otherwise entitled to such fraction a sum in cash equal to the fair market value of such fraction on the date of conversion (as determined in good faith by the Board).

(l) Notices. Any notice required by the provisions of this Section C.4 to be given to the holders of shares of Series A Preferred shall be deemed given if deposited in the United

11

WP02359

6/12/2016                    https://www.sec.gov/Archives/edgar/data/1450390/000120677416005905/exhibit3-1.htm

States mail, postage prepaid, and addressed to each holder of record at his address appearing on the books of the Corporation.

**5. Restrictions and Limitations.**

(a) <u>Required Consents</u>. Until such time that all of the shares of Series A Preferred originally issued have converted to Common Stock, the Corporation shall not, without the vote or written consent by the holders of at least a majority of the then outstanding shares of the Series A Preferred (voting together as a class):

(i) amend the Articles of Incorporation in a manner that would adversely affect the rights, preferences, privileges or powers of or restrictions on the Series A Preferred;

(ii) increase or decrease the authorized number of shares of Series A Preferred;

(iii) authorize or create (by reclassification or otherwise) any new class or series of stock having rights, preferences or privileges with respects to dividends or liquidation senior to or on parity with the Series A Preferred;

(iv) approve any transaction or series of transactions deemed to be a liquidation of the Corporation;

(v) approve any merger, sale or assets or other corporate reorganization or acquisition in which the Corporation is valued at less than Twenty Million dollars ($20,000,000);

(vi) approve the voluntary liquidation or dissolution of the Corporation;

(vii) issue or approve any security or contract that would cause or permit any of the forgoing to occur with respect to the Corporation or any of its subsidiaries;

(viii) declare or pay any dividend or distribution or approve any repurchase with respect to the Series A Preferred (except as otherwise provided in the Corporation's Articles of Incorporation or in this Certificate of Designation) or to the Common Stock (except in relation to employees, officers, directors, consultants or other persons performing services for the Corporation pursuant to an agreement permitting the Corporation to cause a dividend, distribution or repurchase to or from such persons);

(ix) elect the Series A Preferred Director described in Section C.3 as any single director of the Board who, upon joining the Board as a member thereof, would cause the total number of members of the Board to increase to a number of directors exceeding seven (7) directors, where the Series A Preferred holders may choose to elect the eighth (8th), the ninth (9th) or other director whose addition to the Board would increase the total number of members to any number greater than seven (7) members, but in no case may the Series A Preferred elect more than one such director;

12

WP02360

(x) form any entity or acquire the stock or assets of any entity which is not wholly owned by the Corporation;

(xi) make any material change in the nature of the Corporation's or any subsidiary's primary business as presently conducted;

(xii) effect any dissolution, liquidation, or other winding up of the Corporation or any subsidiary; or

(xiii) effect any cessation of all or a substantial part of the business of the Corporation or any subsidiary.

6. **No Reissuance of Series A Preferred.**

(a) Series A Preferred is not Reissuable. No share or shares Series A Preferred acquired by the Corporation by reason of redemption, purchase, conversion or otherwise shall be reissued, and all such shares shall be cancelled, retired and eliminated from the shares which the Corporation shall be authorized to issue.

D. The Series A Preferred shall have registration rights consistent with this Section D and its subsections below, provided, however, that all rights set forth in this Section D shall be subject to and limited by the number of authorized shares available pursuant to the Corporation's Articles of Incorporation (and in such event, the registration rights specified below).

(a) Registration of Common Stock Related to the Series A Preferred. The expenses related to any registration rights described in this Section D will be paid by this Corporation (exclusive of underwriting discounts and commissions), provided, however, that this Corporation will not be required to pay the reasonable fees of more than one counsel to all holders of securities covered under this Paragraph D. All registration rights described under this Section D will terminate on the earlier of (a) such date, on or after this Corporation's initial public offering, on which holders of securities covered by this Section D may immediately sell all covered shares under Rule 144 during any three-month period, and (b) three years after the Corporation's initial public offering. Holders of securities covered under this Section D may transfer any registration right described herein to this Corporation's directors or officers, to affiliates of such a holder, or to other persons acquiring at least 100,000 shares of this Corporation's outstanding Common Stock, provided, however, that this Corporation is given written notice and consents to such transfer. Holders of any securities covered under this Paragraph D hereby agree not to effect any transactions with respect to any of this Corporation's securities within one hundred and eighty (180) days following the initial public offering by this Corporation, provided, however, that all officers and directors of this Corporation are similarly bound.

