# Exhibit D

Val Holm's motion dated May 17, 2016 to enjoin the use of Eagle Transaction's credit facility filed with Judge Flanagan in Department 7 of the Second Judicial Court of the State of Nevada, County of Washoe in Holms v. Bakken, Case No. CV-16-01086

F I L E D
Electronically
CV16-01086
2016-05-17 04:31:56 PM
Jacqueline Bryant
Clerk of the Court
Transaction # 5519637 : yviloria

**1670**
Douglas R. Brown, Esq., NSB #7620
Caryn S. Tijsseling, Esq., NSB #6521
Lemons, Grundy & Eisenberg
6005 Plumas Street, Third Floor
Reno, Nevada 89519
(775) 786-6868
Attorneys for Defendant, VAL HOLMS

IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

IN AND FOR THE COUNTY OF WASHOE

| | |
|---|---|
| VAL HOLMS, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>BAKKEN RESOURCES, INC., a Nevada corporation, DAN ANDERSON, an individual, KAREN MIDTLYNG, an individual, HERMAN R. LANDEIS, an individual, BILL M. BABER, an individual, SOLANGE CHARAS, an individual, DOUGLAS L. WILLIAMS,<br><br>Defendants. | Case No. CV16-01086<br><br>Dept. No. B9 |

**PLAINTIFF VAL HOLMS'S EX PARTE MOTION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND REQUEST FOR HEARING ON PRELIMINARY INJUNCTION**

Plaintiff VAL HOLMS hereby moves this Court, *ex parte*, for a Temporary Restraining Order against Defendants Bakken Resources, Inc. ("BRI"), Dan Anderson, Karen Midtlyng, Herman R. Landeis, Bill M. Baber, Solange Charas, and Douglas L. Williams (collectively Defendants"). This Motion is supported by the herein Memorandum of Points and Authorities, the Verified Complaint, and any other matters this Court may wish to consider.

MEMORANDUM OF POINTS AND AUTHORITIES

I. INTRODUCTION

On March 13, 2014, BRI shareholders, Manuel Graiwer and T.J. Jesky filed a shareholder derivative action against Holms and other current and former BRI directors, some of whom are named as defendants in this action, and BRI's corporate counsel. That lawsuit is

1

currently pending before the Second Judicial District Court in and for the County of Washoe, Nevada, Civil Case No. CV14 00544, Dept. No. B7, styled *Manuel Graiwer et al. v. Val Holms, et al.* (the "Derivative Action").

Between November 2015 and February 2016, the Derivative Plaintiffs and Holms met three times, twice through formal mediation before retired federal judge William F. Downes, to settle the Derivative Action. On February 17, 2016, Derivative Plaintiffs and Holms reached a settlement to resolve the Derivative Action (the "Derivative Settlement Agreement") to Judge Patrick Flanagan for his approval pursuant to NRCP 23.1. A motion to confirm settlement was filed in Case No. CV14-00544 pursuant to NRCP 23.1 on May 9, 2016.

BRI and the BRI Board of Directors resisted all of Holms's efforts to settle and have taken a series of actions to prevent and ultimately thwart any settlement between Derivative Plaintiffs and Holms. Most recently, with full knowledge that the settlement included a sale of all of Holms's stock to Derivative Plaintiff Graiwer, Defendants entered into a credit loan agreement with Eagle Private Equity ("Eagle") that would, upon the sale of Holms's stock to Graiwer under the Derivative Settlement Agreement (or any other sale that results in a change of control), dilute the Holms stock from 47% to 21% of BRI's outstanding shares, emasculate the voting power of what would otherwise have been a controlling interest in BRI, and create an unreasonable restraint on the alienation of Holms's stock. The stock dilution poison pill in the Eagle credit agreement will only take effect, however, if BRI draws on the line of credit. Upon information and belief, the company has not yet done so.

