# Exhibit O

Transcript of a December 12, 2016 hearing in the matter Bakken Resources, Inc. v. Holms, CDV-2016-612 pending in the Montana First Judicial District Court, Lewis & Clark County

1          MONTANA FIRST JUDICIAL DISTRICT

2             COUNTY OF LEWIS AND CLARK

3            *  *  *  *  *  *  *  *  *  *

4

5  BAKKEN RESOURCES, INC.,      )
                                )
6                               )
            PLAINTIFF,          )
7                               )
            VS.                 )   CAUSE NO. DDV 2016-612
8                               )
   VAL M. HOLMS, et al.,        )
9                               )
            DEFENDANTS.         )
10 _____     )

11

12

13             TRANSCRIPT OF PROCEEDINGS

14

15   Before the Honorable James Reynolds, Judge Presiding

16

17      Date and time:    Monday, December 12, 2016
                          10:20 a.m.
18

19      Place:            Lewis & Clark County Courthouse
                          228 Broadway
20                        Helena, MT 59601

21

22

              YVETTE M. HEINZE, CSR, RPR
23       Official Reporter, First Judicial District
              228 Broadway, Second Floor
24              Helena, MT 59601
                (406) 447-8238
25

<pre>
 1                        APPEARANCES

 2

     For the Plaintiff:
 3
             OLIVER H. GOE
 4           BROWNING, KALECZYC, BERRY, & HOVEN, P.C.
             800 N. Last Chance Gulch, #101
 5           Helena, MT 59601

 6

 7
     For the Defendant:
 8
             JOHN C. DOUBEK
 9           DOUBEK, PYFER & FOX, LLP
             307 N. Jackson Street
10           Helena, MT 59602

11

12
     For Third-Party Defendant:
13
             Jordan York Crosby
14           P.O. Box 1746
             Great Falls, MT 59403
15

16

17   Also present:

18           WESLEY PAUL
             ALLAN HOLMS
19

20

21

22

23

24

25
</pre>

1   December 12th, 2016, Monday

2

3              THE COURT:  Please be seated.

4              MR. DOUBEK:  Your Honor, I just put that out

5   there.  That's our position today.

6              (Handing judge paperwork.)

7              THE COURT:  All right.

8              MR. DOUBEK:  It won't change tomorrow, but

9   it's our position today.

10             THE COURT:  It's not going to?  Okay.

11             So I'm a little confused over where we are

12  today to tell you the truth.  I also received a

13  memorandum for Bakken Resources.

14             MR. DOUBEK:  And we received that.

15             THE COURT:  Is there a difference between

16  the two positions?

17             MR. DOUBEK:  There is, and that's why we're

18  here, Judge.

19             THE COURT:  Okay.  I guess I need to have

20  somebody tell me what that is.

21             MR. DOUBEK:  Your Honor, I would like to

22  give a little bit of an overview, and then I have two

23  witnesses I would like to call.  I don't think either

24  one of them will be too terribly long.  But this is

25  the time and place for a hearing pursuant to the

1    Court's TRO issued on October 19th.

2         And so what we -- we do indeed have

3    competing interests.  I know that the other side's

4    position is, well, just put everything on hold and

5    let the Nevada court address everything.  And I have

6    a little opening statement about that if I might.

7         THE COURT:  Okay.

8         MR. DOUBEK:  Your Honor, the only action

9    commenced by Bakken Inc. -- and, for that matter, by

10   Allan Holms -- was this action before this Court.

11   Bakken is domiciled here in Helena.  Its officers

12   work and reside here.  It filed this action here and

13   has asserted that this Court, not some other Court,

14   has jurisdiction over all of the matters.  It chose

15   to file this action.

16        And, now, Bakken wants to keep the two TROs

17   in place until the Court in Nevada has a trial over

18   some issues, not all the same issues, next spring.

19        The Bakken company says it's a matter of

20   principle of comity.  Then, if that's true, why did

21   they file this lawsuit?  Because the origin of the

22   lawsuit in Nevada was a derivative action brought by

23   a shareholder and somehow Bakken got brought in

24   third-party-wise.  But it didn't initiate the lawsuit

25   in Nevada.

1          Your Honor, years ago, my partner Floyd

2    Small told me when he was talking about his view on

3    corporations is that the only problem with

4    corporations is that over time they seem to develop

5    the attitude that they exist for the benefit of those

6    running the corporation, not for the benefit of those

7    who own the corporation, the shareholders.

8          In this case, you have a public company that

9    stopped providing quarterly or yearly reports to its

10   shareholders.  It failed to have a shareholder

11   meeting for over two years.  It has spent over

12   $1.7 million over the past couple of years on

13   attorney's fees, mostly going to in-house corporate

14   counsel, or corporate counsel Wes Paul.

15         Then Mr. Paul got a fellow that he been in

16   businesses with on other ventures, none of which have

17   ever succeeded, named Carl George.  He got him

18   involved, and they created Eagle Equity and sold

19   Bakken a bill of goods, which would prevent others

20   from doing anything that might upset their little

21   apple cart or their nest egg, as it has turned out.

22         And when the shareholders, like Allan Holms,

23   stepped up to take control of the company on behalf

24   of the shareholders, Eagle Equity suddenly became a

25   major, or a majority shareholder.

1          Carl George, who has had many lawsuits and

2     judgments filed against him -- we appended those to

3     our papers in support of the TRO -- is evidently,

4     according to Bakken, now in control.  He and Wes

5     Paul, though, have done business before, and now they

6     have concocted a way to prevent shareholders from

7     asserting any kind of control over the situation by

8     giving 51 percent of the company to Eagle Equity in

9     return for $600,000, which is a terrible deal,

10    considering it has $4 million in the bank.

