# Exhibit Q

Transcript of a February 22, 2017 hearing in the matter Bakken Resources, Inc. v. Holms, CDV-2016-612 pending in the Montana First Judicial District Court, Lewis & Clark County

1              MONTANA FIRST JUDICIAL DISTRICT

2                COUNTY OF LEWIS AND CLARK

3                 * * * * * * * * * *

4    BAKKEN RESOURCES, INC.,              )
                                          )
5                                         )
              Plaintiff,                  )
6                                         )
              VS.                         )    CAUSE NO. DDV
7                                         )    2016-612
     VAL M. HOLMS, ALLAN G. HOLMS,        )
8    TODD JENSEN, and ALLEN COLLINS,      )
                                          )
9              Defendants and            )
               Third-Party Plaintiffs,    )
10                                        )
              VS.                         )
11                                        )
     KAREN MIDTLYNG, DANIEL D.            )
12   ANDERSON, and WESLEY J. PAUL, and    )
     John Does 1-20,                      )
13                                        )
               Third-Party Defendants.    )
14   _____    )

15

                    TRANSCRIPT OF PROCEEDINGS

16

17    Before the Honorable James Reynolds, Judge Presiding

18

         Date and time:    Wednesday, February 22, 2017
19                          10:00 a.m.

20

         Place:            Lewis & Clark County Courthouse
21                         228 Broadway
                           Helena, MT 59601

22

                   YVETTE M. HEINZE, CSR, RPR
23         Official Reporter, First Judicial District
                    228 Broadway, Second Floor
24                      Helena, MT 59601
                        (406) 447-8238

25

<pre>
 1                         APPEARANCES

 2
     For the Plaintiff:
 3
             OLIVER H. GOE
 4           BROWNING, KALECZYC, BERRY, & HOVEN, P.C.
             800 N. Last Chance Gulch, #101
 5           Helena, MT 59601

 6

 7
     For the Defendants and Third-Party Plaintiffs:
 8
             JOHN C. DOUBEK
 9           DOUBEK, PYFER & FOX, LLP
             307 N. Jackson Street
10           Helena, MT 50601

11

12
     For Third-Party Defendants:
13
             Jordan York Crosby
14           P.O. Box 1746
             Great Falls, MT 59403
15

16

17

18

19

20

21

22

23

24

25
</pre>

1   February 22, 2017, Wednesday

2

3          THE COURT:  Please be seated.

4          The staff brought up the whole file for me

5   today.

6          MR. GOE:  Looks kind of small.

7          MR. DOUBEK:  Shame on them.

8          THE COURT:  I know.  So I have only read to

9   this far (indicating).

10          MR. DOUBEK:  Is that from the top down?

11          THE COURT:  That's from the bottom up?  So,

12   anyway.

13          MS. CROSBY:  Judge, maybe in light of that,

14   at the last hearing you noted that there was a lot of

15   exhibits.

16          THE COURT:  Yeah.

17          MS. CROSBY:  So we took the opportunity to

18   put them all in one place for you.

19          THE COURT:  Oh, isn't that special.

20          MS. CROSBY:  With an index.  If you don't

21   mind me approaching.

22          THE COURT:  Sure.  That's fine.

23          MS. CROSBY:  We gave John a copy too.

24          And we cross-referenced where they are all

25   attached as well, with docket numbers for them.

1          THE COURT:  Well, that's helpful.  Thank

2   you.

3          MR. GOE:  A lot of the same exhibits get

4   repeated but with different letters and numbers.

5          THE COURT:  Sure.

6          MR. GOE:  Now they are all together.

7          MS. CROSBY:  In one place.

8          THE COURT:  Okay.  And you've got this too?

9          MR. DOUBEK:  I just got a copy.

10          THE COURT:  Okay.

11          MR. GOE:  And it includes John's exhibits as

12   well.

13          THE COURT:  Okay.  So this is all the

14   exhibits as of today?

