# Exhibit R

Bakken's Objections to Defendant's Proposed Orders Submitted to the Court on April 5, 2017, filed on April 10, 2017 in the matter Bakken Resources, Inc. v. Holms, CDV-2016-612 pending in the Montana First Judicial District Court, Lewis & Clark County.  Note that all four proposed orders are attached herewith.

1
Oliver H. Goe
BROWNING, KALECZYC, BERRY & HOVEN, P.C.
2
800 N. Last Chance Gulch, Suite 101
P.O. Box 1697
3
Helena, MT 59624
(406) 443-6820
4
(406) 443-6883 Facsimile
oliver@bkbh.com
5

6
Attorneys for Bakken Resources, Inc.

7

ANGIE SPARKS
CLERK DISTRICT COURT

2017 APR 10 PM 0: 23

FILED

K RASMUSSEN
Deputy


8
MONTANA FIRST JUDICIAL DISTRICT COURT, LEWIS AND CLARK COUNTY

9

| | |
|---|---|
| BAKKEN RESOURCES, INC., | Case No. DDV 2016-612 |
| Plaintiff, | |
| v. | |
| VAL M. HOLMS, ALLAN G. HOLMS, TODD JENSEN and ALLEN COLLINS, | **BAKKEN RESOURCES, INC.'S OBJECTION TO DEFENDANTS' PROPOSED ORDER SUBMITTED TO THE COURT ON APRIL 5, 2017** |
| Defendants and Third Party Plaintiffs, | |
| v. | |
| KAREN MIDTLYNG, DANIEL D. ANDERSON, and WESLEY J. PAUL, And John Does 1-20, | |
| Third-Party Defendants. | |

20    Plaintiff Bakken Resources, Inc. ("BRI"), through counsel, respectfully submits this

21    Objection to Defendants' Proposed Order Submitted to the Court on April 5, 2017.  BRI is well

22    aware this Court is already inundated with filings in this matter.  However, elements of

23    Defendants' Proposed Order demanded at least a short response.

24    As an initial matter, BRI notes the submission of proposed orders on pending motions

25    that are disputed, absent a request from the Court, is unusual.  Defense counsel informed BRI he

26    intended to submit his proposed order, and BRI has therefore felt it necessary to do the same,

27    even though a review of Defendants' proposed order shows counsel has merely used the



1769984/5364.001

1   proposed order as another opportunity to argue Defendants' position to the Court.  The Court has

2   numerous briefs (and now proposed orders) from all sides of this litigation re-stating their

3   arguments.

4          The main reasons BRI objects to Defendants' Proposed Order are that it utterly ignores

5   the procedural posture of this litigation and it adds "facts" that were not previously before the

6   Court.  The language of Defendants' Proposed Order would result in this Court making factual

7   findings and conclusions of law in the context of a preliminary injunction.  By its terms, a

8   preliminary injunction is not a final equitable remedy.  In this litigation, the parties have not even

9   commenced discovery.  Any final factual findings without a full presentation of the evidence—

10  whether those findings involve the legality of the proxies by which Allan Holms attempted to

11  takeover BRI, the behavior of Defendant Val Holms in relation to his LOAA or the Eagle Private

12  Equity Transaction—would be improper at this time.[1]  Defendants' Proposed Order would

13  obviate the need for any discovery, let alone a trial on the merits.  A preliminary injunction

14  requires the Court to determine whether the applicant "has a legitimate cause of action, and that

15  he is likely to succeed on the merits of that claim," and also whether "that an injunction is an

16  appropriate remedy."  *Sandrock v. DeTienne*, 2010 MT 237, ¶ 16, 358 Mont. 175, 243 P.3d 1123

17  (citations omitted).  Defendants' Proposed Order goes far beyond that task.

18         Moreover, Defendants' Proposed Order presents "facts" and argument to the Court that

19  were not before the Court in the context of the preliminary injunction motions previously.  Those

20  "facts" and argument should not be considered by the Court at this time without giving BRI an

21  opportunity to respond.

22

23  ─────────────

24  [1] Nowhere in the Third-Party Complaint do the Defendants/Third-Party Plaintiffs seek declaratory relief from this Court relating
    to the Eagle Private Equity transaction. The only proceedings challenging the legality of the Eagle Private Equity transaction
    were initiated by Val Homes in Nevada on May 17, 2016 and over which Judge Flanigan has previously exercised jurisdiction.

25  Even if the Defendants/Third-Party Plaintiffs had appropriately sought declaratory relief related to the legality of the Eagle
    Private Equity transaction, Eagle Private Equity is not a party to these proceedings. This Court can't determine the legality of the

26  transaction without the joinder of all indispensable parties. In fact, pursuant to M. R. Civ. P. 19(b), and in light of no attempts by
    Defendants/Third-Party Plaintiffs to join Eagle Private Equity which is clearly an indispensable party, "equity and good
    conscience" dictate that this Court should defer from addressing any claims relating to the legality of the Eagle Private Equity

27  transaction.

1709984/53o4.001

1  Accordingly, while BRI appreciates defense counsel provided it with a copy of
2  Defendants' Proposed Order simultaneous to filing it with the Court, it strenuously objects to its
3  contents and asks the Court not to consider the new "facts," evidence, and arguments contained
4  therein.

5      DATED this 10th day of April, 2017.

6                  BROWNING, KALECZYC, BERRY & HOVEN, P.C.

7
8      By _____
9          Oliver H. Goe
           Attorneys for Bakken Resources, Inc.
10
11
12
13              **CERTIFICATE OF SERVICE**
14      I hereby certify that on the 10th day of April, 2017, a true copy of the foregoing was
15  mailed by first-class mail, postage prepaid, addressed as follows:
16
    John C. Doubek
17  Doubek, Pyfer & Fox, LLP
    307 North Jackson
18  P.O. Box 236
19  Helena, MT  59624-0236

20  Jordan Crosby
    Ugrin, Alexander, Zadick & Higgins, P.C.
21  #2 Railroad Square
    P.O. Box 1746
22  Great Falls, MT 59403-1746
23
24
25      BROWNING, KALECZYC, BERRY & HOVEN, P.C.
26
27

Jordan Y. Crosby
James R. Zadick
UGRIN, ALEXANDER, ZADICK & HIGGINS, P.C.
#2 Railroad Square, Suite B
P.O. Box 1746
Great Falls, MT 59403
Telephone: (406) 771-0007
Facsimile:  (406) 452-9360
E-mail: jyc@uazh.com; jrz@uazh.com
Attorneys for Third Party Defendants

## MONTANA FIRST JUDICIAL DISTRICT COURT, LEWIS AND CLARK COUNTY

| | |
|---|---|
| BAKKEN RESOURCES, INC., | |
| Plaintiff, | Cause No. CDV-2016-612 |
| -vs- | |
| VAL M. HOLMS, ALLAN G. HOLMS, TODD JENSEN and ALLEN COLLINS, | **THIRD-PARTY DEFENDANTS'** |
| | **JOINDER IN PLAINTIFF BAKKEN** |
| Defendants and | **RESOURCES, INC.'S OBJECTION** |
| Third Party Plaintiffs, | **TO DEFENDANTS' AND THIRD-** |
| | **PARTY PLAINTIFFS' PROPOSED** |
| -vs- | **ORDER SUBMITTED TO THE** |
| | **COURT ON APRIL 5, 2017** |
| KAREN MIDTLYNG, DANIEL D. ANDERSON, and WESLEY J. PAUL, and JOHN DOES 1-20, | |
| Third Party Defendants. | |

On April 10, 2017, Plaintiff, Bakken Resources, Inc. (BRI), filed Objection to Defendants'

Proposed Order Submitted to the Court on April 5, 2017.  Third-Party Defendants Daniel Anderson

(Anderson), Karen Midtlyng (Midtlyng), and Wesley Paul (Paul) (collectively Third-Party

Defendants) hereby file their joinder in BRI's objection.  Third-Party Defendants will not reiterate

the arguments made by BRI and therefore joins in, adopts, and incorporates herein BRI's objection.

Third-Party Defendants strenuously object to the contents of Defendants' Proposed Order and asks

the Court not to consider the new "facts," evidence, and arguments contained therein.

DATED this 11ᵗʰ day of April, 2017.

UGRIN, ALEXANDER, ZADICK & HIGGINS, P.C.

By: _____

Jordan Y. Crosby
James R. Zadick
Attorneys for Third-Party Defendants

2

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was duly served upon the following by mail, Federal Express, Hand-delivery or Facsimile transmission:

[ X ] U.S. Mail    [  ] Federal Express    [  ] Hand-Delivery   [  ] FAX transmission

Oliver H. Goe
BROWNING, KALECZYC, BERRY & HOVEN, P.C.
800 N. Last Chance Gulch, Suite 101
P.O. Box 1697
Helena, MT 59624
*Attorneys for Plaintiff*

John C. Doubek
DOUBEK, PYFER & FOX, LLP
307 North Jackson
P.O. Box 236
Helena, MT 59624-0236
*Attorneys for Defendants & Third-Party Plaintiffs*

DATED this ___ day of April, 2017.

UGRIN, ALEXANDER, ZADICK & HIGGINS, P.C.

3

**MONTANA FIRST JUDICIAL DISTRICT COURT, LEWIS AND CLARK COUNTY**

BAKKEN RESOURCES, INC.,

               Plaintiff,

       -vs-

VAL M. HOLMS, ALLAN G. HOLMS, TODD
JENSEN and ALLEN COLLINS,

            Defendants and
            Third Party Plaintiffs,

       -vs-

KAREN MIDTLYNG, DANIEL D.
ANDERSON, and WESLEY J. PAUL, and
JOHN DOES 1-20,

            Third Party Defendants.

Cause No. CDV-2016-612

**THIRD-PARTY DEFENDANTS'
NOTICE OF SUBMITTAL OF
PROPOSED ORDER**

Third-Party Defendants Karen Midtlyng, Daniel D. Anderson, and Wesley J. Paul (Third-

Party Defendants) by and through their attorney of record, Jordan Y. Crosby, hereby submits the

following attached proposed Order (Exhibit A) for the Court's consideration:

    1.     Order Granting Third-Party Defendants' Motion to Dismiss.

//

//

//

DATED this 11th day of April, 2017.

UGRIN, ALEXANDER, ZADICK & HIGGINS, P.C.

By: _____
　　　Jordan Y. Crosby
　　　James R. Zadick
　　　Attorneys for Third-Party Defendants


## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was duly served upon the following by mail, Federal Express, Hand-delivery or Facsimile transmission:

[ X ] U.S. Mail　　[ ] Federal Express　　[ ] Hand-Delivery　　[ ] FAX transmission

Oliver H. Goe
BROWNING, KALECZYC, BERRY & HOVEN, P.C.
800 N. Last Chance Gulch, Suite 101
P.O. Box 1697
Helena, MT 59624
*Attorneys for Plaintiff*

John C. Doubek
DOUBEK, PYFER & FOX, LLP
307 North Jackson
P.O. Box 236
Helena, MT 59624-0236
*Attorneys for Defendants & Third-Party Plaintiffs*

DATED this ____ day of April, 2017.

_____
UGRIN, ALEXANDER, ZADICK & HIGGINS, P.C.

EXHIBIT A

**MONTANA FIRST JUDICIAL DISTRICT COURT, LEWIS AND CLARK COUNTY**

BAKKEN RESOURCES, INC.,

               Plaintiff,

      -vs-

VAL M. HOLMS, ALLAN G. HOLMS, TODD
JENSEN and ALLEN COLLINS,

               Defendants and
               Third Party Plaintiffs,

      -vs-

KAREN MIDTLYNG, DANIEL D.
ANDERSON, and WESLEY J. PAUL, and
JOHN DOES 1-20,

               Third Party Defendants.

Cause No. CDV-2016-612

**ORDER GRANTING THIRD-
PARTY DEFENDANTS' MOTION
TO DISMISS**

      Third-Party Defendants Karen Midtlyng, Daniel D. Anderson, and Wesley J. Paul (Third-

Party Defendants) have moved to dismiss the Third-Party Complaint brought by Third-Party

Plaintiffs Allan G. Holms (Allan), Todd Jensen (Jensen), and Allen Collins (Collins) (collectively

"Third-Party Plaintiffs"). Third-Party Plaintiffs oppose the motion. The motion has been fully

briefed. Third-Party Defendants filed their Notice of Submittal on January 24, 2017. Accordingly,

this motion is deemed submitted.

      Based on the Court's findings that (1) Third-Party Plaintiffs lack standing to bring claims on

behalf of Bakken Resources Inc. (BRI) and their claims are not ripe and thus not justiciable; (2) the third-party claims are procedurally deficient derivative claims that fail to comply with the clear requirements of applicable law; (3) the principles of comity and the "first to file" doctrine are applicable in this matter and deference should be given to the Nevada litigation; (4) Third-Party Plaintiffs' claims are inadequate third-party claims under Rule 14(a)(4) and (5), M.R.Civ.P; and (5) the attorney-client privilege bars claims against corporate counsel Paul.

IT IS HEREBY ORDERED that Third-Party Defendants' Motion to Dismiss is GRANTED and Third-Party Plaintiffs' Third-Party Complaint is hereby DISMISSED. The remaining parties shall appropriately correct the caption in this case to reflect this Court's ruling.

DATED this _____ day of _____, 2017.


_____
James P. Reynolds
District Court Judge


## MEMORANDUM

### I.   FACTS:

Based on the record before this Court, the following facts are undisputed:

1.   Bakken Resources Inc. (BRI) is a public corporation incorporated in Nevada with its principal place of business in Helena, Montana.

2.   Third-Party Plaintiffs consist of shareholder Allan and non-shareholders Jensen and Collins.

3.   Midtlyng is a Director and Corporate Secretary of BRI.

4.   Anderson is a Director and Chief Financial Officer of BRI.

2

5.      Paul is BRI's corporate counsel.

6.      On July 21, 2017, BRI filed suit against Allan, Jensen, and Collins, as well as Val Holms (Val) the former Chief Executive Officer of BRI.[1]  BRI's suit arises out of a series of events culminating in an attempted improper "take-over" of the BRI board and offices.

7.      On or about July 20, 2016, Third-Party Plaintiffs and Val purported to execute proxies to elect a new Board consisting of Allan, Jensen, and Collins, and then purported to install Allan as President and terminate Midtlyng, Anderson, and Paul.

8.      In response to Third-Party Plaintiffs' and Val's actions, BRI was forced to bring suit filing a Complaint and Application for Temporary Restraining Order (TRO) and Injunctive Relief on July 21, 2017.

9.      BRI's TRO was granted on July 22, 2016, and extended by order on August 1, 2016. Based on subsequent orders of this Court, the Court has sought to maintain the status quo and the TRO remains in effect as of this filing.

10.     In response to BRI's complaint, on August, 8, 2016, Third-Party Plaintiffs filed their Answer and Third-Party Complaint asserting third-party claims against Midtlyng, Anderson, and Paul wholly unrelated to the liability BRI alleges against Third-Party Plaintiffs.  In particular, Third-Party Plaintiffs allege that BRI's Board improperly failed to hold an Annual Meeting of Shareholders, that no directors were elected from November 2014 through July 2016, that proxies representing a majority of BRI stock were executed appointing Allan and electing Allan, Jensen, and Collins to the Board, and that this new Board terminated Midtlyng, Anderson, and Paul and elected new officers.  Third-Party Plaintiffs also allege that Midtlyng, Anderson, and Paul have refused to

comply with these actions, leave their positions with BRI, or turn over control of BRI assets and information, and have improperly instigated the present litigation.

11.     The Third-Party Complaint specifically seeks or alleges: (1) injunctive relief prohibiting the Third-Party Defendants from taking action on behalf of BRI, interfering with BRI's business, from entering BRI's property, and from accessing, controlling, or using BRI funds and financial accounts; (2) declaratory relief that the proxies appointing Allan validly elected a new Board and terminated the Third-Party Defendants; and findings that: (3) Third-Party Defendants breached their contracts with BRI; (4) Third-Party Defendants breached the implied covenant of good faith and fair dealing owed to BRI; (5) Third-Party Defendants breached their fiduciary duty owed to BRI and its shareholders; (6) Third-Party Defendants converted and/or misappropriated BRI property; and (7) Third-Party Defendants are trespassing or wrongfully occupying BRI property.

12.     The Third-Party Complaint in this case is identical to a complaint that was previously brought, purportedly on behalf of BRI, against Midtlyng, Anderson, and Paul in the Montana First Judicial District, *Bakken Resources, Inc., v. Daniel D. Anderson, Karen Midtlyng, Wesley J. Paul, and John Does 1-10*, Cause No. DV 2016-611 ("the 611 case").

13.     The 611 case was dismissed with prejudice on August 6, 2016, just four days prior to the filing of the Third-Party Plaintiffs' Complaint.

14.     There is also derivative litigation ongoing in the Second Judicial District Court of the State of Nevada, for the County of Washoe, Cause No. CV14-00544 ("the Nevada Derivative action").

15.     In the Nevada Derivative action, BRI shareholders Manuel Graiwer (Graiwer) and

---

[1]     On January 5, 2017, BRI filed a Suggestion of Death of Defendant Val M. Holms advising the Court of Val's

T.J. Jesky brought derivative claims on behalf of BRI against Val, BRI Board members, the previous BRI CFO, Midtlyng, and Paul.

16.    Graiwer was among the shareholders that executed proxies that gave rise to the situation at issue in the present litigation and the Third-Party Complaint.

17.    The Nevada Derivative action alleges breaches of fiduciary duty, gross negligence and corporate waste against BRI directors and officers, and alleges breach of fiduciary duty, unjust enrichment, and civil conspiracy against Paul.  It seeks to recover allegedly excessive royalty payments made to Holms Energy, LLC, and seeks to recover alleged improper payments made to Paul.

18.    Val also previously filed a complaint against BRI, Anderson, Midtlyng, and BRI Board members in the Second Judicial District Court of the State of Nevada, for the County of Washoe, Cause No. CV16-01086, on May 17, 2016 ("the Val Nevada action") related to the Nevada Derivative action.

19.    The Val Nevada action arises out of the Nevada Derivative action and alleges breach of fiduciary duty by the BRI board regarding changes to BRI bylaws and the terms of financing, alleges tortious interference with contract relating to alleged interference with Val's attempts to settle claims in the Nevada Derivative action, and seeks injunctive relief requiring BRI and its Board to refrain from interfering with settlements in the Derivative action or breaching their fiduciary duties.

20.    Pursuant to stipulation, the Val Nevada action was transferred to Nevada District Court Judge Patrick Flanagan and consolidated with the Nevada Derivative action.

21.    On June 27, 2016, Judge Flanagan held a nearly full day hearing on Val's request for

death on December 24, 2016.

the issuance of a preliminary injunction. The Court has been provided with a full hearing transcript from these proceedings. At the hearing, oral argument from attorneys on behalf of Val and counsel for BRI, Anderson, Midtlyng, and BRI Board members was presented. Additionally, two witnesses were called by defendants, Anderson and Carl George (George), one of the Principals of Eagle Private Equity.

22.   Following the hearing, Judge Flanagan issued an oral decision, which was later memorialized in his July 14, 2016, Order denying Val's request for preliminary injunction. Specifically, Judge Flanagan found the testimony of Anderson and George credible. Judge Flanagan also held:

> The Court finds the ability of a company to maintain institutional knowledge is important, that capitalism is a game of risk, and none of the procedures set forth in the agreement between Eagle Private Equity and BRI are illegal or improper…. Importantly, [Val's] counsel admitted during argument that nothing BRI or its Directors had done was illegal.

> The Court further finds Nevada's business judgment rule, codified at NRS 78.138(3), sets forth a presumption that in making a business decision the Directors of the Company acted on an informed basis, in good faith and in the honest belief the action was taken in the best interests of the Company.

> Given the evidence presented to this Court, as viewed under the template of the business judgment rule set forth above, as well as the standards Plaintiff is required to establish to convert a TRO into a preliminary injunction, the Court finds Plaintiff [Val] Holms (1) does not enjoy a likelihood of success on the merits, and (2) will not suffer irreparable harm if the TRO entered on May 24, 2016 is dissolved and vacated.

Judge Flanagan thus dissolved and vacated the TRO entered on May 24, 2016, on Val's behalf.

21.   Judge Flanagan's June 27, and subsequent July 14, Orders occurred prior to the July 20, 2016, attempted improper take-over.

22.   On July 22, 2016, Judge Flanagan following a hearing with all counsel, issued a TRO

6

against Val and Graiwer preventing any immediate or irreparable harm to BRI and its Board of Directors. Judge Flanagan found in pertinent part that Defendants BRI, Anderson, Midtlyng, and BRI Board members:

> [H]ave a reasonable probability of success on their arguments that the voting proxies executed by Val Holms on July 7, 2016 purporting to transfer to Allan Holms twenty-six million two hundred thirty-five thousand (26,235,000) shares of Common Stock in BRI, and by Manual Graiwer on July 29, 2016, purporting to transfer his shares to Allan Holms are invalid based on SEC regulations pertaining to proxy solicitations....
>
> The Court further finds that Defendants have a reasonable probability of success on their arguments that Eagle Private Equity has properly exercised its rights to convert its loans in the Company to Series A Preferred Stock under the agreement it has with BRI and in so doing has obtained six hundred thousand (600,000) shares of Series A Preferred Stock granting to Eagle Private Equity sixty million (60,000,000) shares of Common Stock in BRI. The 60,000,000 shares held by Eagle Private Equity are the majority of voting shares of all BRI stock. Consequently, the Court also finds Defendants have a reasonable probability of success on their argument that even if the subject voting proxies are valid Eagle Private Equity holds a majority of the voting shares in the Company and thus renders the subject takeover attempt ineffectual.

23.     Judge Flanagan's TRO permitted BRI, the Directors, and Paul to take any actions necessary to contest the same takeover attempt at issue here, permitted those defendants to access the BRI accounts at Wells Fargo, and enjoined any person from inhibiting such access.

24.     On October 25, 2016, Judge Flanagan extended the TRO pending resolution of the Nevada proceedings. This TRO continues in effect to date.

## II.     ANALYSIS:

### A.     As a Threshold Matter, Third-Party Plaintiffs Lack Standing To Bring Their Unripe Claims.

Dismissal is appropriate pursuant to Rule 12(b)(1), M.R.Civ.P, because Third-Party Plaintiffs lack standing to bring their Third-Party Complaint. Standing is, of course, a "threshold,

jurisdictional requirement in **every case.**" *Heffernan v. Missoula City Council*, 2011 MT 91, ¶ 29, 360 Mont. 207, 255 P.3d 80 (emphasis added).

The right to bring claims on behalf of a corporation like BRI – otherwise known as possessing standing – is held by the corporation's board of directors. *Shoen v. SAC Holding Corporation*, 137 P.3d 1171, 1178 (Nev. 2006) ("Ordinarily, under Nevada's corporations' laws, a corporation's 'board of directors has full control over the affairs of the corporation.' … In managing the corporation's affairs, the board of directors may generally decide whether to take legal action on the corporation's behalf."). The exception to this rule is a shareholder derivative suit. *Id.* at 1179.

Derivative claims are fundamentally those claims brought by shareholders to redress alleged harm by directors or officers. *See e.g., Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 95 (1991) ("[T]he purpose of the derivative action [is] to place in the hands of the individual shareholder a means to protect the interest of the corporation from the misfeasance and malfeasance of 'faithless directors and mangers.'"). As the Supreme Court of Delaware has recognized, "to have standing to sue individually, rather than derivatively on behalf of the corporation, the plaintiff must allege more than an injury resulting from a wrong to the corporation." *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 351 (Del. 1988). With a derivative suit, shareholders, and it's important to reiterate that Allan is the only BRI shareholder among the Third-Party Plaintiffs, may assert claims on behalf of the corporation.

Third-Party Plaintiffs' claims, for example in Causes of Action Three through Seven, are explicitly premised on wrongs to BRI and are not separate or distinct from injuries that would be

suffered by BRI shareholders generally, making them undoubtedly derivative claims.[2] *See Cohen v. Mirage Resorts, Inc.*, 62 P.3d 720, 734 (Nev. 2003); *see also Parnes v. Bally Ent'm't Corp.*, 722 A.2d 1243, 1245 (Del. 1999) ("Stockholders may sue on their own behalf (and, in appropriate circumstances, as representatives of a class of stockholders) to seek relief for direct injuries that are independent of any injury to the corporation."); *Gullett v. Van Dyke Const. Co.*, 2005 MT 105, ¶ 14, 327 Mont. 30, 111 P.3d 220 ("The general rule is that shareholders may not sue upon a cause of action belonging to their corporation.").

As a derivative action on behalf of BRI, the law of the place of incorporation governs the prerequisites necessary to bring a shareholder derivative action. *See* § 35-1-548, MCA. There is no dispute that BRI is a Nevada corporation. Accordingly, any derivative claims against BRI officers must comply with the requirements of Nevada law regarding the prerequisites for derivative suits. *See* Nev.R.Civ.Pro. 23.1; *Shoen*, 137 P.3d at 1180. As *Shoen* recognized, individual shareholders do not have standing to bring claims on behalf of a corporation outside of the derivate suit context. *Shoen*, 137 P.3d at 1180.

Here, Third-Party Plaintiffs have not been adjudicated to be the BRI Board. Third-Party Plaintiffs' response relies upon conclusory, and inaccurate, allegations regarding the propriety of the proxies and their alleged status as BRI Board members. Essentially, Third-Party Plaintiffs claim that their third-party claims are appropriate because the proxies were proper and because they are the new BRI Board. Their argument is circular, however, because the validity of these proxies, and whether the Third-Party Plaintiffs are indeed the Board, are central questions still at issue. These preliminary

---

[2]    While the Third-Party Plaintiffs confusingly claim that they are not bringing a derivative suit a derivative suit is the only legal mechanism that grants them standing to bring their Third-Party Complaint.

issues have yet to be adjudicated in either context.

Allan, the only Third-Party Plaintiff shareholder, cannot individually bring claims on behalf of BRI unless he brings a shareholder derivative suit on behalf of BRI that complies with the requirements of Nevada law. Importantly, the Third-Party Plaintiffs' Complaint has wholly failed to comply with Nevada law's clear requirements regarding derivative suits. In particular, the Third-Party Complaint has failed to comply with Nevada Rule of Civil Procedure 23.1, which requires that derivative complaints be verified and allege with particularity the demand efforts the plaintiff shareholders made to the directors to obtain the action they seek in the derivative complaint. *See* Nev.R.Civ.P. 23.1; *see also* NRS 41.520(2) (requiring that a derivative complaint set forth with particularity the efforts the plaintiffs took to secure the action they desire from the board of directors). In particular, Nevada Rule of Civil Procedure 23.1 states:[1]

> In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege that the plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains or that the plaintiff's share or membership thereafter devolved on the plaintiff by operation of law. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort.

The baseline rule is that in a shareholder derivative lawsuit brought to enforce a right of the corporation, the plaintiff shareholder must first make a formal demand on the corporate board to take corrective action. *Shoen*, at 1171. *Schoen* cites directly to the clear requirements of Nevada law at NRS 41.520(2): "the complaint must also set forth with particularity the efforts of the plaintiff to

---

[1]    Rule 23.1(b), M.R.Civ.P., also requires that a derivative complaint be verified and state with particularity any efforts regarding demand made to the directors.

secure from the board of directors or trustees and, if necessary, from the shareholders such action as he desires, and the reasons for his failure to obtain such action or the reasons for not making such effort." *Id.*, at n. 14 (emphasis added).[4]   The Nevada Supreme Court is unequivocal: "[a] shareholder's failure to sufficiently plead compliance with the demand requirement deprives the shareholder of standing and justifies dismissal of the complaint for failure to state a claim upon which relief may be granted." *Id.*, at 1180 (emphasis added).

Here, the Third-Party Plaintiffs' Third-Party Complaint fails to plead any compliance with the demand requirement.  Moreover, two of the Third-Party Plaintiffs—Jensen and Collins—have utterly failed to plead that they are indeed shareholders at the time the actions occurred.  Lastly, Third-Party Plaintiffs' complaint is not verified.  As a result of the failure to comply with Rule 23.1, N.R.Civ.P., and NRS 41.520(2)'s requirements, Allen lacks standing to bring his derivative suit as a BRI shareholder.  Furthermore, Jensen and Collins lack standing to bring a derivative suit in the first place since they did not plead that they are (and are in fact not) shareholders. Dismissal is thus appropriate.

Essentially, because Third-Party Plaintiffs admit that they are not bringing a derivative suit, they have failed to comply with Nevada law's requirements regarding derivative suits regardless, and because Allan, the only BRI shareholder, may not being claims on behalf of BRI as an individual shareholder outside of the derivative mechanism, Third-Party Plaintiffs only possess standing to being their third-party claims on behalf of BRI if they are determined to be the BRI Board. That has not happened.  Therefore, the Third-Party Plaintiffs' claims on behalf of BRI are not ripe, as their

---

[4]     Similarly, § 35-1-543, MCA, provides that a derivative action may not commence without written demand to the corporation.

fundamental standing to bring claims on behalf of BRI claims is contingent upon other, unresolved claims, namely a determination that they are the BRI Board. *See Havre Daily News v. City of Havre*, 2006 MT 215, ¶ 18, 333 Mont. 331, 142 P. 3d 864.

Montana courts simply "will not act when the legal issue raised is only hypothetical or the existence of the controversy is merely speculative," *Havre Daily News*, ¶ 19, and Third-Party Plaintiffs' assertion that they have a right to bring claims on behalf of BRI as the BRI Board is merely hypothetical or speculative until the present litigation considering this very issue has been resolved. Until and unless these questions are resolved in favor of the Third-Party Plaintiffs, the only other legal mechanism by which they could assert claims on behalf of BRI is through a derivate suit, and, as explained above, and the Third-Party Plaintiffs have failed to comply with Nevada law on derivate suits. As a result, the Third-Party Plaintiffs lack standing to bring claims on behalf of BRI, the third-party claims brought on behalf of BRI are not justiciable because they are not ripe, and the Third-Party Complaint must be dismissed. *See Shoen*, 137 P.3d at 1180; *Reichert v. State ex rel. McCulloch*, 2012 MT 111, ¶¶ 53-54, 365 Mont. 92, 115, 278 P.3d 455, 471 (noting that the judicial power of Montana courts is limited to justiciable controversies, and ripeness is an element of justiciability).

