# Exhibit S

Transcript of an August 9, 2016 hearing in the matter Bakken Resources, Inc. v. Holms, CDV-2016-612 pending in the Montana First Judicial District Court, Lewis & Clark County

1        MONTANA FIRST JUDICIAL DISTRICT

2          COUNTY OF LEWIS AND CLARK
               * * * * * * * * * *

3

4
BAKKEN RESOURCES, INC.,       )
5                             )
                              )
6         PLAINTIFF,          )
                              )
7         VS.                 )   CAUSE NO. DDV 2016-612
                              )
8 VAL M. HOLMS, et al.,       )
                              )
9         DEFENDANTS.         )
_____      )
10

11

12
               TRANSCRIPT OF PROCEEDINGS
13

14
   Before the Honorable James Reynolds, Judge Presiding
15

16
      Date and time:    Tuesday, August 9, 2016
17                       2:00 p.m.

18
      Place:            Lewis & Clark County
19 Courthouse
                        228 Broadway
20                      Helena, MT 59601

21

22
            YVETTE M. HEINZE, CSR, RPR
23     Official Reporter, First Judicial District
            228 Broadway, Second Floor
24            Helena, MT 59601
              (406) 447-8238
25

1                          <u>APPEARANCES</u>

2

For the Plaintiff:

3
            OLIVER H. GOE
4           BROWNING, KALECZYC, BERRY, & HOVEN, P.C.
            800 N. Last Chance Gulch, #101
5           Helena, MT 59601

6

7

For the Defendant:

8
            JOHN C. DOUBEK
9           DOUBEK, PYFER & FOX, LLP
            307 N. Jackson Street
10          Helena, MT 59602

11

12

Also present:

13
            WESLEY PAUL
14          ALLAN HOLMS

15

16

17

18

19

20

21

22

23

24

25

**INDEX**

**WITNESS**                                                    **PAGE**

 ALLAN HOLMS
        DIRECT EXAMINATION BY MR. DOUBEK              61

        CROSS-EXAMINATION BY MR. GOE                 88

        REDIRECT EXAMINATION BY MR. DOUBEK          101

 TOBY DEWOLF
        DIRECT EXAMINATION BY MR. DOUBEK            102

        CROSS-EXAMINATION BY MR. GOE                103

 DAN ANDERSON
        DIRECT EXAMINATION BY MR. DOUBEK            105

        CROSS-EXAMINATION BY MR. GOE                133

        REDIRECT EXAMINATION BY MR. DOUBEK          137

                          * * * * *

                         **EXHIBITS**

**NUMBER**                                                    **PAGE**

 Exhibit 15                                          34

                          * * * * *

 recess                                              61

```
1   August 9, 2016, Tuesday

2

3           THE COURT:  Please be seated.

4           All right.  This is Cause DDV-2016-612,

5   Bakken Resources, Inc. versus Val Holms and others.

6   This is the time set for a hearing on the plaintiff's

7   application for preliminary injunction; correct?

8           MR. GOE:  That's correct, your Honor.

9           MR. DOUBEK:  And our application as well.

10          THE COURT:  All right.  What do I have?

11          MR. DOUBEK:  We have dueling TRO

12  applications.

13          THE COURT:  Oh, yeah?

14          MR. GOE:  Your Honor, yesterday at 5:00 I

15  received some pleadings from John's office that

16  indicated they were seeking a temporary restraining

17  order and a preliminary injunction.  I received a

18  motion and two supporting pleadings.

19          It would be our position that they are not

20  properly before the Court at this juncture because

21  the only issue that is to be decided and the only

22  reason this hearing was scheduled was to address the

23  preliminary injunction.

24          MR. DOUBEK:  We actually filed our lawsuit

25  the day before they filed theirs.
```

```
 1              THE COURT:  Okay.  The number that was --
 2              MR. DOUBEK:  Which was Docket Number 611,
 3    not 612.  So we simply took the pleadings, recast
 4    them into one pleading, so that there wasn't
 5    confusion that Mr. Holms had brought an action in the
 6    name of Bakken.
 7              THE COURT:  Okay.  I don't have your
 8    pleadings.  I don't have the 611 or the application.
 9              MR. DOUBEK:  It's all been put in 612.
10              THE COURT:  Yeah, but I'm just talking -- I
11    don't think I have it.  You filed it yesterday?
12              MR. DOUBEK:  Yes.
13              THE COURT:  The most recent document I have
14    in here is from July 29th.
15              MR. DOUBEK:  Well, I know it's been filed
16    downstairs.
17              THE COURT:  Okay.  Because I don't have
18    anything filed on behalf of the defendants here, in
19    response to Bakken Resources' application at all.
20              MR. DOUBEK:  Well, everything has been
21    filed.
22              THE COURT:  Everything has been filed, but
23    I'm just telling you that I don't have it up here in
24    my file.
25              MR. DOUBEK:  Well, that's what we did, your
```

1    Honor.  In the briefs that we've submitted and

2    everything, all of the exhibits and whatnot, we have

3    said these are basically dueling TRO applications.

4            THE COURT:  Okay.

5            MR. DOUBEK:  And I'm sorry they didn't get

6    those up to you, but -- and you were the judge

7    assigned to the other case, 611.  But I know that

8    doesn't mean much.

9            THE COURT:  Right.  All I had on the docket

10   today was the 612 case.  And, again, all I have -- I

11   don't have your most recent filings in the file here.

12           MR. DOUBEK:  We would ask that you consider

13   those, obviously.

14           THE CLERK:  You want me to run down and get

15   them?

16           THE COURT:  Well, it might be helpful.

17           But you object to consideration of those

18   today for lack of --

19           MR. GOE:  Well, yeah, and I will just

20   explain our position, and I will come to some of this

21   again when we're doing our presentation.

22           We filed our action, which is the 612

23   action, which is the one you have before you, where

24   Judge Seeley granted a TRO, extended the TRO, and set

25   this matter for a preliminary injunction hearing.

1    That's the reason we're here today.

2         There was an earlier pleading filed by Mike

3    Lamb and his partner Jamie Carey that was ostensibly

4    filed on behalf of BRI.  We objected to that saying

5    they had no authority to file on behalf of BRI.  They

6    moved to withdraw.  I filed a notice of appearance on

7    behalf of BRI and submitted a notice of dismissal.

8         In the interim, John filed a -- what do you

9    call it?

10        MR. DOUBEK:  Substitution.

11        MR. GOE:  -- substitution in that matter.

12   It's our position that he has no authority to act on

13   behalf of BRI.  And, as such, that pleading shouldn't

14   be considered by the court at all.

15        And then yesterday, at 5:00, I received the

16   pleadings that John is mentioning now, which have to

17   do with their request for a TRO preliminary

18   injunction.  They don't directly address our

19   preliminary injunction, other than the fact that some

20   of the arguments would equally apply to, I assume,

21   their defense to preliminary injunction in our favor.

22        But it's our position that the 611 matter

23   was never properly filed in the first place.  That's

24   been dismissed.  The only matter properly before the

25   Court is the 612 matter, which I represent the BRI,

1    and the defendants are Mr. Holms -- the two

2    Mr. Holmses, Mr. Jensen, and Mr. Collins.

3              MR. DOUBEK:  I'm not aware that 611 has ever

4    been dismissed.  I have not received anything from

5    anybody about that.  I substituted in for Mike Lamb,

6    who asked me to do that on his behalf.

7              And then, in the pleading that we filed

8    yesterday, it's an answer, a counterclaim, and

9    request for TRO.  And it parrots what has been filed

10   and is of record in 611.  And then we provided the --

11   more of the legal argument and exhibits and support

12   of our position; that, A, the TRO should not be

13   continued in favor of Bakken and a TRO should be

14   issued in favor of my clients.

15             THE COURT:  Okay.  I think I did see

16   something with 611 on it.  So maybe I do need to have

17   you -- can you get it real quick?

18             THE CLERK:  Yes.

19             THE COURT:  But, in any event, Mr. Doubek,

20   what you have done is you refiled, recast the 611

21   pleadings back into the 612?

22             MR. DOUBEK:  Right.

23             THE COURT:  Okay.

24             MR. DOUBEK:  And we indicated that, really,

25   for organizational purposes, they ought to be

1   consolidated.

2          THE COURT:  It sounds like they ought to be

3   consolidated anyway.

4          All right.  Well, why don't we start with

5   this and see where we go.  That's what I'm going to

6   do.

7          MR. GOE:  Sounds good.  And I can't tell you

8   that things are going to be any more clarified when

9   we get done, but hopefully they will.

10          THE COURT:  I'm afraid of that.

11          But I did -- again, Mr. Doubek, don't have

12   any -- this is the 612 file, and it consists

13   exclusively of filings on behalf of Bakken Resources,

14   so I don't have that.

15          MR. DOUBEK:  Well, I was advised they were

16   put in there, but...

17          THE COURT:  And I understand that they are

18   going to eventually be put in here.  But, just so you

19   know, starting this off I do not have materials from

20   your client.

21          MR. DOUBEK:  Yeah.

22          MR. GOE:  And I will just start by

23   introducing folks that are here today.  I represent

24   Bakken Resource, Inc.  I do not represent any of the

25   other main parties individually, whether it be in the

1   611 matter or 612.

2          Present at counsel table with me is Wes

3   Paul.  Mr. Paul is corporate counsel for -- retained

4   corporate counsel for BRI.  We also have Dan Anderson

5   in the courtroom.  He's referenced in the various

6   affidavits you have seen.  And his son, whose name I

7   have totally forgot at this point --

8          MR. CHANCE ANDERSON:  Chance.

9          MR. GOE:  And I would also indicate I have

10  Amber Carlson, who is my paralegal here, and

11  hopefully is going to go through some of the

12  documents that you need to take a look at, that we

13  think you need to take a look at, to rule in our

14  favor on the preliminary injunction.

15          And I was going to start with the new

16  documents that were filed yesterday.  And I think

17  they are a prime example of why the preliminary

18  injunction needs to issue.

19          As I indicated earlier, the documents that

20  were filed were a motion for TRO, a point brief, and

21  a memorandum.  And it is directed at Karen Midtlyng,

22  who is a corporate secretary.  It is directed at Wes

23  Paul, and it's also directed at Dan Anderson.  And it

24  seeks to prevent them from doing various things on

25  behalf of BRI, which they are authorized to do by

```
 1   law.
 2          In this particular case, in the supplemental
 3   brief I filed, I kind of asked a rhetorical question
 4   of why does BRI even need a preliminary injunction in
 5   light of the TRO that's been issued up in Nevada --
 6   or down in Nevada and is set for a hearing sometime
 7   in September?
 8          And I indicated in that pleading that, you
 9   know, it's hard to know exactly what the two
10   Mr. Holmses, and perhaps some other folks, may or may
11   not try to do here in Montana, but that we needed the
12   preliminary injunction to address those issues and to
13   prevent them from taking actions which have been
14   specifically addressed in the courts in Nevada.  They
15   also were addressed by Judge Seeley when she granted
16   the TRO.
17          In essence, what we believe is happening
18   here -- and we'll talk a little bit about the
19   proceedings in Nevada here shortly -- is they are
20   attempting to get a second bite of the apple.  They
21   are trying to relitigate issues that have already
22   been litigated in Nevada, and they're attempting to
23   go around a valid Nevada TRO that prohibits the
24   defendants Holms -- or the defendants Val Holms and
25   Manny Graiwer from providing proxies to defendant
```

1   Allan Holms.  And, as such, there's no majority which
2   we can represent.
3          And I should point out that this is not just
4   a proceedings in Nevada, like the one we have here,
5   where we come into court with very little background.
6   Judge Flanagan in Nevada has been dealing with this
7   litigation for over two years and, as such, has a lot
8   more historical background and knowledge regarding
9   what is going on.
10          But, in any event, one of the primary
11   documents that I think the Court needs to look at is
12   Exhibit 4.  I don't know if -- we're going to try a
13   little electronic stuff and see if it works.  You may
14   not be able to see that, I'm afraid.
15          Can we make that the whole screen and see if
16   that helps?
17          THE COURT:  I have exhibits appended to your
18   various pleadings, but they are identified by letter.
19          MR. GOE:  Well, there are actually two
20   different sets.
21          THE COURT:  Okay.
22          MR. GOE:  The documents that are appended to
23   the amended complaint in the complaint are letters.
24   And the documents that are appended to the brief in
25   support of the preliminary injunction, as well as the

1    supplemental brief that we filed, they are letters --

2    excuse me -- they are numbers.  And so that is how we

3    did it.

4            THE COURT:  I see.  Okay.  So you are

5    looking at Exhibit 4?

6            MR. GOE:  Yes, Exhibit 4.

7            And I think there's various points of it

8    that are really important for the Court to consider,

9    and we're going to come back to these, again, a

10   little bit later.  But this was in the context of BRI

11   seeking an injunction against Val Holms and Herb

12   Landis upon a motion that was filed by BRI as well as

13   other board members.  That's reflected on page 2.

14           What the Court says in the middle

15   paragraph -- and I don't know if we're going to be

16   able to see it or -- we might just --

17           THE COURT:  I have it.

18           MR. GOE:  Okay.  If you go to page 2, what

19   it says is (read as):

20               The Court hereby grants defendant's

21               motion in all respects and enters

22               the following temporary restraining

23               order against the plaintiffs and

24               these consolidated actions.

25           And, again, it's issued against Val Holms

1    and Manny Graiwer to preserve the status quo and to

2    prevent immediate and irreparable harm to BRI and the

3    director defendants, which include Dan Anderson and

4    Karen Midtlyng, as well as other directors.

5         Also important, and I think it's extremely

6    relevant to the issues that the Court needs to look

7    at today, it directly addressed some very similar

8    arguments that are made in the pleadings that were

9    filed by Mr. Doubek.  And Court finds that the

10   defendants have a reasonable probability of success

11   on their arguments that the voting proxies -- talking

12   about the same voting proxies we're at here -- to

13   transfer various number of shares are, in fact,

14   invalid based on SEC proxy solicitations.

15        The Court also finds, if you go a little bit

16   further, that there is nothing wrong with the Eagle

17   Private Equity transaction, and the Court

18   specifically relates to the fact that BRI has a

19   reasonable probability of success in their argument

20   that even if the subject voting proxies are valid,

21   Eagle Private Equity holds a majority of the voting

22   shares in the company and that renders the subject

23   takeover attempt ineffectual.  And, again, that's the

24   exact same takeover attempt that we are talking about

25   today.

```
1              The Nevada TRO prohibits various other
2    activity, such as attempting to take over and control
3    the bank accounts of BRI.  And that's reflected in
4    page 3.  Because, as reflected in the pleadings we
5    have already filed, there was an attempt to take over
6    the bank accounts of Wells Fargo, the BRI accounts at
7    Wells Fargo, and the Court specifically held that
8    that was inappropriate and was not something that
9    could be continence by the Court.
10             Now --
11             THE COURT:  Let me just ask a real basic
12   question here.
13             MR. GOE:  Sure.
14             THE COURT:  I haven't had a chance to read
15   all of this and digest all of it.  Why are we here in
16   this court, given the fact that you were down in
17   Nevada arguing over these same issues?
18             MR. GOE:  The reason we are here is because
19   the TRO and the injunction hearing that's set for
20   late September is addressed to Val Holms, who gave
21   his proxy to Allan Holms.  And Allan Holms is using
22   that for purposes of trying to take over the company.
23             And it is also -- the Nevada TRO is against
24   Manny Graiwer, who is a plaintiff in a lawsuit there,
25   and it's been going on for two years.  But the bottom
```

1   line is the Court in Nevada clearly has jurisdiction

2   over those two individuals, it appeared to the Court.

3   That's why the TRO is limited to them because that

4   is, in fact, who is there.

5          It also includes and protects the current

6   makeup of BRI, as well as the current board members,

7   the very board members that Allan Holms attempted to

8   kick out when the attempted takeover took place late

9   last month.

10         The reason we filed up here is for the very

11  reason that we're here today.  The fact of the matter

12  is Allan Holms and the other defendants are trying to

13  use a proxy, which the Nevada judge has already said

14  you can't do, to take over BRI in Helena, Montana,

15  where their offices are.

16         And why we got the TRO and want the

17  preliminary injunction is to prevent this continued

18  attempt, and unauthorized attempt in our belief, to

19  take over the company.  And by having a TRO and a

20  preliminary injunction here, it removes all doubt

21  that they can't do the actions that they are trying

22  to do, pending a full resolution, whether it be here

23  or whether it be in Nevada.

24         THE COURT:  So Bakken Resources is

25  headquartered in?

1          MR. GOE:  In Helena.

2          THE COURT:  In Helena.

3          MR. GOE:  Although, it's a Nevada

4   corporation, and that's why the majority -- the

5   bylaws relate to Nevada and the majority of the

6   litigation.  Mr. Graiwer and Val Holms are involved

7   with litigation in other jurisdictions as well.  It

8   deals with Nevada law, and that is part of the reason

9   that Judge Flanagan relies upon Nevada law, not only

10  this order but another one we'll look at soon, to

11  address various issues.

12          THE COURT:  Okay.

13          MR. GOE:  But what we really need to do is

14  stop -- and I used the word "mischief" in my brief,

15  and I'm thinking that's too light a word, in the mere

16  fact that we're here.  I'll give you a good example

17  of it.  After -- well, I should back up.

18          Prior to the TRO being issued, I filed a

19  complaint, and Mike Lamb filed a complaint.  His

20  complaint is purportedly on behalf of BRI.  It's our

21  position that there was no such authorization for

22  such a lawsuit.  I wrote him a letter, and those are

23  included in the documents that we have identified as

24  exhibits.  They are Exhibit 6 and Exhibit 7.  There's

25  my letter to Mike Lamb and Jamie Carey, explaining

1   why pursuant to the TRO issued in Nevada the

2   management of the company does not rest with Val

3   Holms or his group, but instead rests with the

4   properly constituted board.