13

WP02361

5/12/2016                    https://www.sec.gov/Archives/edgar/data/1450390/000120677416005905/exhibit3-1.htm

(i) <u>Registration upon Conversion or Demand</u>. All Common Stock issued or issuable upon conversion of the Series A Preferred will be "Registrable Securities" that may be registered under the Securities Act of 1933, as amended, and consistent with any other applicable laws. Holders of at least fifty percent (50%) of the Registrable Securities will be entitled to demand that this Corporation effect up to two firmly underwritten registrations; provided, however, that each such registration has aggregate proceeds payable to the Corporation after all applicable fees and commissions of at least Twenty-Five Million Dollars ($25,000,000). Holders of the Series A Preferred may make such a demand at any time following the earlier of either (i) five years following the closing of the financing contemplated in the Convertible Loan Credit Agreement, or (ii) one hundred and eighty (180) days following this Corporation's initial public offering. The Corporation will have the right to delay such registration under certain circumstances for up to two periods of up to one hundred and twenty (120) days each in any twelve month period.

(ii) <u>"Piggyback" Registration</u>. The holders of Registrable Securities will be entitled to tender such securities into any registered offering by the Corporation on its own behalf or on behalf of selling stockholders. In an underwritten offering, the managing underwriters will have the right, in the event of marketing limitations, to limit the number of Registrable Securities included in the offering, provided, however, that in an offering other than the initial public offering, the Registrable Securities may not be limited to less than twenty five percent (25%) of the total offering. In the event of such marketing limitations, each holder of Registrable Securities will have the right to include shares on a *pro rata* basis as among all such holders.

(iii) <u>S-3 Rights</u>. Holders of Registrable Securities will be entitled to demand registrations on Form S-3 (if available to the Corporation) so long as the offering is for common stock having an aggregate offering price of not less than One Million dollars ($1,000,000). This Corporation will not be required to file more than two such Form S-3 registration statements in any twelve month period, and this Corporation may defer an S-3 filing two times during any twelve month period for up to one hundred and twenty (120) days.

E. The powers, preferences, rights, restrictions, and other matters relating to the Common Stock are as follows:

1. **Common Stock Relative to Preferred Stock.**

(a) <u>Relative Rights of Preferred Stock and Common Stock</u>. All preferences, voting powers, relative, participating optional or other special rights and privileges, and qualifications, limitations, or restrictions of the Common Stock are expressly made subject and subordinate to those that are hereby or later fixed with respect to any shares of any series of the Preferred Stock, consistent with the provisions of this Certificate of Designation

(b) <u>Voting Rights</u>. Except as otherwise required by law, in the Corporation's Articles of Incorporation, in its bylaws or in this Certificate of Designation, each holder of Common Stock shall, subject to the provisions of this Certificate of Designation, have one (1)

14

WP02362

vote in respect of each share of stock held by such holder of record on the books of the corporation for the election of directors and on all matters submitted to a vote of stockholders of the corporation

(c) <u>Dividends</u>. Subject to the preferential rights of the Preferred Stock, the holders of shares of Common Stock shall be entitled to receive, when and if declared by the Board, out of the assets of the corporation that are by law available therefor, dividends payable either in cash, in property or in shares of capital stock.

(d) <u>Dissolution, Liquidation or Winding Up</u>. In the event of any dissolution, liquidation or winding up of the affairs of the corporation, after distribution in full of the preferential amounts, if any, to be distributed to the holders of shares of the Preferred Stock, holders of Common Stock shall be entitled to participate with the Preferred Stock in any distribution of the assets of the corporation in accordance with the provisions of this Certificate of Designation.