If BRI and the Board of Directors draw on the line of credit, they will cause immediate and irreparable harm to Holms by having undermined a good faith settlement of the Derivative Action, wrongfully reduced the voting power of Holms's stock, and wrongfully created a restriction on the alienability of Holms's stock. Because of this imminent and irreparable harm, Holms respectfully requests that the Court enter a temporary restraining order preventing BRI and the Board of Directors from drawing on the Eagle line of credit.

## II. FACTUAL BACKGROUND

Val Holms is the former president and CEO of BRI, current Chairman of the BRI Board,

2

1  and the single largest BRI shareholder with approximately 47% of the outstanding stock.
2  (Complaint, ¶ 13). In 2010, through his limited liability company, Holms Energy, LLC ("HELLC"),
3  Holms contributed to BRI his interest in approximately 1,649 net mineral acres located in the
4  heart of the Bakken oil field in McKenzie County, North Dakota in exchange for a controlling
5  share of BRI stock (approximately 40 million shares). (*Id.* ¶ 13). The mineral conveyance was
6  done as part of a reverse merger transaction and a November 26, 2010 Asset Purchase
7  Agreement (the "2010 APA") between Multisys Language Systems, Inc. (*n/k/a* BRI) and HELLC.
8  (*Id.* ¶ 13).  The minerals are BRI's main income generating asset on which the company
9  receives oil and gas royalty payments. (*Id.* ¶ 13).  Upon information and belief, the company
10 does not receive income from any other source.  (*Id.* ¶ 13).  In sum, without the Holms
11 minerals, BRI would not exist.  (*Id.* ¶ 13).

12    The Derivative Complaint alleged two principal causes of action against Holms: (1) that
13 he caused BRI to adopt an interpretation and pay unto HELLC higher overriding royalty than
14 what was provided for in the 2010 APA; and (2) that Holms conspired with Derivative
15 Defendant Wesley J. Paul, corporate counsel for BRI, to not tender the defense of certain
16 lawsuits to BRI's insurance carrier to the financial benefit of Mr. Paul. (*Id.* ¶ 12).  The
17 Derivative Complaint also included claims against the then board of directors, Derivative
18 Defendants Midtlyng, Landeis, Baber, and Deffinbaugh for breach of fiduciary duty, negligence
19 in carrying out their fiduciary duties, and acts that resulted in corporate waste. (*Id.* ¶ 12). In
20 fall 2015, Derivative Plaintiffs moved to amend their Complaint and added allegations directed
21 primarily at Holms including allegations concerning a purchase of the so-called Duck Lake
22 minerals. (*Id.* ¶ 12).

23    On November 10-11, 2015, Manuel Graiwer, on behalf of Derivative Plaintiffs, and
24 Holms participated in a two-day mediation in Denver, Colorado before retired federal Judge
25 William F. Downes. (*Id.* ¶ 14).  That mediation resulted in a preliminary settlement that was
26 subject to BRI Board approval as it contemplated a tender offer to all shareholders other than
27 Holms and the Derivative Defendant directors. (*Id.* ¶ 14).  BRI rejected the settlement, and on
28 December 10, 2015, filed an action in the First Judicial District Court, Lewis & Clark County,

LEMONS, GRUNDY
& EISENBERG
6005 PLUMAS ST.
SUITE 300
RENO, NV 89519
(775) 786-6868

3

—

State of Montana, complaining that Holms was without authority to negotiate a settlement that would resolve the lawsuit for all parties involved, that the "proposed settlement would result in Holms controlling the vast majority of the issued and outstanding shares of BRI, thereby providing him with the ability to replace the Board of Directors and terminate the ongoing [Spira] investigation," and seeking to enjoin Holms from, *inter alia*, "voting his [BRI] shares in any manner with [Plaintiff] Graiwer or any other BRI shareholder that replaces the majority of the members of the Board who are currently charged with overseeing the [Spira] investigation of Holms." (*Id.* at ¶ 14, Ex. 1). BRI further alleged that the Spira investigation concerns the disputed Duck Lake mineral purchase, alleged breach of Holms's employment agreement, and the adequacy of BRI's financial reporting. (*Id.* at ¶ 14).