11          And considering at the last hearing, Dan

12    Anderson, who is the president of the company,

13    admitted that Eagle was under no further obligation

14    to advance any more funds to the company and had the

15    power to liquidate the company and walk away with

16    51 percent of the company for the $600,000 that it

17    paid to the company.

18          Interesting also in the papers that have

19    been filed before the Court, the company hasn't

20    received the $600,000.  The $600,000, all we know,

21    according to the affidavit of Wes Paul, is sitting in

22    his IOLTA account.

23          Now, as Bakken has truly become the fatted

24    calf of Eagle Equity and Wes Paul, it is thus our

25    request that the Court grant the preliminary

1    injunction -- the TRO to become a preliminary

2    injunction, holding that Eagle Equity transaction as

3    a sham, set up as a means of thwarting any exercise

4    of any shareholder rights; that the Holms' effort to

5    take shareholder control did not violate any proxy

6    solicitation rules; and that the actions by Mr. Holms

7    and the two other fellows who were accountants who

8    came in to try to right the company and replace the

9    board of directors should be affirmed.

10         Alternatively, and I say this somewhat

11   reluctantly, because from the testimony that we'll

12   present today it will be clear that Allan Holms

13   didn't violate any proxy solicitation rules, and what

14   he did on July 20th, 2016, was perfectly right and

15   proper under Nevada law and, for that matter, Montana

16   law.

17         But, in any event, if the Court were to

18   order a shareholder meeting without the equity

19   involvement -- because it's a sham -- send out notice

20   and proxies, hold the shareholder meeting within

21   30 days, and report the results within 10 days

22   thereafter, and perhaps appoint a master to oversee

23   the shareholder meeting and report back the results

24   of the Court, that would be our alternative request

25   in this case.

1          I have two witnesses I would like to

2     present.  And, as I indicated, they won't be very

3     lengthy.

4          THE COURT:  I am a little unclear.  I guess

5     it's Monday morning so my mind isn't yet fully up to

6     speed.  But as I read the memo submitted on behalf of

7     Bakken Resources, they ask that the TROs granted at

8     the request of the defendants be maintained.  And

9     that's --

10          MR. DOUBEK:  They want everything

11     maintained.

12          THE COURT:  Right.

13          MR. DOUBEK:  And then just go with whatever

14     Nevada says.

15          THE COURT:  But you folks are the ones who

16     asked for those TROs, though.

17          MR. DOUBEK:  We asked for the one in

18     October, yes, sir.

19          THE COURT:  Okay.  So, now, are you telling

20     me I should modify that?

21          MR. DOUBEK:  I think the next step is to

22     go -- assuming they are not able to rebut the TRO,

23     that the Court go to the next step, and that is let's

24     move this case along and order a shareholder meeting.

25          THE COURT:  Okay.

1        MR. DOUBEK:  Set aside the Eagle Equity

2   transaction, because that is just garbage.  That's

3   just absolutely garbage.  It's a sham transaction.

4        And if for whatever reason the Court doesn't

5   want to recognize that Allan Holms acted properly on

6   July 20th, when he came in and asserted about

7   80 percent of the shareholder vote to have a

8   shareholder meeting and replace the board, then fine.

9   Let's have a -- let's start the shareholder

10  process -- the shareholding meeting process anew,

11  have a shareholder meeting, and report the results of

12  that back to this Court.

13       THE COURT:  But don't I have to have some

14  sort of factual determination, something along the

15  line somewhere that says -- you are saying it's

16  clearly a sham.  They are going to get up and say it

17  isn't.  Right?

18       MR. DOUBEK:  Well, and they can.  And we're

19  going to offer some testimony today about that.

20       THE COURT:  But isn't that more of a

21  long-term factual determination than something I can

22  make on short-term order to show cause?

23       MR. DOUBEK:  I think, your Honor, it's so

24  clear that the Court can see through it and see what

25  it is and order that it's a sham transaction.

1          THE COURT:  Okay.  And is the proceeding in

2    Nevada -- again, I apologize for not having this all

3    in my head yet, but is that -- will that determine

4    whether Eagle Equity was a --

5          MR. DOUBEK:  Not really.

6          THE COURT:  No?

7          MR. DOUBEK:  Because they weren't even a --

8    now, they say, "Oh, yeah.  Well, that's going to be

9    an issue before the Court."  That action started with

10   a shareholder action against the company and Val

11   Holms, one of the -- the majority shareholder at that

12   time.

13         At about that same time, the Eagle

14   transaction was put together as a means clearly to

15   thwart the settlement that was about to be achieved

16   between that plaintiff and Mr. Holms.  And it was

17   also set up to prevent any shareholders from coming

18   forward and asserting their rights.  So that now you

19   had Eagle Equity for 600,000, which maybe it's been

20   paid; maybe it hasn't been paid.  We don't know.  But

21   for $600,000, they now have 51 percent of a company

22   that Mr. Anderson testified to was worth at least $7

23   million.  That doesn't make any sense.

24         And what we submitted in our TRO papers was

25   an outline of all of these judgments and lawsuits

1    that Mr. Carl has been -- nothing in there has

2    anything to do with oil and gas.  This guy is just a

3    huckster.  You know, he owes his wife $400,000 in the

4    divorce.  He owes her lawyers.  He owes this.  He

5    owes that.  He's been run out of all kinds of

6    transactions that he's gotten his fingers into.  But

7    he and Mr. Paul have been in business before on other

8    things that never succeeded, but have been in

9    business in other things.

10          So this transaction has been set up for no

11   other purpose but to prevent shareholders from

12   stepping forward and taking their company back after

13   two years of silence by the folks running the

14   company.  No quarterlies.  No yearlies.  No

15   shareholders meetings.  They have been kept in the

16   dark, although they kind of know what's been going

17   on, and they are tired of seeing others pillage, you

18   know, the Bakken as an entity.