15          MR. GOE:  Yes.

16          THE COURT:  Wow.  All righty.  Thank you.

17   Thanks for doing that.

18          So, I guess, to get on the record, we are

19   here on DDV 2016-612, Bakken Resources versus Holms

20   and others.  This is the time set for oral argument

21   on Bakken's -- well, you requested oral argument with

22   regard to the hearings scheduled for next week.

23          MR. GOE:  That's correct, your Honor.

24          THE COURT:  So what do you want to talk

25   about?

1          MR. GOE:  Thank you.  Well, the reason I

2    requested oral argument and requested a status

3    conference at the same time was the Court's order of

4    January 3rd, setting an evidentiary hearing for

5    February 28th.  And it's our position that there were

6    some pretty significant procedural, as well as

7    substantive, issues that needed to be addressed

8    before we potentially got a little too far off the

9    rails and perhaps ahead of ourselves and where we

10   need to be.

11          As you will recall, we had a hearing back in

12   December.  The order was issued January 3rd.  I

13   received it January 9th.  I believe it was an order

14   that was probably prepared by John that you signed

15   off on, but we have some serious concerns about

16   whether it fairly reflected some of the things that

17   were argued at the time of the hearing, as well as

18   where we were headed in the Nevada proceedings, as

19   well as where we were headed in these proceedings

20   procedurally.

21          In a nutshell -- well, the order states that

22   the hearing on February 28th, among other things, is

23   going to determine whether the takeover was proper

24   and lawful and ought to be approved by the Court,

25   and, if necessary, an evidentiary hearing on the

1  Eagle Private Equity Transaction.  And the way the

2  order reads, it reads like we're having a trial

3  relating to what are -- at least one of the very

4  fundamental issues that are already before the Court.

5  And, of course, this is before discovery and before a

6  couple other matters that we think the Court needs to

7  address.

8          You may or may not be --

9          THE COURT:  Let me just -- I'm shuffling

10  through here.  Again, they did bring up the whole

11  file.

12          MR. GOE:  The motion I filed, your Honor,

13  was that -- like I said, your letter is -- excuse

14  me -- your order is January 3rd.  We received it on

15  January 9th.  And then we filed our brief in support

16  of an emergency motion to vacate order of January 3rd

17  and hearing of February 28th.  We filed that on

18  January 17th of 2017.

19          MS. CROSBY:  It's Docket 80 and 81.

20          THE COURT:  All right.

21          MR. GOE:  And then John filed a reply

22  shortly after that.  I filed our brief, our last

23  brief, and that's the one where I requested oral

24  argument.  I just thought it was extremely important

25  we get before the Court before we show up on the 28th

1   to determine what exactly we're doing.

2          THE COURT:  All right.  I finally got to the

3   part of the files here that relate to the most recent

4   filings.  Go ahead, Mr. Goe.

5          MR. GOE:  And why we filed the brief, your

6   Honor, we felt the order itself, with all due

7   respect, contained some inaccuracies regarding what

8   was argued, as well as where we were procedurally.

9          And, secondarily, I just thought it was very

10  important to get before the Court prior to the 28th

11  to address our concerns regarding the hearing that

12  was set for February 28th and what may or may not

13  occur at that hearing.

14         One of our primary concerns is there are

15  multiple motions pending before the Court already

16  that would to some degree dictate what we have to do

17  on the 28th or at some later date and moving forward.

18         In a nutshell, there's a motion that was

19  fully briefed and submitted for a decision by BRI.

20  That was a motion to stay the Montana proceedings,

21  and that was joined in by the third-party defendants.