**B.      Dismissal of the Third-Party Complaint Must Occur In Deference To The Nevada Proceedings.**

The Montana Supreme Court has recognized that principles of comity, specifically the "first to file" doctrine, supports dismissal "when a complaint involving the same parties and issues has already been filed in another district." *See Wamsley v. Nodak Mut. Ins. Co.*, 2008 MT 56, ¶¶ 31-32, 341 Mont. 467, 178 P.3d 102; *see also Pacesetter Systems, Inc. v. Medtronic, Inc.*, 678 F.2d 93, 94–

95 (9th Cir. 1982). Importantly, "the first-to-file rule requires only substantial similarity of parties," as courts recognize that gamesmanship often comes with the forum shopping that the "first to file" doctrine seeks to prevent. *Kohn Law Grp., Inc. v. Auto Parts Mfg. Mississippi, Inc.*, 787 F.3d 1237, 1239–40 (9th Cir. 2015) (emphasis added). District courts are afforded "an ample degree of discretion" when staying proceedings, as a matter of comity, in favor of a previously filed action in another state. *Wamsley*, ¶ 32.

The Ninth Circuit has further provided that courts should look to the "chronology of the lawsuits, similarity of the parties, and similarity of the issues." *Kohn Law Grp., Inc.*, 787 F.3d at 1239–40. Essentially, "where substantially identical actions are proceeding in different courts, the court of the later-filed action should defer to the jurisdiction of the court of the first-filed action by either dismissing, staying, or transferring the later filed suit." *SAES Getters S.p.A. v. Aeronex, Inc.*, 219 F.Supp.2d 1081, 1089 (S.D.Cal. 2002). Courts have recognized that "[t]he first-to-file rule is intended to 'serve[ ] the purpose of promoting efficiency well and should not be disregarded lightly.'" *Kohn Law Grp., Inc.*, 787 F.3d at 1239. Basically, under the "first to file" doctrine, a district court may decline to exercise jurisdiction over an action in favor of a previously-filed action in another state.

Third-Party Plaintiffs improperly argue that dismissal in favor of the Nevada litigation under the principle of comity is inappropriate because: (1) BRI brought claims against them in this Court; (2) BRI was "not the first to file in Nevada;" and (3) the litigation in Nevada is "different." The Court does not agree. First, the Nevada Derivative action was initiated in 2014, long before BRI brought suit against Defendants/Third-Party Plaintiffs and Val's Nevada action, also brought before BRI brought the present suit, will determine the validity of Val's proxies and the Eagle financing

deal. Most importantly, BRI only initiated the present litigation in this Court in response to the Defendants'/Third-Party Plaintiffs' improper takeover attempt. Third-Party Plaintiffs' actions in Montana are simply attempts to circumvent and outrun the Nevada litigation. BRI's litigation would not be occurring before this Court but for Defendants'/Third-Party Plaintiffs' improper actions in Montana. The essential goal of BRI's claims against the Defendants/Third-Party Plaintiffs in this Court is to halt their improper takeover actions in Montana so as to permit the Nevada litigation, which was already filed, to proceed.

Here, comity and the "first to file" doctrine support dismissal of any proceedings related to the Third-Party Complaint in favor of the previously filed Nevada actions. The Nevada actions involve the same basic questions of BRI governance at issue in the Third-Party Complaint, and involve largely the same parties, as both the Val action and the Derivative action bring claims against various Third-Party Defendants. Both Nevada actions are at a more advanced stage than the present litigation, as several substantive hearings have occurred, and Judge Flanagan is fully familiar with the parties and issues involved. Furthermore, at least two substantive and relevant orders have been issued by the Nevada court. In particular, the Nevada court's July 14, 2016, Order dissolving and vacating Val's TRO demonstrates that the Nevada court has heard substantive argument, testimony, and reviewed significant briefing on the Eagle Private Equity line of credit and has determined that the decision to enter into such transaction was neither illegal nor improper. The propriety of the Eagle deal, which could affect who holds a controlling shares of BRI stock (and is accordingly able to vote in a new Board) is at issue in the Nevada litigation, and clearly bears on the Third-Party Complaint in this case.

These issues, particularly the legality and validity of the proxies appointing Allan and the purported illegal attempted Board takeover, are, again, directly at issue here. The Nevada actions are at a more advanced stage of litigation, and the Nevada court has substantively considered and ruled on the same issues raised by the Third-Party Complaint here. This supports dismissal in deference to the Nevada actions. *See 24 Hour Fitness USA, Inc. v. Salminen*, 2012 WL 4434290, at *1–2 (D. Mont. June 21, 2012) (ordering dismissal in favor of the previously filed litigation in another court because, in part, "[t]he Northern District of California is much more familiar with the parties' disputes than is this Court."). The essence of issues in the Nevada and Montana actions is the same—the governance of BRI and the propriety of the Eagle transaction—and the parties substantially overlap, and exact similarity is not required with regards to either. *See Kohn Law Grp., Inc.*, 787 F.3d at 1240. In particular, all three actions involve alleged breaches of fiduciary duty and alleged misconduct by BRI officers and directors, including the Third-Party Defendants. Moreover, the parallel injunctive relief claims in the Val Nevada action and Third-Party Complaint raise the prospect of potentially conflicting injunctive relief being granted regarding the governance and operations of BRI. The Court finds that the principles of comity and the "first to file" rule dictate dismissal of the Third-Party Complaint to allow the Nevada courts to be allowed the opportunity to address the specific matters at issue here.

## C.    The Third-Party Complaint is an Improper Third-Party Suit.

Alternatively, the Third-Party Complaint flatly fails to comply with the widely-recognized requirements of third-party practice, and should be dismissed. Rule 14, M.R.Civ.P., governs third-party practice in Montana. Rule 14(a)(1) provides that: "A defending party may, as third-party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it for all or part of

the claim itself." The latter part of subsection 14(a)(1), "for all or part of the claim against it," is key. Authority interpreting this language uniformly concludes that the language requires that third-party claims must seek to transfer the liability alleged against the defendant/third-party plaintiff by the plaintiff to the third-party defendant.

Legal treatise *Wright and Miller, Federal Practice and Procedure* provides guidance in interpreting Rule 14, stating:

> The objective of Rule 14 is to avoid the situation that arises when a defendant has been held liable to plaintiff and then finds it necessary to bring a separate action against a third individual who may be liable to defendant for all or part of plaintiff's original claim.

6 Fed. Prac. & Proc. Civ. § 1442 (3d ed.). Rather, the following types of claims are contemplated by Rule 14:

> A third-party claim may be asserted under Rule 14(a)(1) only when the third party's liability is in some way dependent on the outcome of the main claim or when the third party is secondarily liable to the defending party. . . . . The crucial characteristic of a Rule 14 claim is that defendant is attempting to transfer to the third-party defendant the liability asserted against defendant by the original plaintiff. The mere fact that the alleged third-party claim arises from the same transaction or set of facts as the original claim is not enough.

6 Fed. Prac. & Proc. Civ. § 1446 (3d ed.) (emphasis added).

In an attempt to demonstrate compliance with Rule 14 requirements, Third-Party Plaintiffs claim that Third-Party Defendants "may well have liability to Defendants here." Third-Party Plaintiffs misstate the requirements of Rule 14. Rule 14 does not require that Third-Party Defendants "may" be liable, rather it requires that the third-party claims **must** seek to shift liability Third-Party Plaintiffs face because of BRI's initial claims to the Third-Party Defendants. Nor is it simple enough that the claims "are very intertwined" as alleged by Third-Party Plaintiffs. The

authority provides that: "[t]he distinguishing and essential characteristic of a Rule 14 claim is that the third party's liability to the original defendant must, in some way, derive from and be conditional upon a finding that the original defendant is liable to the original plaintiff." 1 Fed.R.Civ.P., Rules and Commentary, Rule 14.

This is clearly not the purpose of the Third-Party Complaint here, which explicitly fails to recover from Third-Party Defendants due to **any** liability imposed by BRI's original claims.  For example, Causes of Action One and Two are for injunctive and declaratory relief which clearly fall outside the parameters of Rule 14. Causes of Action Three through Five are for Breach of Contract, Breach of the Covenant of Good Faith, and Breach of Fiduciary Duty, and are defective derivative claims on behalf of BRI.[5]

There are only two causes of action in BRI's Complaint for which money damages are requested.  First, the breach of contract claim is directed at Val for his breach of the LOAA.  The claims within the Third-Party Complaint for conversion/misappropriation and trespass in no way seek to shift liability for Val's breach of his LOAA to the individual Third-Party Defendants. Similarly, while BRI's Complaint alleges that Third-Party Plaintiffs' have interfered with prospective economic opportunities nothing in the Third-Party Plaintiffs' Complaint seeks to shift liability for those lost opportunities from the Third-Party Plaintiffs to the Third-Party Defendants.

Simply put, the third-party claims against the Third-Party Defendants are not derived from

---

[5]      Not only are these claims inappropriate as third-party claims brought pursuant to Rule 14, but, are the identical claims alleged in a case ostensibly brought on behalf of BRI and subsequently dismissed **with prejudice**. *See BRI v. Don Anderson, et al, Mont First Jud Dist Ct, Lewis and Clark Co*, Cause No. DDV-2016-611.  The doctrines of res judicata and claim preclusion also bar this Third-Party Complaint as outlined and fully briefed in BRI's Motion to Dismiss filed on December 2, 2016.  BRI correctly asserts that preclusion doctrines require dismissal of the Third-Party Complaint. Third-Party Plaintiffs admit that the third-party claims asserted in the subject Third-Party Complaint are identical to those alleged in the -611 litigation.  The -611 litigation was dismissed with prejudice.  Accordingly, res judicata requires the Third-Party Complaint be dismissed.

BRI's claims against the Defendants/Third-Party Plaintiffs. BRI's claims are aimed at stopping the Defendants'/Third-Party Plaintiffs' improper takeover attempt, while the Third-Party Plaintiffs' claims against the Third-Party Defendants seek to validate the attempted takeover. Third-Party Plaintiffs' claims should be dismissed.

**D.    Third-Party Plaintiffs' Claims Against Paul Must be Dismissed Because BRI Has Not Waived the Attorney-Client Privilege.**

Third-Party Defendants assert that the Third-Party Complaint against Paul should be dismissed because BRI has not waived its attorney-client privilege and the only way for Paul to appropriately defend himself, he would need to use and disclose attorney-client-privileged information, which is prohibited by Montana law. The Court agrees. The Montana Supreme Court has held that "the general rule is that, as to questions of evidence, the law of the forum controls." *State v. Lynch*, 1998 MT 308, ¶ 21, 292 Mont. 144, 969 P.2d 920. This is true as to the application of exclusionary rules, which would include the attorney-client privilege. *See id.*; *State ex rel. Union Oil Co. of Cal. v. Dist. Court of Eighth Judicial Dist. In & For Cascade Cty.*, 160 Mont. 229, 235 (1972) (recognizing that "[i]t is also well-established in other jurisdictions that the attorney-client privilege applies to legal opinions prepared for use of a corporation by its house counsel."). Here, the attorney-client privilege which attaches to the relationship between Paul and BRI acts as a complete bar to any independent claims the Third-Party Plaintiffs may have against Paul in his capacity as legal counsel to BRI. § 26-1-803, MCA.

While Montana courts have not addressed the precise situation at issue here, they have recognized that the attorney-client privilege extends to advice given by corporate counsel. *See State ex rel. Union Oil Co. of Cal*, 160 Mont. at 235; *see also Kuiper v. Dist. Court of Eighth Judicial*

*Dist. of State of Mont.*, 193 Mont. 452, 461 (1981).  The Court finds that Paul is constrained from

effectively drawing upon information necessary to defend himself adequately, because of the

privilege protections attached to his attorney-client communications shared with his client/co-

defendant, BRI.

This precise legal issue has been fully litigated and decided in favor of identically situated

attorney-defendants (and subsequently followed), by the California appellate courts.  *McDermott,*

*Will & Emery v. Superior Court of Los Angeles County, et al.,* 83 Cal.App.4th 378, 99 Cal.Rptr.2d

622 (2000); *Reilly v. Greenwald & Hoffman, LLP* 196 Cal.App.4th 891, 906 (2011) and *IP Telesis*

*Inc. v. Velocity Networks Inc.*, C.D. Cal. Case No. CV 11-09950 RGK (AJWx) (Nov. 5, 2012).  In its

decision, the California Court of Appeals made clear that such a derivative corporate claim against a

third-party would not constitute an "assignment" of the potential malpractice claim (*id.,* at 83

Cal.App.4th 382-83), but more to the point, it then ruled that the derivative plaintiffs could not waive

the corporation's attorney-client privilege.   Specifically, the California Court of Appeals stated:

> Having held shareholders have standing to pursue a derivative action against an
> extracorporate third party to enforce the rights of the corporation provided certain
> prerequisites are satisfied, we must still confront the attorney-client privilege issues
> necessarily raised by a derivative malpractice action against corporate outside
> counsel.  In holding a shareholder derivative action not to be tantamount to an
> assignment, we have reasoned that shareholders in such an action essentially "stand
> in the shoes" of the corporation.   While this is true for most purposes, the one
> notable exception is with respect to the attorney-client privilege.
>
> It is the corporation, and not the shareholder, who is the holder of the privilege.  . . .
> Shareholders do not enjoy access to such privileged information merely because the
> attorney's actions also benefit them. . . .   Nor do shareholders obtain the right to
> waive the privilege simply by virtue of filing the action on the corporation's behalf.

*Id.*

The Court of Appeals then distinguished between an ordinary (*i.e.*, non-derivative) legal

19

malpractice claim – where an attorney would be permitted to defend him/herself against the client's

accusations, without a prohibition on using privileged information–and the untenable posture of

defending against such a derivative claim without such a waiver:

> Generally, the filing of a legal malpractice action against one's attorney results in a
> waiver of the privilege, thus enabling the attorney to disclose, to the extent necessary
> to defend against the action, information otherwise protected by the attorney-client
> privilege. . . .   However, because a derivative action does not result in the
> corporation's waiver of the privilege, such a lawsuit against the corporation's outside
> counsel has the dangerous potential for robbing the attorney defendant of the only
> means he or she may have to mount any meaningful defense. It effectively places the
> defendant attorney in the untenable position of having to "preserve the attorney client
> privilege (the client having done nothing to waive the privilege) while trying to show
> that his representation of the client was not negligent."

83 Cal.App.4th at 383-84 (emphasis added).  The Court of Appeals emphasized:

> We simply cannot conceive how an attorney is to mount a defense in a shareholder
> derivative action alleging a breach of duty to the corporate client, where, by the very
> nature of such an action, the attorney is foreclosed, in the absence of any waiver by
> the corporation, from disclosing the very communications which are alleged to
> constitute a breach of that duty.

83 Cal. App. 4th at 385.

At no point in their opposition do Third-Party Plaintiffs address or attempt to contradict the

legal authority relied upon by Third-Party Defendants.  The Court finds the *McDermott* decision

persuasive in this matter.  Paul is in the untenable position of having to defend his actions as the

corporate counsel for BRI, but BRI has not waived its attorney-client privilege.  In order to respond,

Paul would need to use and disclose attorney-client-privileged information, and this is prohibited by

Montana law.  *See* § 26-1-803, MCA.  The Third-Party Plaintiffs cannot themselves waive the

attorney-client privilege on behalf of BRI.  Because of the "dangerous potential" that the defendant

outside corporate counsel could not defend himself against the derivative suit's malpractice claims

20

without violating the attorney-client privilege, which is held by BRI, the third-party claims against

Paul must be dismissed.

## CONCLUSION

For the reasons stated above, Third-Party Defendants' motion is granted.


Cc:   Jordan Y. Crosby/James R. Zadick
      Oliver H. Goe
      John C. Doubek

1   Oliver H. Goe
    BROWNING, KALECZYC, BERRY & HOVEN, P.C.
2   800 N. Last Chance Gulch, Suite 101
    P.O. Box 1697
3   Helena, MT 59624
    (406) 443-6820
4   (406) 443-6883 Facsimile
    oliver@bkbh.com
5

6   Attorneys for Bakken Resources, Inc.

7

8        MONTANA FIRST JUDICIAL DISTRICT COURT, LEWIS AND CLARK COUNTY

9

10  BAKKEN RESOURCES, INC.,                      Case No. DDV 2016-612

11            Plaintiff,

12        v.

13  VAL M. HOLMS, ALLAN G. HOLMS, TODD          **BAKKEN RESOURCES, INC.'S**
    JENSEN and ALLEN COLLINS,                   **SUBMITTAL OF PROPOSED ORDERS**

14            Defendants and
              Third Party Plaintiffs.
15

16        v.

17  KAREN MIDTLYNG, DANIEL D.
    ANDERSON, and WESLEY J. PAUL, And
18  John Does 1-20,

19            Third-Party Defendants.

20        Bakken Resources, Inc. (BRI), through its attorney of record, Oliver H. Goe, hereby

21  submits the following proposed Orders for the Court's consideration:

22        1.     Order Granting Bakken Resources, Inc.'s Motion For Preliminary Injunction; and

23        2.     Order Granting Bakken Resources, Inc.'s Motion to Stay Proceedings.

24        As stated in BRI's Objection to Defendants' Proposed Order Submitted to the Court on

25  April 5, 2017, "BRI notes the submission of proposed orders on pending motions that are

26  disputed, absent a request from the Court, is unusual.  Defense counsel informed BRI he

27  intended to submit his proposed order, and BRI has therefore felt it necessary to do the same,

1  even though a review of Defendants' proposed order shows counsel has merely used the

2  proposed order as another opportunity to argue Defendants' position to the Court. The Court has

3  numerous briefs (and now proposed orders) from all sides of this litigation re-stating their

4  arguments."

5       DATED this 11ᵗʰ day of April, 2017.

6                           BROWNING, KALECZYC, BERRY & HOVEN, P.C.

7

8                           By _____

9                               Oliver H. Goe

                            Attorneys for Bakken Resources, Inc.

10

11

12                    **CERTIFICATE OF SERVICE**

13

14       I hereby certify that on the ___ day of April, 2017, a true copy of the foregoing was
    mailed by first-class mail, postage prepaid, addressed as follows:

15

16  John C. Doubek
    Doubek, Pyfer & Fox, LLP
17  307 North Jackson
    P.O. Box 236
18  Helena, MT  59624-0236

19  Jordan Crosby
    Ugrin, Alexander, Zadick & Higgins, P.C.
20  #2 Railroad Square
    P.O. Box 1746
21  Great Falls, MT 59403-1746

22

23

24       _____

25       BROWNING, KALECZYC, BERRY & HOVEN, P.C.

26

27

- 2 -

1771141/5364.001

1
2
3
4
5
6
7
8

MONTANA FIRST JUDICIAL DISTRICT COURT, LEWIS AND CLARK COUNTY

9   BAKKEN RESOURCES, INC.,

10          Plaintiff,

11        v.

12   VAL M. HOLMS, ALLAN G. HOLMS, TODD
     JENSEN and ALLEN COLLINS,

13

14          Defendants and
            Third Party Plaintiffs,

15        v.

16

17   KAREN MIDTLYNG, DANIEL D.
     ANDERSON, and WESLEY J. PAUL, And
18   John Does 1-20,

19          Third-party Defendants

20

Case No. DDV 2016-612

**ORDER GRANTING BAKKEN
RESOURCES, INC.'S MOTION FOR
PRELIMINARY INJUNCTION**

21        This matter is now before the Court on Bakken Resources, Inc.'s (BRI) Motion For

22   Preliminary Injunction. Defendants oppose the motion. The motion has been fully briefed and is

23   deemed submitted.

24        BRI has satisfied the requirements of Mont. Code Ann. § 27-19-201, *et seq.*, for the

25   issuance of a preliminary injunction. BRI has established that Defendants have committed acts

26   and are threatening acts which would produce great or irreparable harm to BRI, and, if not

27   enjoined, are likely to commit acts rendering any judgment ineffectual. BRI has also established

- 1 -

1771234/5364.001

that it is likely BRI will succeed on the merits; that BRI will suffer irreparable harm absent the issuance of a preliminary injunction; that the threatened injury outweighs whatever damage Defendants may claim; and that the issuance would not be adverse to the public interest.

It is therefore ordered that Defendants' Motion for Preliminary Injunction is DENIED and BRI's Motion for Preliminary Injunction is GRANTED. The following injunction is issued pending final resolution of this matter:

Defendant Val M. Holms or his agents or Estate be prohibited from any of the following actions:

a)    providing a proxy to any person or entity to vote his shares of Common Stock in BRI;

b)    voting his shares in any manner that seeks to replace any member of the Board;

c)    voting his shares in any manner that seeks to replace the Corporate Officer, including the current CFO Dan Anderson and current Corporate Secretary Karen Midtlyng; and

d)    any other actions of any kind that could have a material detrimental impact on BRI's business/operations including those actions set forth below relating to Defendants Allan G. Holms, Todd Jensen and Allen Collins.

Defendants Allan G. Holms, Todd Jensen and Allen Collins or their agents be prohibited from any of the following actions:

a)    taking any actions on behalf of BRI including attempts to replace BRI's Board, Corporate Officer or BRI's attorneys;

b)    taking any action purportedly on behalf of BRI to access BRI's bank accounts including those accounts with Wells Fargo or taking any action to prevent BRI from accessing its bank accounts through the only authorized signatories Karen Midtlyng and Dan Anderson and are further ordered to take all steps necessary to ensure that BRI has access to its bank accounts, including advising Wells Fargo that Defendants neither personally nor in a representative capacity have any claim or interest in such accounts;

c)    representing to any person or entity that they are Directors of BRI with authority to conduct business or take actions on behalf of BRI;

- 2 -

1            d)      attempting to act on behalf of BRI in any manner whatsoever;

2            e)      taking any actions that could affect the business/operations of BRI in any

3                    respect;

4            f)      exercising any of the proxies included in Exhibit A to the Amended

                   Complaint.

5

6    DATED this _____ day of _____, 2017.

7

8

9                           _____

                           James Reynolds

10                        District Judge

11

12                        **MEMORANDUM**

13    Based on the record before this Court, the following facts are undisputed.

14   **I.**     **Procedural History**

15       1.      On July 21, 2016, BRI filed its Complaint and Application For Temporary

16 Restraining Order and Injunctive Relief, Motion For Temporary Restraining Order, Preliminary

17 Injunction and Order to Show Cause Why a Preliminary Injunction Should Not Issue.

18       2.      On July 22, 2016, the Honorable Kathy Seeley granted the TRO and set the

19 hearing on the preliminary injunction for Monday, August 1, 2016 at 9:30 a.m.

20       3.      On July 22, 2016, shortly after the TRO was granted, counsel for BRI, Oliver Goe,

21 emailed a copy of the TRO to Mr. Bil Childress, Defendants' Washington counsel.

22       4.      On July 25, 2016, Mr. Anderson and Ms. Midtlyng were served a lawsuit from

23 BRI naming them as defendants. *BRI v. Anderson, et al.*, Cause No. DDV 2016-611. Mr. Paul

24 was served a few days later. The lawsuit was never authorized by BRI and was the work of

25 Defendant Allan Holms and Mr. Childress, who hired Michael Lamb and James Carey to

26 represent BRI without informing them of any issues regarding BRI's control.

27

                                              1771234/5364.001

5.      Later on July 25, 2016, Oliver Goe, on behalf of BRI, advised Mr. Lamb and Mr. Carey that the case they had filed was not authorized by BRI and that it should be dismissed.

6.      On July 27, 2016 BRI's Board of Directors again wrote Lamb and Carey advising that they had no authority to act on behalf of BRI.

7.      On July 27, 2016 Lamb and Carey moved to withdraw.

8.      On August 2, 2016 Oliver Goe entered his appearance as counsel of record for BRI in *BRI v. Anderson, et al.*, Cause No. DDV 2016-611, and on August 4, 2016, BRI filed its Notice of Dismissal with Prejudice.

9.      On August 8, 2016, this Court dismissed Cause No. DDV 2016-611 with prejudice.

10.     Also on August 8, 2016, Defendants filed a Motion for a Temporary Restraining Order and Preliminary Injunction, asking the Court to issue an injunction preventing Daniel Anderson, Karen Midtlyng and Wesley J. Paul from acting on behalf of BRI. Defendants' Motion was primarily directed at the current Third-Party Defendants, although they had not yet at that time been added as parties to this litigation and were not parties at the time this Court held its August 9, 2016 hearing on BRI's Motion For a Preliminary Injunction. (Defendants have taken no further action in pursuit of such motion, likely because it was rendered moot by this Court's decision to extend the TRO granted in favor of BRI.)

11.     This Court held a hearing on BRI's pending Motion for a Preliminary Injunction on August 9, 2016. The Defendants were all represented by John Doubek. BRI was represented by Oliver Goe.

12.     Defendants' Motion was fully briefed, but this Court kept the previously-issued TRO in place pending further briefing by the parties.

13.     On October 16, 2016, Defendants filed a second Motion for Temporary Restraining Order, asking the Court to enjoin BRI and Third-Party Defendants from holding an annual meeting and from allowing Eagle Private Equity from voting on any corporate matters

1   until the validity of the Eagle Equity transaction has been determined.  The Court granted the
2   TRO requested on the same day.

3       14.   Also in late 2016, BRI and Third-Party Defendants filed various motions,
4   including a motion to dismiss, a motion to stay, a motion to dismiss third-party claims, and a
5   motion for a protective order.  Those motions remain pending.

6       15.   The Court held another hearing on the pending motions for preliminary injunction
7   on December 12, 2016.  All parties were represented by counsel.  The parties and the Court
8   agreed at that hearing to maintain the status quo of all current temporary restraining orders until
9   further review of the materials could be completed by the Court.

10      16.   The Court held a status hearing on February 22, 2017.  At that time, the Court
11  determined that, instead of proceeding with an evidentiary hearing, it would be prudent first to
12  consider and decide the pending motions, including the motions for preliminary injunction, to
13  stay, and to dismiss.  This Order addresses the motions for preliminary injunction.

14  **II.   Factual Summary**

15      BRI is a public corporation incorporated in the state of Nevada, and at all relevant times
16  has its principal place of business and conducted its business operations from an office located at
17  825 Great Northern Blvd., Suite 304, Helena, Lewis and Clark County, MT 59601.  BRI is duly
18  registered with the Montana Secretary of State to conduct business in the state of Montana.
19  BRI's primary business as a royalty company relates to leasing oil and gas properties to oil and
20  gas production companies.  Bakken Resources, Inc. is a publicly-reporting public company
21  whose shares are registered pursuant to Section 12(g) of the Securities Exchange Act of 1934, 15
22  U.S.C. § 78l.

23      **A.  BRI's History with Defendants and the Eagle Equity Transaction**

24      Defendant  Val  M.  Holms[1]  owns  26,350,000  shares  of  BRI  which  represents
25  approximately  47%  ownership  interest  in  BRI's  issued  and  outstanding  common  stock.

26

27

---

[1] Val Holms is now deceased.  All references to him in this Order encompass his Estate.

1   Defendant Val M. Holms is the former Chief Executive Officer (CEO) of BRI.

2          On May 6, 2016, Defendant Val M. Holms was terminated as CEO of BRI. This decision

3   was announced in the 8-K filed with the Securities and Exchange Commission on May 11, 2016.

4   As reflected therein, after an exhaustive investigation by an independent investigator, Ms.

5   Shirley Spira, the Board of BRI made the following findings:

6              1.   Mr. Holms received $200,000 of Company funds as kickback
               payment in 2011 relating to a transaction commonly referred to as
7              the "Duck Lake Transaction." The Duck Lake Transaction was first
               disclosed by the Company in a Current Report on Form 8-K filed
8              with the SEC on September 27, 2011. The Company originally paid
9              $250,000 for the Duck Lake Transaction.

10             2.   Mr. Holms acted without proper authority in executing the "Big
               Willow Lease," which the Company first disclosed in a Current
11             Report filed on Form 8-K with the SEC on July 15, 2014. The Big
12             Willow Lease contemplated the payment of $675,000 in bonus
               payments which the Company has paid in full.
13
               3.   Mr. Holms knowingly participated in providing false
14             information to the Company's auditors in March 2011 relating to a
15             non-existent $30,000 transaction in Texas.

16             4.   Mr. Holms has breached the LOAA on numerous occasions.
               The nature of these breaches relates to certain of Mr. Holms' actions
17             aimed at terminating the internal investigation into his conduct, and
               also in part to certain confidential communications. Such
18             communications are part of a shareholder derivative litigation filed
19             by Manuel Graiwer and T.J. Jesky in Reno, Nevada, and so cannot
               be fully disclosed at this time.
20

21          Previously, in an effort to ensure that the integrity of the investigation would not be

22   compromised, BRI requested and Holms agreed to take a voluntary leave of absence during the

23   pendency of the investigation. On March 24, 2015, BRI and Holms entered into a Leave of

24   Absence Agreement ("LOAA") in which Holms agreed to take a leave of absence "with respect

25   to all his positions with BRI, effective immediately, until conclusion of the Investigation and the

26   results of such investigation are presented to the Board." In the Agreement, "Val agrees not to

27   interfere with BRI's business/operations during the period of his leave of absence."

1    While Defendant Val Holms was terminated as CEO, the LOAA remained in effect. As

2    stated in the May 11 8-K "[a]dditional materials relating to the investigation may be

3    forthcoming. As a result, the investigation remains on-going, and Mr. Holms' LOAA continues

4    to apply to him as Chairman."

5    BRI kept the SEC apprised of the status of independent investigation prior to the 8-K

6    announcing the termination of Defendant Val Holms from his position as CEO.

7    Defendant Val Holms never disputed the effectiveness or enforceability of the LOAA

8    but, by tendering his proxy to Defendant Allan Holms, among other actions, violated the LOAA.

9    On May 6, 2016, BRI entered into a $1,000,000 loan agreement with Eagle Private

10   Equity ("Eagle"). The details of the agreement were reported to the SEC in an 8-K filed May 10,

11   2016. As reflected therein, in the event of a Triggering Event, the loans can be converted into

12   shares of Series A Preferred Stock.

13   The Defendants' actions brought on two separate Triggering Events. First, "any

14   transaction or series of related transactions whereby following such transactions, a majority of

15   the members of the Company's Board of Directors existing prior to such transactions are either

16   replaced or no longer constitute a majority of the Company's Board of Directors." Second, "any

17   transaction or series of related transactions resulting in or reasonably likely to result in the

18   acquisition of "control shares" as defined and subject to Nevada Revised Statutes 78.378 et al.,

19   assuming for the purposes of this section that the Company is an "issuing corporation" as defined

20   under such statutes." BRI received notices from Eagle Private Equity on July 20, 2016, the same

21   day that it received notices from the Defendants, that Eagle was exercising its rights under the

22   Eagle Transaction Documents. The rights that Eagle exercised allowed Eagle to obtain 600,000

23   shares of Series A Preferred Stock.  Series A Preferred Stock has the right to vote at least 100

24   shares of common for each 1 share of Series A Preferred.  Eagle currently has the voting

25   equivalent of 60 million shares of common stock.  Eagle's voting rights exceed the total number

26   of issued and outstanding shares of BRI common stock of 56,735,350 and far exceed the number

27   of shares purportedly represented by Allan Holms Proxies.