5          I then had, in a follow-up to my letter,

6   provided them with a copy of the injunction from

7   Nevada, as well as the TRO that was signed by

8   Judge Seeley.  And then I also provided them with a

9   letter from BRI, signed by the disinterested board

10  members, who were not defendants, so to speak.  And

11  they all indicated that they had no authority to

12  pursue that action.

13         Specifically, in the TRO that was issued by

14  Judge Seeley -- I'll just use Allan Holms as an

15  example since he's here in the courtroom.  What it

16  specifically says among other things -- let me find

17  it here -- Montana TRO:  He is precluded from taking

18  any actions on behalf of BRI, including attempts to

19  replace BRI's board, and has similar types of items.

20         Yet, in the 611 matter, which you just asked

21  to be brought up, he signs a pleading in Court, after

22  the TRO is issued, saying he is president of the

23  corporation.  That's a direct violation of the TRO

24  that was issued by Judge Seeley.  And that gives

25  another good example of why we need a preliminary

```
 1    injunction during the course of this litigation.

 2            They ignored the order in Nevada.  They

 3    ignored the TRO here.  They now filed for a new TRO,

 4    and they claim now that the plaintiffs are not BRI.

 5    They substitute themselves, so to speak, the

 6    defendants, and seek to bring that against Wes Paul

 7    and Dan Anderson and Karen Midtlyng, who are officers

 8    of the corporation.  And, of course, Mr. Paul is

 9    retained counsel.

10            That's a violation of the Nevada TRO,

11    especially in light of Val Holms' involvement in the

12    Nevada TRO.  I do not represent them individually.  I

13    can't.  I represent BRI.  But this attempt by them to

14    stifle and prohibit these important officers and

15    directors from carrying out their duties has a direct

16    impact on BRI.

17            THE COURT:  I didn't quite follow your

18    chronology there.  You said Mr. Holms filed something

19    after Judge Seeley entered her --

20            MR. GOE:  Yes.

21            THE COURT:  Mr. Doubek is over here shaking

22    his head no.

23            MR. GOE:  Well, that's not accurate because

24    I have the pleading in front of me.

25            THE COURT:  Filed on behalf of BRI or on
```

1    behalf of himself?

2            MR. GOE:  Well, what he says is in the

3    motion to withdraw filed by Mike Lamb -- and this is

4    in the 611 matter, your Honor.

5            THE COURT:  Okay.

6            MR. GOE:  In the motion to withdraw,

7    attached to it is a consent.  And it says, "Plaintiff

8    herein consents to the withdrawal of James Carey of

9    Lamb & Carey, as its attorneys of record in this

10   matter," and it's dated July 27th.  And it says,

11   "Allan Holms, president."

12           THE COURT:  Okay.  And that postdates

13   Judge Seeley's issuance of a restraining order?

14           MR. GOE:  I believe it does.  I'd have to

15   look at the exact date.  I apologize.  I don't have

16   that in front of me right now.

17           THE COURT:  My minute entry shows there was

18   a hearing on the restraining order on August 2nd.

19           MR. GOE:  That was the second hearing when

20   she extended the TRO.

21           THE COURT:  Okay.

22           MR. GOE:  So it clearly predated the 27th.

23   In fact, it had to predate that because I filed my

24   letter to --

25           What's that?  The 22nd.  Thank you.

1          Because what I did was -- once I got that

2     TRO, after we got the TRO, Dan gets served.   Karen

3     gets served.   Wes gets served.   You know, in and of

4     themselves, that is a violation of the TRO.

5          I bring that attention to Mr. Lamb and

6     Mr. Carey.   They withdraw.   But they provide a

7     consent from Allan Holms as president of BRI, and

8     he's been specifically ordered by the Court not to do

9     that.

10          And it's just that type of thing, which also

11     includes the recent filings, that we seek to stop.

12          THE COURT:   Okay.

13          MR. GOE:   You asked a --

14          THE COURT:   But the recent filings, the most

15     recent filings, are brought on behalf of the

16     individuals, not on behalf of BRI.

17          MR. GOE:   That is true.   The documents that

18     Mr. Doubek just filed indicate that the plaintiffs

19     are Val and Allan Holms, Todd Jensen, and Allen

20     Collins.

21          THE COURT:   Right.

22          MR. GOE:   Which is different than how the

23     matter was presented --

24          THE COURT:   Okay.

25          MR. GOE:   -- initially to the Court.

1           THE COURT:  All right.

2           MR. GOE:  And I probably already said this,

3  but, in light of the Nevada TRO, I think the filings

4  that they filed just now are in violation of that TRO

5  because the only authority for that would come

6  through Val Holms, and he has been specifically

7  enjoined in Nevada from taking those types of

8  actions.

9           THE COURT:  Okay.

10          MR. GOE:  I should also just, as kind of a

11 housekeeping matter, you do have before you

12 affidavits from Karen Midtlyng, Dan Anderson times

13 two -- you have two affidavits from him.  I will go

14 through a couple of these to perhaps help you with a

15 little more of the chronology.  We also have an

16 affidavit from Carl George, who relates to the

17 Eagle Equity transaction.

18          And then, also, we have recently filed -- I

19 filed this downstairs today, your Honor, shortly

20 before the hearing, and it was filed in large part in

21 response to the arguments that I received last night

22 from Mr. Doubek.

23          And, if I could just approach the bench and

24 give this to the Court, it was filed downstairs

25 already.

1          MR. DOUBEK:  I don't object.

2          THE COURT:  You don't object?

3          MR. DOUBEK:  I don't object.

4          THE COURT:  I don't think I have it.  I

5     might have it.  I don't know.

6          MR. GOE:  Well, unless you got it in the

7     last hour or so -- it looks like this.  I have

8     already lost the date-stamped copy.  But that is the

9     affidavit from Mr. Wes Paul that addresses some of

10    the arguments and issues that are raised in the

11    pleadings filed by Mr. Doubek.

12         THE COURT:  Okay.

13         MR. GOE:  What I would like to do is kind of

14    give the Court a little chronology of events that

15    might be helpful in trying to sort out why and the

16    importance of a preliminary injunction in this

17    particular case.  And what I think I will do is start

18    with some actions by BRI, following internal

19    investigation.

20         And if you look at the Exhibit B to the

21    amended complaint -- I think it's the same thing to

22    the actual complaint -- it is an 8-K filed by Bakken

23    Resources relating to an ongoing independent

24    investigation that had been occurring for over the

25    last year, plus.  And in that document it reflects

1   that Mr. Holms was terminated from his position as

2   chief executive officer.  And if you look down at the

3   first -- page 2 of the document, there's a discussion

4   about Mr. Holms receiving $200,000 of company funds

5   as a kickback payment, relating to a transaction

6   referred to as the Duck Lake transaction.

7          And it goes on from there to identify some

8   other alleged wrongdoing regarding Mr. Holms, upon

9   which the board relied in terminating Mr. Holms from

10   his position as chief executive officer.  Of course,

11   he remained on the board.  And, of course, he also

12   has a substantial interest in BRI.  But that kind of

13   lays a little bit of the groundwork of what happens

14   after that.

15          As reflected in the affidavits that are

16   filed by Dan Anderson and Karen Midtlyng -- those are

17   Exhibits 1 and 2 to the briefing that was filed --

18   you will understand that as a result of this Duck

19   Lake transaction, there is, in fact, an FBI

20   investigation that is pending.  And that is addressed

21   in their affidavits in a very general sense because

22   they are, obviously, not involved directly.  It is

23   addressed at paragraph 24 of the Karen Midtlyng

24   affidavit.  And it's also addressed in the affidavit

25   of Mr. Dan Anderson at paragraph 23.

```
 1              And I'm not bringing this up to say that I

 2   have any information regarding the scope or the

 3   extent of the FBI investigation, but it's clearly

 4   going on, and it relates to Mr. Val Holms, and that

 5   has been relayed to the company by law enforcement

 6   officials.

 7              On June 27th, Judge Patrick Flanagan, Second

 8   Judicial Court, had a hearing regarding the Eagle

 9   Private Equity transaction.  And he issued an order

10   relating to that -- well, first of all, he read his

11   opinion from the bench and then later issued an order

12   containing his written order.  That was on July 14th,

13   and that is Exhibit 3 to the brief in support of the

14   preliminary injunction.

15              There are several findings in there that are

16   extremely important and relevant to the arguments

17   that are now being made by Mr. Doubek.  And I'm not

18   going to -- I'll slow down here if you need me to.

19              THE COURT:  I'm trying to track with you

20   here on the exhibits.

21              MR. GOE:  I apologize.  I tend to take off.

22              THE COURT:  Okay.

23              MR. GOE:  This would be Exhibit 3.

24              THE COURT:  I have it now.

25              MR. GOE:  It was also an order relating to a
```

1    denial of a preliminary injunction.  In this case, it

2    was brought by Mr. Val Holms.  But two issues were

3    really important in that hearing.  One of the issues

4    had to do with the transaction that I identified as

5    the Eagle Private Equity transaction.

6         And the Court heard testimony.  All of the

7    parties were represented.  Heard from Dan Anderson.

8    Heard from Carl George.  And what the Court

9    specifically held was that the transaction was

10   reasonable, appropriate, and lawful.  And when you

11   have an opportunity to review Mr. Doubek's pleadings,

12   you are going to see argument that that's not true,

13   that it's unlawful, et cetera.

14        The fact of the matter is this issue was, in

15   fact, before Judge Flanagan.  After two years and

16   after he heard testimony and after he has the

17   institutional knowledge and what he determined -- and

18   this is on page 5, the middle paragraph there that

19   starts off, "The Court finds the ability of the

20   company to maintain institutional knowledge,"

21   et cetera, and goes on to say, "This includes the

22   bylaws of staggered terms, as well as terms of the

23   Eagle Private Equity financing."

24        Importantly, plaintiff's counsel -- that

25   would be counsel for Mr. Val Holms -- admitted during

1   argument that nothing BRI or its directors have done
2   was illegal.
3          And the Court goes on to look at the Nevada
4   business judgment rule and ultimately determines that
5   this was an appropriate and legal transaction in the
6   best interest of the company.
7          Here's where things get really bizarre, for
8   lack of a better word.  On July 20th, the defendants;
9   their Washington counsel, Bil Childress; and assorted
10  others march into the offices of BRI here in Helena,
11  where Karen Midtlyng is the only person there at the
12  time, and essentially says, "We're taking over.  You
13  are all fired.  We're replacing the board.  Everybody
14  leave."
15         Interestingly, to give you some idea of how
16  this event went down -- and it's reflected in the
17  affidavits from Karen Midtlyng and Dan Anderson,
18  which, again, are Exhibits 1 and 2 to the brief --
19  not only did it include Mr. Allan Holms and other
20  individuals, it included a security guard openly
21  carrying a gun.  It included several other security
22  people.  The wife of Allan Holms, I believe.
23  Unannounced.  Charging in.  "You're all fired.  Get
24  out."
25         Not surprisingly, as reflected in the

1    affidavits filed by both Karen Midtlyng and Dan, they

2    felt somewhat intimidated by these actions,

3    especially in light of the fact that there had been

4    no notice of proxies being issued.  There had been no

5    request to even obtain information that would allow

6    for the presentation of a proxy.

7           It also was a little surprising that Bil

8    Childress, who is counsel for Allan Holms in

9    Washington, in a lawsuit against BRI, in which he's

10   claiming 5 million dollars' worth of damages, is

11   there and speaking with folks that he knows are

12   clearly represented, Ms. Midtlyng and Mr. Anderson.

13          So as you also might imagine, this is

14   somewhat an unusual situation and bizarre.  And Karen

15   calls the police.  And after somewhat of a -- I don't

16   know -- standoff, for lack of a better word, the

17   police talk to the FBI.  There was also, apparently,

18   some discussion with the U.S. Attorney, and they are

19   escorted out.

20          THE COURT:  They?

21          MR. GOE:  When I say "they," the entourage.

22   Mr. Allan Holms and his entourage are escorted out

23   and told to leave.  That, again, is all reflected in

24   the affidavits of Karen Midtlyng and Dan Anderson.

25          THE COURT:  Okay.

```
 1          MR. GOE:  Eagle Private Equity, hearing
 2   about this, exercised its -- under its agreement with
 3   BRI.  And what that results in is that they
 4   effectively have the voting shares to control the
 5   company.  And I'd refer the Court to Exhibit 9, which
 6   is Carl George, from Eagle Equity, and also
 7   Exhibit 10, which is the affidavit of Dan Anderson,
 8   that relate to the Eagle Equity transaction.  This is
 9   the transaction that the Nevada court has already
10   held is legal and proper.
11          THE COURT:  Where are they today?
12          MR. GOE:  What's that?
13          THE COURT:  Where are they today?
14          MR. GOE:  They are not parties to these
15   proceedings at this point.  I mean, they haven't made
16   an appearance.
17          THE COURT:  Right.
18          MR. GOE:  I know that they have -- matters
19   have been filed with the SEC, relating to their
20   involvement.  In fact, the 8-K, relating to that, I
21   believe, is actually an exhibit to one of John
22   Doubek's filings in this case.
23          And what's important about that is what's
24   included in the TRO issued by the Nevada judge, and
25   that is the document that we were looking at earlier,
```

1    wherein he says that the attempt to take over is

2    ineffectual because, even if the proxies are valid,

3    which he doubts that they are, they still are not in

4    control.  Again, another reason why we need a

5    preliminary injunction to stop Mr. Allan Holms and

6    his entourage from carrying on the way that they have

7    been carrying on.

8          Also -- and I don't think this is surprising

9    at all -- we filed our complaint.  Asked for a TRO.

10   Judge Seeley granted that.  I do have the date here

11   in my notes, July 22nd.  And on that same day the

12   Nevada court issued its order, which is Exhibit 4 to

13   the supplemental brief in support of the preliminary

14   injunction that we were looking at earlier.

15         And the quote I was looking for and I had

16   difficulty finding, (read as):

17                The Court found that the shares

18                held by Eagle Private Equity are

19                the majority of voting shares of

20                all BRI stock.  Consequently, the

21                Court also finds defendants have a

22                reasonable probability of success

23                on their argument that even if the

24                subject voting proxies are valid,

25                Eagle Private Equity holds a

1          majority of the voting shares of

2          the company, and thus renders the

3          subject takeover attempt

4          ineffectual.

5     And that's on page 3 of the Exhibit 4.

6     THE COURT:  But it doesn't look like

7   Eagle Equity has been involved in any of this

8   litigation, either here or Nevada.

9     MR. GOE:  No.  They were involved in Nevada

10  too.  In the earlier order that we looked at, your

11  Honor, which is the order of -- that's Exhibit 3.

12  Carl George testified at that hearing.

13     THE COURT:  Okay.

14     MR. GOE:  And the Court specifically -- and

15  this was the order that -- the hearing was in late

16  June.  The order was a little bit later.  This is the

17  case where the Court, after hearing Mr. Anderson and

18  Mr. George, concluded based upon plaintiff's

19  counsel's admissions that nothing BRI or directors

20  had done was illegal, found that the transaction was

21  legal and appropriate and within Nevada's business

22  judgment rule.

23     THE COURT:  Okay.

24     MR. GOE:  Part of this we already touched

25  on.  After the TROs were issued -- and I should -- I

1    don't want to mislead the Court.  Mr. Lamb's action

2    was actually filed prior to the TRO.  It was served

3    on Mr. Paul and Ms. Midtlyng and Mr. Anderson after

4    the TRO.  And, of course, like we talked about

5    earlier, after the TRO, Mr. Allan Holms held himself

6    out to be president of BRI, in direct violation of

7    the TRO that had been filed and approved by

8    Judge Seeley.

9              And then, of course, taking it one step

10   further, they now file for another TRO.  This time

11   they are asking that in their individual names, and

12   they are asking for it against various officers and

13   retained counsel.  Again, we think that's in

14   violation of the Nevada TRO.

15             One of the things I think is important to

16   look at is that one of the reasons we have rules

17   regarding proxies -- or, I mean, regarding proxies,

18   how to get a proxy, how to pursue a proxy, how to

19   exercise a proxy, et cetera -- is to avoid situations

20   like the one that BRI faced on the 20th, which is

21   this armed takeover.  "We're in charge now.

22   Everybody get out."  That's the type of thing that is

23   rather unusual.  And that's the reason we have rules

24   that people have to follow, especially for a publicly

25   traded corporation that is registered pursuant to

```
 1    12(g).

 2           What was also just very bizarre about the

 3    whole situation was that Mr. Childress -- I alluded

 4    to this, but it probably needs a little bit of

 5    expansion.  Mr. Childress, who showed up with Allan

 6    Holms at the takeover, represents Allan Holms in

 7    Washington.  I mentioned that to you.  In that

 8    lawsuit, which was on appeal at the time, seeking

 9    $5 million in damages from Val Holms and, in a

10    roundabout way, from BRI.

11           So the same guy, same attorney, who is suing

12    Val Holms and BRI in Washington, is coming into the

13    office saying, "We're taking over."  As if to say,

14    "I'm going to represent both the plaintiff and the

15    defendant in the Washington litigation."  And won't

16    that be easy to settle then?  The fact of the matter

17    is the Washington court has issued its opinion.

18    There is still a potential for a rehearing.  There's

19    also a potential for, I guess, an appeal to the

20    Washington Supreme Court.  And that litigation

21    continues -- in that respect, it continues on at this

22    point.

23           And what is also interesting about that

24    litigation is that the Court rejected any and all

25    claims made by Mr. Allan Holms in that case.  Awarded
```

1   no damages.  While he did have an attorney fee

2   awarded earlier, that has been overturned.