F. The provisions contained in this Certificate of Designation pertaining to the Series A Preferred's number of shares, voting powers, designations, preferences, limitations, restrictions or relative rights shall remain consistent with this Section F as follows:

1. **Matters Regarding Certain Provisions of the Nevada Revised Statues.**

(a) <u>Reservation</u>. This Corporation hereby specifically reserves all rights, abilities, and authority conferrable to its officers or directors, as the case may be, under the provisions of NRS § 78.1955 to amend or cancel this Certificate of Designation to the extent permitted under such law, and this specific reservation shall be considered incorporated into any form or other document related the filing of this Certificate of Designation that may be filed with the Secretary of State of the State of Nevada for the purpose of affecting such certificate consistent with the laws of that state, such that any relevant amendment or cancellation contemplated under the referenced statute may be affected by a future resolution filed with or referenced in a filing submitted to the Secretary of State of the State of Nevada along with any appropriate form or other required document.

*[signature page follows]*

15

WP02363

IN WITNESS WHEREOF, the Corporation has caused this Certificate of Designation to be duly executed on its behalf by the undersigned as of the date below.

Bakken Resources, Inc.

By: _____
Name: Dan Anderson
Title:   Chief Financial Officer
Date:   May 6, 2016

16

WP02364

5/12/2016                    https://www.sec.gov/Archives/edgar/data/1450390/000120677416005905/exhibit3-1.htm

EXHIBIT 1

## CONVERSION NOTICE

The undersigned hereby elects to convert shares of Series A Preferred, represented by stock certificate No(s). _____, into shares of common stock ("Common Stock") of Bakken Resources, Inc. (the "Corporation") according to the terms and conditions of the Certificate of Designation relating to the Series A Preferred (the "Certificate of Designation"), as of the date written below. Capitalized terms used herein and not otherwise defined shall have the respective meanings set forth in the Certificate of Designation.

Conversion Date:                           _____

Number of Series A Preferred shares to Convert:    _____

Applicable Conversion Price:               _____

Number of Shares of Common Stock to be Issued:    _____

Name of Holder:                            _____

Address:        _____

                _____

                _____

Signature:      _____

Name:           _____

Title:          _____

<u>Holder Requests Delivery to be made</u>
(*check one*)

☐ – By delivery of physical certificates to the address above

☐ – Through the Nevada Agency and Trust Company (NATCO)
     NATCO Account No: _____

WP02365

F I L E D
Electronically
CV16-01086
2016-05-17 04:31:56 PM
Jacqueline Bryant
Clerk of the Court
Transaction # 5519637 : yviloria

# EXHIBIT 7

# EXHIBIT 7

F I L E D
Electronically
CV14-00544
2016-05-13 03:26:02 PM
Jacqueline Bryant
Clerk of the Court
Transaction # 5515379 : csulezic

Code: 2645
PAUL J. ANDERSON, ESQ.
Nevada Bar No. 709
PROCTER J. HUG, IV, ESQ.
Nevada Bar No. 12403
MAUPIN, COX & LeGOY
4785 Caughlin Parkway
Reno, Nevada 89519
Telephone: (775) 827-2000
Facsimile: (775) 827-2185
*Attorneys for Defendant Wesley Paul*

IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

IN AND FOR THE COUNTY OF WASHOE

| | | |
|---|---|---|
| MANUEL GRAIWER and T.J. JESKY, derivatively on behalf of BAKKEN RESOURCES, INC., a Nevada Corporation, | ) ) ) ) | Case No.:    CV14-00544 |
| Plaintiffs, | ) ) ) | Dept. No.:    B7 |
| vs. | ) ) ) | |
| VAL HOLMS, an individual, HERMAN LANDEIS, an individual, KAREN MIDTLYING, an individual, DAVID DEFFINBAUGH, an individual, BILL BABER, an individual, W. EDWARD NICHOLS, an individual, WESLEY PAUL, an individual, and DOES 1-100, | ) ) ) ) ) ) ) | |
| Defendants, | ) ) ) | |
| BAKKEN RESOURCES, INC., a Nevada Corporation, | ) ) ) | |
| Nominal Defendant. | ) ) | |