On January 28, 2016, all parties in the Derivative Action participated in a second mediation before Judge Downes in Reno, Nevada. (*Id.* ¶ 15). While the parties did not reach settlement in Reno, all parties continued settlement discussions with the assistance of Judge Downes, as necessary. (*Id.* ¶ 15).

On or about February 9, 2016, in anticipation that Graiwer and Holms may reach a settlement and to prevent a shareholder vote or settlement that would cause the replacement of the majority of the BRI Board, Defendants attempted to amend the BRI Bylaws (1) by adding language to Art. III, § 3.2 that approved staggering of the BRI Board so that only a limited number of board members could be removed by shareholder vote in a given year and (2) by removing the shareholders right to "adopt, amend, or appeal" any bylaws adopted, amended, or repealed by the BRI Board as provided in Article IX. (*Id.* at ¶16, Ex. 2). Significantly, Defendants sought to conceal the Article IX amendment by only disclosing the Article III changes in its February 9, 2016 Form 8-K, signed by Defendant Anderson and filed with the SEC. (*Id.* at ¶ 16, Ex. 2).

On February 17, 2016, Graiwer, on behalf of the Derivative Plaintiffs, and Holms met in Denver, Colorado to discuss settlement as between them only in order to avoid any issues with needing BRI approval as encountered in the first settlement attempt. (*Id.* at ¶ 17). Graiwer and Holms reached a settlement that resolved all claims between them and also

LEMONS, GRUNDY & EISENBERG
6005 PLUMAS ST. SUITE 300
RENO, NV 89519
(775) 786-6868

resolved the concerns of BRI and the Spira investigation. (*Id.* at ¶ 17). For purposes of this Motion, the central settlement term at issue provides that Holms agreed to sell all of his shares in BRI to Derivative Plaintiff Graiwer at a price of $0.16/share, a price which reflected Holms's shares being 47% of BRI's outstanding stock. (*Id.* at ¶ 17).

On February 29, 2016, Holms informed the Court in a brief that Derivative Plaintiffs and Holms had reached a settlement and attached a letter from Derivative Plaintiffs' counsel confirming the settlement and summarizing the general terms. (*Id.* at ¶ 18). Holms and Derivative Plaintiffs further informed the Court that additional time was needed to finalize the stock sale documents. Derivative Defendants were served with Holms's brief that same day and received an email from Derivative Plaintiffs' counsel notifying them of the settlement and the general terms. (*Id.* ¶ 18).

On May 9, 2016, after finalizing all stock sale documents, Holms filed with the Court the executed settlement agreement between Derivative Plaintiffs and Holms (the "Derivative Settlement Agreement") for Court approval pursuant to NRCP 23.1. (*Id.* ¶ 18).

During the period between Holms's February 29, 2016 notice of settlement to the Court and Holms's May 9, 2016 filing of the Derivative Settlement Agreement for Court approval, Defendants engaged in additional intentional acts to thwart the settlement by impairing the sale of Holms's stock to Graiwer. (*Id.* ¶ 19). Of significance is that there is little or no market for Holms's BRI stock. (*Id.* ¶ 25). BRI shares are not traded through an electronic system and over the last three months, BRI trading has average 15,000 shares per day. (*Id.* ¶ 25). At that rate, it would take Holms nearly five (5) years to sell all of his stock. (*Id.* ¶ 25).

On May 9, 2016, BRI issued a press release attached to a Form 8-K/A filed with the SEC which announced that BRI had entered into a "term sheet on May 3, 2016" with Eagle for debt and equity financing for a one million dollar line of credit that will purportedly "be intended for the acquisition of mineral assets." (*Id.* at ¶ 20, Ex. 5). The press release further states that the "[l]oans made to the Company based on the initial $1 million credit line may be converted into a newly-created class of the Company's preferred stock." (*Id.*). BRI did not

LEMONS, GRUNDY
& EISENBERG
6005 PLUMAS ST.
SUITE 300
RENO, NV 89519
(775) 786-6868

disclose the term sheet with the Form 8-K. (*Id.* ¶ 20).