19          THE COURT:  All right.  Mr. Goe, did you

20   agree with everything he said?

21          MR. GOE:  I agree with probably nothing he

22   said --

23          MR. DOUBEK:  Oh, come on.

24          MR. GOE:  -- other than perhaps, "Good

25   morning."  And I think the Court has already hit the

1   nail on the head here.  They filed for a TRO with

2   specific language.  While we think there's reasons

3   not to continue the TRO, we are willing to let it

4   continue as it is and as it was previously entered by

5   this Court.

6        And what it specifically says is that things

7   are going to remain the same, pending judicial

8   determination of various issues regarding both the

9   proxy, but more importantly, the Eagle Equity

10  transaction.

11       That's all that was contained in their

12  application.  That's all that was contained in the

13  memorandum that they filed in support of the TRO.

14       They now come before this Court, and you

15  will see it in the pleading that I received from

16  Mr. Doubek just right before this hearing, which is

17  called their position statement, wants totally

18  different relief than what this hearing is here and

19  was scheduled for, which is whether or not the TRO

20  that was previously obtained should remain in effect,

21  along with the TRO that we previously maintain.

22  We're okay with that.  That seems to be the proper

23  way to proceed.

24       They now want to introduce testimony and

25  evidence regarding issues that are not even before

1    the Court right now.  The only issue has to do with

2    whether or not this TRO should remain in effect, I

3    assume, as a preliminary injunction, which is

4    something that we are willing to do.

5            What's really troubling about this is that

6    they are trying to shift this from whether or not the

7    TRO should issue pending these various judicial

8    determinations, and then change today's hearing to

9    something totally different, which is a hearing on

10   the propriety of the Eagle Equity transaction itself.

11   We are not prepared to deal with that today, and

12   that's not an issue that's properly before the Court,

13   if we are, in fact, willing to enter into a TRO which

14   allows for a later judicial determination regarding

15   that provision or that transaction.

16           What's really odd, though, is this bizarre

17   idea that Bakken Resources started this litigation.

18   It is false, and I'll tell you why.  In Nevada, there

19   has been a derivative action going on since about

20   2014, that has many of the issues that Mr. Doubek

21   previously referenced.

22           And if I may, I don't know if the Court even

23   had an opportunity to look at it, we filed a motion

24   for stay also and was done previously, which kind of

25   -- and I don't know if the Court has had an

1  opportunity to review it.

2         THE COURT:  I haven't.

3         MR. GOE:  But what it provides to the Court

4  is a summary of the proceedings before Nevada and why

5  Nevada court has primacy in this particular matter.

6         Looking away, to begin with, it's a Nevada

7  corporation.  It's governed by Nevada law, which is

8  different than Montana's, et cetera, et cetera.  But

9  the fact of the matter is after the Eagle Equity

10  transaction came into being, Mr. Doubek's client, Val

11  Holms, filed an action in Nevada specifically

12  challenging the Eagle Equity transaction.  In that

13  proceeding, he argued the very things they want to

14  argue all over again, which is that it was unfair,

15  it's a horrible thing, it's a terrible deal,

16  et cetera, et cetera.

17         The Court held a hearing on whether or not

18  it should issue or continue a preliminary injunction

19  that Mr. Holms had received initially from an earlier

20  judge.  The Court held a hearing, and in that hearing

21  he heard from Dan Anderson, and he heard from Carl

22  George.  And at the close of that hearing, and as you

23  have seen before, the Court made some findings in

24  favor of Bakken Resources regarding the Eagle Equity

25  transaction.

```
 1              And in that particular proceeding -- well,

 2   and let me back up.  In the hearing that the Nevada

 3   judge had -- and this is before any action that

 4   Mr. Doubek is here on was ever filed.  In that

 5   particular proceeding involving Defendant Val Holms

 6   in this proceeding, who is now represented by

 7   Mr. Doubek, he was represented by counsel.  He had an

 8   opportunity to cross-examine Carl George.  He had an

 9   opportunity to present witnesses.  He had an

10   opportunity to comment on exhibits.

11              And the Court at the close of that hearing

12   on June 27th made a finding on the record that the

13   transaction more than likely -- so just set aside the

14   preliminary injunction, or the TRO -- that the

15   transaction was legal and appropriate pursuant to the

16   Nevada law under which that corporation is organized.

17              After hearing that -- and there's no

18   question about it, and this is reflected in our

19   briefs that we filed -- there was an attempt to

20   suddenly -- "Well, let's get a whole bunch of proxies

21   and try to get ourselves someplace else."  And that

22   is the basis for some of the proxies that -- excuse

23   me -- that the Court has seen already.  But let me

24   just back up for a second.

25              In the proceeding before June 27th, and I
```

 1  just filed this with the Court because Mr. Doubek

 2  took two pages of it and attached it as an exhibit to

 3  his brief, but --

 4          THE COURT:  Where is it?  I have it

 5  somewhere?

 6          MR. GOE:  You do.  I just filed this, this

 7  morning.  I provided John a copy.  This is the

 8  transcript from that hearing.

 9          THE COURT:  Okay.

10          MR. GOE:  And what I provided, if I may

11  approach the bench?

12          THE COURT:  You may.

13          Well, I'm interested -- you are referring to

14  findings that the judge made down there.  I'd like to

15  look at those.

16          MR. GOE:  Yes.  What he did, your Honor,

17  is -- and this is my affidavit on it, kind of gives

18  you a guideline of where certain things are.

19          The judge in Nevada made some findings, and

20  then he later memorialized those in his written

21  order.