22         In a nutshell, there's a discussion in that

23  motion and a summary of the litigation that's been

24  pending in Nevada since 2014.  There's a summary of

25  the multiple hearings and orders that have been

1  issued out of Nevada, including, which we have talked

2  about previously, the hearing on the Eagle Equity

3  Private -- excuse me -- the Eagle Equity transaction,

4  as well as the testimony of Dan Anderson and Carl

5  George down in Nevada regarding that particular Eagle

6  Equity transaction.

7         In the Court's order, July 24th, 2016, which

8  is Exhibit 9 in that big giant binder that you have

9  there, where the Nevada Court essentially -- in the

10  context of a preliminary injunction, though,

11  indicated that Eagle Private Equity transaction was

12  reasonable, appropriate, and consistent with the

13  Nevada business judgment rule.

14         There was a later hearing regarding the

15  proxies about the same time that we first came before

16  this Court where, again, the Nevada Court felt that

17  the proxies were invalid and indicated that BRI was

18  likely to prepare on those related issues.

19         It's those hearings in Nevada and those

20  findings in Nevada which precipitated the actions by

21  the defendant Allan Holms up here in Montana and

22  which precipitated our litigation to stop what we

23  believe was an attempt to get around the Nevada

24  orders.  And, of course, you're well familiar with

25  those.

1           And we have had a hearing about the

2   temporary -- excuse me -- the temporary restraining

3   order, and then we've had several other procedures

4   before this Court as well.

5           So that was, in a very brief nutshell, our

6   basis for our motion to stay that we filed previously

7   that the Court has not yet had the opportunity to

8   rule on.

9           THE COURT:  And do you have that marked?  Do

10  you know what that docket number is?

11          MS. CROSBY:  I can get it for you, just one

12  second.

13          Document 53 and 54 is the third-party

14  defendants' motions to dismiss and stay, and BRI's

15  motion to stay is Document 57 and 58, 59.

16          THE COURT:  And that is all fully briefed

17  and before me at this point?

18          MR. GOE:  It is.

19          THE COURT:  All right.

20          MR. GOE:  There are also a couple of other

21  motions that we think the Court needs to rule on

22  before we ever have a trial or hearing on the merits

23  of some of the issues that are before the Court.

24          There was a third party defendants' also

25  filed, which Jordan just mentioned, their motion to

1   dismiss, which is a little different than BRI's

2   motion to dismiss because she represents the

3   individual defendants.  There's additional grounds

4   brought before the Court as to why those individual

5   claims need to be dismissed.  Jordan can discuss

6   those a lot better than I can.

7          Bottom line is we think the individual

8   defendants have a right to have their motions ruled

9   on and decided before we have an evidentiary hearing

10  regarding validity of the proxies that are one of the

11  issues that are currently before the Court.

12         There's also a motion for protective order

13  that somewhat ties into the motions for a stay.  John

14  noticed up the deposition of Dan Anderson.  We felt

15  that was inappropriate for a variety of reasons,

16  primarily in light of the motions to stay that were

17  currently pending, as well as the motion for stay

18  that had been filed by the third-party defendants

19  which was still pending before the Court.

20         All of those matters are currently before

21  the Court -- oh, I should also add BRI joined in the

22  motions for a protective order, as well as the motion

23  to dismiss third-party defendants.  In addition to

24  the arguments that were raised by Jordan in her

25  briefing, we also pointed out to the Court that

1  there's an element of res judicata involved.  The

2  same allegations had been raised previously against

3  the same individual defendants, and that case has

4  previously been dismissed with prejudice.  And that

5  is Docket Number 611, which is right before 612,

6  which you have in front of you.

7           THE COURT:  Oh, a separate case?

8           MR. GOE:  Yes.

9           THE COURT:  Okay.

10          MR. GOE:  And that case was filed initially

11  at the request of Allan Holms.  He was recommended by

12  Mike Lamb's office.  They withdrew, and the case was

13  dismissed with prejudice by BRI.

14          And, again, those pleadings are before the

15  Court and have been fully briefed and submitted for a

16  decision.

17          So, you know, it's our position that before

18  we have a hearing on the merits that there should, in

19  fact, be a decision on various motions that are

20  already pending before the Court.  We also feel that

21  there's some recent events that dictate as well that

22  we not have a hearing on February 28th and allow the

23  Court to not only decide these motions, but also to

24  consider some additional issues that have recently

25  come to light.