1

**B. Nevada Proceedings**

2   A derivative action involving BRI, its Board of Directors, corporate officers, general

3  counsel and Defendant Val Holms, was first filed in Nevada on March 13, 2014. *Graiwer, et al.*

4  *v. Holms, et al.*, Second Judicial Court of the State of Nevada In and For The County of Washoe,

5  Cause No. CV14-0544.

6   On May 17, 2016, Defendant Val Holms filed a lawsuit against BRI, Dan Anderson,

7  Karen Midtlyng and other members of BRI's Board of Directors requesting injunctive relief

8  against BRI and its Board of Directors and alleging a breach of fiduciary duty against the

9  Director Defendants and intentional interference with Contract against all Defendants. *Holms v.*

10  *BRI, et al*, Second Judicial Court of the State Nevada In and For The County of Washoe, Cause

11  No. CV16-0186.  Such legal claims were all premised on the argument that there was no

12  legitimate business purpose for the Eagle Private Equity transaction, that such transaction was

13  intended to dilute the value of Defendant Val Holms' stock and that it should be set aside.

14   On May 24, 2016, Judge Freeman, unaware of the fact that proceedings had been

15  ongoing involving these same parties since 2014, granted an *ex parte* TRO which provided in

16  part that BRI and its Board of Directors were prohibited from drawing on the Eagle Private

17  Equity line of credit.

18   On June 15, 2016, the case filed by Defendant Val Holms, Cause No. CV16-0186 was

19  consolidated with the derivative action that had been filed on March 13, 2014 and over which

20  Judge Flanagan had been presiding for over 2 years.  As reflected on the Docket Sheet from the

21  Nevada court, during that two-year period, there had already been a significant number of filings,

22  hearings and Orders.

23   BRI and the Director Defendants filed their Opposition to Plaintiff Val Holms' Ex Parte

24  Motion and Application For Temporary Restraining Order and Request For Hearing on

25  Preliminary Injunction on June 20, 2016.

26   On June 27, 2016, Judge Flanagan held a hearing on whether the TRO issued by Judge

27  Freeman should be converted to a preliminary injunction.  During the hearing, Judge Flanagan

1   heard the testimony of Dan Anderson and Carl George and at the close of the hearing, announced

2   his decision on the record, later memorialized in his Order of July 14, 2016. As reflected therein,

3   Judge Flanagan found nothing illegal or improper relating to the Eagle Private Equity transaction

4   and held that BRI's decision to enter into such transaction was consistent with the Nevada

5   business judgment rule codified at NRS 78.138(3).

6         The Court finds the ability of a company to maintain institutional
7         knowledge is important, that capitalism is a game of risk, and none of the
      procedures set forth in the agreement between Eagle Private Equity and BRI are
8      illegal or improper.  This includes the BRI Board's amendment to its Bylaws on
      February 9, 2016, to provide for staggered Board terms as well as the terms of the
9      Eagle Private Equity financing.  Importantly, Plaintiff's counsel admitted during
10      argument that nothing BRI or its Directors had done was illegal.

11         The Court further finds Nevada's business judgment rule, codified at
12      NRS-78.138(s), sets forth a presumption that in making a business decision the
      Directors of the Company acted on an informed basis, in good faith in the honest
13      belief the action was taken in the best interests of the Company.

14   (Exhibit 1 to BRI's Brief in Support of Motion to Dissolve Defendants' October 19, 2016 TRO.)

15   Based on those findings, Judge Flanagan dissolved the TRO that had been issued by Judge

16   Freeman and denied the preliminary injunction that had been sought by Defendant Val Holms.

17   **C. Proxies and Attempted Takeover**

18         Having heard Judge Flanagan's opinion regarding the legitimacy of the Eagle Private

19   Equity transaction at the close of the hearing, it appears that Defendants Allan and Val Holms

20   immediately set out to obtain proxies so as to circumvent Judge Flanagan's order and to take

21   over BRI.  During testimony before this Court Defendant Allan Holmes confirmed that the

22   attempted takeover was spurred on by Judge Flanagan's decision and order finding the Eagle

23   Private Equity Transaction reasonable and legal.[2]

24

25         [2] During the preliminary injunction hearing conducted by this Court on August 9, 2016, Defendant Allan
26   Holms testified regarding how he became involved in the Montana litigation. He testified that Defendant Val Holms
      mentioned to him, thirty (30) days prior (roughly early June 2016 immediately after the Nevada court's ruling
27   denying Val's Motion for Preliminary Injunction on June 27, 2016) that Val might be in trouble and that he needed
      Allan's help.  On this point, Allan explained:

1          On July 20, 2016, Defendant Allan Holms and his associates attempted the takeover of

2 BRI's Helena office.   As reflected in the affidavits of Dan Anderson and Karen Midtlyng, on

3 July 20, 2016, at approximately 2:00 p.m., Defendant Allan G. Holms walked into BRI's office

4 in Helena unannounced, accompanied by his attorney, Mr. Childress of Spokane, private security

5 guards, one of which was openly displaying a handgun, Allan G. Holms' wife and several other

6 unknown individuals later identified as Defendants Jensen and Collins.   Defendant Allan G.

7 Holms and his entourage confronted BRI's Corporate Secretary and Board Member Karen

8 Midtlyng and advised her that Allan G. Holms was the new President of BRI, that "this is a

9 takeover", that she was fired, and that she was to immediately pack up her personal items and

10 leave.

11          She was served with 19 proxy statements that were not notarized along with various other

12 documents, which, according to Mr. Childress, proved that Defendant Allan G. Holms was the

13 new Board Chairman and President.   He also represented the documents showed that she had

14 been fired from her position as a Director and Officer.

15          Dan Anderson, a Director of BRI and Chief Financial Officer, arrived shortly thereafter

16 and was confronted with the same representations from Defendant Allan G. Holms and Mr.

17

18      A.      He asked if I could help. He asked me specifically—he told me the situation, told me

19                what had happened in Reno told me where he was at, and he asked me if I could help him.

Hrg. Transcr., 65:14-17.

20          Defendant Allan Holms also testified concerning conversations he had with Defendant Val Holms

21 regarding how he could "help" Val with respect to his situation with BRI. He explained that his attorneys in

22 Spokane, Washington, Dunn & Black, told Allan he would need to "get votes" in order to take action, and that Val "…emailed it (his proxy) to me." *Id.*, at 67:9-11; 68:12. He then explained how Manny Graiwer had seen Allan during a court session in Reno, referencing the June 27, 2016 hearing on Val's Motion for Preliminary Injunction,

23 and mentioned that Graiwer, out of the blue, offered to give Allan his proxy. *Id*, 68:22-69:2. Allan denied any direct solicitation and instead claims that after receiving Val's and Graiwer's proxies, the balance of proxies were obtained

24 by Val. The testimony reads:

25      Q.      And how did the rest of them come to be in your possession?

26      A.      The rest of them, I'm assuming, through Val and his family. There's a lot of family members here in Helena. They just kept coming. I didn't solicit them. They just kept coming.

27          The evidence supports the conclusion that Defendants Val and Allan Holms were orchestrating the attempted takeover, which necessarily included the solicitation of a sufficient percentage of common stock from various shareholders to allow Defendant Allan Holms to attempt the takeover on July 20, 2016. This Court notes that the proxies are almost all on identical forms and contain identical language.

1  Childress, who advised him that he had been removed from the Board and was terminated as the
2  CFO. He likewise was ordered to leave his office.

3         Ms. Midtlyng called the Helena Police Department as she felt intimidated and threatened
4  by the presence of Defendant Allan G. Holms, Mr. Childress, and armed security guards.

5         Ms. Midtlyng and Mr. Anderson, as Directors and Officers of BRI, questioned the legal
6  basis for the actions and orders of Mr. Holms and Mr. Childress. On this basis, they refused to
7  abandon their BRI offices.

8         The Helena Police Department arrived, spoke to all parties and the FBI and ultimately
9  required Defendant Allan G. Holms, Mr. Childress, the armed private security guards, and other
10 individuals to leave BRI's offices.

11        After being ordered to leave BRI's offices, Defendant Allan G. Holms and Mr. Childress
12 went to the Wells Fargo main office in Helena and attempted to switch signatories on BRI's
13 account to Defendant Allan G. Holms. The Wells Fargo representative, Terry Spalinger, CFA,
14 Vice President, refused but indicated that he would be referring the issue to counsel. The
15 morning of July 21, 2016, BRI received an email from Mr. Spalinger advising BRI's accounts
16 had been frozen pending resolution of disputed ownership and control of BRI.

17        Defendant Allan G. Holms served on Plaintiff BRI various documents, including but not
18 limited to 19 documents labeled "Bakken Resources, Inc. Proxy" signed by individuals and/or
19 entities which purport to own certain shares in BRI. The "Proxies" have since expired by their
20 own terms. Each of them was signed in July 2016 on virtually identical or substantially similar
21 forms and they state they will expire six months after the date of execution.

22        **D. Post-Takeover Attempt Legal Proceedings**

23        On July 22, 2016 and as a result of the attempted takeover, BRI sought out and obtained
24 a TRO in Nevada enjoining Defendant Val Holms' voting proxy based on violations of SEC
25 proxy solicitation rules and regulations and invalidating any action taken by Defendant Allan
26 Holms in Montana based on Eagle having acquired the majority of BRI voting rights. The TRO
27 Motion was heard by the Nevada Court with Judge Flanagan presiding on July 22, 2016, with

1771234/5364.001

1  counsel for Val Holms present at that hearing.   The Nevada Court granted the requested
2  Temporary Restraining Order finding: (1) Defendants have a reasonable probability of success in
3  their arguments that the voting proxy executed by Val Holms on July 7, 2016 and by Manuel
4  Graiwer on June 29, 2016 both in favor of Allan Holms are invalid based on SEC rules and
5  regulations pertaining to proxy solicitations, 17 C.F.R. §240.14a-2, et seq., and (2) that
6  Defendants enjoy a reasonable probability of success on their argument that Eagle had properly
7  exercised its right to put and convert its loan to BRI to Series A Preferred Stock pursuant to the
8  loan agreement between BRI and Eagle thereby granting Eagle six hundred thousand (600,000)
9  shares of Series A Preferred Stock, which provides Eagle with the ability to vote the equivalent
10  of sixty million (60,000,000) voting shares of BRI common stock and thus makes Eagle the clear
11  majority shareholder of BRI.

12      Also on July 22, 2016 and only because of the attempted takeover of BRI here in
13  Montana, a TRO was entered by Judge Seeley in favor of BRI and against Defendants which
14  prohibited them from attempting to replace BRI's Board, Corporate Officers or attorneys or
15  taking any actions disruptive to BRI's business/operations. By Order dated August 1, 2016, that
16  TRO was extended by Judge Seeley and has remained in place by Order of this Court ever since.

17  **E. Recent Developments**

18      On December 24, 2016, Val died at his residence located in Polson, Lake County,
19  Montana. *See* Suggestion of Death filed Jan. 5, 2017.  At the time of his death Val continued to
20  own BRI common stock evidenced by certificates 335, 1342, 1343, 1344 and 1345, which total
21  twenty-six million two hundred thirty-five thousand (26,235,000) shares of BRI common stock.
22  Those shares comprise approximately forty-seven percent (47%) of the common shares of BRI.

23      BRI's stock transfer agent, Nevada Agency and Transfer Company ("NATCO"), received
24  several communications from Allan commencing on or about February 7, 2017, and continuing
25  to at least February 14, 2017, during which Allan claimed to have been assigned all of Val's
26  shares. *See NATCO* Affidavits of Tiffany Baxter and Amanda Cardinalli.

27

On February 7, 2017, Allan contacted NATCO via email and provided copies of various documents, including an Assignment Agreement and stock powers. *Id.* The Assignment Agreement was dated December 10, 2016, and purportedly signed by Allan and Defendant Val Holms. *Id.* The Assignment Agreement contained provisions that assigned to Allan a total of 26,235,000 shares of BRI's common stock that were owned by Val Holms. That stock constitutes all of the ownership of Val Holms' stock in BRI. *Id.*

The five stock powers that accompanied Allan's February 7, 2017 email to NATCO were purportedly signed by Val Holms, and each stock power contained medallion guarantee stamps from Washington Trust Bank. *Id.* They were all dated December 10, 2016. *Id.* Stock powers are generally attached to original share certificates and are signed by the transferor. Medallion guarantees are generally provided by certain financial institutions and contain the institution's guarantee on the genuineness of the signature and a guarantee against the forgery of the underlying instrument. Many stock transfer agents, including NATCO, require medallion guarantees on physical share certificates that are transferred.

On February 9, 2017, NATCO contacted Washington Trust Bank, the financial institution whose medallion guarantees appeared on the stock powers, to confirm the guarantees were issued by that institution. *Id.* That afternoon, NATCO received an email from Jody McCormick, in-house corporate counsel for Washington Trust Bank, stating: "This is to confirm that WTB is unable to verify the Medallion Stamps on the Holms transaction." *Id.*

Also on February 9, 2017, NATCO contacted Allan to confirm he has one of the original certificates and four copies of certificates evidencing Val Holms' shares in BRI. *Id.* However, while Allan originally indicated to NATCO that he had one original certificate and copies of four other certificates evidencing the Val Holms shares, he stated in a phone call on February 9 that he did not have any original share certificates. *Id.*

On February 13, 2017, Allan filed a Form 5 with the Securities Exchange Commission. The Form 5 is an "initial statement of beneficial ownership" that is required to be filed whenever an executive officer or director come aboard a public company or when a shareholder acquires

1771234/5364.001

1   more than 10% of the equity securities of such public company.  A copy of the filed Form 5 was

2   provided to BRI by Richard Repp, Allan's corporate and securities attorney. The Form 5

3   indicates Allan is president of BRI and also a director of BRI.  It also indicates that Val Holms

4   purportedly transferred half of his shares to Allan pursuant to a "representation agreement" dated

5   August 1, 2016.  However, that disclosure is inconsistent with Allan's statements to NATCO on

6   or about February 7, 2016, that the shares were transferred to Allan on December 10, 2016. *Id.*

7   None of the documents provided to NATCO were dated August 1, 2016; they were all dated

8   December 10, 2016. Further, while Allan testified before this Court on August 9, 2016 regarding

9   the proxies he received from Val and others, he made no mention of this alleged transfer of half

10  of all the stock Val owned in BRI.

11  **III.   Preliminary Injunction**

12          Preliminary injunctions are governed by Montana Code Ann. § 27-19-201, which sets

13  forth in five separate subsections the grounds upon which an injunction may be granted.  The

14  relevant grounds here are:

15          (1) when it appears that the applicant is entitled to the relief demanded and the

16          relief or any part of the relief consists in restraining the commission or

17          continuance of the act complained of, either for a limited period or perpetually;

18          (2) when it appears that the commission or continuance of some act during the

19          litigation would produce a great or irreparable injury to the applicant;

20          (3) when it appears during the litigation that the adverse party is doing or

21          threatens or is about to do or is procuring or suffering to be done some act in

22          violation of the applicant's rights, respecting the subject of the action, and tending

23          to render the judgment ineffectual....

24  Mont. Code Ann. § 27-19-201(1)-(3). The subsections of the statute are disjunctive, meaning

25  "only one subsection need be met for an injunction to issue." *Sandrock v. DeTienne*, 2010 MT

26  237, ¶ 16, 358 Mont. 175, 243 P.3d 1123 (citations omitted).  Under Mont. Code Ann. § 27-19-

27  201(1), the applicant must show that he "has a legitimate cause of action, and that he is likely to

- 14 -

succeed on the merits of that claim," and also demonstrate "that an injunction is an appropriate remedy." *Id.* (citations omitted). "An applicant for a preliminary injunction must establish a prima facie case, or show that it is at least doubtful whether or not he will suffer irreparable injury before his rights can be fully litigated." *Benefis Healthcare v. Great Falls Clinic, LLP,* 2006 MT 254, ¶ 14, 334 Mont. 86, 146 P.3d 714 (citation omitted). Once that showing has been made, the Court should issue a preliminary injunction to maintain the status quo pending trial. *Sandrock,* ¶ 16. "Status quo" is defined as "the last actual, peaceable, noncontested condition which preceded the pending controversy." *Porter v. K &S Partnership,* 192 Mont. 175, 627 P.2d 836, 839 (1981).

In this case, BRI has made a claim for monetary relief as well. Count 1 is a breach of contract claim against Defendant Val Holms, and Count 2 is a claim for tortious interference with prospective economic opportunity against all Defendants. Accordingly, the Court must also consider whether the monetary relief requested will provide an adequate remedy, because injunctive relief generally does not issue where monetary relief is adequate and available. *See Shammel v. Canyon Resources Corp.,* 2003 MT 372, ¶ 17, 319 Mont. 132, 82 P.3d 912 (citation omitted). The Supreme Court adopted a four-part test to determine whether a preliminary injunction should issue when a party's monetary judgment may be made ineffectual by the actions of the adverse party, thereby injuring the applicant:

(1) the likelihood that the movant will succeed on the merits of the action;

(2) the likelihood that the movant will suffer irreparable injury absent the issuance of a preliminary injunction;

(3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party (a balancing of the equities); and

(4) the injunction, if issued, would not be adverse to the public interest.

*Id.* (citing *Van Loan v. Van Loan,* 271 Mont. 176, 182, 895 P.2d 614, 617 (1995)).

1771234/5364.001

## A. BRI Is Entitled to the Relief Requested

The first factor to consider is whether the applicant is entitled to the relief requested. The primary elements of the injunction BRI requests include restraining Defendants from exercising the Proxies, from holding themselves to the public as directors or officers of BRI, and from interfering with its business operations. To show it is entitled to this relief, BRI has presented the Court with various affidavits and other evidence showing Defendants attempted an armed takeover of BRI's offices, attempted to gain access to BRI's bank accounts, and attempted to terminate BRI's corporate officers and corporate counsel amid on-going litigation in several states. Defendants engaged in this conduct in violation of the LOAA to which Val Holms was subject, and on the basis of the Proxies. While the Proxies are now expired pursuant to their own terms, BRI has presented evidence and argument convincing the Court that it is more likely than not that the Proxies were obtained in violation of federal law governing securities, and that, even if the Proxies were validly obtained and could be exercised, they would not grant Defendants sufficient corporate control due to the Eagle Private Equity transaction.

### i.    The Proxy Statements Are More Likely Than Not Invalid

BRI has established that it has a strong likelihood of proving that the Proxies were not obtained in accordance with applicable law. BRI is registered pursuant to Section 12(g) of the Securities Exchange Act of 1934, 15 U.S.C. § 78 *l* (the "Act"). Accordingly, the rules and regulations regarding proxy solicitations apply to BRI. *See* 15 U.S.C. § 78n(a) (providing that one violates federal securities law by using the mails or an instrumentality of interstate commerce to "solicit or to permit the use of his name to solicit any proxy or consent or authorization" regarding a security registered as required by law "in contravention of such rules and regulations as the Commission may prescribe"). Under § 240.14a-2, the requirements for public disclosure of proxy solicitations apply to every solicitation of a proxy with respect to securities registered pursuant to Section 12 of the Act. 17 C.F.R. § 240.14a-2. The only exemption to this rule that could possibly apply to the circumstances present here permits an exemption for solicitations to ten or fewer shareholders. *See* 17 C.F.R. § 240.14a-2(b)(2). That

1771234/5364.001

1     exemption cannot and does not apply here because Defendants solicited and submitted alleged

2     "Proxies" from 23 separate shareholders.

3             A violation of proxy solicitation and registration rules is a violation of Section 14(a) of

4     the Act, for which a court may "grant all necessary relief." *See Kaufman v. Cooper Cos., Inc.*,

5     719 F.Supp. 174, 178 (S.D.N.Y. 1989) (quoting *J.I. Case Co. v. Borak*, 377 U.S. 426, 431

6     (1964)). If the violation causes provable injury that undermines the purposes of the rule, a

7     plaintiff is entitled to relief. *Ash v. GAF Corp.*, 723 F.2d 1090, 1093 (3d Cir. 1983). Here, BRI

8     has established that (1) Defendants violated the ten-person exemption rule; (2) BRI has been

9     injured; and (3) a causal relationship exists between the violation of the rule and the injury

10    suffered.

11            First, BRI has established that Defendants solicited more than 10 shareholders for their

12    proxies because Allen Holms presented BRI employees with copies of proxies from 23 separate

13    shareholders.

14            Second, BRI has established that Defendants' actions resulted in injury, including, but

15    not limited to, attempting to assert control over BRI's bank account and sending cease-and-desist

16    letters to all counsel, including in-house counsel and counsel assisting BRI in on-going and

17    contentious litigation.

18            Third and finally, the violation of the rule is causally related to the injury sustained. The

19    injury to BRI occurred because Defendants violated the rule by collecting the proxies in secret

20    right before presenting them to BRI and asserting control over the corporation in an extremely

21    hostile manner. Defendants also did nothing to cure the defects in the solicitation: they did not

22    prepare any proxy statement; they attempted entirely to avoid a proxy fight; and they did not

23    allow any time for negotiation or discovery before their hostile takeover. By not complying with

24    the rules, Defendants attempted to put themselves in control, thereby causing injuries such as

25    trying to control BRI's bank account and to fire all counsel in on-going litigation.

26            The injuries resulting from Defendants' violation of § 240.14a-2, and of section 14(a) in

27    general, undermine the rule's purpose, such that the requested relief is appropriate. Section 14(a)

1   is designed to "'prevent management or others from obtaining authorization for corporate action

2   by means of deceptive or inadequate disclosure in proxy solicitation.'"  *Ash*, 723 F.2d at 1093

3   (quoting *Borak*, 377 U.S. at 431).  By enacting section 14(a), Congress intended to provide the

4   opportunity for "'fair corporate suffrage'" for shareholders of "'every equity security bought on

5   a public exchange.'"  *Id.* (quoting *Borak*, 377 U.S. at 431).  *See also Klaus v. Hi-Shear Corp.*,

6   528 F.2d 225, 232 (9th Cir. 1975), *overruled on other grounds* ("In enacting section 14(a),

7   Congress intended to guarantee the integrity of the processes of corporate democracy.").

8        Under Regulation 14A promulgated under the Act, generally, a solicitation for a proxy

9   may not be made unless a preliminary or definitive proxy statement, along with any soliciting

10  materials, is filed with the SEC, and each person solicited is provided with a copy of the filed

11  statement. 17 C.F.R. §§ 240.14a-3,-6. The regulation defines "solicitation" as (1) any request for

12  a proxy whether or not accompanied by or included in a form of proxy; (2) any request to

13  execute or not to execute, or to revoke, a proxy; or (3) the furnishing of a form of proxy or other

14  communication to security holders under circumstances reasonably calculated to result in the

15  procurement, withholding or revocation of a proxy.

16       The SEC definition thus applies not only to direct requests to execute or revoke proxies,

17  but also to "communications which may indirectly accomplish such a result or constitute a step

18  in a chain of communications designed ultimately to accomplish such a result." *Long Island*

19  *Lighting Co. v. Barbash*, 779 F.2d 793, 796 (2d Cir. 1985); *Kass v. Arden-Mayfair, Inc.*, 431

20  F.Supp. 1037, 1046 (C.D.Cal. 1977).

21       No Schedule 14A proxy statement was filed prior to the granting of any proxies to

22  Defendant Allan Holms.  Defendants' argument that a proxy statement was unnecessary carries

23  very little weight in light of the fact that 23 distinct stockholders collectively granted Allan

24  Holms proxies on a single form of proxy for the same purposes.  Obtaining a 23-person proxy for

25  the purpose of taking over BRI would have been virtually impossible without solicitation, as the

26  term is defined in Rule 14a-1(*l*)(1).  Whether Defendant Allan Holms solicited proxies directly,

27  through his Spokane based legal team from any of the 23 shareholders, or those shareholders

1    colluded to offer him proxies, the communications would have been made "under circumstances

2    reasonably calculated to result in the procurement" of a proxy. 17 CFR § 240.14a-1(l)(1)(iii).

3    Granting the proxies was done in violation of Schedule 14A.

4         These rules are intended to provide the investing public with adequate disclosure prior to

5    the types of actions that Defendants are attempting in this case.   The failure to follow the

6    applicable rules regarding disclosures in proxy solicitations can irreparably harm the investors in

7    public companies.   It appears as though Defendants deliberately attempted private consent

8    solicitation because they did not want BRI to do anything to stymie their efforts to remove the

9    current Board and take over the company.   These actions show a desire to undermine the core

10   purpose of section 14(a).   Defendants' actions in this matter have already resulted in injury to

11   BRI and will continue to result in irreparable harm to BRI and its shareholders if they are

12   allowed to proceed.

13        Moreover, the Proxies by their own terms have now expired, meaning Defendants cannot

14   exercise them at this time in any event.   Therefore, not only has BRI established that it is likely

15   to succeed in showing the Proxies were invalid to begin with, making Defendants' takeover

16   attempt illegitimate, but it has also shown that any future attempt by Defendants to use the

17   Proxies to gain leverage over BRI will be illegal as well.   Accordingly, BRI has satisfied its

18   burden to show it is entitled to the relief requested related to the Proxies such that a preliminary

19   injunction may issue.

20        ii.    **Val Holms Likely Violated the LOAA by Providing his Proxy to Allan**
21               **Holms**

22        Pursuant to the LOAA, Defendant Val Holms agreed "not to interfere with BRI's

23   business/operations during his leave of absence."   By providing his proxy to Defendant Allan G.

24   Holms and allowing Defendant Allan G. Holms to attempt to take control of BRI and to replace

25   the current Board of BRI with a new Board, fire its CFO and Corporate Secretary, occupy BRI's

26   offices in Helena and freeze BRI's bank accounts and replace all its counsel, Defendant Val

27   Holms has violated the letter and spirit of the LOAA.

1771234/5364.001

1   Based on the foregoing and even assuming his proxy did not violate SEC regulations, the

2   proxy from Defendant Val Holms to Defendant Allan Holms is invalid as it was tendered in

3   direct violation of the LOAA.

4           iii.   **Even if the Proxies Are Valid, Defendants Likely Violated Section 13D**

5                  **and the Williams Act**

6   Acquiring beneficial ownership of *more than* 5% equity securities in a company

7   registered under Section 12(g) of the Securities Exchange Act of 1934 ("Exchange Act")

8   requires the beneficial owner, or owners comprising an investment group, to comply with

9   Section 13(d) Exchange Act, located at 15 U.S.C § 78m(d), unless an exception applies.   Section

10  13 delegated rulemaking responsibilities to the Commission, which promulgated a series of

11  regulations, including 17 CFR § 240.13d-1 ("Rule 13d-1").   Rule 13d-1 requires filing

12  information required on either Schedule 13D or Schedule 13G, depending on the investor's

13  status.   Investors who acquire equity as a means of shifting control of a company must file the

14  longer Schedule 13D.

15  Section 13(d) of the Act was originally enacted as part of the Williams Act, which is

16  meant to prevent collusion among investors resulting in secret corporate takeovers: "The tragedy

17  of such collusion is that the corporation can be financially raped *without management* or

18  shareholders having any knowledge of the acquisitions." *Piper v. Chris-Craft*, 430 U.S. 1, 28

19  (1977) (emphasis added).   The purpose of Section 13(d) of the Act in particular "is to require

20  disclosure of information by persons who have acquired a substantial interest, or increased their

21  interest in the equity securities of a company by a substantial amount, within a relatively short

22  period of time."   S.Rep.No.550 at 7; H.R.Rep. No.1711 at 8, U.S.Code Cong. & Admin. News p.

23  2818.   Without such information, "investors cannot assess the potential for changes in corporate

24  control and adequately evaluate the company's worth."   *GAF v. Milstein*, 453 F.2d 709, 717 (2d

25  Cir. 1971).

26  Under Section 13(d), the direct or indirect beneficial ownership acquisition of more than

27  5% of a class of equity securities is a significant event that the SEC requires investors to report.

1771234/5364.001

1   The point of filing Schedule 13D (or Schedule 13G) is to make the investors' intentions and
2   identifying information known unless certain exceptions apply and permit the less cumbersome
3   Schedule 13G to stand in for Schedule 13D.  All exemptions allowing Schedule 13G to stand in
4   for Schedule 13D require at a minimum that the investor lack an intention to affect the
5   company's control, and any material change in position reported on either Schedule must be
6   report by amendment.

7        Defendants are well aware of the requirements of Section 13(d) because Defendant Allan
8   Holms filed a Schedule 13D with the SEC recently, which is the subject of BRI's pending
9   Motion for Contempt.  However, no Bakken shareholder with Section 13 reporting obligations
10  filed a Schedule 13D of 13G until Allan Holms filed on in January 2017, in response to his
11  alleged acquisition of Val Holms' shares in BRI.  Both Defendant Val Holms and Allan Holms
12  have Section 13D obligations by each having beneficial ownership in excess of 5% of BRI.  As a
13  group, the individuals who provided the Proxies to Allan Holms had beneficial ownership of
14  more than 20% of BRI's common stock at the time in question, which includes the incident on
15  July 20, 2016 and the events leading up to it.

16       BRI has established that Defendants intended to take over BRI.  Without having made the
17  requisite filings or allowing the waiting period to lapse, Section 13 precludes voting.  The events
18  of July 20, 2016 and the time leading up to that date represent tactics "infected with basic evil
19  which Congress sought to cure by enacting" the Williams Act; namely, secret corporate
20  takeovers.  *Piper v. Chris-Craft*, 430 U.S. at 28.  BRI has shown that it is likely that any votes
21  cast by the group were cast in violation of the Williams Act, specifically Section 13.

22              iv.    **Even if the Proxies Are Valid, Eagle Private Equity Likely Holds a
23                     Controlling Interest in BRI**

24       BRI has also established a likelihood of success on the merits regarding the Eagle Private
25  Equity Transaction.  Defendants have taken the position that the transaction with Eagle Private
26  Equity is a sham intended to dilute the value of BRI's shares.  The Nevada courts have already
27  soundly rejected such arguments, specifically concluding the following:

The Court finds the testimony of Dan Anderson, the CFO of BRI, credible and persuasive. Mr. Anderson testified BRI is presently "unbankable" due to being involved in litigation in several states, including Nevada and because of its present inability to timely file necessary documents with the Securities and Exchange Commission ("SEC") as a result of an ongoing internal investigation involving Plaintiff Holms. He also testified the Eagle Private Equity transaction is good for BRI, which needs private equity funding to acquire new assets especially in light of the current buyer's market that exists for mineral rights in the oil and gas industry. He further testified the five percent (5%) fee being charged by Eagle Private Equity to BRI for use of the funds is reasonable and the transaction with Eagle Private Equity does not harm the Plaintiff, Mr. Holms, because at least five steps must occur before Mr. Holms' stock would be diluted.

Mr. Anderson also testified credibly the communications with Carl George began in September, 2015, well before negotiations in the Derivative Action which ultimately resulted in a Settlement Agreement between Mr. Holms and Mr. Graiwer had commenced. Accordingly, the Court finds it is unlikely that the Eagle Private Equity transaction was designed to disrupt the settlement between Mr. Holms and Mr. Graiwer in the Derivative Action as Holms argues.