3          I guess what I would like to do is file this

4   as another exhibit.  This would be Number 15, I

5   believe.  This would be that decision.  And I'm not

6   saying the Court should read it now, but it certainly

7   would be enlightening about what is going on

8   potentially in another jurisdiction.

9          THE COURT:  So this is a decision by a

10  Washington appellate court?

11         MR. GOE:  Yes, and I think the Court can

12  take judicial notice of it, pursuant to the rules of

13  evidence.

14         THE COURT:  Do you have any objection?

15         MR. DOUBEK:  You know, it has nothing to do

16  with the issues in this case, but that's fine.

17         THE COURT:  All right.  We'll take it in as

18  Exhibit 15, then.

19

20         (Exhibit 15 was admitted into evidence.)

21

22         MR. GOE:  I think it has a lot to do with

23  this case, and the reason being is because of the

24  way -- the takeover attempted.  I alluded to that.

25  Mr. Childress coming into Helena, Montana, claiming

1  to represent the company, and then claiming that they

2  are the new representatives of BRI.  That's in

3  Exhibit A to the complaint, which has all of the

4  documents that were provided to Karen Midtlyng by

5  Allan Holms during the takeover.  They retain, on

6  behalf of BRI, the very firm that is suing BRI in

7  Washington.  And that's all done with the approval,

8  apparently, of Allan Holms exercising his, quote,

9  proxy.

10        So that's a clear problem and another good

11  reason for why there needs to be a preliminary

12  injunction issued in this case.

13        THE COURT:  Just out of curiosity, has there

14  been any appeal taken from the Nevada decisions, any

15  of the Nevada decisions?

16        MR. GOE:  No.

17        THE COURT:  Okay.

18        MR. GOE:  Although I should also point

19  out -- and Mr. Paul can correct me if I'm wrong --

20  that litigation is still ongoing.

21        MR. PAUL:  Correct.

22        MR. GOE:  There are some parties getting

23  dismissed, et cetera, but it's an ongoing --

24        THE COURT:  Okay.

25        MR. GOE:  -- litigation.

```
 1              One of the arguments that you will see when

 2     you have an opportunity -- let me back up.  This is a

 3     publicly traded corporation.  It's registered

 4     pursuant to 12(g).  And, as a result, it has various

 5     obligations for reporting under the Securities

 6     Exchange Act of 1934.

 7              It goes beyond conformance merely with

 8     corporate bylaws and the laws of Nevada.  And with

 9     all due respect for this Court, I think it's much --

10     well, certainly, the judge in Nevada would be much

11     more familiar with Nevada law and Nevada corporate

12     law in making its determinations.

13              But as to the SEC regulations, there are, in

14     fact, various rules that have to be followed when you

15     obtain a proxy or seek a proxy.  And in our briefs,

16     pages 8 and 10, and in the supplemental brief at

17     pages 4 and 6, we address the many ways in which we

18     think the proxies in this case don't meet the

19     requirements of the SEC.  And I am not going to

20     relate -- I won't repeat all of the arguments here

21     because you can certainly read those better than I

22     can.  But I do think it's important that I respond to

23     a couple of things that are in the pleadings that you

24     have from Mr. Doubek on behalf of the defendants.

25              First of all, they make what in our opinion
```

```
 1   is a very almost bizarre argument that they aren't

 2   registered pursuant to Section 12(g) and that they

 3   are a voluntary reporter and not having an obligation

 4   to report.  That is dead wrong.

 5          And to address that issue I submitted the

 6   affidavit of Wes Paul, which explains that, in fact,

 7   they are registered.  They continue to be registered.

 8   Are registered now.  Have always been registered in

 9   that regard.  And, as such, they have various

10   obligations, reporting obligations, as set forth in

11   SEC rules.

12          THE COURT:  Is that in Mr. Paul's affidavit

13   submitted today here?

14          MR. GOE:  Yes.

15          THE COURT:  Okay.

16          MR. GOE:  And the reason it was submitted so

17   late is, in fact, we didn't think this would be even

18   a contested issue.  But they spend a fair amount of

19   time in their brief arguing that they aren't governed

20   by 12(g), which is just flat wrong, and Mr. Paul

21   explains his role and why he knows they are, in fact,

22   registered under 12(g).

23          It also includes some attachments and some

24   letters that have gone to the SEC that he wouldn't

25   have any reason to do or any reason to write unless,
```

```
 1    in fact, you did have those reporting requirements.
 2           They make the argument that there was a
 3    withdrawal of the registration statement.  But, as
 4    explained in Mr. Paul's affidavit, that does not mean
 5    there was a withdrawal of their status under
 6    Rule 12(j) -- excuse me, wrong citation -- 12(g).
 7           THE COURT:  It's 12(g).
 8           In any event, I think Mr. Paul's affidavit
 9    fully answers any questions you are going to have
10    about the reporting requirements of the BRI and why
11    they are, in fact, covered pursuant to the rules and
12    regulations of the SEC.
13           They also make an argument that, "Well, BRI
14    became a voluntary filer based on an inability to
15    file an 810-K.  Number 1, that doesn't make you
16    automatically a voluntary filer, and there's no
17    authority for that.
18           But what is also important to understand,
19    and it's reflected in the documents that the Court
20    has, that the reason that they haven't been able to
21    file has to do with the independent investigation
22    that we kind of started with here because the
23    auditors won't agree to audited financial statements
24    until that investigation is completed.
25           And Exhibit C to the plaintiffs' point
```

1    brief -- and this is looking at a whole different

2    thing now.  Their point brief, Exhibit G, kind of

3    addresses that's the issue.

4              THE COURT:  Let me get caught up here.

5              MR. GOE:  What's that?

6              THE COURT:  Let me get caught up here.

7              MR. GOE:  Okay.  I apologize.

8              THE COURT:  Okay.  So which document am I

9    supposed to look at?

10             MR. GOE:  The one that is Exhibit G, and it

11   is attached to their -- what's referred to as

12   defendant's point brief in support of defendant's

13   motion for temporary restraining order/preliminary

14   injunction.

15             THE COURT:  Okay.

16             MR. GOE:  And what's interesting about that,

17   if you go to page 3, under the "narrative," there's a

18   discussion regarding the difficulties that Bakken has

19   encountered in filing its 10-K and 10-Qs, due to the

20   ongoing independent and internal investigation that

21   was reflected in earlier filings.  And one of those

22   was one of the ones we looked at earlier, at which

23   time Val Holms was terminated.  But that

24   investigation continues to go on, which has, in fact,

25   made it difficult to get audited financial

1    statements.  And you have to have an audited

2    financial statement to file -- to make various

3    filings, including your 10-K.

4           I should also point out, because they make

5    the argument repeatedly, that, "Well, there's been no

6    annual meeting, so we took over the company to

7    protect the company."

8           Well, they are correct.  They have not had

9    an annual meeting for a couple of years.  But the

10   reason isn't a Nevada law.  It's a reason of

11   securities law, which is in order to have a

12   shareholder meeting, you have to have audited

13   financial statements, and you have to do proxy

14   solicitations, et cetera.  I don't understand all of

15   the mechanics of it.  But the fact of the matter is

16   you can't have that annual meeting until you have

17   your audited financial statements.  And, again, the

18   reason we don't have them has to do with Val Holms

19   and his suspected criminal behavior and the fact that

20   he continues not to fully cooperate in the

21   investigation itself.

22          There's no question whatsoever here that

23   this is a company that is required to follow the SEC

24   rules as it is registered pursuant to 12(g).  They

25   apparently kind of recognize that, and they argue in

1    their briefing that they don't have -- they didn't

2    really solicit proxies, and this all kind of came

3    together somehow.  And they said they provided an

4    affidavit from Allan Holms.  But solicitation is a

5    very direct and clear definition under SEC

6    regulations.

7            And I should point out we would like the

8    opportunity to at least, even in a short point brief,

9    respond to what is included in some of the materials

10   that have been filed by Mr. Doubek.  We don't think

11   it would take more than a couple of days, but we

12   would like that opportunity, obviously.

13           In the meantime, though, we think the TRO

14   should stay in place and the preliminary injunction

15   should arise -- or should be issued.

16           But, in any event, there are already

17   specific rules regarding what solicitation is, and

18   it's reflected in -- let me get my right rule here --

19   it is 17 CFR 240.14a-1.  Sorry.

20           THE COURT:  Okay.

21           MR. GOE:  What's that?

22           THE COURT:  Okay.

23           MR. GOE:  There are lots of rules, by the

24   way, but it defines what solicitation is, and it

25   includes (read as):

1                        The furnishing of form of proxy or

2                        other communication to security

3                        holders under circumstances

4                        reasonably calculated to result in

5                        a procurement, withholding, or

6                        revocation of a proxy.

7            And what is very important about that here

8    is that the proxies are all identical.  They are all

9    about the same period of time and defies common sense

10   to say, "Oh, that was all just happenstance."  And,

11   even if it was, the rule against solicitation is

12   still controlling because those proxies are proxies

13   as defined under those regulations.

14           And as I have already pointed out, the

15   proxies are in identical forms.  They are signed in

16   the same manner.  They are all for a common purpose,

17   the same purpose, to have Mr. Allan Holms take over

18   the company.

19           They don't even pretend here that they

20   actually did a proxy solicitation or that they

21   complied in any way with the SEC regulation.  What

22   they are trying to do is find some out for why they

23   didn't do it, and there isn't one there for them.

24           They also argue that, "Well, there's a rule

25   that says, you know, you don't have to follow the

1   solicitation rules if it's only for ten people."  And

2   they cite a couple of cases.  One of them has 11

3   people; one has 12.  First of all, I think those

4   cases are somewhat an anomaly.  But, more

5   importantly, under the regulation, it is a

6   black-and-white issue.  Either you solicited ten or

7   you didn't.  Here, you solicited 23.  Clearly

8   violated that rule.

9        We also have a violation of another rule,

10  and that is laid out somewhat in -- somewhat, but

11  very articulately, I should say, in Mr. Paul's

12  affidavit, and that's 13(d).  There's certain things

13  you have to do when you became a beneficial owner of

14  various securities.  And you have to file schedules

15  with the SEC under Schedule 13(g), 13(d).  And you

16  can't take certain actions within various periods of

17  time until you have filed those schedules.

18       And I'm looking, specifically, your Honor,

19  at the later paragraph starting with paragraph 15.

20  They haven't been filed in this case.  They have no

21  authority, even assuming the proxies are valid.  They

22  have no authority until they meet these threshold

23  requirements.  They should not have any ability to

24  exercise these alleged proxies until these important

25  requirements are met.

```
1              I am going to switch gears just a little bit
2    from the proxy issue, in which I pointed out there
3    wasn't even a pretense to meeting the requirements of
4    the rules of the SEC, to the Eagle Equity
5    transaction.  And the reason I'm doing that is
6    because they argue at length that that transaction
7    violates Nevada law, violates the bylaws, et cetera,
8    and ought to be set aside.  In fact, that's even one
9    of the things that they are requesting in their
10   motion for a TRO.
11             But the fact of the matter is that is
12   something that has already been carefully looked at
13   by the Court in Nevada, and the Court specifically
14   stated that it was reasonable, appropriate -- didn't
15   use those exact words, but that was the meaning --
16   but also legal.  And they did that based in part on
17   admissions made by plaintiff Val Holms, in this case
18   the plaintiff, and by his counsel during the course
19   of that hearing.
20             It was ordered as such in the first order
21   that we looked at.  It was again referred to in the
22   second order, when the TRO was issued in Nevada.  And
23   triggering events have occurred.  And as reflected in
24   the affidavits of Mr. George and Mr. Anderson, they
25   assumed the majority of the voting stock.
```

1          So any attempts to say that Mr. Holms --

2     Mr. Allan Holms, through Val Holms, and through

3     others and these proxies, et cetera, even assuming

4     they were valid, and they are not, essentially are

5     ineffectual.  Again, another reason why we need a

6     preliminary injunction.

7          We also believe -- and it's briefed in our

8     brief -- that there was a violation of the leave of

9     absence agreement, which is referred to by Mr. Val

10    Holms, both by his actions as CEO as well as

11    director.  They argue that tendering his proxy to his

12    stepbrother, or half brother, Allan Holms, is not a

13    violation of that leave of absence agreement.  It

14    clearly is.  As I indicated before, the investigation

15    continues.

16         I have been going on a long time here, and I

17    apologize for that.  But what I think the Court

18    should do and what we're requesting the Court to do

19    is grant the preliminary injunction with the relief

20    requested in the amended complaint.

21         And we need it in light of the Nevada TRO,

22    which prohibits Val Holms from providing a proxy to

23    anyone.  We need it to avoid further attempts at a

24    takeover, such as the one that occurred earlier.

25         We need it so that Karen Midtlyng and Dan

1    Anderson and other board members and Wes Paul can

2    carry out their responsibilities of this publicly

3    traded corporation.

4           We need it to stop attempts at freezing bank

5    accounts when the Nevada TRO specifically says that

6    BRI is to have access to those accounts, even though

7    Mr. Allan Holms attempted to take them over, for lack

8    of a better word.

9           We need the preliminary injunction to

10   preserve the status quo, to allow the company to

11   proceed with its business, to make sure that there

12   are not other attempts to violate the TRO already in

13   Nevada.

14          THE COURT:  The TRO is -- the order out of

15   Nevada at this point is just a TRO?

16          MR. GOE:  It is.  There is a hearing set for

17   September 21st or third; I forget the exact date.

18   And in that the parties have been ordered to do

19   particular briefing.  I believe that's going on

20   currently, and there will be a hearing at that time.

21          THE COURT:  Okay.

22          MR. GOE:  Excuse me, just for one quick

23   second.  (Conferring.)

24          Thank you.  I appreciate it.

25          THE COURT:  All right.  Mr. Doubek.

1            MR. DOUBEK:  Your Honor, what's going on in
2    this case is this:  We have existing shareholders,
3    and these are the shareholders other than
4    Eagle Equity.  Many of them have paid 20 cents, 25
5    cents per share for their stock.  Now we have equal
6    equity, which has received 60 million shares for a
7    penny per share, and we don't think that's fair.  We
8    don't think that's right.  And SEC, on the sideline,
9    it's not right according to Nevada law.

10            Now, this lawsuit, your Honor -- not the
11   Nevada lawsuit -- this lawsuit was initiated by
12   Bakken Resources, Inc., in this court.  It was not
13   initiated by Bakken Resources in the state of Nevada.
14   And if you take a look at their pleadings on page 1,
15   they explain why jurisdiction of this court, not
16   Nevada court, is the appropriate jurisdiction.  This
17   is the court.

18            And so there's constant reference to the
19   other TRO issued by Judge Seeley, who, frankly, never
20   heard our position on anything.  They just ran into
21   court, got a TRO, and that was that.

22            With regard to the Nevada TRO, there were
23   actually two TROs issued in the state of Nevada.  The
24   first one was very favorable to our position because
25   it called into question this Eagle Equity ruse, but

1      then there was a second TRO, which was more to the

2      liking of BRI.

3               The shareholders are taking a fleecing, per

4      this Eagle Equity transaction.  The case that

5      resulted in the favorable-to-them TRO was a

6      derivative action brought by some minority

7      shareholders.  And so how that all got encompassed in

8      that is beyond me because it really wasn't, you know,

9      the up-front issue in the case.  They were brought in

10     as third parties.  Next thing you know, we have a TRO

11     that awaits a hearing on September 21.

12              There was nothing in the Nevada TRO about

13     Allan Holms exercising or receiving proxies.  In our

14     brief we point out why it is that the solicitation

15     rules under the SEC don't apply to him.  We also

16     point out in our brief that while this company was

17     initially a reporting company, it has been delisted

18     down to the lowest level, what's called the pink

19     sheets.  And there isn't a requirement for them to

20     file 10-Qs, 10-Ks, and the like at this point in

21     time.

22              Furthermore, the proxy rules are different

23     when a company is a pink sheet company, and they

24     refer back to the state of incorporation.  So you

25     have to look at the Nevada proxy rules to determine

1   whether the proxies were properly followed or not.

2          I do want to say one thing on behalf of

3   Mr. Carey and Mr. Lamb.  They filed -- Mike Lamb was

4   going to handle it.  He's been transporting his

5   wife's family from Arizona to Nebraska and couldn't

6   do it, wanted out, and Allan consented to that.

7          He's never been served, by the way, with the

8   original TRO of Nevada.  He's never been served with

9   the TRO by Judge Seeley.  So I'm not sure that it

10  does anyone any good to cast aspersions on him

11  because he released Messrs. Lamb and Carey.  That's

12  ridiculous.

13         THE COURT:  Well, let me interrupt you here,

14  Mr. Doubek.  Again, this is a little bit of a

15  complicated factual scenario.  You say the Nevada

16  court did not deal with the proxies that Mr. Allan

17  Holms received.  But, as I read this order, this

18  second order from the court down there, it says on

19  page 3, (read as):

20                 The Court finds the defendants have

21                 a reasonable probability of success

22                 on their arguments that the voting

23                 proxies executed by Val Holms,

24                 purporting to transfer to Allan

25                 Holms 26.2 million shares and by

```
 1                    Manuel Graiwer purporting to
 2                    transfer his shares to Allan Holms
 3                    are invalid, based on SEC
 4                    regulations pertaining to proxy
 5                    solicitations.
 6            MR. DOUBEK:  First of all, that judge is
 7   just flat wrong.
 8            THE COURT:  Okay.  But that's --
 9            MR. DOUBEK:  Secondly, we have never
10   received a copy of that TRO.
11            THE COURT:  Okay.  But that's --
12            MR. DOUBEK:  That's what he said.
13            THE COURT:  That's what he says.  I mean,
14   that's the ruling of the Court down there.
15            MR. DOUBEK:  Right.
16            THE COURT:  Then he does go on further, as
17   Mr. Goe was talking about, that the Eagle Equity
18   stock at this point totals 60 million.  So regardless
19   of the validity of the proxies, transferring stock to
20   Mr. Allan Holms, Eagle Equity is in a superior
21   position.  They own the majority of the stock by
22   virtue of their $60 million holding.
23            And then he does in his earlier ruling say
24   something to the effect of there was a concession
25   that there was nothing wrong done by BRI, with regard
```

1  to the Eagle Equity.