**DEFENDANT WESLEY J. PAUL, ESQ.'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CONTINUANCE
[ORAL ARGUMENT REQUESTED]**

Defendant WESLEY J. PAUL, ESQ., an individual ("Paul" or "Defendant") submits

the following Opposition to Plaintiffs' Motion of Continuance filed by Plaintiffs, Manuel Graiwer and T.J. Jesky, derivatively on behalf of Bakken Resources, Inc. ("BRI"), a Nevada corporation ("Plaintiffs") on May 10, 2016. Within that Motion Plaintiffs requested an Ex Parte Motion for Order Shortening Time which this Court granted on May 11, 2016 allowing Defendants until Friday, May 13, 2016 at 5:00 p.m., to file opposition to the Plaintiffs' Motion and granting Plaintiffs until Monday, May 16, 2016 at 5:00 p.m., to reply. With respect to the request to continue the hearing on the outstanding Motions this constitutes the sixth time such a request has been made.

## I.

## REQUEST FOR ORAL ARGUMENT

Based on Plaintiffs late filing of the Motion for Continuance, as well as the Order Shortening Time to oppose that Motion, Defendant requests this Court grant oral argument on the Motion For Continuance in accordance with WDCR 12(5) so that arguments can be fully developed and presented to the Court. As the Court is aware, oral arguments are set to be heard on May 18, 2016 beginning at 1:30 p.m., and continuing through May 19, 2016 with respect to a several Motions that have been pending in this matter for some time. Since all Counsel have been preparing for oral argument on those Motions, and several individuals have made non-refundable travel arrangements to be present to argue the Motions it is requested that the Motion for Continuance be placed on the calendar for argument along with the other outstanding Motions.

There are numerous issues associated with the Motion for Continuance which cannot be adequately addressed through this Opposition on such short notice. Allowing oral argument on the Motion for Continuance will not prejudice any party since trial in this matter

2

MAUPIN, COX & LeGOY
ATTORNEYS AT LAW
P.O. BOX 30000
RENO, NEVADA 89520
(775) 827-2000

is two months away. Moreover, the Court needs to hear and fully understand all of the nuances involved with this case before determining whether a continuance of the trial date, expert witness disclosure deadline and motions hearing dates are warranted. A few of those arguments are set forth below.

## II.

## ARGUMENT

### A. Plaintiffs Have Failed to Show the Requisite Good Cause Required by WDCR 13 for a Continuance

Motions for continuance in the Second Judicial District Court are governed by WDCR 13 which states in relevant part:

> 1. No continuance of a trial in a civil or criminal case shall be granted except for good cause. A motion or stipulation for continuance shall state the reason therefor and whether or not any previous requests for continuance has been either sought or granted. The motion or stipulation must certify that the party or parties have been advised that a motion or stipulation for continuance is to be submitted in their behalf and must state any objection the parties may have thereto.

With respect to the present Motion Plaintiffs have failed to comply with the provisions of WDCR 13, because they fail to explain all of the continuances that have previously been granted with respect to hearing oral argument on the outstanding motions. Plaintiffs Motion seeks not only a continuance of the trial date, but also of the deadline for disclosure of expert witnesses and the dates for oral argument on all outstanding motions presently before this Court currently set for May 18 and 19, 2016. Plaintiffs inform the Court that at one point the Parties stipulated to continue the original trial date based on the fact that two additional counsel had recently come into the case at that time. Plaintiffs' Motion, at 8:10-12. Plaintiffs fail to set forth the procedural history pertaining to the number of

continuances granted with regard to hearing the outstanding Motions presently set to be heard on May 18 and 19, 2016, Defendant will do that here.