On May 10, 2016, BRI filed another Form 8-K, signed by Defendant Anderson, which provided that BRI had now executed a loan agreement ("Eagle Credit Agreement") with general terms including: (1) that the company paid a 5% fee[1] ($50,000) for the right to draw on the $1 million credit facility (the "Facility"); (2) that Eagle has the right to force "the Company [to borrow] up to the balance of the Facility" if the company has not drawn on the Facility; and (3) in the event there is a "change[] in control of the Company, loans under the Facility are convertible into shares of a newly-designated class of the Company's Series A Preferred stock," with each preferred share being convertible into 100 shares of common stock at Eagle's option. (*Id.* at ¶ 21). Even if Eagle chose not to convert the preferred shares to common stock, each share of preferred stock votes on an as-converted basis, meaning Eagles has 100 votes per preferred share. (*Id.*) A copy of the loan agreement was not disclosed with the Form 8-K. (*Id.*)

The Eagle Credit Agreement is unconventional, at best, and intended to thwart the Derivative Settlement Agreement by diluting the value and voting power of Holms's ownership of 47% of outstanding BRI stock to prevent anyone from acquiring his shares to obtain a controlling interest in BRI that would allow for replacement of the current Board of Directors. (*Id.* ¶ 22). In their desperate attempt to prevent Holms's from selling his interest in BRI and extricating himself from the Derivative Action, the Board of Directors effectively sold control of BRI to Eagle for a million dollars – far less value than Holms contributed to BRI. (*Id.* ¶ 22).

BRI's corporate counsel admitted the same in the Derivative Action in his objection to the Settlement Agreement because

> [u]nder the terms [of the Eagle Facility] agreed to[,] if there is a change of control in the company (BRI), Eagle Private Equity has the right to convert its outstanding loans into shares of Series A preferred stock in BRI. Each share of Series A preferred stock has the voting

---

[1]  A typical fee from a legitimate lender is less than 1%.

LEMONS, GRUNDY
& EISENBERG
6005 PLUMAS ST.
SUITE 300
RENO, NV 89519
(775) 786-6868

6

rights of 100 shares of BRI common stock. As a result, Val Holms shares, on a fully diluted basis, would amount to twenty-one percent (21%) ownership in BRI, which is not controlling or a majority.

(Id. at ¶ 23, and Exhibit 7 thereto).

There is no legitimate business purpose to agree to the Credit Agreement stock conversion terms. (Id. ¶ 24). A line of credit is typically secured by assets, not an option to convert a loan balance to "newly created" preferred shares. BRI could have secured the $1 million loan with its North Dakota minerals or the royalty thereon that Holms himself contributed to the company. Yet, Defendants chose to secure the Facility with a "poison pill" designed solely to dilute the value and voting power of Holms's 47% of BRI stock and thwart the Derivative Settlement Agreement. (Id. ¶ 24). Even more, it effectively restricts Holms's ability to sell his stock to anyone who may own 3% or more of BRI stock. (Id. ¶ 24). Indeed, a 47% stake in a company provides significant degree of control of the company. (Id. ¶ 24).

Upon information and belief, Defendants have not yet drawn on the Facility and therefore the preferred shares poison pill has not yet occurred. (Id. ¶ 27). Should Defendants draw on the Facility, however, they will cause immediate and irreparable harm to Holms. (Id. ¶ 27). Accordingly, Holms respectfully requests that the Court issue a temporary restraining order enjoining Defendants from drawing on the Facility.

Counsel for Holms has not provided notice of the Verified Complaint and this Motion to Defendants or their counsel because Counsel believes that, based on Defendants' demonstrated bad faith conduct in the Derivative Action to thwart Holms's efforts to settle the lawsuit, notice will cause the Defendants to draw on the Eagle Facility thereby causing actual irreparable harm to Holms.