22          MR. CROSBY:  July 14th.

23          MR. GOE:  July 14th.  Thank you, Jordan.

24          THE COURT:  Where do I find that?

25          MR. GOE:  That is attached to our brief in

1    support of the TRO, which we already had a hearing

2    on, as Exhibit A.  I apologize.  I just don't have it

3    in front of me right now.

4          MR. CROSBY:  I can get it for you.

5          MR. GOE:  And those materials are cited at

6    length in our briefing on the motion to stay and are

7    incorporated for purposes of argument here.

8          It's also attached to a motion to dismiss by

9    the third-party defendants.  And this is the

10   July 14th order entered by Judge Flanagan relating to

11   the Eagle Equity transaction and his findings after

12   that hearing that I just provided you a copy of the

13   record of.

14         THE COURT:  All right.  Go ahead.  I'm sorry

15   I interrupted you.

16         MR. GOE:  And what happened after that

17   hearing and after Judge Flanagan's order relating the

18   propriety of the Eagle Equity transaction, he decided

19   -- excuse me -- Val Holms and Allan Holms, and you

20   heard some of the testimony the other day, decided to

21   try to circumvent that order by getting proxies and

22   scampering up here to Montana and taking over the

23   corporation.

24         And what happened was -- and we have the

25   affidavits from Dan Anderson and the affidavit from

1   Karen Midtlyng and the affidavit from Wes Paul, which

2   this Court previously looked at -- they tried to take

3   over the office.  That is what precipitated the

4   filing of this case.  It's because they were losing

5   in Nevada, had lost in Nevada, and they had to

6   scamper up to Montana to try to find some other Court

7   that might be more sympathetic to their particular

8   position.

9           But at the time they did that, they had

10  already had a hearing regarding the propriety of the

11  Eagle Equity transaction.  And, as I indicated

12  before, both in the transcript and in the Court's

13  order, it talks about those issues and found it to be

14  consistent with the Nevada business judgment rule.

15          And not only did the Court make those

16  findings, but it did so after hearing testimony

17  regarding the transaction.  And Defendant Val Holms

18  had a full opportunity to cross-examine, and that's

19  what the transcript that I just provided to you

20  shows.

21          So, as we move forward, what happened is we

22  were forced to do something up here because Allan

23  Holms and his entourage barged into the office, tried

24  to take it over, tried to throw everybody out, police

25  show up, and, ultimately, they leave.

 1          We filed our motion, our motion for a TRO,

 2     which is granted by Judge Seeley, and then was

 3     continued when we had the hearing on August 9th

 4     regarding the underlying request for a TRO in this

 5     matter.

 6          And during that hearing, the Court asked --

 7     and it's found at page 138 of the transcript.  If you

 8     want additional testimony regarding the proxy issues

 9     or the propriety of that TRO, you have to ask for a

10     hearing and let the Court know.  We didn't get

11     anything like that.

12          What instead we got was a notice from

13     Mr. Doubek that the matter was fully briefed and

14     submitted to the Court.  And that happened, I

15     believe, in earlier September.

16          So the briefing regarding the proxies, the

17     validity of the proxies is done, except for it's only

18     done in the context of the TRO.  I mean, it has to do

19     with whether or not the Court is going to issue or

20     continue the TRO that Bakken Resources already

21     received.

22          Let's continue to go forward.  At the same

23     time we got our TRO here, BRI also got a TRO in

24     Nevada.  And that also is in the documents that the

25     Court has, and it is attached to one of the earlier

1   pleadings that we did.  I've got to find out where it

2   is.  Here is another copy of it, though.  It is an

3   attachment to briefing that's already been provided

4   to the Court.  Issued another temporary restraining

5   order, which in large part says those proxies are

6   invalid.  And this is the other order from the Court

7   in Nevada.

8          Specifically, what the Court said in its

9   order -- and this is also attached as an exhibit to

10  our brief in support of a motion to dissolve the

11  preliminary injunction here.  The Court specifically

12  found that the defendant -- BRI in the case, because

13  it was brought initially by Allan Holms, or part of

14  it was -- defendants have a reasonable probability of

15  success in their arguments that the voting proxy

16  executed by Val Holms on July 7th and by Manny

17  Graiwer on June 29th, both in favor of Allan Holms,

18  are invalid based on SEC rules and regulations

19  pertaining to proxy solicitations.

20         It went on to say that defendants enjoy a

21  reasonable probability of success on their argument

22  that Eagle had properly exercised its right to put

23  and convert its loans to BRI, Series A, preferred

24  stock.

25         So as a result of that finding in Nevada,

```
 1   the proxies upon which Allan Holms is relying, has
 2   already been determined in Nevada to be no good.
 3           THE COURT:  They're not quite that far down
 4   the road, are they?
 5           MR. GOE:  They are quite -- I overstate that
 6   a little bit.  What the Court said that the company
 7   has a reasonable probability of success on his
 8   argument that it's invalid.
 9           Let me just jump forward just a little bit.
10   There was a hearing regarding the preliminary
11   injunction, the one that you were just looking at,
12   and that was held in October.  And what the Court
13   decided to do -- it's October 19th by the way.  And I
14   provided that as an exhibit to the Court in the
15   motion to stay.  And I'll just provide the Court with
16   this entire mess.  I apologize.  We have so many
17   exhibits here.
18           THE COURT:  I know.  I am kind of swimming
19   in this stuff here a little bit.
20           MR. GOE:  It's Exhibit 6, to the motion to
21   stay.
22           THE COURT:  Okay.
23           MR. GOE:  What the Court did was it decided
24   that there was going to be a trial and that trial is
25   going to occur in April.  And the issues before the
```

1    Court in that trial include the proxy solicitation

2    issues, as well as the Eagle Equity transaction.