1              As indicated in the suggestion of death that

2    I filed earlier this month, or last month, the

3    defendant Val Holms has passed away.  The case -- or

4    there is a probate opened.  Bakken Resources has

5    filed a claim in that particular case for various

6    damages.  To my knowledge, estate -- there is a

7    personal representative of the estate who is the son

8    of Val Holms.  But to my knowledge, they have not

9    assigned an attorney to represent the estate in the

10   proceedings that are not only going on here in

11   Helena, but also the proceedings in Nevada and

12   elsewhere.

13             In any event what that precipitated was a

14   rather unusual spring of events.  Allan Holms

15   contacted the transfer agent down in Nevada, the

16   transfer agent for BRI in Nevada, claiming that he

17   had been assigned all of the interest in stock owned

18   by Val Holms shortly before Val Holm's death.  He

19   also contacted the transfer agent and indicated that

20   he had various documents that supported the

21   assignment of these shares in BRI; that he wanted to

22   get to the transfer agent and have all of the shares,

23   47 percent of the company I believe it is, assigned

24   to him; and that he would then become the largest

25   shareholder in the corporation.

1          Since this all came to light after Val's

2    death, it raises some significant concerns regarding

3    whether the assignment was made to avoid creditors,

4    whether there might be a fraudulent transfer, whether

5    it was an attempt to bypass the probate proceedings,

6    and those issues.

7          It also came to light through the transfer

8    agent -- and I will provide the documents to the

9    Court that supports this -- that through the transfer

10   agent, they've gotten multiple inconsistent stories

11   from Mr. Holms, as well as another individual,

12   regarding the stock certificates that have to be

13   executed appropriately for any assignment to take

14   place.

15         Initially, there was some claim that he had

16   at least one of the original stock certificates but

17   did not have others.  Then it was claimed that he

18   didn't have any original stock certificates, but they

19   all had been medallion guaranteed, which is kind of a

20   way you transfer stock.  I assume you're familiar

21   with medallion guarantees.  And then it turned out

22   that perhaps they aren't medallion guaranteed.  While

23   there's a stamp on them, the bank where these were

24   allegedly stamped indicates that they would not stand

25   behind that medallion guarantee.

1          Despite that, Mr. Holms filed a Form 5 and a

2    Form 13D, or Schedule 13D, with the Securities and

3    Exchange Commission.  In there, he indicates that he

4    is a director and shareholder in Bakken Resources.

5    He also indicates that shares were not just assigned

6    to him in December following shortly before Val's

7    death, but he also claims that the shares were --

8    half of them were assigned to him on August 1st.

9    What's interesting about that, that's directly

10   contrary to an affidavit he filed with this Court on

11   August 8th, and in the pleadings that were filed by

12   Mr. Doubek on or about that same time where they

13   indicated Val was still the 47-percent owner of BRI.

14          So there's multiple inconsistencies

15   regarding when the assignments were supposed to have

16   taken place, how they were supposed to have taken

17   place, whether they were medallion guaranteed,

18   whether they weren't medallion guaranteed.  And so,

19   essentially, we get a number of different stories

20   provided to the transfer agents and, as I just

21   mentioned, the fact that there was a different story

22   in the affidavits filed with this Court back in

23   August regarding who owned BRI stock.

24          One of the things that BRI did was they had

25   the transfer or the assignment documents reviewed by

1  a forensic expert document examiner.  That document

2  examiner concluded that there's many reasons to

3  believe that these are not valid signatures of Val

4  Holms, which obviously raise a large number of

5  concerns.

6          And all this evidence has been presented to

7  the Nevada court, and the Nevada court issued a TRO

8  yesterday against Mr. Allan Holms indicating that he

9  was not to take any further action related to these

10  alleged assignments until a hearing on March 6th.