Also testifying credibly at the hearing was Carl George, one of the Principals of Eagle Private Equity. He testified to twenty-five (25) years of experience in the oil and gas industry explaining that BRI was a "tainted company," due to the conduct of Plaintiff Holms while CEO of the Company. He testified that although the Eagle Private Equity transaction does not have an express security provision the ability to convert funds loaned to BRI to Series A Preferred stock in the event of certain actions (the five steps referenced by Mr. Anderson) acted as the necessary security. Mr. George explained such security was necessary for Eagle Private Equity to commit its capital investment in BRI and the security was based on market principles. Importantly, there was no evidence presented by Plaintiff to contradict this testimony.

The Court finds the ability of a company to maintain institutional knowledge is important that capitalism is a game of risk, and none of the procedures set forth in the agreement between Eagle Private Equity and BRI are illegal or improper. This includes the BRI Board's amendment to its Bylaws on February 9, 2016, to provide for staggered Board terms as well as the terms of the Eagle Private Equity financing. Importantly, Plaintiff's counsel admitted during argument that nothing BRI or its Directors had done was illegal.

3771234/5364.001

1    Order dated July 14, 2016 in the matter of *Grainger, et al. v. Holms, et al.*, Cause No. DV-14-

2    00544 (emphasis added).

3         In large part because of Defendants' actions, Eagle Private Equity now likely has a

4    controlling interest in BRI.  BRI presented evidence showing that two separate "Triggering

5    Events" occurred on July 20, 2016:

6          First, a Triggering Event is "any transaction or series of related transactions
7          whereby following such transactions, a majority of the members of the
          Company's Board of Directors existing prior to such transactions are either
8          replaced or no longer constitute a majority of the Company's Board of
          Directors.
9

10          Second, a Triggering Event is also "any transaction or series of related
          transactions resulting in or reasonably likely to result in the acquisition of
11          "control shares" as defined and subject to Nevada Revised Statutes 78.378 et
          al., assuming for the purposes of this section that the Company is an "issuing
12          corporation" as defined under such statutes."

13          As a result of Triggering Events that took place on July 20, 2016, Eagle
          exercised its rights and obtained 600,000 shares of Series A Preferred Stock.
14          Series A Preferred Stock has the right to vote at least 100 shares of common
15          for each 1 share of Series A Preferred. Thus, Eagle's currently has the voting
          equivalent of 60 million shares of common stock.
16

17          <u>Eagle's equity holdings constitute a majority of the voting power of the
          Company's stock. Any representation by Allan Holms or his associates to
18          claim that they hold directly or by proxy a majority of the issued and
          outstanding equity of the Company is FALSE.  Any actions taken by Allan
19          Holms or his business associates on or after July 20, 2016 relating to the
          Company are unauthorized and legally improper.</u>
20

21    BRI has therefore established that it is more likely than not, regardless of the validity or

22    invalidity of the Proxies, Defendants do not possess any authority to take the actions they took in

23    July 2016 when they attempted to take over BRI, and there is a strong likelihood of success on

24    the merits.

25    ////

26

27

1771234/5364.001

v.      **Allan Holms violated the TRO and, absent a Preliminary Injunction,
is likely to further interfere with BRI's legitimate business interests**

This Court is also mindful of more recent events that compel the granting of a preliminary injunction. Undisputed by Allan Holms is that on February 13, 2017, he filed a Form 5 with the Securities Exchange Commission ("SEC"). The Form 5 is an "initial statement of beneficial ownership" that is required to be filed whenever an executive officer or director comes aboard a public company or when a shareholder acquires more than 10% of its equity securities of a public company. The Form 5 filed by Allan contains false information as it states that Allan is a Director of BRI as well as the President of BRI. Not only is the Form 5 false, but its filing with the SEC is in direct violation of ¶ c of the TRO, which prohibits Allan from holding himself out as a Director with any authority to act on behalf of BRI.

The filing of the Form 5 also violates ¶¶ d) and e) of the TRO which prohibits Allan from "attempting to act on behalf of BRI in any manner whatsoever" and from "taking any actions that could affect the business/operations of BRI in any respect." By holding himself out as not only a Director, but President as well, Allan is directly interfering in BRI's business with the potential to cause great harm.

Pursuant to the Form 5 Allan filed with the SEC, he paid $10,000 for 13,117,500 shares of BRI on August 1, 2016. This equates to .00076 cents a share. Required SEC documents were not filed then, nor was this development, which would obviously have an enormous effect on these proceedings, shared with this Court. Allan and his counsel did not share the alleged transfer of 26,235,000 of BRI stock from Val to Allan with this Court, even as they argued over the validity of proxies in pleadings filed after August 1, 2016, and as late as December 12, 2016, when all the parties were present in Court. The Court questions why, during the hearing on December 12th, this Court would not have been advised of this alleged transfer. The failure to bring this development to the Court's attention raises significant questions regarding its validity. Of course, if the transfers did in fact happen, then the issue of the legality of the proxies would have become moot and should have been brought to the Court's attention. Also the purported

SEC filings by Allan needed to be paired with analogous filings by Val, which was never accomplished, and thus further calls into question whether that share transaction ever took place.

### B. BRI Will Suffer Irreparable Injury Absent the Requested Relief, and Such Injury Outweighs Whatever Damage it May Cause to Defendants and Will Not Harm the Public Interest

Litigation regarding the Eagle Private Equity transaction, the Proxies, Val Holms' compliance with the LOAA, and other issues central to this matter is on-going in multiple jurisdictions. BRI has established that, until such litigation has been fully and finally decided, any forced take over of its operations pursuant to proxies of dubious legality, and now expired, will result in obvious, irreparable injury. The public interest will be protected by retaining the status quo and permitting the questions regarding all of the transactions potentially affecting the ownership, control, and operation of BRI to be fully, fairly, and finally settled.

### V.   Conclusion

Accordingly, for the reasons stated above, the Court GRANTS BRI's Motion for Preliminary Injunction and DENIES Defendants' Motion for Preliminary Injunction. Defendants are enjoined from the activities described *supra* until such time as this matter has concluded.

1771234/5364.001

1
2
3
4
5
6
7

8    MONTANA FIRST JUDICIAL DISTRICT COURT, LEWIS AND CLARK COUNTY

9

| | |
|---|---|
| BAKKEN RESOURCES, INC., | Case No. DDV 2016-612 |
| Plaintiff, | |
| v. | |
| VAL M. HOLMS, ALLAN G. HOLMS, TODD JENSEN and ALLEN COLLINS, | **ORDER GRANTING BAKKEN RESOURCES, INC.'S MOTION TO STAY PROCEEDINGS** |
| Defendants and Third Party Plaintiffs, | |
| v. | |
| KAREN MIDTLYNG, DANIEL D. ANDERSON, and WESLEY J. PAUL, And John Does 1-20, | |
| Third-party Defendants | |

21    This matter is now before the Court on Bakken Resources, Inc.'s (BRI) Motion to Stay

22 Proceedings.  The motion has been joined by the Third-Party Defendants who also filed a motion

23 for a stay in the event their Motion to Dismiss is denied. Defendants oppose the motion. The

24 motion has been fully briefed and is deemed submitted.

25    Based on the Court's finding that principles of comity and the "first to file" rule dictate

26 that the Nevada courts be allowed the opportunity to address the specific matters at issue here,

27

- 1 -

1  including the propriety of the Eagle Private Equity transaction and the legality of the proxies

2  provided to Allan Holms and the attempted takeover of BRI,

3        It is Ordered that BRI's Motion to Stay Proceedings is granted.

4        DATED this _____ day of _____, 2017.

5

6

7

8                               James Reynolds
                             District Judge

9

10  **MEMORANDUM**

11        Based on the record before this Court, the following facts are undisputed.

12        1.      A derivative action involving BRI, its Board of Directors, corporate officers,

13  general counsel and Defendant Val Holms, was first filed in Nevada on March 13, 2014.

14  *Graiwer, et al. v. Holms, et al.*, Second Judicial Court of the State of Nevada In and For The

15  County of Washoe, Cause No. CV14-0544.

16        2.      On May 17, 2016, Defendant Val Holms filed a lawsuit against BRI, Dan

17  Anderson, Karen Midtlyng and other members of BRI's Board of Directors requesting injunctive

18  relief against BRI and its Board of Directors and alleging a breach of fiduciary duty against the

19  Director Defendants and intentional interference with Contract against all Defendants. *Holms v.*

20  *BRI, et al*, Second Judicial Court of the State Nevada In and For The County of Washoe, Cause

21  No. CV16-0186. Such legal claims were all premised on the argument that there was no

22  legitimate business purpose for the Eagle Private Equity transaction, that such transaction was

23  intended to dilute the value of Defendant Val Holms' stock and that it should be set aside.

24        3.      On May 24, 2016, Judge Freeman, unaware of the fact that proceedings had been

25  ongoing involving these same parties since 2014, granted an *ex parte* TRO which provided in

26  part that BRI and its Board of Directors were prohibited from drawing on the Eagle Private

27  Equity line of credit.

1767783/5364.001

1    4.      On June 15, 2016, the case filed by Defendant Val Holms, Cause No. CV16-0186

2  was consolidated with the derivative action that had been filed on March 13, 2014 and over

3  which Judge Flanagan had been presiding for over 2 years.  As reflected on the Docket Sheet

4  from the Nevada court, during that 2 year period, there had already been a significant number of

5  filings, hearings and Orders.

6    5.      BRI and the Director Defendants filed their Opposition to Plaintiff Val Holms' Ex

7  Parte Motion and Application For Temporary Restraining Order and Request For Hearing on

8  Preliminary Injunction on June 20, 2016.

9    6.      On June 27, 2016, Judge Flanagan held a hearing on whether the TRO issued by

10  Judge Freeman should be converted to a preliminary injunction.  During the hearing, Judge

11  Flanagan heard the testimony of Dan Anderson and Carl George and at the close of the hearing,

12  announced his decision on the record, later memorialized in his Order of July 14, 2016. As

13  reflected therein, Judge Flanagan found nothing illegal or improper relating to the Eagle Private

14  Equity transaction and held that BRI's decision to enter into such transaction was consistent with

15  the Nevada business judgment rule codified at NRS 78.138(3).

16
          The Court finds the ability of a company to maintain institutional
17     knowledge is important, that capitalism is a game of risk, and none of the
       procedures set forth in the agreement between Eagle Private Equity and BRI are
18     illegal or improper.  This includes the BRI Board's amendment to its Bylaws on
       February 9, 2016, to provide for staggered Board terms as well as the terms of the
19     Eagle Private Equity financing.  Importantly, Plaintiff's counsel admitted during
       argument that nothing BRI or its Directors had done was illegal.
20

21
          The Court further finds Nevada's business judgment rule, codified at
22     NRS-78.138(s), sets forth a presumption that in making a business decision the
       Directors of the Company acted on an informed basis, in good faith in the honest
23     belief the action was taken in the best interests of the Company.

24  (Exhibit 1 to BRI's Brief in Support of Motion to Dissolve Defendants' October 19, 2016 TRO.)

25  Based on those findings, Judge Flanagan dissolved the TRO that had been issued by Judge

26  Freeman and denied the preliminary injunction that had been sought by Defendant Val Holms.

27

- 3 -

7.      Having heard Judge Flanagan's opinion regarding the legitimacy of the Eagle Private Equity transaction at the close of the hearing, Defendants Allan and Val Holms immediately set out to obtain proxies so as to circumvent Judge Flanagan's order and to take over BRI.  During testimony before this Court Defendant Allan Holmes confirmed that the attempted takeover was spurred on by Judge Flanagan's decision and order finding the Eagle Private Equity Transaction reasonable and legal.[1]

8.      On July 20, 2016, Defendant Allan Holms and his associates attempted the takeover of BRI's Helena office.

9.      On July 22, 2016 and as a result of the attempted takeover BRI sought out and obtained a TRO in Nevada enjoining Defendant Val Holms' voting proxy based on violations of SEC proxy solicitation rules and regulations and invalidating any action taken by Defendant Allan Holms in Montana based on Eagle having acquired the majority of BRI voting rights.  The TRO Motion was heard by the Nevada Court with Judge Flanagan presiding on July 22, 2016 with counsel for Val Holms, present at that hearing.  The Nevada Court granted the requested Temporary Restraining Order finding: (1) Defendants have a reasonable probability of success in

---

[1] During the preliminary injunction hearing conducted by this Court on August 9, 2016, Defendant Allan Holms testified regarding how he became involved in the Montana litigation. He testified that Defendant Val Holms mentioned to him, thirty (30) days prior (roughly early June, 2016 immediately after the Nevada court's ruling denying Val's Motion for Preliminary Injunction on June 27, 2016) that Val might be in trouble and that he needed Allan's help.  On this point, Allan explained:

A.      He asked if I could help. He asked me specifically—he told me the situation, told me what had happened in Reno told me where he was at, and he asked me if I could help him.

Hrg. Transcr., 65:14-17.

Defendant Allan Holms also testified concerning conversations he had with Defendant Val Holms regarding how he could "help" Val with respect to his situation with BRI.  He explained that his attorneys in Spokane, Washington, Dunn & Black, told Allan he would need to "get votes" in order to take action, and that Val "...emailed it (his proxy) to me."  Id., at 67:9-11; 68:12.  He then explained how Manny Graiwer had seen Allan during a court session in Reno, referencing the June 27, 2016 hearing on Val's Motion for Preliminary Injunction, and mentioned that Graiwer, out of the blue, offered to give Allan his proxy. Id. 68:22-69:2. Allan denied any direct solicitation and instead claims that after receiving Val's and Graiwer's proxies, the balance of proxies were obtained by Val.  The testimony reads:

Q.      And how did the rest of them come to be in your possession?

A.      The rest of them, I'm assuming, through Val and his family. There's a lot of family members here in Helena. They just kept coming. I didn't solicit them. They just kept coming.

The evidence all points to Defendants Val and Allan Holms orchestrating the attempted takeover which necessarily included the solicitation of a sufficient percentage of common stock from various shareholders to allow Defendant Allan Holms, to attempt the takeover on July 20, 2016. It is not lost on this Court that the proxies are almost all on identical forms and contain identical language.

- 4 -

17677X3/5364.001

1   their arguments that the voting proxy executed by Val Holms on July 7, 2016 and by Manuel

2   Graiwer on June 29, 2016 both in favor of Allan Holms are invalid based on SEC rules and

3   regulations pertaining to proxy solicitations, 17 C.F.R. §240.14a-2, et seq., and (2) that

4   Defendants enjoy a reasonable probability of success on their argument that Eagle had properly

5   exercised its right to put and convert its loan to BRI to Series A Preferred Stock pursuant to the

6   loan agreement between BRI and Eagle thereby granting Eagle six hundred thousand (600,000)

7   shares of Series A Preferred Stock which provides Eagle with the ability to vote the equivalent of

8   sixty million (60,000,000) voting shares of BRI common stock and thus makes Eagle the clear

9   majority shareholder of BRI.

10         10.     Also on July 22, 2016 and only because of the attempted takeover of BRI here in

11   Montana, a TRO was entered by Judge Seeley in favor of BRI and against Defendants which

12   prohibited them from attempting to act on behalf of BRI in any manner whatsoever, attempting

13   to replace BRI's Board, Corporate Officers or attorneys, taking any actions disruptive to BRI's

14   business/operations or holding themselves out as Directors of BRI.  By Order dated August 1,

15   2016, that TRO was extended by Judge Seeley and has remained in place by Order of this Court

16   ever since.

17         The Montana Supreme Court has recognized that principles of comity, specifically the

18   "first to file" doctrine, supports dismissal or a stay of an action "when a complaint involving the

19   same parties and issues has already been filed in another district." *See Wamsley v. Nodak Mut.*

20   *Ins. Co.*, 2008 MT 56, ¶¶ 31-32, 341 Mont. 467, 178 P.3d 102; *see also Pacesetter Systems, Inc.*

21   *v. Medtronic, Inc.*, 678 F.2d 93, 94-95 (9th Cir. 1982). Importantly, however, "**the first-to-file**

22   **rule requires only substantial similarity of parties,**" as courts recognize that gamesmanship

23   often comes with the forum shopping that the "first to file" doctrine seeks to prevent. *Kohn Law*

24   *Grp., Inc. v. Auto Parts Mfg. Mississippi, Inc.*, 787 F.3d 1237, 1239-40 (9th Cir. 2015) (emphasis

25   added). District courts are afforded "an ample degree of discretion" when staying proceedings, as

26   a matter of comity, in favor of a previously filed action in another state.  *Wamsley*, ¶ 32.

27

1767783/5364.001

1    The Ninth Circuit has further provided that courts should look to the "chronology of the
2    lawsuit, similarity of the parties, and similarity of the issues." *Kohn Law Grp, Inc.*, 787 F.3d at
3    1239-40. Essentially, "where substantially identical actions are proceeding in different courts, the
4    court of the later-filed action should defer to the jurisdiction of the court of the first-filed action
5    by either dismissing, staying, or transferring the later filed suit." *SAES Getters S.p.A. v. Aeronex,*
6    *Inc.*, 219 F.Supp.2d 1081, 1089 (S.D.Cal. 2002). Courts have recognized that "[t]he first-to-file
7    rule is intended to 'serve[ ] the purpose of promoting efficiency well and should not be
8    disregarded lightly.'" *Kohn Law Grp., Inc.*, 787 F.3d at 1239. Basically, under the "first to file"
9    doctrine, a district court may decline to exercise jurisdiction over an action in favor of a
10    previously-filed action in another state.

11    This Court has considered the fact that Allan Holms is not a party to the Nevada
12    proceedings. However, his interests are the same as his brother Val's and privity clearly exists.
13    "Privity, however, is an exception to the general rule against nonparty preclusion that alleviates
14    due process concerns." *Denturist Ass'n*, ¶ 14 (citing *Sturgell*, 553 U.S. at 893, 128 S.Ct. 2161)
15    (emphasis added). The concept of privity in the context of a judgment "applies to one whose
16    interest has been legally represented at trial." *Denturist Ass'n*, ¶ 14 (citing *Holtman v. 4-G's*
17    *Plumbing & Heating*, 264 Mont. 432, 437, 872 P.2d 318, 321 (1994); *see also Sturgell*, 553
18    U.S. at 894, 128 S.Ct. 2161 ("a nonparty may be bound by a judgment because she was
19    *'adequately represented by someone with the same interests who [wa]s a party' to the suit.*")
20    (citation omitted) (emphasis added). Privity exists where *"two parties are so closely aligned in*
21    *interest that one is the virtual representative of the other...."* *Denturist Ass'n*, ¶ 14 (citing
22    *Nordhorn v. Ladish Co.*, 9 F.3d 1402, 1405 (9th Cir.1993)); *see also United States v. ITT*
23    *Rayonier, Inc.*, 627 F.2d 996 (9th Cir.1980).

24    Defendants Allan G. Holms, Todd Jensen and Allen Collins are in privity with Val
25    Holms and Manuel Graiwer, parties to the Nevada Litigation. Defendant Allan Holms claims
26    that he has been proxied the voting stock for both Val Holms and Manuel Graiwer. Moreover,
27    he expressly stated his actions in Montana are being carried out on behalf of his brother, Val

- 6 -

1    Holms. Defendants' interests are adequately being represented by counsel in the Nevada
2    Litigation.
3              Here, all elements of the "first to file" rule and principles of comity dictate that this case
4    be stayed pending the completion of the Nevada proceedings. The initial derivative action was
5    filed in Nevada in 2014. The parties include Val Holms, Dan Anderson, Karen Midtlyng, Wes
6    Paul and BRI's Board of Directors. BRI is a Nevada corporation governed by Nevada law. The
7    action filed in Nevada by Defendant Val Holms in May 2016 and now consolidated with the
8    derivative action directly addresses issues relating to the propriety of the Eagle Private Equity
9    transaction and the legality of the proxies given by Defendant Val Holms to Defendant Allan
10   Holms. It was only after Defendant Allan Holms and other Defendants attempted their takeover
11   of BRI's Helena office that these Montana proceedings were required so as to protect BRI and its
12   assets.
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

1765780/5364.001



RECEIVED

APR 0 7 2017

BROWNING, KALECZYC,
BERRY & HOVEN, PC

John C. Doubek
DOUBEK, PYFER & FOX, PC
307 N. Jackson
PO Box 236
Helena, MT 59624
Ph: 406-442-7830
Fax: 406-442-7839
jdoubek@doubekpyfer.com

Attorney for Defendants and Third Party Plaintiffs

MONTANA FIRST JUDICIAL DISTRICT COURT, LEWIS AND CLARK COUNTY

\* \* \* \* \* \*

| | |
|---|---|
| BAKKEN RESOURCES, INC., | Cause No. DDV 2016-612 |
| Plaintiff, | |
| vs. | |
| VAL M. HOLMS, ALLAN G. HOLMS, TODD JENSEN and ALLEN COLLINS, | NOTICE OF SUBMITTAL OF PROPOSED OPINION SUBMITTED BY ALLAN HOLMS AND OTHER DEFENDANTS |
| Defendants and Third Party Plaintiffs, | |
| vs. | |
| KAREN S. MIDTLYNG, DANIEL D. ANDERSON, and WESLEY J. PAUL, | |
| Third Party Defendants. | |

\* \* \* \* \* \*

COMES NOW the Defendants and Third-Party Plaintiffs herein and respectfully

submit this their proposed opinion for the Court's utilization herein. Opposing counsel

1

was contacted.  The email correspondence relative to this submittal is attached as Exhibit

A.  The Proposed Opinion is attached as Exhibit B.  We have also attached copies of the

cases and statutes to Exhibit B which are referenced in the Proposed Opinion for the

Court's convenience.

Dated this ____ day of April, 2017.

DOUBEK, PYFER & FOX PC

By _____

John C. Doubek
Attorney for Defendants and Third
Party Plaintiffs

2

## CERTIFICATE OF SERVICE

I hereby certify that on the ___5___ day of April, 2017, I served a true and correct copy of the foregoing upon opposing counsel by inserting a copy of the same in a stamped envelope and depositing it in the United States Post Office at Helena, Montana, addressed as follows:

Oliver Goe
Browning, Kaleczyc, Berry & Hoven
Attorneys at Law
P.O. Box 1697
Helena, MT 59624

Ms. Jordon Crosby
Ugrin Alexander Zadick-Higgins
#2 Railroad Square, Suite B
PO Box 1746
Great Falls, MT 59403-1746

3

Sent from my iPhone

On Mar 30, 2017, at 10:23 AM, john doubek <jdoubek@doubekpyfer.com> wrote:

> Oliver, I did not hear back from you about my email from last Friday. You were likely in lala land with grandkids. Give me a holler as I want to submit on the same day. John D

**From:** john doubek
**Sent:** Friday, March 24, 2017 12:54 PM
**To:** Oliver Goe (oliver@bkbh.com)
**Subject:** bakken v holms

I hope you are enjoying a little time off. I asked the court's clerk if he thought the court wanted any proposed order. He said we sure could submit one. I will submit one by Thursday of next week (3/30/17) and presumed we should put a firm date on it for both of us. I of course wanted to include you on this.
John D
Ps. give me a holler about the work comp case we have too when you get a chance.

---

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

---

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.



EXHIBIT

2

# john doubek

**From:**        Oliver Goe <oliver@bkbh.com>
**Sent:**        Friday, March 31, 2017 2:09 PM
**To:**          john doubek; Jordan Crosby
**Cc:**          Kathy Summers
**Subject:**     RE: bakken v holms

Hi John: neither Jordan or I will be in a position to submit any proposed orders on Wed.  As there is no court imposed deadline I assume you can submit on Wed. or any other day for that matter that you choose. However, I believe you are obligated to share the proposed order with us prior to submitting to the court so you can advise the court as to whether the proposed order is opposed and, that you are also required to serve us with the proposed order when it is submitted to the Court.

Let me know if you disagree.


Oliver H. Goe          Browning, Kaleczyc, Berry & Hoven, P.C.
Attorney               800 N. Last Chance Gulch, Ste. 101, Helena, MT 59601
oliver@bkbh.com        P.O. Box 1697, Helena, MT 59624
www.bkbh.com           p. (406) 443-6820
                       f. (406) 443-6883

Confidentiality Notice - This e-mail and its attachments (if any) may contain privileged information, confidential information, proprietary information, attorney/client work product, or other information protected from disclosure by law. Any use, dissemination, disclosure or reproduction of this e-mail other than by the intended recipient as authorized by the sender is strictly prohibited. If you have received this e-mail in error, please delete this e-mail and its attachments (if any) and notify the sender via a reply e-mail, or by telephone at (406) 443-6820. It is not the intention of the sender to waive any privileges, confidentiality rights, proprietary rights or other rights relative to the information contained within this e-mail or any of its attachments.

**From:** john doubek [mailto:jdoubek@doubekpyfer.com]
**Sent:** Thursday, March 30, 2017 10:53 AM
**To:** Oliver Goe
**Subject:** RE: bakken v holms

I told you what I know about submitting the proposed order. I am uncomfortable waiting another 2 weeks. Though I wanted to submit my proposed order today, I will wait a bit but I intend to submit my proposed order by next Wednesday (4/5/17). John D

**From:** Oliver Goe [mailto:oliver@bkbh.com]
**Sent:** Thursday, March 30, 2017 10:39 AM
**To:** john doubek
**Subject:** Re: bakken v holms

Hi John: I meant to get back to you sooner. We generally don't disagree regarding providing the court with draft orders. However, it won't be today. It doesn't sound like the court has requested them or is really working that hard on our case. I suggest two weeks from today.

Are you intending to submit a draft orders for all pending motions. I agree that we should have a simultaneous submittal.

John C. Doubek
DOUBEK, PYFER & FOX, PC
307 N. Jackson
PO Box 236
Helena, MT 59624
Ph:  406-442-7830
Fax:  406-442-7839
jdoubek@doubekpyfer.com

Attorney for Defendants and Third Party Plaintiffs

MONTANA FIRST JUDICIAL DISTRICT COURT, LEWIS AND CLARK COUNTY

* * * * * *

| | |
|---|---|
| BAKKEN RESOURCES, INC., | Cause No. DDV 2016-612 |
| Plaintiff, | |
| vs. | |
| VAL M. HOLMS, ALLAN G. HOLMS, TODD JENSEN and ALLEN COLLINS, | PROPOSED OPINION SUBMITTED BY DEFENDANTS HOLMS, ET AL. |
| Defendants and Third Party Plaintiffs, | |
| vs. | |
| KAREN S. MIDTLYNG, DANIEL D. ANDERSON, and WESLEY J. PAUL, | |
| Third Party Defendants. | |

* * * * * *

In open court, this Court announced on February 23, 2017 that it would decide

pending issues and particularly those arising out of prior hearings before the Court in this



1

case. This Court, having reviewed all of the pleadings, briefs, matters appended to the

parties' briefs, and evidence presented to the Court does hereby enter its opinion herein.

Bakken Resources, Inc., submitted an application for a preliminary injunction and

the Defendants, Holms, et al., submitted a motion for a temporary restraining

order/preliminary injunction pertaining to many of the same issues.  In its Notice of Issue

Bakken requested a preliminary injunction prohibiting Val Holms or his agents from any

of the following actions:

(a)   Providing a proxy to any person or entity to vote his shares of
      common stock in BRI;

(b)   Voting his shares in any manner that seeks to replace any member
      of the Board;

(c)   Voting his shares in any manner that seeks to replace a corporate
      officer, including the current CFO Dan Anderson and current
      corporate secretary Karen Midtlyng; and

(d)   Any other actions of any kind that could have a material
      detrimental impact on Bakken's business/operations including
      those actions relating to defendants, Allan Holms, Todd Jensen and
      Allen Collins.

Further, as to the Defendants Holms, Jensen and Collins, Bakken asked that its

preliminary injunction prohibit them from any of the following actions:

(a)   Taking any action on behalf of Bakken, including attempts to
      replace Bakken's Board, corporate officers or its attorneys;

(b)   Taking any action purportedly on behalf of Bakken to access
      Bakken's bank accounts including those accounts with Wells
      Fargo or taking any action to prevent Bakken from accessing its
      bank accounts through the only authorized signatories, Karen
      Midtlyng and Dan Anderson and are further ordered to take all
      steps necessary to insure that Bakken has access to its bank
      accounts;

2

(c)     Representing any person or entity that are directors with Bakken with authority to conduct business or take actions on behalf of Bakken;

(d)     Attempting to act on behalf of Bakken in any manner whatsoever;

(e)     Taking any action that could affect the business/operations of Bakken in any respect;

(f)     Exercising any of the proxies included in Exhibit A to the Complaint; and

(g)     Taking any action to prosecute or in furtherance of the case pending in the other case number DDV-2016-611, which was dismissed an then joined into this action of CDV-2016-612.

The Defendants filed their Notice of Issue and requested that the Court issue a decision relative to their request to set aside the Eagle Equity transaction and ratify the action taken on July 20, 2016 by a majority of the shareholders (Allan Holms, et al.) existent before Eagle Equity wherein they duly acted so as to take control of Bakken and then cancel the Eagle Equity arrangement.  They pointed out in their Notice of Issue that the Eagle Equity financing agreement arrangement was not reasonable and was utilized as a poison pill to prevent shareholders from acting so as to protect existing shareholders' interests.  Bakken admitted at the hearing held on August 9, 2016 that it gave Eagle Equity approximately 60% shareholder control of Bakken (Tr. 6, lines 9-14) even though Bakken had $3.8 million in cash and $1.2 million in receivable revenues (Tr. 45, lines 15-18) currently and even though Eagle Equity could then liquidate the Company if it desired (Tr. 73, lines 3-6) and walk away with more than half of Bakken.

The action taken by shareholders Allan Holms, et al. was taken before the common stock (convertible preferred) was transferred to Eagle Equity.

This Court believes that there are really two issues before it and on which the Court can rule and issue injunctive relief. Those two issues are first, whether the Eagle Equity transaction should be set aside and secondly, whether actions taken by Allan Holms and others on July 20, 2016 was a valid exercise of shareholders' rights and whether they could do what they purported to do and accomplish on that date.

Regarding the Eagle Equity transaction, it clearly was created to give Eagle Equity shareholder control of Bakken. It must be deemed inoperative. Eagle Equity claims to have made a loan to Bakken. There has been no proof, though, that any monies were paid or loaned to Bakken. Sometime later, attorney Wes Paul noted that the money had been put in his trust account, thus not paid to Bakken. As a term of that transaction Eagle Equity purported to have received the right to convert its loan into convertible preferred stock. That would then supposedly allow Eagle Equity to convert to common stock and have 51% of Bakken's voting common stock, thus substantially reducing by over half the percentage ownership held by Val Holms, Allan Holms and other shareholders ownership of Bakken's outstanding shares. There was never any showing, however, that the $600,000 loan was ever transferred to Bakken.