2        MR. DOUBEK:  Well, I don't know what

3  concessions Val Holms made in that case.  All I can

4  say is that when Allan Holms went in and asserted the

5  proxy rights and so forth, it was after that that the

6  stock was issued to Eagle Equity.

7        THE COURT:  Okay.

8        MR. DOUBEK:  Furthermore, Nevada -- and the

9  Articles of Incorporation, there is only 100 million

10 shares of common stock authorized.  If you add

11 60 million and 56 million, you are over the

12 authorized level, and that is illegal in, I think, 50

13 states.  You can't do that.

14       And there's so much about this transaction

15 that's illegal, that's what we want to point out to

16 your Honor, so as to stop the bleeding.  Because this

17 company, they loaned $600,000 to a company that's got

18 $7 million.  That doesn't make any sense to give away

19 a majority of the stock of the company for a

20 fractional interest in the assets of the company.  It

21 just makes no sense whatsoever.  And that's why the

22 shareholders, the existing shareholders, are quite

23 upset.

24       Now, in this case, we know that Bakken is

25 not in compliance with SEC reporting requirements.

1   We know that they are a delisted pink sheet company.

2   We know that the shareholders have never received any

3   notification of the Eagle Equity deal, except that

4   there was an 8-K -- and 8-K reports are just event

5   reports.  That's it.

6           Shareholders have not been afforded the

7   opportunity to vote at annual meetings.  Now, we have

8   heard about, "Well, we can't have an annual meeting

9   because we're not in compliance with our filing

10  requirements before the SEC."  Fact of the matter is

11  Nevada law requires an annual meeting.  Fact of the

12  matter is you can't give away controlling interest in

13  a corporation before it's presented to the

14  shareholders for a vote.

15          Now, their argument is, "Well, the bylaws

16  were amended to give the board of directors the power

17  to do what we did."  Those bylaws were amended after

18  the fact.  In the original bylaws it says the board

19  can't do that without giving the shareholders a right

20  and a say in the matter.  But what they did was they

21  just went to the next step and said, "Well, this is

22  what we're going to do.  It's now in the amended

23  bylaws."  You can't do that.

24          Everything they have done in this case is

25  wrong, and we want to stop the bleeding.  We want to

1    stop the gravy train that Mr. Paul has going for him.

2    We'll talk about the fees that have been paid to him

3    over the course of the last couple of years.

4         There has been a failure.  The shareholders

5    haven't received audited returns or any returns.  The

6    affidavit says, "Well, we filed unaudited 10-Qs the

7    last three quarters with the SEC."  The shareholders

8    have never seen any information like that.  We have a

9    pretty good idea of what money is in the bank, which

10   makes the Eagle Equity deal even more spurious.

11        Val Holms' proxy and others', we contend,

12   conforms to Nevada law.  There's nothing in his

13   agreement to sit out active management of the company

14   that says, "You hereby forfeit your stock.  You

15   hereby forfeit your rights to your stock.  You hereby

16   forfeit your ability to give someone else your voting

17   power on that stock."  Now, I realize that the judge

18   down there may have referenced that in the order, but

19   you can't do that.

20        The Eagle Equity deal, as I say, is

21   nonsensical.  It enables the company management to

22   keep control.  The first TRO down in Nevada called a

23   spade a spade.  It said, "This is not right."  And

24   then through some machinations, we get to the next

25   judge and the next TRO.

1           Our position is that Val Holms didn't

2    violate any agreement that he might have entered into

3    with -- with the company.  You can have annual

4    meetings.  Nevada law requires it.  There wasn't

5    anything specifically about the proxies that were

6    contested by the company.  And, certainly, coming

7    into the company quickly, giving them a copy of the

8    proxies, giving them a copy of the resolutions that

9    they are being replaced is the way to go.  I mean, it

10   stops the bleeding then and there.  And there's

11   nothing wrong with that procedure under Nevada law.

12          So we're here to stop the bleeding and

13   return the right to run this company, ultimately, to

14   the owners of the company, which are the

15   shareholders, not those running the company.

16          Thank you.

17          THE COURT:  All right.

18          MR. GOE:  Your Honor, I don't -- it's hard

19   to know where to begin.  I heard so many

20   misstatements that it's hard to pack them all

21   together and present them in a cogent fashion to the

22   Court.

23          I am going to start with the argument about

24   the Nevada TRO, that we had a good one and now we

25   have a bad one.  Well, they did.  They went and

 1    handed it to a different judge in Nevada and got a

 2    TRO.  And then, Judge Flanagan, who had the

 3    litigation for years, had the preliminary injunction

 4    hearing on that.  And that's what you have before

 5    you.

 6            And during that preliminary injunction

 7    hearing, the Eagle transaction was specifically at

 8    issue.  And Judge Flanagan heard the arguments of

 9    Val Holms' attorneys.  And based on Mr. Doubek's

10    argument, I am not sure if he's actually representing

11    Val Holms at this point.  He made the argument,

12    "Well, we've never been served with the TRO."

13    Val Holms was there.  He was part of the TRO.  His

14    attorney was there.  He got served the TRO.  He also

15    was there at the earlier hearing.  He was there

16    through his counsel, who made the arguments and had

17    ultimately conceded there was nothing illegal about

18    the transaction.

19            And as you rightly pointed out, they already

20    went to the -- it's also referred to in the TRO order

21    from Judge Flanagan a little later against Mr. Holms

22    and against Mr. Graiwer.  So to say that that was

23    just kind of a throw-away issue somewhere is

24    nonsense.  The Court's order clearly displays that --

25    and articulates the fact that it was a central issue

 1    the Court was looking at, at the time.

 2              Shareholders fleecing, you know, and all of

 3    this other stuff, the fact of the matter is if you

 4    are a pink sheet company, that does not equal that

 5    you are a voluntary filer.  And I think some of that

 6    is addressed in Mr. Holms' affidavit.  And,

 7    certainly, additional briefing is appropriate.

 8              THE COURT:  In whose affidavit?  Mr. Paul's

 9    affidavit?

10              MR. GOE:  Mr. Paul.  Who did I say?

11              THE COURT:  Mr. Holms.

12              MR. GOE:  I meant Mr. Paul.

13              THE COURT:  What about Mr. Doubek's comment

14    that once a company is identified as a pink sheet

15    company their proxy rules are different, that they

16    don't have to comply with those?

17              MR. GOE:  Wrong.

18              THE COURT:  That's not accurate?

19              MR. GOE:  Not accurate.

20              THE COURT:  Okay.

21              MR. GOE:  It's a 12(g) company.  It still is

22    one.  They have the same requirements.

23              THE COURT:  Okay.

24              MR. GOE:  There's a discussion about, "Well,

25    this is too many shares of stock to Eagle Equity."

1  Wrong.  These are preferred shares.  They are allowed

2  for under the -- it's a charter of the company.

3  Excuse me.  I was searching for the right word.

4       THE COURT:  He says it's limited to 100

5  million shares and you are over that amount at this

6  point.

7       MR. GOE:  Different types of shares.

8       THE COURT:  Okay.

9       MR. GOE:  Bottom line is -- and perhaps

10  these are things that we would like to, like I said

11  before, maybe address in a short pleading to the

12  Court.

13       But the bottom line is that I heard so much

14  that was just flat wrong and in kind of a passion

15  plea that somehow everybody is being fleeced here.

16  But what you didn't hear is any real argument against

17  what I have already advised the Court, or at least

18  argued to the Court, of why we need a preliminary

19  injunction, why we don't just go into somebody's

20  office like a cowboy with an armed guard saying, "Get

21  out."

22       There are rules that have to be followed.

23  There's specific solicitation rules that have to be

24  followed.  They weren't followed.  They don't even

25  pretend that they followed them.  And that's why we

```
 1    need the preliminary injunction.
 2           THE COURT:  All right.  So you want to do
 3    some more briefing?  Is that --
 4           MR. GOE:  Not really.
 5           THE COURT:  Okay.
 6           MR. GOE:  But I do think what I would limit
 7    it to is just basically the issues that Mr. Doubek
 8    raised in his oral argument here.
 9           THE COURT:  I actually have two briefs, just
10    to make sure because of some of the filing things
11    here.  I have a point brief that you've been
12    referring to in support of defendant's motion for
13    temporary restraining order/preliminary injunction,
14    filed by Mr. Doubek.  And then I have a memorandum in
15    support of defendant's motion for a temporary
16    restraining order/preliminary injunction.
17           Do you have both of those?
18           MR. GOE:  I do have both of those, yes.
19           THE COURT:  Okay.  I haven't seen these
20    before.  They hadn't brought it up to me.  So I don't
21    know what's in here.
22           MR. GOE:  Just in a general sense of -- and
23    Mr. Doubek can speak to it better than I can -- the
24    point brief is primarily proxy-related issues, and
25    the other brief is primarily related to the
```

```
 1    Eagle Equity transaction.
 2              THE COURT:  All right.
 3              MR. GOE:  Fair to say?
 4              MR. DOUBEK:  Close enough.
 5              THE COURT:  Okay.  So how much time do you
 6    want to do any follow-up memo?
 7              MR. GOE:  How about a week?
 8              THE COURT:  A week is fine by me.
 9              Do you want to respond to him?
10              MR. DOUBEK:  Sure.
11              THE COURT:  Okay.  A week after that?
12              MR. DOUBEK:  Three days.
13              THE COURT:  Three days after that?  So we're
14    looking at next Tuesday for you.  We're talking
15    calendar week, not work week.
16              MR. GOE:  That will work.
17              THE COURT:  And then --
18              MR. DOUBEK:  He works on weekends.
19              THE COURT:  I know he does.  I know he does.
20    You guys both all work too hard.  Look at all of this
21    paper.
22              And then you have till Friday, a week from
23    Friday --
24              MR. DOUBEK:  Thank you, your Honor.
25              THE COURT:  -- to get your reply back in.
```

1          All right.  I am going to leave the

2    temporary restraining order in place until I have a

3    chance to review some of this stuff.

4          MR. DOUBEK:  Right.

5          THE COURT:  Okay.

6          MR. GOE:  Thank you.

7          THE COURT:  I truly did not have that

8    opportunity, particularly with regard to the new

9    filings.  So everything will stay in place until --

10   do we want to have another hearing?

11         MR. DOUBEK:  Are you putting witnesses on

12   today?

13         MR. GOE:  No.

14         MR. DOUBEK:  You're not?

15         MR. GOE:  No.  I did it through affidavits.

16   I requested a preliminary injunction through the

17   affidavits that have been filed, and that's

18   consistent with the rules.

19         THE COURT:  Okay.  So do you want to have

20   another hearing?

21         MR. DOUBEK:  Can I call witnesses?

22         THE COURT:  You want to call witnesses

23   today?

24         MR. DOUBEK:  Sure.

25         THE COURT:  All right.  Well, let's come

```
 1   back at 25 till.

 2

 3            (Proceedings were in recess from

 4            3:20 p.m. until 3:30 p.m.)

 5

 6            THE COURT:  Okay.  Mr. Doubek.

 7            MR. DOUBEK:  Mr. Allan Holms.

 8            THE COURT:  Come forward.  Ms. Dillman will

 9   swear you in.

10

11                  ALLAN HOLMS,

12   called as a witness, having been duly sworn,

13   testified as follows:

14

15                  DIRECT EXAMINATION

16   BY MR. DOUBEK:

17       Q.   There should be some water there if you need

18   it.

19            Please state your name and professional

20   address.

21       A.   Allan Holms, 1314 South Grand Boulevard,

22   Spokane, Washington.

23       Q.   Would you briefly describe your educational

24   background.

25       A.   Well, high school in Montana; University of
```

1   Montana, Missoula, Montana, for several years.

2   Involved in several different businesses.

3        Q.   What did you get a degree in at Missoula?

4        A.   I didn't.  My senior year, a bank brought a

5   company to me to help them figure it out, and it

6   turned out I purchased that company, and that was

7   1964.

8        Q.   Okay.  And so, then, trace your work

9   experience from that point, please.

10       A.   I became the director at First Bank System,

11   which is now the U.S. Bank.  Was investments in

12   various businesses throughout my career.  I do a lot

13   of consulting, financial consulting, currently.  And

14   I'm trying to retire.

15       Q.   Well, good luck.

16            Have you in your experience in business

17   dealt with corporations, bylaws, articles of

18   incorporation, of the like?

19       A.   Certainly.  Public companies are different

20   than private, of course, but a lot of the same rules

21   apply, you know.

22            I remember one of the businesses that we

23   sold in Montana that some time ago had the owners

24   owned the company, but there were several minority

25   shareholders.  And before the company could be sold,

```
 1   we had to get an opinion from the small shareholders,

 2   which, basically back to this case, I thought maybe

 3   we should have an opinion from our shareholders on

 4   this transaction, in fairness.

 5           MR. GOE:  Your Honor, I'm going to object.

 6           THE WITNESS:  I --

 7

 8           (Simultaneous speaking.)

 9

10           THE COURT:  Hold on just a second.

11           MR. GOE:  I'll object and move to strike.

12   It was totally nonresponsive to the question that was

13   asked.

14           THE COURT:  I would tend to agree with that.

15   Why don't you --

16   BY MR. DOUBEK:

17       Q.  In the course of your work experience, then,

18   you have had occasion to deal with smaller

19   corporations where there was minority interests?

20       A.  Yes.  And I apologize for not staying on

21   track.  Yes, definitely.

22       Q.  Tell us about that experience.

23       A.  Well, there's --

24           MR. GOE:  Your Honor, I object.  What's the

25   relevance?  Is this anything that we're talking about
```

```
 1   here today?
 2          MR. DOUBEK:  Well, he doesn't come at this
 3   case blind, experience-wise, and I just want to put
 4   that on the record, your Honor.  I am not going to --
 5          THE COURT:  We don't want to go into it a
 6   lot.
 7          MR. DOUBEK:  Sure.
 8          THE COURT:  I am going to overrule that
 9   objection.
10          THE WITNESS:  The last 20 years I have
11   probably been -- was involved with 20 different -- 30
12   different companies as a middle person, adviser,
13   consultant.  I don't have a current operating
14   business, and that's really what I do for a living.
15   BY MR. DOUBEK:
16      Q.   And are these businesses that are bought and
17   sold or divided amongst shareholders?
18      A.   Definitely.  They were businesses that a
19   public company would buy or a private company would
20   buy, and I was sort of the middleman in putting this
21   transaction together.
22      Q.   What would you do in order to accommodate
23   the interests of both sides, typically?
24      A.   A lot of times I represented the seller or
25   the buyer.  Then, if they agreed, I would represent
```

them both.

Q.   Okay.  How is it that you became involved in the case of Bakken Resources, Inc. versus Val and you and Todd Jensen and Allen Collins?

A.   I came through out of frustration from my brother.  Val Holms lived with me when he was growing up, and we were rather close, and then we would not be close, and then close and not be close.  And so he reached out to me and told me that he might be in trouble.

Q.   And when, approximately, was that?

A.   Oh, in the last 30 days.

Q.   Okay.  And was he in need of your help?

A.   He asked if I could help.  He asked me specifically -- he told me the situation, told me what had happened in Reno, told me where he was at, and he asked me if I could help him.

Q.   Why did you agree to help him?

A.   Blood is thicker than water.

Q.   Okay.  Was he ill?

A.   Val has terminal cancer and probably a life span of maybe two more years.

Q.   All right.  Did you actually cause a lawsuit to be filed, which was that other lawsuit, 611 that I referred to, where you purported to act on behalf of

1  Bakken Resources, Inc.?

2      A.   That was filed by -- we sort of put a legal

3  team together to assist me in this, and they

4  suggested various procedures that I should follow,

5  and I followed them.

6      Q.   Okay.  And when you say, "your legal team,"

7  who advised you as to what to do?

8      A.   The -- the law firm in Spokane, which is

9  quite large, helps me in various transactions.  And

10  they were also aware of Val's situation, and I

11  explained it to him.  And so they studied the entire

12  transaction, went to the bylaws --

13          MR. GOE:  Your Honor, I'm going to object.

14  He cannot testify about what somebody else did.  He

15  has no personal knowledge of that, and no foundation

16  has been laid for that.  If he's waiving his

17  attorney-client privilege completely, then we might

18  be here for a while, perhaps.

19          MR. DOUBEK:  Well, I'm trying to skip along

20  merrily to try to get to some points, your Honor.

21          THE COURT:  Okay.  So he was advised by the

22  legal team --

23          MR. DOUBEK:  By counsel.

24          THE COURT:  -- to do that.  That's as far as

25  he can go.

1    BY MR. DOUBEK:

2        Q.   And they told you to -- did you prepare the

3    proxy statements?

4        A.   The paperwork was prepared by them.

5        Q.   Did you ever solicit anybody's proxy?

6        A.   Absolutely not.

7        Q.   How is it that you came to receive some

8    20-plus proxies, if that's the right number?

9        A.   Let's go back to the original.  Val, I told

10   him that my counsel said that in order for me to help

11   you, you have to get me votes or shares.  So then --

12       Q.   Were you a shareholder of the company at

13   that time?

14       A.   What's that?

15       Q.   Were you a shareholder of the company?

16       A.   Small.  Very small.

17       Q.   How small?

18       A.   Five percent.

19       Q.   And Val owned 47 percent, roughly?

20       A.   47, 48, something like that.

21       Q.   All right.  So you were advised that you

22   needed to get his proxy in order to help him?