Oral argument was initially set with respect to the outstanding Motions for November 24, 2015 at 1:30 p.m. That setting occurred pursuant to an Order entered by this Court on October 22, 2015. Five days prior to that hearing this Court entered an Amended Order continuing the hearings until December 22, 2015. Five days prior to hearing the Motions on December 22, 2015, this Court entered an Order granting the Plaintiffs' Motion for a Stay so that settlement negotiations could be pursued. On January 21, 2016, this Court set all outstanding Motions for oral argument on March 3, 2016 beginning at 9:00 a.m. That hearing did not go forward because on March 3, 2016 Defendant Val Holms' filed a Motion for Order Confirming Stay until mediation had been concluded. On March 31, 2016, the Court entered an Order lifting the stay after being informed that settlement negotiations were unsuccessful. The Court reset oral argument beginning May 18, 2016 at 1:30 p.m., and continuing through May 19, 2016 beginning at 9:00 a.m. The hearing on the outstanding Motions has been set five (5) separate times, mostly as a result of Plaintiffs' requests to continue the previously set hearing date, and by their current Motion for Continuance they now want to reset the outstanding motions hearing date for the sixth time.

Based on all the continuances of the hearing on outstanding motions Defendants should be allowed to argue the outstanding Motions as presently scheduled and obtain rulings with respect to the important issues raised through those Motions. To again continue the hearing date on those Motions at Plaintiffs' request is unfair and unjust. Defendant submits that Plaintiffs late filing of the Motion for Continuance is nothing more than an attempt to prevent rulings on issues that will favor the Defendants. It is also an attempt to distract

1  Defendants from their current preparation for oral argument on the outstanding motions.

2  This Court should not countenance such behavior, and can do so by denying the Motion for

3  Continuance.

4      Defendant further submits that the Motion for Continuance could be held in abeyance

5  until after all presently pending Motions have been heard and decided. Depending on how

6  the Court rules on those Motions, there may not be a need to continue the trial date as the

7  case could be disposed of on the merits through decisions this Court enters on certain

8  dispositive motions. Plaintiffs are fearful of the fact that this Court may actually address the

9  merits of the dispositive Motions which may very well result in judgment being entered in

10  favor of this Defendant and the other Defendants in the case. The point, however, is that the

11  Parties are entitled to decisions on the outstanding Motions before the Court begins to

12  entertain another potential continuance of the trial date which is two months away. For these

13  reasons Plaintiffs have failed to show any good cause for a continuance of the trial date, let

14  alone to continue the disclosure of expert witnesses as previously agreed to between the

15  Parties, or to again delay the hearing on the outstanding Motions which will significantly

16  impact this case. Because Plaintiffs have failed to show the requisite good cause required by

17  WDCR 13 for a continuance their Motion must be denied.

18  

19      **B.**    **The Purported "Good Faith" Settlement Between Plaintiffs and Co-Defendant Val Holms Violates Internal Agreements Between BRI and Holms as well as Federal Securities and Exchange Commission ("SEC") Rules and Regulations, Should Not be Approved and Should Not Form a Basis for Continuing the Trial, Expert Witness Disclosures or Motion Hearing Dates**

20  

21  

22  

23  

24      The crux of Plaintiffs' Motion is that they have entered into a settlement with Co-

25  

26  Defendant Val Holms ("Holms") which has been presented to this Court in the form of a

Motion for Court Approval and Determination of Good Faith Settlement.. That Motion was filed with the Court on May 9, 2016. Interestingly, Plaintiffs did not seek an order shortening time for Defendants to respond to that Motion, despite the fact they now argue that the settlement between Mr. Graiwer and Holms effectively ends this litigation. Instead, they have granted Defendants an extension of time through June 9, 2016 to oppose that motion.

Plaintiffs also argue that because that this is a shareholder derivative action brought pursuant to NRCP 23.1, approval of the settlement between the Plaintiffs and Holms is necessary. Without fully informing this Court as to the information used to achieve the settlement between Plaintiffs and Holms, they represent to this Court that settlement is in the best interests of all of the shareholders, as well as the company (BRI) thereby eliminating the need for a trial, or the need to hear any of the outstanding Motions presently before the Court. Nothing could be further from the truth.