### III. LEGAL ARGUMENT

This Court is aware of the factors for evaluating a request for temporary restraining order or preliminary injunction. *See* NRCP 65; NRS 33.010. Pursuant to NRS 33.010, an injunction may be granted in the following cases:

1. When it shall appear by the complaint that the plaintiff is entitled to the relief demanded, and such relief or any part thereof consists in

7

restraining the commission or continuance of the act complained of, either for a limited period or perpetually.

2. When it shall appear by the complaint or affidavit that the commission or continuance of some act, during the litigation, would produce great or irreparable injury to the plaintiff.

3. When it shall appear, during the litigation, that the defendant is doing or threatens, or is about to do, or is procuring or suffering to be done, some act in violation of the plaintiff's rights respecting the subject of the action, and tending to render the judgment ineffectual.

NRS 33.010. Additionally, injunctive relief is appropriate to preserve the status quo when (1) the plaintiff enjoys a reasonable probability of success on the merits of its claims and (2) defendant's conduct, if allowed to continue, would result in irreparable harm, for which compensatory damages are an inadequate remedy. *See Number One Rent-A-Car v. Ramada Inns*, 94 Nev. 779, 780-81, 587 P.2d 1329, 1330 (1978).

This Court may grant a temporary restraining order *ex parte* if:

(1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and

(2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required.

Here, the Verified Complaint sets forth the facts demonstrating that absent the issuance of a temporary restraining order, Holms will suffer immediate and irreparable harm because the Defendants will draw on the Eagle Facility to intentionally thwart the Derivative Settlement Agreement, to deprive Holms of his shareholder voting rights and power, and to create an unreasonable restriction on the alienation of Holms's BRI shares. *See Louisiana Mun. Police Employees' Ret. Sys. v. Cont'l Res., Inc.*, 886 F. Supp. 2d 1255, 1267 (W.D. Okla. 2012) ("Irreparable harm *may* be established where corporate management denies shareholders the right to 'vote their shares and to exercise their rightful control over the corporation."); *International Banknote Co., Inc. v. Muller*, 713 F.Supp. 612, 623 (S.D.N.Y.1989) ("Courts have consistently found that corporate management subjects shareholders to

LEMONS, GRUNDY
& EISENBERG
6005 PLUMAS ST.
SUITE 300
RENO, NV 89519
(775) 786-6868

irreparable harm by denying them the right to vote their shares or unnecessarily frustrating them in their attempt to obtain representation on the board of directors."); *Aprahamian v. HBO & Co.,* Del.Ch., 531 A.2d 1204, 1208 (1987) (Irreparable harm can be assumed where the postponement of a shareholders' meeting potentially defeats the will of the majority of shareholders); *Blasius Industries, Inc. v. Atlas Corp.,* Del.Ch., 564 A.2d 651, 659 (1988) ("The shareholder franchise is the ideological underpinning upon which the legitimacy of directorial power rests."); *See also Danaher Corporation v. Chicago Pneumatic Tool Co.,* No. 86 Civ. 3499 (PNL) slip op., 1986 WL 7001 (S.D.N.Y. June 16, 1986); *Treco, Inc. v. Land of Lincoln Sav. and Loan,* 572 F. Supp. 1447, 1450 (N.D.IL 1983); *Minstar Acquiring Corp. v. AMF Inc.,* 621 F.Supp. 1252 (S.D.N.Y.1985) (plaintiff will suffer irreparable harm if its tender offer is defeated due to illegal defensive tactics); *Bank of New York Company, Inc. v. Irving Bank Corporation,* 139 Misc.2d 665, 528 N.Y.S.2d 482, 484 (Sup.Ct.1988) (irreparable harm if corporate electoral process is tainted).