3           And it's our position, based on comity,

4    based on the first-to-file rule -- and, in this case,

5    there's no question about it, Defendant Val Holms is

6    the first one to try to attack the Eagle Equity

7    transaction, and he did so in Nevada.  And, of

8    course, the Court in Nevada has been dealing with

9    this since 2014.  It's going to have a trial in

10   April, which is going to include the issues currently

11   before this Court regarding the Eagle Equity

12   transaction, proxies, and, of course, the related

13   issues arising out of derivative action.

14          What the defendants represented by

15   Mr. Doubek asked for was a TRO, putting everything on

16   hold, stopping basically a shareholders meeting,

17   pending Court action.  We agree with that.  That

18   Court action is scheduled to have a full-blown trial

19   in April of 2017.  And as we argue in our motion for

20   stay, principles of comity, first-to-file rule, and a

21   variety of other things, dictate that they get that

22   shot.  That's why we are in agreement with their TRO.

23          Now, do we agree with all they are saying?

24   Absolutely not.  All of this attack on Eagle Equity

25   and Wes Paul, et cetera, totally disagree with it.

1   But the fact of the matter is, for purposes of these

2   proceedings, we're willing to agree to the TRO, which

3   is the only issue before the Court right now.

4          THE COURT:  Is this thing scheduled at all,

5   this case?

6          MR. GOE:  We have no scheduling order at

7   all.

8          THE COURT:  Out of this Court?

9          MR. GOE:  That is correct.

10         That's our position, and we believe that any

11  testimony regarding other issues or "we want a

12  different restraining order than the one we already

13  requested" is not properly before the Court.  It

14  would result in prejudice to us because we have not

15  had a chance to prepare for it.  We basically asked

16  for the Court to enter the order they asked for.

17         THE COURT:  So Mr. Doubek's got a couple of

18  folks that he's arranged to be here to testify.  What

19  if we take their testimony?

20         MR. GOE:  Your Honor, we have some

21  significant issues with the testimony.  Now, I don't

22  know what Allan Holms is going to testify to, but

23  what I was provided today was something called,

24  "Defendant's third-party plaintiff's position."  And

25  then attached to that is a memo written by a

1  Professor Dan Morrissey, relating to potential

2  testimony at hearing on December 12th of 2016.

3          Well, I would submit I just had an

4  opportunity for, like, 10 minutes before we started

5  out today to take a look at what this expert is

6  apparently being proffered for, but I would say it

7  relates in large part to issues that are not before

8  the Court, relating to this particular hearing.

9          Now, he wants to expand it into proxy issues

10  and all of the proxies are great and basically rebut

11  certain things that were brought up in the prior

12  pleadings, but we already had that argument.  It was

13  already submitted to the Court.  By their own

14  pleadings they submitted that issue to the Court.

15  And the relief they are specifically asking for in

16  their position statement is entirely different than

17  what this hearing is about.

18          So it's our position that no one should be

19  called to testify, and certainly not the professor,

20  Dan Morrissey, whose opinion, looking it over, is

21  basically a lot of legal opinions that this Court is

22  going to have to decide, not him.

23          But the underlying problem is that it's

24  relating to issues that are not before the Court

25  right now.

1              MR. DOUBEK:  Your Honor, if I might, the

2      temporary order by this Court ordered that BRI and

3      its agents be temporarily enjoined from holding the

4      annual meeting until 60 days after the Court decides

5      whether the July 20, 2016, election of the new board

6      of directors was valid and enforceable.  So the issue

7      of proxies is clearly pending.  Whether or not the

8      Eagle Equity transaction was fraudulent, again, that

9      issue is what we're going to address.  Whether there

10     was a triggering event allowing Eagle to convert its

11     loan to stock, again, something we're going to

12     address.  And then, Number 2, temporarily enjoin from

13     allowing Eagle to vote on any matters at any time,

14     including an annual meeting or motion by shareholder

15     consent until the Court issues a ruling whether the

16     July 20th election of the new board was valid and

17     enforceable, whether the Eagle Equity transaction was

18     fraudulent, whether there was any triggering event to

19     allow Eagle to convert its loan to stock.

20              In other words, Bakken was ordered to show

21     cause why those things shouldn't be done and further

22     enjoined by the Court.  And now they are here today

23     saying, "Well, we don't have anything to offer the

24     Court other than just keep it going because all of

25     this is going to be decided down in Nevada," in a

1    proceeding where, you know, Allan Holms has not been

2    served or participated and so forth.

3            And, by the way, the finding that the Eagle

4    Equity transaction satisfied the business judgment

5    rule, there were two opinions by two different Courts

6    down there.  One said it was a sham, and the other

7    one said it seems to satisfy the business judgment

8    rule.  That latter Court is the one that scheduled

9    the matter for trial.

10           And now we see -- we just received in the

11   mail another counterclaim, and so forth, that

12   probably is going to prolong that proceeding past the

13   point where it's been set.  So, you know, who knows

14   when its going to be actually heard by a Court down

15   there.

16           We did submit a document outlining our

17   position, and we tried to, you know, be fair and give

18   notice that this is what -- this is the testimony

19   that we're going to present today so that everybody

20   is on the same page.  Nobody has been surprised, too

21   surprised.  And we would like to offer very limited

22   testimony by Mr. Allan Holms, and then a little bit

23   more but limited testimony by Professor Morrissey,

24   who is an expert in SEC matters and has taken a look

25   at a number of documents.  We appended to his

1    statement of what he's going to address, all of the

2    documents that he's reviewed, his resume, articles

3    and books that he's authored, and so forth, so that

4    the Court knows that -- try to shorten the process

5    for a direct examination.  Certainly, he's available

6    for cross.