11          What I have for the Court -- and I even hate

12  to give the Court more documents.  But what I can

13  provide to the Court is, in fact, the restraining

14  order that was issued in Nevada, as well as the

15  documents supporting the summary that I just gave the

16  Court.

17          And, again, we think this goes directly to

18  the credibility of Allan Holms, the underlying issue

19  of the proxies of this case.  And it's just another

20  reason why, if the motions are denied that we have

21  filed and the Court doesn't think a stay is

22  appropriate, there has to be a reasonable time for

23  discovery to prepare this case for an ultimate trial

24  regarding the underlying issue of legitimacy of the

25  proxies, which by the way at this point have already

1    expired on their own.  They expired, I think, in

2    January.  It might have been December.  But in any

3    event we think this --

4            THE COURT:  Can I see the order from the

5    Nevada Court?

6            MR. GOE:  Yes.

7            THE COURT:  Uh-oh.  I thought you were going

8    to be bringing up three pages, and you are bringing

9    up --

10           MR. GOE:  I can do that too, but I just want

11   to -- what it is --

12           THE COURT:  Mr. Doubek, have you seen the

13   order?

14           MR. DOUBEK:  No.

15           MR. GOE:  This is the one I gave you this

16   morning.

17           MR. DOUBEK:  Well, you just handed it to me,

18   and you took back the copy.

19           MR. GOE:  Well, I only have one copy.

20           MR. DOUBEK:  Well, that's fine.  I'm just --

21   I haven't seen it.

22           MR. GOE:  This is the restraining order.

23   This was the verified complaint that was filed in

24   Nevada relating to that, and this is the application.

25   And they are having a hearing on March 6th relating

1   to that.

2          The TRO itself that was issued in Nevada

3   relates to recent events as opposed to some of the

4   old events.  It deals primarily with the assignment,

5   tells Mr. Holms he shouldn't be filing any more

6   matters with the SEC, shouldn't be taking any actions

7   claiming that he is now the majority shareholder of

8   BRI, and setting it for hearing.

9          THE COURT:  So this order is based on this

10  application.  And then what's the bottom document?

11         MR. GOE:  That's the verified complaint that

12  served as the underlying basis for it.

13         THE COURT:  Okay.

14         MR. GOE:  And multiple exhibits as you can

15  tell.

16         THE COURT:  Okay.

17         MR. GOE:  And many of those exhibits are

18  included in the binder that we just gave you at the

19  end, which includes the affidavits from the transfer

20  agent and some of the other documents and the

21  exchanges of e-mails between BRI and counsel for

22  Mr. Allan Holms.

23         THE COURT:  Okay.

24         MR. GOE:  Not Mr. Doubek, but a different

25  counsel for Allan Holms.

1          THE COURT:  Okay.

2          MR. GOE:  So we also think this raises some

3   additional reasons why time is important to try to

4   sort out some of these issues before we have a

5   hearing relating to the proxies and who is in control

6   of the company and the related items.

7          What I would also say is I don't know how

8   the Court is going to rule on our motions.  We think

9   our motions are strong.  We think the legal arguments

10   are very strong as to why this Court should defer on

11   certain issues until the Nevada proceedings run their

12   course, but I understand the Court may think

13   otherwise.

14          And if, in fact, the Court denies the

15   motions, I think due process requires that everyone

16   have the opportunity to conduct discovery and to

17   prepare the matter for trial, not just a, quote,

18   "evidentiary hearing" that to my understanding is

19   only set for three hours, which is woefully

20   inadequate for what ultimately would need to be

21   presented.  You know, there's not even a scheduling

22   order issued.  I think we need a scheduling order.

23   We would need a discovery deadline.  We would need a

24   motions deadline.  We would need a trial date.

25          And, you know, in the prior hearing that we

1    had -- and this was the basis for our motion -- the

2    Court recognized that it was premature to have a

3    hearing on the merits when we haven't had any

4    discovery and we haven't gotten ready, so to speak,

5    is how the Court put it.  That is cited in my brief,

6    and we totally agree.

7            We think the motion should be granted.  We

8    urge the Court to grant the motion.  But in the event

9    that they are not, we need to move forward in a

10   reasonable fashion as opposed to immediately trying

11   to jump to a trial on the merits, what?  Six days

12   from now.  That doesn't make any sense to me.