Additionally, the evidence shows that no right minded company exercising reasoned business judgment would do business with the principal of Eagle Equity, Carl George, who had numerous lawsuits and judgments entered against him. It does not appear from his résumé that he had any background or knowledge in oil and gas matters.

4

Bakken's president, Dan Anderson, could not give any specific detail about his background, experience, intent, what he was offering to do for the Company or why Bakken was willing to give one-half of the Company for $600,000. Further, the Company never presented any evidence in any submittal to this Court that Eagle Equity brought anything to the table of Bakken in terms of future business or direction for the Company. The arrangement was nothing more than a poison pill set up by retained counsel for Bakken, Wes Paul. Eagle Equity was a company set up by Wes Paul, Carl George and Wes Paul had obviously been in business together on others matters at other times and other places. It does not appear that he was brought in because of any specialty knowledge in the areas of concern to Bakken. The transaction itself which gave 51% of the voting stock to Eagle Equity for only $600,000 (and no evidence has been presented that that money was ever actually paid to Bakken) is unjustifiable because it "dilutes a percentage ownership interest in relation to the interest of other shareholders" which has been held to be "actionably coercive" under Nevada corporate law. See, *Brown vs. Kinross Gold USA Inc.*, 531 F.Supp.2d 1234, 1246 (D.Nev. 2008). Clearly and even if this $600,000 was appropriately paid to and received by Bakken, it is grossly disproportionate consideration for what Eagle Equity and the Paul group now claim is their majority ownership in the Company. If the transaction is recognized Eagle Equity would have control of Bakken's assets which are comprised of at least $5.6 million in current assets and more than $4 million in cash and other investments. Eagle Equity has been given control of all that for a fraction of its value. As Dan Anderson, Bakken's CFO acknowledged in his testimony, with such power Eagle could

dissolve and liquidate Bakken. It could taken then 51% of those assets gaining a sum far greater than the $600,000 it paid for its shares.

This Court has reviewed the Business Judgment Rule both under Montana law and Nevada law and what is clear is that it cannot be invoked to justify the Eagle transaction. The clear purpose of the Eagle transaction was to block the Holms shareholders from taking control of the Company that the shareholders own. Bakken admitted often that this was the "triggering event." Action such as the Eagle transaction that interferes with the effectiveness of shareholder voting is subject to a standard of review that is more demanding than the Business Judgment Rule. In such cases, the Board of Directors bears a heavy burden of demonstrating a compelling justification for its action. See, *Shoen vs. Amerco*, 1994 U.S. Dist. Lexis 21588 later settled at 885 F. Supp. at 1332. The *Shoen* case also holds that the Board of Directors' prerogatives under the Business Judgment Rule must always be qualified by the right of "unhappy shareholders to vote the board out of office." *Shoen*, at 1340. Another case decided under Nevada law reinforces that point holding that any actions that disenfranchise shareholders are not reasonable unless a "compelling justification exists." *Hilton Hotels Corp. vs. ITT Corp.*, 978 F. Supp. 1342, at 1348 (D. Nev. 1997). Here, no justification has been proffered in any of the briefs or attachments thereto or testimony or in any other way from Bakken. Bakken had no need to borrow $600,000 from Eagle Equity (assuming the transaction was ever consummated). It already had $5.6 million in current assets and more than $4 million in cash and other investments. The true purpose of the Eagle Equity transaction was to dilute the ownership interest of Val Holms and

others and pirate control of the Company away from them for the sole benefit of Eagle Equity and those who owned and controlled it. There is simply no justification in the record or which this Court could possibly imagine to justify the Eagle transaction. Thus, this Court regards it as a sham. This Court regards it as nothing more than an ill-conceived poison pill tactic designed to subordinate all other shareholders' interests to the interests of Eagle Equity. Accordingly, it cannot be sustained and the transaction is deemed null and void as far as the stock transfer is concerned.

With regard to the actions taken by Allan Holms, et al, on July 20, 2016, the Court has reviewed precisely what has occurred and considered the law of Nevada and arguments submitted by all counsel. Based upon the same, the Court believes that Bakken and those running Bakken do not have "clean hands" to protest any violation of any SEC regulations such as the alleged failure of the Holms group to comply with the SEC's rules regarding proxy solicitation. There was extensive briefing submitted as to whether the proxy solicitation rules applied here in any event and the Court believes that they do not. First of all, the evidence shows, as testified to by Allan Holms, that he didn't solicit any of the proxies. He and his brother, Val, together with just one other individual who offered his shares to be utilized by Val and Allan Holms brings their total to just slightly greater than 50%. If all of the shares for which proxies were signed are totaled, the amount exceeds 58%.

Importantly, Bakken never did cause the company to file its periodic reports for over 2 years with the SEC as required by § 12(g) of the Security Exchange Act of 1934. Chief among those reports is the annual report on form 10-K which is required by the

Exchange Act Rule 13a-11, 17 C.F.R. § 240.13a-11.  Among other things it must

contain audited financial statements.  For two years, therefore, there was no reliable

public information about Bakken's financial situation.  In addition, Bakken never called

a shareholder meeting during that period of time so that the folks listed as directors were

simply "holdovers" without any renewed mandate from the shareholders.

There appeared to be an effort by Bakken to have this Court believe that the SEC

condoned these delinquencies as Mr. Paul attempted to confirm phone conversations

with an SEC official about the matter with letters.  However, as offered in the submittal

from Professor Morrissey, whose report indicates that he worked in the SEC's

"delinquent report" unit, the SEC would give no such approval to such delinquencies by

Bakken.  To the contrary, the Exchange Act Rule 12b-25, 17 C.F.R. § 240.12b-25

provides that if a reporting company cannot file a required periodic report on time it

must make a filing to that effect on SEC forms 12b-25.  There it must state the reasons

for its delinquency.  The rule then gives the company a 15 day grace period to make the

filing.  After that the company is in violation of its filing requirements.  Additionally, no

inference can be drawn from the SEC's failure to take enforcement action against

Bakken for its delinquent filings.  The SEC recently stated, according to Professor

Morrissey, that it has the resources to prosecute only approximately 1% of the wrongful

conduct that occurs under federal securities laws.  Bakken's violation of failing to meet

its filing requirements would be a small objective for the SEC given the larger and more

wealthy Wall Street community that it must police.

It is thus apparent to this Court that Bakken comes before the Court with unclean hands. Nevertheless and that matter aside, the Holms group did not violate the SEC's proxy solicitation rules. Even if that occurred, any violation would be technical and de minimis. It should therefore not affect the validity of the proxies that Allan Holms voted. That action elected new directors for the Company because it was done in compliance with Nevada Corporate Law.

The SEC's proxy rules govern solicitation of proxies. As Allan Holms testified, he did nothing to request that the proxies he received be given to him (Tr. 11, lines 10-23 (8/9/16 hearing)). In other words, he didn't "solicit" the proxies. Further, even if the proxies had been solicited, the SEC's rules governing those transactions exempt situations were no more than 10 shareholders are solicited. Exchange Act Rule 14a-2(b)(2), 17 C.F.R. § 240.14a-2(b)(2). Here, two of the proxies that Allan Holms received, those from Val Holms and Manuel Graiwer, gave him plenary power to vote more than a majority of the Company's shares. Those two proxies were all that Allan Holms needed to affect the corporate actions he took on July 20, 2016. The other proxies he received are irrelevant. Any violation of the SEC rules as to them is at most technical. The other proxies, therefore, didn't impact the validity of the corporate actions undertaken by Allan Holms which were properly done under Nevada corporate law. See, NRS 78.355(1) (Bylaws § 2.12) which allows shareholders to give their proxies in writing to any person who may act for them. In addition, NRS 78.320(2) (Bylaws § 2.10) provides that a shareholder having a majority of the voting power may take any action by written consent that is permitted at a stockholder meeting. Since

Allan Holms had the written proxies of Val Holms and Manuel Graiwer (and others), he was entitled to vote those shares. When he therefore tendered a written consent to an appropriate official of Bakken on July 20, 2016 electing himself, Jensen and Collins as the Company's three new directors, that was an effective shareholder action just as if it had taken place at a shareholder meeting. Since the terms of the other Company directors had expired, Allan Holms, Jensen and Collins then constituted Bakken's Board of Directors. After that the resolutions they adopted were legitimate and duly authorized actions of Bakken.

Even if there were any violations of the proxy solicitation rules, which appears not to be the case, they were nugatory and de minimis. The equities of this case are simple and clearly favor the Holms group. The shares which Allan Holms voted represented a majority interest in the Company. The proxies he received came from people who wanted him to be in control of the Company. Nevada corporate law states that an entrenched board cannot block the duly authorized actions by shareholders to take control of the company that they own. See, *Shoen v. Amerco*, 885 F.Supp. 1332, 1341 (D. Nev. 1994).

Nevada corporate law also recognizes the paramount rights of shareholders to exercise their voting rights and elect directors. "Any interference with shareholder franchise is especially serious." See, *Hilton Hotels Corp. vs. ITT Corp.*, 978 F. Supp. 1342, 1351 (D. Nev. 1997). This would include any of the tactics employed by Bakken (and Eagle Equity) or its officers, directors or attorneys to frustrate Allan Holms' use of his proxies to elect directors.

Shareholders' rights are adjudicated by the court sitting in equity and equitable jurisdiction applies in this case. Since the shareholders own a majority of the stock in this Company and have supported Allan Holms, this Court is compelled to recognize their legitimate ownership rights. The Court opines that Bakken unjustly attempted to seize control from Allan Holms.

The Court has considered whether the easier path of less resistance would be to simply order a shareholder meeting without the involvement of Eagle Equity but it appears to the Court that there is no need to do so because the action taken by Allan Holms on July 20, 2016 was a fully lawful and appropriate act on his part representing a majority of the shareholders of Bakken and the action he took needs to be recognized as lawful and appropriate.

Further, this Court previously issued a TRO which ordered that Eagle Equity was enjoined from voting on any matters at any meeting including an annual meeting or a motion by shareholders consent until the Court issued a ruling whether the July 20, 2016 election of a new board of directors (Allan Holms, et al.) was valid and enforceable. Bakken up to this point has never shown any reason why that temporary order should not be made permanent or at least pending further proceedings. Bakken has simply attempted to defer everything to decisions of the Nevada court made preliminarily and which remains pending in Nevada. This Court is aware that there have been rulings in Nevada and that those rulings have varied. In one instance one court found that the Eagle Equity transaction was a sham and another found that it was an exercise of business judgment. Bakken never made any factual presentation either way to this

Court and this Court has jurisdiction over this matter. After all, Bakken filed its complaint in this Court and clearly assert that this Montana District Court had jurisdiction over this matter. This Court is not aware that Bakken has ever filed a complaint like this in any other court nor in the State of Nevada.

Accordingly, this Court grants a preliminary injunction in favor of the Holms group. This injunction fully recognizes and affirms as lawful the actions taken by Allan Holms on July 20, 2016. Pending further hearings herein, which appear to be of dubious need, Allan Holms, Todd Jensen and Allen Collins are hereby recognized as the new Bakken directors and the other actions they took and are reflected in this Stockholder Action By Written Consent on July 20, 2016 are affirmed.

DATED _____

_____
District Court Judge

Lexis Advance®
Research

More ▾

Document: Hilton Hotels Corp. v. ITT Corp., 978 F. Supp. 1342   Actions ▾

Go to ▾  Q Search Document  •••

**Hilton Hotels Corp. v. ITT Corp., 978 F. Supp. 1342**

Copy Citation

United States District Court for the District of Nevada

October 2, 1997, Decided ; October 2, 1997, Filed

CV-S-97-095-PMP (RLH) BASE FILE, CV-S-97-850-PMP (RLH)

**Reporter**

978 F. Supp. 1342 * | 1997 U.S. Dist. LEXIS 15707 **

HILTON HOTELS CORPORATION and HLT CORPORATION, Plaintiffs, v. ITT CORPORATION, Defendant. ITT CORPORATION, Defendant and Counterclaimant, v. HILTON HOTELS CORPORATION and HLT CORPORATION, Plaintiffs and Counterdefendants.

**Disposition:** [**1] Hilton's Motion for Permanent Injunctive Relief ( # 29) granted to the extent that ITT be enjoined from implementing its Comprehensive Plan announced July 15, 1997. ITT's annual meeting to be held no later than November 14, 1997. Hilton's Motion for Declaratory and Injunctive Relief ( # 29) and ITT's Complaint for Declaratory Relief ( # 1) denied in all other respects.

## Core Terms

shareholders, annual meeting, classified, tender offer, defensive, franchise, declaratory relief, injunction, incumbent, primary purpose, good faith, preclusive, announced, contest, proxy, entrench, takeover, elected, issues, corporate policy, coercive, duties, target, disenfranchise, companies, enjoined, hostile, argues, permanent injunctive relief, business judgment

## Case Summary

**Procedural Posture**
Defendant corporation filed a motion for declaratory relief and plaintiff corporations filed a motion for injunctive and declaratory relief in an action concerning the powers and duties of a board of directors in responding to a hostile takeover attempt.

**Overview**
Plaintiff corporations made a hostile takeover attempt of defendant corporation. Defendant sold several assets, refused to conduct its annual meeting, and adopted a "Comprehensive Plan" whereby it would split itself into three new entities. Defendant sought to implement the Comprehensive Plan, which also contained a poison pill, prior to the annual meeting and without shareholder approval. Plaintiffs sought an injunction and declaratory relief regarding the powers of defendant's board of directors; defendant also sought declaratory relief. The court granted plaintiffs' motion for a permanent injunction preventing defendant from implementing its Comprehensive Plan and ordered defendant to hold its annual meeting. The Comprehensive Plan was preclusive, and the court found little doubt but that its primary purpose was to disenfranchise defendant's shareholders.

**Outcome**
The court ordered defendant to hold its annual meeting and granted plaintiffs' motion for a permanent injunction, preventing defendant from implementing its plan because the plan was preclusive and sought to disenfranchise defendant's shareholders.

▼ LexisNexis® Headnotes

Civil Procedure > Remedies ▪ ▪ > Injunctions ▪ ▪ > Preliminary & Temporary Injunctions ▪

**HN1▲** The legal standard applicable to a request for preliminary injunctive relief is well settled. The party requesting such relief must show: (1) probable success on the merits and irreparable injury; or (2) sufficiently serious questions going to the merits to make the case a fair ground for litigation and a balance of hardships tipping decidedly in favor of the party requesting relief. These are not two separate tests, but merely extremes of a single continuum. 🔍 More like this Headnote

Shepardize - Narrow by this Headnote

Civil Procedure > Judgments ▪ > Relief From Judgments ▪ > General Overview ▪
Civil Procedure > Remedies ▪ ▪ > Injunctions ▪ ▪ > 🔲 Permanent Injunctions ▪
Civil Procedure > Remedies ▪ ▪ > Injunctions ▪ ▪ > Preliminary & Temporary Injunctions ▪

**HN2** The standards for issuing a permanent injunction are substantially similar to those applied to requests for preliminary injunctive relief; however, in order to obtain a permanent injunction plaintiffs must actually succeed on the merits of their claims. ⊟ More like this Headnote

Shepardize - Narrow by this Headnote (1)

Business & Corporate Law > ... > Directors & Officers ▾ > Compensation ▾ > General Overview ▾
Business & Corporate Law > ... > Shareholders ▾ > Meetings & Voting ▾ > General Overview ▾
Mergers & Acquisitions Law > Takeovers & Tender Offers ▾ > General Overview ▾
Mergers & Acquisitions Law > Takeovers & Tender Offers ▾ > Duties & Liabilities of Shareholders ▾

**HN3** While Nev. Rev. Stat. § 78.138 addresses several powers of a corporate board in undertaking defensive measures to resist a hostile takeover, nothing in the Nevada statutes, or elsewhere in the law of Nevada, authorizes the incumbent board of a corporation to entrench itself by effectively removing the right of the corporation's shareholders to vote on who may serve on the board of the corporation in which they own a share. ⊟ More like this Headnote

Shepardize - Narrow by this Headnote (4)

Mergers & Acquisitions Law > Mergers ▾ > General Overview ▾
Mergers & Acquisitions Law > Takeovers & Tender Offers ▾ > General Overview ▾

**HN4** In assessing a challenge to defensive actions by a target corporation's board of directors in a takeover context, the Court of Chancery should evaluate the board's overall response, including the justification for each contested defensive measure, and the results achieved thereby. Where all of the target board's defensive actions are inextricably related, the principles of the Unocal test require that such actions be scrutinized collectively as a unitary response to the perceived threat. ⊟ More like this Headnote

Shepardize - Narrow by this Headnote (1)

Business & Corporate Law > Distributorships & Franchises ▾ > General Overview ▾
Mergers & Acquisitions Law > Mergers ▾ > General Overview ▾
Mergers & Acquisitions Law > Takeovers & Tender Offers ▾ > General Overview ▾
Securities Law > Postoffering & Secondary Distributions ▾ > Tender Offers ▾ > Factors & Tests ▾

**HN5** Where an acquiror launches both a proxy fight and a tender offer, it necessarily invokes both the Unocal and Blasius tests because both tests recognize the inherent conflicts of interest that arise when shareholders are not permitted free exercise of their franchise. In certain circumstances, the judiciary must recognize the special import of protecting the shareholders' franchise within Unocal's requirement that any defensive measure be proportionate and reasonable in relation to the threat posed. ⊟ More like this Headnote

Shepardize - Narrow by this Headnote (1)

Mergers & Acquisitions Law > Mergers ▾ > General Overview ▾
Mergers & Acquisitions Law > Takeovers & Tender Offers ▾ > General Overview ▾

**HN6** A board's unilateral decision to adopt a defensive measure touching upon issues of control that purposefully disenfranchises its shareholders is strongly suspect under the Unocal test, and cannot be sustained without a compelling justification. ⊟ More like this Headnote

Shepardize - Narrow by this Headnote

Business & Corporate Law > ... > Directors & Officers ▾ > Compensation ▾ > General Overview ▾
Business & Corporate Law > ... > Shareholders ▾ > Meetings & Voting ▾ > General Overview ▾
Mergers & Acquisitions Law > Takeovers & Tender Offers ▾ > Duties & Liabilities of Shareholders ▾
Business & Corporate Compliance > ... > Real Property Law ▾ > Zoning ▾ > Comprehensive Plans ▾

**HN7** A board has power over the management and assets of a corporation, but that power is not unlimited. That power is limited by the right of shareholders to vote for the members of the board. This right underlies the concept of corporate democracy. ⊟ More like this Headnote

Shepardize - Narrow by this Headnote

Business & Corporate Law > ... > Directors & Officers ▾ > Compensation ▾ > General Overview ▾
Business & Corporate Law > ... > Shareholders ▾ > Meetings & Voting ▾ > General Overview ▾

**HN8** The Unocal test requires the court to consider the following two questions: 1) Does the board have reasonable grounds for believing a danger to corporate policy and effectiveness exists? 2) Is the response reasonable in relation to the threat? If it is a defensive measure touching on issues of control, the court must examine whether the board purposefully disenfranchised its shareholders, an action that cannot be sustained without a compelling justification. ⊟ More like this Headnote

Shepardize - Narrow by this Headnote

Mergers & Acquisitions Law > Mergers ▾ > General Overview ▾
Mergers & Acquisitions Law > Takeovers & Tender Offers ▾ > General Overview ▾

**HN9** Inadequacy of an offer is a legally cognizable threat. ⊟ More like this Headnote

Opinion

Hilton Hotels Corp. v. ITT Corp., 978 F. Supp. 1342

[*1343] ORDER RE: INJUNCTIVE AND DECLARATORY RELIEF

Before the Court for consideration is the Complaint for Declaratory Relief ( # 1), filed  [*1344]  on behalf of ITT Corporation ("ITT") on July 16, 1997, and the Motion for Injunctive and Declaratory Relief ( # 29), filed August 26, 1997, on behalf of Hilton Hotels Corporation and HLT Corporation (collectively "Hilton"). [1.A]

The parties have completed discovery and all issues have been extensively briefed. At the close of the hearing conducted September 29, 1997, the Court orally [**N] entered its ruling granting Hilton's Motion for Permanent Injunctive Relief. This Order constitutes the Court's written Findings of Fact and Conclusions of Law regarding ITT's Request for Declaratory Relief and Hilton's Motion for Injunctive and Declaratory Relief.


1. FACTS

On January 27, 1997, Hilton announced a $ 55.00 per share tender offer for the stock of ITT, and announced plans for a proxy contest at ITT's 1997 annual meeting. This litigation commenced on the same date with the filing of Hilton's Complaint for Injunctive and Declaratory Relief seeking to enjoin ITT from impeding the shareholder franchise regarding the election of directors at ITT's annual meeting, and from taking other defensive measures in response to Hilton's announced tender offer and proxy contest.

On February 11, 1997, ITT formally rejected Hilton's tender offer. ITT proceeded to sell several of its non-core assets and opposed Hilton's takeover attempts before gaming regulatory bodies in Nevada, New Jersey and Mississippi.

When it became apparent that ITT would not conduct its annual meeting in May 1997, as it had customarily done in preceding years, Hilton filed a motion for a mandatory injunction [**11] to compel ITT to conduct the annual meeting in May. On April 21, 1997, this Court denied Hilton's Motion finding that Nevada law and ITT's by-laws did not require that ITT conduct its annual meeting within twelve months of the prior meeting, but rather that ITT had eighteen months within which to do so. Hilton Hotels Corp. and HLT v. ITT Corp., 962 F. Supp. 1309 (D. Nev. 1997), aff'd, 116 F.3d 1483 (9th Cir. 1997).

On July 15, 1997, ITT announced a Comprehensive Plan which, among other things, proposed to split ITT into three new entities, the largest of which would become ITT Destinations. ITT Destinations would be comprised of the current ITT's hotel and gaming business which account for approximately 93% of ITT's current assets. A second entity, ITT Educational Services, would consist of the current ITT's technical schools, and ITT's European Yellow Pages Division would remain with the current ITT as ITT World Directories.

Most significantly, under the Comprehensive Plan, the board of directors of the new ITT Destinations would be comprised of the members of ITT's current board with one important distinction. The new board would be a "classified" or "staggered" board divided [**12] into three classes with each class of directors serving for a term of three years, and with one class to be elected each year. Moreover, a shareholder vote of 80% would be required to remove directors without cause, and 80% shareholder vote would also be required to repeal the classified board provision or the 80% requirement to remove directors without cause.

Additionally, the record fairly supports Hilton's contention that the Comprehensive Plan contains a "poison pill" resulting in a $ 1.4 billion tax liability which would be triggered if Hilton successfully acquired more than 50% of ITT Destinations and that Hilton would be liable for 90% of the tax bill.

Finally, and critical to this Court's analysis, ITT seeks to implement the Comprehensive Plan prior to ITT's 1997 annual meeting and without obtaining shareholder approval.


II. THE PARTIES' CONTENTIONS AND APPLICABLE LEGAL STANDARDS

On July 16, 1997, ITT filed the Complaint for Declaratory Relief ( # 1) now before the Court, seeking two declarations:

[*1345]

1. That Hilton cannot show that ITT's board acted outside its powers or failed to exercise its powers in good faith and with a view to the interests of the corporation [**13], and its shareholders in adopting the Comprehensive Plan; and

2. That Hilton, as a would-be acquiror, is antagonistic to other ITT shareholders and thus lacks standing as a proper derivative plaintiff to pursue an injunction against the Comprehensive Plan based on alleged breach of fiduciary duty by ITT's board.

Shortly after ITT's announcement of its Comprehensive Plan, Hilton announced an amended tender offer of $ 70.00 per share which was rejected by ITT. On August 26, 1997, Hilton filed its Motion for Injunctive and Declaratory Relief ( # 29) seeking:

1. A preliminary and permanent injunction enjoining ITT from proceeding with its Comprehensive Plan;

2. Declaring that by adopting the Comprehensive Plan, ITT's directors had breached their fiduciary duties to ITT and its shareholders;

3. Declaring that ITT may not implement its Comprehensive Plan without obtaining a shareholder vote; and

4. Requiring ITT to conduct its 1997 annual meeting for the election of directors not later than November 14, 1997.

HN1 The legal standard applicable to a request for preliminary injunctive relief is well settled. The party requesting such relief must show: (1) probable success in the [**14] merits and irreparable injury; or (2) sufficiently serious questions going to the merits to make the case a fair ground for litigation and a balance of hardships tipping decidedly in favor of the party requesting relief. Tuolumne Press, Inc. v. City of Los Angeles, 989 F.2d 1524, 1528 (9th Cir. 1993). These are not two separate test, but "merely extremes of a single continuum." Id. (citation omitted).

Where, as here, Hilton's Motion seeks mandatory injunctive relief in the sense that a trial on the merits could not practically reverse a preliminary decision enjoining implementation of ITT's Comprehensive Plan until after the 1997 annual meeting, the Motion is subject to heightened scrutiny and the injunction requested should not issue unless the facts and the law clearly favor the party requesting such relief. Hilton, 962 F. Supp. at 1309 (citations omitted). Therefore, this Court will apply the standard for permanent injunctive relief with regard to Hilton's Motion.

HN2 "The standards for issuing a permanent injunction are substantially similar to those applied to requests for preliminary injunctive relief. However, in order to obtain a permanent injunction plaintiffs must [**15] actually succeed on the merits of their claims." Coleman v. Wilson, 912 F. Supp. 1282, 1311 (E.D. CA. 1995) (citing Sierra Club v. Penfold, 857 F.2d 1307, 1318 (9th Cir. 1988)).

The requests for declaratory relief advanced by ITT and Hilton are governed by Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201.

**III. DISCUSSION**

This case involves consideration of the powers and duties of the board of directors of a Nevada corporation in responding to a hostile takeover attempt, and the importance of protecting the franchise of the shareholders of the corporation in the process.

Many courts have grappled with legal issues presented by the strategies employed by hostile bidders, such as Hilton, and the concomitant anti-takeover defensive measures utilized by target companies, such as ITT. Coupling an unsolicited tender offer with a proxy contest to replace the incumbent board is a favored strategy of would-be acquirors. A variety of sophisticated defensive measures, including "poison pill" plans have also evolved to frustrate a hostile takeover attempt. As a result, "replacing the incumbent directors of the target corporation is viewed as an efficient [*1320] way to eliminate the target company's ability to utilize these anti-takeover defenses." [citation] v. [citation] 22, 674 A.2d 483, 490 (Del. Ch. 1995). See also [citation], Inc. v. American Gen. Corp., 651 A.2d 1361, 1379 (Del. 1995).

Nevada state case law is virtually silent on the subject. However, provisions of Chapter 78 of the Nevada Revised Statutes ("N.R.S.") [*1346] speak to the respective rights and duties of directors and officers of corporations, and the rights of corporate stockholders. Nevada's statutory scheme does not, however, provide clear guidance in this case. While N.R.S. § 78.138 addresses several powers of a corporate board in undertaking defensive measures to repulse a hostile takeover, nothing in the Nevada statutes, or elsewhere in the law of Nevada, authorizes the incumbent board of a corporation to entrench itself by effectively removing the right of the corporation's shareholders to vote on who may serve on the board of the corporation in which they own a share. Whether a target corporation such as ITT can do so in the face of a hostile takeover attempt by Hilton is the dispositive issue presented in this case.

Where, as here, there is no Nevada statutory or [*1311] case law on point for an issue of corporate law, this Court finds persuasive authority in Delaware case law. [citation] v. ambIACO, 885 F. Supp. 1301, 1341 n.20 (D. Nev. 1994).

**A. Legal Framework for Board Action in Response to a Proxy Contest and Tender Offer.**

As this case involves both a tender offer and a proxy contest by Hilton, the proper legal standard is a Unocal/Blasius analysis as articulated in Stroud v. Grace, 606 A.2d 75, 92 n.3 (Del. 1992), and Unitrin, 651 A.2d at 1379.

> In assessing a challenge to defensive actions by a target corporation's board of directors in a takeover contest, this Court has held that the Court of Chancery should evaluate the board's overall response, including the justification for each contested defensive measure, and the results achieved thereby. Where all of the target board's defensive actions are inextricably related, the principles of Unocal require that such actions be scrutinized collectively as a unitary response to the perceived threat.

Unitrin, 651 A.2d at 1386-87 (emphasis supplied).

Where an acquiror launches both a proxy fight and a tender offer, it

> "necessarily invoke[s] both [*1312] Unocal and Blasius" because "both [tests] recognize the inherent conflicts of interest that arise when shareholders are not permitted free exercise of their franchise. . . . In certain circumstances, [the judiciary] must recognize the special import of protecting the shareholders' franchise within Unocal's requirement that any defensive measure be proportionate and 'reasonable in relation to the threat posed.'"

Unitrin, 651 A.2d at 1379 (quoting Stroud, 606 A.2d at 92 n.3)

> A board's unilateral decision to adopt a defensive measure touching "upon issues of control" that purposefully disenfranchises its shareholders is strongly suspect under Unocal, and cannot be sustained without a "compelling justification."

Stroud, 606 A.2d at 92 n.3.

These cases have drawn a distinction between the exercise of two types of corporate power: 1) power over the assets of the corporation and 2) the power relationship between the board (management) and the shareholders. Actions involving the first type of power invoke the business judgment rule, or Unocal if an action is in response to a reasonably perceived threat to the corporation. Actions [*1312] involving the second power invoke a Blasius analysis. The issues raised in this case require the Court to focus on the power relationship between ITT's board and ITT shareholders, not on the ITT board's actions relating to corporate assets.

Several amicus briefs have been filed on behalf of ITT shareholders, urging that they be allowed to vote on the Comprehensive Plan and the board of directors at the 1997 annual meeting. This Court has found no legal basis mandating a shareholder vote on the adoption of ITT's Comprehensive Plan in its entirety. However, as the Court finds that the Comprehensive Plan would violate the power relationship between ITT's board and ITT's shareholders by impermissibly infringing on the shareholders' right to vote on members of the board of directors, it must be enjoined.

ITT argues that Nevada does not follow Delaware case law since N.R.S. § 78.138 provides [*1347] that a board, exercising its powers in good faith and with an view to the interests of the corporation can resist potential changes in control of a corporation based on the affect to constituencies other than the shareholders. However, the corporate rights provided under N.R.S. § 78.138 are [*14] not incompatible with the duties articulated in Unocal Corp. v. Mesa Petroleum Co., 493 A.2d 946 (Del. 1985), Revlon Inc. v. MacAndrews & Forbes Holdings, Inc., 506 A.2d 173 (Del. 1986) and Blasius Indus. Inc. v. Atlas Corp., 564 A.2d 651 (Del. 1988).