23       A.   He -- yes.

24            And so I talked to him, and I said, "This is

25   what you have to do."  And I said, "The best thing

```
 1   for you to do is go to your attorney in Missoula, sit
 2   down and explain the facts to him, and then have him
 3   recommend what you should do."
 4           He did that, and the attorney --
 5           MR. GOE:  Objection.  Lack of foundation.
 6           THE COURT:  Sustained.
 7   BY MR. DOUBEK:
 8       Q.  Who is his attorney?
 9       A.  Milt Datsopoulos.
10       Q.  And so as a result of that, you came to
11   receive his proxy?
12       A.  He e-mailed it to me.
13       Q.  And how did you receive the other proxies?
14   Did you call them up and solicit those?
15       A.  No.  No.  I was in the court in Reno, and
16   Manny Graiwer said, "Why don't you help me out here,
17   Allan.  I am going to Europe for a month."
18           I said, "How am I going to do that?"
19           He said, "I will just give you my proxy."
20           So he gave me his proxy, so now I have two
21   proxies.
22       Q.  And how did the rest of them come to be in
23   your possession?
24       A.  The rest of them, I'm assuming, through Val
25   and his family.  There's a lot of family members here
```

1  in Helena.  They just kept coming.  I didn't solicit

2  them.  They just kept coming.

3       Q.  And when they came to you, was that before

4  the Eagle Equity folks, or company, had received --

5       A.  Yes.

6       Q.  -- the 60 million shares?

7       A.  Yes.

8       Q.  Okay.

9       A.  I guess, a day -- I mean, we do our thing

10  one day, and the next day they released it,

11  Eagle Equity.

12       Q.  What did you do, then, with the proxies?

13       A.  I gave them to the law firm.

14       Q.  Okay.

15       A.  And I said, "Now you have to figure out how

16  to handle this because I want to make sure that I'm

17  not in trouble.  I don't want to be in trouble.  So

18  what do you suggest we do?"

19       Q.  And what did you then do?

20       A.  They developed the paperwork, showed me the

21  paperwork, and they said, "You should find some

22  directors."  And I selected two independent CPAs and

23  myself.  And we served it on BRI here in Helena.

24       Q.  All right.  And you heard the rendition by

25  Mr. Goe that there were guns blazing and so forth.

1    A.   No.

2    Q.   Tell us what happened.

3    A.   Basically, we went in, and the attorney

4  said, you know, "This is a new situation where you

5  have to do this because that's what the paperwork

6  calls for, and you have to leave."

7         I did not tell them we were taking the

8  company over.  I said, "We're changing the board and

9  changing officers."  And I told them specifically

10 that, "Don't be looking at me for doing this.  This

11 is what the shareholders want, and they are calling

12 me.  They want to know what's happening.  You can

13 call your shareholders."

14   Q.   And those proxies and the resolutions to

15 replace the board members and the officers, some of

16 the officers of the company, were given to the

17 company at that time.

18   A.   Yes.

19   Q.   True?  All right.

20        And were you escorted out of the building?

21   A.   No.

22   Q.   Okay.

23   A.   It was mutual.  Oliver Goe showed up, and he

24 said, "Hey, we can't be doing this.  We just have to

25 get this resolved in the court."

```
 1             And I said, "Fine."
 2      Q.   All right.  And so then you filed your
 3  action through Mr. Lamb and Mr. Carey?
 4      A.   Yes.
 5      Q.   And did you know that you were, quote,
 6  violating, quote, any TRO when you released them from
 7  their job as attorneys for you?
 8      A.   Did not know that.
 9      Q.   Had you ever been served with the first TRO
10  issued by Judge Seeley?
11      A.   No.
12      Q.   Have you ever been served with the TRO of
13  either court down in Nevada?
14      A.   No.
15      Q.   Did you also -- or were shareholder consents
16  also prepared and served on the company?
17      A.   Yes.
18      Q.   All right.  And did you purport to terminate
19  the corporate secretary and the CFO president, Daniel
20  Anderson?
21      A.    I just served them the papers.  And I said,
22  "The papers sort of indicate that we have to have a
23  change."
24      Q.   Okay.  Did you also provide notice to
25  Wells Fargo that the director had been changed and
```

 1    that corporate assets and financial accounts needed

 2    to be frozen?

 3         A.   I didn't, but the attorney did.

 4         Q.   Okay.  Why was that?

 5         A.   He said that's standard operating procedure.

 6         Q.   Were you aware of the leave of absence

 7    agreement signed by your brother Val?

 8         A.   Studied it.  Looked at it.

 9         Q.   Okay.  To your knowledge, did he ever

10    violate the terms of that agreement?

11         A.   No.

12         Q.   Are you or have you -- you are a shareholder

13    of BRI.

14              Have there been, to your knowledge, any

15    directors elected by the stockholders during the past

16    two years?

17         A.   I believe that Wes Paul has a couple from

18    New York.

19         Q.   But they were not elected by the

20    shareholders --

21         A.   No.

22         Q.   -- to your knowledge?

23              And there hasn't been a shareholder meeting

24    since late 2014; is that true?

25         A.   The way I understand it from the team in

1   Spokane because there was no --

2        MR. GOE:  Your Honor, I'm going to object.

3   It sounds like he's heading into perhaps a legal

4   conclusion, but he's also testifying about what

5   somebody else said and thought.

6   BY MR. DOUBEK:

7        Q.  Just testify as to what your understanding

8   was.

9        A.  My understanding is that we would have a new

10  team, new directors and a new operation.

11       Q.  Have you ever received as a shareholder, or

12  as a holder of proxies constituting that it's in your

13  -- it's attached to the pleading, some 57 percent of

14  the original shareholders' shares, have you ever

15  received any notice of the arrangement between BRI

16  and Eagle Equity?

17       A.  Yes.  I got it through -- excuse me -- I

18  received a notification from the attorney in Reno.

19       Q.  Okay.  And who was that attorney?

20       A.  That's the attorney who was representing

21  either Val or Manny Graiwer.

22           Could I have that file that I had right

23  there?

24       Q.  (Complying.)

25       A.  I'm sorry.

1      Q.   That's fine.

2      A.   Would you ask the question again.

3      Q.   Did you ever receive notice of the

4  arrangement between BRI and Eagle Equity?

5      A.   I did, yes.  No.  I looked at it, and the

6  attorney described it to me, but didn't receive a

7  notice, no.

8      Q.   And you've never seen the actual agreement

9  between those two parties, have you?

10     A.   No.

11     Q.   To your knowledge, has it ever been made

12  public?

13     A.   I believe they have filed an 8-K on that.

14     Q.   Was the --

15     A.   I think that's what started the whole

16  process.  They filed an 8-K.

17     Q.   Okay.  Was the entire agreement attached to

18  any 8-K --

19     A.   No.

20     Q.   -- to your recollection?

21     A.   No.

22     Q.   Do you know, when you received the proxies,

23  approximately how many shares of common stock were

24  issued and outstanding?

25     A.   56 million.

         1        Q.   Okay.  And you have proxies for about how

         2    much?  We can added them up.  Is it, roughly,

         3    53 million?

         4        A.   Something like that, yes.

         5        Q.   Okay.  What's your understanding in

         6    reviewing the company's documents, as to the amount

         7    of authorized shares of common stock, that the

         8    company could actually issue?

         9        A.   Well, I think there's --

        10             MR. GOE:  Your Honor, to the extent he's

        11    asking for a legal conclusion, I am going to object

        12    to the question.

        13             If he's asked to read the documents, the

        14    Court can do that just as easily.

        15             THE COURT:  Would you repeat the question?

        16             MR. DOUBEK:  I'll shorten it up.

        17             THE COURT:  Okay.

        18    BY MR. DOUBEK:

        19        Q.   Is there 100,000 shares of authorized common

        20    stock according to the Articles of Incorporation?

        21        A.   100 million, I think.

        22        Q.   100 million?

        23        A.   Yes.

        24        Q.   All right.  And there were also 10 million

        25    shares of a preferred A series stock?

```
 1        A.    That's what I understand.
 2        Q.    What is your understanding based upon the
 3   company's documents as to what voting rights --
 4        A.    There's --
 5
 6              (Simultaneous speaking.)
 7
 8   BY MR. DOUBEK:
 9        Q.    -- as to what voting rights attach to those
10   two types --
11        A.    From my --
12
13              (Simultaneous speaking.)
14
15   BY MR. DOUBEK:
16        Q.    -- those two types of stock?
17        A.    I believe one vote per share.
18        Q.    All right.  And that's the same preferred
19   versus common?
20        A.    Yes.
21              MR. GOE:  Your Honor, I think that's
22   directly contrary to what the documents say
23   themselves.  To the extent that he is making some
24   type of legal argument, it's not admissible in the
25   first place.  I'd object and move to strike.
```

```
 1          MR. DOUBEK:  Well, your Honor, we'll take a
 2   look at those documents.
 3          THE COURT:  I will look at them.  You're
 4   going to have a chance to cross-examine.
 5          MR. GOE:  Thank you.
 6   BY MR. DOUBEK:
 7      Q.  Did you have your initial board meeting,
 8   then, pursuant to your proxies and corporate
 9   resolutions?
10      A.  Yes.
11      Q.  Okay.  And when was that?
12      A.  That was here in Helena.
13      Q.  And what was the result of your efforts as
14   it relates to your attempt to --
15      A.  Well --
16
17          (Simultaneous speaking.)
18
19   BY MR. DOUBEK:
20      Q.  I'll ask it again.
21          What was the result of your efforts as it
22   relates to the directors and officers of the company
23   at that time?
24      A.  Well, I -- there was a board meeting to
25   terminate the legal representation of Wes Paul.
```

```
 1   There was a board meeting to terminate Dan Anderson
 2   and also Karen Midtlyng.  There was also a board
 3   meeting to review the enormous expenses for
 4   litigation, which we didn't get that document at the
 5   time because their attorney showed up, and I wanted
 6   to cooperate with them.
 7        Q.   Were you able to learn anything about the
 8   company's finances at the time you went into the --
 9        A.   Yes.
10        Q.   -- corporate office?
11        A.   The company is very deep financially, very
12   deep.
13        Q.   Did the Eagle Equity deal make any sense to
14   you?
15        A.   Absolutely not.
16        Q.   Did you have --
17             MR. GOE:  Your Honor, I'm going to object to
18   lack of foundation.
19             MR. DOUBEK:  Well --
20             MR. GOE:  You don't know anything about it
21   other than it's an 8-K.  Now he's going to tell us
22   whether it's a good deal or bad deal?
23             MR. DOUBEK:  Well let me --
24             MR. GOE:  And what --
25             MR. DOUBEK:  -- boil it down for you,
```

```
 1    Oliver.
 2            MR. GOE:  And I don't think it has any
 3    relevance to the issues we're talking about.
 4            MR. DOUBEK:  It has every relevancy in these
 5    issues.
 6            THE COURT:  Okay.
 7            MR. DOUBEK:  I'll rephrase.
 8            THE COURT:  Rephrase.
 9    BY MR. DOUBEK:
10        Q.  Is it your understanding that they were
11    given 60 million votes, like, common stock, in return
12    for --
13        A.  Six hundred --
14
15            (Simultaneous speaking.)
16
17    BY MR. DOUBEK:
18        Q.  -- in return for $600,000?
19        A.  That 600,000 was a loan to the company.
20        Q.  Did that make sense to you based upon your
21    experience?
22        A.  Well, the company is sitting with close to
23    $7 million in liquidity.  It doesn't make sense to
24    me.
25        Q.  As a shareholder --
```

```
 1        A.   Yes --

 2

 3             (Simultaneous speaking.)

 4

 5             THE WITNESS:  I'm sorry.

 6             THE COURT:  Here's the way this works.  Let

 7  Mr. Doubek finish his question so my court reporter

 8  can get an accurate record of what we're doing here.

 9             THE WITNESS:  I will.  I just get it.

10             THE COURT:  I know.  And that's not

11  uncommon, and it happens.  But because it's happened

12  now several times, be sure --

13             THE WITNESS:  I'll be sure.

14             THE COURT:  -- be sure to give him a chance

15  to finish his question fully so that she can get it

16  down fully, and then you can give your full answer

17  and she can get that down fully.  That's what we're

18  shooting for here.

19             THE WITNESS:  All right.

20  BY MR. DOUBEK:

21      Q.   Did you do anything to review Eagle Equity

22  and its background?

23      A.   Yes.

24      Q.   What did you do?

25      A.   I have a report here that -- if I can
```

1   certainly -- if I may read it.

2       Q.   Well, can you paraphrase it?

3       A.   Well --

4       Q.   And if Oliver wants to take a look at it --

5       A.   -- it's Carl George and several judgments

6   filed against him.

7           MR. GOE:  Your Honor, I would object.  This

8   is all hearsay.  It's not relevant to anything that

9   we're talking about.

10          MR. DOUBEK:  Is it --

11          MR. GOE:  There's no foundation for it.

12          THE COURT:  Okay.  I'm going to sustain

13  that.  We seem to be wandering off a little bit from

14  what I understand to be the issue is here.

15  BY MR. DOUBEK:

16      Q.   Is it your understanding that Eagle Equity

17  was established by Wesley Paul?

18      A.   Yes.

19      Q.   Did Eagle Equity come into existence in the

20  spring of 2016, to the best of your knowledge?

21      A.   Best of my knowledge, I think it's been

22  ongoing over the years, according to this report.

23      Q.   Do you know whether Wesley Paul has also

24  acted as attorney for Val Holms, his wife Mary, and

25  several of Val's other companies?

1          MR. GOE:  Objection.  Foundation.

2    Relevance.

3          THE COURT:  Can you answer that question?

4          THE WITNESS:  Yes, I can.  In the litigation

5    we were involved with, Wes Paul represented Val.  He

6    represented Bakken.  He represented Val's trust.  He

7    was a trustee for Val.  And that's one of the reasons

8    Val reached out to me.

9          MR. GOE:  Objection.  Move to strike.  Lack

10   of foundation.  The last portion of his answer there.

11         THE COURT:  I'm going to sustain that.

12   Strike that part.

13   BY MR. DOUBEK:

14        Q.   Do you have a recollection as to how much

15   you paid for your stock?

16        A.   I don't.

17        Q.   Does the -- in your mind as a shareholder

18   did the transfer of stock to Eagle Equity represent

19   an immediate dilution of your stock?

20        A.   Down to zero.

21        Q.   Did you ever receive notice of the transfer

22   of that stock by way of notice from the company to

23   you as a shareholder?

24        A.   No.

25        Q.   Did you ever have an opportunity to vote or

```
 1   question it at any meeting, special meeting or

 2   otherwise?

 3        A.   No.

 4        Q.   Are you aware whether the company has ever

 5   had a special meeting of the shareholders after its

 6   November 2014 meeting?

 7        A.   They haven't.

 8        Q.   Okay.  Did you have an opinion, based upon

 9   what you have seen, whether the company needed the

10   $600,000 from Eagle Equity?

11             MR. GOE:  Objection.  Foundation.

12   Relevance.

13             THE WITNESS:  I would say --

14             THE COURT:  Wait a second.

15             THE WITNESS:  Excuse me.

16             THE COURT:  Does he have any foundation for

17   that?

18             MR. DOUBEK:  Well, based upon what he saw,

19   and that is that there was some $7 million in the

20   company coffers, and now the company is giving away

21   60 percent of the company for $600,000.  I think the

22   opinion is probably obvious, but I wanted to put it

23   on the record.

24             THE COURT:  Overruled.  Go ahead.

25             THE WITNESS:  Yeah, I happened to see a
```

1   financial statement when I was in the offices.

2   BY MR. DOUBEK:

3       Q.  And what did it reveal?

4       A.  They've got about $3.8 million in an

5   investment account.  They have a million two in

6   royalty income.  They have monthly royalty income of,

7   roughly, 130,000 a month.  And they have overhead of

8   legal expenses of about 100, and I guess the rest was

9   for the company.

10       Q.  Are you familiar with poison pills and such

11   actions taken sometimes by companies to thwart

12   takeovers?

13          MR. GOE:  Objection.  Foundation.

14          THE WITNESS:  This is --

15          MR. GOE:  Relevance.

16          THE COURT:  Wait.  Wait.  Wait.

17   BY MR. DOUBEK:

18       Q.  Are you familiar with that?

19       A.  Yes.

20       Q.  Have you seen them in the course of your

21   work as a consultant?

22       A.  Yes.

23       Q.  And did this appear to you, the arrangement

24   with Eagle Equity, to simply create a poison pill to

25   thwart efforts by shareholders to take back their

1   company?

2   MR. GOE:  Your Honor, I'm going to object to

3   that.  Foundation.  It's asking for an opinion that

4   he is not qualified to provide.  Ultimately, I guess,

5   there are some of the decisions the Court is going to

6   have to make, but it interferes with your findings as

7   the finder of fact.

8   THE COURT:  Okay.  I'll overrule that

9   objection.

10   MR. DOUBEK:  Go ahead.

11   THE WITNESS:  Repeat it, would you?

12   BY MR. DOUBEK:

13   Q.  Well, did it appear to you that this stock

14   arrangement with Eagle Equity was simply to create a

15   poison pill to thwart any effort on the part of the

16   shareholders to take their company back?

17   A.  A classic poison pill.

18   Q.  Okay.  Why do you think that it's

19   appropriate for exiting shareholders, that you

20   represent per written proxies, to a preliminary

21   injunction or temporary restraining order?

22   A.  From my opinion?

23   Q.  Yes, sir.

24   A.  State my opinion?  As an entity expert, I

25   would recommend that the shareholders look at the

1  real facts, look at the background of this Carl

2  George, look at his pedigree, find out really what

3  the true story is, and have a shareholders meeting.

4  I don't want to run the company.  I just want to be

5  interim.

6      Q.  Would that be your intent as far as

7  management of the company during the pendency of a

8  shareholder meeting?