Plaintiffs contend the purported settlement agreement between Plaintiffs and Val Holms involves, and benefits, a majority of the shareholders of BRI. Once again, Plaintiffs are misinformed. On May 6, 2016, BRI announced through an SEC 8-K filing that Eagle Private Equity and BRI had agreed to terms by which Eagle Private Equity can fund up to $1 Million to BRI. Under the terms agreed to if there is a change of control in the company (BRI), Eagle Private Equity has the right to convert its outstanding loans into shares of Series A preferred stock in BRI. Each share of Series A preferred stock has the voting rights of 100 shares of BRI common stock. As a result, Val Holms shares, on a fully diluted basis, would amount to twenty-one percent (21%) ownership in BRI, which is not controlling or a majority. Again, because there have been several recent events that affect this case, granting

the Plaintiffs Motion for Continuance would not be proper. Instead, oral argument needs to be heard on all the outstanding issues first.

Plaintiffs briefly touch on the issue of the Spira Investigation, an internal investigation conducted by the BRI Board of Directors originally through former Defendant Ed Nichols, Esq., and subsequently through Shirley Spira, Esq., an attorney in New York City. The investigation sought information on various issues related to Val Holms while acting as an Officer and Director of BRI. Certain information has been discovered through that investigation which the BRI Board of Directors is required to complete to avoid violation of certain SEC rules and regulations which could potentially impose significant liability against BRI, as well as the individual Directors. That, standing alone, is a very significant reason as to why the proposed settlement cannot be approved and why this litigation must move forward to completion.

In addition, the proposed settlement is based on information obtained by the derivative Plaintiff, Manuel Graiwer, through confidential settlement negotiations in this case which violates insider trading rules and regulations of the SEC, and again potentially imposes significant liability to the company if the settlement is approved. Moreover, tender offer violations associated with SEC rules and regulations have been violated as a result of the purported settlement agreement. Finally, the settlement agreement violates NRCP 23.1 in that this is a derivative action which is supposed to be brought on behalf of, and for the benefit of, minority shareholders, but only benefits Plaintiff Graiwer.

Defendant mentions all of the above so the Court gets a flavor of some of the issues that must be heard at the hearings on the outstanding Motions set for May 18 and 19, 2016. It is for these reasons that the Motion for Continuance should not be granted, or at a

7

IAUPIN, COX & LEGOY
ATTORNEYS AT LAW
P.O. BOX 30000
RENO, NEVADA 89520
(775) 827-2000

1  minimum, should at least be held in abeyance until the outstanding Motions have been heard

2  and determined.

3   C.   **It is More Costly to Continue This Matter Then to Proceed as Presently Scheduled**

4

5   Plaintiffs' Motion for Continuance should also be denied on the basis that costs and

6  fees have already been incurred by the company, BRI, as well as its insurance carrier, who

7  have been funding the defense of this matter for counsel to prepare for oral argument on the

8  outstanding motion.  Continuing the hearing on those Motions does nothing more than

9  require the same costs and fees again be incurred when oral argument is ultimately heard on

10 the outstanding Motions. Additionally, some of the out-of-state counsel who will be

11 appearing for the arguments next week have made non-refundable travel arrangements. See,

12 Declaration of Paul J. Anderson, Esq., attached hereto as Exhibit "1."  The same is true with

13 respect to Defendant Paul and some of the Director Defendants. Accordingly, the Motion for

14

15 Continuance should be denied or held in abeyance until after the hearing on the outstanding

16 Motions has occurred, rulings have been made and the Court and the litigants understand

17 what remains to be litigated in this case.

18

19                              **III.**

20                         **CONCLUSION**

21    Based on the foregoing, Defendant respectfully requests that this Court enter an order

22 setting the Motion for Continuance for oral argument along with all other outstanding

23 Motions on May 18 and 19, 2016, as the final Motion to be heard, and subsequently denying

24 that Motion because it does not set forth good cause as required by WDCR 13.