Holms has a reasonable probability of success on the merits of the Verified Complaint for breach of fiduciary duty and tortious interference with contract. First, the Defendant Board of Directors breached their fiduciary duties because the Bylaw amendments and the Eagle Credit Agreement are contrary to the best interest of Holms as a shareholder and are designed improperly to protect and enrich the Board by depriving Holms as the single largest shareholder of his voting rights and powers to, *inter alia*, approve director amendments to the Bylaws and to replace Board members. *In re Amerco Derivative Litig.*, 127 Nev. Adv. Op. 17, 252 P.3d 681, 700-01 (2011) ("[T]he duty of loyalty requires the board and its directors to maintain, in good faith, the corporation's and its shareholders' best interests over anyone else's interests."). Second, Defendants had knowledge of the Derivative Settlement Agreement and the sale of Holms's shares to Graiwer when they entered into the Eagle Credit Agreement. *J.J. Indus., LLC v. Bennett*, 119 Nev. 269, 274, 71 P.3d 1264, 1267 (2003) (intentional interference with contract exists when a defendant has knowledge of a valid and existing contract and whose acts are intended or designed to disrupt the contractual relationship resulting in actual disruption of the contract and damages). Should Defendants

LEMONS, GRUNDY
& EISENBERG
6005 PLUMAS ST.
SUITE 300
RENO, NV 89519
(775) 786-6868

draw on the Facility, they will have caused damage to Holms as provided herein including, but not limited to, interference, frustration, and disruption of the Derivative Settlement Agreement.

Maintaining the status quo during the pendency of the litigation protects Holms and the other BRI shareholders from having their stock substantially diluted in voting power and value and allows Judge Flanagan the opportunity to consider whether to approve the Derivative Settlement Agreement. Maintaining the status quo will not cause injury to Defendants because the company does not have an immediate need for a $1 million loan from Eagle, the Derivative Settlement Agreement must first be considered and approved by the Court, and if approved, Derivative Plaintiffs have offered to dismiss their claims against the remaining Derivative Defendants with prejudice.

Preliminary injunctive relief is necessary because Holms has demonstrated the immediate and irreparable harm posed by the Eagle Credit Agreement if Defendants draw on the line of credit, the reasonable probability that Holms will succeed on the merits of his claims for breach of fiduciary duty and tortious interference with contract, the protection that maintenance of the status quo provides to the public, and the absence of the harm to Defendants is the status quo is maintained. The Verified Complaint also sets for the facts demonstrating that temporary relief is justified.

The Verified Complaint sets forth that the harm in this case would take place before the Court has an opportunity to hear from Defendants. Unless otherwise ordered by the Court, given Defendants prior conduct, there is a high likelihood that Defendants will immediately draw on the Facility to prevent Judge Flanagan from approving the Derivative Settlement Agreement on the terms as agreed to by the parties therein. Holms simply asks the Court to prevent Defendants from drawing on the Facility and maintain the status quo until such time that a judicial determination can be made.

### IV. CONCLUSION

Because there is a high likelihood that Defendants will immediately draw on the Eagle Facility to thwart the Derivative Settlement Agreement before Judge Flanagan has an

LEMONS, GRUNDY
& EISENBERG
6005 PLUMAS ST.
SUITE 300
RENO, NV 89519
(775) 786-6868

10

opportunity to consider it, Holms has demonstrated that he will be immediately and irreparably harmed unless the Court enters a temporary restraining order without notice to Defendants. Accordingly, Holms respectfully requests that the Court enter a temporary restraining order prohibiting Defendants from drawing on the Eagle Facility until such time as the Court can fully consider the merits of the argument that such action will constitute a breach of Defendants fiduciary duties and intentional interference with contract.

**The undersigned does hereby affirm that the preceding document does not contain the social security number of any person.**

Dated: May 17, 2016.

Lemons, Grundy & Eisenberg
6005 Plumas Street, Suite 300
Reno, Nevada 89519

By: _____
Douglas R. Brown, Esq.
Attorneys for Defendant, VAL HOLMS