7              So, your Honor, with that, we'd like --

8              THE COURT:  I'm not sure, Mr. Doubek,

9    that -- this process just doesn't feel right to me;

10   that we're going into some of the substance of the

11   ultimate determinations that need to be made in this

12   case.  It seems like this is a short-circuiting of

13   that.  I haven't had a chance to absorb all this --

14             MR. DOUBEK:  I know.

15             THE COURT:  -- stuff by any means.  Some of

16   this stuff was filed last week, and some even this

17   morning.  So I have had no ability to absorb what all

18   these issues are and what I would need to listen to.

19   And I don't think there's been adequate notice

20   provided to the defense, or to BRI here.

21             MR. DOUBEK:  Part of what we want to do is

22   just provide amplification on what's pending before

23   the Court, not that it's going to result in a final

24   binding decision by the Court at all.  But in order

25   for the Court to keep -- to maybe modify the TROs

1    that are in place, we thought this testimony would be

2    good for the Court to hear.

3           THE COURT:  But do I even have -- again, I

4    apologize for not having the opportunity to absorb

5    all of this or to even be aware of some of this.  Do

6    I even have anything in front of me that is a motion

7    to modify the existing TROs?  Do I have something

8    like that?

9           MR. DOUBEK:  No, but you will have evidence

10   that would allow you to do whatever the Court wants

11   to do.

12          THE COURT:  But isn't that part of the

13   notice requirement here?  You are coming in today --

14   that's why I was confused when I came out here to the

15   bench.  Their motion says they agree with your TROs

16   that you already have.  Their statement paper agreed

17   with the TROs that are already in place.  But now you

18   are standing up saying, "We want to change those."

19          MR. DOUBEK:  Well, your Honor, I don't think

20   it's sufficient for them to say, "Oh, your Honor,

21   we'll agree to keep the TRO going," as opposed to --

22   you know, you ordered that they appear here and show

23   cause and so forth.  And they are just saying, "No,

24   we're fine.  We're fine with this."  And I think the

25   implication of that is they should admit, then, to

```
1    the allegations that have been advanced in support of
2    the TRO.  That is that the Eagle transaction, for
3    example, is a sham transaction.  I don't think it's
4    sufficient for them to say, "Your Honor, don't worry
5    about it.  It will all be handled down in Nevada.
6    We're perfectly fine for you to just keep the TRO in
7    place."  I don't think that's satisfying what the
8    Court ordered that they do at this hearing.
9              THE COURT:  Well --
10             MR. DOUBEK:  Show cause why it shouldn't be
11   determined to be a sham transaction.
12             THE COURT:  Well, I think what the order to
13   show cause is directed to is you have asked that
14   everybody kind of be stayed, put on hold.
15             MR. DOUBEK:  Right.
16             THE COURT:  And they come in and say, "We
17   don't agree with the reasons for why you want that,
18   but we'll go along with that."
19             Now, if your goal was to come in and say,
20   "Well, we want it put on hold except for these
21   particular determinations we made and these
22   particular actions to be allowed," I think that
23   requires further notice to them so they can come in
24   and respond to that.
25             MR. DOUBEK:  And I understand what the Court
```

1   is saying, your Honor.  But what we did -- when we

2   filed for this TRO, they had suddenly filed a 10K for

3   an annual report for the first time and announced

4   there was going to be a shareholder meeting.  Well,

5   we knew that that was going to go nowhere, as far as

6   we were concerned, because Eagle Equity was going to

7   vote 51 percent of the vote.  And so we thought

8   that's wrong because it's a sham transaction.  They

9   shouldn't have the right to vote.

10          And so on the basis of that we asked the

11  Court to stay the annual meeting and order why they

12  shouldn't come in and demonstrate to this Court why

13  it shouldn't be regarded as a sham transaction, and

14  they are being derelict of their responsibility under

15  the Court's TRO by saying, "We're not going to fight

16  it.  We're just going to be complacent before this

17  Court because, as a matter of comity, it's all in the

18  hands of the Nevada court."

19          And that makes it real difficult for all the

20  Montana shareholders, you know, to run down to Nevada

21  to participate.  They ought to have a right to

22  participate in the proceedings that was initiated by

23  the company here in Montana.

24          And so all we're saying is that, your Honor,

25  the reason that gave rise to the TRO on October 19th

```
 1    was our position that the -- there shouldn't be an
 2    annual shareholder meeting with Eagle Equity because
 3    it was a fraudulent transaction.  And you ordered
 4    them to appear before this Court and show why that
 5    was or wasn't true.
 6              And I don't think it's proper for them to
 7    simply take the position, you know, "Judge, we're
 8    just going to wait.  We're going to defer.  We'd ask
 9    you to defer to Nevada."  I don't think that's
10    proper, and I don't think it's fair to these
11    shareholders.
12              THE COURT:  And I don't know that I need to
13    defer ultimately to the Nevada proceedings.  But I'm
14    still troubled by the fact that you are coming in and
15    asking in your statement here that was given, the
16    defendant's third-party plaintiff's position, that
17    you are asking me to remove the temporary order,
18    temporary restraining order, and allow a vote to go
19    forward without Eagle Equity participation, reinstate
20    the third-party plaintiffs as the directors of
21    Bakken, strike the Eagle Equity transaction as a sham
22    that it is, order a shareholder meeting, appoint
23    someone to oversee the meeting and report back to the
24    Court the results thereof -- those are substantive
25    changes in the underlying foundation of what we're
```

1   doing here today.

2           MR. DOUBEK:  And I agree, Judge.  I think --

3           THE COURT:  So what I'm thinking is you then

4   have an obligation to say this is a hearing on that

5   motion to modify the previously imposed --

6           MR. DOUBEK:  But I don't think -- you know,

7   this is a hearing on the Court's temporary

8   restraining order.

9           THE COURT:  Right.

10          MR. DOUBEK:  Wherein the Court ordered that

11  they do certain things, show certain things, or else.