13           And I would also indicate that -- you know,

14   I understand we are only set for three hours.  I am

15   talking three or four days, probably, at a minimum to

16   try the issues that Mr. Doubek wants to try as

17   reflected in your order, which includes validity of

18   proxies and related issues.

19           There's also a reference to the Eagle Equity

20   transaction in the order, which indicates that that

21   might be litigated as well.  We don't think that's

22   properly before the Court, and we've argued that in

23   various pleadings that we filed.

24           But the bottom line is if the Court

25   disagrees and if we are in fact going to do that,

1   that's going to be an extensive proceeding, not

2   something that's going to happen in three hours or

3   even a day.  And, again, I would think three or four

4   days would probably be the minimum.

5          Bottom line, we think it's premature to have

6   a hearing of any evidentiary nature next week.  The

7   Court should have the opportunity to rule on the

8   motions, consider the motions, rule on them.  And

9   based on how the Court decides those motions, that

10   will dictate how we move forward.

11          THE COURT:  All right.

12          MR. GOE:  Thank you.

13          THE COURT:  Mr. Doubek.

14          MR. DOUBEK:  Your Honor, the Court's order

15   dated January 3, 2017, simply recites fact.  There's

16   no conclusions in that.  As the Court will recall

17   when we all met on December 12th, the Court was

18   inclined and did say that more notice needed to be

19   given to Bakken so they could be prepared, so get a

20   date from the clerk, and we'll set this for a

21   hearing.  On December 12th, it was then determined

22   that the hearing would be on February 28th.

23          We have been trying to take depositions in

24   this case.  But, "Oh, no, we've got to file these

25   motions for protective orders.  We've got to keep

1    these third-party defendants safe from discovery."

2    Now, they want to have full discovery and time for

3    this and time for that.

4         And, as we've maintained since our initial

5    filings last August, they just want to stall this out

6    and hope that Nevada figures it out and rules in

7    their favor.  That's what they want to do.  It's pure

8    and simple.

9         This Court has a couple of issues that it

10   could decide now, which may obviate the need for

11   another hearing even.  And that is the matters that

12   were submitted to the Court in August.  Ollie filed a

13   notice that the matter should be deemed submitted.  I

14   think we might have even joined in that.  And there

15   was all of the proxy information and issues.  There

16   was, you know, what Allan Holms purported to

17   accomplish on July 20, 2016, by coming in and

18   asserting majority shares in an effort to take the

19   company back for the shareholders.  The Bakken deal

20   with -- the Eagle Equity transaction was part and

21   parcel of that.  All of that is contained in the

22   briefs and the exhibits that we filed with the Court

23   back in August-ish.  And then the matter was

24   submitted by approximately the end of August.

25         THE COURT:  What's that in connection with?

1    What was the motion that was all tied to?

2            MR. DOUBEK:  Well, we have maintained that

3    the efforts by Mr. Allan Holms on July 20th, should

4    be recognized as legitimate.  And if that's the case,

5    then he should be the one in control of this company.

6    And if he's in control of this company, the Eagle

7    Equity transaction goes away.

8            THE COURT:  Okay.

9            MR. DOUBEK:  It just goes away.  So all of

10   that was briefed and submitted to the Court in

11   August.  You know, we had a short hearing on

12   August 9th or August 8th, something like that.  And

13   then there were follow-up briefs and affidavits and

14   all of that sort of thing, which is probably largely

15   in that binder there.  I haven't looked through it.

16   I just got it as you did.

17           THE COURT:  My understanding is what's in

18   the binder is exclusively the exhibits.

19           MR. GOE:  That's right.

20           THE COURT:  It's not the briefing attached

21   to the exhibits; right?

22           MS. CROSBY:  Correct.

23           MR. DOUBEK:  And I presume that's exactly

24   what's in there.