Delaware case law merely clarifies the basic duties established by the Nevada statutes. Shoen recognized this, and explicitly found that a good faith breach of duty was actionable under Nevada corporate law. Neither the Nevada Legislature in two successive sessions nor the Nevada Supreme Court has disagreed. ITT would have this Court establish that the only duty a board has under Nevada law is a duty of good faith. This Court will not eliminate the principles articulated in Unocal, Blasius and Revlon and the common law duties of care and loyalty without any indication from the Nevada Legislature or the Nevada Supreme Court that that is the legislative intent.

Thus, Delaware precedent establishes that a board's power over the management and assets of a corporation, but that power is not unlimited. That power is limited by the right of shareholders to vote for the members of the board. As articulated [*15] in Shoen, this right underlies the concept of corporate democracy. This Court fully endorses the reasoning in Shoen and Blasius regarding the importance of the shareholder franchise to the entire scheme of corporate governance. This Court will, therefore, examine ITT's Comprehensive Plan under the Unocal/Blasius analysis.

Unocal requires the Court to consider the following two questions: 1) Does ITT have reasonable grounds for believing a danger to corporate policy and effectiveness exists? 2) Is the response reasonable in relation to the threat? If it is a defensive measure touching on issues of control, the court must examine whether the board purposefully disenfranchised its shareholders, an action that cannot be sustained without a compelling justification. Stroud, 606 A.2d at 92 n.3.

**1. The Classified Board for ITT Destinations**

The first defensive action this Court will analyze under the *Unocal* standard is the provision in the Comprehensive Plan for a classified board for ITT Destinations.

**a. Reasonable grounds for believing a threat to corporate policy and effectiveness exists.**

None of ITT's eleven directors are outside directors. [**14]. Under *Unocal*, such a majority materially enhances evidence that a hostile offer presents a threat warranting a defensive response. *Unitrin*, 651 A.2d at 1375.

ITT argues strenuously that the Comprehensive Plan is better than Hilton's offer. This is not for the Court to decide, and it is not determinative under its analysis. Under *Unocal*, a court must first determine if there is a threat to corporate policy and effectiveness. ITT has failed to demonstrate such a threat.

ITT has made no showing that Hilton will pursue a different corporate policy than ITT seeks to implement through its Comprehensive Plan. In fact, over the past few months, ITT has to a large extent adopted Hilton's proposed strategy of how it says it will govern ITT if its slate of directors is elected. There has also been no showing of Hilton's inability or ineffectiveness to run ITT if it does succeed in its takeover attempt. ITT cites to the fact that some Sheraton franchise owners will be unhappy if Hilton enters into certain management contracts, but this is not fundamental or pervasive enough to constitute a "threat" to ITT's corporate policy or effectiveness.

The ITT board has also failed to meet [**17] its burden of showing "good faith and reasonable investigation" of a threat to corporate policy or effectiveness which would meet the burden placed on the board under the first prong of the *Unocal* test. Since Hilton's tender offer was announced, the ITT board has not met with Hilton to discuss the offer. Moreover, the overwhelming majority of ITT's evidence of good faith relates to its [*1348] approval of the Comprehensive Plan, not to the inadequacy of Hilton's offer.

The sole "threat" ITT points to is that Hilton's offer of $ 70 a share is inadequate, primarily because this price does not contain a control premium. However, at the August 14, 1997, ITT board meeting, Goldman Sachs told the ITT board that the market valued ITT's plan at $ 62 to $ 64 dollars a share. This contradicts ITT's argument that there is no control premium over market price contained in Hilton's offer. That ITT itself was offering to buy back roughly 20% of its stock at $ 70 a share does not nullify this fact.

The only attempt ITT has made to satisfy the first prong of the *Unocal* analysis is to argue that Hilton's price is inadequate. However, while [**19] inadequacy of an offer is a legally cognizable threat, [**18] *Paramount Communications, Inc. v. Time, Inc.*, 571 A.2d 1140, 1153 (Del. 1990), ITT has shown no real harm to corporate policy or effectiveness. The facts in *Unocal* illustrate this point well. *Unocal* involved a tender offer with a back-end offer of junk bonds. 493 A.2d at 949-950. Junk bond financing could reasonably harm the future policy and effectiveness of a company. As ITT itself is offering only $ 70 a share, and the Comprehensive Plan involves greatly increasing the leveraging of ITT, its claim that Hilton's offer of $ 70 a share is a threat to policy or effectiveness is unpersuasive. In light of these facts, the alleged inadequacy of Hilton's offer is not a severe threat to ITT. Under the proportionality requirement, the nature of Hilton's threat will set the parameters for the range of permissible defensive tactics under the second prong of the *Unocal* test. *Unitrin*, 651 A.2d 1361 at 1384.

**b. ITT's Response was Preclusive.**

Assuming Hilton's offer constitutes a cognizable threat under *Unocal*, ITT's response cannot be preclusive or coercive, and it must be within the range of reasonableness. As articulated in *Unitrin*, [**21] a board cannot "cram down" [**19] on shareholders a management sponsored alternative. *Unitrin*, 651 A.2d at 1387. The installation of a classified board for ITT Destinations, a company which will encompass 93% of the current ITT's assets and 87% of its revenues, is clearly preclusive and coercive under *Unitrin*. The classified board provision for ITT Destinations will preclude current ITT shareholders from exercising a right they currently possess - to determine the membership of the board of ITT. At the very minimum, ITT shareholders will have no choice but to accept the Comprehensive Plan and a majority of ITT's incumbent board members for another year. Therefore, the Comprehensive Plan is preclusive.

**c. The Primary Purpose of the Comprehensive Plan is to Interfere with Shareholder Franchise.**

ITT's response to Hilton's tender offer touches upon issues of control, and this Court must determine whether the response purposefully disenfranchises ITT's shareholders. If so, under the analysis of *Stroud* and *Unitrin*, it is not a reasonable response unless a "compelling justification" exists. It is important to note that in *Blasius*, the board did something that normally would be entirely permissible, [**20] under Delaware law and its own by-laws: it expanded the board from seven to nine individuals. It did this in the face of a hostile takeover by a company financed through "junk bonds" and then individuals who sought to substantially "cash out" many of the target corporation's assets. *Blasius*, 564 A.2d at 652-54. Still, while the board in *Blasius* had a good faith reason to act as it did, and it acted with appropriate care, the board could not lawfully prevent the shareholders from electing a majority of new directors.

*Blasius*' factual scenario is strikingly similar to the circumstances surrounding ITT's actions. Normally, a corporation is free to adopt a classified board structure. In fact many companies, including Hilton, have classified boards. As long as the classified board is adopted in the proper manner, whether through charter amendment, changes in the by-laws of a company or through shareholder vote, it is permissible. However, *Blasius* illustrates that [**22] even if an action is normally permissible, and the board adopts it in good faith and with proper care, a board cannot undertake such action if the primary purpose is to disenfranchise the shareholders in light [*1349] of [**23] a proxy contest. *Blasius*, 564 A.2d at 652. Thus, while ITT could normally adopt a classified board or issue a dividend of shares creating ITT Destinations, it cannot undertake these actions if the primary purpose is to disenfranchise ITT shareholders in light of Hilton's tender offer and proxy contest.

As a board would likely never concede that its primary purpose was to entrench itself, this Court must look to circumstantial evidence to determine the primary purpose of ITT's action touching upon issues of control. While none of the following factors are dispositive, collectively they eliminate all questions of material fact, and demonstrate that the primary purpose of ITT's Comprehensive Plan was to disenfranchise its shareholders.

**i. Timing**

The intent evidenced by the timing of the Comprehensive Plan is transparent. Although ITT claims that a spin-off or sale was contemplated before Hilton's tender offer, it makes no mention of when the board determined to have ITT's newly elected board to a classified board. Moreover, all aspects of ITT's Comprehensive Plan were formulated against the backdrop of Hilton's tender offer and proxy contest, and this Plan was not announced [**24] until well after Hilton's initial tender offer. Finally, this major restructuring of ITT was announced and to be implemented in a little over two months, and designed to take effect less than two months before the annual meeting was to be held at which shareholders would have the opportunity to vote on an annually elected rather than a classified board.

**ii. Entrenchment**

The ITT directors who are approving the Comprehensive Plan are the same directors who will fill the classified board positions of ITT Destinations. ITT and its advisors recognized from the outset that they were vulnerable because they did not have a staggered board of directors. The members of ITT's board are appointing themselves to new, more insulated positions, and at least seven of the eleven directors are avoiding the shareholder vote that would otherwise occur at ITT's 1997 annual meeting. While companies may convert from annual to classified boards, as *Blasius* illustrates, the rub is in the details. It is the manner of adopting the Comprehensive Plan with its provision for a new certified board comprised of incumbent ITT directors which supports the conclusion that ITT's Plan is primarily designed [**25] to entrench the incumbent board.

**iii. ITT's Stated Purpose**

ITT has offered no credible justification for not seeking shareholder approval of the Comprehensive Plan. ITT simply claims that it wants to "avoid market risks and other business problems." (pp. 10-11 of ITT's Opposition). Such vague generalizations do not approach the required showing of a reasonable justification other than entrenchment

Hilton Hotels Corp. v. ITT Corp., 978 F. Supp. 1342

for the board's action. Simply stating that its "advisors" suggested a rapid implementation of the Comprehensive Plan, without pointing to a specific risk or problem, is insufficient to meet ITT's burden.

### b. Benefits of Comprehensive Plan

ITT argues that there are economic benefits to the Comprehensive Plan, and general benefits of the classified board provision for ITT Destinations. That may be true, but the additional benefits of a plan infringing on shareholder voting rights do not remedy the fundamental flaw of board entrenchment.

### c. Effect of Classified Board

The classified board provision for ITT Destinations under ITT's Comprehensive Plan ensures that ITT shareholders will be absolutely precluded from electing a majority of the directors nominated under Hilton's [**24], proxy contest at the 1997 annual meeting. Such a Plan, coupled with ITT's vehement opposition to Hilton's tender offer, is inconsistent with ITT's earlier argument that a delay of the 1997 annual meeting from May to November would afford shareholders additional time to inform themselves and more fully consider the implications of their vote for directors at the 1997 annual meeting.

ITT's position is particularly anomalous given the fact that when ITT previously split the company in 1995, it sought shareholder approval. While shareholder approval may not be absolutely required to split ITT now anymore than it was in 1995, the fact that the ITT board decided to subject the 1995 split [**1350] of the company to a shareholder vote is strong evidence that the primary purpose of its attempts to implement the Comprehensive Plan prior to the 1997 annual meeting is to entrench the incumbent ITT board.

### d. Failure to Obtain an IRS Opinion as to Effects of the Comprehensive Plan

ITT is not seeking an Internal Revenue Service opinion regarding the tax consequences of the three-way split of ITT under the Comprehensive Plan. It is doubtful that an Internal Revenue Service opinion on the matter could [**25], be obtained before ITT's 1997 annual meeting. Furthermore, there are serious questions as to the extent to which implementation of the Comprehensive Plan will constitute a taxable event to ITT and its shareholders, or the extent to which Hilton would incur adverse tax consequences if it attempted to takeover ITT Destinations once the Comprehensive Plan is implemented. ITT dismisses these concerns by arguing that its attorneys advise that there are no adverse tax consequences under the Comprehensive Plan. However, the record demonstrates otherwise. ITT's counsel conceded that there is no binding precedent on point and that the issue was not free from doubt. While obtaining a tax opinion from the Internal Revenue Service may not be mandatory, ITT's failure to seriously consider obtaining such an opinion provides additional evidence that ITT's primary intention in implementing the Comprehensive Plan at this time was to impede the shareholder franchise.

### 2. Other Provisions of the Comprehensive Plan

This Court's analysis regarding the threat to ITT under the first prong of Unocal is equally applicable to the remaining elements of the Comprehensive Plan. Whether the other aspects [**26], of ITT's Comprehensive Plan violate the second step of the Unocal analysis, that is whether they are preclusive or coercive, is problematic. Certainly the record before the Court supports Hilton's contention that the "tax poison pill" relating to its potential purchase of ITT Destinations is preclusive and coercive. Hilton also argues that ITT's Plan is coercive because ITT is offering a $70.00 a share for only 26% of the stock. Since the trading value of the stock is $ 62.00 to $ 64.00 per share, shareholders will have to tender their shares immediately to avoid a financial loss. These arguments create serious questions as to whether the other elements of the Comprehensive Plan are preclusive and coercive.

HN11 The Unocal test is also referred to as a "proportionality test." see, e.g., Unitrin, 651 A.2d at 1384. Serious questions remain as to whether the Comprehensive Plan is reasonable in relation to the threat posed by Hilton's offer. The Comprehensive Plan entails a split-up of ITT and spin-off of 93% of the company's assets without a shareholder vote. There are important tax considerations, both the "tax poison pill" discussed above and the relative tax burdens of spinning [**27], off World Directories as opposed to one of the smaller entities. Additionally, other aspects of the financial restructuring involved in the Comprehensive Plan illustrate that the plan is extremely complex, and that the three ITTs emerging from the plan will be fundamentally different companies.

Serious questions exist as to whether the remaining provisions of the Comprehensive Plan are preclusive or coercive, or reasonable responses under Unocal. This Court finds it unnecessary, however, to undertake an exhaustive analysis of the laundry list of issues presented by both parties. The different provisions of the Comprehensive Plan are inextricably related, and this Court has already concluded that the staggered board provision is preclusive and was enacted for the primary purpose of entrenching the current board. Therefore, the entire Comprehensive Plan must be enjoined.

### 3. Duty to Maximize Value to Shareholders Under Revlon

Hilton further argues that injunctive relief is warranted based on an analysis of the Comprehensive Plan under the Revlon standard. The Court finds that Hilton has not extinguished all material facts as to whether the Comprehensive Plan involves: [**28], 1) an abandonment of the long-term strategy of ITT involving a breakup of the company or 2) a sale of control is contemplated in Revlon and Paramount v. QVC. 637 A.2d 34 (Del. [*1351] 1994). Therefore, permanent injunctive relief on this basis is not warranted.

### IV. CONCLUSION

Earlier in this litigation, the Court fully embraced pertinent language in Blasius and Unitrin regarding the importance of the shareholder franchise. Hilton, 962 F. Supp. at 1310. These principles encompass fundamental concepts of corporate governance and laws repetition.

Shareholders do not exercise day-to-day business judgments regarding the operation of a corporation -- those are matters left to the reasonable discretion of directors, officers and the corporation's management team. Corporate boards have great latitude in exercising their business judgments as they should. As a result, shareholders generally have only two protections against perceived inadequate business performance. They may sell their stock or vote to replace incumbent board members. For this reason, interference with the shareholder franchise is especially serious. It is not to be left to the board's business judgment. [**29], precisely because it underlies a primary justification for allowing directors to rely on their business judgment in almost every other context. Indeed, as the court in Blasius noted, "one of the justifications for the business judgment rule's insulation of directors from liability for almost all of their decisions is that unhappy shareholders can always vote the directors out of office." Blasius, 690 F. Supp. at 1340.

As the Court has noted previously, HN12 "inquiries concerning fiduciary duties are inherently particularized and contextual. It is probably not possible to work out rules that will be perfectly predictive of future cases involving claimed impediments to the shareholder vote. It is sufficient to express a reasoned judgment on the facts presented." Hilton, 962 F. Supp. at 1311 (quoting Stahl v. Apple Bancorp, Inc., 579 A.2d 1115 at (1/25).

ITT strongly argues that its Comprehensive Plan is superior to Hilton's alternative tender offer. This argument should be directed to ITT's shareholders, not this Court.

Hilton Hotels Corp. v. ITT Corp., 978 F. Supp. 1342                                    Page 8 of 9

ITT also claims that it has properly considered other constituencies in responding to Hilton's offer, as it is expressly allowed to do under N.R.S. § 78.138. ITT is correct. Other [**32] constituencies may be considered under that provision, but nothing in that statute suggests that the interests of third parties are as important as the right of shareholder franchise. While the two interests are not exclusive, neither are they equal. The right of shareholders to vote on directors at an annual meeting is a fundamental principle of corporate law, and it is not outweighed by the interests listed in N.R.S. § 78.138.

Likewise, the good faith of the ITT board in implementing the Comprehensive Plan does not change this Court's analysis. Shoen, relying on Blasius, recognized a good faith breach of duty under Nevada law. Simply put, there is no compelling justification for infringement of the shareholder franchise as proposed by the implementation of ITT's Comprehensive Plan before the 1997 annual meeting.

The ultimate outcome of the election of directors at ITT's 1997 annual meeting is not a relevant inquiry for this Court. That is something for the shareholders who own ITT to decide when they select the board who will lead the corporation. If a majority of the incumbent ITT board is re-elected after a fully-informed and fair shareholder vote, that board will be [**33] free to implement any business plan it chooses so long as that plan is consistent with ITT's charter and by-laws, and governing law.

This Court concludes that the structure and timing of ITT's Comprehensive Plan with its classified board provision for ITT Destinations, is preclusive and leaves no doubt that the primary purpose for ITT's proposed implementation of the Comprehensive Plan before the 1997 annual meeting is to impermissibly impede the exercise of the shareholder franchise by depriving shareholders of the opportunity to vote to re-elect or to oust all or as many of the incumbent ITT directors as they may choose at the upcoming annual meeting. It has as its primary purpose the entrenchment of the incumbent ITT board. As a result, the Court concludes that Hilton has prevailed on the merits of its claim for permanent injunctive relief.

[*1353] IT IS THEREFORE ORDERED that Hilton's Motion for Permanent Injunctive Relief [ # 29] is granted to the extent that ITT is hereby enjoined from implementing its Comprehensive Plan announced July 15, 1997.

IT IS FURTHER ORDERED that ITT's annual meeting shall be held no later than November 14, 1997.

IT IS FURTHER ORDERED that Hilton's Motion [**32], for Declaratory and Injunctive Relief [ # 28] and ITT's Complaint for Declaratory Relief [ # 1] are denied in all other respects.

DATED: October 2, 1997

PHILIP M. PRO *

United States District Judge

Footnotes

[1 *]   ITT's Complaint for Declaratory Relief was originally assigned to the Honorable David W. Hagen *, United States District Judge, Case No. CV-S-97-853-DWH. On August 20, 1997, that action was reassigned [ # 34] and on August 26, 1997, was consolidated with the previously filed action, Hilton Hotels Corp. and HLT Corp. v. ITT Corp., Cv-S-97-95-PMP (RLH) [ # 28].



LexisNexis                                                                              RELX Group



(https://www.cornell.edu)Cornell University Law School (http://www.lawschool.cornell.edu/)Search Cornell (https://www.cornell.edu/search/)

CFR (/cfr/text) » Title 17 (/cfr/text/17) » Chapter II (/cfr/text/17/chapter-II) » Part 240
(/cfr/text/17/part-240) » Section 240.12b-25

## CFR Toolbox

Co-maintained with:

# 17 CFR 240.12b-25 - Notification of inability to timely file all or any required portion of a Form 10-K, 20-F, 11-K, N-SAR, N-CSR, 10-Q, or 10-D.

(http://law.uci.edu) (https://lawblogs.uc.edu/ext/)
Wex: Securities Law: Overview (/wex/securities)
@CLS: Securities Law Clinic
(http://www.lawschool.cornell.edu/academics/clinicalprograms/index.cfm)
Clarke Business Law Institute
(http://www.lawschool.cornell.edu/academics/clarke_business)
View eCFR (http://www.ecfr.gov/cgi-bin/text-idx?c=ecfr&sid=ecfr/browse/Title/17/17cfr240_main_02.tpl)
Table of Popular Names (/topn)
Parallel Table of Authorities (/ptoa)

eCFR (/cfr/text/17/240.12b-25?qt-ecfrmaster=0#qt-ecfrmaster)
Authorities (U.S. Code) (/cfr/text/17/240.12b-25?qt-ecfrmaster=1#qt-ecfrmaster)
Rulemaking (/cfr/text/17/240.12b-25?qt-ecfrmaster=3#qt-ecfrmaster)
What Cites Me (/cfr/text/17/240.12b-25?qt-ecfrmaster=3#qt-ecfrmaster)

prev | next

§ 240.12b-25 Notification of inability to timely file (/definitions/index.php?
width=840&height=800&iframe=true&def_id=86fa57f915c36d6d065582de5e3a3c6&term... 25) all or any required portion of a Form 10-K, 20-F, 11-K, N-SAR, N-CSR, 10-Q, or 10-D.

Link to an amendment published at 81 FR 82020 (https://www.law.cornell.edu/rio/citation/81_FR_82020).
Nov. 18, 2016.

(a) If all or any required portion of an annual or transition report on Form 10-K, 20-F or 11-K (17 (https://www.law.cornell.edu/cfr/text/17) CFR 249.310 (https://www.law.cornell.edu/cfr/text/17/249.310), 249.220f (https://www.law.cornell.edu/cfr/text/17/249.220f) or 249.311) (https://www.law.cornell.edu/cfr/text/17/249.311)), a quarterly or transition report on Form 10-Q (17 CFR 249.308a (https://www.law.cornell.edu/cfr/text/17/249.308a)), or a distribution (/definitions/index.php?
width=840&height=800&iframe=true&def_id=232d7a0a635d41062ad67e0209ad41&term_occur=1&term_src=Title 17 Chapter II:Part 240:Subppt-25) report on Form 10-D (17 CFR 249.312) (https://www.law.cornell.edu/cfr/text/17/249.312)) required to be filed (/definitions/index.php?
width=840&height=800&iframe=true&def_id=86fa57f915c36d6d065582de5e3a3c6&term_occur=2&term_src=Title 17 Chapter II:Part 240:Subppt-25) pursuant to Section (/definitions/index.php?
width=840&height=800&iframe=true&def_id=173a792100796ea53368c53f4b4535#6a&term_occur=1&term_src=Title 17 Chapter II:Part 240:Subppt-25) 13 or 15(d) of the Act ( 15 (https://www.law.cornell.edu/uscode/text/15) U.S.C. 78m (https://www.law.cornell.edu/uscode/text/15/78m) or 78o(d) (https://www.law.cornell.edu/uscode/text/15/78o#d)) and rules thereunder, or if all or any required portion of a semi-annual, annual or transition report on Form N-CSR ( 17 CFR 249.331 (https://www.law.cornell.edu/cfr/text/17/249.331), 17 CFR 274.128 (https://www.law.cornell.edu/cfr/text/17/274.128)) or Form N-SAR ( 17 CFR 249.330 (https://www.law.cornell.edu/cfr/text/17/249.330), 17 CFR 274.101 (https://www.law.cornell.edu/cfr/text/17/274.101)) required to be filed (/definitions/index.php?
width=840&height=800&iframe=true&def_id=86fa57f915c36d6d065582de5e3a3c6&term_occur=3&term_src=Title 17 Chapter II:Part 240:Subppt-25) pursuant to Section (/definitions/index.php?
width=840&height=800&iframe=true&def_id=173a792100796ea53368c53f4b4535#6a&term_occur=2&term_src=Title 17 Chapter II:Part 240:Subppt-25) 13 or 15(d) of the Act or section (/definitions/index.php?
width=840&height=800&iframe=true&def_id=173a792100796ea53368c53f4b4535#6a&term_occur=3&term_src=Title 17 Chapter II:Part 240:Subppt-25) 30 of the Investment Company Act (/definitions/index.php?
width=840&height=800&iframe=true&def_id=fd0867917ef1026426161/2aacfdeb5&term_occur=1&term_src=Title 17 Chapter II:Part 240:Subppt-25) of 1940 ( 15 U.S.C. 80a-29 (https://www.law.cornell.edu/uscode/text/15/80a-29)) and the rules thereunder, is not filed (/definitions/index.php?
width=840&height=800&iframe=true&def_id=86fa57f915c36d6d065582de5e3a3c6&term_occur=4&term_src=Title 17 Chapter II:Part 240:Subppt-25) within the time period prescribed for such report, the registrant (/definitions/index.php?
width=840&height=800&iframe=true&def_id=14a421385c1=cab4377bda6fcbd6d1=1a&term_occur=1&term_src=Title 17 Chapter II:Part 240:Subppt-25), no later than one business day (/definitions/index.php?
width=840&height=800&iframe=true&def_id=7d0621aa6fe3b0ca6e6a207fcu18659&term_occur=1&term_src=Title 17 Chapter II:Part 240:Subppt-25) after the due date for such report, shall file (/definitions/index.php?
width=840&height=800&iframe=true&def_id=86fa57f915c36d6d065582de5e3a3c6&term_occur=5&term_src=Title 17 Chapter II:Part 240:Subppt-25) a Form 12b-25 ( 17 CFR 249.322) (https://www.law.cornell.edu/cfr/text/17/249.322)) with the Commission which shall contain disclosure (/definitions/index.php?
width=840&height=800&iframe=true&def_id=bd921ad36f06a7d6cf1a87fd77ca00&term_occur=1&term_src=Title 17 Chapter II:Part 240:Subppt-25) of its inability to (/definitions/index.php?
width=840&height=800&iframe=true&def_id=86fa57f915c36d6d065582de5e3a3c6&term_occur=6&term_src=Title 17 Chapter II:Part 240:Subppt-25) the report timely and the reasons therefore in reasonable detail





## Retiring Comfortably?



If you have a $500,000 portfolio,
download The Definitive Guide to
Retirement Income

## Find a Lawyer

(b) With respect to any report or portion of any report described in paragraph (a) of this section /definitions/index.php?

width=640&height=600&frame=true&def_id=173a792109796a03306b3594d03546a&term_occur=4&term_src=Title:17:Chapter:II:Part:240:Subgrp:76:240.12b-25) which is not timely filed /definitions/index.php?

width=640&height=600&frame=true&def_id=866d1791c36db0d065582de5e3a3c0&term_occur=7&term_src=Title:17:Chapter:II:Part:240:Subgrp:76:240.12b-25) because the registrant /definitions/index.php?

width=640&height=600&frame=true&def_id=74e421385c11eab4377bed4fc6d0211a&term_occur=2&term_src=Title:17:Chapter:II:Part:240:Subgrp:76:240.12b-25) is unable to do so without unreasonable effort or expense, such report shall be deemed to be filed /definitions/index.php?

width=640&height=600&frame=true&def_id=866d1791c36db0d065582de5e3a3c0&term_occur=6&term_src=Title:17:Chapter:II:Part:240:Subgrp:76:240.12b-25) on the prescribed due date for such report if:

(1) The registrant /definitions/index.php?

width=640&height=600&frame=true&def_id=74e421385c11eab4377bed4fc6d0211a&term_occur=5&term_src=Title:17:Chapter:II:Part:240:Subgrp:76:240.12b-25) files /definitions/index.php?

width=640&height=600&frame=true&def_id=866d1791c36db0d065582de5e3a3c0&term_occur=6&term_src=Title:17:Chapter:II:Part:240:Subgrp:76:240.12b-25) the Form 12b-25 in compliance with paragraph (a) of this section /definitions/index.php?

width=640&height=600&frame=true&def_id=173a792109796a03306b3594d03546a&term_occur=5&term_src=Title:17:Chapter:II:Part:240:Subgrp:76:240.12b-25) and, when applicable, furnishes the exhibit required by paragraph (c) of this section /definitions/index.php?

width=640&height=600&frame=true&def_id=173a792109796a03306b3594d03546a&term_occur=6&term_src=Title:17:Chapter:II:Part:240:Subgrp:76:240.12b-25);

(2) The registrant /definitions/index.php?

width=640&height=600&frame=true&def_id=74e421385c11eab4377bed4fc6d0211a&term_occur=4&term_src=Title:17:Chapter:II:Part:240:Subgrp:76:240.12b-25) represents in the Form 12b-25 that:

(i) The reason(s) causing the inability to file /definitions/index.php?

width=640&height=600&frame=true&def_id=866d1791c36db0d065582de5e3a3c0&term_occur=10&term_src=Title:17:Chapter:II:Part:240:Subgrp:76:240.12b-25) timely could not be eliminated by the registrant /definitions/index.php?

width=640&height=600&frame=true&def_id=74e421385c11eab4377bed4fc6d0211a&term_occur=5&term_src=Title:17:Chapter:II:Part:240:Subgrp:76:240.12b-25) without unreasonable effort or expense; and

(ii) The subject annual report, semi-annual report or transition report on Form 10-K, 20-F, 11-K, N-SAR, or N-CSR, or portion thereof, will be filed /definitions/index.php?

width=640&height=600&frame=true&def_id=866d1791c36db0d065582de5e3a3c0&term_occur=11&term_src=Title:17:Chapter:II:Part:240:Subgrp:76:240.12b-25) no later than the fifteenth calendar day following the prescribed due date, or the subject quarterly report or transition report on Form 10-Q or distribution /definitions/index.php?

width=640&height=600&frame=true&def_id=232d7a03e63548106 2ce687a0206ad4 1&term_occur=2&term_src=Title:17:Chapter:II:Part:240:Subgrp:76:240.12b-25) report on Form 10-D, or portion thereof, will be filed /definitions/index.php?

width=640&height=600&frame=true&def_id=866d1791c36db0d065582de5e3a3c0&term_occur=12&term_src=Title:17:Chapter:II:Part:240:Subgrp:76:240.12b-25) no later than the fifth calendar day following the prescribed due date; and

(3) The report/portion thereof is actually filed /definitions/index.php?

width=640&height=600&frame=true&def_id=866d1791c36db0d065582de5e3a3c0&term_occur=13&term_src=Title:17:Chapter:II:Part:240:Subgrp:76:240.12b-25) within the period specified by paragraph (b)(2)(ii) of this section /definitions/index.php?

width=640&height=600&frame=true&def_id=173a792109796a03306b3594d03546a&term_occur=7&term_src=Title:17:Chapter:II:Part:240:Subgrp:76:240.12b-25)

(c) If paragraph (b) of this section /definitions/index.php?

width=640&height=600&frame=true&def_id=173a792109796a03306b3594d03546a&term_occur=4&term_src=Title:17:Chapter:II:Part:240:Subgrp:76:240.12b-25) is applicable and the reason the subject report/portion thereof cannot be filed /definitions/index.php?

width=640&height=600&frame=true&def_id=866d1791c36db0d065582de5e3a3c0&term_occur=14&term_src=Title:17:Chapter:II:Part:240:Subgrp:76:240.12b-25) timely without unreasonable effort or expense relates to the inability of any person, other than the registrant /definitions/index.php?

width=640&height=600&frame=true&def_id=74e421385c11eab4377bed4fc6d0211a&term_occur=6&term_src=Title:17:Chapter:II:Part:240:Subgrp:76:240.12b-25), to furnish any required opinion, report or certification, the Form 12b-25 shall have attached as an exhibit a statement signed by such person stating the specific reasons why such person is unable to furnish the required opinion, report or certification on or before the date such report must be filed.