9      A.  That's it.

10      Q.  Is it -- do you know whether BRI is a

11  reporting company as you understand?

12      A.  Well, as you and everybody's done enormous

13  research, it's on the lowest level of a pink sheet.

14      Q.  What does that mean?

15          MR. GOE:  Objection.

16          THE WITNESS:  It means --

17          THE COURT:  Wait.  Wait.

18          MR. GOE:  Lack of foundation.  Also asks for

19  a legal opinion.

20          MR. DOUBEK:  Well, we'll brief it, Judge.

21          THE COURT:  All right.

22          MR. DOUBEK:  So I'll withdraw it.

23  BY MR. DOUBEK:

24      Q.  Do you believe that a shareholder meeting is

25  required?

 1      A.   I think it would be a crime if it didn't

 2  happen.

 3      Q.   And by "shareholder meeting," I mean a

 4  meeting of the shareholders who have never yet been

 5  presented with the Eagle Equity arrangement or deal?

 6          MR. GOE:  Objection.  Leading.

 7          MR. DOUBEK:  Is that your belief?

 8          THE COURT:  I'm going to sustain.  That was

 9  a pretty leading question.

10          He's answered that, though.  He believes

11  there needs to be a shareholders meeting.

12  BY MR. DOUBEK:

13      Q.   All right.  Is it your request as proxy

14  holder of a majority of existing shareholders stock,

15  that the Court order the company have a shareholder

16  meeting prior to giving away control of the company

17  to someone who has paid a penny per share for that

18  controlling interest?

19      A.   I hope they do.

20          MR. GOE:  Objection.  Leading.

21          THE WITNESS:  I hope they do.

22          THE COURT:  I'll overrule that.  That's

23  already part of the record.

24          MR. DOUBEK:  Your Honor, I have no other

25  questions.

```
 1                    CROSS-EXAMINATION
 2    BY MR. GOE:
 3        Q.   There would be a real benefit to you,
 4    potentially, to run the company, personal benefit,
 5    isn't there?
 6        A.   No.
 7        Q.   Well, in your affidavit that you filed in
 8    this Court, you talk about all of this litigation
 9    that's been going on; is that right?
10        A.   There is a lot of litigation.
11        Q.   Yeah.  And, specifically, in your affidavit
12    you talk about BRI has almost been in continuous
13    litigation in numerous jurisdictions.  Is that part
14    of what you believe?
15        A.   That is the facts.
16        Q.   And one piece of significant litigation is
17    one that you brought; right?
18        A.   That's correct.
19        Q.   On behalf of a company that you have and
20    also personally; is that right?
21        A.   That's correct.
22        Q.   And the defendants in that case in
23    Washington happen to be, among others, BRI; right?
24        A.   BRI for one.  Val Holms for two.
25        Q.   Yeah.  And you were seeking 5-plus million
```

1  dollars from them; is that right?

2       A.   That's what the expert thought I lost.

3       Q.   And, in fact, you filed this lawsuit and

4  pursued it in state court, had an attorney; right?

5  The state court in Washington?

6       A.   Yes.

7       Q.   And what firm was your attorney from?

8       A.   It was Geeza (phonetic) and -- Geeza Law

9  Firm.

10      Q.   And at some point Bil Childress got

11  involved; isn't that right?

12      A.   Much, much later.

13      Q.   Well, not that much later because he filed

14  briefs in the federal district -- excuse me -- state

15  district court of appeals on your behalf; isn't that

16  right?

17      A.   Yes.

18      Q.   In fact, he was your counsel while this

19  matter was being appealed; is that right?

20      A.   Correct.

21      Q.   And part of what you were trying to recover

22  from Mr. Holms, who you are now helping, and BRI is

23  in excess of $5 million; right?

24      A.   That was what the experts claim.

25      Q.   And also trying to seek recovery of

1    attorney's fees of about $400,000; is that right?

2         A.   Yes, that's what they claimed.

3         Q.   Well, they didn't claim it.  You are the

4    plaintiff; right?

5         A.   They -- okay.  So I claimed it.

6         Q.   Yeah.  Your representatives are making these

7    claims; right?

8         A.   My representatives, yes.

9         Q.   And they're wanting over $5 million from

10   Val Holms and BRI?

11        A.   Yes.

12        Q.   And they want $400,000 in attorney's fees;

13   right?

14        A.   Yes.

15        Q.   And on July 20th, when you came into the BRI

16   offices, that case was still pending; right?

17        A.   The case was pending, but may I explain?

18        Q.   No, you don't get to right now because I'm

19   asking the questions.

20             The case was pending; correct?

21        A.   Yes.

22        Q.   And it was also awaiting a decision in the

23   appeals court; is that correct?

24        A.   Yes.

25        Q.   And you don't have an opinion yet in the

1   appeals court; is that right?

2       A.   True.

3       Q.   And I happened to pull up the brief that was

4   filed by Mr. Childress and Mr. Dunn from Dunn, Black,

5   and Roberts.  And looking at their brief, they start

6   off with, (read as):

7                   This case is about the unabashed

8                   greed involving a brazen conspiracy

9                   of one brother against another

10                  brother.

11      You saw that; right?

12      A.   I did.

13      Q.   And that's something you concurred in;

14  right?

15      A.   He did, yes.

16      Q.   And, in fact, you go on to talk about all of

17  the things that Val Holms did to cheat you out of a

18  whole bunch of things; right?

19      A.   Yes.

20      Q.   And that was part of your underlying claim

21  for $5 million; is that right?

22      A.   That's what it says.

23      Q.   That was a claim both against BRI and Val

24  Holms?

25      A.   Yes.

1      Q.   And you recently got an opinion from the

2  district court -- I mean, excuse me -- appellate

3  court; right?

4      A.   Yes.

5      Q.   And you got zero?

6      A.   That's what it says.

7      Q.   Nothing; right?

8      A.   That's what it says.

9      Q.   But during the time that you were -- on

10  July 20th, when you came into the BRI offices, one of

11  the people you brought with you was Mr. Childress; is

12  that right?

13     A.   Yes.

14     Q.   And he is, in fact, the attorney who filed

15  this brief against BRI and was representing you in

16  that ongoing litigation in Washington; right?

17     A.   Yes.

18     Q.   And, in fact, one of these things that you

19  wanted to do at this board meeting that you wanted to

20  have is have all of the lawyers fired that were

21  representing BRI and appoint the law firm of Dunn,

22  Black, and Roberts; is that right?

23     A.   That's correct.

24     Q.   The same ones that were representing you in

25  the ongoing litigation in Washington --

1      A.   That's correct.

2      Q.   -- where you had this claim --

3      A.   Correct.

4      Q.   -- for an excess of $5 million?

5      A.   Right.

6      Q.   So at that point in time and as the, quote,

7  interim manager, you are both the plaintiff and the

8  defendant in the lawsuit; right?

9      A.   That's not the way it was going to work.

10     Q.   Well, you say that's not the way it's going

11 to work, but that's the way it could work.

12          And, in fact, you were going to be on both

13 sides, and you were going to have the same lawyer

14 representing BRI and also representing yourself in a

15 case where you wanted $5 million; right?

16     A.   I think you are -- you are casting it a

17 little different than what actually happened.

18     Q.   Well, no.

19     A.   BRI was going to get a new board of

20 directors, not Allan Holms.  Who's going to get a new

21 chief?  Not Allan Holms.  I did this out of courtesy

22 and love for my brother.

23     Q.   Courtesy and love for your brother.  The

24 same one you described as basically co-conspirator in

25 a brazen conspiracy against you; is that right?

1       A.   That's what the lawyer came up with.

2       Q.   Getting back to my question, though, in

3  Exhibit A to the complaint, one of the things you

4  want to do is replace Wes Paul and all of the other

5  lawyers, all of them, involved in any type of BRI

6  litigation with the firm of Dunn, Black, and Roberts;

7  is that right?

8       A.   Don't forget Mr. Doubek.

9       Q.   It says Dunn, Black, and Roberts; right?

10  And that was the --

11      A.   True.

12      Q.   -- document that you gave to Karen Midtlyng;

13  right?

14      A.   That's correct, at that time.

15      Q.   Now, you made the comment that you were

16  unaware of this TRO; right?

17      A.   Well, there was so many papers going back

18  and forth, so many TROs, I was not served with a TRO

19  from this court.

20      Q.   So when I served you with a summons that

21  specifically says the TRO is attached, you didn't get

22  that?

23      A.   Not that I remember.

24      Q.   Not that you remember.  You may have.  You

25  just don't remember.  Right?

1      A.   You can be a little nicer, Oliver.

2      Q.   I'm sometimes not that, especially when I

3 think somebody --

4      A.   Do you think --

5      Q.   -- is not being totally honest.

6

7           (Simultaneous speaking.)

8

9           THE COURT:  Okay.

10          MR. DOUBEK:  Objection to comment by

11 counsel.  Move to strike.

12          THE COURT:  Yeah, I'm going to --

13          MR. DOUBEK:  Let's see the summons.

14          THE COURT:  Okay.  Let's get back to the

15 process of asking the questions --

16          MR. GOE:  I apologize.

17          THE COURT:  -- and answering the questions.

18          MR. GOE:  I apologize for my rudeness.

19          THE COURT:  All right.

20 BY MR. GOE:

21      Q.   But the fact of the matter is one of the

22 counsel that you were involved with was Mike Lamb and

23 Jamie Carey; right?

24      A.   Yes.

25      Q.   They just didn't file that lawsuit out of

1    thin air because they felt like they needed to;

2    right?

3         A.   You'd have to talk to them.

4         Q.   Well, somebody had to authorize it; correct?

5         A.   I believe my law firm in Spokane authorized

6    it.

7         Q.   And, again, that would be Mr. Childress' law

8    firm, I assume?

9         A.   There's more than one lawyer in that law

10   firm.

11        Q.   Yeah, but all of that same firm, Dunn,

12   Black, and Roberts.  So Dunn, Black, and Roberts

13   authorized it; correct?

14        A.   Yes.

15        Q.   And that's your attorneys as well; right?

16        A.   Yes.

17        Q.   And Mr. Childress never advised you of the

18   TRO, even though I sent it to him?

19        A.   He could have.

20        Q.   So you may have been aware of it right when

21   it got issued?

22        A.   Not that I recall.

23        Q.   What about with Mr. Lamb?  Did you ever talk

24   to Mr. Lamb or Mr. Carey at all?  I sent copies of

25   the TRO to them as well, and they were representing

1   DRI and you?

2       A.   I believe they would have to go through

3   counsel.

4       Q.   So you were aware of the TRO?

5       A.   I believe that he -- if Bil Childress would

6   have been advising me, but he didn't advise me there

7   was a TRO.

8       Q.   You just kind of buried your head in the

9   sand and didn't know anything about it?

10          MR. DOUBEK:  Objection.

11          THE COURT:  Yeah, why don't you rephrase

12  that.

13          THE WITNESS:  I think that --

14          MR. GOE:  All right.  I'll move on.

15

16          (Simultaneous speaking.)

17

18  BY MR. GOE:

19      Q.   In any event, you did file a document in

20  court where you identified yourself as the president

21  of Bakken Resources; right?

22      A.   That's what the documents say.

23      Q.   I mean, you signed it; is that correct?

24      A.   Well, that's what it says.

25      Q.   Do you need to see it at all to make sure

```
 1    you saw it and know what I'm talking about?  I can

 2    show it to you if you need to see it?

 3         A.   I have already said yes.

 4         Q.   Okay.

 5              MR. GOE:  Excuse me just one minute, your

 6    Honor.  I apologize.

 7    BY MR. GOE:

 8         Q.   Have you ever filed a Rule 13 disclosure in

 9    this case?

10         A.   I would have to check with counsel.

11         Q.   You don't know?  You can't sit here today

12    and say that you did?

13         A.   Well, I pay attorneys to do my work for me.

14         Q.   Okay.  So you pay your attorneys to tell you

15    when there might be solicitation and when there might

16    not be a solicitation of a proxy; is that right?

17         A.   If I may, there was a great lot of review on

18    the proxy issue, and it was concluded that a fourth

19    level pink sheet company is not under the same

20    regulations that you are trying to state.

21         Q.   So I want to know.  Specifically, who told

22    you that?

23         A.   I think I can give you documents.

24         Q.   No.  I want to know who told you that.

25         A.   My attorneys.
```

1      Q.   Okay.  Would that be the same law firms that

2  we have been talking about before?

3      A.   I think we -- it's a consensus of John

4  Doubek, as well as Spokane, as well as Reno.  We all

5  got involved.

6      Q.   When did Mr. Doubek first get involved in

7  this case?

8           MR. DOUBEK:  That's a -- objection.  He

9  doesn't have to answer that.

10          THE COURT:  Sustained.

11          Although, we're kind of getting close to the

12  waiver of the attorney-client privilege.

13          MR. GOE:  I think there has been a waiver of

14  the attorney-client privilege, your Honor.  He has

15  repeatedly said, "It was my understanding based

16  on" -- and every time he said it, he said it was

17  based on my discussion with counsel.

18          THE COURT:  So why don't you ask that

19  question again.

20  BY MR. GOE:

21      Q.   Yeah.  Your comments here today that

22  everything was done appropriately as far as the

23  proxies, that's based on what your attorneys told

24  you?

25      A.   Yes.

```
 1        Q.   And so your testimony today was of what your
 2   attorney told you; correct?
 3        A.   Too.  They told me, but I also looked and
 4   reviewed documents in John Doubek's office.  It's
 5   pretty clear-cut.
 6        Q.   It's clear-cut to you?
 7        A.   Yes, both clear-cut to John and myself.
 8        Q.   And that's based upon your discussion with
 9   your counsel?
10        A.   He's my counsel.
11        Q.   And also your counsel in Spokane?
12        A.   Yes.
13        Q.   Did you ever prepare -- strike that.
14             MR. GOE:  Can I have just one minute, your
15   Honor?
16             THE COURT:  You may.
17             MR. GOE:  Can we take a quick break?  I
18   apologize.
19             THE COURT:  Sure.  How long?
20             MR. GOE:  Just a couple of minutes.
21             THE COURT:  I'm not going to leave, but you
22   can go ahead.
23             MR. GOE:  Okay.
24             THE COURT:  Do you want people to leave the
25   room?
```

```
 1              MR. GOE:  No, no.  I just wanted to have a

 2    chance to talk to my clients.

 3              THE COURT:  Okay.  You can leave, but I'm

 4    going to stay here.

 5

 6              (Off the record.)

 7

 8              (Mr. Goe, along with others, leaves

 9              the courtroom and subsequently

10              returns.)

11

12              MR. GOE:  Thank you, your Honor.  I do not

13    have any further questions.

14              THE COURT:  Very well.

15              MR. DOUBEK:  Just one redirect.

16

17                    REDIRECT EXAMINATION

18    BY MR. DOUBEK:

19       Q.   Counsel asked you about the lawsuit between

20    you and your brother but now you are trying to help

21    him.  Can you reconcile those two?

22       A.   We made peace.  We made peace.

23              MR. DOUBEK:  No other questions.

24              MR. GOE:  I have nothing further, your

25    Honor.
```

```
 1              THE COURT:  All right.  You may step down.

 2              MR. DOUBEK:  We'd like to call our next

 3    witness, Toby Dewolf.

 4              THE COURT:  All right.

 5

 6                   TOBY DEWOLF,

 7    called as a witness, having been duly sworn,

 8    testified as follows:

 9

10                   DIRECT EXAMINATION

11    BY MR. DOUBEK:

12        Q.   We'll get you back before the dinner hour.

13        A.   Thank you.

14        Q.   Please state your name and address.

15        A.   Toby -- my whole name? -- John Dewolf, 611

16    Cannon, Helena, Montana.  D-E-W-O-L-F.

17        Q.   And you are an owner of Bert & Ernie's?

18        A.   I am.

19        Q.   All right.  Are you a shareholder of Bakken

20    Resource, Inc.?

21        A.   I am.

22        Q.   How much did you pay for your stock?

23        A.   The initial investment was $50,000.

24        Q.   And do you know how many shares you received

25    for that?
```

1       A.   Yes.  It was 200,000 shares, I believe.

2       Q.   So $0.25 per share?

3       A.   That's right.

4       Q.   Have you ever been told by the company that

5  they have done a deal with an outfit called

6  Eagle Equity?

7       A.   No.

8       Q.   Whereby Eagle Equity would get 60 million

9  voting shares for 600,000, which is a penny a share?

10      A.   No.

11      Q.   Do you believe as a shareholder you should

12  have been told about that deal and had a chance to

13  have a say in the matter?

14      A.   Absolutely.

15      Q.   Do you believe as a shareholder the Court

16  should halt the deal before it moves ahead and let

17  the shareholders sort this out first?

18      A.   Absolutely.

19           MR. DOUBEK:  No further questions, your

20  Honor.

21           THE COURT:  Cross-examination.

22

23                CROSS-EXAMINATION

24  BY MR. GOE:

25      Q.   Do you read the public filings of the

1    company?

2        A.   I do.  I mean, on occasion.  I am not -- I'm

3    not glued to the computer on it.  But, yes, I have

4    read some of them.

5        Q.   Did you read the various public filings

6    regarding the Eagle Equity transaction?

7        A.   I did not.

8        Q.   So you have never read about them.

9             So my next question was going to be, did you

10   ever contact anybody at BRI, like Dan Anderson or

11   Karen Midtlyng or Wes Paul or anybody else, that you

12   have any concerns about it -- or register any

13   concerns?