25

26  ///

## AFFIRMATION PURSUANT TO NRS 239B.030

1       The undersigned does hereby affirm that the preceding document does not contain the

2 social security number of any person.

3      DATED this _13th_ day of May, 2016.

4

5                   MAUPIN, COX & LeGOY

6

7                   By: _____

8                      Paul J. Anderson, Esq.

                       Procter J. Hug, IV, Esq.

9                      4785 Caughlin Parkway

                       Reno, Nevada 89519

10

11                  _Attorneys for Defendant Wesley Paul_

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## CERTIFICATE OF SERVICE BY MAIL

I hereby certify that I am an employee of Maupin, Cox and LeGoy, and in such capacity and on the date indicated below, I served the foregoing document as follows:

Via the E-Flex Electronic Filing System:

Matthew C. Addison, Esq.
McDonald, Carano, Wilson, LLP
100 W. Liberty Street, 10th Floor
Reno, NV 89501

Robert F. Greer, Esq.
Frank J. Gebhart, Esq.
Feltman, Gebhart, Greer
& Zeimantz, P.S.
421 W. Riverside Avenue, Ste. 1400
Spokane, WA 99201

Thomas C. Bradley, Esq.
Sinai, Schroeder, Mooney, Boetsch,
Bradley & Pace
448 Hill Street
Reno, NV 89501

Jack Gabriel Angaran, Esq.
Mary-Ann Lebrun, Esq.
Georgeson Angaran, Chtd.
5450 Longley Lane
Reno, NV 89511

John A. Aberasturi, Esq.
Erickson, Thorpe & Swainston, LTD.
99 West Arroyo Street
Reno, NV 89509

Douglas R. Brown, Esq.
Richard G. Verlander, Esq.
Lemons, Grundy & Eisenberg
6005 Plumas Street, Third Floor
Reno, NV 89519

Via placing an original or true copy thereof in a sealed envelope with sufficient postage affixed thereto, in the United States mail at Reno Nevada, addressed to:

Joseph C. Pierzchala, Esq.
Welborn, Sullivan, Meck & Tooley, P.C.
1125 17th Street, Suite 2200
Denver, CO 80202

Dated this 13th day of April, 2016.

_____
EMPLOYEE

## INDEX OF EXHIBITS

NO.    DESCRIPTION                                                PAGES

1.     Declaration of Paul J. Anderson, Esq.                        1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

MAUPIN, COX & LEGOY
ATTORNEYS AT LAW
P.O. BOX 30000
RENO, NEVADA 89520
(775) 827-2000

11

F I L E D
Electronically
CV14-00544
2016-05-13 03:26:02 PM
Jacqueline Bryant
Clerk of the Court
Transaction # 5515379 : csulezic

# EXHIBIT 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# EXHIBIT 1

AUPIN, COX & LEGOY
ATTORNEYS AT LAW
P.O. BOX 30000
RENO, NEVADA 89520
(775) 827-2000

## DECLARATION OF PAUL J. ANDERSON, ESQ.

Paul J. Anderson, Esq. declares as follows:

1. I am an attorney license to practice law before all courts in the State of Nevada, including the Second Judicial District Court.

2. I am counsel for Defendant, Wesley J. Paul, Esq., in Case No. CV14-00544, presently pending in Department B7 of the Second Judicial District Court.

3. The assertions that I make in this Declaration are based on my own personal knowledge, except for those matters set forth herein upon information and belief, as to which matters, I believe to them to be true.

4. I have had conversations with Rob Greer, Esq., one of the attorneys for the Director Defendants, who informs me that he has made non-refundable travel arrangements from Spokane, Washington to Reno, Nevada for purposes of the hearing on the outstanding Motions which are set for May 18 and May 19, 2016. I have also been informed by my client that other Defendants have made similar arrangements.

Dated this 13ᵗʰ day of May, 2016.

_____
Paul J. Anderson, Esq.

MAUPIN, COX & LEGOY
ATTORNEYS AT LAW
P.O. BOX 30000
RENO, NEVADA 89520
(775) 827-2000