12  We don't know for sure what they are going to show,

13  so it would be -- it would be speculative of us to

14  file a motion to do anything, to modify anything.

15          But assuming that they come in -- and we

16  kind of thought, you know, this is what was going to

17  happen.  So we thought maybe we'd better take the

18  bull by the horns and show the Court that there's

19  evidence, there's clear evidence that this

20  transaction is a sham.  So if they don't satisfy

21  their burden of proof at this TRO hearing, that

22  there's an evidentiary record that the Court can rely

23  upon to issue a further order.

24          So, yeah, I would like the Court to do

25  certain things, but you are the judge.  And I do

1    think, Judge, what you have done with your TRO order

2    is being flaunted by -- yeah, that's too harsh a

3    term.

4            THE COURT:  I guess I'm having a hard time

5    understanding that because you asked me to do

6    something.

7            MR. DOUBEK:  Sure.

8            THE COURT:  You asked me to issue a

9    temporary restraining order, and I do it.  I give you

10   what you want.  And I tell them, "Come in and tell me

11   why there shouldn't be a temporary restraining

12   order."  And they come in and say, "Judge, we don't

13   object to a temporary restraining order under the

14   terms you have already imposed.  We don't object to

15   that."

16           So why is that flaunting it or disregarding

17   it or why haven't they done what they are supposed to

18   do?

19           MR. DOUBEK:  Then it should go to the next

20   step and become a preliminary injunction based upon

21   the proof, or lack thereof, to resist the TRO.

22           THE COURT:  Well, did you object to a

23   preliminary injunction going forward?

24           MR. GOE:  Your Honor, what our position

25   is -- and this was relayed to John before this

```
 1    hearing today -- that our position is that we'll live
 2    with these, pending a judicial determination of the
 3    issues they outlined in the TRO that they requested.
 4    We have a TRO.  They have a TRO.  Their argument in
 5    their application and in their briefing was, "We've
 6    got to keep the status quo until a Court decides the
 7    issues relating to the Eagle Equity transaction and
 8    the proxies."
 9              THE COURT:  Right.
10              MR. GOE:  We agree.
11              MR. DOUBEK:  And we fully expect --
12              MR. GOE:  Excuse me.
13              MR. DOUBEK:  Oh, excuse me.  I'm sorry.
14              MR. GOE:  And we agree.  And whether it's
15    called an extension of the TRO or a preliminary
16    injunction -- because that's what we asked for, the
17    same relief that they are asking for, essentially --
18    that's what should happen.
19              And what they asked for specifically was
20    enjoin from holding our annual meeting until after
21    the Court decides whether the July 20th -- blah,
22    blah, blah, goes on from there.  And we're saying,
23    "That's correct.  That's why we agreed to this.
24    That's our position."
25              And, now, if they want to come in and
```

1    present a whole bunch of testimony regarding -- to

2    basically convince the Court that the transaction

3    should be looked at more carefully and it's a fraud

4    or a sham, that's not an issue before the Court

5    today.  The issue before the Court is solely whether

6    this TRO should stay in place or be a preliminary

7    injunction, whatever the Court wants to characterize

8    it, pending a judicial determination of the

9    underlying issues.

10            And, as I said before in my earlier

11   discussion with the Court, the fact of the matter is

12   they challenged this first in Nevada.  That's where

13   they went.  That's where they wanted to litigate that

14   particular issue.  A trial for that is set in April.

15            Now, ultimately, this Court may decide that

16   it has to decide some of these issues.  We will have

17   a scheduling conference.  We'll do discovery.  We'll

18   have a hearing after we have notice that the issue is

19   something different than what they want.  That's when

20   you present testimony to the Court regarding these

21   various issues, after we have had notice and after

22   both parties have had the opportunity to do what they

23   feel to be appropriate to present their case.

24            Instead, what happens here -- and we agree

25   to TRO, we agree to keep it in place -- they come to

1  this Court this morning wanting a different result

2  from this Court, of which we had no notice of and

3  want to present testimony on issues that we had no

4  notice of.  And that's where I think the Court is

5  correct that the testimony and the things that they

6  want to present now are not properly before the

7  Court.  Thank you.

8          MR. DOUBEK:  Your Honor, and, once again,

9  the TRO that the Court issued to Bakken and its

10  agents was that they should show cause why these

11  findings by the Court should not be made permanent,

12  pending a further hearing, not just continued because

13  something is going on down in Nevada.

14          You know, they have an obligation to come

15  into this Court under this TRO and demonstrate why

16  that Eagle Equity transaction is valid or whether

17  it's a sham, why the election that was done on

18  July 20th should be recognized or shouldn't be

19  recognized.  And they are here -- they have shown up

20  with no proof, not one scintilla of evidence are they

21  offering to the Court.

22          And so we're going to offer the evidence to

23  the Court so that the Court knows that it's proper

24  and there's a basis for continuing this injunction on

25  a temporary injunction basis.

```
 1              THE COURT:  But isn't some of what's going
 2    on down in Nevada -- you know, I'm supposed to take
 3    judicial notice of Court decisions and laws in other
 4    states that are going on with regard to issues before
 5    this Court.  Isn't this some evidence of their
 6    position that it's not a sham, that the proxy
 7    solicitation was not invalid -- or was invalid.  I
 8    mean, so there's something there that --
 9              MR. DOUBEK:  There's something there to
10    reckon with, and that's why we were here with
11    evidence to present to the Court.
12              THE COURT:  But it seems --
13              MR. DOUBEK:  Our people were not involved in
14    that proceeding down there.  Val Holms was, but Allan
15    Holms wasn't.
16              THE COURT:  Well, okay.
17              MR. DOUBEK:  A lot of these decisions have
18    been made in the -- and this last decision by the
19    Court in October, as I understood from other counsel
20    in the case, it was more a discussion amongst counsel
21    used as a status conference to determine where we go
22    from here.
23              THE COURT:  Well, I am not comfortable with
24    the idea that we're going to proceed with evidentiary
25    presentation here today.  I don't feel that there was
```

1    adequate notice provided to BRI of what we were going

2    to be talking about today.  I think the issue was

3    whether the TRO should remain in effect.  And they

4    have an obligation, if they don't want it to remain

5    in effect, to come in and tell me why they don't want

6    it to remain in effect.  If they do not object to

7    that, then the goal of the TRO, the temporary

8    restraining order, has been achieved.  You have what

9    you asked for.  They haven't convinced me to alter

10   it.