25           THE COURT:  Okay.

```
 1              MR. DOUBEK:  But in any event all of that
 2    was submitted to the Court.
 3              Now, the further obscuring of issues now
 4    that -- you know, what has Allan Holms done with the
 5    stock that he received from Val Holms and all of
 6    that?  We know that he received Val's proxy for all
 7    of the stock that Val had, and he went forward with
 8    that on July 20th.
 9              After that, there was some agreement made
10    between Val and Allan with regard to half of the
11    stock.  And then they went back and evidently Val
12    assigned all of his stock or the balance of his stock
13    to Allan.  I haven't been involved in that other than
14    to file -- I filed an affidavit and gave it to
15    Allan's SEC lawyers and said, you know, "All I know
16    is that Val told me this is what he was going to do
17    and that he had done it."
18              I wasn't involved in any of that
19    transaction, but I don't -- I think that's a red
20    herring, Judge, because that's all stuff that has
21    happened more recently.
22              We're talking about the things that happened
23    on or before July 20th.  And if the Court decides the
24    motions that were presented to the Court in August
25    and had been fully briefed, that may resolve a lot of
```

1    these later issues.  It certainly may well resolve

2    the issues filed by Jordan with respect to the

3    third-party defendants because they came in later.

4         They weren't served at the time of the

5    initial hearing in August.  They were served later

6    on.  And after they were served, I tried to take

7    depositions.  But, "No, no, we can't have

8    depositions."  But now we maybe need a hearing on the

9    merits that will take three or four days.  We need a

10   scheduling order and all of that sort of thing.

11        I would suggest that there's a way to

12   resolve all of this by having the Court take a look

13   at what's been filed in August and resolve things at

14   that point.  But --

15        THE COURT:  Well, let me just tell everybody

16   here, this is truly the first time I have seen the

17   whole file.  When we were having these previous

18   hearings -- and this isn't anybody's fault, but I was

19   being brought up the most recent filings, the ones

20   that were pertinent to the particular hearing.  So I

21   was not aware that I had as much here to review as I

22   do.  And so just so you know that's -- I'm sitting up

23   here pretty much barricaded in by paper at this

24   point.

25        MR. DOUBEK:  I understand.  And, Judge, with

1 regard to your January 3rd order, we simply wanted to

2 go forward as we tried to do in December and present

3 some additional evidence so that you had maybe even a

4 fuller record to consider when you were resolving the

5 issues presented to you in August.  That's what we

6 were trying to do.

7         THE COURT:  Okay.

8         MR. DOUBEK:  There was nothing secretive

9 about what we were trying to do.  We gave them our

10 exhibits and so forth in December.  And it was at

11 that time you said, "Get a date.  We'll have a

12 hearing on this issue."  And that's what we did.

13 And, now, you know, it's further stalling tactics.

14         So our request is that we go ahead with the

15 hearing on February 28th to supplement the record for

16 the benefit of your Honor.  But if the Court decides,

17 "No, I have got enough to go ahead and decide the

18 issues that were presented in August," that's

19 perfectly fine.

20         THE COURT:  Okay.  I think that's where I'm

21 going to probably come down on this.  Again, having

22 not been fully aware of the scope of what had been

23 filed, I do -- and, you know, I'm taking Mr. Goe's

24 assessment at his word that three hours is not going

25 to be an adequate amount of time if we're going to

1    get anywhere near the volume of materials that have

2    been presented.

3              MR. DOUBEK:  I don't disagree with that.

4              THE COURT:  So I think the hearing next week

5    is probably not going to be fruitful at this point.

6    So what I would propose doing is let me look at --

7    both sides are telling me there are things in the

8    record that may very well slice this thing, either

9    eliminate it completely or slice it down

10   substantially.  And I think that's what I want to try

11   to do.  I think I want to try to get to this material

12   and get back to the motions on both sides of this and

13   see if those will, in fact, help us focus.

14             MR. DOUBEK:  Appreciate that.

15             THE COURT:  Does that work for both sides?

16             MR. GOE:  That's fine.

17             THE COURT:  So I am vacating the hearing for

18   next week.