(d) Notwithstanding paragraph (b) of this section /definitions/index.php?

width=640&height=600&frame=true&def_id=173a792109796a03306b3594d03546a&term_occur=5&term_src=Title:17:Chapter:II:Part:240:Subgrp:76:240.12b-25), a registrant /definitions/index.php?

width=640&height=600&frame=true&def_id=74e421385c11eab4377bed4fc6d0211a&term_occur=7&term_src=Title:17:Chapter:II:Part:240:Subgrp:76:240.12b-25) will not be eligible to use any registration statement /definitions/index.php?

width=640&height=600&frame=true&def_id=a0bace0356c1cfb68b153acd703e9f6&term_occur=1&term_src=Title:17:Chapter:II:Part:240:Subgrp:76:240.12b-25) form under the Securities Act /definitions/index.php?

width=640&height=600&frame=true&def_id=71f139d626ca303401 6738dbb1s2a4&term_occur=1&term_src=Title:17:Chapter:II:Part:240:Subgrp:76:240.12b-25) of 1933 the use of which is predicated on timely filed /definitions/index.php?

width=640&height=600&frame=true&def_id=866d1791c36db0d065582de5e3a3c0&term_occur=15&term_src=Title:17:Chapter:II:Part:240:Subgrp:76:240.12b-25) reports until the subject report is actually filed /definitions/index.php?

width=640&height=600&frame=true&def_id=866d1791c36db0d065582de5e3a3c0&term_occur=16&term_src=Title:17:Chapter:II:Part:240:Subgrp:76:240.12b-25) pursuant to paragraph (b)(3) of this section /definitions/index.php?

width=640&height=600&frame=true&def_id=173a792109796a03306b3594d03546a&term_occur=10&term_src=Title:17:Chapter:II:Part:240:Subgrp:76:240.12b-25)

(https://www.law.cornell.edu/honc/citation/73_FR_974), Jan. 4, 2008; 74 FR 6818
(https://www.law.cornell.edu/honc/citation/74_FR_6818), Feb. 10, 2009]

# Start Download - View PDF

Convert From Doc to PDF, PDF to Doc Simply With The Free Online
App! Go to download.fromdoctopdf.com



| About LII | Contact us | Advertise here (/li/help_outsponsor) | Help | Terms of use |
| (/li/about/about_lii) | (/li/about/contact_us) | | (/li/help) | (/li/terms/documentation) |

Privacy
(/li/terms/privacy_policy)

[ 1 . 11 ]

(f)



(https://www.cornell.edu/Cornell University Law School (http://www.lawschool.cornell.edu/)Search Cornell (https://www.cornell.edu/search))

CFR (/cfr/text) › Title 17 (/cfr/text/17) › Chapter II (/cfr/text/17/chapter-II) › Part 240
(/cfr/text/17/part-240) › Section 240.13a-11

## CFR Toolbox

Co-maintained with:
(http://law.uc.edu) (https://lawblogs.uc.edu/sll/)
Wex: Securities Law: Overview (/wex/securities)
@CLS: Securities Law Clinic
(http://www.lawschool.cornell.edu/academics/clinicalprog
law/index.cfm); Clarke Business Law Institute
(http://www.lawschool.cornell.edu/academics/clarke_bus
View eCFR (http://www.ecfr.gov/cgi-bin/text-idx?
c=ecfr&tpl=/ecfrbrowse/Title17/17cfr240_main_02.tpl)
Table of Popular Names (/topn)
Parallel Table of Authorities (/ptoa)

# 17 CFR 240.13a-11 - Current reports on Form 8-K (§ 249.308 of this chapter).

eCFR (/cfr/text/17/240.13a-11?tpl=ecfr=master=8tpl-ecfr=master)
Authorities (U.S. Code) (/cfr/text/17/240.13a-11?tpl=ecfr=master=b#tpl-ecfr=master)
Rulemaking (/cfr/text/17/240.13a-11?tpl=ecfr=master=3#tpl-ecfr=master)
What Cites Me (/cfr/text/17/240.13a-11?tpl=ecfr=master=3#tpl-ecfr=master)
prev (/cfr/text/17/240.13a-10) | next (/cfr/text/17/240.13b-1)

§ 240.13a-11 Current reports on Form 8-K (§ 249.308 of this chapter).

Link to an amendment published at 81 FR 82020
(https://www.law.cornell.edu/rio/citation/81_FR_82020), Nov. 18, 2016.

(a) Except as provided in paragraph (b) of this section (/definitions/index.php?

(b) This section (/definitions/index.php?

(1) Notice of a blackout period pursuant to § 245.104
(https://www.law.cornell.edu/cfr/text/17/245.104) of this chapter:

(2) Disclosure (/definitions/index.php?

(3) Disclosure (/definitions/index.php?

chrome

Find a Lawyer

by which a nominating shareholder or nominating shareholder group must submit the notice required pursuant to § 240.14a-11(b)(10) (https://www.law.cornell.edu/cfr/text/17/240.14a-11#b_10).

(c) No failure to file (/definitions/index.php?width=640&height=800&iframe=true&def_id=869a57915c36dc0d065fd2defa3a3c0&term_occur=3&term_src=Title:17:Chapter:II:Part:240:Subjgrp:64:240.13a-11) a report on Form 8-K that is required solely pursuant to Item 1.01, 1.02, 2.03, 2.04, 2.05, 2.06, 4.02(a), 5.02(e) or 6.03 of Form 8-K shall be deemed to be a violation of 15 U.S.C. 78j(b) (https://www.law.cornell.edu/uscode/text/15/78j#b) and § 240.10b-5.

[ 42 FR 4428 (https://www.law.cornell.edu/rio/citation/42_FR_4428), Jan. 25, 1977, as amended at 50 FR 27939 (https://www.law.cornell.edu/rio/citation/50_FR_27939), July 9, 1985; 66 FR 4355 (https://www.law.cornell.edu/rio/citation/66_FR_4355), Jan. 29, 2003; 69 FR 15618 (https://www.law.cornell.edu/rio/citation/69_FR_15618), Mar. 25, 2004; 70 FR 1621 (https://www.law.cornell.edu/rio/citation/70_FR_1621), Jan. 7, 2005; 71 FR 53290 (https://www.law.cornell.edu/rio/citation/71_FR_53290), Sept. 8, 2006; 75 FR 56780 (https://www.law.cornell.edu/rio/citation/75_FR_56780), Sept. 16, 2010]

# Download This To PDF

Free to Download and Convert. Get It Instantly. Download Now.
Go to fromdoctopdf.com.



About LII (/lii/about/about_lii)    Contact us (/lii/about/contact_us)    Advertise here (/lii/help_out/sponsor)    Help (/lii/help)    Terms of use (/lii/terms/documentation)

Privacy (/lii/terms/privacy_policy)

[1.11]



(https://www.cornell.edu/)Cornell University Law School (http://www.lawschool.cornell.edu/)Search Cornell (https://www.cornell.edu/search/)

CFR (/cfr/text) › Title 17 (/cfr/text/17) › Chapter II (/cfr/text/17/chapter-II) › Part 240
(/cfr/text/17/part-240) › Section 240.14a-2

## CFR Toolbox

Co-maintained with:
(http://law.uci.edu) Wex: Securities Law: Overview (/wex/securities)
@CLS: Securities Law Clinic

# 17 CFR 240.14a-2 - Solicitations to which § 240.14a-3 to § 240.14a-15 apply.

eCFR (/cfr/text/17/240.14a-2?qt-ecfr=aster=0#qt-ecfr=aster)

Authorities (U.S. Code) (/cfr/text/17/240.14a-2?qt-ecfr=aster=1#qt-ecfr=aster)

Rulemaking (/cfr/text/17/240.14a-2?qt-ecfr=aster=2#qt-ecfr=aster)

What Cites Me (/cfr/text/17/240.14a-2?qt-ecfr=aster=3#qt-ecfr=aster)

prev (/cfr/text/17/240.14a-1) | next (/cfr/text/17/240.14a-3)

(http://www.lawschool.cornell.edu/academics/clinicalprograms/index.cfm), Clarke Business Law Institute
(http://www.lawschool.cornell.edu/academics/clarke_business/)
View eCFR (http://www.ecfr.gov/cgi-bin/text-idx?c=ecfr&tpl=ecfrbrowse/Title17/17cfr240_main_02.tpl)
Table of Popular Names (/topn)
Parallel Table of Authorities (/ptoa)

## § 240.14a-2 Solicitations (/definitions/index.php?width=840&height=800&iframe=true&def_id=3cc8aa58b0104fdfbba812639e01106b&term_...cc=vr=18*srm_rrc=fTitle:17:Chapter:II:Part:2-

to which § 240.14a-3 to § 240.14a-15 apply.

Sections 240.14a-3 (https://www.law.cornell.edu/cfr/text/17/240.14a-3) to 240.14a-15, except as specified, apply to every solicitation (/definitions/index.php?width=840&height=800&iframe=true&def_id=3cc8aa58b0104fdfbba812639e01106b&term_occur=2&term_src=Title of a proxy (/definitions/index.php?width=840&height=800&iframe=true&def_id=2bb039b7674d0e3368d9637ee4dea&term_occur=3&term_src=Title with respect to securities registered pursuant to section (/definitions/index.php?width=840&height=800&iframe=true&def_id=173a792109796fa53369c559469354fa&term_occur=1&term_src=Title 12 of the Act.) 13 U.S.C. 78 (https://www.law.cornell.edu/uscode/text/15/78l), whether or not trading in such securities has been suspended. To the extent specified below, certain of these sections (/definitions/index.php?width=840&height=800&iframe=true&def_id=173a792109796fa53369c559469354fa&term_occur=3&term_src=Title also apply to roll-up transactions that do not involve an entity with securities registered pursuant to section (/definitions/index.php?width=840&height=800&iframe=true&def_id=173a792109796fa53369c559469354fa&term_occur=3&term_src=Title 12 of the Act.

[a] Sections 240.14a-3 (https://www.law.cornell.edu/cfr/text/17/240.14a-3) to 240.14a-15 do not apply to the following:

(1) Any solicitation (/definitions/index.php?width=840&height=800&iframe=true&def_id=3cc8aa58b0104fdfbba812639e01106b&term_occur=3&term_src=Title:17:Cha... by a person in respect to securities carried in his name or in the name of his nominee (otherwise than an voting trustee) or held in his custody, if such person -

(i) Receives no commission or remuneration for such solicitation (/definitions/index.php?width=840&height=800&iframe=true&def_id=3cc8aa58b0104fdfbba812639e01106b&term_occur=4&term_src=Title:17:Chapter:II:Part:240:240.14a-2). directly or indirectly, other than reimbursement of reasonable expenses.

(ii) Furnishes promptly (/definitions/index.php?width=840&height=800&iframe=true&def_id=9e88f4af9dd43fac21731ae2732b4191&term_occur=1&term_src=Title:17:Chapter:II:Part:240:240.14a-2) to the person solicited (or such person's household in accordance with § 240.14a-3(e)(1) (https://www.law.cornell.edu/cfr/text/17/240.14a-3#e_1) a copy of all soliciting material (/definitions/index.php?width=840&height=800&iframe=true&def_id=6162e29bd7ed2f98fa412&term_occur=1&term_src=Title:17:Chapter:II:Part:240:240.14a-2) with respect to the same subject matter or meeting received from all persons who shall furnish copies thereof for such purpose and who shall, if requested, defray the reasonable expenses to be incurred in forwarding such material (/definitions/index.php?width=840&height=800&iframe=true&def_id=6162e29bd7ed2f98fa412&term_occur=2&term_src=Title:17:Chapter:II:Part:240:240.14a-2); and

(iii) In addition, does no more than impartially instruct the person solicited to forward a proxy (/definitions/index.php?width=840&height=800&iframe=true&def_id=2bb039b7674d0e3368d9637ee4dea&term_occur=2&term_src=Title:17:Chapter:II:Part:240:240.14a-2) to the person, if any, to whom the person solicited desires to give a proxy (/definitions/index.php?width=840&height=800&iframe=true&def_id=2bb039b7674d0e3368d9637ee4dea&term_occur=3&term_src=Title:17:Chapter:II:Part:240:240.14a-2) or impartially request from the person solicited instructions (/definitions/index.php?width=840&height=800&iframe=true&def_id=2479bae97af6443ab4f39476e04bc12b2&term_occur=1&term_src=Title:17:Chapter:II:Part:240:240.14a-2) as to the authority to be conferred by the proxy (/definitions/index.php?width=840&height=800&iframe=true&def_id=2bb039b7674d0e3368d9637ee4dea&term_occur=4&term_src=Title:17:Chapter:II:Part:240:240.14a-2) and state that a proxy (/definitions/index.php?width=840&height=800&iframe=true&def_id=2bb039b7674d0e3368d9637ee4dea&term_occur=5&term_src=Title:17:Chapter:II:Part:240:240.14a-2)

High Yield Savings Account

Enjoy Over

17x

the National
Average APY*

PLUS

Get a

Cash
Bonus*

Learn More

CIT Bank

chrome

Find a Lawyer

will be given if no instructions (/definitions/index.php?
width=640&height=800&iframe=true&def_id=24796cef7afb84)&b6%04796a0dbc12b2&term_occur=2&term_src=Title 17 Chapter II Part 240.240.14a-2)
are received by a certain date.

(2) Any solicitation (/definitions/index.php?
width=640&height=800&iframe=true&def_id=3ccbaa596c1046f6ba61263920110fb&term_occur=5&term_src=Title 17 Chapter II Part 240.240.14a-2)
by a person in respect of securities of which he is the beneficial owner (/definitions/index.php?
width=640&height=800&iframe=true&def_id=d5437276476fb0bb259b279a40ec2748&term_src=Title 17 Chapter II Part 240.240.14a-2).

(3) Any solicitation (/definitions/index.php?
width=640&height=800&iframe=true&def_id=3ccbaa596c1046f6ba61263920110fb&term_occur=6&term_src=Title 17 Chapter II Part 240.240.14a-2)
involved in the offer and sale of securities registered under the Securities Act (/definitions/index.php?
width=640&height=800&iframe=true&def_id=77d130a62fba303d0116736db0162a66&term_occur=1&term_src=Title 17 Chapter II Part 240.240.14a-2)
of 1933: Provided, That this paragraph shall not apply to securities to be issued in any transaction of
the character specified in paragraph (a) of Rule 145 under that Act.

(4) Any solicitation (/definitions/index.php?
width=640&height=800&iframe=true&def_id=3ccbaa596c1046f6ba61263920110fb&term_occur=7&term_src=Title 17 Chapter II Part 240.240.14a-2)
with respect to a plan (/definitions/index.php?
width=640&height=800&iframe=true&def_id=b62430b0d4305ab16fa606587a0caff&term_occur=1&term_src=Title 17 Chapter II Part 240.240.14a-2)
of reorganization under Chapter 11 of the Bankruptcy Reform Act of 1978, as amended, if made after
the entry of an order approving the written disclosure (/definitions/index.php?
width=640&height=800&iframe=true&def_id=ef421aea565f06a1dfd7d57fd71cc08&term_occur=1&term_src=Title 17 Chapter II Part 240.240.14a-2)
statement concerning a plan (/definitions/index.php?
width=640&height=800&iframe=true&def_id=b62430b0d4305ab16fa606587a0caff&term_occur=2&term_src=Title 17 Chapter II Part 240.240.14a-2)
of reorganization pursuant to section (/definitions/index.php?
width=640&height=800&iframe=true&def_id=173a792109796453306bf596d045a6&term_occur=4&term_src=Title 17 Chapter II Part 240.240.14a-2)
1125 of said Act and after, or concurrently with, the transmittal of such disclosure
(/definitions/index.php?
width=640&height=800&iframe=true&def_id=ef421aea565f06a1dfd7d57fd71cc08&term_occur=2&term_src=Title 17 Chapter II Part 240.240.14a-2)
statement as required by section (/definitions/index.php?
width=640&height=800&iframe=true&def_id=173a792109796453306bf596d045a6&term_occur=5&term_src=Title 17 Chapter II Part 240.240.14a-2)
1125 of said Act.

(5) [Reserved]

(6) Any solicitation (/definitions/index.php?
width=640&height=800&iframe=true&def_id=3ccbaa596c1046f6ba61263920110fb&term_occur=8&term_src=Title 17 Chapter II Part 240.240.14a-2)
through the medium of a newspaper advertisement which informs security (/definitions/index.php?
width=640&height=800&iframe=true&def_id=d6e27e61dff92045ac4d0f0eeb4f&term_occur=1&term_src=Title 17 Chapter II Part 240.240.14a-2)
holders of a source from which they may obtain copies of a proxy statement (/definitions/index.php?
width=640&height=800&iframe=true&def_id=b816d67eba1ca0b32f8babc6b39366f&term_occur=1&term_src=Title 17 Chapter II Part 240.240.14a-2)
form of proxy (/definitions/index.php?
width=640&height=800&iframe=true&def_id=d2bd33fc767d40e33fdb6963f&term_occur=6&term_src=Title 17 Chapter II Part 240.240.14a-2)
and any other soliciting material (/definitions/index.php?
width=640&height=800&iframe=true&def_id=acb6162e29bcd7ed2f96f0c4126fc5cf&term_occur=3&term_src=Title 17 Chapter II Part 240.240.14a-2)
and does no more than:

 (i) Name the registrant (/definitions/index.php?
 width=640&height=800&iframe=true&def_id=74e421365c11eab4377fed66bd6021a&term_occur=1&term_src=Title 17 Chapter II Part 240.240.14a-2).

 (ii) State the reason for the advertisement, and

 (iii) Identify the proposal or proposals to be acted upon by security (/definitions/index.php?
 width=640&height=800&iframe=true&def_id=d6e27e61dff92045ac4d0f0eeb4f&term_occur=2&term_src=Title 17 Chapter II Part 240.240.14a-2)
 holders.

(b) Sections 240.14a-3 (https://www.law.cornell.edu/cfr/text/17/240.14a-3) to 240.14a-8 (other than
paragraphs 14a-6(g) and 14a-6(p)), § 240.14a-8 (https://www.law.cornell.edu/cfr/text/17/240.14a-8), §
240.14a-10 (https://www.law.cornell.edu/cfr/text/17/240.14a-10), and §§ 240.14a-12
(https://www.law.cornell.edu/cfr/text/17/240.14a-12) to 240.14a-15 do not apply to the following:

(1) Any solicitation (/definitions/index.php?
width=640&height=800&iframe=true&def_id=3ccbaa596c1046f6ba61263920110fb&term_occur=9&term_src=Title 17 Chapter II Part 240.240.14a-2)
by or on behalf of any person who does not, at any time during such solicitation
(/definitions/index.php?
width=640&height=800&iframe=true&def_id=3ccbaa596c1046f6ba61263920110fb&term_occur=10&term_src=Title 17 Chapter II Part 240.240.14a-2),
seek directly or indirectly, either on its own or another's behalf, the power to act as proxy
(/definitions/index.php?
width=640&height=800&iframe=true&def_id=d2bd33fc767d40e33fdb6963f&term_occur=7&term_src=Title 17 Chapter II Part 240.240.14a-2)
for a security (/definitions/index.php?
width=640&height=800&iframe=true&def_id=d6e27e61dff92045ac4d0f0eeb4f&term_occur=3&term_src=Title 17 Chapter II Part 240.240.14a-2)
holder and does not furnish or otherwise request, or act on behalf of a person who furnishes or
requests, a form of revocation, abstention, consent or authorization. Provided, however, That the
exemption set forth in this paragraph shall not apply to:

(i) The registrant (/definitions/index.php?
width=640&height=600&frame=true&def_id=74a421385c11eab4377ed48u8d921!a&term_occur=3&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
or an affiliate (/definitions/index.php?
width=640&height=600&frame=true&def_id=9bdfcab9d6203fe0729d40aaf41475b6&term_occur=1&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
or associate (/definitions/index.php?
width=640&height=600&frame=true&def_id=3e402d6d91acebca96a391d6bf1994&term_occur=1&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
of the registrant (/definitions/index.php?
width=640&height=600&frame=true&def_id=74a421385c11eab4377ed48u8d921!a&term_occur=3&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
(other than an officer or director or any person serving in a similar capacity);

(ii) An officer or director of the registrant (/definitions/index.php?
width=640&height=600&frame=true&def_id=74a421385c11eab4377ed48u8d921!a&term_occur=4&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
or any person serving in a similar capacity engaging in a solicitation (/definitions/index.php?
width=640&height=600&frame=true&def_id=3cd8ad58c0104fd8ba812839e01108b&term_occur=11&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
financed directly or indirectly by the registrant (/definitions/index.php?
width=640&height=600&frame=true&def_id=74a421385c11eab4377ed48u8d921!a&term_occur=5&term_src=Title:17:Chapter:II:Part:240:240.14a-2)

(iii) An officer, director, affiliate (/definitions/index.php?
width=640&height=600&frame=true&def_id=9bdfcab9d6203fe0729d40aaf41475b6&term_occur=2&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
or associate (/definitions/index.php?
width=640&height=600&frame=true&def_id=3e402d6d91acebca96a391d6bf1994&term_occur=2&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
of a person that is ineligible to rely on the exemption set forth in this paragraph (other than persons
specified in paragraph (b)(1)(i) of this section), or any person serving in a similar capacity.

(iv) Any nominee for whose election as a director proxies are solicited.

(v) Any person soliciting in opposition to a merger, recapitalization, reorganization, sale of assets or
other extraordinary transaction recommended or approved by the board of directors of the
registrant (/definitions/index.php?
width=640&height=600&frame=true&def_id=74a421385c11eab4377ed48u8d921!a&term_occur=6&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
who is proposing or intends to propose an alternative transaction to which such person or one of its
affiliates (/definitions/index.php?
width=640&height=600&frame=true&def_id=9bdfcab9d6203fe0729d40aaf41475b6&term_occur=3&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
is a party.

(vi) Any person who is required to report beneficial ownership of the registrant
(/definitions/index.php?
width=640&height=600&frame=true&def_id=74a421385c11eab4377ed48u8d921!a&term_occur=6&term_src=Title:17:Chapter:II:Part:240:240.14a-2)'s
equity securities on a Schedule 13D (§ 240.13d-101)
(https://www.law.cornell.edu/cfr/text/17/240.13d-101), unless such person has filed
(/definitions/index.php?
width=640&height=600&frame=true&def_id=989a57f615c36db0d0f0582defa3a3c0&term_occur=1&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
a Schedule 13D and has not disclosed pursuant to Item 4 thereto an intent, or reserved the right, to
engage in a contest (/definitions/index.php?
width=640&height=600&frame=true&def_id=5810cbd6e365a0d8f022045b7047243&term_occur=1&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
transaction, or any contested solicitation (/definitions/index.php?
width=640&height=600&frame=true&def_id=3cd8ad58c0104fd8ba812839e01108b&term_occur=12&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
for the election of directors.

(vii) Any person who receives compensation from an ineligible person directly related to the
solicitation (/definitions/index.php?
width=640&height=600&frame=true&def_id=3cd8ad58c0104fd8ba812839e01108b&term_occur=13&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
of proxies, other than pursuant to § 240.14a-13 (https://www.law.cornell.edu/cfr/text/17/240.14a-
13);

(viii) Where the registrant (/definitions/index.php?
width=640&height=600&frame=true&def_id=74a421385c11eab4377ed48u8d921!a&term_occur=8&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
is an investment company registered under the Investment Company Act (/definitions/index.php?
width=640&height=600&frame=true&def_id=16096791741020542810!2aacfdeb6&term_occur=1&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
of 1940 (15 U.S.C. 80a-1 (https://www.law.cornell.edu/uscode/text/15/80a-1)a1 seq.), an "interested
person" of that investment company, as that term is defined in section (/definitions/index.php?
width=640&height=600&frame=true&def_id=173a792109794a53368c5594b9554&term_occur=6&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
2(a)(19) of the Investment Company Act (/definitions/index.php?
width=640&height=600&frame=true&def_id=16096791741020542810!2aacfdeb6&term_occur=2&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
( 15 U.S.C. 80a-2 (https://www.law.cornell.edu/uscode/text/15/80a-2));

(ix) Any person who, because of a substantial interest in the subject matter of the solicitation
(/definitions/index.php?
width=640&height=600&frame=true&def_id=3cd8ad58c0104fd8ba812839e01108b&term_occur=14&term_src=Title:17:Chapter:II:Part:240:240.14a-2),
is likely to receive a benefit from a successful solicitation (/definitions/index.php?
width=640&height=600&frame=true&def_id=3cd8ad58c0104fd8ba812839e01108b&term_occur=14&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
that would not be shared (/definitions/index.php?
width=640&height=600&frame=true&def_id=73207fe20ace1b5a1058432ba02u23&term_occur=1&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
pro rata by all other holders of the same class of securities, other than a benefit arising from the

person's employment with the registrant /definitions/index.php?
width=840&height=800&iframe=true&def_id=74s421385c11eab4377ed48db9211a&term_occur=9&term_src=Title:17:Chapter:II:Part:240:240.14a-2);
and

(iii) Any person acting on behalf of any of the foregoing.

(2) Any solicitation /definitions/index.php?
width=840&height=800&iframe=true&def_id=3cdbad58b010dfd9bad12639e0110f0b&term_occur=15&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
made otherwise than on behalf of the registrant /definitions/index.php?
width=840&height=800&iframe=true&def_id=74s421385c11eab4377ed48db9211a&term_occur=10&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
where the total number of persons solicited is not more than ten;

(3) The furnishing of proxy /definitions/index.php?
width=840&height=800&iframe=true&def_id=2bb020fc787440e33fdb89637ee4dea&term_occur=6&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
voting advice by any person (the "advisor") to any other person with whom the advisor has a business
relationship, if:

(i) The advisor renders financial advice in the ordinary course of his business;

(ii) The advisor discloses to the recipient of the advice any significant relationship with the registrant
/definitions/index.php?
width=840&height=800&iframe=true&def_id=74s421385c11eab4377ed48db9211a&term_occur=11&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
or any of its affiliates, or a security /definitions/index.php?
width=840&height=800&iframe=true&def_id=47d6a27e61dff82045acdf0f0eeb4f&term_occur=48&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
holder proponent of the matter on which advice is given, as well as any material
/definitions/index.php?
width=840&height=800&iframe=true&def_id=adbf182e29bd7ed2f980c4c26b0f0cd9&term_occur=4&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
interests of the advisor in such matter;

(iii) The advisor receives no special commission or remuneration for furnishing the proxy
/definitions/index.php?
width=840&height=800&iframe=true&def_id=2bb020fc787440e33fdb89637ee4dea&term_occur=9&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
voting advice from any person other than a recipient of the advice and other persons who receive
similar advice under this subsection; and

(iv) The proxy /definitions/index.php?
width=840&height=800&iframe=true&def_id=2bb020fc787440e33fdb89637ee4dea&term_occur=10&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
voting advice is not furnished on behalf of any person soliciting proxies or on behalf of a participant
in an election subject to the provisions of § 240.14a-12(c)
(https://www.law.cornell.edu/cfr/text/17/240.14a-12#c); and

(4) Any solicitation /definitions/index.php?
width=840&height=800&iframe=true&def_id=3cdbad58b010dfd9bad12639e0110f0b&term_occur=17&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
in connection with a roll-up transaction as defined in item 901(c) of Regulation S-K (§ 229.901
(https://www.law.cornell.edu/cfr/text/17/229.901) of this chapter) in which the holder of a security
/definitions/index.php?
width=840&height=800&iframe=true&def_id=47d6a27e61dff82045acdf0f0eeb4f&term_occur=5&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
that is the subject of a proposed roll-up transaction engages in preliminary communications with other
holders of securities that are the subject of the same limited partnership roll-up transaction
/definitions/index.php?
width=840&height=800&iframe=true&def_id=730abd27da2cc39f1de7c11a50f4a7f&term_occur=1&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
for the purpose of determining whether to solicit proxies, consents, or authorizations in opposition to
the proposed limited partnership roll-up transaction /definitions/index.php?
width=840&height=800&iframe=true&def_id=730abd27da2cc39f1de7c11a50f4a7f&term_occur=2&term_src=Title:17:Chapter:II:Part:240:240.14a-2).
provided, however, that:

(i) This exemption shall not apply to a security /definitions/index.php?
width=840&height=800&iframe=true&def_id=47d6a27e61dff82045acdf0f0eeb4f&term_occur=6&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
holder who is an affiliate /definitions/index.php?
width=840&height=800&iframe=true&def_id=8bd6cab04b209be72940aa&term_occur=4&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
of the registrant /definitions/index.php?
width=840&height=800&iframe=true&def_id=74s421385c11eab4377ed48db9211a&term_occur=12&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
or general partner or sponsor; and

(ii) This exemption shall not apply to a holder of five percent (5%) or more of the outstanding
securities of a class that is the subject of the proposed roll-up transaction who engages in the
business of buying and selling limited partnership interests in the secondary market unless that
holder discloses to the persons to whom the communications are made such ownership interest
and any relations of the holder to the parties of the transaction or to the transaction itself, as
required by § 240.14a-6(n)(1) (https://www.law.cornell.edu/cfr/text/17/240.14a-6#n_1) and specified
in the Notice of Exempt Preliminary Roll-up Communication ( § 240.14a-104)
(https://www.law.cornell.edu/cfr/text/17/240.14a-104). If the communication is oral, the disclosure
/definitions/index.php?
width=840&height=800&iframe=true&def_id= b42 1aea069f06a7dbd7d077d77cc0f&term_occur=3&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
may be provided to the security /definitions/index.php?
width=840&height=800&iframe=true&def_id=47d6a27e61dff82045acdf0f0eeb4f&term_occur=7&term_src=Title:17:Chapter:II:Part:240:240.14a-2)

of any other group, as determined under section (/definitions/index.php?
width=840&height=800&frame=true&def_id=173a792109796a63306b55940354b&term_occur=9&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
13(d)(3) of the Act ( 15 U.S.C. 78m(d)(3) (https://www.law.cornell.edu/uscode/text/15/78m#d_3) and §
240.13d-5(b)), or otherwise, with persons engaged in soliciting o other nominating activities o connection
with the subject election of directors.