14       A.   I did not.

15            MR. GOE:  I don't have anything further.

16            MR. DOUBEK:  No other questions.  Thank you,

17   Judge.

18            THE COURT:  You may step down thank you.

19            MR. DOUBEK:  Thanks, Toby.

20            Dan Anderson.

21

22                      DAN ANDERSON,

23   called as a witness, having been duly sworn,

24   testified as follows:

25

<u>DIRECT EXAMINATION</u>

BY MR. DOUBEK:

    Q.   Can you tell me about the assets of the company at year-end 2015?

    A.   Yes.

    Q.   Tell me.  What assets did it have?

    A.   The company has cash.  It has some receivables.

    Q.   You heard Mr. Holms talk about 3.8 in receivables.  1.2 in -- 3.8 in cash and 1.2 in accounts -- revenue receivable?

    A.   That would be accurate, yes.

    Q.   Okay.  And would that be roughly true as of the end of May 2016?

    A.   I -- I don't recall.

    Q.   You prepare monthly balance sheets?  Or does the company prepare monthly balance sheets?

    A.   Yes.

    Q.   Have you looked at a monthly balance sheet in the last couple months?

    A.   Of course.  Every day.

    Q.   Then, roughly, what significant changes in the company's balance sheet has there been if we take a look, for example, at the end of May 2016?

    A.   Well, there are a number of factors that

1    come into play that the -- there are a number of

2    factors that come into play on a monthly basis that

3    affect the company's cash flow, that would include

4    the prevailing price of oil within the marketplace,

5    the amount of production that's going on, the status

6    of the producing wells that we have, new wells coming

7    online, existing wells being taken off line, any

8    number of factors that the company play on a monthly

9    basis.

10          Q.   There was a leave of absence agreement

11   signed by the company with Val Holms; correct?

12          A.   Yes.

13          Q.   While that was in place, did Mr. Holms ever

14   act as CEO or director of the company?

15          A.   Not that I'm aware of.

16          Q.   Okay.  As I understand it, he was terminated

17   on March 12th, 2013, and then, effectively as a

18   director, on 5-6-16; is that true?

19          A.   I believe so, yes.

20          Q.   What role did he play with the company in

21   those intervening years?

22          A.   I believe he was terminated as CEO, but the

23   leave of absence agreement still extends to his

24   directorship.

25          Q.   Okay.  Did he ever violate the terms of that

1   leave of absence agreement during that period of

2   time?

3       A.   We had cited a number of instances where he

4   had violated his leave of absence.

5       Q.   In what respects?

6       A.   In many respects, in the actions that he was

7   taking to --

8           THE REPORTER:  Excuse me?  Taking to what?

9           MR. DOUBEK:  Adversely affect the company.

10  BY MR. DOUBEK:

11      Q.   Is that your testimony?

12      A.   Yes, that's correct.

13      Q.   Okay.

14          THE COURT:  Let me just interrupt here.  You

15  tend to talk pretty fast.

16          THE WITNESS:  Oh, okay.

17          THE COURT:  And I'm trying to take notes

18  here.  And my court reporter, again, her job is to

19  get down everything you say.  So just be aware that

20  maybe --

21          THE WITNESS:  Will do.

22          THE COURT:  -- speak a little more slowly.

23          All right.  Mr. Doubek.

24          MR. DOUBEK:  You know, I'm trying to shorten

25  it up because I didn't get a lot of time here, so let

1    me do that.

2    BY MR. DOUBEK:

3        Q.   When did Eagle Equity receive or convert its

4    stock interest to receive the 60 million voting

5    shares?

6        A.   The triggering event was on July 20th.

7        Q.   Okay.  So he exercised that option, let me

8    call it.  And if that's a bad word, correct me.  But

9    he exercised his option to receive the 60 million

10   shares the day after that.  True?

11       A.   The triggering event was on July 20th.

12       Q.   And he exercised his option, on July 21st

13   the next day.  True?

14       A.   I can't attest to that.  I can't attest that

15   the triggering event was on July 20th with the armed

16   intrusion.

17       Q.   Now, when you say, "armed intrusion," did

18   they come in with a gun in their hand, or was it

19   holstered?

20       A.   There was a sidearm holster.

21       Q.   All right.  So "intrusion" is how you are

22   defining that?

23       A.   For lack of a better word, yes.

24       Q.   Right.  And you weren't there initially, but

25   you came to the scene shortly after being summoned;

 1   right?

 2        A.   Correct.

 3        Q.   Would you flip to Exhibit Number 7.  It's

 4   towards the back.  There are a bunch of statutes from

 5   Nevada, and there's a copy called, "The Corporate

 6   Statutes" there.

 7             MR. GOE:  Exhibit 7 to what?  I apologize.

 8             MR. DOUBEK:  It's in the packet I just gave

 9   you right there.

10             MR. GOE:  Oh, I'm sorry.

11             THE COURT:  I'm trying to track on you too.

12   Where are we?

13             MR. DOUBEK:  It would be nice if I gave your

14   Honor one.

15             THE COURT:  It helps every now and then.

16   BY MR. DOUBEK:

17        Q.   All right.  Do you have Exhibit 7?

18        A.   I do.

19        Q.   All right.  Is that a letter from Carl

20   George dated July 21, 2016?

21        A.   That is correct.

22        Q.   And is that when he triggered his --

23   exercised his right, shall I say, to the shares?

24        A.   He's notifying us that there were two

25   triggering events which occurred on July 20th.

1     Q.   All right.  If the proxies were lawful on

2  the 20th, wouldn't it be true that Allan Holms, armed

3  with those proxies, was in a position such that he

4  took over the company?

5     A.   I can't answer that.  I would have to defer

6  to counsel on that.

7     Q.   Okay.  If there had been no other

8  Eagle Equity and 60 million shares, would it be true

9  that the proxies represented by Allan Holms

10  constituted a majority, a clear majority, of the

11  shareholders of BRI at that time?

12     A.   Again, I would defer to counsel on that.

13     Q.   Well, you knew how many shares he was

14  purporting to represent per the proxies; true?

15     A.   We were told two different figures.  At

16  first we were told, I believe, 85 percent.  And then

17  the figure was altered to, I want to say, 55 percent.

18     Q.   So in either case you were aware that he had

19  a majority of shares of common stock represented per

20  proxies.  True?

21     A.   No.

22     Q.   Okay.  Tell me why that's not true if one of

23  your figures was 85 percent and the other figure was

24  roughly 55 percent?

25     A.   Because when I was handed the documents, I

```
1   scanned through them, and I didn't see a proxy
2   statement, which I believed was necessary for the
3   proxies to be legitimate.  And, also, I saw there was
4   a proxy statement put forth by Val Holms and that
5   that proxy was in violation of his leave of absence
6   agreement.  And I made it abundantly clear that we
7   believe that the proxies on -- for those reasons the
8   proxies were in error.
9        Q.   So what in the leave of absence agreement
10  restricted Val Holms from giving his rights to his
11  shares to somebody else?
12       A.   Well, I would -- since it's a legal
13  agreement, I would defer to counsel on that.  But the
14  understanding we had is that very clearly that the
15  idea was that he would do anything to interfere with
16  the company.  And so we felt, very strongly, that
17  this was a violation of the leave of absence
18  agreement.
19       Q.   So exercising his voting rights in your mind
20  was interference with the management of the company?
21       A.   No.
22       Q.   Okay.  Tell me what you -- how you construed
23  that then?
24       A.   The proxy agreement gave control of the
25  company to Allan Holms, and it created a possibility
```

1   where ongoing litigation would be terminated,

2   litigation that is contrary to Allan -- or excuse

3   me -- to Val Holms and Manny Graiwer as well.

4          But also we believe that since we were in

5   the middle of a criminal investigation and we had key

6   evidence, that we were in a position where that

7   investigation would most definitely be compromised.

8       Q.   Were you ever interviewed by the FBI?

9       A.   Not yet.

10      Q.   How long ago did you contact -- or who on

11  behalf of BRI contacted the FBI?

12      A.   We did not contact the FBI.

13      Q.   Okay.  So nobody on behalf of BRI, to your

14  knowledge, ever contacted the FBI?

15      A.   That is correct.

16      Q.   And yet you heard Mr. Goe say that the FBI

17  has been involved in this?

18      A.   Correct.

19      Q.   How do you know that?

20      A.   Because the Helena Police Officers notified

21  us that the case had been handed off on the County

22  Attorney's recommendation to the FBI.

23      Q.   And how long ago did that happen, to your

24  knowledge?

25      A.   I have no idea.

1     Q.   So you don't know what's become of that?

2     A.   I do not.

3     Q.   Okay.  Did you ever have any prior dealings

4  with Shirley Spira before she was brought in as an

5  investigator?

6     A.   I did not.

7     Q.   Do you know who brought her in as an

8  investigator?

9     A.   She was recommended.  We had a number of

10  individuals who were recommended.  I had made

11  recommendations.  Karen Midtlyng had made

12  recommendations.  Wes Paul had made recommendations.

13  And we interviewed a number of folks, and that's who

14  we ultimately decided to deal with.

15     Q.   And Wes Paul also introduced Carl George to

16  the company; true?

17     A.   Yes, he did.

18     Q.   And did he form Eagle Equity, as far as you

19  know?

20     A.   I have no knowledge of that.

21     Q.   Okay.  What do you know about Carl George?

22     A.   We've had conversations with Carl.  We

23  talked to him at great length about his knowledge of

24  the industry, his knowledge of the Bakken, and, you

25  know, really the value proposition that the company

1    offers and how the value proposition fits well within

2    their expertise and their vision for the company.

3        Q.   Who is "their vision"?

4        A.   That would be Eagle.

5        Q.   Okay.  When you say "Eagle," who are you

6    referring to specifically within Eagle?

7        A.   Carl, Carl George.

8        Q.   He operates out of the office of his

9    brother, doesn't he?

10       A.   I have no knowledge of that.

11       Q.   Or, now, out of the office of some lady in

12   Minnesota, do you know?

13       A.   I have no knowledge of that.

14       Q.   Did you ever check to see whether he had

15   filed previous bankruptcies?

16       A.   I did not.

17       Q.   Did you ever check to see whether he had

18   been successful in any ventures that he had had?

19       A.   When we discussed -- when we had discussions

20   with him, we talked about a number of things,

21   including past successes and failures that he had.

22       Q.   Did you learn of any successes that he had

23   had?

24       A.   He talked as generically as he could,

25   without violating confidentiality.

1      Q.   But he worked with public entities

2  sometimes, didn't he?

3      A.   I can't answer that.

4      Q.   Did he ever tell you about lawsuits he had

5  been involved in?

6      A.   He did not.

7      Q.   Did he ever tell you that he had hacked into

8  a client's computer, put a virus in, and then offered

9  to remove the virus for $60,000, and that there was a

10  restraining order placed against him?

11          MR. GOE:  Objection.  Assumes facts not in

12  evidence.  Lack of foundation.

13          MR. DOUBEK:  I'm just asking if he's aware

14  of it.

15          THE COURT:  Overruled.

16          THE WITNESS:  My knowledge of that came from

17  Carl's direct testimony provided in Nevada.

18  BY MR. DOUBEK:

19      Q.   Did he give you a copy of this -- oh, this

20  is when he testified in Judge Flanagan's court?

21      A.   Yes.

22      Q.   All right.  And what did he tell you about

23  that?  Or what did he tell the Court about that?

24      A.   Well, I would defer to the court transcript.

25      Q.   Sure.

1          Was that matter settled out of court, then?

2     A.   I'm sorry?  Which matter?

3     Q.   Was the allegation against him, hacking into

4  a computer and then extorting $60,000, settled out of

5  court?

6     A.   Well, he had a credible explanation for it,

7  yes.

8     Q.   Did he pay any money?  Do you know?

9     A.   I don't recall.  I would, again, defer to

10  the transcript.

11    Q.   Did you understand that a retraining order

12  had been issued against him in that case?

13    A.   He may have mentioned that.  I don't recall.

14  Again, I would defer to the transcript.

15    Q.   What other successes did you hear him tell

16  you, as you talked to him, prior to entering into any

17  contract relationship with Eagle Equity?

18    A.   Well, he had talked about some successes

19  that he had in the Bakken and in the oil and natural

20  gas industry.  It's so many months later.  I do not

21  remember exactly the specifics.  But he clearly

22  demonstrated to have ver significant knowledge of the

23  oil/gas industry and of the Bakken, in particular.

24    Q.   Based upon what?

25    A.   Based upon the conversation that we had.  He

1   had demonstrated that had a strong knowledge of the

2   industries and also had a very strong technical skill

3   set as well.

4        Q.   I understand he talked a good talk.  Did he

5   give you the names of any references in that respect?

6        A.   We did not ask.

7        Q.   Was there anything else about him or his

8   background that you looked into before you entered

9   into the Eagle Equity arrangement?

10        A.   I was more interested in his knowledge of

11   the oil and gas industry, his knowledge of the

12   various domestic places that are significant in the

13   oil and gas industry, and especially interested in

14   his vision for the company and how he could help

15   bring critical capital to the table to move the

16   company forward.

17        Q.   Did you think that $600,000 for 60 percent,

18   or for a majority vote of BRI, was appropriate?

19        A.   I think the bottom line is I'm excited about

20   Eagle and what they can bring to the table.  Private

21   equity firms don't invest in companies that they

22   think do not have strong fundamentals.  Everything

23   that a private equity firm is about is about growing

24   the company and building tremendous value for the

25   shareholders.

1          You're talking about bringing, initially, a

2   million dollars to the table.  And, then, following

3   up on that, $10 million to acquire undervalued

4   assets.

5          Right now we're in, you know, an absolutely

6   amazing marketplace.  Even though oil and gas prices

7   have hit pretty low levels, asset prices are also

8   down as well.  There's some good assets out there

9   that we're doing a great deal of due diligence on.

10  And our due diligence and the opportunities in the

11  marketplace create long-term value for the

12  shareholders.

13     Q.   So these great opportunities exist

14  irrespective of Carl George; right?

15     A.   Yes.  I believe that everybody's money is

16  grain.

17     Q.   And there would be value that you could add,

18  as CEO of the company, irrespective of Carl George;

19  isn't that true?

20     A.   I'm the chief financial officer of the

21  company.

22     Q.   Right.  How long have you been the chief

23  financial officer of the company?

24     A.   Since May of 2014.

25     Q.   Prior to that, did you have any experience

1    with the Bakken or oil and gas?

2        A.   I did.  I was an auditor with the Montana

3    Department of State Lands a number of years ago,

4    auditing oil, gas, and coal companies.

5        Q.   When was that?

6        A.   That was in the -- that was in the late

7    '80s.

8        Q.   Okay.  And then for a period of some

9    twenty-something-five years, what did you do?

10       A.   I was a senior management in a healthcare

11   company, and then I was a consultant, a partner in a

12   CPA firm.  Left there to become, basically, a

13   consultant for the Helena Small Business Development

14   Center.

15       Q.   So that didn't have anything to do with oil

16   and gas royalties and the like, did it?

17       A.   It did not.  But it's about business

18   fundamentals.  And regardless of the industry that

19   you are in, if you have strong fundamentals, that's

20   what is important.  And Bakken has strong

21   fundamentals, and in the marketplace right now, that

22   offers a great deal of enticing opportunities.

23       Q.   Did you ever check with a bank to see if

24   Bakken, BRI, would qualify for an operating line of

25   credit or an operating loan?

```
 1        A.   We began looking for capital in November of
 2   2014.   One of the challenges that we have is that one
 3   of the significant assets that the company has are
 4   its minerals.   But the way that the company was
 5   formed, as a reversed merger, the company was
 6   unable -- under financial accounting rules, wasn't
 7   able to book the valve of those assets as an asset on
 8   its balance sheet.   So, you know, of a number of
 9   reasons, the company just isn't bankable.
10        Q.   So your answer is you never sought out
11   financing from traditional means; true?
12        A.   That is incorrect.
13        Q.   That is incorrect?
14        A.   Yes.
15        Q.   So who did you go to for traditional
16   financing?
17        A.   Oh, I reached out to many firms, from, you
18   know, Goldman Sachs, Morgan Stanley, to various
19   lenders.
20        Q.   Did you actually make proposals to these
21   more traditional lenders?
22        A.   Sure.
23        Q.   Okay.   And you kept them in the records of
24   the company, I presume?
25        A.   I'm sure we have record somewhere, yes.
```

121

1      Q.  And then this company, Eagle Equity, that

2  was a company formed by Mr. Paul; true?

3      A.  I can't attest to that.

4      Q.  Did he bring Carl George to the table?

5      A.  Which table?

6      Q.  Did Wesley Paul bring Carl George and his

7  company Eagle Equity to BRI?

8      A.  He made the initial introduction, correct.

9      Q.  Do you know what was in the background, as

10  between Wesley Paul and Eagle Equity, as far as

11  history and that sort of thing?

12      A.  I do not.

13      Q.  Did you understand that Eagle Equity was a

14  brand-new company in the spring of 2016?

15      A.  That's not my understanding.

16      Q.  What is your understanding as to when

17  Eagle Equity was formed?

18      A.  Right offhand, I don't recall exactly when I

19  thought it was formed.  But Carl, individually, had a

20  great deal of private equity and experience.  And,

21  again, a great deal of knowledge and experience in

22  the oil and gas industry.

23        And, again, he has a vision for the company,

24  and a vision for the company that is, you know,

25  closely aligned with the vision that I and Karen have

1    for the company as well.  And we didn't have anybody

2    else beating down the door.

3         Q.   Why would it be in the best interest of

4    existing shareholders to turn over a majority

5    interest in the stock for $600,000?

6         A.   Well, I would say ask your client because

7    they treated the triggering event that made that

8    occur.

9         Q.   Why would the company -- but the company

10   decided to go along with Eagle Equity; right?

11        A.   That is correct.

12        Q.   Why did it decide to go with Eagle Equity,

13   other than what you told me, that this guy talked a

14   good talk?

15        A.   Again, we liked the vision that he had for

16   the company, liked the capital that he had to deploy,

17   and there was nobody else beating down our doors, for

18   a number of reasons.  He seemed to be a very good

19   match at exactly the right time.