11          Now, if you want to alter it, I think

12   there's an obligation on your part to say clearly

13   what you intend to alter it to.  And it seems like

14   what you're getting into is the substance.  The

15   ultimate issues that need to be decided in the case,

16   whether this Eagle Equity transaction was valid,

17   whether this proxy solicitation was valid -- but

18   those I think are factual determinations that are

19   made, not at this earlier stage of the proceeding,

20   but after full discovery and after we go through the

21   process of getting people ready to present testimony

22   on both sides of those particular issues.  At this

23   point they are just saying we're willing to go along

24   with what --

25          MR. DOUBEK:  Then, your Honor, I think that

1    the TRO should be made a preliminary injunction.

2              THE COURT:  All right.

3              MR. DOUBEK:  I will prepare an order for the

4    Court.

5              THE COURT:  Okay.  I am comfortable with

6    that approach, that we would have a preliminary

7    injunction.

8              And I guess, just to be real clear, I'm not

9    making a determination at this point that we are

10   completely bound by the time frame down in the Nevada

11   proceedings at all.

12             MR. DOUBEK:  Thank you.

13             THE COURT:  They are going to go along --

14   because it could be that you are going to get up to

15   March and somebody is going to come in and say, "Oh,

16   we need to have a continuance.  This thing can't be

17   decided until next December."  That's not going to

18   bind our --

19             MR. DOUBEK:  And I know there was another

20   pleading that was just filed this week or so.

21             THE COURT:  So that doesn't necessarily tie

22   our hands into an ultimate determination of the

23   issues that are before the Court.

24             But I do think at this point I'm just not

25   comfortable with the idea that we're going to go

1  forward with some sort of a substantive hearing on

2  some of the ultimate issues in the case given that

3  BRI is agreeable to the continuation of a temporary

4  restraining order or an issuance of a preliminary

5  injunction.

6         MR. DOUBEK:  We'll talk to your clerk about

7  a time.

8         THE COURT:  Get a schedule.

9         MR. DOUBEK:  Okay.

10        THE COURT:  Is that good?

11        MR. GOE:  Your Honor, the only other thing I

12  would mention is we have a TRO now.  Even if it's

13  designed to keep the status quo, the Court has

14  already continued that in the last hearing we had.  I

15  don't know if the Court wants to characterize that as

16  a preliminary injunction as well so that everybody

17  basically stands down pending, ultimately, the

18  determination of the Court.  And we have already

19  fully briefed that.  It's already been before the

20  Court.  We already had a hearing on it.

21        MR. DOUBEK:  We certainly didn't agree to

22  any TRO, and we resist it.  So I would --

23        THE COURT:  Did you get --

24        MR. DOUBEK:  -- object to simply including

25  that in a preliminary injunction.

```
 1              THE COURT:  Okay.  Did Judge Seeley sign off

 2    on that one?

 3              MR. DOUBEK:  She gave them the TRO

 4    initially.  She was disqualified on Friday.  She just

 5    continued it.  And then following the hearing on

 6    August 9th, you said, "I am just going to continue

 7    things for the time being."

 8              THE COURT:  Okay.

 9              MR. DOUBEK:  I think that's accurate.

10              MR. GOE:  It is still in place.  You

11    indicated you were going to keep it in place until

12    you had a chance to look at all of this.

13              MR. DOUBEK:  Judge, the pile is getting

14    bigger.

15              THE COURT:  I know.  I say I'm going to look

16    at all of this stuff, and then all of this stuff

17    keeps getting bigger and bigger.

18              MR. DOUBEK:  I do not even want to see your

19    Monday mail.

20              THE COURT:  Yeah, I know.  I have a whole

21    stack in there.

22              MR. DOUBEK:  Don't look at it.

23              THE COURT:  I won't.

24              MR. DOUBEK:  Just don't look at it.

25              THE COURT:  So, anyway, I want to keep
```

1    everything -- the goal here is to keep everything in

2    place, status quo in place.

3            MR. GOE:  Thank you.

4            MR. DOUBEK:  We'll prepare the preliminary

5    injunction.

6            THE COURT:  Okay.  Good enough then?

7            MR. GOE:  Thank you.

8            MR. DOUBEK:  Thank you.

9

10           The proceedings concluded at 11:13 a.m.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2                    REPORTER'S CERTIFICATE
 3
 4
 5          I, Yvette M. Heinze, a Registered
 6   Professional Reporter, residing in the City of
 7   Helena, State of Montana, hereby certify:
 8          That prior to being examined, the witnesses
 9   named in the foregoing proceeding were sworn to
10   testify to the truth, the whole truth, and nothing
11   but the truth;
12          That the said proceeding, taken down by me
13   in stenotype, was thereafter reduced to typewriting
14   by computer-aided transcription under my direction
15   and is a true record of the testimony given.
16          I further certify that I am not in any way
17   interested in the outcome of this action and that I
18   am not related to any of the parties thereto.
19          Witness my hand this 12th day of January,
20   2017.
21
```

_____
YVETTE M. HEINZE, CSR, RPR

```
25
```