19             I don't know that we want to do a scheduling

20   conference right this minute.

21             MR. GOE:  The only thing --

22             MR. DOUBEK:  We would wait.

23             THE COURT:  Yeah, I was wondering if we want

24   to wait for a ruling on this.

25             MR. GOE:  The only thing I would indicate --

1  well, I think it would be fine to wait for a ruling.

2  I think that makes a certain amount of sense.

3          I would just argue that the matters that

4  were submitted for a decision back in August that

5  Mr. Doubek mentions were in the context of temporary

6  restraining orders and preliminary injunctions.  They

7  were not full-scale trials on the underlying merits

8  of the various arguments that were being raised by

9  the trial.

10          Now, the Court may decide it has enough or

11  it may decide it doesn't have enough, but I want the

12  Court to understand, procedurally, we were not having

13  a trial on the merits.  We were briefing and having a

14  hearing relating to some of the issues that led up to

15  the preliminary injunction requests that were filed

16  by the respective parties.

17          THE COURT:  Okay.

18          MR. GOE:  I would also point out that when

19  we were doing this in August, Jordan and her clients

20  weren't parties --

21          THE COURT:  Were not even in it yet.

22          MR. GOE:  -- weren't even in the case yet.

23  So to the extent that what is decided may impact

24  them, they should have the opportunity to participate

25  in some fashion.

```
 1              So, I mean, that kind of complicates things
 2   a little bit as well.  They were not brought in
 3   until, what?  October or November?
 4              MS. CROSBY:  October.
 5              THE COURT:  Okay.
 6              MR. GOE:  So whatever happened in August,
 7   they were not part of it, and that makes a difference
 8   as well.
 9              THE COURT:  Okay.  Well, let me -- did you
10   want to say something?
11              MS. CROSBY:  Just to follow up on that, your
12   Honor.  I think our position would be we have a
13   dispositive motion to dismiss as to the third-party
14   claims.  So if the Court were to find for us on that
15   motion, it doesn't matter what happened in August.
16              THE COURT:  You're done.  All right.
17              Well, let's take it at that, then.  I will
18   review the pending motions.  And if I feel like I
19   need more information or if I feel like I want to
20   hear from the third party defendants, then I will
21   advise the parties of that as I review through these
22   materials.
23              MR. DOUBEK:  That makes sense.
24              THE COURT:  Does that work for everybody?
25              MR. GOE:  Just from the caveat that this was
```

1   still decided in the context of a preliminary

2   injunction, which is different than a final say on

3   the underlying merits.

4           THE COURT:  I understand.

5           MR. GOE:  Yes.

6           THE COURT:  I understand.  All right.

7           MR. DOUBEK:  Thank you, Judge.

8           THE COURT:  So we're good to go, then?

9           MR. GOE:  Yes.

10          MS. CROSBY:  Thank you.

11          MR. GOE:  Thank you.

12          THE COURT:  All right.  Thank you.

13

14          The proceedings concluded at 10:27 a.m.

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2                    REPORTER'S CERTIFICATE
 3
 4
 5          I, Yvette M. Heinze, a Registered
 6   Professional Reporter, residing in the City of
 7   Helena, State of Montana, hereby certify:
 8          That prior to being examined, the witnesses
 9   named in the foregoing proceeding were sworn to
10   testify to the truth, the whole truth, and nothing
11   but the truth;
12          That the said proceeding, taken down by me
13   in stenotype, was thereafter reduced to typewriting
14   by computer-aided transcription under my direction
15   and is a true record of the testimony given.
16          I further certify that I am not in any way
17   interested in the outcome of this action and that I
18   am not related to any of the parties thereto.
19          Witness my hand this April day of 3rd, 2017.
20
21
22   _____
23   YVETTE M. HEINZE, CSR, RPR
24
25
```

YVETTE M. HEINZE, CSR,  RPR, OFFICIAL COURT REPORTER