(B) Any solicitation (/definitions/index.php?
width=840&height=800&frame=true&def_id=3cc8aa59fc01040f&baf=12639e01:10fb4&term_occur=6&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
by or on behalf of a nominating shareholder or nominating shareholder group in support of its
nominee that is included or that will be included on the registrant (/definitions/index.php?
width=840&height=800&frame=true&def_id=74e421385c11eab4377fed4b8d6211a&term_occur=26&term_src=Title:17:Chapter:II:Part:240:240.14a-2)'s
form of proxy (/definitions/index.php?
width=840&height=800&frame=true&def_id=d2bb005fc7874d0e33f8d6963fee4dea&term_occur=12&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
in accordance with § 240.14a-11 (https://www.law.cornell.edu/cfr/text/17/240.14a-11) or for or against
the registrant (/definitions/index.php?
width=840&height=800&frame=true&def_id=74e421385c11eab4377fed4b8d6211a&term_occur=27&term_src=Title:17:Chapter:II:Part:240:240.14a-2)'s
nominee or nominees, provided that:

(i) The soliciting party does not, at any time during such solicitation (/definitions/index.php?
width=840&height=800&frame=true&def_id=3cc8aa59fc01040f&baf=12639e01:10fb4&term_occur=25&term_src=Title:17:Chapter:II:Part:240:240.14a-2),
seek directly or indirectly, either on its own or another's behalf, the power to act as proxy
(/definitions/index.php?
width=840&height=800&frame=true&def_id=d2bb035fc787e40e33f8d963fee4dea&term_occur=13&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
for a shareholder and does not furnish or otherwise request, or act on behalf of a person who
furnishes or requests, a form of revocation, abstention, consent or authorization;

(ii) Any written communication includes:

(A) The identity of each nominating shareholder and a description of his or her direct or indirect
interests, by security (/definitions/index.php?
width=840&height=800&frame=true&def_id=17dfa21a51dff6204acc4df0f0eeb4f&term_occur=6&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
holdings or otherwise;

(B) A prominent legend in clear, plain language advising shareholders that a shareholder
nominee is or will be included in the registrant (/definitions/index.php?
width=840&height=800&frame=true&def_id=74e421385c11eab4377fed4b8d6211a&term_occur=28&term_src=Title:17:Chapter:II:Part:240:240.14a-2)'s
proxy statement (/definitions/index.php?
width=840&height=800&frame=true&def_id=db816d67eba1ca0b32f0babc0b30bb4f&term_occur=2&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
and that they should read the registrant (/definitions/index.php?
width=840&height=800&frame=true&def_id=74e421385c11eab4377fed4b8d6211a&term_occur=29&term_src=Title:17:Chapter:II:Part:240:240.14a-2)'s
proxy statement (/definitions/index.php?
width=840&height=800&frame=true&def_id=db816d67eba1ca0b32f0babc0b30bb4f&term_occur=3&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
when available because it includes important information (or, if the registrant
(/definitions/index.php?
width=840&height=800&frame=true&def_id=74e421385c11eab4377fed4b8d6211a&term_occur=30&term_src=Title:17:Chapter:II:Part:240:240.14a-2)'s
proxy statement (/definitions/index.php?
width=840&height=800&frame=true&def_id=db816d67eba1ca0b32f0babc0b30bb4f&term_occur=4&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
is publicly available, advising shareholders of that fact and encouraging shareholders to read the
registrant (/definitions/index.php?
width=840&height=800&frame=true&def_id=74e421385c11eab4377fed4b8d6211a&term_occur=31&term_src=Title:17:Chapter:II:Part:240:240.14a-2)'s
proxy statement (/definitions/index.php?
width=840&height=800&frame=true&def_id=db816d67eba1ca0b32f0babc0b30bb4f&term_occur=5&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
because it includes important information). The legend also must explain to shareholders that
they can find the registrant (/definitions/index.php?
width=840&height=800&frame=true&def_id=74e421385c11eab4377fed4b8d6211a&term_occur=32&term_src=Title:17:Chapter:II:Part:240:240.14a-2)'s
proxy statement (/definitions/index.php?
width=840&height=800&frame=true&def_id=db816d67eba1ca0b32f0babc0b30bb4f&term_occur=6&term_src=Title:17:Chapter:II:Part:240:240.14a-2),
other soliciting material (/definitions/index.php?
width=840&height=800&frame=true&def_id=c9d2e2f9bd7ed2f96fc4128b4fcd8&term_occur=6&term_src=Title:17:Chapter:II:Part:240:240.14a-2),
and any other relevant documents at no charge on the Commission's Web site; and

(iii) Any written soliciting material (/definitions/index.php?
width=840&height=800&frame=true&def_id=ea3d6182e29bd7ed2f96fc412669bcd9&term_occur=10&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
published, sent or given to shareholders in accordance with this paragraph must be filed
(/definitions/index.php?
width=840&height=800&frame=true&def_id=89a57615c36db0d0855f82de5a3a3c0&term_occur=9&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
by the nominating shareholder or nominating shareholder group with the Commission, under the
registrant (/definitions/index.php?
width=840&height=800&frame=true&def_id=74e421385c11eab4377fed4b8d6211a&term_occur=33&term_src=Title:17:Chapter:II:Part:240:240.14a-2)'s
Exchange Act (/definitions/index.php?
width=840&height=800&frame=true&def_id=df1eu1feb921fc3eb01685845073769&term_occur=3&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
file (/definitions/index.php?
width=840&height=800&frame=true&def_id=89a57615c36db0d0855f82de5a3a3c0&term_occur=10&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
number, or, in the case of a registrant (/definitions/index.php?
width=840&height=800&frame=true&def_id=74e421385c11eab4377fed4b8d6211a&term_occur=34&term_src=Title:17:Chapter:II:Part:240:240.14a-2)
that is an investment company registered under the Investment Company Act
(/definitions/index.php?

(https://www.law.cornell.edu/rio/citation/59_FR_63694), Dec. 8, 1994; 65 FR 65749
(https://www.law.cornell.edu/rio/citation/65_FR_65749), Nov. 2, 2000; 70 FR 44829
(https://www.law.cornell.edu/rio/citation/70_FR_44829), Aug. 3, 2005; 72 FR 4168
(https://www.law.cornell.edu/rio/citation/72_FR_4168), Jan. 29, 2007; 73 FR 4456
(https://www.law.cornell.edu/rio/citation/72_FR_4456), Jan. 25, 2008; 73 FR 17814
(https://www.law.cornell.edu/rio/citation/73_FR_17814), Apr. 1, 2008; 75 FR 56780
(https://www.law.cornell.edu/rio/citation/75_FR_56780), Sept. 16, 2010)

# Download This To PDF

Free to Download and Convert. Get It Instantly. Download Now.
Go to fromdoctopdf.com 

About LII
(/lii/about/about_lii)

Contact us
(/lii/about/contact_us)

Advertise here (/lii/help_out/sponsor)

Help
(/lii/help)

Terms of use
(/lii/terms/documentation)

Privacy
(/lii/terms/privacy_policy)

[1.11]
(/)

Shoen v. Amerco, 1994 U.S. Dist. LEXIS 21588    Page 1 of 14

Case 1:15-cv-08686-ALC  Document 73-18   Filed 05/26/17   Page 107 of 120

Research    Daniel Merrihew advany. | P94 US Dist LEXIS 21588   Actions ▾    🔍    More ▾

Go to  ▾  🔍 Search Document  •••

○ **Shoen v. Amerco, 1994 U.S. Dist. LEXIS 21588**

**Copy Citation**

United States District Court for the District of Nevada

October 5, 1994, Decided ; October 6, 1994, Filed

Civ-N-94-0475-ECR

**Reporter**
1994 U.S. Dist. LEXIS 21588 *

PAUL F. SHOEN, Plaintiff, v. AMERCO, a Nevada corporation, EDWARD J. SHOEN, MARK V. SHOEN, AUBREY K. JOHNSON, RICHARD J. HERRERA, WILLIAM E. CARTY, CHARLES J. BAYER, JOHN M. DODDS, and JAMES P. SHOEN, in their capacities as directors of AMERCO; AMERCO EMPLOYEE SAVINGS, PROFIT SHARING AND EMPLOYEE STOCK OWNERSHIP PLAN; EDWARD J. SHOEN, DONALD W. MURNEY, and GARY B. HORTON, in their capacities as trustees of AMERCO EMPLOYEE SAVINGS, PROFIT SHARING AND EMPLOYEE STOCK OWNERSHIP PLAN, Defendants.

**Subsequent History:** Later proceeding at Shoen v. AMERCO, 885 F. Supp. 1332, 1994 U.S. Dist. LEXIS 20080 (D. Nev., 1994)
Related proceeding at Shoen v. Shoen, 2012 Colo. App. LEXIS 1918 (2012)

**Disposition:** [*1] All voting directions so far obtained from the ESOP participants completely void. All defendants specifically enjoined from committing any further violations of the federal securities laws.

## Core Terms

participants, proxy, shareholders, voting, materials, shares, solicitation, annual meeting, proxy statement, proposals, stock, incumbent, company's, meeting date, allocated, election, pass through, contest, Appointment, trustees', newsletter, shareholder agreement, parties, preliminary injunction, Securities, faction, Notice, dispute, men, fiduciary

**Counsel:** FOR PLAINTIFF(S): Richard L. Elmore ▾, HALE, LANE, PEEK, DENNISON & HOWARD ▾, Reno, NV.

FOR PLAINTIFF(S): Marc M. Rappel ▾, Gary R. Ignatin ▾, LATHAM & WATKINS ▾, Los Angeles, CA.

FOR PLAINTIFF(S): Mark W. Smith ▾, LATHAM & WATKINS ▾, San Francisco, CA.

FOR PLAINTIFF(S): James Ryan, STREICH LANG ▾, Phoenix, AZ.

FOR Amerco Employee Svngs, Profit Sharing & Employee Stock Ownership Plan, Edward J. Shoen, Donald W. Murney & Gary B. Horton, DEFENDANT(S): PAUL J. ANDERSON ▾, ESQ , WALTHER, KEY, MAUPIN, OATS, COX, KLAICH & LEGOY ▾, Reno, NV

FOR Amerco Employee Svngs, Profit Sharing & Employee Stock Ownership Plan, Edward J. Shoen, Donald W. Murney & Gary B. Horton, DEFENDANT(S): KENNETH B. SEGEL ▾, ESQ , SEELEY, SEGEL, GOLDMAN & MAZOTTIA, P.C. ▾, Albany, New York

FOR Amerco, defendant: Michael E. Hoy ▾, Sq , Bible, Hoy, Reno, NV

FOR Amerco, DEFENDANT: JEFFREY WILLIS ▾, ESQ , STREICH LANG, P.A. ▾, Tucson, Arizona

FOR AMERCO EMPLOYEE SAVINGS, PROFIT SHARING & EMPLOYEE STOCK OWNERSHIP PLAN, [*3] DEFENDANTS: WAYNE W. SMITH ▾, ESQ , RODNEY J. STONE ▾, ESQ , GAIL E. LEES ▾, ESQ , Los Angeles, CA

FOR John M. Dodds & Charles J. Bayer, DEFENDANTS: LEO F. BERGIN, III ▾ ESQ , McDonald, Carano, Wilson, McCune Bergin, Frankovich & Hicks ▾, Reno, NV

FOR John M. Dodds & Charles J. Bayer, DEFENDANTS: THOMAS J. KAWLER ▾, ESQ , LAURENCE A. SILVERMAN ▾, ESQ , CAHILL GORDON & REINDEL ▾, New York, New York

FOR Charles Bayer, John Dodds, DEFENDANTS: Jonnamson, Davis & Santoni ▾, Leo F. Bergin, III ▾, McDonald, Carano, Las Vegas, NV

**Judges:** Edward C. Reed, Jr. ▾, UNITED STATES DISTRICT JUDGE.

**Opinion by:** Edward C. Reed, Jr. ▾

## Opinion

MEMORANDUM AND ORDER



Shoen v. ...

## II. JURISDICTION

The court has jurisdiction over the ERISA claims in this matter pursuant to 29 U.S.C. § 1132(a) and over the Exchange Act claims pursuant to 15 U.S.C. § 78aa. The state corporation law claims are pendent.

## III. STANDARD OF REVIEW.

In this circuit,

to obtain a preliminary injunction, a party must show either (1) a likelihood of success on the merits and the possibility of irreparable injury, [*11] or (2) the existence of serious questions going to the merits and the balance of hardships tipping in (the movant's) favor. These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases.

In other words, where a party can show a strong chance of success on the merits, he need only show a possibility of irreparable harm. Where, on the other hand, a party can show only that serious questions are raised, he must show that the balance of hardships tips sharply in his favor.

Document: Shoen v. Amerco, 1994 U.S. Dist. LEXIS 21588    Actions ▾

## A. PROBABILITY OF SUCCESS ON THE MERITS.

### 1. Facts.

Paul is a party to a registration rights agreement -- formally titled "Share Repurchase and Registration Rights Agreement" -- with AMERCO, which provides that AMERCO must "take all steps necessary to register [Paul Shoen's AMERCO] shares and list such shares on a public exchange." Shoen Aff. at P 6. Kappel ▾ Aff. Ex. II at 21. If AMERCO breaches this registration rights agreement, Paul can terminate the shareholder agreement. [*13] [3.A] Id., see also Kappel ▾ Aff. Ex. II at 10-11, 23. On April 8, Paul notified AMERCO of his "submission of the dispute involving the Registration Rights Agreements to arbitration." [3.A] An arbitration decision favorable to Paul would result in termination of the shareholder agreement. Shoen Aff. P 6. Moreover, such a decision would likely come before the traditional late September meeting date. Id. at P 7. If so, Joe would probably lose control of AMERCO.

On April 17, AMERCO sought unsuccessfully to obtain a temporary restraining order enjoining the arbitration. [1.A]

[*13] On May 3, the board decided to advance the meeting date from late September to July 21. [3.A] The next day, May 4, the board received notice of Paul's candidacy for election as a director and of his proposals for consideration at the shareholders' meeting. Id.

The board did not notify Paul of the advanced meeting date; instead, he discovered it "during a deposition of AMERCO's general counsel in an unrelated matter" on May 26, 1994. Shoen Aff. P 8; Kappel ▾ Aff. at 2.

On May 27, Paul requested that the board reconsider its decision to advance the date of the annual meeting. Kappel ▾ Aff. Ex. 9.

On June 6, Joe, acting in his capacity as President of AMERCO, amended the ESOP. Kappel ▾ Aff. Ex. XX at 5. Joe is also a trustee of the ESOP. Previously, according to Paul, the ESOP had required that participants submit proxies to the trustees at least ten days before the annual meeting. Prelim. Motion at 5. With the meeting scheduled for July 21, proxies would [*54] thus have had to be returned by July 11. According to Paul, AMERCO could not send out its proxy materials until July 8, due to SEC regulations. Id. This would make it almost impossible for participants to return proxies by July 11. Therefore, according to Paul, Joe amended the plan to require only that proxies be returned at least two days before the meeting, i.e., by July 19, thus making it possible for proxy materials to be sent out on July 8 and still returned in time for the meeting. Id.; Kappel ▾ Aff. Ex. XX at 4.

On June 16, AMERCO replied to Paul's May 27 request that it reconsider its decision to advance the meeting date. After justifying its decision to advance the meeting on various grounds (e.g., New York Stock Exchange policies, and cost savings from incorporation into AMERCO's SEC filings of items previously disclosed in its proxy statements), it nevertheless agreed to consider Paul's request. See Kappel Aff. Ex. 1 at 2. AMERCO requested that Paul give it until 5:00 p.m., June 30 to respond. Id., and Paul agreed. Kappel ▾ Aff. Ex. X.

During the last week of June, Paul claims, an ESOP participants received two documents that he terms "management solicitation[s]." [*18] 7 See Prelim. Motion at 6. One was the June edition of U-Haul News, the monthly company newsletter. The newsletter is about twenty-three pages long. Pages six and seven contain a notice, dated June 20 and titled "Pass Through voting Rights," from the ESOP trustees to the ESOP participants. [3.A] The second document was a flyer enclosed in the participants' payroll envelopes on June 24. Id. At this time, AMERCO had not yet provided proxy materials to its shareholders. Prelim. Motion at 6, AMERCO Answer at P 39.

On June 30, [*30] fifteen minutes before the deadline for its response to Paul's request for reconsideration of the meeting date, AMERCO informed him that the meeting would go forward, as planned, on July 21. See Kappel Aff. Ex. L. [3.A] AMERCO cited two factors supporting its decision. First, "the logistics and planning that go into scheduling the annual shareholders meeting for a company the size of AMERCO." Id. Second, the recommendation contained in § 401.04 of the New York Stock Exchange's Listed Company Manual that companies hold their annual meetings "within a reasonable interval after the close of the fiscal year" and the fact that the majority of listed companies hold their meetings within three months of the end of the fiscal year. [3.A] Id.

[*17] On July 8, the trustees forwarded AMERCO's proxy materials to the ESOP participants, along with a "final Notice of Voting Rights" and a voting card. [3.A]

On July 12, Paul's own proxy materials were cleared by the SEC. TRO Motion at 2. On July 13 and 14, he delivered these materials to the ESOP trustees for mailing to the participants. Id. at 3.

On July 14, at a meeting of parties to the shareholder agreement, the trustees voted the non-allocated ESOP shares in favor of incumbent management and against Paul's shareholder proposal. [17.A]

On July 15, the ESOP trustees met and decided [*18] "that Paul Shoen's proxy materials should not be forwarded to ESOP participants as there was insufficient time for participants to review the information and make an informed decision as to the positions contained therein." [3.A]

On July 20, this court, acting on an application from Paul, issued a TRO enjoining AMERCO from holding its annual meeting on July 21. That TRO was amended on July 25 to enjoin the meeting until September 24.

Since then, the parties have been sparring over Paul's demand that the ESOP trustees either mail his proxy materials to the ESOP participants or return the materials to him, along with mailing labels and the participants' addresses. [3.A] Apparently the ESOP trustees are willing to return the proxy materials. See ESOP TRO Opp. at 7. What they are not willing to turn over is a list of ESOP participants or mailing labels with the participants' [*19] names and addresses. Id.

### [*30] 2. The Decision to Advance AMERCO's Annual Meeting Date.

The directors of a corporation are fiduciaries and owe a duty of loyalty to the shareholders. Hanson v. Southwest Forest Industries, Inc., 614 F. Supp. 1130, 1134 (D. Nev. 1985). In determining whether that duty has been breached, a director's actions typically are analyzed under the "business judgment" rule. Id. The rule provides that "if directors' actions can arguably be taken to have been done for the benefit of the corporation, then the directors are presumed to have been exercising their sound business judgment" rather than acting in their own self-interest, and "the burden of showing bad faith rests upon the plaintiff." Id. at 1135.

Because directors' decisions will give rise to liability to the shareholders only if those decisions fail to satisfy the business judgment rule, and because that rule is deferential and thus easy to satisfy, shareholders normally have "only two protections against perceived inadequate business performance. They may sell their stock . . . or they may vote to replace incumbent board members." 564 A.2d at 659. Indeed, one of the justifications [*51] for the business judgment rule's insulation of directors from liability for almost all of their decisions is that unhappy shareholders can always vote the directors out of office. Thus, interference with shareholder voting is an especially serious matter, not to be left to the directors' business judgment, precisely because it undercuts a primary justification for allowing directors to rely on their judgment in almost every other context. Put another way, "the ordinary considerations to which the business judgment rule originally responded are simply not present in the shareholder voting context." Blasius Indus. v. Atlas Corp., 564 A.2d 651, 659 (Del. Ch. 1988), because when a board interferes with shareholder voting it interferes with the very "allocation between shareholders as a class and the board, of effective power with respect to governance of the corporation." Id. at 660. [33.A]

[*33] Therefore, while "the reasonable exercise of good faith and due care generally validates, in equity, the exercise of legal authority even if the act" has the effect of entrenching incumbent board members, id. at 658 (emphasis added), "action designed for the primary purpose of interfering with the effectiveness of a stockholder vote" is

### a. Rule 14a-3.

### b. Rule 14a-6.

### [*42] C. Rule 14a-9.

### 4. Violations of Fiduciary Duties Under ERISA.



The trustees' brief -- replete with references to, inter alia, lengthy meetings, independent judgment, Joe's abstention [*63] from certain votes, and an independent, unbiased advisory committee -- has an Alice in Wonderland quality to it. It cheerily ignores the fact that, by the time the trustees met, on July 15, they had already placed the story in the company newsletter, inserted the flyer in the payroll envelopes, and sent the "Final Notice of Voting Rights" and voting card to the participants. Each of these items, an already-explained, was an outright solicitation, or was at least slanted, in favor of incumbent management and against Paul's shareholder proposal. It is utterly implausible that the trustees then met with open and neutral minds to consider Paul's proposals and candidacy.

## 5. Summary of the Merits

This is a motion for preliminary relief and no conclusive findings of fact can be made. However, based on the voluminous materials already submitted to the court, it appears overwhelmingly likely that:

(a) the AMERCO board breached its fiduciary duties under Nevada corporation law by advancing the annual meeting date, so that the meeting could be conducted before an arbitration decision which might render incumbent management unable to control Paul's shares for voting purposes, [*64] and before Paul had an opportunity to campaign for his candidacy and shareholder proposal;

(b) AMERCO violated SEC Rules 14a-8 and 14a-9;

(c) the ESOP trustees violated SEC Rules 14a-3 and 14a-4; and

(d) the ESOP trustees breached their fiduciary duties under ERISA by campaigning on behalf of incumbent management rather than remaining neutral and by refusing to forward "necessary information" (i.e., Paul's proxy statement) to the ESOP participants because of minor and easily corrected errors.

I therefore appears most likely that Paul will prevail on the merits.

## B. IRREPARABLE HARM.

As this court stated in its Order of July 20, "the denial or frustration of the right of shareholders to vote their shares or obtain representation on the board of directors amounts to an irreparable injury." See Int'l Banknote Co. v. Muller, 713 F. Supp. 612, 623 (S.D.N.Y. 1989); Hubbard, 980 Ga. Ch. LEXIS 9 at *17-*18; Abrahamson v. HBO & Company, 531 A.2d 1204, 1208.

## C. OTHER FACTORS.

The standard for granting preliminary relief is sometimes formulated to include other factors -- the "balance of hardships" and the "public interest." The balance of [*65] hardships here favors Paul, he will, as noted above, most likely suffer irreparable harm, while the only harm to AMERCO will be that its meeting is further delayed. There is no indication that the daily operations of U-Haul will be interrupted in any way. The public interest plays little role in this case, as this is basically a dispute among private parties about private matters -- money and control of a company. To the extent that the public interest is involved, it favors adherence to the law and thus weighs in favor of a grant of injunctive relief in this case. Paul has made the requisite showing and a preliminary injunction will issue.

## IV. REMEDIES.

It is perhaps indicative of the defendants' own assessment of the merits of this case that they devote large portions of their briefs to arguing that, even if an injunction issues, Paul is not entitled to the relief he seeks. The asserted reasons are numerous. AMERCO claims that, because the meeting has already been enjoined and "the entire process must begin anew, continued expenditure of time and resources to litigate the underlying merits of Plaintiff's claims would be an exercise in expense and futility." AMERCO [*66] Prelim. Opp. at 4-5. The company then argues, among other things, that Paul's "requested 'preliminary' relief is completely inappropriate because it . . . demands final mandatory injunctive relief which can only be granted (if at all) after a full trial on the merits," id. at 5; that "curative disclosures are improper at this 'preliminary' stage of the litigation," id. at 15; that even if it did violate Rule 14a-6, such a violation is de minimis and does not merit relief, id. at 19 n.12; that appointment of a neutral trustee for the ESOP would constitute "extraordinary judicial action" and is "wholly inappropriate" in this case, id. at 24; and that Paul "cannot possibly suffer irreparable harm because everything done to date will be redone" and "the process must begin anew regardless of the outcome of this litigation." Id. at 26.

The ESOP trustees strike a similar chord. They claim to have "carried out their responsibility in accordance with" their "fundamental obligation" to act only in the participants' best interests. ESOP Prelim. Opp. at 2. More specifically, they argue that, pursuant to the Ninth Circuit's decision in Arizela v. Pacific Enters., 350 F.2d 611 (9th Cir. 1992), [*67] Paul has no right to a list of ESOP participants, id. at 11; and that Paul's request that a neutral trustee be appointed for the ESOP is "totally misplaced." Id. at 13.

This is not persuasive. If the only problem were that the AMERCO board had advanced the date of the annual meeting, then the first claim -- that further litigation is unnecessary and that the entire matter should be remitted to AMERCO's internal corporate election process -- might carry some weight, as the problem of the meeting date unipulcher was solved by this court's initial restraining order. Things are not so simple. The trustees have already "pre-conditioned" the ESOP participants to give voting directions in favor of incumbent management, and those solicitations have not disappeared. Curative disclosures are needed to remove their tamt, to the extent it can be removed. Moreover, the prospect of restarting the election process with the same trustees in charge of the ESOP is not an appealing one. The trustees are mostly responsible for the problems that have already cropped up.

The defendants' other arguments are similarly without force. Assuming that Rule 14a-6 violations are de minimis, the plethora [*68] of other violations in this case is a sufficient basis for granting relief, completely apart from Rule 14a-6. Curative disclosures are, despite the defendants' contentions, an appropriate component of injunctive relief. See, e.g., Rosenfeld Corp. v. Disney, 862 F.2d 967, 1006 (3rd Cir. 1988). More generally, injunctive relief is particularly appropriate in this type of case: "In corporate control contests the stage of the preliminary injunctive relief, rather than post-contest lawsuits, 'is the time when relief can best be given.'" Piper v. Chris-Craft Indus., 430 U.S. 1, 42, 51 L. Ed. 2d 124, 97 S. Ct. 926 (1977) (quoting Electronic Specialty Co. v. Int'l Controls Corp., 409 F.2d 937, 947 (2nd Cir. 1969) (Friendly, J.)). The court has a great deal of discretion in deciding what that relief shall be, and generally IV L. Loss & J. Seligman, Securities Regulation 2111-19 (1990), and other courts have ordered many of the same remedies sought here (e.g., voiding of proxies already obtained, corrective disclosures, and sufficient time between date of order and meeting date to permit resolicitation). See id. at 2117 n.5(f). [*69] see also United Paperworkers Int'l Union v. Int'l Paper Co., 985 F.2d 1190, 1202 (2nd Cir. 1993) (allowing sponsor of a section 14a-8 proposal to include in its sponsoring statement a description of trial court's adjudication that company's proxy statement violated Rule 14a-9). Similarly, ERISA authorizes plaintiffs to seek injunctions and "other appropriate equitable relief," 29 U.S.C. § 1132(a)(3), which logically implies that courts have the power to award such relief.

Document Shoen v. Amerco, 1994 U.S. Dist. LEXIS 21588   Actions *

## A. NEUTRAL TRUSTEES.

## B. LIST OF ESOP PARTICIPANTS' NAMES AND ADDRESSES.

## V. ORDER.



IT IS FURTHER ORDERED that in consideration of... with no material relationship to any party to this litigation and approved by all parties to this litigation, be appointed to tabulate the voting directions, the results of said vote (except for the final, aggregate results) to be kept secret, permanently, from all parties to this litigation, and such appointment to be evidenced by a stipulation signed by the parties and filed with the court within fifteen (15) days from the date that this order is filed with the clerk.

DATED: October 5, 1994.

Edward C. Reed, Jr. •

UNITED STATES DISTRICT JUDGE

---

**Footnotes**

**[1]**
There are numerous Shoens involved in this case. The principal players, for present purposes, are Paul Shoen and Edward J. ("Joe") Shoen. To avoid confusion, they will be referred to as Paul and Joe.

**[2]**
See Affidavit of Mark W. Rappend • in Support of Plaintiff's Ex Parte Application for a Temporary Restraining Order ("Rappet • Aff.") Ex. E (AMERCO Proxy Statement) at 8 n.1. AMERCO Employee Savings, Profit Sharing and Employee Stock Ownership Plan and the ESOP Trustees' Opposition to Paul Shoen's Application for an Additional Temporary Restraining Order ("ESOP TRO Opp.") at 2 & n.3.

**[3]**
See Plaintiff's Memorandum in Support of Motion for Preliminary Injunction ("Prelim. Motion") at 27-30.

**[4]**
See Plaintiff's Memorandum in Support of Application for Temporary Restraining Order Compelling Return of Proxy Materials Along With List of ESOP Participants, or in the Alternative, Compelling Mailing of Proxy Materials ("TRO Motion") at 8.

**[5]**
Affidavit of Paul F. Shoen in Support of Plaintiff's Ex Parte Application for Temporary Restraining Order ("Shoen Aff.") P 2.

**[6]**
For a description of earlier family squabbles, see Shoen v. Shoen, 107 Ariz. 58, 804 P.2d 787 (Ariz. Ct. App. 1991)

**[7]**
Virtually all of this stock (1,758,536 shares) is not allocated; only 6, 643 shares are allocated to individual parties to the shareholder agreement. Id. at 10.

**[8]**
The shareholder agreement must be distinguished from the registration rights agreement, discussed below, and from the AMERCO below giving the company a right of first refusal on any transfers of its shares.

**[9]**
Again, it is important to remember that these are separate agreements.

**[10]**
Affidavit of Michael M. Fleming in Support of Plaintiff's Ex Parte Application for a Temporary Restraining Order ("Fleming Aff.") at P 2.

**[11]**
Deposition Excerpts Cited in Plaintiff's Reply Memorandum in Support of Preliminary Injunction, Ex. B (Deposition of Gary Klinefelter as Designee of AMERCO) ("AMERCO Dep.") at 33.

**[12]**
Affidavit of Richard Amicides ("Amicides Aff.") P 3 at 3.

**[13]**
See Answer of Defendants AMERCO, a Nevada Corporation, Edward J. Shoen, Mark V. Shoen, Aubrey K. Johnson, Richard J. Herrera, William E. Carty, Charles J. Bauer, John M. Dodds, and James P. Shoen, in Their Capacities as Directors of AMERCO to Plaintiff's Complaint ("AMERCO Answer") at P 39 & Ex. A at 6-7; see also Complaint for Violation of the Federal Securities Laws and Breach of Fiduciary Duty and for Preliminary and Permanent Injunctive Relief ("Complaint") at P 39.

**[14]**
Paul claims that the board simply lied, and in fact never even met to consider his request that it reschedule the meeting. Prelim. Reply at 2 (citing AMERCO Dep. at 28). The deposition passage he cites strongly suggests, but does not establish conclusively, that the board did not consider his request.

**[15]**
As noted above, AMERCO's common stock is not publicly traded. Apparently, however, the company is bound by NYSE rules because its non-voting preferred stock is traded on that exchange.

**[16]**

Document: Shoen v. America, 1994 U.S. Dist. LEXIS 21588   Actions

[48 ¶]
He claims that his shareholder proposals would create a public market for AMERCO stock, which would benefit the ESOP participants in two significant ways: first, by eliminating the fifteen percent discount in the appraised value of the stock currently caused by its "illiquidity," i.e., by the fact that there is no public market for it and it therefore cannot easily be sold; and, second, by eliminating potential ESOP "put" liability under 26 U.S.C. § 409(h), which requires that, if a plan participant is entitled to a distribution from the plan, the participant has a right to demand that the distribution take the form of the employer's securities, and, if there is no ready market for the securities, has a right to demand that the employer repurchase the securities. Prelim. Motion at 20.

[49 ¶]
It is worth noting that, at least according to Paul, "all three members of the Committee are appointed by Joe Shoen, and he can remove them without cause. The head of the Committee is Joe Shoen's Assistant." Prelim. Reply at 7 n.7.



· LexisNexis                                                          RELX Group™