20             And, you know, bottom line, our job is to

21   grow the company and create value for the

22   shareholders.  And what he saw in Carl is a partner

23   that will most definitely help us to do that.

24             But at the time we had, as we do now -- we

25   have a great deal of litigation going on.  We've had

1  a number of challenges to attempt to gain control of

2  the company for various purposes.

3        And I don't blame him at all.  If I was in

4  that situation, if I was going to invest in Bakken,

5  to the extent that investment in Bakken is investing

6  in management and investing in the board, I would

7  want to know who I'm investing in.  I would want to

8  know.  If I'm putting up my money and my time and my

9  reputation, I would want to know that they are going

10 to be there at the end of the day.

11     Q.  Do you understand that existing shareholders

12 believe that their stock interest is immediately

13 diluted when a majority of the company is given away

14 for $600,000?

15     A.  I do not know that.  I have spoken to three

16 shareholders, and they understood the situation.

17     Q.  Okay.  These were not three who gave their

18 proxy?

19     A.  They were not.

20     Q.  I understand that BRI is not a reporting

21 company at the moment because it's in the pink

22 sheets.  Is that your understanding?  Or is it your

23 understanding they are still a reporting company?

24     A.  We are a reporting company.

25     Q.  But you are in the pink sheets; true?

124

1      A.   True.

2      Q.   Do you know whether the rules, as it relates

3  to proxies, are any different for a company that's in

4  the pink sheets versus one fully reporting?

5      A.   We're still registered under 12G of the SEC

6  rules, and we are required to report.

7      Q.   The basis on which you contend Val Holms was

8  not permitted to give his proxy is based upon his

9  leave of absence agreement; true?

10      A.   No.

11      Q.   Okay.  What is the basis then?

12      A.   It would be the Nevada temporary restraining

13  order and the leave of absence agreement.

14      Q.   When was the leave of absence agreement

15  terminated?

16      A.   It was not.

17      Q.   Okay.  When was his position as both

18  director and CEO terminated?

19      A.   It was not.

20      Q.   He's still a director of the company?

21      A.   He is.

22      Q.   Okay.

23      A.   He's on a leave of absence.

24      Q.   Okay.  And when he can return to an acting

25  director depends upon the balance of the Board or

1    Directors, I presume?

2         A.   Complicated question.   I would defer counsel

3    on that.

4         Q.   Just so the record is clear, it was after

5    the existing shareholders submitted their proxies and

6    resolutions to you that BRI and Eagle announce that

7    Eagle was the new majority common stockholder of BRI;

8    true?

9         A.   That is not correct.

10        Q.   We just took a look at the letter from Carl

11   George.   Do you want to take another look at it?

12        A.   I see the letter.   The proxies were not

13   presented to me.   They were presented to the

14   corporate secretary.

15        Q.   And did you ever look at them?

16        A.   I did.

17        Q.   So at the time they were presented to the

18   companies, and you were there, was it sometime after

19   that -- matter of hours, matter of a day -- that BRI

20   and Eagle announced that Eagle was the new majority

21   common stockholders?

22        A.   The triggering event occurred on July 20th

23   when they presented the documents, when they prepared

24   and presented the documents.

25        Q.   So is your answer "yes"?   I asked you was it

1    after that.  And your answer is "yes," I presume.

2        A.   No.  My answer is "no."

3        Q.   Okay.  So the triggering event happened when

4    the proxies, et al., were given to the company;

5    right?

6        A.   When they were prepared.  I would have to

7    defer to counsel on that, as it is a legal issue.

8        Q.   Oh, okay.

9             So when was it that BRI and Eagle announced

10   that Eagle was now the majority shareholder?

11       A.   I would -- right offhand, I don't recall

12   when that 8-K filing went out.  I believe it's one of

13   the exhibits.

14       Q.   Was it after the proxies were presented to

15   the company?

16       A.   The announcement?

17       Q.   Yes.

18       A.   Well, the announcement would have to be

19   because the triggering event occurred when they

20   attempted to take control of the company.

21       Q.   Right.  And that was my simple question all

22   along, and I take it your answer is "yes"?

23       A.   My answer is the triggering event occurred

24   when they threatened a change of control of the

25   company.

1    Q.   And, thereafter, the company and Eagle

2  announced that Eagle was now the majority

3  shareholder?

4    A.   Well, they can't announce it before the

5  triggering event occurs.

6    Q.   So your answer is "yes"?

7    A.   No.  I stated my answer.

8    Q.   Is your position about this stock that there

9  were then -- that the shares held by Eagle Equity

10  were converted from preferred to common?

11    A.   No.

12    Q.   So they were always preferred, and they're

13  still to this day preferred?

14    A.   To the best of my knowledge, yes.

15    Q.   And so they have voting rights of 100 for 1,

16  but their stock is still -- I'm sorry.  10,000, I

17  said -- 10 million shares of preferred stock; true?

18    A.   I'm sorry.  Can you repeat the question?

19    Q.   Probably.

20         What you're telling me is that -- the

21  preferred stock didn't magically become common stock;

22  right?

23    A.   That is correct.

24    Q.   But the voting rights attached to the

25  preferred series was 100 for 1 voting interest?

1       A.   Correct.

2       Q.   So if you had 10 million, it was now

3   100 million --

4       A.   Correct.

5       Q.   -- of voting stock?

6       A.   No, not of voting stock.  Of votes.

7       Q.   Of votes.

8            So if they had 100,000, and there was an

9   authorized 100,000, and it was all issued and

10  outstanding, there would be 200 million shares of

11  voting, of votes?

12      A.   Rephrase the questions.  I'm not sure what

13  you are talking about.

14      Q.   Well, let me ask you this:  Are you aware in

15  the bylaws that there's a provision that says there

16  is to be one vote for one share, regardless of the

17  classifications of stock?

18      A.   I am not aware of that.

19      Q.   Okay.  You are aware that the company

20  changed its bylaws, amended its bylaws; correct?

21      A.   Yes.

22      Q.   And in the original bylaws, isn't it true

23  that the company was not allowed to permit an

24  acquisition of control of the company unless it was

25  submitted to shareholder vote?  The original bylaws?

1      A.   I can't attest to that.

2      Q.   Okay.  Do you have an understanding that the

3 bylaws were amended so as to give that power to the

4 Board of Directors as opposed to the shareholders?

5      A.   The bylaws were amended primarily to stagger

6 board terms, which is a sound governance practice.

7      Q.   So you don't have any opinion as to whether

8 the bylaws were ever amended so that control of the

9 company could be given to the board as opposed to the

10 shareholders?

11      A.   No.

12      Q.   If -- I'm going to ask you to assume that

13 control of the company and the ability to fight a

14 takeover of the company rested with the shareholders;

15 that that's in the original bylaws.  Okay?  I'd ask

16 you to assume that.  Would it be right for the board

17 members to cancel that aspect of the bylaws and

18 simply put in place a provision that allowed the

19 board to have that power, or should that be a power

20 decided by the shareholders?

21      A.   I can't answer that.  There are too many

22 factors that are not entered into the equation that

23 could alter my opinion one way or the other.

24      Q.   Well, assume that the original bylaws said

25 it can't have a takeover of the company without

    1    letting the shareholders vote.  Simple enough?

    2         A.   Okay.

    3         Q.   Do you understand that?

    4         A.   Uh-huh.

    5         Q.   And then you have an amended bylaw that says

    6    the ability to control whether a controlling interest

    7    can be conveyed is now power held by the board

    8    members.  Simple enough?

    9         A.   Okay.

   10         Q.   How do you square those two things, if you

   11    can?

   12         A.   Well, you are talking about a hypothetical,

   13    again.

   14         Q.   Sure.

   15         A.   Deferring to my past answer, I won't answer

   16    a hypothetical question.

   17         Q.   Okay.  So you don't want to answer that;

   18    right?

   19         A.   I gave my answer.

   20         Q.   Okay.  Is it your opinion, then, that the

   21    Eagle stock of 60 million votes for the $600,000 is

   22    what renders Allan Holms' proxy effort a nullity?

   23         A.   I would defer to counsel on that.

   24         Q.   Well, what's your understanding?  Do you

   25    have any?

1      A.   Yeah, my understanding is very simply this,

2  that when Eagle entered in the transaction with

3  Bakken Resources, they were investing in the board

4  and investing in management.  And they knew the

5  various attempts that were going on to get control of

6  the company.  And they wanted to know at the end of

7  the day that if they were going to invest in this

8  company, if they were going to grow this company, and

9  they were going to build tremendous value for the

10  shareholders and themselves, they wanted to know at

11  the end of the day who was going to be governing the

12  company and who was going to be managing the company.

13      Q.   And it matter to you as CFO and a board

14  member of the company as well; right?

15      A.   Absolutely.  We have fiduciary

16  responsibility to the shareholders to create value

17  for the company, and we saw a tremendous opportunity

18  to partner with Eagle to make that happen.

19      Q.   What does the company have to pay Eagle for

20  any additional financing?

21      A.   There may be fees in the agreement for

22  additional financing, which is -- which is standard.

23      Q.   How about interest rate?

24      A.   There's -- yes, there was an interest rate

25  on the debt portion of the agreement, which has now

1  been converted to preferred.

2      Q.   So what's the interest rate on the 600,000?

3      A.   There's no interest rate on the 600,000.

4      Q.   Because they converted?

5      A.   Because they converted to a preferred.

6      Q.   Is the company able to simply call

7  Carl George and say, "We want another million"?

8      A.   No.

9      Q.   Okay.  And he's not obligated to supply

10 another million, is he?

11     A.   No.  There were -- you know, the idea was to

12 acquire assets, and all we have on qualifying assets

13 that meet our asset acquisition criteria that we

14 have, then we'll take advances as are needed.

15     Q.   If he's agreeable?

16     A.   If they meet the terms of the underlying

17 agreement and they pass internal scrutiny.

18     Q.   Right now, he and his company control BRI;

19 true?

20     A.   They have -- through the number of voting

21 shares that they have, yes.

22     Q.   Okay.  So he could elect a new board; he

23 could liquidate the company; he could do anything he

24 wanted, ultimately; isn't that true?

25     A.   I would have to defer to counsel on that.

1        Q.   What's your best guess, as CEO and board

2   member and somebody who entered into the agreement

3   with Eagle Equity?  Was that a consideration?

4        A.   Again, we have a number of agreements in

5   place, and I would have to refer to the agreements.

6        Q.   What other agreements do you have in place

7   with Eagle Equity?

8        A.   We have other agreements in place that --

9   you know, agreements that define the nature of the

10  transaction.

11       Q.   Has the transaction ever been made public?

12       A.   Through 8-Ks, yes.

13       Q.   Well, in a very superficial way.  The

14  entirety of the agreement has never been made public

15  to the shareholders, has it?

16       A.   No, it has not.

17            MR. DOUBEK:  Your Honor, in the interest of

18  time, I will stop with my questions at this point.

19            THE COURT:  Mr. Goe, you have two minutes.

20            MR. GOE:  I have two minutes.  Well, that's

21  going to be quick.

22

23                    CROSS-EXAMINATION

24  BY MR. GOE:

25       Q.   You are the CFO of BRI?

1      A.   Correct.

2      Q.   And you testified in Nevada, I gather?

3      A.   Correct.

4      Q.   And one of the things we looked at earlier

5  today was the order following your testimony?

6      A.   Correct.

7      Q.   And as part of your testimony in Nevada, did

8  you explain the rationale for entering into the

9  Eagle Equity transaction?

10     A.   Correct.

11     Q.   I think you've already done it, but I just

12  want to make sure.  In a very brief way, why was that

13  agreement or that transaction with Eagle Equity in

14  your opinion good for the company?

15     A.   The long and the short of it is I saw an

16  opportunity to partner with a firm that was bringing

17  capital and expertise rolodex to the equation that

18  would enable us to build a long-term value for

19  shareholders.

20     Q.   And one of the things that was raised

21  earlier in this hearing is the inability to file a

22  10-K.  Do you recall some of discussions about that?

23     A.   Yes, sir.

24     Q.   What's the holdup?

25     A.   We can't file a 10-K until we have audited

1     financials.  We can't have audited financial

2     statements until we're able to ascertain the impact

3     of the financial statements by the ongoing criminal

4     investigation.

5          We have been working very closely with our

6     auditors and the Securities and Exchange Commission

7     since the initiation of the criminal inquiry.

8     Q.   How does that impact the ability -- I have

9     two questions.

10         You mentioned that you thought that there

11    had been a violation of the leave of absence

12    agreement.  That issue kind of got left.  Was

13    there -- were there violations of the leave of

14    absence agreement, as you understood it, related to

15    investigation itself?

16    A.   Oh, absolutely, yes.

17    Q.   Just give us a sampling of that.

18    A.   Failure to cooperate.  Mr. Holms indicated

19    that his alibi for the $200,000 kickback included

20    some notes attesting to loans that were provided by

21    John Reilly (phonetic).  This notebook, it's called

22    the "Mystical Theories Notebook."  And we were told

23    by his legal counsel that they were going to provide

24    it.  But then they failed to provide it, and failed

25    to provide it since, as has Mr. Holms.

1      Q.   And have we asked for it?  Has BRI asked for

2   it?

3      A.   Multiple times, yes.

4      Q.   One of the other things that was talked

5   about earlier today was the failure to hold

6   shareholder meetings.  Does the ongoing investigation

7   and failure to cooperate impact the ability to have

8   shareholder meetings?

9      A.   Oh, absolutely.  In order to have an annual

10  meeting, we have to have our filings current with the

11  SEC, which requires audited financial statements,

12  which, you know, again, goes back to the criminal

13  investigation, being able to determine the impact on

14  the financial statements from his alleged criminal

15  activities.

16     Q.   Did the Eagle transaction have any impact on

17  stock prices for BRI?

18     A.   Yes.  After it was announced, the stock

19  price doubled, more than doubled.

20     Q.   Is that -- strike that.

21          I don't have any further questions.  Thank

22  you.

23          MR. DOUBEK:  Just one, your Honor.

24  ///

25  ///

<u>REDIRECT EXAMINATION</u>

BY MR. DOUBEK:

Q.   Mr. Anderson, are Nevada laws written for just public companies or private companies as well, corporations?

A.   Well, I would defer to counsel on that, but I'm sure it applies to all companies, I would imagine.

Q.   All right.  Thank you.  No further questions.

THE COURT:  Anything further?

MR. GOE:  No, your Honor.

MR. DOUBEK:  Not at this time.

THE COURT:  All right.

MR. DOUBEK:  File our brief next Friday.

THE COURT:  You may step down.  Thank you.

All right.  Well, you actually kind of did do it, within a couple of minutes there.

Okay.  So we're back to our briefing schedule.  The briefing schedule is still appropriate as we outlined it earlier?

MR. DOUBEK:  Yes.

THE COURT:  That's still going to work for both sides?

MR. GOE:  Yes.

```
 1              THE COURT:  All right.  We'll do that.
 2    We'll leave everything in place until we get the
 3    briefs in.  If you decide we need to have a further
 4    hearing, advise the Court of that with your filings.
 5              MR. GOE:  Thank you.
 6              MR. DOUBEK:  Thank you, Judge.
 7              MR. GOE:  I do have one question, and I even
 8    hate to raise it at this point.  The hearing we were
 9    having today is a preliminary injunction relating to
10    BRI's request for a preliminary injunction.  The
11    filings from Mr. Doubek relate to individual
12    defendants in this action requesting a TRO and a
13    preliminary injunction against certain officers of
14    BRI and outside counsel, who I do not represent.  The
15    only entity I -- the only folks I represent are BRI.
16              So when I'm filing briefs in this matter,
17    it's not going to be on behalf of Mr. Anderson or
18    Ms. Midtlyng or Wes Paul.  It's going to be solely
19    related to the only issue that I believe is
20    appropriately before the Court, which is the
21    preliminary injunction.  They would have certain --
22              MR. DOUBEK:  I agree.
23              MR. GOE:  They would have certain rights and
24    remedies, et cetera, aside from these particular
25    proceedings.
```

1          MR. DOUBEK:  I agree.  Our claims against

2     the individuals exist separately, and our intent in

3     presenting testimony today was relative to our

4     application -- relative to the competing applications

5     for TROs.

6          THE COURT:  Okay.  Let me ask you something,

7     though, Mr. Doubek.  You have had Mr. Allan Holms

8     with you today, but you are also representing Val

9     Holms, Todd Jensen, and Allen Collins.  Is that

10    correct?

11         MR. DOUBEK:  Yes.  And that's in the

12    pleading.

13         THE COURT:  And I assumed it was, but I

14    haven't seen it.

15         MR. DOUBEK:  Yes.

16         THE COURT:  All right.  Good enough, then?

17         MR. GOE:  Thanks, Judge.

18         MR. DOUBEK:  Thanks.

19         MR. GOE:  Appreciate your time.

20         THE COURT:  Thank you.

21

22         The proceedings concluded at 5:04 p.m.

23

24

25

```
 1
 2                    REPORTER'S CERTIFICATE
 3
 4
 5           I, Yvette M. Heinze, a Registered
 6   Professional Reporter, residing in the City of
 7   Helena, State of Montana, hereby certify:
 8           That prior to being examined, the witnesses
 9   named in the foregoing proceeding were sworn to
10   testify to the truth, the whole truth, and nothing
11   but the truth;
12           That the said proceeding, taken down by me
13   in stenotype, was thereafter reduced to typewriting
14   by computer-aided transcription under my direction
15   and is a true record of the testimony given.
16           I further certify that I am not in any way
17   interested in the outcome of this action and that I
18   am not related to any of the parties thereto.
19           Witness my hand this 13th day of November,
20   2016.
21
22
23   _____
24   YVETTE M. HEINZE, CSR, RPR
25
```